## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ARGOS HOLDINGS INC. and PETSMART, INC., | ) ) | Case No.  18-cv-5773 |
| | ) | |
| Plaintiffs, | ) ) | **COMPLAINT** |
| v. | ) ) | |
| CITIBANK, N.A., | ) ) | |
| Defendant. | ) ) | |

Plaintiffs Argos Holdings Inc. ("Argos Holdings") and PetSmart, Inc. ("PetSmart"), by and through their undersigned attorneys, for their Complaint against Defendant Citibank, N.A. ("Citibank") as Administrative Agent ("Agent") under that certain Credit Agreement, dated as of March 11, 2015, among Argos Holdings, PetSmart, the lenders from time to time party thereto, and Citibank (as amended, the "Credit Agreement"), allege as follows:

### NATURE OF THE ACTION

1.      This action is necessary because the Agent is refusing to fulfill its clear and explicit contractual obligations, as Agent under the Credit Agreement, arising from two transactions executed by PetSmart and Argos Holdings on June 1, 2018 (as defined below, the "Transactions").  The Agent is contractually required under the Credit Agreement to document the release of certain terminations and releases that resulted *automatically* from the Transactions. Yet, despite these clear contractual obligations, the Agent is refusing to provide the required documentation, thereby impeding PetSmart from realizing the full benefits of the Transactions.

2.      The Transactions—which were allowed under PetSmart's debt documents and fully complied with relevant law—involved transfers of equity interests in PetSmart's online

retail-focused subsidiary Chewy, Inc. ("Chewy").  PetSmart executed the Transactions as part of its ongoing efforts to manage its capital structure in accordance with its governing agreements, as well as to successfully operate and grow its business.

3.       Specifically, on June 1, 2018, the Board of Directors of PetSmart declared and made a distribution in the form of 20 percent of the outstanding common stock of Chewy to its parent, Argos Holdings (the "PetSmart Distribution").  That same day, the Board of Directors of Argos Holdings declared and made a distribution of this Chewy equity to its parent company (the "Argos Distribution" and, together with the PetSmart Distribution, the "Distribution").  Also on June 1, PetSmart invested 16.5 percent of the outstanding common stock of Chewy in the form of a capital contribution to a wholly owned subsidiary of PetSmart (the "Contribution" and, together with the Distribution, the "Transactions").  In total, PetSmart transferred 36.5 percent of the outstanding common stock of Chewy in the Transactions (the "Transferred Equity").  The Transactions automatically resulted in the termination and release of certain security interests and guarantees under the Credit Agreement.  The Agent refuses to execute and provide the documentation evidencing those terminations and releases.

4.       Worse, the Agent's conduct appears designed to serve the parochial interests of a partial ad hoc group of lenders (the "Ad Hoc Group") seeking to hinder PetSmart's exercise of its contractual rights and harm its business operations in order to gain "leverage" over PetSmart.  The Ad Hoc Group—composed of sophisticated and opportunistic hedge funds and asset managers with a well-established practice of obstructing contractually permitted transactions— has attacked and seeks to interfere with the Transactions.  It has purported to direct the Agent to withhold the documentation given alleged "concerns" that the Transactions do not comply with the Credit Agreement and therefore "would constitute an Event of Default."

5.      The Ad Hoc Group's purported "concerns" with the Transactions are baseless. As set forth herein, Argos Holdings and PetSmart properly executed the Transactions in strict compliance with all applicable provisions of the Credit Agreement and relevant law. Indeed, in the Credit Agreement, the lenders already agreed that PetSmart could make distributions and investments that qualify under certain "baskets," which are contractually defined amounts determined through a combination of fixed sums and various financial metrics or variables. Combined, these baskets permitted PetSmart to transfer far more of Chewy's equity than it did. In short, as described below, PetSmart's compliance with the Credit Agreement covenants is not even a close question; PetSmart unquestionably complied. Because the Transactions were plainly permitted by the Credit Agreement, the Agent is required to document the releases, and there are no legitimate grounds for PetSmart's lenders to claim any Event of Default.

6.      Nor can there be any "concerns" about the process by which PetSmart arrived at the Transactions. The Transactions were the result of a robust and deliberative corporate governance process. Separate, disinterested directors and Special Committees of each of the PetSmart and Argos Holdings Boards of Directors—with the assistance of their own independent legal and financial advisors at each entity—held multiple separate meetings with their advisors to thoroughly consider and ultimately approve the Transactions. Each of the Special Committees also obtained separate opinions from independent third-party financial advisors regarding valuation, solvency, and surplus issues with respect to the Transactions. PetSmart did too.

7.      To be clear, the Agent and the Ad Hoc Group already know all of these facts and have still failed to act. Instead of complying with its obligation to provide the required documentation of the releases resulting from the Transactions and to file a UCC-3 statement, the Agent sent PetSmart an overbroad "information request" regarding both the Transactions and

PetSmart's corporate governance process. In response, PetSmart provided the Agent (and the members of the Ad Hoc Group that have consented to receiving material non-public information) with confidential information far beyond what is required under the Credit Agreement, including pages of calculations showing how the Transactions fall within certain financial parameters set by the express terms of the Credit Agreement, as well as a detailed description of the corporate governance process.

8.     The Agent has all of the information it could possibly need to confirm that the Transactions fully comply with the Credit Agreement. Rather than perform its responsibilities, the Agent continues to refuse to provide the documentation evidencing the release of the security interests and guarantees at issue, in improper deference to the Ad Hoc Group. And the Agent now has confirmed in writing that, at the instruction of the Ad Hoc Group, it will not deliver the documentation. It is equally clear that, by its words and conduct, the Ad Hoc Group will continue to direct and pressure the Agent to withhold the required documentation regardless of the information PetSmart provides. Indeed, members of the Ad Hoc Group with significant holdings have threatened to tie PetSmart up in litigation for years to gain negotiation leverage.

9.     Accordingly, Plaintiffs bring this action to establish that the Transactions comply with the Credit Agreement in all respects and that the Agent is obligated to execute and deliver the requested documentation to which Plaintiffs are entitled under the Credit Agreement.

## **PARTIES**

10.     Plaintiff Argos Holdings Inc. is a Delaware corporation with its headquarters and principal place of business in Arizona.

11.     Plaintiff PetSmart, Inc. is a Delaware corporation that is a wholly owned subsidiary of Argos Holdings, with its headquarters and principal place of business in Arizona.

12.     Defendant Citibank, N.A., is a national banking association with its registered main office in South Dakota, as designated in its articles of association pursuant to 12 U.S.C. § 21 et seq.

13.     Non-party Chewy, Inc. is a Delaware corporation with its headquarters and principal place of business in Florida.  Until the Transactions, Chewy was a wholly owned direct subsidiary of PetSmart.  PetSmart continues to own directly and indirectly 80 percent of Chewy's outstanding common stock.

<u>**JURISDICTION AND VENUE**</u>

14.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  Plaintiffs are citizens of Delaware and Arizona because they are corporations that are incorporated and/or have their principal places of business in those states.  Pursuant to 28 U.S.C. § 1348, Defendant is a citizen of South Dakota because it is a national banking association whose articles of association designate its main office as being located in South Dakota.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over the parties because, under Section 9.09(b) of the Credit Agreement, they have consented to the exclusive jurisdiction of the "United States District Court of the Southern District of New York sitting in New York County . . . in any action or proceeding arising out of or relating to" the Credit Agreement.

16.     Venue in this action is proper in the United States District Court of the Southern District of New York under Section 9.09(c) of the Credit Agreement.  The Agent has irrevocably and unconditionally waived any objection to the laying of venue in this Court for any action arising out of or relating to the Credit Agreement.  Venue is also proper under 28 U.S.C. § 1391(b) because this Court has personal jurisdiction over Defendant.

## FACTUAL BACKGROUND GIVING RISE TO THIS DISPUTE

### I.   PETSMART

17.     PetSmart is a leading specialty provider of products, services, and solutions for the lifetime needs of pets.  PetSmart sells its products through stores it operates across the country and on websites.  PetSmart offers a broad assortment of products for all stages of a pet's life, as well as various services, including professional grooming and boarding for cats and dogs, and training and day camp for dogs.  PetSmart also owns Chewy, which operates an online pet supplies retail business through Chewy.com.

18.     PetSmart has approximately $8 billion in debt, which consists primarily of a term loan facility, an asset-based revolving loan credit facility, a series of senior secured notes, and two series of senior unsecured notes.

19.     First, PetSmart has approximately $4.2 billion of secured term loan indebtedness issued under the Credit Agreement, which is guaranteed by Argos Holdings and certain of PetSmart's subsidiaries.  As described in more detail below, the Credit Agreement permits PetSmart to make "Restricted Payments" and "Investments" up to the amount of certain "baskets."  *See generally* CA §§ 6.04, 6.08.  Certain of PetSmart's subsidiaries guaranty the term loan indebtedness, and their assets serve as collateral.  But the Credit Agreement also provides for the release of guarantees and liens under certain circumstances, as described below.

20.     Second, PetSmart is party to a $955 million senior secured asset-based revolving loan facility, dated as of March 11, 2015, as amended through and including May 15, 2018 (the "ABL Agreement").  The ABL Agreement permits PetSmart to borrow on a revolving basis and to request the issuance of credit up to $955 million, subject to availability of the borrowing base supporting PetSmart's obligations under the ABL Agreement.  Citibank is also administrative agent under the ABL Agreement.

21.     Third, PetSmart is an issuer of notes under three indentures:

- An indenture governing 7.125% Senior Notes Due 2023, dated as of March 4, 2015, by and among PetSmart as issuer, the guarantors party thereto, and the Bank of New York Mellon Trust Company, N.A. ("BNY") as Trustee (as amended and supplemented, the "2015 Notes Indenture");

- An indenture governing 8.875% Senior Notes Due 2025, dated as of May 31, 2017, by and among PetSmart as issuer, the guarantors party thereto, and BNY as Trustee (as amended and supplemented, the "2017 Notes Indenture"); and

- An indenture governing 5.875% Senior First Lien Notes Due 2025, dated as of May 31, 2017, by and among PetSmart as issuer, the guarantors party thereto, and BNY as Trustee and Collateral Agent (as amended and supplemented, the "2017 Secured Notes Indenture," and, together with the 2017 Notes Indenture, the "2017 Notes Indentures," and, with the 2015 Notes Indenture, the "Indentures").

## II.    THE TRANSACTIONS

22.     PetSmart has been actively monitoring its capital structure and, with assistance from its legal and financial advisors, evaluating potential strategic transactions and opportunities to extend its maturities, reduce its leverage, and grow its business.

23.     On May 1, 2018, two disinterested directors (the "PetSmart Disinterested Directors") were elected to the PetSmart Board of Directors ("PetSmart Board") to assist PetSmart in its review, evaluation, and analysis of potential transactions.  After their election, separate independent legal and financial advisors were retained to advise the PetSmart Disinterested Directors.  These professionals obtained extensive information from PetSmart and had access to representatives and employees of PetSmart.

24.     On May 1, 2018, two other disinterested directors (the "Argos Holdings Disinterested Directors") likewise were elected to the Argos Holdings Board of Directors ("Argos Holdings Board") to assist Argos Holdings in its review, evaluation, and analysis of potential transactions.  After their election, separate independent legal and financial advisors were retained to advise the Argos Holdings Disinterested Directors.  These professionals also

obtained extensive information from PetSmart and had access to representatives and employees of PetSmart.

25.     The PetSmart Disinterested Directors and Argos Holdings Disinterested Directors were each separately authorized to explore and consider any strategic or financial transactions they determined to be advisable for PetSmart and Argos Holdings, respectively, including potential transactions involving their equity sponsors (the "Sponsors").  The resolutions appointing the PetSmart Disinterested Directors and the Argos Holdings Disinterested Directors also required the affirmative vote of each disinterested director for each company to permit either company to take any action with respect to matters in which the Sponsors have an interest as determined in the sole judgment of the company's disinterested directors.

26.     The PetSmart Disinterested Directors and the Argos Holdings Disinterested Directors spent several weeks analyzing the Transactions and potential alternatives.  On May 25, 2018, the PetSmart Board formed a special committee consisting of the two PetSmart Disinterested Directors (the "PetSmart Special Committee") to further review, negotiate, evaluate, and, if appropriate, approve PetSmart's entry into the Transactions.  On the same date, the Argos Holdings Board formed a special committee consisting of the two Argos Holdings Disinterested Directors (the "Argos Holdings Special Committee") to further review, negotiate, evaluate, and, if appropriate, approve Argos Holdings' entry into the Transactions.  The PetSmart Disinterested Directors and PetSmart Special Committee met separately with their advisors at least seven times before approving the Transactions.  The Argos Holdings Disinterested Directors and Argos Holdings Special Committee met separately with their advisors at least nine times before approving the Transactions.

27.      In addition to the meetings of the PetSmart Disinterested Directors and their professionals and the Argos Holdings Disinterested Directors and their professionals described above, the PetSmart Board and the Argos Holdings Board met five other times (on May 4, May 9, May 18, May 25, and June 1, 2018) in connection with the Transactions.

28.      PetSmart also retained a valuation expert to advise it on various financial issues in connection with the Transactions, including valuation, solvency, and surplus.  PetSmart's financial advisor opined, among other things, that PetSmart's corporate surplus exceeded the value of the Distribution under Delaware law and that, after giving effect to the Transactions, PetSmart would be solvent.  PetSmart's valuation expert also opined that the value of Chewy is $4.150 to $4.750 billion, with a midpoint value of $4.450 billion.  At the midpoint, this valuation is $1.450 billion more than the amount PetSmart paid for Chewy approximately a year ago in May 2017.

29.      The PetSmart Special Committee also obtained an independent opinion from its financial advisor that addressed, among other things, valuation, solvency, and corporate surplus under Delaware law.  The Argos Holdings Special Committee likewise obtained an independent opinion from its financial advisor on the same topics.

30.      In total, PetSmart and Argos Holdings respectively had 12 and 14 board, special committee, and disinterested director meetings where they analyzed the Transactions, obtained three separate and independent solvency opinions, and had three separate law firms independently provide advice regarding the Transactions.

31.      The Boards of PetSmart and Argos Holdings then met on June 1, 2018, to again consider the Transactions.  Following extensive analysis and diligence, PetSmart's valuation expert presented its conclusions to the PetSmart Board and Argos Holdings Board, including

their respective disinterested directors.  After further, separate deliberations with their respective advisors to determine whether to approve the Transactions, each of the PetSmart Special Committee and Argos Holdings Special Committee approved the Transactions on June 1, 2018. The PetSmart Board and the Argos Holdings Board each then considered and approved the Transactions.

32.     Earlier on June 1, 2018, PetSmart designated Buddy Chester Corp. and Buddy Chester Sub Corp. (collectively, "Chester")—two new subsidiaries that PetSmart created on May 30, 2018—as Unrestricted Subsidiaries of PetSmart for all purposes under each Indenture, the Credit Agreement and the ABL Agreement.  PetSmart and Argos Holdings then executed the Transactions on June 1, 2018.

## III.   THE ADMINISTRATIVE AGENT REFUSES TO FULFILL ITS CONTRACTUAL OBLIGATIONS

33.     After the Transactions, Chewy ceased to be a wholly owned subsidiary of PetSmart.  As a result, Chewy also automatically ceased to be a guarantor under the Credit Agreement.  The Credit Agreement provides:

> A Loan Party **_shall automatically be released_** from its obligations under the Loan Documents, and all security interests created by the Security Documents in Collateral owned by such Subsidiary Loan Party shall be automatically released . . . upon the request of the Borrower, in connection with a transaction permitted under this Agreement, as a result of which such Subsidiary Loan party ceases to be a wholly-owned Subsidiary.

CA § 9.15 (emphasis added).

34.     After the Transactions, PetSmart ceased to own the transferred Chewy equity and, as a result, the security interests in those transferred equity interests were automatically released as well:

> Upon (i) any sale or other transfer by any Loan Party (other than to Holdings, the Borrower or any other Subsidiary Loan Party) of any

> Collateral in a transaction permitted under this Agreement . . . the
> security interests in such Collateral created by the Security
> Documents or such guarantee ***shall be automatically released***.

CA § 9.15 (emphasis added).

35.     Accordingly, PetSmart provided the Agent with notice of the Transactions and a resulting request (as expressly set out in the Credit Agreement) to release Chewy and its subsidiaries from their obligations as guarantors under the Credit Agreement, and to release all security interests in the Transferred Equity and Chewy's assets (including each subsidiary of Chewy).  Under the plain terms of the Credit Agreement, the delivery of that notice and request alone resulted in the *automatic* release of all security interests in the Transferred Equity and Chewy's assets, as well as Chewy's and its subsidiaries' obligations as guarantors.  It also resulted in the *automatic* release of Chewy's and its subsidiaries' guarantees of PetSmart's secured and unsecured notes under the Indentures.

36.     In light of the automatic release of the security interests, PetSmart asked both Citibank (as Agent) and BNY (as the Trustee and Collateral Agent under PetSmart's 2017 Secured Notes Indenture) to document the termination and release of these liens as required under the Credit Agreement and 2017 Secured Notes Indenture.  BNY immediately took steps to meet its contractual obligations and promptly provided the requested documentation evidencing the release of the bondholders' liens on June 1, 2018, the *same day* as the Transactions.

37.     Citibank, as Agent, should have proceeded likewise.  After all, the Credit Agreement is clear:  "In connection with any termination or release pursuant to this Section, the Administrative Agent *shall* execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release."  CA § 9.15 (emphasis added).

38.     Unlike BNY, however, the Agent has avoided meeting its clear contractual obligations.  Rather, despite PetSmart's extensive and responsive efforts to encourage compliance, the Agent has only dawdled and delayed.  In the days after the Transactions, advisors for PetSmart had three calls with the Agent's advisors (on June 4, 5, and 6) to respond to its questions and explain how the Transactions are permitted under the Credit Agreement. Still, the Agent did not act.

39.     Then, on June 6, the Agent sent PetSmart an overbroad "Information Request" seeking 21 expansive categories of documents and information purportedly related to the Transactions.  Many of these "categories" had nothing to do with compliance with the Credit Agreement covenants, and some even asked for information regarding PetSmart's *future* plans. Despite the Agent's overreach, on June 10, PetSmart sent responses to the Agent's requests related to compliance with the Credit Agreement.

40.     Purportedly satisfied with PetSmart's responses, and convinced that the Transactions complied with the terms of the Credit Agreement, the Agent and its advisors then repeatedly informed PetSmart and its advisors that the Agent would comply with the Credit Agreement and provide the requested documentation at 3 p.m. Eastern Time on June 14.  But when that time came, the Agent failed to provide the documentation.  Instead, with no warning, the Agent simply forwarded a letter from counsel for the Ad Hoc Group claiming a default under the Credit Agreement due to supposed deficiencies in PetSmart's responses to the Agent's information requests (the "Ad Hoc Letter").  The Ad Hoc Letter further alleged that if the Transactions did not comply with the Credit Agreement, the Transactions would "constitute an Event of Default," and the Ad Hoc Letter "direct[ed] the Agent to refrain from taking any action" to recognize the validity of the Transactions.  If an Event of Default occurs, then among

other things the Agent may—or, at the direction of requisite lenders, shall—accelerate PetSmart's debt obligations under the Credit Agreement, making them immediately due and payable.

41.     The claims in the Ad Hoc Letter are without merit.  Nonetheless, while it had no contractual obligation to do so, PetSmart provided even more information to the Agent in an effort to encourage the Agent to comply with its contractual commitments despite the tactics of the Ad Hoc Group.  To that end, on June 22, PetSmart sent the Agent (and, through the Agent, private-side members of the Ad Hoc Group) significant additional information in response to the Agent's information request.  PetSmart's supplemental response went above and beyond what is required under the Credit Agreement and provided the Agent with all information the Agent could reasonably request regarding the Transactions, including:

- A detailed description of the approval process undertaken by the PetSmart and Argos Holdings Boards for the Transactions;

- PetSmart's valuation of the Chewy equity in the Transactions and an officer's certificate supporting that valuation;

- Explanations of why the Transactions comply with the negative covenants in the Credit Agreement, including detailed calculations of certain metrics described in the Credit Agreement;

- Detailed exhibits showing calculations for various financial metrics relevant to compliance with negative covenants in the Credit Agreement;

- Although not relevant to the Agent's obligations, explanations of why the Transactions comply with covenants in PetSmart's Indentures, including detailed calculations of certain relevant financial metrics and ratios; and

- PetSmart's current intentions for funding Chewy's cash needs.

42.     PetSmart's June 22 correspondence to the Agent also explained that the Ad Hoc Letter had no bearing on the Agent's obligations to provide the documentation—in fact, the Agent has no obligation to follow the instructions of the Ad Hoc Group at all, even if its

members hold a majority of the loans under the Credit Agreement.  Indeed, the Agent's obligation to provide the release documentation does not depend on approval from the Ad Hoc Group in any respect.  Therefore, PetSmart urged the Agent "to decide, once again, whether it will comply with its express contractual obligations to document what already has occurred automatically under the Credit Agreement . . . ."  And PetSmart once again requested that the Agent provide the required documentation.  Despite the breadth of PetSmart's response, the Agent has refused to confirm that PetSmart has complied with its obligations under the Credit Agreement.  Instead, on June 25, the Agent notified PetSmart that "the Required Lenders have taken the position that the Borrower's failure to provide certain information constitutes a Default and, under Article VIII of the Credit Agreement, it is not the Agent's responsibility or duty to 'ascertain or inquire into . . . the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default.'"

43.    In that same June 25 letter, the Agent confirmed that it will continue to take its direction from the Ad Hoc Group and will not deliver the requested documentation.  The Agent's stated position makes clear that the Agent will not comply with the Credit Agreement's requirements absent legal action.

## IV.    THE CREDIT AGREEMENT EXPRESSLY PERMITS THE TRANSACTIONS

44.    The Agent's obligation to provide the documentation at issue is mandatory under the Credit Agreement as long as the Transactions were "permitted under" the agreement.  CA § 9.15.  And, while the Agent has never articulated *any* reason for its continued noncompliance, on information and belief, the Agent's breach is a result of the Ad Hoc Group's tactics and

purported "concerns . . . as to whether the Transactions were made in compliance with the terms of the Term Loan Agreement."

45.     As the Agent and the Ad Hoc Group can readily determine from the information provided by PetSmart, the Ad Hoc Group's professed "concerns" are baseless (as would be any claim by the Ad Hoc Group, other Lenders, or the Agent that the Transactions give rise to any purported Event of Default).  The Credit Agreement expressly permits Plaintiffs to consummate the Distribution and Contribution.  While the Credit Agreement contains restrictions on Plaintiffs' ability to engage in certain transactions, Article VI provides clear and explicit exceptions for qualifying payments and investments.  Those exceptions apply directly to the Transactions here.

### A.     The Distribution Is Permitted Under the Credit Agreement's Restricted Payments Covenant

46.     The Credit Agreement defines Restricted Payments to include "any dividend or other distribution . . . with respect to any Equity Interests in" PetSmart, Argos Holdings, or their Restricted Subsidiaries.  CA § 1.01.  While the Credit Agreement restricts Plaintiffs' ability to make certain Restricted Payments, it also includes exceptions that explicitly permit others.  CA § 6.08(a).

47.     First, the Credit Agreement permits PetSmart and Argos Holdings to make "Restricted Payments" that do not exceed $200,000,000.  CA § 6.08(a)(viii)(A).

48.     Second, the Credit Agreement allows PetSmart and Argos Holdings to make additional Restricted Payments up to the Available Equity Amount (the "Available Equity Amount Basket").  CA § 6.08(a)(viii)(C).  The Available Equity Amount includes "capital contributions received by the Borrower after the Effective Date in cash or Permitted Investments."  CA § 1.01.  Because PetSmart received $1.0 billion in capital contributions from

the indirect equity owners of PetSmart after the Effective Date related to the acquisition of Chewy, the Available Equity Amount as of June 1, 2018, was at least $1.0 billion.

49.     In sum, these two provisions of the Credit Agreement enable and entitle Plaintiffs to make Restricted Payments of at least $1.2 billion.  PetSmart and Argos Holdings determined, based on the mid-point of the value range determined by its financial advisor, that the value of the Distribution was $908.5 million.  Accordingly, PetSmart and Argos Holdings properly made the Distribution based on the express terms of the Credit Agreement.

> **B.     The Contribution Is Permitted Under the Credit Agreement's Investments Covenant**

50.     While the Credit Agreement includes an Investments covenant that restricts Plaintiffs' ability to "make or hold any Investment," it also contains express exceptions.  CA § 6.04.  As with the Restricted Payments covenant, these exceptions allow Plaintiffs to make investments that qualify under certain baskets.

51.     First, the Credit Agreement permits PetSmart and Argos Holdings to make "other Investments and other acquisitions" that do not exceed $375,000,000 (the "General Investments Basket").  CA § 6.04(n)(A).

52.     Second, on top of the General Investments Basket, the Credit Agreement allows PetSmart to make Investments up to the Available Amount (the "Available Amount Basket").  CA § 6.04(n)(B).  The Available Amount includes, among other things, the sum of $200,000,000 (the "Starter Basket") and 50% of Consolidated Net Income for the period from the "Effective Date to the end of the most recent Test Period."  CA § 1.01.  Consolidated Net Income for that period, as defined in the Credit Agreement, was approximately $1,254,657,000.  Therefore,

when 50% of Consolidated Net Income is added to the Starter Basket, the Available Amount Basket allows Plaintiffs to make investments up to approximately $827,000,000.

53.     Taken together, the General Investments Basket and Available Amount Basket permit Plaintiffs to make investments up to $1,202,328,500.  PetSmart determined, based on the mid-point of the value range determined by its financial advisor, that the value of the Contribution was $749.5 million.  Accordingly, PetSmart properly made the Contribution based on the express terms of the Credit Agreement.

### C.     The Transactions Are Not Prohibited By Any Other Covenants in the Credit Agreement

54.     None of the other covenants in the Credit Agreement prohibits the Distribution or Contribution.

55.     For example, Section 6.05 of the Credit Agreement prohibits PetSmart and Argos Holdings from transferring or disposing "of any asset, including any Equity Interest owned" by them.  But this restriction does not apply to "Investments permitted by Section 6.04" or "Restricted Payments permitted by Section 6.08."  CA § 6.05(e).  Because the Contribution and Distribution are permitted by Sections 6.04 and 6.08, respectively, *see supra* ¶¶ 44–53, the Asset Sale covenant in the Credit Agreement does not prohibit either transaction.

56.     Similarly, Section 6.09 of the Credit Agreement restricts PetSmart's and Argos Holding's ability to transfer property or assets to "Affiliates," which are defined as "another Person that directly or indirectly Controls or is Controlled by or is under common Control" with the specified Person.  But even if the recipients of the Contribution and Distribution qualify as Affiliates, Section 6.09 does not apply to either transaction.  With exceptions not applicable here, the Affiliate Transaction covenant does *not* apply to transfers that are "Restricted Payments permitted under Section 6.08," a category which includes the Distribution. *See supra* ¶¶ 46–49;

CA § 6.09(ix).  Nor does the Affiliate Transaction covenant apply to transactions "on terms substantially as favorable to [PetSmart] as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate."  CA §§ 6.09(ii), (ix).

57.     PetSmart owns all of the equity interests in Chester, which received the contributed Chewy equity.  PetSmart therefore retains complete control of all of the equity and the value of the equity transferred through the Contribution.  Accordingly, the Contribution by definition is on terms at least as favorable as those that would be obtainable in an arm's-length transaction.  Therefore, the Affiliate Transactions covenant in the Credit Agreement does not prohibit the Contribution.

## V.     THERE HAS BEEN NO CROSS-DEFAULT UNDER THE CREDIT AGREEMENT

58.     As described above, the covenants in the Credit Agreement are the only ones relevant to the Agent's obligations, and the Transactions strictly complied with all of them.  The Agent and the Ad Hoc Group, however, requested information regarding Plaintiffs' compliance with covenants in the Indentures, arguing that a default under the Indentures could lead to a cross-default under Section 7.01(g) of the Credit Agreement.

59.     The Transactions complied with all of the covenants and other terms of all three of PetSmart's Indentures.  PetSmart is the issuer of three sets of notes governed by the three Indentures: (a) the 2015 Notes, (b) the 2017 Secured Notes, and (c) the 2017 Unsecured Notes.  While the terms of the three Indentures vary in some respects, all three explicitly permit the Distribution and Contribution.  The Distribution is a permitted "Restricted Payment" under the

terms of all three Indentures.  Likewise, the Contribution is a Permitted Investment or permitted Restricted Payment under each of the Indentures.

60.     In its June 22 letter to the Agent, PetSmart provided the Agent detailed explanations and calculations that demonstrate why the Distribution and Contribution qualify as permitted Restricted Payments or Permitted Investments under the Indentures.  PetSmart's positions and calculations are confirmed by the fact that BNY, as Trustee under each of the Indentures, promptly provided documentation evidencing releases of liens and guarantees under the Indentures, unlike the Agent.  Thus, the Agent has no basis to claim that there is any risk of a cross-default.

61.     Finally, PetSmart is also a party to an ABL Agreement, although PetSmart has not drawn any funds from it.  Like the Credit Agreement, the ABL Agreement contains covenants addressing Restricted Payments and Investments.  And, like the Credit Agreement, the ABL Agreement contains express exceptions to those covenants that permit the Transactions here. The ABL Agreement permits Restricted Payments and Investments if "Payment Conditions" are met, which depend on available borrowing capacity under the ABL Agreement.  Because PetSmart has not drawn on the ABL Agreement, those "Payment Conditions" are easily met, and the ABL Agreement permits the Transactions.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
Breach of Contract

62.     Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 61 of this Complaint as if fully set forth in this claim for relief.

63.     The Credit Agreement is a binding contract between Plaintiffs and the Agent.

64.     Plaintiffs have fully performed their obligations under the Credit Agreement.

65.     In the Credit Agreement, the Agent agreed to "execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release" of liens or guarantees.  CA § 9.15.

66.     On June 1, 2018, PetSmart requested that the Agent execute and deliver all documents necessary to evidence the termination and release of liens on the assets of Chewy and Chewy's subsidiaries and the Chewy common equity involved in the Transactions, including the filing of the UCC-3 financing statement, intellectual property security agreement releases, releases from the Guarantee Agreement and Collateral Agreement, and terminations of Deposit Account Control Agreements.

67.     Under Section 9.15 of the Credit Agreement, the Agent is obligated to provide the documentation described in paragraph 66.  The Agent is capable of providing that documentation, but, to date, the Agent has not done so.  By failing to provide the documentation described in paragraph 66, the Agent has breached, and continues to breach, Section 9.15 of the Credit Agreement.

68.     Plaintiffs lack an adequate remedy at law for the Agent's breach.  Among other things, absent obtaining the documentation at issue, Plaintiffs will not be able to realize the full benefits of the Transactions, as there will continue to be outdated and obsolete financing statements purporting to encumber their now-unencumbered assets.

## SECOND CLAIM FOR RELIEF
<u>Declaratory Judgment</u>

69.     Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 68 of this Complaint as if fully set forth in this claim for relief.

70.     By virtue of the Agent's actions described herein, an actual, present, substantial, and justiciable controversy under 28 U.S.C. § 2201(a) exists between Plaintiffs and the Agent

concerning the Credit Agreement and the parties' respective legal rights and obligations thereunder.

71.     Pursuant to 28 U.S.C. § 2201(a) and Federal Rule of Civil Procedure 57, Plaintiffs seek a declaration from this Court that no Default or Event of Default (as defined in the Credit Agreement) has occurred or is occurring as a result of the Transactions and that the Transactions were permitted by and complied with the terms of the Credit Agreement.

72.     Pursuant to 28 U.S.C. § 2201(a) and Federal Rule of Civil Procedure 57, Plaintiffs also seek a declaration from this Court that because the Transactions were permitted under the Credit Agreement and resulted in Chewy ceasing to be a wholly owned subsidiary of PetSmart, Chewy was automatically released from its obligations under the Credit Agreement, all security interests in the Transferred Equity and Chewy's assets (including each subsidiary of Chewy) were automatically released, and that the Agent is required to provide the documentation requested by PetSmart set forth in paragraph 66 evidencing such termination and release.

73.     Pursuant to 28 U.S.C. § 2201(a) and Federal Rule of Civil Procedure 57, Plaintiffs further seek a declaration from this Court that PetSmart's responses to information requests from the Agent and/or the Ad Hoc Group complied with the terms of the Credit Agreement and therefore no Default or Event of Default (as defined in the Credit Agreement) has occurred or is occurring.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that a judgment be awarded in their favor and against Citibank, as Agent, as follows:

A.      Directing the Agent's specific performance of Section 9.15 of the Credit Agreement, specifically:

      1.   To execute and/or file all documents necessary to evidence the termination or release of liens or guarantees, including, among other things, the filing of a UCC-3 financing statement; and

      2.   To deliver to PetSmart all documents that PetSmart has requested to evidence the termination or release of liens or guarantees.

B.      Declaring and adjudging that no Default or Event of Default (as defined in the Credit Agreement) has occurred or is occurring as a result of the Transactions and that the Transactions were permitted by and complied with the terms of the Credit Agreement in all respects.

C.      Declaring and adjudging that no Default or Event of Default (as defined in the Credit Agreement) has occurred or is occurring as a result of PetSmart's responses to information requests from the Agent and/or the Ad Hoc Group because the responses complied with the terms of the Credit Agreement.

D.      Declaring and adjudging that the Agent shall bear its own expenses, including costs, attorneys' fees, and other fees, incurred in defending against this Action and that Plaintiffs are not required to indemnify or otherwise reimburse the Agent for its expenses, including costs, attorneys' fees, and other fees, incurred in defending against this Action due to the Agent's material breach of the Credit Agreement.

E.       Enjoining the Agent from sending any Notice of Default—or exercising any

purported remedy—under the Credit Agreement as a result of the Transactions.

F.       Awarding such other and further relief as this Court may deem just and proper.


Dated: New York, New York
      June 26, 2018

HOLWELL SHUSTER & GOLDBERG LLP


By: _____

Michael S. Shuster
Daniel P. Goldberg
Brendon DeMay
Benjamin F. Heidlage
Margot B. Hoppin (admission pending)

425 Lexington Avenue
New York, NY 10017
(646) 837-5151
dgoldberg@hsgllp.com

*Counsel to Argos Holdings Inc. and
PetSmart, Inc.*