**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARGOS HOLDINGS INC. and PETSMART, INC., | |
| Plaintiffs, Counterclaim-Defendants, | No. 18 Civ. 5773 (RJS) |
| v. | |
| WILMINGTON TRUST, NATIONAL ASSOCIATION, as Administrative Agent, | |
| Defendant, Counterclaim-Plaintiff, | |
| v. | |
| ARGOS INTERMEDIATE HOLDCO III INC., BUDDY CHESTER CORP., BUDDY CHESTER SUB CORP., BUDDY HOLDINGS CORP., ALAN M. SCHNAID, PAULETTE R. DODSON, PAUL KEGLEVIC, PETER S. KRAVITZ, SCOTT D. VOGEL, CEZAR M. FROELICH, RAYMOND SVIDER, MICHAEL CHANG, and FAHIM AHMED, | |
| Counterclaim-Defendants. | |

## SECOND AMENDED COUNTERCLAIMS

Defendant Wilmington Trust, National Association ("Wilmington Trust"), solely in its

capacity as the Administrative Agent (the "Agent") under the Credit Agreement, dated as of

March 11, 2015 (as amended, restated, modified, or supplemented from time to time, the "Credit

Agreement"), among PetSmart, Inc. ("PetSmart"), Argos Holdings Inc. ("Holdings"), the lenders

from time to time party thereto (the "Lenders"), and the Agent, by and through its undersigned

counsel, for its Counterclaims against Plaintiffs/Counterclaim-Defendants Holdings and

PetSmart and Counterclaim-Defendants Argos Intermediate Holdco III Inc., Buddy Chester

Corp., Buddy Chester Sub Corp., Buddy Holdings Corp., Alan M. Schnaid, Paulette R. Dodson,

Paul Keglevic, Peter S. Kravitz, Scott D. Vogel, and Cezar M. Froelich, upon personal knowledge and/or upon information and belief, counterclaims as follows:

## **COUNTERCLAIMS**

Wilmington Trust, as Agent, for its Counterclaims, upon personal knowledge as to itself and its own acts and upon information and belief as to all others, alleges as follows:

1.      These Counterclaims arise out of an attempt by PetSmart's owners[1] to enrich themselves by stripping some $900 million of value out of the business and placing a chunk of PetSmart's most promising asset—web retailer Chewy, Inc. ("Chewy")—outside the reach of PetSmart's creditors.  This gambit, which forces PetSmart's creditors to rely increasingly on PetSmart's struggling brick-and-mortar business as security, violates the governing debt documents and the law.

2.      At issue are two simultaneous, coordinated transactions orchestrated by an insider group of investors led by BC Partners, which owns and controls PetSmart following a leveraged buyout of the company several years ago.  The transactions had no legitimate business purpose.  To the contrary, they siphoned away 36.5% of PetSmart's interest in Chewy to enrich the insider investor group and to impair the interests of PetSmart's creditors.  Meanwhile, PetSmart remained on the hook for the billions of dollars it had borrowed to buy Chewy.

3.      The first transaction, referred to as the "Dividend," was a simple value grab by the BC Partners Consortium.  PetSmart gave away 20% of the equity in its prized Chewy subsidiary to its parent, Holdings, which was then passed along to other entities controlled by the BC

---

[1]    Upon information and belief, the equity of PetSmart is held indirectly by a consortium of investors led by BC Partners, Inc. ("BC Partners"), and including La Caisse de dépôt et placement du Québec, GIC Special Investments Pte Ltd, StepStone Group LP, and Longview Asset Management, LLC (all entities collectively, the "BC Partners Consortium").

Partners Consortium. The Dividend allowed the BC Partners Consortium, which had invested in a brick-and-mortar retail business that now faced serious industry and other headwinds, to misappropriate approximately $900 million in value (by PetSmart's own calculations) from PetSmart's best asset, Chewy.

4.      The second transaction, called the "Drop-Down," was a corporate shell game designed to impair PetSmart's existing creditors. This transaction transferred an additional 16.5% of Chewy's equity to a newly incorporated subsidiary, dubbed "Buddy Chester Corp." The subsidiary was designated as an "Unrestricted Subsidiary," which means that it is not bound to guarantee PetSmart's debts, to pledge its assets as security for PetSmart's debt, or to comply with any of the restrictive covenants in the Credit Agreement. Through the Drop-Down, PetSmart placed 16.5% of Chewy's equity beyond the reach of PetSmart's creditors.

5.      These maneuvers (collectively, the "Transactions") breached the governing contracts and violated applicable law, all for the benefit of the BC Partners Consortium and to the detriment of all of PetSmart's creditors. For starters, the Transactions directly violated the documents governing PetSmart's debt, including the Credit Agreement, for which Counterclaim-Plaintiff Wilmington Trust serves as Agent, and the Collateral Agreement, dated as of March 11, 2015 (as amended, restated, modified, or supplemented from time to time, the "Collateral Agreement"), among Holdings, PetSmart, the grantors party thereto, and Wilmington Trust, as Collateral Agent.

6.      The Transactions directly violate cross-default provisions in the Credit Agreement. More particularly, the Credit Agreement defines an Event of Default to include any default under the several bond indentures to which PetSmart is a party. The indentures require PetSmart to maintain a 2:1 ratio of EBITDA (earnings before interest, taxes, depreciation, and

amortization) to fixed charges in order to access certain "baskets" available for dividend payments and investments. This is known as a "Fixed Charge Coverage Ratio" or "FCCR," and it is designed to protect creditors from a debtor saddling itself with too many expenses relative to earnings.

7.      PetSmart failed this FCCR requirement at the time of the Transactions, rendering the Transactions impermissible under the indentures and thus under the Credit Agreement. PetSmart has claimed in recent disclosures to the Agent that, following the Transactions, PetSmart's FCCR was 2.015:1. That claimed result—which, by PetSmart's own calculations, cleared the threshold by a slim $7.3 million—was engineered largely with $148 million[2] of purported "cost savings" and "synergies" from PetSmart's 2017 acquisition of Chewy. Despite repeated requests for full transparency on its FCCR calculations, PetSmart has not provided sufficient back-up to support this $148 million in dubious adjustments. There is good reason: Those massive purported synergies are belied by the actual synergies achieved within the eight months after PetSmart acquired Chewy (a mere $17 million), and unachievable within the period required by the debt documents (24 months from the Chewy acquisition). These so-called "synergies" were manufactured to enable PetSmart to claim compliance with the FCCR provision. They are vastly overstated, and the Transactions therefore violated the FCCR requirement. PetSmart also failed to give the Agent notice of this violation, which in itself triggered an Event of Default under the Credit Agreement.

8.      PetSmart has also violated the Credit Agreement's restrictions on transactions with its own corporate affiliates. As relevant here, Section 6.09 states that PetSmart may not

---

[2]      The $148 million constitutes 15% of PetSmart's Consolidated EBITDA calculation of $972.6 million.

"transfer any property or assets to . . . or otherwise engage in any other transactions with" its corporate affiliates "except . . . on terms substantially as favorable to [PetSmart] as would be obtainable by [PetSmart] at the time in a comparable arm's-length transaction with a Person other than an Affiliate." But here, PetSmart has sent 16.5% of its equity stake in Chewy to a PetSmart Affiliate and begun cannibalizing the PetSmart enterprise for Chewy's benefit. That is not even remotely an arm's-length arrangement that PetSmart would have undertaken with a true third party.

9.      Moreover, the Transactions violated the Collateral Agreement. That agreement states that PetSmart may not exercise its rights as the owner of Chewy stock to "materially and adversely affect" the rights and remedies of PetSmart's secured creditors under the Credit Agreement. Yet that is precisely what the Drop-Down did. It deprived the Lenders of their lien on Chewy stock having significant value and their ability to exercise remedies against that collateral upon an Event of Default under the Credit Agreement. Standing alone, this dooms the Drop-Down.

10.     The reasons for these machinations are also clear. PetSmart's acquisition of Chewy in 2017 provided an important and necessary online presence, but it added $2 billion in debt and required the BC Partners Consortium to inject an additional $1 billion in cash into PetSmart. But PetSmart is struggling. Competition from online retailers, large general retailers, and supermarkets have taken their toll, and earlier this year, Amazon announced the launch of its own pet product brand. The market ultimately grew concerned about PetSmart's solvency. In the days before the Transactions, in late May 2018, interests in the Term Loan governed by the Credit Agreement were trading in the upper 70s, the secured notes in the upper 60s, and the unsecured notes in the upper 40s, reflecting a perception that PetSmart was insolvent by $2.3

billion.  (Bond prices are quoted in "cents."  A price of 100 cents, or "par," usually indicates that everything is going as planned.)  Faced with these realities, the BC Partners Consortium is attempting to extract what value it can, and move assets away from PetSmart's existing creditors, in order to protect its own investment.

11.     PetSmart has tried to paper over its obvious self-dealing, to no avail.  The co-chairman of BC Partners, Raymond Svider, has run PetSmart since mid-2017.  In an attempt to justify handing some $900 million in Chewy equity to the BC Partners Consortium (less than a year after the consortium invested $1 billion so that PetSmart could acquire Chewy), PetSmart orchestrated sham "independent" Special Committees.  Those Committees, which by PetSmart's own admission existed only for a matter of days prior to approval of the Transactions, did not exercise the independent judgment necessary to review and approve these Transactions.

12.     The Transactions were also unlawful.  The Transactions were designed to hinder and defeat the rights of PetSmart's creditors, and therefore constituted actual fraudulent conveyances.  Because the Transactions were fraudulent conveyances, the Credit Agreement does not obligate the Agent to release any liens or guarantees purported to be released under the Transactions.  The Dividend, apart from being an actual fraudulent conveyance, was a constructive fraudulent conveyance because PetSmart was insolvent and received no value in return.  For much the same reason, the Dividend was illegally declared, for which the transferor, the directors of the transferor, and the recipients—all of whom well knew that PetSmart was insolvent—are liable.

13.     What is more, those who orchestrated this scheme have now rejected many of the Agent's timely, legitimate, and repeated attempts to obtain information about the Transactions and PetSmart's finances—information to which the Agent is entitled by the governing contracts

precisely so that creditors are able to assess PetSmart's self-proclaimed compliance with its legal obligations. As a result of PetSmart's post-Transaction breach of these obligations, the Agent has been left significantly in the dark as to the analysis of and rationales for the Transactions notwithstanding their direct, negative, and substantial impact on the collateral of PetSmart's creditors. Even the limited information provided, however, has revealed that these Transactions are improper.

14.    The Agent is empowered by the Credit Agreement to exercise "all powers, rights and remedies under the" Credit Agreement and certain related agreements "on behalf of the Lenders in accordance with the terms thereof." In this capacity, the Agent hereby asserts the following counterclaims.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over these counterclaims under 28 U.S.C. § 1367.

16.    This Court has personal jurisdiction over PetSmart and Holdings because they have consented to the jurisdiction of this Court through the initiation of this action and because, under Section 9.09(b) of the Credit Agreement, they have irrevocably consented to the jurisdiction of this Court.

17.    This Court has personal jurisdiction over the other Counterclaim-Defendants pursuant to New York CPLR 302(a)(1) because, upon information and belief, they conducted business in the State of New York, including business related to the Transactions, and the claims in the present action arise out of that business activity. In the alternative, the Court has personal jurisdiction over the other Counterclaim-Defendants pursuant to New York CPLR 302(a)(3)(ii) because, upon information and belief, the other Counterclaim-Defendants transacted business outside the State of New York causing injury to persons in that State, should reasonably have

expected their activities to have consequences in that State, and derive substantial revenue from interstate commerce.

18.     Venue is proper in the Southern District of New York because the counterclaims asserted herein are compulsory counterclaims and venue is proper in the original action, and, under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the counterclaims occurred in this District and this Court has personal jurisdiction over the Counterclaim-Defendants.

## COUNTERCLAIM PARTIES

19.     Plaintiff and Counterclaim-Defendant Argos Holdings Inc. is a Delaware corporation with its principal place of business in Arizona.  It owns 100% of PetSmart, Inc.

20.     Plaintiff and Counterclaim-Defendant PetSmart, Inc. is a Delaware corporation with its principal place of business in Arizona.  It owns 100% of Buddy Chester Corp.

21.     Counterclaim-Plaintiff Wilmington Trust, National Association, is a national bank with its registered main office in Delaware.  Wilmington Trust, National Association, replaced Citibank, N.A., as Agent under the Credit Agreement on August 16, 2018.

22.     Counterclaim-Defendant Argos Intermediate Holdco III Inc. is a Delaware corporation with its principal place of business in Arizona.  It owns 100% of Argos Holdings Inc. and Buddy Holdings Corp.

23.     Counterclaim-Defendant Buddy Chester Corp. is a Delaware corporation.  It owns 100% of Buddy Chester Sub Corp.

24.     Counterclaim-Defendant Buddy Chester Sub Corp. is a Delaware corporation.

25.     Counterclaim-Defendant Buddy Holdings Corp. is a Delaware corporation.

26.     On information and belief, Counterclaim-Defendant Alan M. Schnaid is a director of both Holdings and PetSmart.

27.     On information and belief, Counterclaim-Defendant Paulette R. Dodson is a director of both Holdings and PetSmart.

28.     On information and belief, Counterclaim-Defendant Paul Keglevic is a director of PetSmart.

29.     On information and belief, Counterclaim-Defendant Peter S. Kravitz is a director of PetSmart.

30.     On information and belief, Counterclaim-Defendant Scott D. Vogel is a director of Holdings.

31.     On information and belief, Counterclaim-Defendant Cezar M. Froelich is a director of Holdings.

## STATEMENT OF FACTS

### The BC Partners Consortium Acquires PetSmart

32.     PetSmart is the largest specialty retailer of pet products and services in North America.  It operates over 1,600 retail pet stores and over 200 pet hotels, and it sells the full range of pet products through multiple online platforms.  In addition, PetSmart offers pet training, grooming, boarding, and adoption services to customers in North America.

33.     Starting with two stores in the Phoenix area in 1987, the company that would become PetSmart quickly grew into a retail heavyweight.  In July 1993, PetSmart held a $125 million initial public offering and was listed on the NASDAQ stock exchange.

34.     In 2015, PetSmart was acquired by a private equity consortium led by BC Partners, through a leveraged buyout at a purchase price of $8.7 billion (the "LBO").

35.     PetSmart incurred over $6 billion in debt to finance the LBO.  That debt included (i) a $4.3 billion term loan with a maturity date of March 11, 2022 (the "Term Loan") under the Credit Agreement, which is at issue here and for which Counterclaim-Plaintiff Wilmington Trust serves as Agent; and (ii) $1.9 billion of notes due March 2023 (the "Unsecured 2023 Notes") under an indenture (the "Unsecured 2023 Notes Indenture").

36.     Upon closing of the LBO, PetSmart became a wholly owned subsidiary of Holdings.  Holdings is, in turn, a wholly owned indirect subsidiary of Argos Holdings L.P.  The BC Partners Consortium owns substantially all (if not all) of the issued and outstanding capital stock of Argos Holdings L.P.

37.     As a result of the LBO, the BC Partners Consortium controlled PetSmart.  The Co-Chairman and Managing Partner of BC Partners in New York, Svider, became the Executive Chairman of the PetSmart board of directors (the "Board").  Two other BC Partners professionals, Chang and Ahmed, were also placed on the Board.  BC Partners was bullish about the deal it had struck.  Svider, for instance, stated that retailers were stronger than the market perceived and that "[t]he Company should never have been put in play."

**PetSmart Acquires Chewy, Substantially Increasing PetSmart's Debt**

38.     At the time the BC Partners Consortium took control of PetSmart, the retail market was starting to shift toward online platforms.  Like many brick-and-mortar retailers, PetSmart increasingly faced challenges from Amazon and other online competitors.  As a result, PetSmart looked to expand its online presence to capitalize on that growing trend in the market.

39.     PetSmart thus set out to acquire Chewy, which at the time was the fastest-growing and largest online pet retailer.  Founded in 2011, Chewy was not yet profitable, but its large revenues and capacity for growth were attractive to PetSmart.

40.    PetSmart acquired Chewy on May 31, 2017 for just over $3 billion.  The combination of PetSmart and Chewy was designed to accelerate the execution of PetSmart's "omni-channel" strategy.  The plan was to increase PetSmart's reach across multiple channels— retail stores, online, and mobile—in order to retain customers moving online.  Retaining those customers would enable PetSmart to compete more effectively with online behemoths like Amazon.  As PetSmart stated at the time, "[t]he combination of PetSmart and Chewy will enhance both companies' capabilities and reach, offering the widest selection of pet products and service available both in-store and online in North America."

41.    But the acquisition of Chewy came at a price.  The deal was financed with an additional $2 billion in debt: (i) $1.35 billion of secured notes due June 2025 (the "Secured 2025 Notes") under an indenture (the "Secured 2025 Notes Indenture"); and (ii) $650 million of notes due June 2025 (the "Unsecured 2025 Notes," together with the Secured 2025 Notes, the "Chewy Notes") under an indenture (the "Unsecured 2025 Notes Indenture," together with the Secured 2025 Notes Indenture, the "Chewy Indentures").  PetSmart was now levered with over $8.1 billion in debt: (i) the $4.235 billion Term Loan; (ii) the $1.9 billion Unsecured 2023 Notes from the LBO; and (iii) the $2 billion Chewy Notes.

42.    The $2 billion in new debt, however, was insufficient to cover the full purchase price of Chewy, which exceeded $3 billion.  Accordingly, the BC Partners Consortium injected $1 billion of its *own* cash into the company.  PetSmart's cash on hand covered the relatively small remainder of the purchase price.  Upon closing, Chewy became a wholly owned subsidiary of PetSmart and guaranteed PetSmart's obligations under the Term Loan, the Unsecured 2023 Notes, and the Chewy Notes.

11

43.     The Chewy transaction, however, did not deliver the intended benefits.  Chewy has yet to turn a profit.  And, in the eight months after the transaction closed, PetSmart has achieved a small fraction—less than 10%—of the $204 million in "synergies" over the first twelve months that management had promised to creditors in its offering memorandum.

44.     The bad news started soon after the acquisition.  In August 2017, PetSmart's CEO announced his resignation, leaving Svider, the BC Partners Co-Chairman and Managing Partner, in charge as Executive Chairman.  (Svider was functionally the CEO as well, as that post sat vacant until late May 2018.)  The Term Loan was trading below 90.  In September, S&P downgraded PetSmart from B+ to B with a negative outlook after PetSmart reported EBITDA and gross margin declines in the second quarter of 2017.

45.     PetSmart's situation continued to decline.  In December 2017, PetSmart reported a 30% reduction in EBITDA for the third quarter of 2017 and indicated that the upcoming quarter's results were trending below expectations.  While Chewy's revenue and market share were up during that time, PetSmart's non-Chewy revenue declined 1.3%.  PetSmart's bonds tumbled, with its unsecured notes hitting a then-record low of 66.5.  The Chewy Notes were among the year's worst performers in their asset class.  *See* Eliza Ronalds-Hannon, *PetSmart Bonds Plunge to Record Low as Earnings Are Said to Sink*, Bloomberg News, Dec. 12, 2017.  Meanwhile, PetSmart's declining fortunes meant that the company's relative leverage continued to increase, up to 7.7x EBITDA at end of the third quarter of 2017 from 6.3x EBITDA a year before.  In December 2017, S&P downgraded PetSmart's credit rating from B to CCC+, citing an "unsustainable capital structure" at current levels of EBITDA.  In January 2018, Moody's downgraded PetSmart from B2 to B1, citing weak operational performance, and it predicted no meaningful improvement in the next year.

46.     The downward trend continued in spring 2018.  In March, Chewy's co-founder and CEO left.  In April, the price of the Term Loan continued its decline, dropping to about 78. In May, Amazon announced the launch of its own pet-product brand.  Moody's downgraded PetSmart two notches, to Caa1, and stated that it did not expect improvement in the next year.

47.     In April 2018, PetSmart revealed its overall earnings for fiscal year 2017, laying bare the challenges to its brick-and-mortar business.  PetSmart reported significant declines in EBITDA and retail sales, and net sales were down for all of PetSmart except for Chewy.  *See* Reshmi Basu, *PetSmart Bonds Soften as EBITDA and Gross Margins Decline*, Debtwire, Apr. 26, 2018.  And declining EBITDA had pushed PetSmart's leverage to new heights: 10x EBITDA overall, and 7x EBITDA considering only the secured debt.

48.     The market took note of PetSmart's declining fortunes.  PetSmart's debt traded nowhere near par.  As of June 1, 2018, the date of the Transactions, interests in the Term Loan were trading in the upper 70s, the secured notes in the high 60s, and the unsecured notes in the high 40s.  These trading prices reflected the market's belief that the value of the debt was materially impaired.

49.     PetSmart's debt prices show that, in the market's view, PetSmart was insolvent by $2.3 billion.  The amount by which a company is insolvent is the amount by which its liabilities (debt) exceed its assets (enterprise value).  The face value of PetSmart's debt was $8.7 billion. That measures PetSmart's liabilities because it is how much PetSmart owed.  However, the market was valuing the same debt at $6.0 billion, as shown in the table below.  Thus, because PetSmart had $0.3 billion in cash, the implied enterprise value of PetSmart was $6.3 billion. (The implied value of PetSmart's equity, another component of enterprise value, was $0.)  The

excess of liabilities ($8.7 billion) over assets ($6.3 billion) is the measure of insolvency ($2.3 billion, with a negligible discrepancy due to rounding).

| *($ in millions)* | Face Value | × | Market Price | = | Market Value |
|---|---|---|---|---|---|
| Term Loan | $4,182 | | 77.9% | | $3,257 |
| Secured 2025 Notes | $1,350 | | 68.9% | | $930 |
| Capital Leases | $626 | | (n/a) | | $626 |
| Unsecured 2023 Notes | $1,900 | | 48.7% | | $926 |
| Unsecured 2025 Notes | $650 | | 47.7% | | $310 |
| Total | $8,708 | | | | $6,049 |

### PetSmart Transfers 36.5% Of Chewy Away From PetSmart's Creditors, In A Sham Process Shrouded In Secrecy

50.    On June 4, 2018, in announcing its first-quarter earnings, PetSmart reported that Chewy was responsible for nearly all of PetSmart's first-quarter net sales growth.  *See* Alexandra Scaggs, *PetSmart Gives Shares of Its Growth Engine to PE Sponsor*, Financial Times Alphaville, June 5, 2018.  Then, in the next breath, PetSmart announced that it had, three days earlier, transferred more than one third of Chewy's value away from PetSmart's creditors.  The actions through which PetSmart transferred Chewy's equity—the Transactions—had no legitimate business purpose.  Rather, the Transactions were intended to—and did—move PetSmart's assets out of the reach of its creditors.  Unsurprisingly, the Transactions occurred with PetSmart under the continued leadership of BC Partners' co-chairman, Svider.

51.    The first of the Transactions, the Dividend, was an outright value grab by the BC Partners Consortium.  Despite Chewy's critical role in ensuring PetSmart's survival, PetSmart gave away 20% of the stock of Chewy.  The Dividend sent that stock from PetSmart to Holdings, then from Holdings to its parent (Argos Intermediate Holdco III Inc.), then from that entity to its new, wholly owned subsidiary, Buddy Holdings Corp.  All of these entities are controlled by the BC Partners Consortium.  According to PetSmart, this 20% of Chewy equity was worth $908.5 million.  It is no coincidence that the value of this equity is close to $1 billion—the amount that

the BC Partners Consortium contributed to the Chewy acquisition.  A year and a day after PetSmart acquired Chewy, at a time when PetSmart and Chewy were (and still are) struggling, the BC Partners Consortium reimbursed itself for its $1 billion infusion for the purchase of Chewy.  On top of the value transfer, the Dividend sought to end Chewy's status as a wholly owned subsidiary of PetSmart.  That meant that the Dividend would release the guarantee provided by Chewy to the Lenders and release the Lenders' lien on Chewy's assets.

52.    The second of the Transactions, the Drop-Down, was effected at the same time. Like the Dividend, the Drop-Down put a chunk of Chewy equity outside of the reach of PetSmart's creditors.  But, whereas the Dividend sent Chewy equity up the corporate chain, the Drop-Down sent equity down the chain.  Specifically, in the Drop-Down, PetSmart transferred 16.5% of the stock of Chewy to Buddy Chester Corp., a wholly owned Unrestricted Subsidiary of PetSmart, which in turn transferred the stock to its wholly owned subsidiary, Buddy Chester Sub Corp.  The essential feature of an Unrestricted Subsidiary is that its assets are not subject to the security claims and other restrictions imposed by PetSmart's existing credit facilities. Accordingly, the manifest purpose of the Drop-Down was to insulate 16.5% of Chewy's value from PetSmart's creditors.

53.    The Complaint dated June 26, 2018 (the "Complaint") claims that the Transactions (that is, the Dividend and the Drop-Down) were the brainchild of independent committees constituted of "disinterested" directors without the undue influence of the BC Partners Consortium.  Complaint ¶¶ 6, 23-27, 29-31.  But the Complaint's own timeline, in addition to the limited information received by the Agent to date, tells a fundamentally different story: a hurried process in which hastily constituted committees—comprising newly appointed directors—rubber stamped the Transactions.  Indeed, the limited information made available to

the Agent strongly suggests that the Transactions were developed by the BC Partners

Consortium, for its benefit. The BC Partners Consortium then constructed a process around the

Transactions to create the false appearance of fairness.

54.    PetSmart's proffered timeline tells the story:

(a)    On April 21, 2018, the Board retained a financial advisor in connection

with the Transactions.

(b)    On May 1—at which point the Board's financial advisor had been at work

justifying the Transactions for a week and a half—two purportedly

disinterested directors (Keglevic and Kravitz) were added to the PetSmart

Board, and two purportedly disinterested directors (Vogel and Froelich)

were added to the Holdings Board.

(c)    On May 14, Keglevic and Kravitz retained their own financial advisor.

Four days later, Vogel and Froelich retained their own financial advisor.

(d)    On May 25, a Special Committee of the PetSmart Board was formed,

comprising Keglevic and Kravitz. The same day, a Special Committee of

the Holdings Board was formed, comprising Vogel and Froelich. On

information and belief, neither Special Committee considered any

alternative to the Transactions.

(e)    On June 1, both week-old Special Committees, followed by both Boards,

approved the Transactions.

55.    PetSmart, a traditional brick-and-mortar business, and Chewy, a fast-growing but

unprofitable online retailer, are extraordinarily complex businesses in their own rights, let alone

when combined into a single enterprise. It defies credulity to say that the independent directors,

who are alleged not to have had any prior connection to PetSmart or Chewy, became sufficiently knowledgeable about the businesses within one month after showing up—and less than two weeks after retaining advisors—to exercise informed judgment and determine that the Transactions were in the best interests of PetSmart and Holdings.  To the contrary, the committees did not exercise the independence or apply the rigor required to review and approve the Transactions.  They rubber stamped what the BC Partners Consortium wanted.

56.     As a consequence of the Transactions, Chewy is no longer a wholly owned subsidiary of PetSmart.  And, because Chewy is no longer a wholly owned subsidiary, PetSmart contends that the Transactions resulted in the release of Chewy's guarantee of the obligations under the Term Loan and the release of the liens on Chewy's assets securing those obligations, and thus also a release of Chewy's guarantee under the Unsecured 2023 Notes and the Chewy Notes.  In light of this weakening of creditor protections, the Transactions prompted S&P to downgrade PetSmart still further, to CCC.

57.     Promptly after announcement of the Transactions, the Agent sought additional information from PetSmart, given PetSmart's articulated view that the Transactions put significant assets out of the reach of its creditors.  The Credit Agreement provides the Agent with that right.  Specifically, Section 5.01(g) provides:

> [PetSmart] will furnish to the Administrative Agent, on behalf of each Lender . . . reasonably promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of [PetSmart] or any Restricted Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request in writing.

Notwithstanding diligent and repeated efforts, the Agent's requests for information about the "operations, business affairs and financial condition" of PetSmart remain unsatisfied in critical respects.

**The Dividend Violates The Fixed Charge Coverage Ratio Requirement In The Indentures**

58.    To be able to effectuate the Dividend, PetSmart must have had a ratio of consolidated EBITDA to "fixed charges" of at least 2.0 to 1.0.  This Fixed Charge Coverage Ratio (FCCR) requirement is no mere technicality; it is an important protection for creditors.  It prevents loss of value at a time when PetSmart's financial condition is precarious.

59.    As demonstrated below, PetSmart claimed that the Transactions complied with the FCCR requirement by manufacturing a consolidated EBITDA number based in significant part on projected, unrealized synergies and cost-savings that were wildly out of proportion to reality (and to historical savings).  Even with these unreasonable projections, PetSmart's stated EBITDA exceeds the required ratio by just a hair, at a ratio of merely 2.015 to 1.  To frame that narrow margin differently, if just *$7.3 million* of PetSmart's highly suspect Consolidated EBITDA figure of $972.6 million lacks support, as appears to be the case, then the Dividend violated the FCCR requirement.  This leaves a 0.7% margin of error in PetSmart's own calculations.

60.    The FCCR requirement is set forth in the Unsecured 2023 Notes Indenture, the Secured 2025 Notes Indenture, and the Unsecured 2025 Notes Indenture (collectively, the "Indentures").  The requirement is imported into the Credit Agreement by virtue of that agreement's cross-default provision, Section 7.01(g), as explained below.

61.    Section 4.07 of each Indenture generally bars PetSmart from making "Restricted Payments," a term defined to encompass the Dividend.  However, Section 4.07 allows PetSmart to make Restricted Payments to the extent that they fit into certain "baskets," which are limited exceptions to the general rule.  To pay the Dividend, PetSmart had no choice but to use the "basket" laid out in Section 4.07(a)(3) of the Indentures.

62. The Indentures allowed PetSmart to use the "basket" in Section 4.07(a)(3) only if PetSmart satisfied Section 4.07(a)(2), which contains the FCCR requirement.

63. To satisfy the FCCR requirement, PetSmart must, "immediately after giving effect to [the proposed dividend, such as the Dividend] on a pro forma basis," have a Fixed Charge Coverage Ratio of 2.0 to 1.0. (Two of the Indentures allow PetSmart to circumvent this requirement if it had a sufficiently low "Consolidated Total Debt Ratio." That is not at issue here because PetSmart does not and cannot claim to fit under the threshold.) The Fixed Charge Coverage Ratio, in turn, is defined as the ratio of Consolidated EBITDA to "Fixed Charges," which basically means debt-payment obligations. Put simply, the Fixed Charge Coverage Ratio is a measure of PetSmart's financial health and its ability to pay its debts. The higher the ratio, the more financially healthy and less risky PetSmart is. Conversely, the lower the ratio, the more financially distressed PetSmart is, suggesting difficulty in meeting its interest expenses.

64. PetSmart has claimed that its FCCR at the time of the Dividend was 2.015 to 1.0. That assertion is based on a Consolidated EBITDA for the applicable time period of $972.6 million and "Fixed Charges" for the applicable time period of $482.7 million. Had PetSmart's Consolidated EBITDA fallen below $965.4 million (i.e., twice the amount of Fixed Charges), its FCCR would have been below the required 2-to-1 ratio. Thus, by PetSmart's calculation, it cleared the FCCR hurdle by a mere $7.3 million ($972.6 million minus $965.4 million, with a negligible discrepancy due to rounding).

65. On information and belief, PetSmart's FCCR at the time of the Dividend was below 2.0 to 1.0 because its Consolidated EBITDA was in fact well below $965.4 million. That is principally because some fifteen percent of PetSmart's claimed Consolidated EBITDA—$148

million out of $972.6 million—is attributed to improperly claimed "cost savings" and "synergies" purportedly arising from PetSmart's acquisition of Chewy.

66.     To be sure, the Indentures permit PetSmart to count certain unrealized cost savings and synergies arising from the Chewy acquisition when calculating Consolidated EBITDA—but there are two significant conditions.  First, PetSmart must expect that it will realize those cost savings and synergies within 24 months of the acquisition.  Here, that means that PetSmart must realize those savings and synergies by May 31, 2019.  Second, the cost savings and synergies must be "factually supportable" and "reasonably quantifiable" (or "reasonably identifiable").

67.     PetSmart's $148 million number does not plausibly meet either condition.  First, under the terms of the Indentures, the FCCR calculation for the Dividend was performed as of January 31, 2018.  Thus, PetSmart claimed that it will realize $148 million of cost savings and synergies between that date and May 31, 2019, a period of sixteen months.  Yet, in the eight months between the Chewy acquisition (on May 31, 2017) and the calculation (on January 31, 2018), PetSmart actually recognized only $17 million in cost savings and synergies.  Thus, to hit its $148 million projection, PetSmart would need to more than quadruple the rate at which it is achieving cost savings and synergies.  Common sense and recent experience show that it will come nowhere close.  When PetSmart acquired Chewy, it told investors that it would realize $204 million of cost savings and synergies in just the first twelve months.  To repeat, by month eight, it had achieved only $17 million of cost savings and synergies.  PetSmart's projections on this subject are thus demonstrably inaccurate.

68.     Second, PetSmart has provided neither facts nor reasonable numbers to back up its $148 million estimate.  Despite repeated requests for detail, PetSmart has provided only high-

level and unexplained subcategories for the $148 million number. PetSmart also has not

provided the Agent with any serious description explaining how PetSmart expected to realize the

$148 million in cost savings and synergies.

69.     Returning to the FCCR requirement, PetSmart would fail to have satisfied that

requirement if, at the time of the Dividend, its Consolidated EBITDA number were a mere $7.3

million lower than claimed. As just explained, there is already ample evidence that PetSmart's

reported $148 million of cost savings and synergies, which is part of its claimed Consolidated

EBITDA, was *at least* $7.3 million too high.

70.     Even if the $148 million figure were correct, a number of "add backs"

(adjustments made by management to earnings for one-off items) in the fourth quarter of fiscal

year 2017 are suspicious. This is still further evidence that the actual Consolidated EBITDA was

at least $7.3 million lower than reported.

71.     Therefore, on information and belief, PetSmart did not satisfy the FCCR

requirement at the time of the Dividend. As a result, the Dividend violated Section 4.07 of the

Indentures because the Dividend could not use the "basket" provided in Section 4.07(a)(3).

72.     This violation of the FCCR requirement authorized holders of the notes governed

by the Indentures to accelerate the principal due on those notes. Section 6.01(a)(3) of each

Indenture provides that the principal may be accelerated upon:

> failure by [PetSmart] for 60 days after receipt of written notice given by the Trustee
> or the Holders of not less than 30% in principal amount of the Notes then
> outstanding [under the applicable indenture] (with a copy to the Trustee) to comply
> with any of its obligations, covenants or agreements (other than a default referred
> to in clauses (1) or (2) above) contained in this Indenture or the Notes.

73.     Due to the noteholders' ability to accelerate the principal due under the

Indentures, the violation of the FCCR requirement triggered an Event of Default under the Credit

Agreement.  That is because the notes governed by each Indenture constitute "Material

Indebtedness" within the meaning of the Credit Agreement, and an Event of Default under the

Credit Agreement is triggered under Section 7.01(g) thereof when:

> any event or condition occurs . . . that enables or permits (with all applicable grace
> periods having expired) the holder or holders of any Material Indebtedness or any
> trustee or agent on its or their behalf to cause any Material Indebtedness to become
> due, or to require the prepayment, repurchase, redemption or defeasance thereof,
> prior to its scheduled maturity.

74.    Under this provision, an Event of Default occurs under the Credit Agreement if

the Indentures would permit holders (upon expiration of applicable grace periods) to accelerate

their debt; it is explicitly not necessary for holders under any Indenture to actually accelerate.

75.    Under Sections 5.02(a) and 7.01(d) of the Credit Agreement, an Event of Default

occurs if PetSmart fails to disclose to the Agent the existence of a Default.  By failing to provide

notice of the Default created by the breach of the Indentures as a result of the failure to satisfy

the FCCR requirement, an immediate Event of Default occurred under the Credit Agreement.

76.    The Event of Default triggered by the Dividend's violation of the FCCR

requirement rendered the Drop-Down impermissible under the Credit Agreement.  According to

PetSmart's Complaint, the Drop-Down was authorized in part by Section 6.04(n)(B) of the

Credit Agreement.  However, Section 6.04(n)(B) could authorize the Drop-Down only if, in

relevant part, "no Event of Default ha[d] occurred or [wa]s continuing."  This condition was not

satisfied because the Dividend triggered an Event of Default.

77.    For the foregoing reasons, the releases sought to be effected by the Transactions

did not occur.  Section 9.15 of the Credit Agreement gives rise to releases upon certain

transactions permitted by the Credit Agreement.  This provision is inapplicable to the Dividend

and the Drop-Down because, as demonstrated, neither Transaction was permitted by the Credit

Agreement.

## PetSmart Lacked Sufficient Capacity Under The Chewy Indentures
## To Effectuate The Drop-Down

78.    Like the Dividend, the Drop-Down violated the Indentures, which triggered an

Event of Default under the Credit Agreement.

79.    Upon information and belief, PetSmart moved 16.5% of Chewy stock to Buddy

Chester Corp. by relying on an "Investment in a Similar Business" basket under the Chewy

Indentures.  More particularly, the definition of "Permitted Investments" allows an "Investment

[] in a Similar Business having an aggregate fair market value . . . not to exceed at the time of

such Investment the greater of (x) $300.0 million and (y) 30.0% of Consolidated EBITDA of

[PetSmart] for the Applicable Measurement Period."  The definition of "Similar Business" under

the Chewy Indentures is "any business conducted or proposed to be conducted by the Issuer and

its Restricted Subsidiaries on the Issue Date or any business that is similar, complementary,

reasonably related, synergistic, incidental or ancillary thereto, or is a reasonable extension,

development or expansion thereof."

80.    But here, the "investment" was in Buddy Chester Corp., an empty shell with no

operational assets or involvement in the actual business.  The only relevant feature of Buddy

Chester Corp. upon its creation was that it was an Unrestricted Subsidiary and thus outside the

group of entities subject to the Credit Agreement.  Indeed, Buddy Chester Corp. and its

subsidiary, Buddy Chester Sub Corp., play no role whatsoever in operating the business of

PetSmart or some related line of business.  These entities were simply vessels to hold the 16.5%

interest in Chewy.

81.     Thus, the function of Buddy Chester Corp., the recipient of the "investment," was not to operate a Similar Business but to divert the value of the transferred Chewy equity and strip the liens and guarantees encumbering Chewy to the detriment of the Lenders.  The Drop-Down was undertaken, therefore, not to further a legitimate business purpose, but to hinder PetSmart's creditors by stripping away value, liens, and guarantees, and diverting value from PetSmart for the benefit of the BC Partners Consortium.

82.     Because the use of the basket was prohibited, PetSmart lacked the capacity to make the transfer of 16.5% of Chewy's stock to Buddy Chester Corp.  As a result, PetSmart violated Section 4.07 of the Indentures and triggered an Event of Default under the Credit Agreement.

## PetSmart Was, And Still Is, Insolvent

83.     A company is insolvent if its liabilities exceed its assets.  Under this standard, upon information and belief, PetSmart was insolvent at the time of the Transactions and remains insolvent today.

84.     Both of PetSmart's retail channels pose problems.  On the one hand, PetSmart's brick-and-mortar pet stores are profitable, but the revenue and market share of brick-and-mortar pet stores is declining.  The combined revenues of such stores fell at a 2.3% annualized rate from 2016 to 2018, according to market-research firm Euromonitor, despite growth in the pet market overall.  On the other hand, Chewy's market space, online pet stores, is growing.  But, despite considerable revenue and market penetration, Chewy has been unable to turn a profit.  To compete with Amazon and other online retailers, Chewy must maintain rock-bottom prices.

85.     The trading prices of PetSmart's debt furnish strong evidence that PetSmart was insolvent.  PetSmart's total net debt is $8.473 billion, so, in order to be solvent, PetSmart as an

enterprise must be worth more than that. The market, per the trading prices of the debt, does not believe that the value of the company exceeds its debt. That a company's bonds are trading at a discount to par (100 cents) is a "useful, though not exclusive, indicator of insolvency." *E.g.*, *In re Williams Commc'ns Group, Inc.*, 281 B.R. 216, 221 (Bankr. S.D.N.Y. 2002). At the time of the Transactions, the Term Loan was trading in the upper 70s, the secured debt in the upper 60s, and the unsecured notes in the upper 40s. These steeply discounted debt trading prices indicate that PetSmart was (and still is) insolvent by $2.3 billion.

86.     Further evidence of insolvency is provided by the "EBITDA multiple" of a comparable company. Companies operating in the same industry often have similar ratios of enterprise value to EBITDA. According to PetSmart itself, the business most comparable to PetSmart (excluding Chewy) is Petco, also a brick-and-mortar pet-supplies retailer. *See In re PetSmart, Inc.*, No. 10782-VCS, 2017 WL 2303599, at *3, *17 (Del. Ch. May 26, 2017). Petco has seen declining operating performance in response to an increasingly competitive environment, just like PetSmart has. Petco's first lien debt trades at 74, which implies that its enterprise value is approximately 3.7 times its EBITDA. If the same ratio holds for the brick-and-mortar operations of PetSmart, and even assuming that PetSmart correctly values Chewy at $4.45 billion (*see* Complaint ¶ 28), then PetSmart's enterprise value including Chewy would fall well short of its $8.473 billion debt load.

87.     PetSmart has claimed that it is solvent based on its management projections and opinions derived from them. But those projections are suspect for at least three reasons. First, management at the time of the Transactions was led by BC Partners' Svider, who served as Executive Chairman. Upon information and belief, the motive underlying these unrealistically

optimistic projections was to give PetSmart the appearance of solvency, and thereby to secure valuation and solvency opinions so that BC Partners could pull Chewy equity out of PetSmart.

88.     Second, the projections assume that PetSmart and Chewy will increase their collective market share.  But such an assumption makes no sense.  PetSmart faces increased competition from large general retailers and supermarkets.  Chewy faces competition from Amazon's own pet product brand, whose announcement by Amazon drove PetSmart's debt prices to new lows in May 2018.  Realistically, there is not room for market share growth; just keeping their current market share is a tall task.  But the projections assume that the brick-and-mortar business will grow even though the brick-and-mortar segment overall is shrinking.  Indeed, PetSmart's brick-and-mortar business has been falling short of its budget for the last two fiscal years.  In fiscal year 2017, PetSmart's brick-and-mortar business was 15.5% below its EBITDA budget.  Chewy, for its part, projects that its revenue will account for nearly two-thirds of the entire online pet store market by 2022 as forecast by Euromonitor, despite the increasing competition Chewy faces.

89.     Third, the projections treat PetSmart and Chewy as wholly separate, yet both businesses to some extent operate in the same industry and compete with each other.  Given the well-documented shift from brick-and-mortar retail to online across industries, Chewy very likely is cannibalizing some of PetSmart's customers.  But Chewy's predictions assume near-perfect symbiosis and growth in spite of the near-certain headwinds facing traditional retailers.  As a result, these projections by management inflate the value of the enterprise.

90.     PetSmart has consistently refused the Agent's requests for information about the relationship between Chewy and brick-and-mortar PetSmart.  For instance, PetSmart has provided no details about the allocation of overhead between Chewy and PetSmart, or about any

intercompany transfers between Chewy and PetSmart.  Without any verifiable and specific information regarding the metrics behind Chewy's valuation, its value may be even lower, requiring a still higher valuation of PetSmart's brick-and-mortar business to imply solvency, which is even more implausible.

91.     Because PetSmart was insolvent both before and after the Dividend, the Dividend constituted a fraudulent conveyance.  Moreover, because neither PetSmart nor Holdings is authorized by applicable law to pay a dividend while insolvent, the Dividend was unlawful.

## PetSmart Is Violating The Affiliate Transactions Covenant

92.     The objective of PetSmart's maneuvering is to move the equity in Chewy away from PetSmart's creditors, while simultaneously concentrating enterprise value in Chewy.  That double-whammy violates the Credit Agreement's express prohibition on using corporate affiliates to engage in deals that do not reflect true arm's-length terms.

93.     Section 6.09 of the Credit Agreement is crystal clear:  PetSmart may not "transfer any property or assets to . . . or otherwise engage in any other transactions with" its corporate affiliates.  There are certain exceptions to this covenant, including exceptions for "transactions with . . . any Restricted Subsidiary" and transactions "on terms substantially as favorable to [PetSmart] as would be obtainable by [PetSmart] at the time in a comparable arm's-length transaction with a Person other than an Affiliate."

94.     "Affiliate" is defined in Section 1.01 to mean "with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified."  Buddy Chester Corp. and Buddy Chester Sub Corp. are wholly owned by PetSmart, and are therefore indisputably Affiliates of PetSmart.

95.     PetSmart, however, sent 16.5% of the equity in Chewy to the Buddy Chester entities (the stock of which PetSmart already owned), plus 20% of the equity in Chewy to other

Affiliates, and has operated Chewy on terms that drive value to Chewy and away from PetSmart. For example, PetSmart has acknowledged shutting down web portals associated with PetSmart (Pet360.com and PetFoodDirect.com) and "[t]ransition[ing]" away from PetSmart.com so that users of those websites move to Chewy.com. PetSmart is also moving various categories of Chewy's "corporate overhead" to PetSmart.

96.     In short, the plan appears to be to move value from PetSmart to Chewy, at the same time as PetSmart moves equity in Chewy to corporate affiliates. Were PetSmart to propose such an arrangement to true third parties—to offer those third parties, in effect, both equity in Chewy and transactions designed to increase Chewy's value at the expense of PetSmart—it would have commanded a substantial premium. It received no such premium here and therefore has violated Section 6.09 of the Credit Agreement. Upon information and belief, PetSmart may well be engaged in further dealings that prefer Chewy at the expense of PetSmart.

**The Drop-Down Violated The Collateral Agreement Because It Prejudiced Lenders' Rights And Remedies**

97.     The Drop-Down put a big piece of collateral—$749.5 million worth, by PetSmart's valuation of the Chewy stock involved—beyond the reach of the Lenders. The Drop-Down therefore undermined the Lenders' rights to seize their collateral if needed to secure payment. This rendered the Drop-Down impermissible under the Collateral Agreement and, consequently, the Credit Agreement.

98.     Under the Collateral Agreement, the Agent and the Lenders were granted a lien and security interest in certain of PetSmart's property, including its Chewy stock. The Collateral Agreement authorizes the parties with a security interest to foreclose on, and exercise remedies against, the pledged Chewy stock.

99.     The Collateral Agreement forbids PetSmart from using its rights as an owner of Chewy stock to undermine the rights of the secured creditors.  Specifically, Section 2.06(a) of the Collateral Agreement provides that PetSmart "shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Securities," which includes Chewy stock, "provided that such rights and powers shall not be exercised in any manner that could materially and adversely affect . . . the rights and remedies of any of the Collateral Agent or the other Secured Parties under this Agreement or any other Loan Document or the ability of the Secured Parties to exercise the same."

100.     The Drop-Down was an exercise of the consensual rights PetSmart had (specifically, the right to transfer ownership) as an owner of the Chewy stock.  That is because, in the Drop-Down, PetSmart transferred 16.5% of Chewy's stock to Buddy Chester Corp.

101.     Therefore, the Drop-Down violated Section 2.06(a) of the Collateral Agreement if this transfer of stock ownership "could materially and adversely affect" the "rights and remedies" of the secured creditors, or those creditors' ability to exercise those rights.

102.     That is precisely what the Drop-Down did.  Before the Drop-Down, the Agent had a lien on all of the Chewy stock owned by PetSmart and had the right to exercise remedies against that Chewy stock, including the 16.5% thereof involved in the Drop-Down, if PetSmart failed to pay its debts.  After the Drop-Down, that right was worth less—some $749.5 million less, by PetSmart's own numbers—because the Lenders no longer had a lien on and could no longer exercise remedies against the Chewy stock given to Buddy Chester Corp.  Of course, the secured creditors still maintained a lien on the Chewy stock that PetSmart kept.  But that is not the issue.  The issue is whether the Drop-Down "could materially and adversely affect" creditors' rights.  And it certainly could.  If PetSmart defaults on payment of the Term Loan,

then the stock that the Drop-Down spirited away could make the difference between full recovery and drastically lower recovery for the Lenders.

103.    Indeed, the Drop-Down served no purpose other than to prejudice the rights of secured creditors.  PetSmart still owns and controls the 16.5% of Chewy stock now held by Buddy Chester Sub Corp.  Neither Buddy Chester Sub Corp. nor Buddy Chester Corp. does anything whatsoever beyond holding this stock.  They are legal fictions, created and existing for the sole purpose of trying to evade binding contracts.

104.    Consequently, the Drop-Down violated Section 2.06(a) of the Collateral Agreement.

105.    This violation of the Collateral Agreement triggered an Event of Default under the Credit Agreement.  Under Section 7.01(*l*) of the Credit Agreement, an Event of Default occurs if PetSmart asserts that a lien on a material portion of the collateral has ceased to be valid, except (in relevant part) "as a result of the sale or other disposition of the applicable Collateral to a Person that is not a Loan Party in a transaction permitted under the Loan Documents."  This provision applies to the Drop-Down because Buddy Chester Corp. is a "Person that is not a Loan Party," and the Drop-Down was forbidden by the Collateral Agreement, which is a Loan Document.  Separately, and in addition, the Drop-Down's violation of the Collateral Agreement triggered a default under Section 7.01(e) of the Credit Agreement, which matures into an Event of Default if unremedied for 30 days after notice by the Agent.

106.    Because the Drop-Down triggered an Event of Default under the Credit Agreement, the Agent is not bound by Section 9.15 of the Credit Agreement to release the liens on the Chewy stock transferred to Buddy Chester Corp. in the Drop-Down.

**PetSmart Conceals Details About The Transactions**

107.    While the Agent now has obtained some information from PetSmart pursuant to the express terms of the Credit Agreement, obtaining that information has been a struggle, to say the least.  The provided information remains incomplete, indicating that PetSmart seeks to shield from disclosure information that tends to contradict the faulty premises on which the Transactions rest.

108.    On June 6, 2018, the Agent sent a detailed request for information to PetSmart, all of which fell squarely within the scope of Section 5.01(g) of the Credit Agreement.  As noted above, that provision requires PetSmart to provide the Agent "information regarding the operations, business affairs and financial condition of" PetSmart, or information about PetSmart's "compliance with the terms of any Loan Document."

109.    PetSmart provided a response on June 11, 2018 (the "Initial Response") that did not come close to adequately responding to the substance of the requests.  In its Initial Response, PetSmart refused to provide some of even the most basic information that would allow the Agent to evaluate PetSmart's claims that the Transactions did not violate the Credit Agreement.

110.    On June 22, 2018, PetSmart sent the Agent a letter claiming that the Initial Response provided all the information that was required under the Credit Agreement.  Despite this position, PetSmart provided additional responses to the Agent's initial requests (the "Second Response," together with the Initial Response, the "Responses").

111.    Despite these additional responses, however, the Second Response failed to answer the requests and failed to satisfy PetSmart's obligations under the Credit Agreement.  In particular, the Second Response omitted information such as detailed calculations of each of the add backs to the Consolidated Net Income and the firm affiliations of the legal and financial

31

advisors to the boards of directors and the companies. Of particular note, the list of PetSmart directors did not include anyone affiliated with BC Partners, despite the representation on the BC Partners website that three of its partners were on the PetSmart board.

112.    Rather than providing complete responses, PetSmart and Holdings initiated this action four days after the Second Response. The lawsuit sought declaratory and injunctive relief directing the Agent to take action on the premise that the Transactions were permissible, even though PetSmart had refused to provide the Agent with information sufficient to evaluate the accuracy of that premise.

113.    PetSmart's continued resistance to required disclosures constitutes a violation of Section 5.01(g) of the Credit Agreement. And it casts serious doubt on the validity of PetSmart's valuations for Chewy, its solvency analysis for PetSmart, and its compliance with covenants within the Credit Agreement and the Indentures.

### PetSmart Refuses To Pay The Attorney's Fees It Agreed To Pay

114.    When it sued the Agent instead of sharing information, PetSmart knew or should have known that it would have to pay the Agent's attorney's fees. Yet, months later, and despite the plain language of the Credit Agreement, PetSmart has refused to do so.

115.    Section 9.03(a) of the Credit Agreement provides, in relevant part, that PetSmart "shall pay":

> all reasonable and documented or invoiced out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of counsel for the Administrative Agent and the Lenders, in connection with the enforcement or protection of its rights in connection with the Loan Documents [which term includes the Credit Agreement and Collateral Agreement], including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans, provided that such counsel shall be limited to one lead counsel and one local counsel in each applicable

jurisdiction and, in the case of an actual or perceived conflict of interest, one additional counsel per affected party.

116.    Winnowed down, the Credit Agreement obligates PetSmart to pay "all reasonable and documented or invoiced out-of-pocket expenses incurred by the Administrative Agent," including the "fees, charges and disbursements of counsel for the Administrative Agent" "in connection with the enforcement or protection of its rights" under the Credit Agreement.

117.    Similarly, Section 9.03(b) of the Credit Agreement provides, in relevant part, that PetSmart "shall indemnify" the Agent against

> any and all . . . reasonable and documented or invoiced out-of-pocket fees and expenses of one counsel and one local counsel in each applicable jurisdiction . . . for [the Agent] . . . , incurred by or asserted against [the Agent] by any third party or by Holdings or any Subsidiary arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, . . . , or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Holdings or any Subsidiary and regardless of whether [the Agent] is a party thereto, <u>provided</u> that such indemnity shall not, as to [the Agent], be available to the extent that such losses, claims, damages, liabilities or related expenses . . . are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of, or a material breach of the Loan Documents by, [the Agent].

118.    Amounts due under Section 9.03 "shall be payable not later than 10 Business Days after written demand therefor."  Credit Agreement § 9.03(e).

119.    To defend its rights in this case, the Agent retained Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP ("Robbins Russell") as counsel, *nunc pro tunc* to July 1, 2018.

120.    Pursuant to Section 9.03, on August 23, 2018, the Agent sent PetSmart an invoice for the fees and expenses of Robbins Russell incurred through July 31, 2018.

121.    On September 17, 2018—more than ten business days later—PetSmart responded by refusing to pay any fees and disbursements incurred by the Agent whatsoever.

122.    PetSmart tried to justify its refusal on two grounds.  First, PetSmart claimed that, "[p]ursuant to Section 9.03 of the Credit Agreement, PetSmart is only obligated to pay 'reasonable and documented' fees of counsel."  In particular, PetSmart argued, the invoice "fail[ed] to provide sufficient documentation and detail to assess whether the requested fees are reasonable," such as "time detail to show what services were provided or by whom."

123.    Second, PetSmart asserted that fees incurred in connection with this case are not incurred "in connection with the enforcement or protection" of the rights of the Agent or the Lenders, as the Credit Agreement requires.  That is so, PetSmart wrote, because "PetSmart has complied with the Credit Agreement in all respects," so that "there are no material rights for the administrative agent or lenders to enforce or protect."

124.    Neither ground for PetSmart's refusal is solid.  First, the Credit Agreement does not require "reasonable and documented" fees.  Rather, it requires "reasonable and documented *or invoiced*" fees (emphasis added).  Whether or not the fees at issue were "documented," they assuredly were "invoiced."  They were recorded on an invoice from Robbins Russell to the Agent.  In any event, the fees were "documented," that is, established by documentary evidence.

125.    Second, the Credit Agreement nowhere entitles PetSmart to determine unilaterally that it has complied with its obligations thereunder.  To the contrary, in the Credit Agreement, PetSmart agreed to pay "all reasonable and documented or invoiced" attorney's fees of the Agent.  That provision covers the fees here, where PetSmart refused to provide documents showing that the challenged transactions were permissible and instead sued the Agent.  As the Agent's counterclaims demonstrate, those transactions were not permissible.  What is more, PetSmart submitted to the jurisdiction of this Court and agreed to cover the cost of the Agent's "enforcement or protection of its rights."  Those terms would be meaningless were PetSmart the

arbiter of its own conduct. It is for this Court, not PetSmart, to decide whether PetSmart has complied with the Credit Agreement. And, as these counterclaims show, PetSmart has not done so.

126.    The Agent's August 23 submission to PetSmart complied with the Credit Agreement. Nonetheless, in an effort to resolve the issue, on October 4, the Agent submitted to PetSmart further documentation for the July 2018 fees of Robbins Russell. This further documentation provided the firm's line-item hourly charges, with time-entry descriptions redacted to preserve privileged and confidential information. As of the date of these Second Amended Counterclaims, PetSmart has not responded to this further documentation.

127.    PetSmart has breached the Credit Agreement because it has failed to pay reasonable and documented or invoiced fees, charges, and disbursements of counsel for the Agent incurred in connection with the enforcement or protection of the Agent's rights under the Credit Agreement within ten business days after written demand therefor.

## FIRST COUNTERCLAIM FOR RELIEF
### (Against Holdings and PetSmart)

**Declaratory Judgment That The Transactions Violated The Indentures And Constitute An Event Of Default Under The Credit Agreement**

128.    The Agent repeats the prior allegations as if the same were made part of and fully set forth at length herein.

129.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

130.    The proper interpretation and application of the provisions of the Credit Agreement and Indentures to the case at hand, including whether there have been Defaults and Events of Default under the Credit Agreement, is a justiciable, present, and actual controversy between Counterclaim-Plaintiff the Agent and Counterclaim-Defendants Holdings and PetSmart.

131.    Under Section 7.01(g) of the Credit Agreement, any event or condition that results in the holders of any of PetSmart's Material Indebtedness having the right to cause such Material Indebtedness to become due prior to its scheduled maturity date constitutes an Event of Default under the Credit Agreement.  The Unsecured 2023 Notes, Secured 2025 Notes, and Unsecured 2025 Notes all fall within the definition of Material Indebtedness because they each represent debt obligations on behalf of PetSmart exceeding $100 million in principal amount.  Therefore, violations of an Indenture that result in a Default that would (upon expiration of applicable grace periods) give holders the ability to accelerate under that Indenture, whether or not that ability to accelerate is actually exercised, constitutes an Event of Default under the Credit Agreement.

132.    Section 4.07 of the Indentures prohibits PetSmart from using the "basket" defined in Section 4.07(a)(3) to declare a dividend on account of equity interests it owns (unless, unlike here, the equity interest that is the subject of the dividend is PetSmart stock) or to make "Restricted Investments" (defined as anything that is not a "Permitted Investment"), unless (i) there is no Event of Default; and (ii) the dividend payment complies with a FCCR greater than or equal to 2.0 to 1.0.

133.    PetSmart violated Section 4.07 of the Indentures by effecting the Dividend in reliance on the "basket" defined in Section 4.07(a)(3) because PetSmart did not satisfy the minimum FCCR level of 2.0 to 1.0.

134.    This violation constitutes a Default under the Indentures and therefore an Event of Default under Section 7.01(g) of the Credit Agreement.

135.    Moreover, PetSmart failed to provide the Agent notice of the aforementioned Default.  This failure of notice constitutes an Event of Default under Sections 5.02(a) and 7.01(d) of the Credit Agreement.

136.    Due to the Event of Default triggered by violation of the Indentures and failure to give notice, the Drop-Down was not authorized by Section 6.04(n)(B) of the Credit Agreement.

137.    By reason of the foregoing, both the Dividend and the Drop-Down should be avoided or rescinded.

## SECOND COUNTERCLAIM FOR RELIEF
### (Against Holdings and PetSmart)

**Declaratory Judgment That The Drop-Down Violated The Indentures And Constitutes An Event Of Default Under The Credit Agreement**

138.    The Agent repeats the prior allegations as if the same were made part of and fully set forth at length herein.

139.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

140.    The proper interpretation and application of the provisions of the Credit Agreement and Indentures to the case at hand, including whether there have been Defaults and Events of Default under the Credit Agreement, is a justiciable, present, and actual controversy between Counterclaim-Plaintiff the Agent and Counterclaim-Defendants Holdings and PetSmart.

141.    The Chewy Indentures authorize certain "Investments," as defined therein, that are Investments "in a Similar Business."

142.    The Drop-Down required use of the foregoing authorization of Investments. Thus, the Drop-Down was authorized by the Chewy Indentures only if its recipient, Buddy Chester Corp., constituted a "Similar Business" within the meaning of the Chewy Indentures.

143.    Buddy Chester Corp. was not a "Similar Business" within the meaning of the Chewy Indentures because it was not "similar, complementary, reasonably related, synergistic, incidental or ancillary" to the existing business of PetSmart, nor was it "a reasonable extension, development or expansion thereof."

144.    The Drop-Down therefore lacked authorization under the Chewy Indentures,

violating Section 4.07 of those Indentures.

145.    This violation constitutes a Default under the Chewy Indentures and therefore an

Event of Default under Section 7.01(g) of the Credit Agreement.

146.    Moreover, PetSmart failed to provide the Agent notice of the aforementioned

Default.  This failure of notice constitutes an Event of Default under Sections 5.02(a) and 7.01(d)

of the Credit Agreement.

147.    By reason of the foregoing, the Drop-Down should be avoided or rescinded.

## THIRD COUNTERCLAIM FOR RELIEF
**(Against Buddy Chester Corp., Buddy Chester Sub Corp., Holdings, Buddy Holdings Corp., and Argos Intermediate Holdco III Inc.)**

**Actual Fraudulent Conveyance Relating To The Transactions, Pursuant To Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1304(a), And/Or Arizona Uniform Fraudulent Transfer Act, A.R.S. § 44-1004(A), Or, In The Alternative, New York Debtor and Creditor Law § 276**

148.    The Agent repeats the prior allegations of these counterclaims as if the same were

made part of and fully set forth at length herein.

149.    The Lenders were creditors of PetSmart prior to the Transactions.

150.    The Transactions conveyed assets to Buddy Chester Corp., Buddy Chester Sub

Corp., Holdings, Buddy Holdings Corp., and Argos Intermediate Holdco III Inc. (together, the

"Recipients").  The Recipients were insiders of PetSmart.

151.    At the time of the Transactions, PetSmart was insolvent insofar as its debts were

greater than the fair salable value of its assets.

152.    The conveyances made by PetSmart to the Recipients pursuant to the

Transactions constituted intentional fraudulent conveyances that are voidable pursuant to the

Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1304(a), and/or the Arizona Uniform

Fraudulent Transfer Act, A.R.S. § 44-1004(A), or, in the alternative, New York Debtor and Creditor Law § 276.

153.    On information and belief, PetSmart intended to hinder, delay, or defraud its creditors by effecting the Transactions for the benefit of the BC Partners Consortium, an insider in control of PetSmart.

154.    PetSmart did so by consummating the Transactions for no legitimate purpose and by removing a significant portion of a significant asset, Chewy, from PetSmart in order to ensure that it was outside the reach of the creditors for the benefit of the BC Partners Consortium.

155.    The Transactions did not affect the control of the BC Partners Consortium over the property transferred in the Transactions.

156.    By reason of the foregoing, both the Dividend and the Drop-Down should be avoided or rescinded.

### FOURTH COUNTERCLAIM FOR RELIEF
**(Against Holdings, Buddy Holdings Corp., and Argos Intermediate Holdco III Inc.)**

**Constructive Fraudulent Conveyance Relating To The Dividend, Pursuant To Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1305, And/Or Arizona Uniform Fraudulent Transfer Act, A.R.S. § 44-1005, Or, In The Alternative, New York Debtor and Creditor Law § 273**

157.    The Agent repeats the prior allegations of these counterclaims as if the same were made part of and fully set forth at length herein.

158.    The Lenders were creditors of PetSmart prior to the Dividend.

159.    The Dividend conveyed assets to Holdings, Buddy Holdings Corp., and Argos Intermediate Holdco III Inc. (together, the "Dividend Recipients").

160.    At the time of the Dividend, PetSmart was insolvent insofar as its debts were greater than the fair salable value of its assets.

161.     The conveyances made by PetSmart to the Dividend Recipients pursuant to the Dividend constituted constructive fraudulent conveyances that are voidable pursuant to the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1305, and/or the Arizona Uniform Fraudulent Transfer Act, A.R.S. § 44-1005, or, in the alternative, New York Debtor and Creditor Law § 273.

162.     In the Dividend, PetSmart did not receive reasonably equivalent value or fair consideration at all and thus did not receive reasonably equivalent value or fair consideration in exchange for the conveyances made to the Dividend Recipients, all to the detriment of the insolvent PetSmart's creditors, who by the Dividend were, among other things, denied the guarantee of PetSmart's obligations by Chewy.

163.     Neither PetSmart nor the Dividend Recipients acted in good faith.  They all knew that PetSmart was insolvent at the time of the Dividend.

164.     By reason of the foregoing, the Dividend should be avoided or rescinded.

## FIFTH COUNTERCLAIM FOR RELIEF
### (Against Holdings and PetSmart)

**Declaratory Judgment That, Because The Transactions Were Fraudulent Conveyances, Liens Or Guarantees Need Not Be Released**

165.     The Agent repeats the prior allegations of these counterclaims as if the same were made part of and fully set forth at length herein.

166.     Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

167.     The proper interpretation and application of the provisions of the Credit Agreement to the case at hand, including whether there has been an Event of Default under the Credit Agreement, is a justiciable, present, and actual controversy between Counterclaim-Plaintiff the Agent and Counterclaim-Defendants Holdings and PetSmart.

168.    The Transactions were actual and/or constructive fraudulent conveyances.

169.    Effecting fraudulent conveyances the size of the Transactions violates Section 5.09 of the Credit Agreement, which provides, in relevant part, that each of Holdings and PetSmart will "comply with . . . all Requirements of Law with respect to it or its property . . . , except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect."

170.    The Transactions therefore were not permitted under the Credit Agreement.

171.    Section 9.15 of the Credit Agreement provides that liens and guarantees created by the Credit Agreement and related documents may be released only upon transactions that are permitted by the Credit Agreement.

172.    The Agent is not obligated to release the liens or guarantees purported to be released upon consummation of the Transactions.

## SIXTH COUNTERCLAIM FOR RELIEF
**(Against Alan M. Schnaid, Paulette R. Dodson, Paul Keglevic, Peter S. Kravitz, Scott D. Vogel, Cezar M. Froelich, Holdings, and Argos Intermediate Holdco III Inc.)**

### Illegal Dividend In Violation Of 8 Del. C. §§ 170, 173, and 174

173.    The Agent repeats the prior allegations as if the same were made part of and fully set forth at length herein.

174.    The Lenders are creditors of PetSmart.

175.    The Lenders and Agent are creditors of Holdings.  Under the Guarantee Agreement, an exhibit to the Credit Agreement, Holdings "guarantees . . . as a primary obligor and not merely as a surety, by way of an independent payment obligation, the due and punctual payment" of debts due under the Credit Agreement.  Moreover, Holdings' guarantee is "a Guarantee of payment when due . . . and not merely of collection," with no requirement that creditors exhaust their remedies against PetSmart.

176.    Alan M. Schnaid and Paulette R. Dodson were directors of both Holdings and PetSmart at the time of the Dividend and the Drop-Down.  Paul Keglevic and Peter S. Kravitz were directors of PetSmart at the time of the Dividend and the Drop-Down.  Scott D. Vogel and Cezar M. Froelich were directors of Holdings at the time of the Dividend and the Drop-Down.

177.    As alleged in more detail above, at all relevant times from at least May 2018 to the present, PetSmart was insolvent and lacked adequate surplus to pay the Dividend.

178.    Because PetSmart was insolvent, Holdings was insolvent.  Holdings agreed in the Credit Agreement that it would "not conduct, transact or otherwise engage in any business or operations other than . . . the ownership and/or acquisition of the Equity Interests of [PetSmart]." On information and belief, Holdings has complied with this covenant.  Holdings also had over $4 billion in liabilities due to its guarantee of the Credit Agreement debt, with no offsetting asset.

179.    In causing PetSmart to declare a dividend, the directors on PetSmart's board knew that PetSmart was insolvent and lacked adequate surplus, but the directors, nonetheless, willfully diverted value from PetSmart for the benefit of its equity owners, the BC Partners Consortium.

180.    In causing Holdings to declare a dividend, the directors on Holdings' board knew that Holdings was insolvent and lacked adequate surplus, but the directors willfully diverted value from Holdings to Argos Intermediate Holdco III Inc. for the benefit of its equity owner, the BC Partners Consortium.

181.    The Dividend was unlawful because it was made while PetSmart and Holdings were insolvent.

182.    Payment of the Dividend when PetSmart and Holdings were insolvent violated applicable law, including 8 Delaware Code §§ 170 and 173.

183.    Pursuant to 8 Delaware Code § 174, each of the PetSmart directors is jointly and severally liable to PetSmart for payment of an illegal dividend.

184.    Pursuant to 8 Delaware Code § 174, each of the Holdings directors is jointly and severally liable to Holdings for payment of an illegal dividend.

185.    The directors of Holdings knew that PetSmart was insolvent at the time of the receipt of the Dividend.  The directors of Argos Intermediate Holdco III Inc. also knew that PetSmart was insolvent at the time of the receipt of the Dividend.  As indirect parent, the BC Partners Consortium knew that PetSmart was insolvent at the time of the Dividend.

186.    Each of Holdings and Argos Intermediate Holdco III Inc. are jointly and severally liable to PetSmart for the knowing receipt of an illegal dividend.

187.    PetSmart and its creditors have been damaged as a proximate result of the illegal dividend paid by PetSmart.

188.    By reason of the foregoing, (i) the Dividend should be avoided and rescinded, and the Chewy equity transferred in the Dividend should be returned to PetSmart, and/or (ii) damages should be distributed pro rata to PetSmart's creditors in an amount equivalent to the value of the Dividend.

### SEVENTH COUNTERCLAIM FOR RELIEF
**(Against Holdings and PetSmart)**

**Declaratory Judgment That The Drop-Down And Subsequent Transactions Constitute An Event Of Default Under The Credit Agreement**

189.    The Agent repeats the prior allegations as if the same were made part of and fully set forth at length herein.

190.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

191.    The proper interpretation and application of the provisions of the Credit Agreement to the case at hand, including whether there has been an Event of Default under the Credit Agreement, is a justiciable, present, and actual controversy between Counterclaim-Plaintiff the Agent and Counterclaim-Defendants Holdings and PetSmart.

192.    Section 6.09 of the Credit Agreement generally prohibits transactions between PetSmart and "any of its Affiliates." Buddy Chester Corp., Buddy Chester Sub Corp., Holdings, Argos Intermediate Holdco III Inc., and Buddy Holdings Corp. are Affiliates within the meaning of the Credit Agreement.

193.    The Drop-Down was within the scope of Section 6.09 because it was a contribution of Chewy equity by PetSmart to Buddy Chester Corp. Buddy Chester Corp. subsequently contributed the same equity to Buddy Chester Sub Corp.

194.    Transactions following the Drop-Down between PetSmart and Chewy were, in substance, transactions between PetSmart, Buddy Holdings Corp., and Buddy Chester Sub Corp., insofar as Buddy Holdings Corp. owns 20% of the equity of Chewy and Buddy Chester Sub Corp. owns 16.5% of the equity of Chewy. Such transactions were within the scope of Section 6.09.

195.    The aforementioned transactions violated Section 6.09 unless they were "on terms substantially as favorable to [PetSmart] as would be obtainable by [PetSmart] at the time in a comparable arm's-length transaction with a Person other than an Affiliate." No other exception to the general rule of Section 6.09 applies to the aforementioned transactions.

196.    The aforementioned transactions were not on terms as favorable to PetSmart as would have been obtainable in comparable arm's-length transactions with a third party. Those transactions therefore violated Section 6.09 of the Credit Agreement.

197.    As a result, the aforementioned transactions triggered an Event of Default under Section 7.01(d) of the Credit Agreement.

## EIGHTH COUNTERCLAIM FOR RELIEF
### (Against Holdings and PetSmart)

**Declaratory Judgment That The Drop-Down Violated The Collateral Agreement And Constitutes An Event Of Default Under The Credit Agreement**

198.    The Agent repeats the prior allegations as if the same were made part of and fully set forth at length herein.

199.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

200.    The proper interpretation and application of the provisions of the Credit Agreement and Collateral Agreement to the case at hand, including whether there has been an Event of Default under the Credit Agreement, is a justiciable, present, and actual controversy between Counterclaim-Plaintiff the Agent and Counterclaim-Defendants Holdings and PetSmart.

201.    On June 1, 2018, PetSmart effected the Drop-Down, wherein it elected to exercise its rights and powers as an owner of Chewy stock to transfer 16.5% of the Chewy stock to Buddy Chester Corp., a wholly owned Unrestricted Subsidiary of PetSmart.

202.    PetSmart's ownership interest in Chewy remained unchanged as a result of the Drop-Down.

203.    However, PetSmart asserts that, as a result of the Drop-Down, the Agent must release its liens on the 16.5% of Chewy stock.

204.    The primary purpose of the Drop-Down was to remove the Agent's and Lenders' liens on 16.5% of Chewy's stock, which PetSmart alleges is worth $749.5 million, while keeping the ultimate ownership of Chewy unchanged.

205.    The Drop-Down could and does materially and adversely affect the rights and remedies of the Agent and Lenders by depriving them of their liens on 16.5% of Chewy's stock and depriving them of their right to exercise remedies against that stock upon an Event of Default under the Credit Agreement.

206.    The Drop-Down therefore violated Section 2.06 of the Collateral Agreement.

207.    As a result, the Drop-Down triggered an Event of Default under Sections 7.01(*l*) and 7.01(e) of the Credit Agreement.

208.    By reason of the foregoing, the Drop-Down should be avoided or rescinded.

## NINTH COUNTERCLAIM FOR RELIEF
### (Against Holdings and PetSmart)

**Breach Of The Credit Agreement For Failure To Pay Reasonable And Documented Or Invoiced Fees, Charges, And Disbursements Of Counsel**

209.    The Agent repeats the prior allegations as if the same were made part of and fully set forth at length herein.

210.    The Credit Agreement is a binding contract between Holdings, PetSmart, and the Agent.

211.    The Agent has fully performed its obligations under the Credit Agreement.

212.    In the Credit Agreement, PetSmart agreed to pay "all reasonable and documented or invoiced out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of counsel for the Administrative Agent and the Lenders, in connection with the enforcement or protection of its rights in connection with the Loan Documents."  Credit Agreement § 9.03(a).

213.    Separately, the Credit Agreement obligates PetSmart to indemnify the Agent against any "reasonable and documented or invoiced out-of-pocket fees and expenses" of counsel "incurred by" the Agent "arising out of, in connection with, or as a result of . . . the

performance by the parties to the Loan Documents of their respective obligations thereunder" or any litigation relating to that performance, provided that such indemnity "shall not . . . be available to the extent that" such fees and expenses "are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of, or a material breach of the Loan Documents by," the Agent. Credit Agreement § 9.03(b).

214.    PetSmart agreed that all amounts due under Section 9.03 of the Credit Agreement "shall be payable not later than 10 Business Days after written demand therefor."  Credit Agreement § 9.03(e).

215.    On August 23, 2018, the Agent submitted to PetSmart a request for payment of $132,864.65 under the foregoing provisions of the Credit Agreement.  This request complied with the terms of the Credit Agreement.

216.    On September 17, 2018, PetSmart refused to pay the amounts requested.  Neither the Credit Agreement nor any applicable law justified PetSmart's refusal to pay.

217.    The Credit Agreement obligates PetSmart to pay interest on the amount it has refused to pay.  Specifically, "if any principal of or interest on any Loan or any fee or other amount payable by [PetSmart] hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to . . . 2.00% per annum plus the rate applicable to Term Loans that are ABR Loans as provided in [Section 2.11(a)]."  Credit Agreement § 2.11(c).

218.    Holdings has, as a primary obligor and not merely as a surety, by way of an independent payment obligation, guaranteed the punctual payment of amounts due under the Credit Agreement.  This guarantee is unconditional.

219.    No court has determined that the Agent has acted with gross negligence, bad faith, or willful misconduct, or that the Agent has breached any contract.

220.    The Agent has been damaged by the refusal of Holdings and PetSmart to pay the amounts requested to be paid on August 23, 2018.

## PRAYER FOR RELIEF

WHEREFORE, the Agent on behalf of the Lenders requests that the Court grant the following relief:

A.    On the Agent's first counterclaim for relief, an order (i) declaring that PetSmart and Holdings breached the Credit Agreement, and any guarantee release in connection with the Transactions is null and void, (ii) declaring that an Event of Default has occurred and is continuing as a result of the Transactions, and (iii) any other relief the circumstances may require, including attorneys' fees and the costs of this action;

B.    On the Agent's second counterclaim for relief, an order (i) declaring that PetSmart and Holdings breached the Credit Agreement, and any guarantee release in connection with the Drop-Down is null and void, (ii) declaring that an Event of Default has occurred and is continuing as a result of the Drop-Down, and (iii) any other relief the circumstances may require, including attorneys' fees and the costs of this action;

C.    On the Agent's third counterclaim for relief, an order (i) declaring that the transfers to the Recipients constituted intentional fraudulent conveyances, (ii) granting avoidance of the Transactions, attachment, or any other necessary remedy against the transferred assets or their proceeds, (iii) levying execution on the transferred assets or their proceeds, (iv) granting injunctive relief preventing further dissipation of PetSmart's assets, and (v) any other relief the circumstances may require, including attorneys' fees and the costs of this action;

D.    On the Agent's fourth counterclaim for relief, an order (i) declaring that the transfers to the Dividend Recipients constituted constructive fraudulent conveyances, (ii) granting avoidance of the Dividend, attachment, or any other necessary remedy against the transferred assets or their proceeds, (iii) levying execution on the transferred assets or their proceeds, (iv) granting injunctive relief preventing further dissipation of PetSmart's assets, and (v) any other relief the circumstances may require, including attorneys' fees and the costs of this action;

E.    On the Agent's fifth counterclaim for relief, an order (i) declaring that the transfers to the Recipients constituted fraudulent conveyances, (ii) declaring that any guarantee release in connection with the Transactions is null and void, and

(iii) any other relief the circumstances may require, including attorneys' fees and the costs of this action;

F.      On the Agent's sixth counterclaim for relief, an order (i) declaring that the Dividend was illegal, (ii) returning the Dividend to PetSmart, (iii) awarding appropriate damages (including, without limitation, compensatory and/or rescissory damages, attorneys' fees, interest, and the costs of this action), and (iv) granting such further injunctive relief as may be necessary to return the wrongfully expropriated stock to PetSmart;

G.      On the Agent's seventh counterclaim for relief, an order (i) declaring that PetSmart and Holdings breached the Credit Agreement, and any guarantee release in connection with the Drop-Down is null and void, (ii) declaring that an Event of Default has occurred and is continuing as a result of the Drop-Down and subsequent transactions nominally between PetSmart and Chewy, and (iii) any other relief the circumstances may require, including attorneys' fees and the costs of this action;

H.      On the Agent's eighth counterclaim for relief, an order (i) declaring that PetSmart and Holdings breached the Collateral Agreement, and any guarantee release in connection with the Drop-Down is null and void, (ii) declaring that an Event of Default has occurred and is continuing as a result of the Drop-Down, and (iii) any other relief the circumstances may require, including attorneys' fees and the costs of this action;

I.      On the Agent's ninth counterclaim for relief, an order (i) declaring that PetSmart and Holdings have breached the Credit Agreement, and (ii) awarding to the Agent damages in the amount of $132,864.65, being the amount properly requested by the Agent under Section 9.03 of the Credit Agreement, plus interest as specified in the Credit Agreement;

J.      An order awarding reasonable attorneys' fees and costs incurred by the Agent in asserting these counterclaims; and

K.      An order granting such other and further relief as the Court may deem just and proper.

Dated: _____, 2018
       Washington, D.C.

Respectfully submitted.

_____
Mark T. Stancil (admitted *pro hac vice*)
Kathryn S. Zecca (admitted *pro hac vice*)
Rachel S. Li Wai Suen
Joshua S. Bolian
Lauren M. Cassady (admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
   UNTEREINER & SAUBER, LLP
1801 K Street, N.W., Suite 411
Washington, DC 20006
Telephone:  (202) 775-4500
Facsimile:  (202) 775-4510
Email:        mstancil@robbinsrussell.com
         kzecca@robbinsrussell.com
         rliwaisuen@robbinsrussell.com
         jbolian@robbinsrussell.com
         lcassady@robbinsrussell.com

*Counsel to Defendant and Counterclaim-Plaintiff Wilmington Trust, National Association, as Administrative Agent*

**<u>Exhibit A</u>**

(Credit Agreement)

*Execution Version*

CREDIT AGREEMENT

dated as of

March 11, 2015,

among

ARGOS HOLDINGS INC.,
as Holdings,

ARGOS MERGER SUB INC.,
(which on the Effective Date shall be merged with and into PETSMART, INC., with PETSMART, INC.
surviving such merger as the Borrower),
as the Borrower,

The Lenders Party Hereto,

CITIBANK, N.A.,
as Administrative Agent and the Collateral Agent,

BARCLAYS BANK PLC,
as Syndication Agent,

DEUTSCHE BANK SECURITIES INC., NOMURA SECURITIES INTERNATIONAL, INC. and
JEFFERIES FINANCE LLC,
as Co-Documentation Agents

and

NATIXIS, NEW YORK BRANCH
as Co-Manager

_____

CITIGROUP GLOBAL MARKETS INC., BARCLAYS BANK PLC, DEUTSCHE BANK
SECURITIES INC., NOMURA SECURITIES INTERNATIONAL, INC., JEFFERIES FINANCE LLC,
RBC CAPITAL MARKETS and MACQUARIE CAPITAL (USA) INC.,
as Lead Arrangers and Joint Bookrunners

TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS

SECTION 1.01  Defined Terms..................................................................................1
SECTION 1.02  Classification of Loans and Borrowings ...................................55
SECTION 1.03  Terms Generally.............................................................................55
SECTION 1.04  Accounting Terms; GAAP .........................................................55
SECTION 1.05  Effectuation of Transactions ......................................................56
SECTION 1.06  Currency Translation; Rates ......................................................56
SECTION 1.07  Limited Condition Acquisitions ................................................56

ARTICLE II

THE CREDITS

SECTION 2.01  Commitments...................................................................................58
SECTION 2.02  Loans and Borrowings ................................................................58
SECTION 2.03  Requests for Borrowings.............................................................58
SECTION 2.04  Funding of Borrowings ...............................................................59
SECTION 2.05  Interest Elections ..........................................................................59
SECTION 2.06  Termination and Reduction of Commitments..........................60
SECTION 2.07  Repayment of Loans; Evidence of Debt ...................................60
SECTION 2.08  Amortization of Loans .................................................................61
SECTION 2.09  Prepayment of Loans....................................................................61
SECTION 2.10  Fees ..................................................................................................69
SECTION 2.11  Interest..............................................................................................69
SECTION 2.12  Alternate Rate of Interest ...........................................................70
SECTION 2.13  Increased Costs..............................................................................71
SECTION 2.14  Break Funding Payments .............................................................72
SECTION 2.15  Taxes ................................................................................................72
SECTION 2.16  Payments Generally; Pro Rata Treatment; Sharing of Setoffs .................75
SECTION 2.17  Mitigation Obligations; Replacement of Lenders ....................76
SECTION 2.18  Increased Loans..............................................................................77
SECTION 2.19  Refinancing Amendments.............................................................79
SECTION 2.20  Defaulting Lenders ........................................................................80
SECTION 2.21  Illegality ..........................................................................................80
SECTION 2.22  Loan Modification Offers ............................................................81

ARTICLE III

REPRESENTATIONS AND WARRANTIES

SECTION 3.01  Organization; Powers...................................................................82
SECTION 3.02  Authorization; Enforceability......................................................82
SECTION 3.03  Governmental and Third-Party Approvals; No Conflicts ........82
SECTION 3.04  Financial Condition; No Material Adverse Effect ....................82

SECTION 3.05    Properties; Insurance ..................................................................... 83
SECTION 3.06    Litigation and Environmental Matters ................................................ 84
SECTION 3.07    Compliance with Laws and Agreements .............................................. 84
SECTION 3.08    Investment Company Status ............................................................. 84
SECTION 3.09    Taxes ........................................................................................... 84
SECTION 3.10    ERISA .......................................................................................... 84
SECTION 3.11    Disclosure ..................................................................................... 85
SECTION 3.12    Subsidiaries .................................................................................. 85
SECTION 3.13    Intellectual Property; Licenses, Etc. ................................................. 85
SECTION 3.14    Solvency ....................................................................................... 85
SECTION 3.15    Senior Indebtedness ....................................................................... 85
SECTION 3.16    Federal Reserve Regulations ........................................................... 85
SECTION 3.17    Use of Proceeds ............................................................................ 86
SECTION 3.18    PATRIOT Act, OFAC and FCPA ..................................................... 86

ARTICLE IV

CONDITIONS

SECTION 4.01    Effective Date................................................................................ 86

ARTICLE V

AFFIRMATIVE COVENANTS

SECTION 5.01    Financial Statements and Other Information......................................... 89
SECTION 5.02    Notices of Material Events ............................................................... 91
SECTION 5.03    Information Regarding Collateral ....................................................... 92
SECTION 5.04    Existence; Conduct of Business ........................................................ 92
SECTION 5.05    Payment of Taxes, etc. ................................................................... 92
SECTION 5.06    Maintenance of Properties................................................................ 92
SECTION 5.07    Insurance ...................................................................................... 92
SECTION 5.08    Books and Records; Inspection and Audit Rights.................................. 93
SECTION 5.09    Compliance with Laws .................................................................... 93
SECTION 5.10    Use of Proceeds ............................................................................ 93
SECTION 5.11    Additional Subsidiaries ................................................................... 94
SECTION 5.12    Further Assurances ........................................................................ 94
SECTION 5.13    Ratings ......................................................................................... 94
SECTION 5.14    Certain Post-Closing Obligations ...................................................... 94
SECTION 5.15    Designation of Subsidiaries .............................................................. 95
SECTION 5.16    Change in Business ........................................................................ 95
SECTION 5.17    Changes in Fiscal Periods ............................................................... 95
SECTION 5.18    Quarterly Lender Calls .................................................................... 95

ARTICLE VI

NEGATIVE COVENANTS

SECTION 6.01    Indebtedness; Certain Equity Securities............................................. 95
SECTION 6.02    Liens............................................................................................ 100
SECTION 6.03    Fundamental Changes .................................................................... 103

-ii-

SECTION 6.04    Investments, Loans, Advances, Guarantees and Acquisitions ............................... 104
SECTION 6.05    Asset Sales ..................................................................................................... 107
SECTION 6.06    Holdings Covenant ......................................................................................... 108
SECTION 6.07    Negative Pledge ............................................................................................. 109
SECTION 6.08    Restricted Payments; Certain Payments of Indebtedness...................................... 110
SECTION 6.09    Transactions with Affiliates ............................................................................. 114

## ARTICLE VII

## EVENTS OF DEFAULT

SECTION 7.01    Events of Default............................................................................................ 116
SECTION 7.02    Application of Proceeds .................................................................................. 118

## ARTICLE VIII

## THE ADMINISTRATIVE AGENT

## ARTICLE IX

## MISCELLANEOUS

SECTION 9.01    Notices .......................................................................................................... 122
SECTION 9.02    Waivers; Amendments .................................................................................... 123
SECTION 9.03    Expenses; Indemnity; Damage Waiver ............................................................. 126
SECTION 9.04    Successors and Assigns.................................................................................... 127
SECTION 9.05    Survival ......................................................................................................... 132
SECTION 9.06    Counterparts; Integration; Effectiveness ........................................................... 133
SECTION 9.07    Severability .................................................................................................... 133
SECTION 9.08    Right of Setoff ............................................................................................... 133
SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process ............................... 133
SECTION 9.10    WAIVER OF JURY TRIAL............................................................................. 134
SECTION 9.11    Headings........................................................................................................ 134
SECTION 9.12    Confidentiality................................................................................................ 134
SECTION 9.13    USA Patriot Act ............................................................................................. 135
SECTION 9.14    Judgment Currency ........................................................................................ 136
SECTION 9.15    Release of Liens and Guarantees ..................................................................... 136
SECTION 9.16    No Fiduciary Relationship .............................................................................. 136
SECTION 9.17    Effectiveness of the Mergers........................................................................... 137
SECTION 9.18    Interest Rate Limitation.................................................................................. 137

Error! Unknown document property name.
LEGAL_US_E # 113405763.8

ANNEXES

Annex I                    Amortization Table

SCHEDULES:

Schedule 1.01(a)    —    Excluded Subsidiaries
Schedule 2.01       —    Term Commitments
Schedule 3.12       —    Subsidiaries
Schedule 5.14       —    Certain Post-Closing Obligations
Schedule 6.01       —    Existing Indebtedness
Schedule 6.02       —    Existing Liens
Schedule 6.04(f)    —    Existing Investments
Schedule 6.07       —    Existing Restrictions
Schedule 6.09       —    Existing Affiliate Transactions

EXHIBITS:

Exhibit A      —    Form of Assignment and Assumption
Exhibit B      —    Form of Affiliated Lender Assignment and Assumption
Exhibit C      —    Form of Guarantee Agreement
Exhibit D      —    Form of Collateral Agreement
Exhibit E      —    Form of ABL Intercreditor Agreement
Exhibit F-1    —    Form of First Lien Intercreditor Agreement
Exhibit F-2    —    Form of Second Lien Intercreditor Agreement
Exhibit G      —    Form of Closing Certificate
Exhibit H      —    Form of Intercompany Note
Exhibit I      —    Form of Specified Discount Prepayment Notice
Exhibit J      —    Form of Specified Discount Prepayment Response
Exhibit K      —    Form of Discount Range Prepayment Notice
Exhibit L      —    Form of Discount Range Prepayment Offer
Exhibit M      —    Form of Solicited Discounted Prepayment Notice
Exhibit N      —    Form of Solicited Discounted Prepayment Offer
Exhibit O      —    Form of Acceptance and Prepayment Notice
Exhibit P-1    —    Form of U.S. Tax Compliance Certificate (For Non-U.S. Lenders That Are
                    Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit P-2    —    Form of U.S. Tax Compliance Certificate (For Non-U.S. Lenders That Are
                    Partnerships For U.S. Federal Income Tax Purposes)
Exhibit P-3    —    Form of U.S. Tax Compliance Certificate (For Non-U.S. Participants That
                    Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit P-4    —    Form of U.S. Tax Compliance Certificate (For Non-U.S. Participants That
                    Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit Q      —    Form of Mortgage

LEGAL_US_E # 113405763.8

CREDIT AGREEMENT dated as of March 11, 2015 (this "Agreement"), among ARGOS HOLDINGS INC., a Delaware corporation ("Initial Holdings"), ARGOS MERGER SUB INC., a Delaware corporation ("Merger Sub," which on the Effective Date shall be merged (the "Merger ) with and into PETSMART, INC., with PETSMART, INC. surviving such merger as the Borrower) (the "Borrower"), the LENDERS party hereto and CITIBANK, N.A., as Administrative Agent and as Collateral Agent.

WHEREAS, the Borrower has requested the Lenders to extend Loans, which, on the Effective Date shall be in the form of $4,300,000,000 aggregate principal amount of Term Loans.

NOW THEREFORE, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01    Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABL Agent" has the meaning assigned to such term in the ABL Intercreditor Agreement.

"ABL Credit Agreement" has the meaning assigned to such term in the definition of "ABL Facility".

"ABL Facility" means the revolving facility pursuant to that certain ABL Credit Agreement (the "ABL Credit Agreement"), dated as of the date hereof, by and among Holdings, the Borrower, the other borrowers party thereto, Citibank, N.A., as administrative agent and collateral agent, the lenders party thereto and the other agents party thereto (it being understood and agreed that the ABL Facility shall include any additional commitments thereunder after the date hereof that are permitted pursuant to the ABL Intercreditor Agreement).

"ABL Financial Covenant Default" means any breach or violation of any financial maintenance covenant in the ABL Facility.

"ABL Intercreditor Agreement" means the Intercreditor Agreement, dated as of the date hereof, among the Collateral Agent, the ABL Agent, and the Loan Parties, substantially in the form of Exhibit E.

"ABR," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Discount" has the meaning assigned to such term in Section 2.09(a)(ii)(D).

"Acceptable Prepayment Amount" has the meaning assigned to such term in Section 2.09(a)(ii)(D).

"Acceptance and Prepayment Notice" means an irrevocable written notice from a Lender accepting a Solicited Discounted Prepayment Offer to make a Discounted Loan Prepayment at the Acceptable Discount specified therein pursuant to Section 2.09(a)(ii)(D) substantially in the form of Exhibit O.

"Acceptance Date" has the meaning specified in Section 2.09(a)(ii)(D)

"Accepting Lenders" has the meaning specified in Section 2.22(a).

"Accounting Changes" has the meaning specified in Section 1.04(d).

"Acquired EBITDA" means, with respect to any Pro Forma Entity for any period, as the amount for such period of Consolidated EBITDA of such Pro Forma Entity (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of the term "Consolidated EBITDA" (and in the component financial definitions used therein) were references to such Pro Forma Entity and its Subsidiaries which will become Restricted Subsidiaries), all as determined on a consolidated basis for such Pro Forma Entity.

"Acquired Entity or Business" has the meaning given such term in the definition of "Consolidated EBITDA."

"Acquisition" means the acquisition of the Target and its subsidiaries pursuant to the Acquisition Agreement.

"Acquisition Agreement" means the Agreement and Plan of Merger dated as of December 14, 2014 among Holdings, Merger Sub and the Target.

"Acquisition Documents" means the Acquisition Agreement, all other agreements entered into between the Target or its Affiliates and Holdings or its Affiliates in connection with the Acquisition and all schedules, exhibits and annexes to each of the foregoing and all side letters, instruments and agreements affecting the terms of the foregoing or entered into in connection therewith.

"Acquisition Transaction" means the purchase or other acquisition, by merger, consolidation or otherwise, by Holdings (subject to Section 6.06), the Borrower or any Subsidiary of Equity Interests in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of), any Person.

"Additional Lender" means, at any time, any bank or other financial institution (including any such bank or financial institution that is a Lender at such time) that agrees to provide any portion of any (a) Incremental Loan pursuant to an Incremental Facility Amendment in accordance with Section 2.18 or (b) Credit Agreement Refinancing Indebtedness pursuant to a Refinancing Amendment in accordance with Section 2.19; provided that each Additional Lender (other than any Person that is a Lender, an Affiliate of a Lender or an Approved Fund of a Lender at such time) shall be subject to the approval of the Administrative Agent (such approval in each case not to be unreasonably withheld or delayed) and the Borrower.

"Adjusted LIBO Rate" means, with respect to any Eurocurrency Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" means Citibank, N.A., in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affected Class" has the meaning specified in Section 2.22(a).

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Affiliated Debt Fund" means (a) an Affiliated Lender that is a bona fide debt fund primarily engaged in, or that advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and the investment decisions of which are not controlled by the private equity business of the relevant Sponsor and (b) any trust, fund, other entity or separate allocation of funds and portfolio of assets of an Affiliated Lender which, in each case, is managed independently from all other trusts, funds, allocation of funds, portfolios of assets or other entities managed or controlled by a Sponsor, which have been established for the primarily or main purpose of investing in the share capital of companies (and, for the avoidance of doubt, but without limitation, an entity, trust, fund, allocation of funds  or portfolio of assets shall be treated as being managed independently from all other trusts, funds, allocations of funds, portfolios of assets or other entities managed or controlled by a Sponsor, if it has a different  general partner,  (or equivalent)) or a different person or committee who has the ultimate decision making power on investments.

"Affiliated Lender" means, at any time, any Lender that is an Affiliate of the Borrower (other than Holdings, the Borrower or any of their respective Subsidiaries) at such time.

"Affiliated Lender Assignment and Assumption" has the meaning assigned to such term in Section 9.04(f)(6).

"Affiliated Lender Cap" has the meaning assigned to such term in Section 9.04(f)(5).

"Agent" means the Administrative Agent, the Collateral Agent, each Lead Arranger, each Joint Bookrunner, the Syndication Agent, each Co-Documentation Agent and any successors and assigns in such capacity, and "Agents" means two or more of them.

"Agreement" has the meaning provided in the preamble hereto.

"Agreement Currency" has the meaning assigned to such term in Section 9.14(b).

"Alternate Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Effective Rate plus 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by Citibank as its "prime rate," and (c) the Adjusted LIBO Rate on such day (or if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1.00%.  The "prime rate" is a rate set by Citibank based upon various factors including Citibank's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.  Any change in such prime rate announced by Citibank shall take effect at the opening of business on the day specified in the public announcement of such change.  Notwithstanding the foregoing, the Alternate Base Rate will be deemed to be 2.00% per annum if the Alternate Base Rate calculated pursuant to the foregoing provisions would otherwise be less than 2.00% per annum.

"Applicable Account" means, with respect to any payment to be made to the Administrative Agent hereunder, the account specified by the Administrative Agent from time to time for the purpose of receiving payments of such type.

"Applicable Creditor" has the meaning assigned to such term in Section 9.14(b).

"Applicable Discount" has the meaning assigned to such term in Section 2.09(a)(ii)(C).

"Applicable Rate" means, (i) for Eurocurrency Loans, 4.00% and (ii) for ABR Loans, 3.00%.

"Approved Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Electronic Communications" means each notice, demand, communication, information, document and other material that any Loan Party is obligated to, or otherwise chooses to, provide to the Administrative Agent and/or the Collateral Agent pursuant to any Loan Document or the transactions contemplated therein, including (a) any supplement, joinder or amendment to the Security Documents and any other written communication delivered or required to be delivered in respect of any Loan Document or the transactions contemplated therein and any financial statements, financial and other report, notice, request, certificate and other information materials;  provided, however, that solely with respect to delivery of any such Communication by any Loan Party to the Administrative Agent and without limiting or otherwise affecting either the Administrative Agent's right to effect delivery of such Communication by posting such Communication to the Approved Electronic Platform or the protections afforded hereby to the Administrative Agent in connection with any such posting, "Approved Electronic Communication" shall exclude (i) any notice of borrowing, letter of credit request, notice of conversion or continuation, and any other notice, demand, communication, information, document and other material relating to a request for a new, or a conversion of an existing, Borrowing, (ii) any notice relating to the payment of any principal or other amount due under any Loan Document prior to the scheduled date therefor, (iii) all notices of any Default or Event of Default and (iv) any notice, demand, communication, information, document and other material required to be delivered to satisfy any of the conditions set forth in Article IV or any other condition to any Borrowing or other extension of credit hereunder or any condition precedent to the effectiveness of this Agreement.

"Approved Electronic Platform" has the meaning assigned to such term in Section 9.01.

"Approved Foreign Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required by Section 9.04), substantially in the form of Exhibit A or any other form reasonably approved by the Administrative Agent.

"Auction Agent" means (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Loan Prepayment pursuant to Section 2.09(a)(ii); provided that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent).

"Audited Financial Statements" means the audited consolidated balance sheets of the Target and its subsidiaries as at the end of and the related consolidated statements of income, stockholders' equity

-4-

and cash flows of the Target and its Subsidiaries, for the fiscal years ended January 29, 2012, February 3, 2013 and February 2, 2014, including the notes thereto.

"Available Amount," means a cumulative amount equal to (without duplication):

(a)     $200,000,000 (the "Starter Basket"); plus

(b)     50% of Consolidated Net Income for the period (treated as one accounting period) from the Effective Date to the end of the most recent Test Period (with any portion of such calculation representing less than a full fiscal quarter of the Borrower calculated based on the total Consolidated Net Income for such fiscal quarter pro rated for the actual number of days during such fiscal quarter occurring on and after the Effective Date), plus

(c)     returns, profits, distributions and similar amounts received in cash or Permitted Investments by the Borrower and the Restricted Subsidiaries on Investments made using the Available Amount (not to exceed the amount of such Investments), plus

(d)     Investments of the Borrower or any of the Restricted Subsidiaries in any Unrestricted Subsidiary made using the Available Amount that has been re-designated as a Restricted Subsidiary or that has been merged or consolidated with or into the Borrower or any of the Restricted Subsidiaries (up to the lesser of (i) the Fair Market Value of the Investments of the Borrower and the Restricted Subsidiaries in such Unrestricted Subsidiary at the time of such re-designation or merger or consolidation and (ii) the Fair Market Value of the original Investment by the Borrower and the Restricted Subsidiaries in such Unrestricted Subsidiary), plus

(e)     the Net Proceeds of a sale or other Disposition of any Unrestricted Subsidiary (including the issuance of stock of an Unrestricted Subsidiary, but excluding any such Disposition to the Borrower or a Restricted Subsidiary) received by the Borrower or any Restricted Subsidiary, plus

(f)     dividends or other distributions or returns on capital received by the Borrower or any Restricted Subsidiary from an Unrestricted Subsidiary, plus

(g)     the aggregate amount of any Retained Declined Proceeds since the Effective Date.

"Available Equity Amount" means a cumulative amount equal to (without duplication):

(a)     the Net Proceeds of new public or private issuances of Qualified Equity Interests in Holdings or any parent of Holdings which are contributed to the Borrower, plus

(b)     capital contributions received by the Borrower after the Effective Date in cash or Permitted Investments (other than in respect of any Disqualified Equity Interest or constituting a Cure Amount (as defined in and pursuant to the terms of the ABL Credit Agreement) and the Fair Market Value of other property that is useful in the business of the Borrower and its Restricted Subsidiaries and contributed to the capital of the Borrower after the Effective Date (including through consolidation or merger), plus

(c)     the net cash proceeds received by the Borrower from Indebtedness and Disqualified Equity Interest issuances issued after the Effective Date and which have been exchanged or converted into Qualified Equity Interests, plus

LEGAL_US_E # 113405763.8

(d)      returns, profits, distributions and similar amounts received in cash or Permitted Investments by the Borrower and the Restricted Subsidiaries on Investments made using the Available Equity Amount (not to exceed the amount of such Investments).

"Basel III" means, collectively, those certain agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A Global Regulatory Framework for More Resilient Banks and Banking Systems," "Basel III:  International Framework for Liquidity Risk Measurement, Standards and Monitoring," and "Guidance for National Authorities Operating the Countercyclical Capital Buffer," each as published by the Basel Committee on Banking Supervision in December 2010 (as revised from time to time), and as implemented by a Lender's primary banking regulatory authority.

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers or board of directors of such Person, (c) in the case of any partnership, the board of directors or board of managers of a general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning provided in the preamble hereto and including any Successor Borrower.

"Borrower Offer of Specified Discount Prepayment" means the offer by the Borrower to make a voluntary prepayment of Loans at a specified discount to par pursuant to Section 2.09(a)(ii)(B).

"Borrower Solicitation of Discount Range Prepayment Offers" means the solicitation by the Borrower of offers for, and the corresponding acceptance by a Lender of, a voluntary prepayment of Loans at a specified range at a discount to par pursuant to Section 2.09(a)(ii)(C).

"Borrower Solicitation of Discounted Prepayment Offers" means the solicitation by the Borrower of offers for, and the subsequent acceptance, if any, by a Lender of, a voluntary prepayment of Loans at a discount to par pursuant to Section 2.09(a)(ii)(D).

"Borrowing" means Loans of the same Class and Type, made, converted or continued on the same date in the same currency and, in the case of Eurocurrency Loans, as to which a single Interest Period is in effect.

"Borrowing Base Basket" means, as of any date, an amount equal to (a) 85% of the book value of all accounts receivable (including credit card receivables), plus (b) 85% of the book value of all inventory, in each case, of the Borrower and its Restricted Subsidiaries.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that when used in connection with a Eurocurrency Loan the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Expenditures" means, for any period, the additions to property, plant and equipment and

other capital expenditures of the Borrower and the Restricted Subsidiaries that are (or should be) set forth in a consolidated statement of cash flows of the Borrower for such period prepared in accordance with GAAP.

"Capital Lease Obligation" means an obligation that is a Capitalized Lease; and the amount of Indebtedness represented thereby at any time shall be the amount of the liability in respect thereof that would at that time be required to be capitalized on a balance sheet in accordance with GAAP as in effect on the Effective Date.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP as in effect on the Effective Date, recorded as capitalized leases.

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrower and the Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of the Borrower and the Restricted Subsidiaries.

"Cash Management Obligations" means (a) obligations in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services or any automated clearing house transfers of funds and (b) other obligations in respect of netting services, employee credit or purchase card programs and similar arrangements.

"Cash Management Services" has the meaning provided in the definition of Secured Cash Management Obligations.

"Casualty Event" means any event that gives rise to the receipt by the Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"Change in Control" means (a) the failure of Holdings prior to an IPO, or, after an IPO, the IPO Entity, to own directly or indirectly through wholly-owned Subsidiaries that are Guarantors, all of the Equity Interests in the Borrower, (b) prior to an IPO, the failure by the Permitted Holders to own, directly or indirectly through one or more holding company parents of Holdings, beneficially and of record, Equity Interests in Holdings representing at least a majority of the aggregate ordinary voting power for the election of the Board of Directors of Holdings represented by the issued and outstanding Equity Interests in Holdings, unless the Permitted Holders otherwise have the right (pursuant to contract, proxy or otherwise), directly or indirectly, to designate, nominate or appoint (and do so designate, nominate or appoint) a majority of the Board of Directors of Holdings, (c) after an IPO, the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group, other than the Permitted Holders (directly or indirectly, including through one or more holding companies), of Equity Interests representing 40% or more of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in the IPO Entity and the percentage of the aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests in the IPO Entity held by the Permitted Holders, unless the Permitted Holders (directly or indirectly, including through one of more holding companies) otherwise have the right (pursuant to contract, proxy or otherwise), directly or indirectly, to designate, nominate or appoint (and do so designate, nominate or appoint) a majority of the Board of Directors of Holdings or the IPO Entity, or (d) the occurrence of a "Change of Control" (or similar event, however denominated), as defined in the documentation governing the Senior Notes (and any Permitted Refinancing thereof), the ABL Facility (and any Permitted

Refinancing thereof) or any other Material Indebtedness that is Subordinated Indebtedness.  For purposes of this definition, (i) "beneficial ownership" shall be as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act, (ii) the phrase Person or "group" is within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person or "group" and its subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and (iii) if any Person or "group" includes one or more Permitted Holders, the issued and outstanding Equity Interests of Holdings, the IPO Entity or the Borrower, as applicable, directly or indirectly owned by the Permitted Holders that are part of such Person or "group" shall not be treated as being owned by such Person or "group" for purposes of determining whether clause (c) of this definition is triggered).

"Change in Law" means (a) the adoption of any rule, regulation, treaty or other law after the date of this Agreement, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of  any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that, notwithstanding anything herein to the contrary, (i) any requests, rules, guidelines or directives under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 or issued in connection therewith and (ii) any requests, rules, guidelines or directives promulgated by the Bank of International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case shall be deemed to be a "Change in Law," regardless of when enacted, adopted, promulgated or issued, but only to the extent such rules, regulations, or published interpretations or directives are applied to the Borrower and its Subsidiaries by the Administrative Agent or any Lender in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities, including, without limitation, for purposes of Section 2.13.

"Citibank" means Citibank, N.A., and its successors.

"Class" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Loans, Incremental Loans or Other Loans, (b) any Commitment, refers to whether such Commitment is a Term Commitment or Other Commitment and (c) any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments.  Other Commitments, Other Loans and Incremental Loans that have different terms and conditions shall be construed to be in different Classes.

"Co-Documentation Agents" means Deutsche Bank Securities Inc., Nomura Securities International, Inc. and Jefferies Finance LLC.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Security Documents as security for the Secured Obligations.

"Collateral Agent" has the meaning assigned in the Collateral Agreement.

"Collateral Agreement" means the Collateral Agreement among Holdings, the Borrower, each other Loan Party and the Administrative Agent, substantially in the form of Exhibit D.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)      the Administrative Agent shall have received from (i) Holdings, the Borrower and each Domestic Subsidiary (other than an Excluded Subsidiary) either (x) a counterpart of the Guarantee Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Guarantee Agreement, in the form specified therein, duly executed and delivered on behalf of such Person and (ii) Holdings, the Borrower and each Subsidiary Loan Party either (x) a counterpart of the Collateral Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Subsidiary Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, in each case under this clause (a) together with, in the case of any such Loan Documents executed and delivered after the Effective Date, documents and, to the extent reasonably requested by the Administrative Agent, opinions of the type referred to in Section 4.01(b) and 4.01(c));

(b)      all outstanding Equity Interests of the Borrower and the Restricted Subsidiaries (other than any Equity Interests constituting Excluded Assets or Equity Interests of Immaterial Subsidiaries) owned by or on behalf of any Loan Party shall have been pledged pursuant to the Collateral Agreement (and the Administrative Agent shall have received certificates or other instruments representing all such Equity Interests (if any), together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank);

(c)      if any Indebtedness for borrowed money of Holdings, the Borrower or any Subsidiary in a principal amount of $10,000,000 or more is owing by such obligor to any Loan Party, such Indebtedness shall be evidenced by a promissory note, such promissory note shall have been pledged pursuant to the Collateral Agreement and the Administrative Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank;

(d)      all certificates, agreements, documents and instruments, including Uniform Commercial Code financing statements, required by the Security Documents, Requirements of Law and reasonably requested by the Administrative Agent to be filed, delivered, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens to the extent required by, and with the priority required by, the Security Documents and the other provisions of the term "Collateral and Guarantee Requirement," shall have been filed, registered or recorded or delivered to the Administrative Agent for filing, registration or recording; and

(e)      the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Mortgaged Property duly executed and delivered by the record owner of such Mortgaged Property, (ii) to the extent applicable in the relevant jurisdiction (w) a policy or policies of title insurance (or marked unconditional commitment to issue such policy or policies) in the amount equal to not less than 100% (or such lesser amount as reasonably agreed to by the Administrative Agent) of the Fair Market Value of such Mortgaged Property and fixtures, as reasonably determined by the Borrower and agreed to by the Administrative Agent, issued by a nationally recognized title insurance company reasonably acceptable to the Administrative Agent insuring the Lien of each such Mortgage as a first priority Lien on the Mortgaged Property described therein, free of any other Liens except as expressly permitted by Section 6.02, together with such endorsements (other than a creditor's rights endorsement), coinsurance and reinsurance as the Administrative Agent may reasonably request to the extent available in the applicable jurisdiction at commercially reasonable rates, (x) such affidavits,  instruments of indemnification

(including a so-called "gap" indemnification) as are customarily requested by the title company to induce the title company to issue the title policies and endorsements contemplated above, (y) evidence reasonably acceptable to the Collateral Agent of payment by the Borrower of all title policy premiums, search and examination charges, escrow charges and related charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of the Mortgages and issuance of the title policies referred to above, (iii) a survey of each Mortgaged Property in such form as shall be required by the title company to issue the so-called comprehensive and other survey-related endorsements and to remove the standard survey exceptions from the title policies and endorsements contemplated above (provided, however, that a survey shall not be required to the extent that the issuer of the applicable title insurance policy provides reasonable and customary survey-related coverages (including, without limitation, survey-related endorsements) in the applicable title insurance policy based on an existing survey and/or such other documentation as may be reasonably satisfactory to the title insurer), (iv) completed "Life-of-Loan" Federal Emergency Management Agency ("FEMA") Standard Flood Hazard Determination with respect to each Mortgaged Property subject to the applicable FEMA rules and regulations (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto), (v) if any Mortgaged Property is located in an area determined by FEMA to have special flood hazards, evidence of such flood insurance as may be required under applicable law, including Regulation H of the Board of Governors and the other Flood Insurance Laws and as required under Section 5.07, and (vi) such legal opinions as the Administrative Agent may reasonably request with respect to any such Mortgage or Mortgaged Property.

(f)     Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, (a) the foregoing provisions of this definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Loan Parties, or the provision of Guarantees by any Subsidiary, if, and for so long as and to the extent that the Administrative Agent and the Borrower reasonably agree in writing that the cost of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance, legal opinions or other deliverables in respect of such assets, or providing such Guarantees (taking into account any material adverse Tax consequences to Holdings and its Subsidiaries (including the imposition of withholding or other material Taxes)), shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (b) Liens required to be granted from time to time pursuant to the term "Collateral and Guarantee Requirement" shall be subject to exceptions and limitations set forth in the Security Documents as in effect on the Effective Date, (c) in no event shall control agreements or other control or similar arrangements be required with respect to deposit accounts, securities accounts, commodities accounts or other assets specifically requiring perfection by control agreements, (d) no perfection actions shall be required with respect to Vehicles and other assets subject to certificates of title, (e) no perfection actions shall be required with respect to commercial tort claims with a value less than $10,000,000 and no perfection shall be required with respect to promissory notes evidencing debt for borrowed money in a principal amount of less than $10,000,000, (f) no actions in any non-U.S. jurisdiction (other than Canada) or required by the laws of any non-U.S. jurisdiction (other than Canada) shall be required except as provided in clause (b)(ii) of the preceding paragraph to be taken to create any security interests in assets located or titled outside of the United States (including any Equity Interests of Foreign Subsidiaries and any Foreign Intellectual Property) or to perfect or make enforceable any security interests in any such assets (it being understood that except as provided in clause (b)(ii) of the preceding paragraph there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction (other than Canada)), (g) no actions shall be required to perfect a security interest in letter of credit

rights (other than the filing of UCC financing statements), (h) no delivery of share certificates evidencing Equity Interests in Immaterial Subsidiaries shall be required and (i) in no event shall the Collateral include any Excluded Assets.  The Administrative Agent may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee by any Subsidiary (including extensions beyond the Effective Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Effective Date) where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

"Commitment" means with respect to any Lender, its Term Commitment, Other Commitment of any Class or any combination thereof (as the context requires).

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Company Disclosure Letter" has the meaning specified in Section 4.01(g).

"Company Material Adverse Effect" has the meaning assigned to such term in the Acquisition Agreement.

"Company Materials" has the meaning specified in Section 5.01.

"Compliance Certificate" means a Compliance Certificate required to be delivered pursuant to Section 5.01.

"Consolidated EBITDA" means, for any period, the Consolidated Net Income for such period, plus:

(a)     without duplication and to the extent already deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)     total interest expense and, to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations or such derivative instruments, and bank and letter of credit fees and costs of surety bonds in connection with financing activities, together with items excluded from the definition of "Consolidated Interest Expense" pursuant to clauses (i) through (xi) thereof,

(ii)     provision for taxes based on income, profits, revenue or capital gains, including federal, foreign and state income, franchise, excise, value added and similar taxes and foreign withholding taxes paid or accrued during such period (including in respect of repatriated funds) including penalties and interest related to such taxes or arising from any tax examinations, and any payments to a direct or indirect parent company pursuant to Section 6.08(a)(vii) in respect of such taxes,

(iii)     depreciation and amortization (including amortization of Capitalized Software Expenditures, internal labor costs and deferred financing fees or costs),

(iv)    other non-cash charges (other than any accrual in respect of bonuses) (provided, in each case, that if any non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period),

(v)    the amount of any non-controlling interest consisting of income attributable to non-controlling interests of third parties in any non-wholly-owned subsidiary deducted (and not added back in such period to Consolidated Net Income) excluding cash distributions in respect thereof,

(vi)    (A) the amount of management, monitoring, consulting and advisory fees, indemnities and related expenses paid or accrued in such period to (or on behalf of) the Sponsors (including any termination fees payable in connection with the early termination of management and monitoring agreements) to the extent otherwise permitted under Section 6.09(x) and (B) the amount of payments made to option holders of the Borrower or any of its direct or indirect parent companies in connection with, or as a result of, any distribution being made to shareholders of such person or its direct or indirect parent companies, which payments are being made to compensate such option holders as though they were shareholders at the time of, and entitled to share in, such distribution, in each case to the extent permitted in the Loan Documents,

(vii)    losses or discounts on sales of receivables and related assets in connection with any Permitted Receivables Financing,

(viii)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not included in the calculation of Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (c) below for any previous period and not added back,

(ix)    any costs or expenses incurred by the Borrower or any Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, any severance agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are non-cash or otherwise funded with cash proceeds contributed to the capital of the Borrower or Net Cash Proceeds of an issuance of Equity Interests of the Borrower (other than Disqualified Equity Interests or relating to Equity Interests constituting a Cure Amount (as defined in and pursuant to the terms of the ABL Credit Agreement)),

(x)    any net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of FASB Accounting Standards Codification 715, and any other items of a similar nature,

plus

(b)    without duplication, the amount of "run rate" cost savings, operating expense reductions and synergies related to the Transactions or any other Specified Transaction, any restructuring, cost saving initiative or other initiative projected by the Borrower in good faith to

-12-

be realized as a result of actions that have been taken or initiated or are expected to be taken (in the good faith determination of the Borrower), including any cost savings, expenses and charges (including restructuring and integration charges) in connection with, or incurred by or on behalf of, any joint venture of the Borrower or any of the Restricted Subsidiaries (whether accounted for on the financial statements of any such joint venture or the Borrower) (i) with respect to the Transactions, on or prior to the date that is 24 months after the Effective Date (including actions initiated prior to the Effective Date) and (ii) with respect to any other Specified Transaction, any restructuring, cost saving initiative or other initiative, within 24 months after such Specified Transaction, restructuring, cost saving initiative or other initiative (which cost savings shall be added to Consolidated EBITDA until fully realized and calculated on a Pro Forma Basis as though such cost savings had been realized on the first day of the relevant period), net of the amount of actual benefits realized from such actions; provided that (A) such cost savings are reasonably identifiable and factually supportable, (B) no cost savings, operating expense reductions or synergies shall be added pursuant to this clause (b) to the extent duplicative of any expenses or charges relating to such cost savings, operating expense reductions or synergies that are included in clause (a) above (it being understood and agreed that "run rate" shall mean the full recurring benefit that is associated with any action taken) and (C) the share of any such cost savings, expenses and charges with respect to a joint venture shall not exceed the total amount thereof for any such joint venture multiplied by the percentage of income of such venture expected to be included in Consolidated EBITDA for the relevant Test Period;

less

(c)    without duplication and to the extent included in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Consolidated EBITDA in any prior period),

(ii)    the amount of any non-controlling interest consisting of loss attributable to non-controlling interests of third parties in any non-wholly-owned subsidiary added (and not deducted in such period from Consolidated Net Income),

in each case, as determined on a consolidated basis for the Borrower and the Restricted Subsidiaries in accordance with GAAP; provided that,

(I)    there shall be included in determining Consolidated EBITDA for any period, without duplication, the Acquired EBITDA of any Person, property, business or asset acquired by the Borrower or any Restricted Subsidiary during such period (other than any Unrestricted Subsidiary) whether such acquisition occurred before or after the Effective Date to the extent not subsequently sold, transferred or otherwise disposed of (but not including the Acquired EBITDA of any related Person, property, business or assets to the extent not so acquired) (each such Person, property, business or asset acquired, including pursuant to the Transactions or pursuant to a transaction consummated prior to the Effective Date, and not subsequently so disposed of, an "Acquired Entity or Business"), and the Acquired EBITDA of any Unrestricted Subsidiary that is converted into a Restricted Subsidiary during such period (each, a "Converted Restricted Subsidiary"), in each case based on the Acquired EBITDA of such Pro Forma Entity for such period (including the portion thereof occurring prior to such

-13-

acquisition or conversion) determined on a historical Pro Forma Basis, and

(II)    there shall be (A) excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset (other than any Unrestricted Subsidiary) sold, transferred or otherwise disposed of, closed or classified as discontinued operations by the Borrower or any Restricted Subsidiary during such period (but if such operations are classified as discontinued due to the fact that they are subject to an agreement to dispose of such operations, only when and to the extent such operations are actually disposed of) (each such Person, property, business or asset so sold, transferred or otherwise disposed of, closed or classified, a "Sold Entity or Business"), and the Disposed EBITDA of any Restricted Subsidiary that is converted into an Unrestricted Subsidiary during such period (each, a "Converted Unrestricted Subsidiary"), in each case based on the Disposed EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary for such period (including the portion thereof occurring prior to such sale, transfer, disposition, closure, classification or conversion) determined on a historical Pro Forma Basis and (B) included in determining Consolidated EBITDA for any period in which a Sold Entity or Business is disposed, an adjustment equal to the Pro Forma Disposal Adjustment with respect to such Sold Entity or Business (including the portion thereof occurring prior to such disposal) as specified in the Pro Forma Disposal Adjustment certificate delivered to the Administrative Agent (for further delivery to the Lenders).

Notwithstanding the foregoing, for all purposes of this Agreement, Consolidated EBITDA shall be deemed to equal (a) $262,700,000 for the fiscal quarter ended November 2, 2014, (b) $252,600,000 for the fiscal quarter ended August 3, 2014, (c) $264,000,000 or the fiscal quarter ended May 4, 2014 and (d) $310,200,000 for the fiscal quarter ended February 2, 2014, in each case and, without duplication, adjusted to reflect any Pro Forma Adjustment with respect to any relevant Specified Transaction or any restructuring, cost saving initiative or other initiative, in each case, occurring or identified after the Effective Date and not otherwise included in the calculation of the foregoing amounts.

"Consolidated First Lien Debt" means the sum, without duplication, of the amount of Consolidated Total Debt (a) under the Loans and under any Incremental Loan, (b) that is secured by liens on the Collateral on an equal or senior priority basis (but without regard to the control of remedies) with Liens securing the Secured Obligations and (c) constituting Capital Lease Obligations. For the avoidance of doubt, any Indebtedness under the ABL Facility shall constitute Consolidated First Lien Debt and Consolidated First Lien Debt shall be reduced, without duplication, by the amount of cash and Permitted Investments reducing Consolidated Total Debt as of the relevant date of determination.

"Consolidated Interest Expense" means the sum of (a) cash interest expense (including that attributable to Capitalized Leases), net of cash interest income, of the Borrower and the Restricted Subsidiaries with respect to all outstanding Indebtedness of the Borrower and the Restricted Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under hedging agreements plus (b) non-cash interest expense resulting solely from the amortization of original issue discount from the issuance of Indebtedness of the Borrower and the Restricted Subsidiaries (excluding Indebtedness borrowed hereunder, under the Senior Notes and under the ABL Facility in connection with the Transactions) at less than par, plus (c) pay-in-kind interest expense of the Borrower and the Restricted Subsidiaries, but excluding, for the avoidance of doubt, (i) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses and any other amounts of non-cash interest other than referred to in clause (b) above (including as a result of the effects of acquisition method accounting or pushdown accounting), (ii) non-cash interest expense attributable to the movement of the mark-to-market valuation of obligations under hedging agreements or

other derivative instruments pursuant to FASB Accounting Standards Codification No. 815-Derivatives and Hedging, (iii) any one-time cash costs associated with breakage in respect of hedging agreements for interest rates, (iv) commissions, discounts, yield, make whole premium and other fees and charges (including any interest expense) incurred in connection with any Permitted Receivables Financing, (v) any "additional interest" owing pursuant to a registration rights agreement with respect to any securities, (vi) any payments with respect to make-whole premiums or other breakage costs of any Indebtedness, including, without limitation, any Indebtedness issued in connection with the Transactions, (vii) penalties and interest relating to taxes, (viii) accretion or accrual of discounted liabilities not constituting Indebtedness, (ix) interest expense attributable to a direct or indirect parent entity resulting from push-down accounting, (x) any expense resulting from the discounting of Indebtedness in connection with the application of recapitalization or purchase accounting and (xi) any interest expense attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto and with respect to any Permitted Acquisition or similar Investment permitted hereunder, all as calculated on a consolidated basis in accordance with GAAP.

For purposes of this definition, interest on a Capitalized Lease shall be deemed to accrue at an interest rate reasonably determined by the Borrower to be the rate of interest implicit in such Capitalized Lease in accordance with GAAP.

"Consolidated Net Income" means, for any period, the net income (loss) of the Borrower and the Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding (and excluding the effect of), without duplication:

(a)     extraordinary, non-recurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses (including any unusual or non-recurring operating expenses directly attributable to the implementation of cost savings initiatives and any accruals or reserves in respect of any extraordinary, non-recurring or unusual items), severance, relocation costs, integration and facilities' opening costs and other business optimization expenses (including related to new product introductions and other strategic or cost savings initiatives), restructuring charges, accruals or reserves (including restructuring and integration costs related to acquisitions and adjustments to existing reserves), whether or not classified as restructuring expense on the consolidated financial statements, signing costs, retention or completion bonuses, other executive recruiting and retention costs, transition costs, costs related to closure/consolidation of facilities and curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities and charges resulting from changes in estimates, valuations and judgments),

(b)     the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income,

(c)     Transaction Costs,

(d)     the net income for such period of any Person that is an Unrestricted Subsidiary and any Person that is not a Subsidiary or that is accounted for by the equity method of accounting (other than MMI Holdings, Inc.); provided that Consolidated Net Income shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Permitted Investments (or, if not paid in cash or Permitted Investments, but later converted into cash or Permitted Investments, upon such conversion) by such Person to the Borrower or a Restricted Subsidiary thereof during such period,

(e)     any fees and expenses (including any transaction or retention bonus or similar payment) incurred during such period, or any amortization thereof for such period, in connection with any acquisition, Investment, asset disposition, issuance or repayment of debt, issuance of equity securities, refinancing transaction or amendment or other modification of any debt instrument (in each case, including any such transaction consummated prior to the Effective Date and any such transaction undertaken but not completed) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful (including, for the avoidance of doubt, the effects of expensing all transaction-related expenses in accordance with FASB Accounting Standards Codification 805 and gains or losses associated with FASB Accounting Standards Codification 460),

(f)     any income (loss) for such period attributable to the early extinguishment of Indebtedness, hedging agreements or other derivative instruments,

(g)     accruals and reserves that are established or adjusted as a result of the Transactions in accordance with GAAP (including any adjustment of estimated payouts on existing earn-outs) or changes as a result of the adoption or modification of accounting policies during such period,

(h)     all Non-Cash Compensation Expenses,

(i)     any income (loss) attributable to deferred compensation plans or trusts,

(j)     any income (loss) from investments recorded using the equity method of accounting (but including any cash dividends or distributions actually received by the Borrower or any Restricted Subsidiary in respect of such investment),

(k)     any gain (loss) on asset sales, disposals or abandonments (other than asset sales, disposals or abandonments in the ordinary course of business) or income (loss) from discontinued operations (but if such operations are classified as discontinued due to the fact that they are subject to an agreement to dispose of such operations, only when and to the extent such operations are actually disposed of),

(l)     any non-cash gain (loss) attributable to the mark to market movement in the valuation of hedging obligations or other derivative instruments pursuant to FASB Accounting Standards Codification 815-Derivatives and Hedging or mark to market movement of other financial instruments pursuant to FASB Accounting Standards Codification 825-Financial Instruments; provided that any cash payments or receipts relating to transactions realized in a given period shall be taken into account in such period,

(m)     any non-cash gain (loss) related to currency remeasurements of Indebtedness (including the net loss or gain resulting from hedging agreements for currency exchange risk and revaluations of intercompany balances),

(n)     any non-cash expenses, accruals or reserves related to adjustments to historical tax exposures (provided, in each case, that the cash payment in respect thereof in such future period shall be subtracted from Consolidated Net Income for the period in which such cash payment was made),

LEGAL_US_E # 113405763.8

(o)    any impairment charge or asset write-off or write-down (including related to intangible assets (including goodwill), long-lived assets, and investments in debt and equity securities), and

(p)    solely for the purpose of calculating the Available Amount, the net income for such period of any Restricted Subsidiary (other than any Guarantor) shall be excluded to the extent the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its net income is not at the date of determination wholly permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, is otherwise restricted by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived (or the Borrower reasonably believes such restriction could be waived and is using commercially reasonable efforts to pursue such waiver); <u>provided</u> that Consolidated Net Income of the Borrower will be increased by the amount of dividends or other distributions or other payments actually paid in cash or Permitted Investments (or, if not paid in cash or Permitted Investments, but later converted into cash or Permitted Investments, upon such conversion) to the Borrower or a Restricted Subsidiary thereof in respect of such period, to the extent not already included therein.

There shall be excluded from Consolidated Net Income for any period the effects from applying acquisition method accounting, including applying acquisition method accounting to inventory, property and equipment, loans and leases, software and other intangible assets and deferred revenue (including deferred costs related thereto and deferred rent) required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries), as a result of the Transactions, any acquisition consummated prior to the Effective Date and any Permitted Acquisitions or other Investment or the amortization or write-off of any amounts thereof.

In addition, to the extent not already included in Consolidated Net Income, Consolidated Net Income shall include the amount of proceeds received or, so long as such Person has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer or indemnifying party and only to the extent that such amount is in fact reimbursed within 365 days of the date of the insurable or indemnifiable event (net of any amount so added back in any prior period to the extent not so reimbursed within the applicable 365-day period), due from business interruption insurance or reimbursement of expenses and charges that are covered by indemnification and other reimbursement provisions in connection with any acquisition or other Investment or any disposition of any asset permitted hereunder.

"<u>Consolidated Secured Debt</u>" means Consolidated Total Debt that is secured by a Lien on the Collateral and all Capital Lease Obligations of the Borrower or any Restricted Subsidiary. For the avoidance of doubt, Consolidated Secured Debt shall be reduced, without duplication, by the amount of cash and Permitted Investments reducing Consolidated Total Debt as of the relevant date of determination.

"<u>Consolidated Total Assets</u>" means, as at any date of determination, the amount that would be set forth opposite the caption "total assets" (or any like caption) on the most recent consolidated balance sheet of the Borrower and the Restricted Subsidiaries in accordance with GAAP.

"<u>Consolidated Total Debt</u>" means, as of any date of determination (i) the outstanding principal amount of all third party Indebtedness for borrowed money (including purchase money Indebtedness),

-17-

unreimbursed drawings under letters of credit, Capital Lease Obligations, third party Indebtedness obligations evidenced by notes or similar instruments and, without duplication, Receivables Guarantees, in each case of the Borrower and the Restricted Subsidiaries on such date, on a consolidated basis and determined in accordance with GAAP (excluding, in any event, the effects of any discounting of Indebtedness resulting from the application of acquisition method accounting in connection with the Transactions or any Permitted Acquisition or other Investment) minus (ii) the aggregate amount of cash and Permitted Investments on the consolidated balance sheet of the Borrower and the Restricted Subsidiaries on such date to the extent the use thereof for the application to the payment of Indebtedness is not prohibited by law or any contract to which the Borrower and any Restricted Subsidiary is a party (which, for the avoidance of doubt, shall include all Qualified Cash (as defined in the ABL Credit Agreement) so long as no Cash Dominion Event (as defined in the ABL Credit Agreement) is continuing).  It is understood that to the extent the Borrower or any Restricted Subsidiary incurs any Indebtedness and receives the proceeds of such Indebtedness, for purposes of determining any incurrence test under this Agreement and whether the Borrower is in Pro Forma Compliance with any such test, the proceeds of such incurrence may  be considered cash or Permitted Investments for purposes of any "netting" pursuant to clause (ii) of this definition to the extent not promptly applied to the transaction financed in connection with such incurrence.

"Consolidated Working Capital" means, at any date, the excess of (a) the sum of all amounts (other than cash and Permitted Investments) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries at such date, excluding the current portion of current and deferred income taxes over (b) the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries on such date, including deferred revenue but excluding, without duplication, (i) the current portion of any Funded Debt, (ii) all Indebtedness consisting of Loans and obligations under letters of credit to the extent otherwise included therein, (iii) the current portion of interest and (iv) the current portion of current and deferred income taxes; provided that, for purposes of calculating Excess Cash Flow, increases or decreases in working capital (A) arising from acquisitions or dispositions by the Borrower and the Restricted Subsidiaries shall be measured from the date on which such acquisition or disposition occurred until the first anniversary of such acquisition or disposition with respect to the Person subject to such acquisition or disposition and (B) shall exclude (I) the impact of non-cash adjustments contemplated in the Excess Cash Flow calculation, (II) the impact of adjusting items in the definition of "Consolidated Net Income" and (III) any changes in current assets or current liabilities as a result of (x) the effect of fluctuations in the amount of accrued or contingent obligations, assets or liabilities under hedging agreements or other derivative obligations, (y) any reclassification, other than as a result of the passage of time, in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent or (z) the effects of acquisition method accounting.

"Contract Consideration" has the meaning given such term in the definition of "Excess Cash Flow."

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Converted Restricted Subsidiary" has the meaning given such term in the definition of "Consolidated EBITDA."

"Converted Unrestricted Subsidiary" has the meaning given such term in the definition of

"Consolidated EBITDA."

"Credit Agreement Refinancing Indebtedness" means Indebtedness issued, incurred or otherwise obtained (including by means of the extension or renewal of existing Indebtedness) in exchange for, or to extend, renew, replace or refinance, in whole or part, existing Loans ("Refinanced Debt"); provided that such exchanging, extending, renewing, replacing or refinancing Indebtedness (a) is in an original aggregate principal amount not greater than the aggregate principal amount of the Refinanced Debt (plus any premium, accrued interest and fees and expenses incurred in connection with such exchange, extension, renewal, replacement or refinancing ), (b) does not mature earlier than or have a Weighted Average Life to Maturity shorter than the Refinanced Debt, (c) shall not be guaranteed by any entity that is not a Loan Party, (d) in the case of any secured Indebtedness (i) is not secured by any assets not securing the Secured Obligations , (ii) is secured on a pari passu or junior basis to the Secured Obligations and (iii) is subject to the relevant Intercreditor Agreement(s) and (e) has terms and conditions (excluding pricing, interest rate margins, rate floors, discounts, fees, premiums and prepayment or redemption provisions) that are not materially more favorable (when taken as a whole) to the lenders or investors providing such Indebtedness than the terms and conditions of this Agreement (when taken as a whole) are to the Lenders (except for covenants or other provisions applicable only to periods after the Latest Maturity Date at the time of such refinancing) (it being understood that, to the extent that any financial maintenance covenant is added for the benefit of any such Indebtedness, no consent shall be required by the Administrative Agent or any of the Lenders if such financial maintenance covenant is either (i) also added for the benefit of any corresponding Loans remaining outstanding after the issuance or incurrence of such Indebtedness or (ii) only applicable after the Latest Maturity Date at the time of such refinancing).

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that has (a) failed to fund any portion of its Loans within one Business Day of the date on which such funding is required hereunder, (b) notified the Borrower, the Administrative Agent or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement or provided any written notification to any Person to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements in which it commits to extend credit, (c) failed, within three Business Days after request by the Administrative Agent (whether acting on its own behalf or at the reasonable request of the Borrower (it being understood that the Administrative Agent shall comply with any such reasonable request)), to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans, (d) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute or subsequently cured, or (e)(i) become or is insolvent or has a parent company that has become or is insolvent or (ii) become the subject of a bankruptcy or insolvency proceeding or any action or proceeding of the type described in Section 7.01(h) or (i), or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"Designated Non-Cash Consideration" means the Fair Market Value of non-cash consideration received by Holdings, any Intermediate Parent, the Borrower or a Subsidiary in connection with a

Disposition pursuant to Section 6.05(k) that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of the Borrower, setting forth the basis of such valuation (which amount will be reduced by the Fair Market Value of the portion of the non-cash consideration converted to cash within 180 days following the consummation of the applicable Disposition).

"Discount Prepayment Accepting Lender" has the meaning assigned to such term in Section 2.09(a)(ii)(B).

"Discount Range" has the meaning assigned to such term in Section 2.09(a)(ii)(C).

"Discount Range Prepayment Amount" has the meaning assigned to such term in Section 2.09(a)(ii)(C).

"Discount Range Prepayment Notice" means a written notice of a Borrower Solicitation of Discount Range Prepayment Offers made pursuant to Section 2.09(a)(ii)(C) substantially in the form of Exhibit K.

"Discount Range Prepayment Offer" means the irrevocable written offer by a Lender, substantially in the form of Exhibit L, submitted in response to an invitation to submit offers following the Auction Agent's receipt of a Discount Range Prepayment Notice.

"Discount Range Prepayment Response Date" has the meaning assigned to such term in Section 2.09(a)(ii)(C).

"Discount Range Proration" has the meaning assigned to such term in Section 2.09(a)(ii)(C).

"Discounted Loan Prepayment" has the meaning assigned to such term in Section 2.09(a)(ii)(A).

"Discounted Prepayment Determination Date" has the meaning assigned to such term in Section 2.09(a)(ii)(D).

"Discounted Prepayment Effective Date" means, in the case of a Borrower Offer of Specified Discount Prepayment or Borrower Solicitation of Discount Range Prepayment Offer, five Business Days following the receipt by each relevant Lender of notice from the Auction Agent in accordance with Section 2.09(a)(ii)(B), Section 2.09(a)(ii)(C) or Section 2.09(a)(ii)(D), as applicable, unless a shorter period is agreed to between the Borrower and the Auction Agent.

"Disposed EBITDA" means, with respect to any Sold Entity or Business or Converted Unrestricted Subsidiary for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of the term "Consolidated EBITDA" (and in the component financial definitions used therein) were references to such Sold Entity or Business and its subsidiaries or to such Converted Unrestricted Subsidiary and its subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business or Converted Unrestricted Subsidiary.

"Disposition" has the meaning assigned to such term in Section 6.05.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

(a)     matures or is mandatorily redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

(b)     is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests); or

(c)     is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof;

in each case, on or prior to the date 91 days after the Latest Maturity Date; provided, however, that (i) an Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale," a "change of control" or similar event shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after repayment in full of all the Loans and all other Loan Document Obligations that are accrued and payable and the termination of the Commitments and (ii) if an Equity Interest in any Person is issued pursuant to any plan for the benefit of employees of Holdings (or any direct or indirect parent thereof), the Borrower or any of the Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by Holdings (or any direct or indirect parent company thereof), the Borrower or any of the Subsidiaries in order to satisfy applicable statutory or regulatory obligations of such Person.

"Disqualified Lenders" means (a) those Persons identified by a Sponsor or Holdings to the Joint Bookrunners in writing prior to December 14, 2014 (or, if identified in writing after such date but prior to the date hereof, with the consent of Joint Bookrunners holding at least a majority of the financing commitments as of December 14, 2014), (b) those Persons who are competitors of the Borrower and its Subsidiaries identified by a Sponsor or Holdings to the Administrative Agent from time to time in writing (including by email) and (c) in the case of each Persons identified pursuant to clauses (a) and (b) above, any of their Affiliates that are either (i) identified in writing by Holdings or a Sponsor from time to time or (ii) clearly identifiable as Affiliates on the basis of such Affiliate's name (other than, in the case of this clause (c), Affiliates that are bona fide debt funds); provided, that no designation of any Person as a Disqualified Lender shall retroactively disqualify any assignments or participations made to, or information provided to, such Person before it was designated as a Disqualified Lender, and such Person shall not be deemed to be a Disqualified Lender in respect of any assignments or participations made to such Person prior to the date of such designation.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is not a Foreign Subsidiary.

"ECF Percentage" means, with respect to the prepayment required by Section 2.09(c) with respect to any fiscal year of the Borrower, if the First Lien Leverage Ratio (prior to giving effect to the applicable prepayment pursuant to Section 2.09(c), but after giving effect to any voluntary prepayments made pursuant to Section 2.09(a) prior to the date of such prepayment) as of the end of such fiscal year is (a) greater than 3.75 to 1.00, 50% of Excess Cash Flow for such fiscal year, (b) less than or equal to 3.75 to 1.00 but greater than 3.25 to 1.00, 25% of Excess Cash Flow for such fiscal year and (c) less than or

-21-

equal to 3.25 to 1.00, 0% of Excess Cash Flow for such fiscal year.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Effective Date Refinancing" means, the repayment, repurchase or other discharge of the Existing Credit Agreement Indebtedness and termination and/or release of any security interests and guarantees in connection therewith (other than the letters of credit issued (and related cash collateral) under the letter of credit facility listed on Schedule 6.01).

"Effective Yield" means, as to any Indebtedness, the effective yield on such Indebtedness in the reasonable determination of the Administrative Agent in consultation with the Borrower and consistent with generally accepted financial practices, taking into account the applicable interest rate margins, any interest rate floors (the effect of which floors shall be determined in a manner set forth in the proviso below) or similar devices and all fees, including upfront or similar fees or original issue discount (amortized over the shorter of (a) the remaining Weighted Average Life to Maturity of such Indebtedness and (b) the four years following the date of incurrence thereof) payable generally to Lenders or other institutions providing such Indebtedness, but excluding any arrangement, structuring, ticking or other similar fees payable in connection therewith that are not generally shared with the relevant Lenders and, if applicable, consent fees for an amendment paid generally to consenting Lenders; provided that with respect to any Indebtedness that includes a "LIBOR floor" or "Base Rate floor," (i) to the extent that the LIBO Rate or Alternate Base Rate (without giving effect to any floors in such definitions), as applicable, on the date that the Effective Yield is being calculated is less than such floor, the amount of such difference shall be deemed added to the interest rate margin for such Indebtedness for the purpose of calculating the Effective Yield and (ii) to the extent that the LIBO Rate or Alternative Base Rate (without giving effect to any floors in such definitions), as applicable, on the date that the Effective Yield is being calculated is greater than such floor, then the floor shall be disregarded in calculating the Effective Yield.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person (including the Borrower or any of its Affiliates), other than, in each case, (i) a natural person, (ii) a Defaulting Lender or (iii) a Disqualified Lender.

"EMU Legislation" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"Environmental Laws" means applicable common law and all applicable treaties, rules, regulations, codes, ordinances, judgments, orders, decrees and other applicable Requirements of Law, and all applicable injunctions or binding agreements issued, promulgated or entered into by or with any Governmental Authority, in each instance relating to the protection of the environment, including with respect to the preservation or reclamation of natural resources or the Release or threatened Release of any Hazardous Material, or to the extent relating to exposure to Hazardous Materials, the protection of human health or safety.

"Environmental Liability" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities), of Holdings, the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to

which liability is assumed or imposed with respect to any of the foregoing.

"Equity Financing" means the cash equity contributions by the Sponsors, directly or indirectly, to Parent, the Net Proceeds of which are further contributed as common Equity Interests, directly or indirectly, to Merger Sub, in an aggregate amount equal to, when combined with the fair value of any Equity Interests, restricted stock units and stock options issued by the Target of any of the Rollover Investors rolled over or invested in connection with the Transactions, at least 20% of the sum of (a) the aggregate gross proceeds of the Term Loans (excluding any gross proceeds received from any increase in the Term Loans used to finance any additional original issue discount or upfront fees imposed in connection with "market flex" provisions of the Fee Letter) and the Senior Notes and any funding under the ABL Facility on the Effective Date (excluding any gross proceeds used to (i) finance additional original issue discount or upfront fees imposed in connection with "market flex" provisions of the Fee Letter, (ii) finance any working capital needs or (iii) backstop letters of credit issued under the letter of credit facility listed on Schedule 6.01), (b) the aggregate amount of Capital Lease Obligations outstanding as of the Effective Date and (c) the total equity capitalization of Holdings and its Subsidiaries on the Effective Date after giving effect to the Transactions; provided that the Sponsors shall own, directly or indirectly through one or more holding company parents of Holdings, beneficially and of record, Equity Interests in Holdings representing at least a majority of the aggregate ordinary voting power for the election of the Board of Directors of Holdings on the Effective Date after giving effect to the Transactions.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) any failure by any Plan to satisfy the minimum funding standards (within the meaning of Section 412 or Section 430 of the Code or Section 302 of ERISA) applicable to such Plan, whether or not waived; (c) the filing pursuant to Section 412 of the Code or Section 302 of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (e) the incurrence by a Loan Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (f) the receipt by a Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (g) the incurrence by a Loan Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan (including any liability under Section 4062(e) of ERISA) or Multiemployer Plan; or (h) the receipt by a Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA or in endangered or critical status, within the meaning of Section 305 of ERISA.

"euro" means the single currency of the European Union as constituted by the Treaty on European Union and as referred to in the EMU Legislation.

"Eurocurrency" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Excess Cash Flow" means, for any period, an amount equal to the excess of:

      (a)      sum, without duplication, of:

            (i)      Consolidated Net Income for such period,

            (ii)      an amount equal to the amount of all non-cash charges to the extent deducted in arriving at such Consolidated Net Income (provided, in each case, that if any non-cash charge represents an accrual or reserve for cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Excess Cash Flow in such future period),

            (iii)      decreases in Consolidated Working Capital, long-term receivables and long-term prepaid assets and increases in long-term deferred revenue for such period,

            (iv)      an amount equal to the aggregate net non-cash loss on dispositions by the Borrower and the Restricted Subsidiaries during such period (other than dispositions in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income, and

            (v)      extraordinary gains; less:

      (b)      the sum, without duplication, of:

            (i)      an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income (including any amounts included in Consolidated Net Income pursuant to the next to last sentence of the definition of "Consolidated Net Income" to the extent such amounts are due but not received during such period) and cash charges included in clauses (a) through (q) of the definition of "Consolidated Net Income" (other than cash charges in respect of Transaction Costs paid on or about the Effective Date to the extent financed with the proceeds of Indebtedness incurred on the Effective Date or an equity investment on the Effective Date),

            (ii)      without duplication of amounts deducted pursuant to clause (x) below in prior fiscal years, the amount of Capital Expenditures made in cash or accrued during such period, to the extent that such Capital Expenditures were financed with internally generated cash flow of the Borrower or the Restricted Subsidiaries,

            (iii)      (x) the aggregate amount of all principal payments of Indebtedness, including (A) the principal component of payments in respect of Capitalized Leases and (B) the amount of any mandatory prepayment of Loans to the extent required due to a Disposition that resulted in an increase to Consolidated Net Income and not in excess of

-24-

the amount of such increase but excluding (x) all other prepayments of Term Loans and (y) all prepayments of revolving loans and swingline loans made during such period (other than in respect of any revolving credit facility to the extent there is an equivalent permanent reduction in commitments thereunder), except to the extent financed with the proceeds of other Indebtedness of the Borrower or the Restricted Subsidiaries and (y) the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by the Borrower and the Restricted Subsidiaries during such period that are required to be made in connection with any prepayment of Indebtedness,

(iv)    an amount equal to the aggregate net non-cash gain on Dispositions by the Borrower and the Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income,

(v)    increases in Consolidated Working Capital and long-term receivables, long-term prepaid assets and decreases in long-term deferred revenue for such period,

(vi)    cash payments by the Borrower and the Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and the Restricted Subsidiaries other than Indebtedness to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income, except to the extent financed with the proceeds of long-term Indebtedness of the Borrower or the Restricted Subsidiaries,

(vii)    without duplication of amounts deducted pursuant to clause (x) below in prior fiscal years, the amount of Investments (other than Investments in Permitted Investments) and acquisitions not prohibited by this Agreement, to the extent that such Investments and acquisitions were financed with internally generated cash flow of the Borrower or the Restricted Subsidiaries,

(viii)    the amount of dividends and distributions paid in cash during such period not prohibited by this Agreement, to the extent that such dividends and distributions were financed with internally generated cash flow of the Borrower or the Restricted Subsidiaries,

(ix)    the aggregate amount of expenditures actually made by the Borrower and the Restricted Subsidiaries in cash during such period (including expenditures for the payment of financing fees) to the extent that such expenditures are not expensed during such period or are not deducted in calculating Consolidated Net Income, to the extent that such expenditure was financed with internally generated cash flow of the Borrower or the Restricted Subsidiaries,

(x)    without duplication of amounts deducted from Excess Cash Flow in prior periods, (1) the aggregate consideration required to be paid in cash by the Borrower or any of the Restricted Subsidiaries pursuant to binding contracts, commitments, letters of intent or purchase orders (the "Contract Consideration"), in each case, entered into prior to or during such period and (2) to the extent set forth in a certificate of a Financial Officer delivered to the Administrative Agent at or before the time the Compliance Certificate for the period ending simultaneously with such Test Period is required to be delivered pursuant to Section 5.01(a) or 5.01(b), the aggregate amount of cash that is reasonably expected to be paid in respect of planned cash expenditures by the Borrower

-25-

or any of the Restricted Subsidiaries (the "Planned Expenditures"), in the case of each of clauses (1) and (2), relating to Permitted Acquisitions, other Investments (other than Investments in Permitted Investments) or Capital Expenditures (including Capitalized Software Expenditures or other purchases of intellectual property) to be consummated or made during a subsequent Test Period (and in the case of Planned Expenditures, the subsequent Test Period); provided, that to the extent the aggregate amount of internally generated cash actually utilized to finance such Permitted Acquisitions, Investments or Capital Expenditures during such Test Period is less than the Contract Consideration and Planned Expenditures, the amount of such shortfall shall be added to the calculation of Excess Cash Flow at the end of such Test Period,

(xi)    the amount of taxes (including penalties and interest) paid in cash and/or tax reserves set aside or payable (without duplication) in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period, and

(xii)    extraordinary losses.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Excluded Assets" means (a) any fee-owned real property with a book value of less than $10,000,000 as determined on the Effective Date for existing real property and on the date of acquisition for after acquired real property, (b) all leasehold interests in real property, (c) any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such license, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction, but excluding any prohibition or restriction that is ineffective under the Uniform Commercial Code of any applicable jurisdiction), (d) any asset if, to the extent that and for so long as the grant of a Lien thereon to secure the Secured Obligations is prohibited by any Requirements of Law (other than to the extent that any such prohibition would be rendered ineffective pursuant to any other applicable Requirements of Law) or would require consent or approval of any Governmental Authority, (e) margin stock and, to the extent prohibited by, or creating an enforceable right of termination in favor of any other party thereto under (other than any Loan Party) the terms of any applicable Organizational Documents, joint venture agreement or shareholders' agreement, Equity Interests in any Person other than wholly-owned Restricted Subsidiaries, (f) assets to the extent a security interest in such assets would result in material adverse tax consequences to Holdings or one of its subsidiaries as reasonably determined by the Borrower in consultation with the Administrative Agent, (g) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, (h) any lease, license or other agreement or any property subject thereto (including pursuant to a purchase money security interest or similar arrangement) to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money arrangement or create a breach, default or right of termination in favor of any other party thereto (other than any Loan Party) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code of any applicable jurisdiction or other similar applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code of any applicable jurisdiction or other similar applicable law notwithstanding such prohibition, (i) in excess of 65% of the voting Equity Interests of (A) any Foreign Subsidiary or (B) any FSHCO, (j) receivables and related assets (or interests therein) (A) sold to any Receivables Subsidiary or (B) otherwise pledged, factored, transferred or sold in connection with any Permitted Receivables Financing, (k) commercial tort claims with a value of less than $10,000,000 and letter-of-credit rights with a value of less than $10,000,000 (except to the extent a security interest therein can be

perfected by a UCC filing), (l) Vehicles and other assets subject to certificates of title, (m) any aircraft, airframes, aircraft engines or helicopters, or any Equipment or other assets constituting a part thereof and (n) any and all assets and personal property owned by any Subsidiary that is not a Loan Party.

"Excluded Subsidiary" means (a) any Subsidiary that is not a wholly-owned subsidiary of the Borrower, (b) each Subsidiary listed on Schedule 1.01(a), (c) each Unrestricted Subsidiary, (d) each Immaterial Subsidiary, (e) any Subsidiary that is prohibited by (i) applicable Requirements of Law or (ii) any contractual obligation existing on the Effective Date or on the date any such Subsidiary is acquired (so long in respect of any such contractual prohibition such prohibition is not incurred in contemplation of such acquisition), in each case from guaranteeing the Secured Obligations (but only for so long as such restriction is continuing) or which would require governmental (including regulatory) consent, approval, license or authorization to provide a Guarantee, or for which the provision of a Guarantee would result in a material adverse tax consequence (including as a result of the operation of Section 956 of the Code or any similar law or regulation in any applicable jurisdiction) to Holdings or one of its subsidiaries (as reasonably determined by the Borrower in consultation with the Administrative Agent), (f) any Foreign Subsidiary, (g) any direct or indirect Domestic Subsidiary of a direct or indirect Foreign Subsidiary of Holdings that is a "controlled foreign corporation" within the meaning of Section 957 of the Code, (h) any FSHCO, (i) any other Subsidiary excused from becoming a Loan Party pursuant to clause (a) of the last paragraph of the definition of the term "Collateral and Guarantee Requirement," (j) each Receivables Subsidiary and (k) any not-for-profit Subsidiaries, captive insurance companies or other special purpose subsidiaries designated by the Borrower from time to time.

"Excluded Swap Obligation" means, with respect to any Guarantor, (a) any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, as applicable, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to any applicable keep well, support, or other agreement for the benefit of such Guarantor and any and all Guarantees of such Guarantor's Swap Obligations by other Loan Parties) at the time the Guarantee of such Guarantor, or a grant by such Guarantor of a security interest, becomes effective with respect to such Swap Obligation or (b) any other Swap Obligation designated as an "Excluded Swap Obligation" of such Guarantor as specified in any agreement between the relevant Loan Parties and counterparty applicable to such Swap Obligations. If a Swap Obligation arises under a Master Agreement governing more than one Swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swaps for which such Guarantee or security interest is or becomes excluded in accordance with the first sentence of this definition.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) Taxes imposed on (or measured by) its net income or profits (however denominated), branch profits Taxes, and franchise Taxes, in each case imposed by (i) a jurisdiction as a result of such recipient being organized or having its principal office located in or, in the case of any Lender, having its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) any jurisdiction as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than a connection arising solely from such recipient having executed, delivered, or become a party to, performed its obligations or received payments under, received or perfected a security interest under, sold or assigned of an interest in, engaged in any other transaction pursuant to, or enforced, any Loan Documents), (b) any withholding Tax that is attributable to a Lender's failure to comply with Section 2.15(e), (c) except in the case of an assignee pursuant to a request by the Borrower under Section 2.17, any U.S. federal withholding Taxes

imposed due to a Requirement of Law in effect at the time a Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding Tax under Section 2.15(a) and (d) any U.S. federal withholding Tax imposed pursuant to FATCA.

"Existing Credit Agreement Indebtedness" means the principal, interest, fees and other amounts, other than contingent obligations not due and payable, outstanding under (a) that certain Credit Agreement, dated as of March 23, 2012, among the Target, as the lead borrower, the borrowers named therein, the guarantors named therein and Wells Fargo Bank, National Association, as administrative agent, collateral agent and swing line lender and (b) that certain Letter of Credit Agreement, dated as of March 23, 2012, among the Target, as the lead borrower, the borrowers named therein, the guarantors named therein and Wells Fargo Bank, National Association, as L/C issuer.

"Fair Market Value" means with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset. Except as otherwise expressly set forth herein, such value shall be determined in good faith by the Borrower.

"Fair Value" means the amount at which the assets (both tangible and intangible), in their entirety, of the Borrower and its Subsidiaries taken as a whole would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

"FATCA" means Sections 1471 through 1474 of the Code as in effect on the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official administrative interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) of the Code and any law, regulation, rule, promulgation or official agreement implementing an official governmental agreement or intergovernmental agreement with respect to the foregoing.

"FCPA" has the meaning assigned to such term in Section3.18(b).

"Federal Funds Effective Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Citibank on such day on such transactions as determined by the Administrative Agent.

"FEMA" has the meaning assigned to such term in the definition of "Collateral and Guarantee Requirement."

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"First Lien Intercreditor Agreement" means an Intercreditor Agreement, substantially in the form of Exhibit F-1, among the Collateral Agent and the Senior Representatives for one or more classes of obligations to be secured pari passu relative to the Liens on the Collateral securing the Secured Obligations, with such modifications thereto as the Administrative Agent and the Borrower shall reasonably agree.

"First Lien Leverage Ratio" means, on any date, the ratio of (a) Consolidated First Lien Debt as of such date to (b) Consolidated EBITDA for the Test Period as of such date.

"Foreign Intellectual Property" means any right, title or interest in or to any copyrights, copyright licenses, patents, patent applications, patent licenses, trade secrets, trade secret licenses, trademarks, service marks, trademark and service mark applications, trade names, trade dress, trademark licenses, technology, know-how and processes or any other intellectual property governed by or arising or existing under, pursuant to or by virtue of the laws of any jurisdiction other than the United States of America or any state thereof.

"Foreign Prepayment Event" has the meaning assigned to such term in Section 2.09(f).

"Foreign Subsidiary" means any Subsidiary that is organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"FSHCO" means any direct or indirect Domestic Subsidiary of Holdings (other than the Borrower) that has no material assets other than Equity Interests in one or more direct or indirect Foreign Subsidiaries that are "controlled foreign corporations" within the meaning of Section 957 of the Code.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"Funded Debt" means all Indebtedness of the Borrower and the Restricted Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of the Borrower or the Restricted Subsidiaries, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, (a) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under FASB Accounting Standards Codification 825-Financial Instruments, or any successor thereto (including pursuant to the FASB Accounting Standards Codification), to value any Indebtedness of the Borrower or any subsidiary at "fair value," as defined therein and (b) the amount of any Indebtedness under GAAP with respect to Capital Lease Obligations

shall be determined in accordance with the definition of Capital Lease Obligations.

"Governmental Approvals" means all authorizations, consents, approvals, permits, licenses and exemptions of, registrations and filings with, and reports to, Governmental Authorities.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Granting Lender" has the meaning assigned to such term in Section 9.04(e).

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Effective Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantee Agreement" means the Master Guarantee Agreement among the Loan Parties and the Administrative Agent, substantially in the form of Exhibit C.

"Guarantors" means collectively, (i) Holdings, each Intermediate Parent and the Subsidiary Loan Parties and (ii) with respect to the Secured Obligations of Holdings, each Intermediate Parent and the Subsidiary Loan Parties, the Borrower.

"Hazardous Materials" means all explosive, radioactive, hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum by-products or distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated as hazardous or toxic, or any other term of similar import, pursuant to any Environmental Law.

"Holdings" means (a) prior to any IPO, Initial Holdings and (b) on and after an IPO, (i) if the IPO Entity is Initial Holdings or any Person of which Initial Holdings is a subsidiary, Initial Holdings or (ii) if the IPO Entity is a subsidiary of Initial Holdings, the IPO Entity.

"Identified Participating Lenders" has the meaning assigned to such term in Section 2.09(a)(ii)(C).

"Identified Qualifying Lenders" has the meaning specified in Section 2.09(a)(ii)(D).

"IFRS" means international accounting standards as promulgated by the International Accounting Standards Board.

"Immaterial Subsidiary" means any Subsidiary that is not a Material Subsidiary.

"Immediate Family Members" means with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, qualified domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including adoptive relationships) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"Impacted Loans" has the meaning assigned to such term in Section 2.12(b).

"Incremental Cap" means, as of any date of determination (a) (i) $800,000,000 plus (ii) the principal amount of all voluntary prepayments of the Loans pursuant to Section 2.09(a) made prior to such date other than to the extent made with the proceeds of long-term Indebtedness, minus (iii) the amount of all Incremental Facilities and all Incremental Equivalent Debt outstanding at such time that was incurred in reliance on the foregoing clauses (i) and (ii) plus (b) the maximum aggregate principal amount that can be incurred without causing the First Lien Leverage Ratio, after giving effect to the incurrence of any Incremental Loans or Incremental Equivalent Debt (which shall assume that all such Indebtedness is Consolidated First Lien Debt) and the use of proceeds thereof, on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Incremental Facility or Incremental Equivalent Debt made pursuant to the foregoing clause (a)), to exceed 4.43 to 1.00 for the most recent Test Period then ended.

"Incremental Equivalent Debt" means Indebtedness incurred pursuant to Section 6.01(a)(xxiii).

"Incremental Facility Amendment" has the meaning assigned to such term in Section 2.18(b)(ii).

"Incremental Loan" has the meaning assigned to such term in Section 2.18(a).

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred and unpaid purchase price of property or services (excluding trade accounts payable in the ordinary course of business and any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and if not paid within 60 days after being due and payable), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of others (other than by endorsement of negotiable instruments for collection in the ordinary course of business), (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances; provided that the term "Indebtedness" shall not include (i) deferred or prepaid revenue, (ii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or

other unperformed obligations of the seller, (iii) any obligations attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, (iv) Indebtedness of any Parent Entity appearing on the balance sheet of the Borrower solely by reason of push down accounting under GAAP, (v) accrued expenses and royalties and (vi) asset retirement obligations and obligations in respect of reclamation and workers' compensation (including pensions and retiree medical care) that are not overdue by more than 60 days. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.  The amount of Indebtedness of any Person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith. For all purposes hereof, the Indebtedness of Holdings, the Borrower and the Restricted Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax, and accounting operations and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms) and made in the ordinary course of business.

"Indemnified Taxes" means all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Information" has the meaning assigned to such term in Section 9.12(a).

"Information Memorandum" means the Confidential Information Memorandum dated February 2015 relating to the Loan Parties and the Term Facility.

"Initial Holdings" has the meaning assigned to such term in the preamble hereto.

"Insignificant Subsidiary" means any subsidiary of the Target other than any such subsidiary that is a "significant subsidiary" of the Target within the meaning of Rule 405 of the Securities Act of 1933, as amended, in each case determined as of the date of the most recent financial statements of the Target delivered pursuant to Section 4.01(h).

"Intellectual Property" has the meaning assigned to such term in the Collateral Agreement.

"Intercreditor Agreements" means the ABL Intercreditor Agreement, any First Lien Intercreditor Agreement and any Second Lien Intercreditor Agreement.

"Interest Coverage Ratio" means, as of any date, the ratio of (a) Consolidated EBITDA to (b) Consolidated Interest Expense, in each case for the Test Period as of such date.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.05.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each January, April, July and October and (b) with respect to any Eurocurrency Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurocurrency Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"Interest Period" means, with respect to any Eurocurrency Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter (or, if agreed to by each Lender participating therein, twelve months or such other period less than one month thereafter as the Borrower may elect), provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Intermediate Parent" means any subsidiary of Holdings of which the Borrower is a subsidiary.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and the Restricted Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms) and made in the ordinary course of business) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  The amount, as of any date of determination, of (i) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, minus any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment and without duplication of amounts increasing the Available Amount or the Available Equity Amount), but without any adjustment for write-downs or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof, (ii) any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof, as determined in good faith by a Financial Officer, (iii) any Investment in the form of a transfer of Equity Interests or other non-cash property by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the Fair Market Value of such Equity Interests or other property as of the time of the transfer, minus any payments actually received by such investor representing a return of capital of, or dividends or other distributions in respect of, such Investment (to the extent such payments do not exceed, in the aggregate, the original amount of such Investment and without duplication of amounts increasing the Available Amount or the Available Equity Amount), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment, and (iv) any Investment (other than any Investment referred to in clause (i), (ii) or (iii) above) by the specified Person in the form of a purchase or other acquisition for value of any Equity Interests, evidences of Indebtedness or other securities of any other Person shall be the original cost of such Investment (including any Indebtedness assumed in connection therewith), plus (A) the cost of all additions thereto and minus (B) the amount of any portion of such Investment that has been repaid to the investor in cash as a repayment of principal or a return of capital, and of any cash payments actually received by such investor representing interest, dividends or other distributions in respect of such Investment (to the extent the amounts referred to in clause (B) do not, in the aggregate, exceed the original cost of such Investment plus the costs of additions thereto and

without duplication of amounts increasing the Available Amount or the Available Equity Amount), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment.  For purposes of Section 6.04, if an Investment involves the acquisition of more than one Person, the amount of such Investment shall be allocated among the acquired Persons in accordance with GAAP, provided that pending the final determination of the amounts to be so allocated in accordance with GAAP, such allocation shall be as reasonably determined by a Financial Officer.

"Investor" means a holder of Equity Interests in Holdings (or any direct or indirect parent thereof) on the Effective Date.

"IPO" means the initial underwritten public offering (other than a public offering pursuant to a registration statement on Form S-8) of common Equity Interests in the IPO Entity.

"IPO Entity" means, at any time at and after an IPO, Initial Holdings, a parent entity of Initial Holdings, or an Intermediate Parent, as the case may be, the Equity Interests in which were issued or otherwise sold pursuant to the IPO; provided that, immediately following the IPO, the Borrower  is a wholly-owned subsidiary of such IPO Entity and such IPO Entity owns, directly or through its subsidiaries, substantially all the businesses and assets owned or conducted, directly or indirectly, by the Borrower immediately prior to the IPO.

"Joint Bookrunners" means Citigroup Global Markets Inc., Barclays Bank PLC, Deutsche Bank Securities Inc., Nomura Securities International, Inc., Jefferies Finance LLC, RBC Capital Markets and Macquarie Capital (USA) Inc.

"Judgment Currency" has the meaning assigned to such term in Section 9.14(b).

"Junior Financing" means any Material Indebtedness (other than any permitted intercompany Indebtedness owing to Holdings, the Borrower or any Restricted Subsidiary or any Indebtedness under the ABL Facility) that is either (a) subordinated in right of payment to the Loan Document Obligations, or (b) is secured on a junior basis to the Liens securing the Secured Obligations.

"Latest Maturity Date" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Other Loan, any Incremental Loan or any Other Commitment, in each case as extended in accordance with this Agreement from time to time.

"LCA Election" has the meaning assigned to such term in Section 1.07.

"LCA Test Date" has the meaning assigned to such term in Section 1.07.

"Lead Arrangers" means Citigroup Global Markets Inc., Barclays Bank PLC, Deutsche Bank Securities Inc., Nomura Securities International, Inc., Jefferies Finance LLC, RBC Capital Markets and Macquarie Capital (USA) Inc.

"Lenders" means the Term Lenders and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, an Incremental Facility Amendment or a Refinancing Amendment, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Liabilities" means the recorded liabilities (including contingent liabilities that would be recorded

in accordance with GAAP) of the Borrower and its Subsidiaries taken as a whole, as of the Effective Date after giving effect to the consummation of the Transactions, determined in accordance with GAAP consistently applied.

"LIBO Rate" means:

(a)    for any Interest Period with respect to a Eurocurrency Borrowing, the rate per annum equal to the London Interbank Offered Rate ("LIBOR") or a comparable or successor rate, which rate is approved by the Administrative Agent, as published on the ICE Benchmark LIBOR01 screen page (or such other commercially available source providing quotations of LIBOR as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; and

(b)    for any interest calculation with respect to an ABR Borrowing on any date, the rate per annum equal to LIBOR, at approximately 11:00 a.m., London time determined two Business Days prior to such date for U.S. dollar deposits with a term of one month commencing that day;

provided that to the extent a comparable or successor rate is approved by the Administrative Agent in connection herewith, the approved rate shall be applied to the applicable Interest Period in a manner consistent with market practice; provided, further that to the extent such market practice is not administratively feasible for the Administrative Agent, such approved rate shall be applied to the applicable Interest Period as otherwise reasonably determined by the Administrative Agent.

Notwithstanding the foregoing, the LIBO Rate in respect of any applicable Interest Period will be deemed to be 1.00% per annum if the LIBO Rate for such Interest Period calculated pursuant to the foregoing provisions would otherwise be less than 1.00% per annum.

"LIBOR" has the meaning assigned to such term in the definition of "LIBO Rate."

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Limited Condition Acquisition" shall mean any Acquisition Transaction the consummation of which is not conditioned on the availability of, or on obtaining, third party financing.

"Loan Document Obligations" means (a) the due and punctual payment by the Borrower of (i) the principal of and interest at the applicable rate or rates provided in this Agreement (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar

-35-

proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment and performance of all other obligations of the Borrower under or pursuant to each of the Loan Documents and (c) the due and punctual payment and performance of all the obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents (including interest and monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"Loan Documents" means this Agreement, any Refinancing Amendment, any Loan Modification Agreement, the Guarantee Agreement, the Collateral Agreement, the Intercreditor Agreements, the other Security Documents and, except for purposes of Section 9.02, any promissory notes delivered pursuant to Section 2.07(e).

"Loan Modification Agreement" means a Loan Modification Agreement, in form reasonably satisfactory to the Administrative Agent, among the Borrower, the Administrative Agent and one or more Accepting Lenders, effecting one or more Permitted Amendments and such other amendments hereto and to the other Loan Documents as are contemplated by Section 2.22.

"Loan Modification Offer" has the meaning specified in Section 2.22(a).

"Loan Parties" means Holdings, the Borrower and the Subsidiary Loan Parties.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Management Investors" means the directors and officers and employees of Holdings, the Borrower and/or any of their respective subsidiaries who are (directly or indirectly through one or more investment vehicles) Investors.

"Master Agreement" has the meaning assigned to such term in the definition of "Swap Agreement."

"Material Adverse Effect" means any event, circumstance or condition that has had, or could reasonably be expected to have, a materially adverse effect on (a) the business or financial condition of the Borrower and the Restricted Subsidiaries, taken as a whole, (b) the ability of the Borrower and the Guarantors, taken as a whole, to perform their payment obligations under the Loan Documents or (c) the rights and remedies of the Administrative Agent and the Lenders under the Loan Documents.

"Material Indebtedness" means Indebtedness (other than the Loan Document Obligations), or obligations in respect of one or more Swap Agreements, of any one or more of Holdings, the Borrower and the Restricted Subsidiaries in an aggregate principal amount exceeding $100,000,000; provided that in no event shall any Permitted Receivables Financing be considered Material Indebtedness for any purpose.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that Holdings, the Borrower or such Restricted Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Material Subsidiary" means (a) each wholly-owned Restricted Subsidiary that, as of the last day of the fiscal quarter of the Borrower most recently ended for which financial statements are available, had revenues or total assets for such quarter in excess of 2.5% of the consolidated revenues or total assets, as applicable, of the Borrower for such quarter or that is designated by the Borrower as a Material Subsidiary and (b) any group comprising wholly-owned Restricted Subsidiaries that each would not have been a Material Subsidiary under clause (a) but that, taken together, as of the last day of the fiscal quarter

-36-

of the Borrower most recently ended for which financial statements are available, had revenues or total assets for such quarter in excess of 10.0% of the consolidated revenues or total assets, as applicable, of the Borrower for such quarter; provided that solely for purposes of Sections 7.01(h) and 7.01(i) each such Restricted Subsidiary forming part of such group is subject to an Event of Default under one or more of such Sections.

"Maximum Rate" has the meaning assigned to such term in Section 9.18.

"Merger" has the meaning provided in the preamble hereto.

"Merger Sub" has the meaning provided in the preamble hereto.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgage" means a mortgage, deed of trust, assignment of leases and rents, leasehold mortgage or other security document granting a Lien on any Mortgaged Property to secure the Secured Obligations, provided, however, in the event any Mortgaged Property is located in a jurisdiction which imposes mortgage recording taxes or similar fees, the applicable Mortgage shall not secure an amount in excess of 100% of the Fair Market Value of such Mortgaged Property. Each Mortgage shall be substantially in the form of Exhibit Q with such modifications as may be required by local laws.

"Mortgaged Property" means each parcel of real property and the improvements thereon owned in fee by a Loan Party with respect to which a Mortgage is granted pursuant to Section 4.01(f) (if any), 5.11 or 5.12.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event, (a) the proceeds received in respect of such event in cash or Permitted Investments, including (i) any cash or Permitted Investments received in respect of any non-cash proceeds, including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment or earn-out (but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds that are actually received, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments that are actually received, minus (b) the sum of (i) all fees and out-of-pocket expenses paid by Holdings, the Borrower and the Restricted Subsidiaries in connection with such event (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, underwriting discounts and commissions, other customary expenses and brokerage, consultant, accountant and other customary fees), (ii) in the case of a Disposition of an asset (including pursuant to a Sale Leaseback or Casualty Event or similar proceeding), (x) the amount of all payments that are permitted hereunder and are made by Holdings, the Borrower and the Restricted Subsidiaries as a result of such event to repay Indebtedness (other than the Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (y) the pro rata portion of net cash proceeds thereof (calculated without regard to this clause (y)) attributable to minority interests and not available for distribution to or for the account of Holdings, the Borrower and the Restricted Subsidiaries as a result thereof and (z) the amount of any liabilities directly associated with such asset and retained by Holdings, the Borrower or the Restricted Subsidiaries and (iii) the amount of all Taxes paid (or reasonably estimated to be payable), and the amount of any reserves established by Holdings, the Borrower and the Restricted Subsidiaries to fund contingent liabilities reasonably estimated to be payable, that are directly attributable to such event, provided that any reduction at any time in the amount of any such reserves (other than as a result of payments made in

-37-

respect thereof) shall be deemed to constitute the receipt by the Borrower at such time of Net Proceeds in the amount of such reduction.

"New Project" shall mean (a) each facility or store which is either a new facility, store, branch or office or an expansion, relocation, remodeling or substantial modernization of an existing facility, store, branch or office owned by the Borrower or its Subsidiaries which in fact commences operations and (b) each creation (in one or a series of related transactions) of a business unit to the extent such business unit commences operations or each expansion (in one or a series of related transactions) of business into a new market.

"Non-Accepting Lender" has the meaning assigned to such term in Section 2.22(c).

"Non-Cash Compensation Expense" means any non-cash expenses and costs that result from the issuance of stock-based awards, partnership interest-based awards and similar incentive based compensation awards or arrangements.

"Non-Consenting Lender" has the meaning assigned to such term in Section 9.02(c).

"Not Otherwise Applied" means, with reference to the Available Amount, the Starter Basket or the Available Equity Amount, as applicable, that was not previously applied pursuant to Section 6.04(n), 6.08(a)(viii) or 6.08(b)(iv).

"OFAC" has the meaning assigned to such term in Section 3.18.

"Offered Amount" has the meaning assigned to such term in Section 2.09(a)(ii)(D).

"Offered Discount" has the meaning assigned to such term in Section 2.09(a)(ii)(D).

"OID" has the meaning assigned to such term in Section 2.18(a).

"Organizational Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Commitments" means one or more Classes of term loan commitments hereunder that result from a Refinancing Amendment.

"Other Loans" means one or more Classes of Loans that result from a Refinancing Amendment.

"Other Taxes" means all present or future recording, stamp, court or documentary, intangible, filing or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document, except any such Taxes imposed with respect to an assignment.

"<u>Parent Entity</u>" means any Person that is a direct or indirect parent of the Borrower.

"<u>Participant</u>" has the meaning assigned to such term in Section 9.04(c)(i).

"<u>Participant Register</u>" has the meaning assigned to such term in Section 9.04(c)(iii).

"<u>Participating Lender</u>" has the meaning assigned to such term in Section 2.09(a)(ii)(C).

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"<u>Permitted Acquisition</u>" means an Acquisition Transaction; <u>provided</u> that (a) in the case of any purchase or other acquisition of Equity Interests in a Person, (i) such Person, upon the consummation of such purchase or acquisition, will be a Subsidiary (including as a result of a merger or consolidation between any Subsidiary and such Person), or (ii) such Person is merged into or consolidated with a Subsidiary and such Subsidiary is the surviving entity of such merger or consolidation, (b) the business of such Person, or such assets, as the case may be, constitute a business permitted by Section 5.16, (c) with respect to each such purchase or other acquisition, all actions required to be taken with respect to any such newly created or acquired Subsidiary (including each subsidiary thereof) or assets in order to satisfy the requirements set forth in clauses (a), (b), (c) and (d) of the definition of the term "Collateral and Guarantee Requirement" to the extent applicable shall have been taken (or arrangements for the taking of such actions after the consummation of the Permitted Acquisition shall have been made that are reasonably satisfactory to the Administrative Agent) (unless such newly created or acquired Subsidiary is designated as an Unrestricted Subsidiary pursuant to Section 5.15 or is otherwise an Excluded Subsidiary) and (d) after giving effect to any such purchase or other acquisition, no Event of Default under clause (a), (b), (h) or (i) of Section 7.01 shall have occurred and be continuing.

"<u>Permitted Amendment</u>" means an amendment to this Agreement and, if applicable the other Loan Documents, effected in connection with a Loan Modification Offer pursuant to Section 2.22, providing for an extension of a maturity date applicable to the Loans and/or Commitments of the Accepting Lenders and, in connection therewith, (a) a change in the Applicable Rate with respect to the Loans and/or Commitments of the Accepting Lenders and/or (b) a change in the fees payable to, or the inclusion of new fees to be payable to, the Accepting Lenders and/or (c) additional covenants or other provisions applicable only to periods after the Latest Maturity Date at the time of such Loan Modification Offer (it being understood that to the extent that any financial maintenance covenant is added for the benefit of any such Loans and/or Commitments, no consent shall be required by the Administrative Agent or any of the Lenders if such financial maintenance covenant is either (i) also added for the benefit of any corresponding Loans remaining outstanding after the issuance or incurrence of such Loans and/or Commitments or (ii) only applicable after the Latest Maturity Date at the time of such Loan Modification Offer).

"<u>Permitted Encumbrances</u>" means:

(a)     Liens for taxes or other governmental charges that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(b)     Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' Liens and other similar Liens arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days

or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Liens or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such Liens do not individually or in the aggregate have a Material Adverse Effect;

(c)     Liens incurred or deposits made in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) insurance carriers providing property, casualty or liability insurance to Holdings, any Intermediate Parent, the Borrower or any Restricted Subsidiary or otherwise supporting the payment of items set forth in the foregoing clause (i);

(d)     Liens incurred or deposits made to secure the performance of bids, trade contracts, governmental contracts and leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds, bankers acceptance facilities and other obligations of a like nature (including those to secure health, safety and environmental obligations) and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, incurred in the ordinary course of business or consistent with past practices;

(e)     easements, rights-of-way, restrictions, encroachments, protrusions and other similar encumbrances and minor title defects affecting real property that, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of Holdings the Borrower and the Restricted Subsidiaries, taken as a whole;

(f)     Liens securing, or otherwise arising from, judgments not constituting an Event of Default under Section 7.01(j);

(g)     Liens on goods the purchase price of which is financed by a documentary letter of credit issued for the account of the Borrower or any of its Subsidiaries or Liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments, provided that such Lien secures only the obligations of the Borrower or such subsidiaries in respect of such letter of credit to the extent such obligations are permitted by Section 6.01;

(h)     rights of set-off, banker's lien, netting agreements and other Liens arising by operation of law or by of the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments; and

(i)     Liens arising from precautionary Uniform Commercial Code financing statements or any similar filings made in respect of operating leases entered into by the Borrower or any of its subsidiaries.

"Permitted First Priority Refinancing Debt" means any secured Indebtedness incurred by the Borrower or any Loan Party in the form of one or more series of senior secured notes; provided that (i) such Indebtedness is secured by the Collateral on an equal priority basis (but without control of remedies) with the Loan Document Obligations and is not secured by any property or assets of the Borrower or any Subsidiary other than the Collateral, (ii) such Indebtedness constitutes Credit Agreement Refinancing

Indebtedness in respect of Loans (including portions of Classes of Loans or Other Loans), (iii) such Indebtedness does not have mandatory redemption features (other than customary asset sale, insurance and condemnation proceeds events, change of control offers or events of default) that could result in redemptions of such Indebtedness prior to the maturity of the Refinanced Debt and (iv) a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to the ABL Intercreditor Agreement, any First Lien Intercreditor Agreement and any Second Lien Intercreditor Agreement. Permitted First Priority Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"Permitted Holder" means (a) any one or more of the Sponsors; (b) Longview Asset Management LLC and its Affiliates; (c) the Management Investors and their Immediate Family Members; and (d) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act as in effect on the date hereof) of which the Persons described in clauses (a), (b) and/or (c) are members; provided that the Persons described in clauses (a), (b) and/or (c) beneficially own a majority of the Equity Interests beneficially owned by such group.

"Permitted Holdings Debt" has the meaning assigned to such term in Section 6.01(a)(xviii).

"Permitted Investments" means any of the following, to the extent owned by the Borrower or any Restricted Subsidiary:

(a)    dollars, euro, pounds, Australian dollars, Canadian dollars, Yuan or such other currencies held by it from time to time in the ordinary course of business;

(b)    readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, having average maturities of not more than 24 months from the date of acquisition thereof; provided that the full faith and credit of the United States or such member nation of the European Union is pledged in support thereof;

(c)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least (x) $250,000,000 in the case of U.S. banks and (y) $100,000,000 (or the dollar equivalent as of the date of determination) in the case of non-U.S. banks (any such bank meeting the requirements of clause (i) or (ii) above being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)    commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 24 months from the date of acquisition thereof;

(e)    repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer, in each case, having capital and surplus in excess of (x) $250,000,000 in the case of U.S. banks and (y) $100,000,000 (or the dollar equivalent as of the date of determination) in the case of non-U.S. banks, in each case, for direct obligations issued by or fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union rated A (or the equivalent thereof)  or better by S&P and A2 (or the

LEGAL_US_E # 113405763.8

equivalent thereof) or better by Moody's, in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a Fair Market Value of at least 100% of the amount of the repurchase obligations;

(f)    marketable short-term money market and similar highly liquid funds either (i) having assets in excess of (x) $250,000,000 in the case of U.S. banks or other U.S. financial institutions and (y) $100,000,000 (or the dollar equivalent as of the date of determination) in the case of non-U.S. banks or other non-U.S. financial institutions or (ii) having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(g)    securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, or by any political subdivision or taxing authority of any such state, commonwealth or territory having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)    investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(i)    instruments equivalent to those referred to in clauses (a) through (h) above denominated in euro or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction;

(j)    investments, classified in accordance with GAAP as current assets, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (i) of this definition;

(k)    with respect to any Foreign Subsidiary: (i) obligations of the national government of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business, provided such country is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business, provided such country is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-2" or the equivalent thereof or from Moody's is at least "P-2" or the equivalent thereof (any such bank being an "Approved Foreign Bank"), and in each case with maturities of not more than 24 months from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank; and

(l)    investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (k) above.

"Permitted Receivables Financing" means, collectively, any receivables securitizations or other

receivables financings (including any factoring program) in an aggregate amount not to exceed the greater of $320,000,000 and 32% of Consolidated EBITDA for the last Test Period (measured at each time any such financing is entered into) and that are non-recourse to Holdings and the Restricted Subsidiaries (except for (x) any customary limited recourse or recourse limited Subsidiaries that are not Loan Parties, (y) any performance undertaking or Guarantee and (z) an unsecured parent Guarantee (a "Receivables Guarantee") by Holdings, Intermediate Holdings or a Restricted Subsidiary that is a parent company of a Restricted Subsidiary of obligations of Restricted Subsidiaries, and, in each case, reasonable extensions thereof); provided that with respect to Permitted Receivables Financings incurred in the form of a factoring program, the outstanding amount of such Permitted Receivables Financing for the purposes of this definition shall be deemed to be equal to the Permitted Receivables Net Investment for the last Test Period.

"Permitted Receivables Net Investment" means the aggregate cash amount paid by the purchasers under any Permitted Receivables Financing in the form of a factoring program in connection with their purchase of accounts receivable and customary related assets or interests therein, as the same may be reduced from time to time by collections with respect to such accounts receivable and related assets or otherwise in accordance with the terms of such Permitted Receivables Financing (but excluding any such collections used to make payments of commissions, discounts, yield and other fees and charges incurred in connection with any Permitted Receivables Financing in the form of a factoring program which are payable to any Person other than the Borrower or a Restricted Subsidiary).

"Permitted Refinancing" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other amounts paid, and fees and expenses incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing revolving commitments unutilized thereunder to the extent that the portion of any existing and unutilized revolving commitment being refinanced was permitted to be drawn under Sections 6.01 and 6.02 of this Agreement immediately prior to such refinancing (other than by reference to a Permitted Refinancing) and such drawing shall be deemed to have been made, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 6.01(a)(v), Indebtedness resulting from such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (c) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Loan Document Obligations, Indebtedness resulting from such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Loan Document Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, (d) immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, and (e) if the Indebtedness being modified, refinanced, refunded, renewed or extended is permitted pursuant to Section 6.01(a)(ii), 6.01(a)(xxi), 6.01(a)(xxii), 6.01(a)(xxiii) or 6.01(a)(xxiv), (i) the terms and conditions (excluding as to subordination, interest rate (including whether such interest is payable in cash or in kind), rate floors, fees, discounts and premiums) of Indebtedness resulting from such modification, refinancing, refunding, renewal or extension are, taken as a whole, are not materially more favorable to the investors providing such Indebtedness than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed or extended (except for covenants or other provisions applicable to periods after the Latest Maturity Date at the time such Indebtedness is incurred) (it being understood that, to the extent that any financial maintenance covenant is added for the benefit of any such Permitted Refinancing, the terms shall not be considered materially more favorable if

-43-

such financial maintenance covenant is either (A) also added for the benefit of any corresponding Loans remaining outstanding after the issuance or incurrence of such Permitted Refinancing or (B) only applicable after the Latest Maturity Date at the time of such refinancing); provided that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days prior to such modification, refinancing, refunding, renewal or extension, together with a reasonably detailed description of the material terms and conditions of such resulting Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement, shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees) and (ii) the primary obligor in respect of, and/or the Persons (if any) that Guarantee, the Indebtedness resulting from such modification, refinancing, refunding, renewal or extension are the primary obligor in respect of, and/or Persons (if any) that Guaranteed the Indebtedness being modified, refinanced, refunded, renewed or extended.  For the avoidance of doubt, it is understood that a Permitted Refinancing may constitute a portion of an issuance of Indebtedness in excess of the amount of such Permitted Refinancing; provided that such excess amount is otherwise permitted to be incurred under Section 6.01.  For the avoidance of doubt, it is understood and agreed that a Permitted Refinancing includes successive Permitted Refinancings of the same Indebtedness.

"Permitted Second Priority Refinancing Debt" means any secured Indebtedness incurred by the Borrower or any Loan Party in the form of one or more series of junior lien secured notes or junior lien secured loans; provided that (i) such Indebtedness is secured by the Collateral on a junior basis with the Loan Document Obligations and is not secured by any property or assets of the Borrower or any Subsidiary other than the Collateral, (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness in respect of Loans (including portions of Classes of Loans or Other Loans), (iii) such Indebtedness does not have mandatory redemption features (other than customary asset sale, insurance and condemnation proceeds events, change of control offers or events of default) that could result in redemptions of such Indebtedness prior to the maturity of the Refinanced Debt and (iv) a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to a Second Lien Intercreditor Agreement.  Permitted Second Priority Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"Permitted Unsecured Refinancing Debt" means unsecured Indebtedness incurred by Borrower or any Loan Party in the form of one or more series of senior unsecured notes or loans; provided that (i) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness in respect of Loans (including portions of Classes of Loans or Other Loans), (ii) such Indebtedness does not have mandatory redemption features (other than customary asset sale, insurance and condemnation proceeds events, change of control offers or events of default) that could result in redemptions of such Indebtedness prior to the maturity of the Refinanced Debt and (iii) such Indebtedness is not secured by any Lien on any property or assets of Holdings, Intermediate Parent, the Borrower or any Restricted Subsidiary.  Permitted Unsecured Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which a Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Planned Expenditures" has the meaning assigned to such term in the definition of "Excess Cash

-44-

Flow".

"Platform" has the meaning specified in Section 5.01.

"Post-Transaction Period" means, with respect to any Specified Transaction, the period beginning on the date on which such Specified Transaction is consummated and ending on the last day of the eighth full consecutive fiscal quarter of the Borrower immediately following the date on which such Specified Transaction is consummated.

"Prepayment Event" means:

      (a)      any sale, transfer or other Disposition of any property or asset of the Borrower or any of the Restricted Subsidiaries pursuant to Section 6.05(j), Section 6.05(k), Section 6.05(m) and Section 6.05(n) other than Dispositions resulting in aggregate Net Proceeds not exceeding $10,000,000 in the case of any single transaction or series of related transactions; or

      (b)      the incurrence by the Borrower or any of the Restricted Subsidiaries of any Indebtedness, other than Indebtedness permitted under Section 6.01 (other than Permitted Unsecured Refinancing Debt, Permitted First Priority Refinancing Debt, Permitted Second Priority Refinancing Debt and Other Loans) or permitted by the Required Lenders pursuant to Section 9.02.

"Present Fair Saleable Value" means the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of the Borrower and its Subsidiaries taken as a whole are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated.

"Pro Forma Adjustment" means, for any Test Period, any adjustment to Consolidated EBITDA made in accordance with clause (b) of the definition of that term.

"Pro Forma Basis," "Pro Forma Compliance" and "Pro Forma Effect" means, with respect to compliance with any test, financial ratio or covenant hereunder required by the terms of this Agreement to be made on a Pro Forma Basis, that (a) to the extent applicable, the Pro Forma Adjustment shall have been made and (b) all Specified Transactions and the following transactions in connection therewith that have been made during the applicable period of measurement or subsequent to such period and prior to or simultaneously with the event for which the calculation is made shall be deemed to have occurred as of the first day of the applicable period of measurement in such test, financial ratio or covenant: (i) income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction, (A) in the case of a Disposition of all or substantially all Equity Interests in any subsidiary of Holdings or any division, product line, or facility used for operations of Holdings, the Borrower or any of the Restricted Subsidiaries, shall be excluded, and (B) in the case of a Permitted Acquisition or Investment described in the definition of "Specified Transaction," shall be included, (ii) any retirement of Indebtedness, and (iii) any Indebtedness incurred or assumed by Holdings, the Borrower or any of the Restricted Subsidiaries in connection therewith and if such Indebtedness has a floating or formula rate, shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness as at the relevant date of determination; provided that, without limiting the application of the Pro Forma Adjustment pursuant to clause (a) above, the foregoing pro forma adjustments may be applied to any such test, financial ratio or covenant solely to the extent that such adjustments are consistent with the definition of "Consolidated EBITDA" (and subject to the limitations set forth in clause (b) thereof) and give effect to events (including cost savings, operating expense reductions and synergies) that are (i) (x) directly

-45-

attributable to such transaction, (y) expected to have a continuing impact on Holdings, the Borrower and any of the Restricted Subsidiaries and (z) factually supportable or (ii) otherwise consistent with the definition of "Pro Forma Adjustment."

"Pro Forma Disposal Adjustment" means, for any four-quarter period that includes all or a portion of a fiscal quarter included in any Post-Transaction Period with respect to any Sold Entity or Business, the pro forma increase or decrease in Consolidated EBITDA projected by the Borrower in good faith as a result of contractual arrangements between the Borrower or any Restricted Subsidiary entered into with such Sold Entity or Business at the time of its disposal or within the Post-Transaction Period and which represent an increase or decrease in Consolidated EBITDA which is incremental to the Disposed EBITDA of such Sold Entity or Business for the most recent four-quarter period prior to its disposal.

"Pro Forma Entity" means any Acquired Entity or Business or any Converted Restricted Subsidiary.

"Pro Forma Financial Statements" has the meaning assigned to such term in Section 3.04(c).

"Proposed Change" has the meaning assigned to such term in Section 9.02(c).

"Public Lender" has the meaning specified in Section 5.01.

"Purchasing Borrower Party" means Holdings or any subsidiary of Holdings.

"Qualified Equity Interests" means Equity Interests in Holdings or any parent of Holdings other than Disqualified Equity Interests.

"Qualifying Lender" has the meaning assigned to such term in Section 2.09(a)(ii)(D).

"Receivables Guarantee" has the meaning assigned to such term in the definition of "Permitted Receivables Financing".

"Receivables Subsidiary" means any Special Purpose Entity established in connection with a Permitted Receivables Financing.

"Refinanced Debt" has the meaning assigned to such term in the definition of "Credit Agreement Refinancing Indebtedness."

"Refinancing Amendment" means an amendment to this Agreement executed by each of (a) the Borrower and Holdings, (b) the Administrative Agent and (c) each Additional Lender and Lender that agrees to provide any portion of the Credit Agreement Refinancing Indebtedness being incurred pursuant thereto, in accordance with Section 2.19.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Registered Equivalent Notes" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act of 1933, substantially identical notes (having substantially the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the

partners, directors, officers, employees, trustees, agents, controlling persons, advisors and other representatives of such Person and of each of such Person's Affiliates and permitted successors and assigns.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) and including the environment within any building or other structure.

"Removal Effective Date" has the meaning assigned to such term in Article VIII.

"Repricing Transaction" means (a) the incurrence by the Borrower of any Indebtedness in the form of term loans that are broadly syndicated to banks and other institutional investors (i) having an Effective Yield that is less than the Effective Yield for the Term Loans, but excluding Indebtedness incurred in connection with an IPO, Change of Control or Transformative Acquisition, and (ii) the proceeds of which are used to prepay (or, in the case of a conversion, deemed to prepay or replace), in whole or in part, outstanding principal of Term Loans or (b) any effective reduction in the Effective Yield for the Term Loans (e.g., by way of amendment, waiver or otherwise), except for a reduction in connection with an IPO, Change of Control or Transformative Acquisition.

"Required Additional Debt Terms" means with respect to any Indebtedness, (a) such Indebtedness does not mature earlier than the Latest Maturity Date (except in the case of customary bridge loans which subject to customary conditions (including no payment or bankruptcy event of default), would either automatically be converted into or required to be exchanged for permanent refinancing which does not mature earlier than the Latest Maturity Date), (b) such Indebtedness does not have mandatory redemption features (other than customary asset sale, insurance and condemnation proceeds events, change of control offers or events of default or, if term loans, excess cash flow prepayments applicable to periods before the Latest Maturity Date) that could result in redemptions of such Indebtedness prior to the Latest Maturity Date, (c) such Indebtedness is not guaranteed by any entity that is not a Loan Party, (d) such Indebtedness that is secured (i) is not secured by any assets not securing the Secured Obligations, (ii) is subject to the relevant Intercreditor Agreement(s) and (iii) is subject to security agreements relating to such Indebtedness that are substantially the same as the Security Documents (with such differences as are reasonably satisfactory to the Administrative Agent) and (e) the terms and conditions of such Indebtedness (excluding pricing, interest rate margins, rate floors, discounts, fees, premiums and prepayment or redemption provisions) are not materially more favorable (when taken as a whole) to the lenders or investors providing such Indebtedness than the terms and conditions of this Agreement (when taken as a whole) are to the Lenders (except for covenants or other provisions applicable only to periods after the Latest Maturity Date at such time) (it being understood that, to the extent that any financial maintenance covenant is added for the benefit of any Indebtedness, no consent shall be required by the Administrative Agent or any of the Lenders if such financial maintenance covenant is either (i) also added for the benefit of any corresponding Loans remaining outstanding after the issuance or incurrence of any such Indebtedness in connection therewith or (ii) only applicable after the Latest Maturity Date at such time); provided that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such resulting Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement, shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees).

"<u>Required Lenders</u>" means, at any time, Lenders having Loans and unused Commitments representing more than 50% of the aggregate amount of outstanding Loans at such time; <u>provided</u> that (a) Loans of the Borrower or any Affiliate thereof (other than Affiliated Debt Funds) and (b) whenever there are one or more Defaulting Lenders or Disqualified Lenders, the total outstanding Loans of each Defaulting Lender and each Disqualified Lender shall in each case be excluded for purposes of making a determination of Required Lenders.

"<u>Requirements of Law</u>" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Resignation Effective Date</u>" has the meaning assigned to such term in Article VIII.

"<u>Responsible Officer</u>" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer, or other similar officer, manager or a director of a Loan Party and with respect to certain limited liability companies or partnerships that do not have officers, any manager, sole member, managing member or general partner thereof, and as to any document delivered on the Effective Date or thereafter pursuant to paragraph (a) of the definition of the term "Collateral and Guarantee Requirement," any secretary or assistant secretary of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings, the Borrower, any other Restricted Subsidiary or any Intermediate Parent, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in Holdings, any Intermediate Parent, the Borrower or any Restricted Subsidiary or any option, warrant or other right to acquire any such Equity Interests.

"<u>Restricted Subsidiary</u>" means any Subsidiary other than an Unrestricted Subsidiary.

"<u>Retained Declined Proceeds</u>" has the meaning assigned to such term in Section 2.09(d).

"<u>Rollover Investors</u>" means certain equity holders of the Target that have elected to roll over their common stock in the Target, restricted stock units and/or stock options issued by the Target into Holdings (or a parent company thereof).

"<u>S&P</u>" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"<u>Sale Leaseback</u>" means any transaction or series of related transactions pursuant to which the Borrower or any other Restricted Subsidiary (a) sells, transfers or otherwise disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold, transferred or disposed of.

"<u>Sanctions</u>" means economic sanctions administered or enforced by the United States Government (including without limitation, sanctions enforced by OFAC), the United Nations Security

Council, the European Union or Her Majesty's Treasury.

"SEC" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Second Lien Intercreditor Agreement" means a Second Lien Intercreditor Agreement, substantially in the form of Exhibit F-2, entered into among the Collateral Agent, the ABL Agent, the Loan Parties and one or more Senior Representatives for holders of Indebtedness secured by Liens on the Collateral that rank junior to the Liens on the Collateral securing the Secured Obligations, with such modifications thereto as the Administrative Agent and the Borrower may reasonably agree.

"Secured Cash Management Obligations" means the due and punctual payment and performance of all obligations of Holdings, the Borrower and the Restricted Subsidiaries in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services, corporate credit and purchasing cards and related programs or any automated clearing house transfers of funds (collectively, "Cash Management Services") provided to Holdings, the Borrower or any Subsidiary (whether absolute or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor)) that are (a) owed to the Administrative Agent or any of its Affiliates, (b) owed on the Effective Date to a Person that is a Lender or an Affiliate of a Lender as of the Effective Date or (c) owed to a Person that is an Agent, a Lender or an Affiliate of an Agent or Lender at the time such obligations are incurred.

"Secured Leverage Ratio" means, on any date, the ratio of (a) Consolidated Secured Debt as of such date to (b) Consolidated EBITDA for the Test Period as of such date.

"Secured Obligations" means (a) the Loan Document Obligations, (b) the Secured Cash Management Obligations and (c) the Secured Swap Obligations (excluding with respect to any Loan Party, Excluded Swap Obligations of such Loan Party).

"Secured Parties" means (a) each Lender, (b) the Administrative Agent and Collateral Agent, (c) each Joint Bookrunner, (d) each Person to whom any Secured Cash Management Obligations are owed, (e) each counterparty to any Swap Agreement the obligations under which constitute Secured Swap Obligations and (f) the permitted successors and assigns of each of the foregoing.

"Secured Swap Obligations" means the due and punctual payment and performance of all obligations of Holdings, the Borrower, and the Restricted Subsidiaries under each Swap Agreement that (a) is with a counterparty that is the Administrative Agent or any of its Affiliates, (b) is in effect on the Effective Date with a counterparty that is a Lender or an Affiliate of a Lender as of the Effective Date or (c) is entered into after the Effective Date with any counterparty that is a Lender, an Agent or an Affiliate of a Lender or an Agent at the time such Swap Agreement is entered into.

"Security Documents" means the Collateral Agreement, the Mortgages and each other security agreement or pledge agreement executed and delivered pursuant to the Collateral and Guarantee Requirement, Section 4.01(f),  5.11, 5.12 or Section 5.14 to secure any of the Secured Obligations.

"Senior Notes" means the $1,900,000,000 in aggregate principal amount of senior unsecured notes due 2023 issued by the Borrower on or prior to the Effective Date.

"Senior Representative" means, with respect to any series of Permitted First Priority Refinancing Debt, Permitted Second Priority Refinancing Debt or other Indebtedness, the trustee, Administrative Agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to

-49-

which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"Sold Entity or Business" has the meaning given such term in the definition of "Consolidated EBITDA."

"Solicited Discount Proration" has the meaning assigned to such term in Section 2.09(a)(ii)(D).

"Solicited Discounted Prepayment Amount" has the meaning assigned to such term in Section 2.09(a)(ii)(D).

"Solicited Discounted Prepayment Notice" means an irrevocable written notice of a Borrower Solicitation of Discounted Prepayment Offers made pursuant to Section 2.09(a)(ii)(D) substantially in the form of Exhibit M.

"Solicited Discounted Prepayment Offer" means the irrevocable written offer by each Lender, substantially in the form of Exhibit N, submitted following the Administrative Agent's receipt of a Solicited Discounted Prepayment Notice.

"Solicited Discounted Prepayment Response Date" has the meaning assigned to such term in Section 2.09(a)(ii)(D).

"Solvent" means (a) the Fair Value of the assets of Holdings and its Subsidiaries on a consolidated basis taken as a whole exceeds their Liabilities, (b) the Present Fair Salable Value of the assets of Holdings and its Subsidiaries on a consolidated basis taken as a whole exceeds their Liabilities, (c) Holdings and its Subsidiaries on a consolidated basis taken as a whole after consummation of the Transactions is a going concern and has sufficient capital to reasonably ensure that it will continue to be a going concern for the period from the date hereof through the Latest Maturity Date taking into account the nature of, and the needs and anticipated needs for capital of, the particular business or businesses conducted or to be conducted by Holdings and its Subsidiaries on a consolidated basis as reflected in the projected financial statements and in light of the anticipated credit capacity and (d) for the period from the date hereof through the Latest Maturity Date, Holdings and its Subsidiaries on a consolidated basis taken as a whole will have sufficient assets and cash flow to pay their Liabilities as those liabilities mature or (in the case of contingent Liabilities) otherwise become payable, in light of business conducted or anticipated to be conducted by Holdings and its Subsidiaries as reflected in the projected financial statements and in light of the anticipated credit capacity.

"Special Purpose Entity" means a direct or indirect subsidiary of Holdings, whose organizational documents contain restrictions on its purpose and activities and impose requirements intended to preserve its separateness from Holdings and/or one or more Subsidiaries of Holdings.

"Specified Discount" has the meaning assigned to such term in Section 2.09(a)(ii)(B).

"Specified Discount Prepayment Amount" has the meaning assigned to such term in Section 2.09(a)(ii)(B).

"Specified Discount Prepayment Notice" means an irrevocable written notice of a Borrower Offer of Specified Discount Prepayment made pursuant to Section 2.09(a)(ii)(B) substantially in the form of Exhibit I.

"Specified Discount Prepayment Response" means the irrevocable written response by each

-50-

Lender, substantially in the form of Exhibit J, to a Specified Discount Prepayment Notice.

"Specified Discount Prepayment Response Date" has the meaning assigned to such term in Section 2.09(a)(ii)(B).

"Specified Discount Proration" has the meaning assigned to such term in Section 2.09(a)(ii)(B).

"Specified Representations" means the following:  (a) the representations made by, or with respect to, the Target and its Subsidiaries in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that Holdings (or its Affiliates) has the right (taking into account applicable cure provisions) to terminate its obligations under the Acquisition Agreement as a result of a breach of such representations in the Acquisition Agreement or to decline to consummate the Acquisition (in each case, in accordance with the terms of the Acquisition Agreement), and (b) the representations and warranties of the Borrower and the Guarantors set forth in Section 3.01 (with respect to Holdings, the Borrower and the Guarantors), Section 3.02 (with respect to the entering into, borrowing under, and performance of the Loan Documents and the granting of Liens in the Collateral), Section 3.03(b)(i) (with respect to the entering into, borrowing under, guaranteeing under, and performance of the Loan Documents and the granting of Liens in the Collateral), Section 3.08, Section 3.14, Section 3.16, Section 3.18(a), Section 3.18(b), Section 3.18(c) (with respect to the Patriot Act only) and Section 3.02(c) of the Security Agreement. Notwithstanding the foregoing, in no event shall the Specified Representations (other than with respect to Section 3.14) include any representation or warranty with respect to any Insignificant Subsidiary of the Target.

"Specified Transaction" means, with respect to any period, any Investment, Disposition, incurrence or repayment of Indebtedness, Restricted Payment, New Project, subsidiary designation or other event that by the terms of the Loan Documents requires "Pro Forma Compliance" with a test or covenant hereunder or requires such test or covenant to be calculated on a "Pro Forma Basis."

"Sponsor" means each of (a) BC Partners, Inc. and its Affiliates (including the funds, partnerships or other co-investment vehicles managed, advised or controlled thereby but other than, in each case, Holdings and its Subsidiaries or any portfolio company, (b) Caisse de dépôt et placement du Québec and its Affiliates (including the funds, partnerships or other co-investment vehicles managed, advised or controlled thereby but other than, in each case, Holdings and its Subsidiaries or any portfolio company) and (c) Government of Singapore Investment Corporation and its Affiliates (including the funds, partnerships or other co-investment vehicles managed, advised or controlled thereby but other than, in each case, Holdings and its Subsidiaries or any portfolio company).

"Spot Rate" means on any day with respect to any currency other than Dollars, the rate at which such currency may be exchanged into Dollars, as set forth at approximately 11:00 a.m. (London time) on such day as determined by OANDA Corporation (and available at http://www.oanda.com/)  for such currency; in the event that such rate is not determined by OANDA Corporation, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower, or, in the absence of such agreement, such Exchange Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 10:00 a.m. (New York City time) on such date for the purchase of Dollars for delivery two Business Days later.

"SPV" has the meaning assigned to such term in Section 9.04(e).

"Starter Basket" has the meaning assigned to such term in the definition of "Available Amount."

"Statutory Reserve Rate" means, with respect to any currency, a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve, liquid asset or similar percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by any Governmental Authority of the United States or of the jurisdiction of such currency or any jurisdiction in which Loans in such currency are made to which banks in such jurisdiction are subject for any category of deposits or liabilities customarily used to fund loans in such currency or by reference to which interest rates applicable to Loans in such currency are determined. Such reserve, liquid asset or similar percentages shall include those imposed pursuant to Regulation D of the Board of Governors, and if any Lender is required to comply with the requirements of The Bank of England and/or the Prudential Regulation Authority (or any authority that replaces any of the functions thereof) or the requirements of the European Central Bank. Eurocurrency Loans shall be deemed to be subject to such reserve, liquid asset or similar requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under Regulation D or any other applicable law, rule or regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Submitted Amount" has the meaning assigned to such term in Section 2.09(a)(ii)(C).

"Submitted Discount" has the meaning assigned to such term in Section 2.09(a)(ii)(C).

"Subordinated Indebtedness" means any Junior Financing under clause (a) of the definition thereof.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of the Borrower.

"Subsidiary Loan Party" means each Subsidiary that is a party to the Guarantee Agreement.

"Successor Borrower" has the meaning assigned to such term in Section 6.03(a)(iv).

"Successor Holdings" has the meaning assigned to such term in Section 6.03(a)(v).

"Swap" means any agreement, contract, or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar

transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" means, with respect to any Person, any obligation to pay or perform under any Swap.

"Syndication Agent" means Barclays Bank PLC.

"Target" means PetSmart, Inc., a Delaware corporation.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Commitment" means, with respect to each Term Lender, the commitment of such Term Lender to make a Term Loan hereunder on the Effective Date, expressed as an amount representing the maximum principal amount of the Term Loan to be made by such Term Lender hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.06 and (b) reduced or increased from time to time pursuant to assignments by or to such Term Lender pursuant to an Assignment and Assumption.  The initial amount of each Term Lender's Term Commitment is set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Term Lender shall have assumed its Term Commitment, as the case may be.  As of the date hereof, the total Term Commitment is $4,300,000,000.

"Term Facility" means the Term Loans and any Incremental Loans or any refinancing thereof.

"Term Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, an Incremental Facility Amendment in respect of any Term Loans or a Refinancing Amendment in respect of any Term Loans, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Term Loans" means Loans made pursuant to clause (a) of Section 2.01.

"Term Maturity Date" means March 11, 2022.

"Test Period" means, at any date of determination, the most recently completed four consecutive fiscal quarters of the Borrower ending on or prior to such date for which financial statements have been (or were required to have been) delivered pursuant to Section 5.01(a) or Section 5.01(b); provided that prior to the first date financial statements have been delivered pursuant to Section 5.01(a) or Section 5.01(b), the Test Period in effect shall be the period of four consecutive fiscal quarters of the Borrower ended November 2, 2014.

"Total Leverage Ratio" means, on any date, the ratio of (a) Consolidated Total Debt as of such date to (b) Consolidated EBITDA for the Test Period as of such date.

"Transactions" means, collectively, (a) the Equity Financing, (b) the Acquisition and the Merger, (c) the funding of the Term Loans on the Effective Date and the consummation of the other transactions

contemplated by this Agreement, (d) the funding of the Senior Notes, (e) the effectiveness of the ABL Facility, (f) the Effective Date Refinancing, (g) the consummation of any other transactions in connection with the foregoing (including in connection with the Acquisition Documents) and (h) the payment of the fees and expenses incurred in connection with any of the foregoing (including the Transaction Costs).

"Transaction Costs" means any fees or expenses incurred or paid by the Sponsors, Merger Sub, Holdings, the Borrower or any Subsidiary in connection with the Transactions, this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"Transformative Acquisition" means any acquisition by the Borrower or any Restricted Subsidiary that is either (a) not permitted by the terms of this Agreement immediately prior to the consummation of such acquisition or (b) if permitted by the terms of this Agreement immediately prior to the consummation of such acquisition, would not provide the Borrower and its Restricted Subsidiaries with adequate flexibility under this Agreement for the continuation and/or expansion of their combined operations following such consummation, as determined by the Borrower acting in good faith.

"Type," when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's security interest in any item or portion of the Pledged Collateral (as defined in the Collateral Agreement) is governed by the Uniform Commercial Code as in effect in a U.S. jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"Unrestricted Subsidiary" means any Subsidiary (other than the Borrower) designated by the Borrower as an Unrestricted Subsidiary pursuant to Section 5.15 subsequent to the Effective Date.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"Vehicles" means all railcars, cars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title law of any state and all tires and other appurtenances to any of the foregoing.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"wholly-owned subsidiary" means, with respect to any Person at any date, a subsidiary of such Person of which securities or other ownership interests representing 100% of the Equity Interests (other than (a) directors' qualifying shares and (b) nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law) are, as of such date, owned, controlled or held by such Person or one or more wholly-owned subsidiaries of such Person or by such Person and one or more

-54-

wholly-owned subsidiaries of such Person.

"<u>Withdrawal Liability</u>" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"<u>Withholding Agent</u>" shall mean any Loan Party, the Administrative Agent and, in the case of any U.S. federal withholding tax, any other withholding agent, if applicable.

SECTION 1.02    <u>Classification of Loans and Borrowings</u>.  For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Class (e.g., a "Term Loan") or by Type (e.g., a "Eurocurrency Loan") or by Class and Type (e.g., a "Eurocurrency Term Loan").  Borrowings also may be classified and referred to by Class (e.g., a "Term Borrowing") or by Type (e.g., a "Eurocurrency Borrowing") or by Class and Type (e.g., a "Eurocurrency Term Borrowing").

SECTION 1.03    <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04    <u>Accounting Terms; GAAP</u>.

(a)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP.

(b)    Notwithstanding anything to the contrary herein, for purposes of determining compliance with any test contained in this Agreement, the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio and the Interest Coverage Ratio shall be calculated on a Pro Forma Basis to give effect to all Specified Transactions that have been made during the applicable period of measurement or subsequent to such period and prior to or simultaneously with the event for which the calculation is made.

(c)    Where reference is made to "the Borrower and the Restricted Subsidiaries on a consolidated basis" or similar language, such consolidation shall not include any Subsidiaries of the Borrower other than the Restricted Subsidiaries.

(d)      In the event that the Borrower elects to prepare its financial statements in accordance with IFRS and such election results in a change in the method of calculation of financial covenants, standards or terms (collectively, the "Accounting Changes") in this Agreement, the Borrower and the Administrative Agent agree to enter into good faith negotiations in order to amend such provisions of this Agreement (including the levels applicable herein to any computation of the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio and the Interest Coverage Ratio) so as to reflect equitably the Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition shall be substantially the same after such change as if such change had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed in accordance with GAAP (as determined in good faith by a Responsible Officer of the Borrower) (it being agreed that the reconciliation between GAAP and IFRS used in such determination shall be made available to Lenders) as if such change had not occurred.

SECTION 1.05      Effectuation of Transactions.  All references herein to Holdings, the Borrower and their subsidiaries shall be deemed to be references to such Persons, and all the representations and warranties of Holdings, the Borrower and the other Loan Parties contained in this Agreement and the other Loan Documents shall be deemed made, in each case, after giving effect to the Acquisition and the other Transactions to occur on the Effective Date, unless the context otherwise requires.

SECTION 1.06      Currency Translation; Rates.

(a)      Notwithstanding the foregoing, for purposes of any determination under Article V, Article VI or Article VII or any determination under any other provision of this Agreement expressly requiring the use of a current exchange rate, all amounts incurred, outstanding or proposed to be incurred or outstanding in currencies other than dollars shall be translated into dollars at the Spot Rate (rounded to the nearest currency unit, with 0.5 or more of a currency unit being rounded upward); provided, however, that for purposes of determining compliance with Article VI with respect to the amount of any Indebtedness, Investment, Disposition or Restricted Payment in a currency other than dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred or Disposition or Restricted Payment made; provided, further, that, for the avoidance of doubt, the foregoing provisions of this Section 1.06 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred or Disposition or Restricted Payment made at any time under such Sections. For purposes of any determination of Consolidated Total Debt, amounts in currencies other than dollars shall be translated into dollars at the currency exchange rates used in preparing the most recently delivered financial statements pursuant to Section 5.01(a) or Section 5.01(b).  Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Borrower's consent (such consent not to be unreasonably withheld) to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

(b)      The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to the rates in the definition of "LIBO Rate" or with respect to any comparable or successor rate thereto, except as expressly provided herein.

SECTION 1.07      Limited Condition Acquisitions. In connection with any action being taken solely in connection with a Limited Condition Acquisition, for purposes of:

-56-

(i)      determining compliance with any provision of this Agreement which requires the calculation of the First Lien Leverage Ratio, Secured Leverage Ratio, Total Leverage Ratio or the Interest Coverage Ratio;

(ii)      determining compliance with representations, warranties, defaults or Events of Default; and

(iii)      testing availability under baskets set forth in this agreement (including baskets measured as a percentage of Consolidated EBITDA or Consolidated Total Assets);

in each case, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "LCA Election"), the date of determination of whether any such action is permitted hereunder, shall be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "LCA Test Date") (provided that the Borrower shall be required to make an LCA Election on or prior to the date on which the definitive agreements for such Limited Condition Acquisition have been entered into), and if, after giving Pro Forma Effect to the Limited Condition Acquisition and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) as if they had occurred at the beginning of the most recent Test Period ending prior to the LCA Test Date (after giving effect to any increases or decrease in Indebtedness of the Borrower and Restricted Subsidiaries since such date), the Borrower could have taken such action on the relevant LCA Test Date in compliance with such ratio, representation, warranty, default, Events of Default or basket, such ratio, representation, warranty, default, Event of Default or basket shall be deemed to have been complied with for the purposes of such Limited Condition Acquisition.  For the avoidance of doubt, if the Borrower has made an LCA Election and any of the ratios or baskets for which compliance was determined or tested as of the LCA Test Date are exceeded as a result of fluctuations in any such ratio or basket, including due to fluctuations in Consolidated EBITDA or Consolidated Total Assets of the Borrower or the Person subject to such Limited Condition Acquisition, at or prior to the consummation of the relevant transaction or action, such baskets or ratios will not be deemed to have been exceeded as a result of such fluctuations.  If the Borrower has made an LCA Election for any Limited Condition Acquisition, then in connection with any subsequent calculation of any ratios, representations, warranties, defaults, Events of Defaults or basket availability with respect to the incurrence of Indebtedness or Liens, or the making of Restricted Payments, mergers, the conveyance, lease or other transfer of all or substantially all of the assets of the Borrower, the prepayment, redemption, purchase, defeasance or other satisfaction of Indebtedness, or the designation of an Unrestricted Subsidiary on or following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such ratios, representations, warranties, defaults, Events of Defaults or baskets shall be calculated on a Pro Forma Basis assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have not been consummated until such time as the applicable Limited Condition Acquisition has actually closed (it being further understood that any Consolidated Net Income , Consolidated EBITDA and/or Consolidated Total Assets therefrom shall not be included in the Borrower's Consolidated Net Income, Consolidated EBITDA or Consolidated Total Assets, as applicable, in any such subsequent calculation until such Limited Condition Acquisition has actually closed).

LEGAL_US_E # 113405763.8

ARTICLE II

THE CREDITS

SECTION 2.01    Commitments.  Subject to the terms and conditions set forth herein, each Term Lender agrees to make a Term Loan to the Borrower on the Effective Date in a principal amount not exceeding its Term Commitment.  Amounts repaid or prepaid in respect of Loans may not be reborrowed.

SECTION 2.02    Loans and Borrowings.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Commitments of the applicable Class.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder, provided that the Commitments of the Lenders are several and, other than as expressly provided herein with respect to a Defaulting Lender, no Lender shall be responsible for any other Lender's failure to make Loans as required hereby.

(b)    Subject to Section 2.12, each Borrowing shall be comprised entirely of ABR Loans or Eurocurrency Loans as the Borrower may request in accordance herewith; provided that all Borrowings made on the Effective Date must be made as ABR Borrowings unless the Borrower shall have given the notice required for a Eurocurrency Borrowing under Section 2.03 and provided an indemnity letter extending the benefits of Section 2.14 to Lenders in respect of such Borrowings.

SECTION 2.03    Requests for Borrowings.  To request a Borrowing, the Borrower shall notify the Administrative Agent of such request in writing (a) in the case of a Eurocurrency Borrowing, not later than 3:00 p.m., New York City time, three Business Days before the date of the proposed Borrowing (or, in the case of any Eurocurrency Borrowing to be made on the Effective Date, such shorter period of time as may be agreed to by the Administrative Agent) or (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, on the date of the proposed Borrowing.  Each such Borrowing Request shall be irrevocable and shall be delivered by hand delivery, facsimile or other electronic transmission to the Administrative Agent and shall be signed by the Borrower.  Each such Borrowing Request shall specify the following information:

(i)    whether the requested Borrowing is to be a Term Loan Borrowing or a Borrowing of any other Class (specifying the Class thereof);

(ii)    the aggregate amount of such Borrowing;

(iii)    the date of such Borrowing, which shall be a Business Day;

(iv)    whether such Borrowing is to be an ABR Borrowing or a Eurocurrency Borrowing;

(v)    in the case of a Eurocurrency Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(vi)    the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.04.

If no election as to the Type of Borrowing is specified as to any Borrowing, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurocurrency Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04     Funding of Borrowings.

(a)     Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds in dollars by 2:00 p.m., New York City time, to the Applicable Account of the Administrative Agent most-recently designated by it for such purpose by notice to the Lenders.  The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower designated by the Borrower in the applicable Borrowing Request.

(b)     Obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 9.03(c) are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 9.03(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and, other than as expressly provided herein  with respect to a Defaulting Lender, no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 9.03(c).

SECTION 2.05     Interest Elections.

(a)     Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request or designated by Section 2.03 and, in the case of a Eurocurrency Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or designated by Section 2.03.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurocurrency Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such Interest Election Request shall be irrevocable and confirmed promptly to the Administrative Agent by hand delivery, facsimile or other electronic transmission to the Administrative Agent in the form of a written Interest Election Request signed by the Borrower.

(c)     Each Interest Election Request shall specify the following information in compliance with Section 2.03:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)      the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)      whether the resulting Borrowing is to be an ABR Borrowing or a Eurocurrency Borrowing; and

(iv)      if the resulting Borrowing is to be a Eurocurrency Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Eurocurrency Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)      Promptly following receipt of an Interest Election Request in accordance with this Section, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)      If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurocurrency Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.

SECTION 2.06      Termination and Reduction of Commitments.

(a)      Unless previously terminated, the Term Commitments shall terminate upon the earlier of (i) 5:00 p.m., New York City time, on the Effective Date and (ii) 11:59 p.m., New York City time, on June 19, 2015.

(b)      The Borrower may at any time terminate, or from time to time reduce, the Commitments of any Class; provided that each reduction of the Commitments of any Class shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000.

(c)      The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments under paragraph (b) of this Section at least one Business Day prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable. Any termination or reduction of the Commitments of any Class shall be permanent. Each reduction of the Commitments of any Class shall be made ratably among the Lenders in accordance with their respective Commitments of such Class.

SECTION 2.07      Repayment of Loans; Evidence of Debt.

(a)      The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.08.

(b)      Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section shall control.

(e)    Any Lender may request through the Administrative Agent that Loans of any Class made by it be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form provided by the Administrative Agent and approved by the Borrower.

SECTION 2.08    Amortization of Loans.

(a)    Subject to adjustment pursuant to paragraph (c) of this Section, the Borrower shall repay Term Loan Borrowings on the dates and in the amounts set forth on Annex I, together in each case with accrued and unpaid interest on the principal amount to be paid to but excluding the date of such payment; provided that if any such date is not a Business Day, such payment shall be due on the next preceding Business Day.

(b)    To the extent not previously paid, all Term Loans shall be due and payable on the Term Maturity Date, or, if such date is not a Business Day, on the next preceding Business Day.

(c)    Any prepayment of a Borrowing of any Class (i) pursuant to Section 2.09(a)(i) shall be applied to reduce the subsequent scheduled and outstanding repayments of the Borrowings of such Class to be made pursuant to this Section as directed by the Borrower (and absent such direction in direct order of maturity) and (ii) pursuant to Section 2.09(b) or 2.09(c) shall be applied to reduce the subsequent scheduled and outstanding repayments of the Borrowings of such Class to be made pursuant to this Section, or, except as otherwise provided in any Refinancing Amendment, pursuant to the corresponding section of such Refinancing Amendment, in direct order of maturity.

(d)    Prior to any repayment of any Borrowings of any Class hereunder, the Borrower shall select the Borrowing or Borrowings of the applicable Class to be repaid and shall notify the Administrative Agent in writing (via hand delivery or facsimile) of such election not later than 3:00 p.m., New York City time, two Business Day before the scheduled date of such repayment.  In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.14.  Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing.  Repayments of Borrowings shall be accompanied by accrued interest on the amount repaid.

SECTION 2.09    Prepayment of Loans.

-61-

(a)    (i)    The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to the requirements of this Section; provided that in the event that, on or prior to the twelve month anniversary of the Effective Date, the Borrower (i) makes any prepayment of Term Loans in connection with any Repricing Transaction the primary purpose of which is to decrease the Effective Yield on such Term Loans or (ii) effects any amendment of this Agreement resulting in a Repricing Transaction the primary purpose of which is to decrease the Effective Yield on the Term Loans, the Borrower shall pay to the Administrative Agent, for the ratable account of each of the applicable Lenders, (x) in the case of clause (i), a prepayment premium of 1.00% of the aggregate principal amount of the Term Loans being prepaid in connection with such repricing Transaction and (y) in the case of clause (ii), an amount equal to 1.00% of the aggregate principal amount of the Term Loans outstanding immediately prior to such amendment that are subject to an effective reduction in Effective Yield pursuant to such Repricing Transaction.

(ii)    Notwithstanding anything in any Loan Document to the contrary, so long as no Default or Event of Default has occurred and is continuing, the Borrower may prepay the outstanding Loans on the following basis:

(A)    The Borrower shall have the right to make a voluntary prepayment of Loans at a discount to par (such prepayment, the "Discounted Loan Prepayment") pursuant to a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offers or Borrower Solicitation of Discounted Prepayment Offers, in each case made in accordance with this Section 2.09(a)(ii); provided that the Borrower shall not initiate any action under this Section 2.09(a)(ii) in order to make a Discounted Loan Prepayment unless (I) at least ten (10) Business Days shall have passed since the consummation of the most recent Discounted Loan Prepayment as a result of a prepayment made by the Borrower on the applicable Discounted Prepayment Effective Date; or (II) at least three (3) Business Days shall have passed since the date the Borrower was notified that no Lender was willing to accept any prepayment of any Loan and/or Other Loan at the Specified Discount, within the Discount Range or at any discount to par value, as applicable, or in the case of Borrower Solicitation of Discounted Prepayment Offers, the date of the Borrower's election not to accept any Solicited Discounted Prepayment Offers.

(B)    (1)  Subject to the proviso to subsection (A) above, the Borrower may from time to time offer to make a Discounted Loan Prepayment by providing the Auction Agent with three (3) Business Days' notice in the form of a Specified Discount Prepayment Notice; provided that (I) any such offer shall be made available, at the sole discretion of the Borrower, to each Lender and/or each Lender with respect to any Class of Loans on an individual tranche basis, (II) any such offer shall specify the aggregate principal amount offered to be prepaid (the "Specified Discount Prepayment Amount") with respect to each applicable tranche, the tranche or tranches of Loans subject to such offer and the specific percentage discount to par (the "Specified Discount") of such Loans to be prepaid (it being understood that different Specified Discounts and/or Specified Discount Prepayment Amounts may be offered with respect to different tranches of Loans and, in such an event, each such offer will be treated as a separate offer pursuant to the terms of this Section), (III) the Specified Discount Prepayment Amount shall be in an aggregate amount not less than $10,000,000 and whole increments of $1,000,000 in excess thereof and (IV) each such offer shall remain outstanding through the Specified Discount Prepayment Response Date.  The Auction Agent will promptly provide each relevant Lender with a copy of such Specified Discount Prepayment Notice and a form of the Specified Discount Prepayment Response to be completed and returned by each such Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to the relevant Lenders (the "Specified Discount Prepayment Response Date").

(2)     Each relevant Lender receiving such offer shall notify the Auction Agent (or its delegate) by the Specified Discount Prepayment Response Date whether or not it agrees to accept a prepayment of any of its relevant then outstanding Loans at the Specified Discount and, if so (such accepting Lender, a "Discount Prepayment Accepting Lender"), the amount and the tranches of such Lender's Loans to be prepaid at such offered discount. Each acceptance of a Discounted Loan Prepayment by a Discount Prepayment Accepting Lender shall be irrevocable. Any Lender whose Specified Discount Prepayment Response is not received by the Auction Agent by the Specified Discount Prepayment Response Date shall be deemed to have declined to accept the applicable Borrower Offer of Specified Discount Prepayment.

(3)     If there is at least one Discount Prepayment Accepting Lender, the Borrower will make prepayment of outstanding Loans pursuant to this paragraph (B) to each Discount Prepayment Accepting Lender in accordance with the respective outstanding amount and tranches of Loans specified in such Lender's Specified Discount Prepayment Response given pursuant to subsection (2); provided that, if the aggregate principal amount of Loans accepted for prepayment by all Discount Prepayment Accepting Lenders exceeds the Specified Discount Prepayment Amount, such prepayment shall be made pro-rata among the Discount Prepayment Accepting Lenders in accordance with the respective principal amounts accepted to be prepaid by each such Discount Prepayment Accepting Lender and the Auction Agent (in consultation with the Borrower and subject to rounding requirements of the Auction Agent made in its reasonable discretion) will calculate such proration (the "Specified Discount Proration"). The Auction Agent shall promptly, and in any case within three (3) Business Days following the Specified Discount Prepayment Response Date, notify (I) the Borrower of the respective Lenders' responses to such offer, the Discounted Prepayment Effective Date and the aggregate principal amount of the Discounted Loan Prepayment and the tranches to be prepaid, (II) each Lender of the Discounted Prepayment Effective Date, and the aggregate principal amount and the tranches of Loans to be prepaid at the Specified Discount on such date and (III) each Discount Prepayment Accepting Lender of the Specified Discount Proration, if any, and confirmation of the principal amount, tranche and Type of Loans of such Lender to be prepaid at the Specified Discount on such date. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the Borrower and Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the Borrower shall be due and payable by the Borrower on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(C)     (1) Subject to the proviso to subsection (A) above, the Borrower may from time to time solicit Discount Range Prepayment Offers by providing the Auction Agent with three (3) Business Days' notice in the form of a Discount Range Prepayment Notice; provided that (I) any such solicitation shall be extended, at the sole discretion of the Borrower, to each Lender and/or each Lender with respect to any Class of Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate principal amount of the relevant Loans (the "Discount Range Prepayment Amount"), the tranche or tranches of Loans subject to such offer and the maximum and minimum percentage discounts to par (the "Discount Range") of the principal amount of such Loans with respect to each relevant tranche of Loans willing to be prepaid by the Borrower (it being understood that different Discount Ranges and/or Discount Range Prepayment Amounts may be offered with respect to different tranches of Loans and, in such an event, each such offer will be treated as a separate offer pursuant to the terms of this Section), (III) the Discount Range Prepayment Amount shall be in an aggregate amount not less than $10,000,000 and whole increments of $1,000,000 in excess thereof and (IV) each such solicitation by the Borrower shall remain outstanding through the Discount Range Prepayment Response Date. The Auction Agent will promptly provide each relevant Lender with a copy of

-63-

such Discount Range Prepayment Notice and a form of the Discount Range Prepayment Offer to be submitted by a responding relevant Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to the relevant Lenders (the "Discount Range Prepayment Response Date").  Each relevant Lender's Discount Range Prepayment Offer shall be irrevocable and shall specify a discount to par within the Discount Range (the "Submitted Discount") at which such Lender is willing to allow prepayment of any or all of its then outstanding Loans of the applicable tranche or tranches and the maximum aggregate principal amount and tranches of such Lender's Loans (the "Submitted Amount") such Lender is willing to have prepaid at the Submitted Discount.  Any Lender whose Discount Range Prepayment Offer is not received by the Auction Agent by the Discount Range Prepayment Response Date shall be deemed to have declined to accept a Discounted Loan Prepayment of any of its Loans at any discount to their par value within the Discount Range.

(2)    The Auction Agent shall review all Discount Range Prepayment Offers received on or before the applicable Discount Range Prepayment Response Date and shall determine (in consultation with the Borrower and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the Applicable Discount and Loans to be prepaid at such Applicable Discount in accordance with this subsection (C).  The Borrower agree to accept on the Discount Range Prepayment Response Date all Discount Range Prepayment Offers received by Auction Agent by the Discount Range Prepayment Response Date, in the order from the Submitted Discount that is the largest discount to par to the Submitted Discount that is the smallest discount to par, up to and including the Submitted Discount that is the smallest discount to par within the Discount Range (such Submitted Discount that is the smallest discount to par within the Discount Range being referred to as the "Applicable Discount") which yields a Discounted Loan Prepayment in an aggregate principal amount equal to the lower of (I) the Discount Range Prepayment Amount and (II) the sum of all Submitted Amounts.  Each Lender that has submitted a Discount Range Prepayment Offer to accept prepayment at a discount to par that is larger than or equal to the Applicable Discount shall be deemed to have irrevocably consented to prepayment of Loans equal to its Submitted Amount (subject to any required proration pursuant to the following subsection (3)) at the Applicable Discount (each such Lender, a "Participating Lender").

(3)    If there is at least one Participating Lender, the Borrower will prepay the respective outstanding Loans of each Participating Lender in the aggregate principal amount and of the tranches specified in such Lender's Discount Range Prepayment Offer at the Applicable Discount; provided that if the Submitted Amount by all Participating Lenders offered at a discount to par greater than the Applicable Discount exceeds the Discounted Range Prepayment Amount, prepayment of the principal amount of the relevant Loans for those Participating Lenders whose Submitted Discount is a discount to par greater than or equal to the Applicable Discount (the "Identified Participating Lenders") shall be made pro-rata among the Identified Participating Lenders in accordance with the Submitted Amount of each such Identified Participating Lender and the Auction Agent (in consultation with the Borrower and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "Discount Range Proration").  The Auction Agent shall promptly, and in any case within five (5) Business Days following the Discount Range Prepayment Response Date, notify (I) the Borrower of the respective Lenders' responses to such solicitation, the Discounted Prepayment Effective Date, the Applicable Discount, and the aggregate principal amount of the Discounted Loan Prepayment and the tranches to be prepaid, (II) each Lender of the Discounted Prepayment Effective Date, the Applicable Discount, and the aggregate principal amount and tranches of Loans to be prepaid at the Applicable Discount on such date, (III) each Participating

-64-

Lender of the aggregate principal amount and tranches of such Lender to be prepaid at the Applicable Discount on such date, and (z) if applicable, each Identified Participating Lender of the Discount Range Proration.  Each determination by the Auction Agent of the amounts stated in the foregoing notices to the Borrower and Lenders shall be conclusive and binding for all purposes absent manifest error.  The payment amount specified in such notice to the Borrower shall be due and payable by the Borrower on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(D)     (1)  Subject to the proviso to subsection (A) above, the Borrower may from time to time solicit Solicited Discounted Prepayment Offers by providing the Auction Agent with three (3) Business Days' notice in the form of a Solicited Discounted Prepayment Notice; provided that (I) any such solicitation shall be extended, at the sole discretion of the Borrower, to each Lender and/or each Lender with respect to any Class of Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate dollar amount of the Loans (the "Solicited Discounted Prepayment Amount") and the tranche or tranches of Loans the Borrower is willing to prepay at a discount (it being understood that different Solicited Discount Prepayment Amounts may be offered with respect to different tranches of Loans and, in such an event, each such offer will be treated as a separate offer pursuant to the terms of this Section), (III) the Solicited Discounted Prepayment Amount shall be in an aggregate amount not less than $10,000,000 and whole increments of $1,000,000 in excess thereof and (IV) each such solicitation by the Borrower shall remain outstanding through the Solicited Discounted Prepayment Response Date.  The Auction Agent will promptly provide each relevant Lender with a copy of such Solicited Discounted Prepayment Notice and a form of the Solicited Discounted Prepayment Offer to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time on the third Business Day after the date of delivery of such notice to the relevant Lenders (the "Solicited Discounted Prepayment Response Date").  Each Lender's Solicited Discounted Prepayment Offer shall (x) be irrevocable, (y) remain outstanding until the Acceptance Date, and (z) specify both a discount to par (the "Offered Discount") at which Lender is willing to allow prepayment of its then outstanding Loan and the maximum aggregate principal amount and tranches of such Loans (the "Offered Amount") such Lender is willing to have prepaid at the Offered Discount.  Any Lender whose Solicited Discounted Prepayment Offer is not received by the Auction Agent by the Solicited Discounted Prepayment Response Date shall be deemed to have declined prepayment of any of its Loans at any discount.

(2)     The Auction Agent shall promptly provide the Borrower with a copy of all Solicited Discounted Prepayment Offers received on or before the Solicited Discounted Prepayment Response Date.  The Borrower shall review all such Solicited Discounted Prepayment Offers and select the largest of the Offered Discounts specified by the relevant responding Lenders in the Solicited Discounted Prepayment Offers that is acceptable to the Borrower (the "Acceptable Discount"), if any.  If the Borrower elects to accept any Offered Discount as the Acceptable Discount, then as soon as practicable after the determination of the Acceptable Discount, but in no event later than by the third Business Day after the date of receipt by the Borrower from the Auction Agent of a copy of all Solicited Discounted Prepayment Offers pursuant to the first sentence of this subsection (2) (the "Acceptance Date"), the Borrower shall submit an Acceptance and Prepayment Notice to the Auction Agent setting forth the Acceptable Discount.  If the Auction Agent shall fail to receive an Acceptance and Prepayment Notice from the Borrower by the Acceptance Date, the Borrower shall be deemed to have rejected all Solicited Discounted Prepayment Offers.

(3)     Based upon the Acceptable Discount and the Solicited Discounted Prepayment Offers received by Auction Agent by the Solicited Discounted Prepayment Response Date, within

three (3) Business Days after receipt of an Acceptance and Prepayment Notice (the "Discounted Prepayment Determination Date"), the Auction Agent will determine (in consultation with the Borrower and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the aggregate principal amount and the tranches of Loans (the "Acceptable Prepayment Amount") to be prepaid by the Borrower at the Acceptable Discount in accordance with this Section 2.09(a)(ii)(D)).  If the Borrower elects to accept any Acceptable Discount, then the Borrower agrees to accept all Solicited Discounted Prepayment Offers received by Auction Agent by the Solicited Discounted Prepayment Response Date, in the order from largest Offered Discount to smallest Offered Discount, up to and including the Acceptable Discount.  Each Lender that has submitted a Solicited Discounted Prepayment Offer with an Offered Discount that is greater than or equal to the Acceptable Discount shall be deemed to have irrevocably consented to prepayment of Loans equal to its Offered Amount (subject to any required pro-rata reduction pursuant to the following sentence) at the Acceptable Discount (each such Lender, a "Qualifying Lender").  The Borrower will prepay outstanding Loans pursuant to this subsection (D) to each Qualifying Lender in the aggregate principal amount and of the tranches specified in such Lender's Solicited Discounted Prepayment Offer at the Acceptable Discount; provided that if the aggregate Offered Amount by all Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount exceeds the Solicited Discounted Prepayment Amount, prepayment of the principal amount of the Loans for those Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount (the "Identified Qualifying Lenders") shall be made pro rata among the Identified Qualifying Lenders in accordance with the Offered Amount of each such Identified Qualifying Lender and the Auction Agent (in consultation with the Borrower and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "Solicited Discount Proration").  On or prior to the Discounted Prepayment Determination Date, the Auction Agent shall promptly notify (I) the Borrower of the Discounted Prepayment Effective Date and Acceptable Prepayment Amount comprising the Discounted Loan Prepayment and the tranches to be prepaid, (II) each Lender of the Discounted Prepayment Effective Date, the Acceptable Discount, and the Acceptable Prepayment Amount of all Loans and the tranches to be prepaid to be prepaid at the Applicable Discount on such date, (III) each Qualifying Lender of the aggregate principal amount and the tranches of such Lender to be prepaid at the Acceptable Discount on such date, and (IV) if applicable, each Identified Qualifying Lender of the Solicited Discount Proration.  Each determination by the Auction Agent of the amounts stated in the foregoing notices to the Borrower and Lenders shall be conclusive and binding for all purposes absent manifest error.  The payment amount specified in such notice to the Borrower shall be due and payable by the Borrower on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(E)    In connection with any Discounted Loan Prepayment, the Borrower and the Lenders acknowledge and agree that the Auction Agent may require as a condition to any Discounted Loan Prepayment, the payment of customary fees and expenses from the Borrower in connection therewith.

(F)    If any Loan is prepaid in accordance with paragraphs (B) through (D) above, the Borrower shall prepay such Loans on the Discounted Prepayment Effective Date.  The Borrower shall make such prepayment to the Auction Agent, for the account of the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, at the Administrative Agent's Office in immediately available funds not later than 11:00 a.m., New York City time, on the Discounted Prepayment Effective Date and all such prepayments shall be applied to the remaining principal installments of the relevant tranche of Loans on a pro rata basis across such installments. The Loans so prepaid shall be accompanied by all accrued and unpaid

LEGAL_US_E # 113405763.8

interest on the par principal amount so prepaid up to, but not including, the Discounted Prepayment Effective Date.  Each prepayment of the outstanding Loans pursuant to this Section 2.09(a)(ii) shall be paid to the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable.  The aggregate principal amount of the tranches and installments of the relevant Loans outstanding shall be deemed reduced by the full par value of the aggregate principal amount of the tranches of Loans prepaid on the Discounted Prepayment Effective Date in any Discounted Loan Prepayment.

(G)      To the extent not expressly provided for herein, each Discounted Loan Prepayment shall be consummated pursuant to procedures consistent, with the provisions in this Section 2.09(a)(ii), established by the Auction Agent acting in its reasonable discretion and as reasonably agreed by the Borrower.

(H)      Notwithstanding anything in any Loan Document to the contrary, for purposes of this Section 2.09(a)(ii), each notice or other communication required to be delivered or otherwise provided to the Auction Agent (or its delegate) shall be deemed to have been given upon Auction Agent's (or its delegate's) actual receipt during normal business hours of such notice or communication; provided that any notice or communication actually received outside of normal business hours shall be deemed to have been given as of the opening of business on the next Business Day.

(I)      Each of the Borrower and the Lenders acknowledges and agrees that the Auction Agent may perform any and all of its duties under this Section 2.09(a)(ii) by itself or through any Affiliate of the Auction Agent and expressly consents to any such delegation of duties by the Auction Agent to such Affiliate and the performance of such delegated duties by such Affiliate. The exculpatory provisions pursuant to this Agreement shall apply to each Affiliate of the Auction Agent and its respective activities in connection with any Discounted Loan Prepayment provided for in this Section  2.09(a)(ii) as well as activities of the Auction Agent.

(J)      The Borrower shall have the right, by written notice to the Auction Agent, to revoke in full (but not in part) its offer to make a Discounted Loan Prepayment and rescind the applicable Specified Discount Prepayment Notice, Discount Range Prepayment Notice or Solicited Discounted Prepayment Notice therefor at its discretion at any time on or prior to the applicable Specified Discount Prepayment Response Date (and if such offer is revoked pursuant to the preceding clauses, any failure by the Borrower to make any prepayment to a Lender, as applicable, pursuant to this Section  2.09(a)(ii) shall not constitute a Default or Event of Default under Section 7.01 or otherwise).

(b)      In the event and on each occasion that any Net Proceeds are received by or on behalf of Holdings, the Borrower or any of the Restricted Subsidiaries in respect of any Prepayment Event, the Borrower shall, within ten Business Days after such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (b) of the definition of the term "Prepayment Event," on the date of such Prepayment Event), prepay Borrowings in an aggregate amount equal to 100% of the amount of such Net Proceeds; provided that, in the case of any event described in clause (a) of the definition of the term "Prepayment Event," if the Borrower and the Restricted Subsidiaries invest (or commit to invest) the Net Proceeds from such event (or a portion thereof) within 12 months after receipt of such Net Proceeds in the business of the Borrower and the other Subsidiaries (including any acquisitions permitted under Section 6.04), then no prepayment shall be required pursuant to this paragraph in respect of such Net Proceeds in respect of such event (or the applicable portion of such Net Proceeds, if applicable) except to the extent of any such Net Proceeds therefrom that have not been so invested (or committed to be invested) by the end of such 12-month period (or if committed to be so invested within such 12-month

period, have not been so invested within 18 months after receipt thereof), at which time a prepayment shall be required in an amount equal to such Net Proceeds that have not been so invested (or committed to be invested); provided, further, that the Borrower may use a portion of such Net Proceeds to prepay or repurchase any other Indebtedness that is secured by the Collateral on a pari passu basis with the Borrowings to the extent such other Indebtedness and the Liens securing the same are permitted hereunder and the documentation governing such other Indebtedness requires such a prepayment or repurchase thereof with the proceeds of such Prepayment Event, in each case in an amount not to exceed the product of (x) the amount of such Net Proceeds and (y) a fraction, the numerator of which is the outstanding principal amount of such other Indebtedness and the denominator of which is the aggregate outstanding principal amount of Term Loans and such other Indebtedness.

(c)     Following the end of each fiscal year of the Borrower, commencing with the fiscal year ending January 29, 2017, the Borrower shall prepay Borrowings in an aggregate amount equal to the ECF Percentage of Excess Cash Flow for such fiscal year; provided that such amount shall be reduced by the aggregate amount of prepayments of (i) Loans made pursuant to Section 2.09(a) (provided that such reduction as a result of prepayments pursuant to clause (ii) thereof shall (x) be limited to the actual amount of such cash prepayment and (y) only be applicable if the applicable prepayment offer was made to all Lenders) during such fiscal year  and (ii) other Consolidated First Lien Debt (provided that in the case of the prepayment of any revolving commitments, there is a corresponding reduction in commitments), excluding, in each case, all such prepayments funded with the proceeds of other long-term Indebtedness or the issuance of Equity Interests).  Each prepayment pursuant to this paragraph shall be made on or before the date that is five Business Days after the date on which financial statements are required to be delivered pursuant to Section 5.01 with respect to the fiscal year for which Excess Cash Flow is being calculated.

(d)     Prior to any optional or mandatory prepayment of Borrowings hereunder, the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (e) of this Section.  In the event of any mandatory prepayment of Borrowings made at a time when Borrowings of more than one Class remain outstanding, the Borrower shall select Borrowings to be prepaid so that the aggregate amount of such prepayment is allocated between Borrowings (and, to the extent provided in the Refinancing Amendment for any Class of Other Loans, the Borrowings of such Class) pro rata based on the aggregate principal amount of outstanding Borrowings of each such Class; provided that any Lender (and, to the extent provided in the Refinancing Amendment for any Class of Other Loans, any Lender that holds Other Loans of such Class) may elect, by notice to the Administrative Agent in writing (via hand delivery or facsimile) at least one Business Day prior to the prepayment date, to decline all or any portion of any prepayment of its Loans or Other Loans of any such Class pursuant to this Section (other than an optional prepayment pursuant to paragraph (a)(i) of this Section or a mandatory prepayment as a result of the Prepayment Event set forth in clause (b) of the definition thereof, which may not be declined), in which case the aggregate amount of the prepayment that would have been applied to prepay Loans or Other Loans of any such Class but was so declined shall be retained by the Borrower and the Restricted Subsidiaries (such amounts, "Retained Declined Proceeds").  Optional prepayments of Borrowings shall be allocated among the Classes of Borrowings as directed by the Borrower. In the absence of a designation by the Borrower as described in the preceding provisions of this paragraph of the Type of Borrowing of any Class, the Administrative Agent shall make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.14.

(e)     The Borrower shall notify the Administrative Agent in writing (via hand delivery or facsimile) of any prepayment hereunder (i) in the case of prepayment of a Eurocurrency Borrowing or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall specify the

prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that, so long as the Administrative Agent is notified prior to the prepayment date, a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest to the extent required by Section 2.11.  At the Borrower's election in connection with any prepayment pursuant to this Section 2.09, such prepayment shall not be applied to any Loan of a Defaulting Lender and shall be allocated ratably among the relevant non-Defaulting Lenders.

(f)      Notwithstanding any other provisions of Section 2.09(b) or (c), (A) to the extent that any of or all the Net Proceeds of any Prepayment Event set forth in clause (a) of the definition thereof by a Foreign Subsidiary giving rise to a prepayment pursuant to Section 2.09(b) (a "Foreign Prepayment Event") or Excess Cash Flow are prohibited or delayed by any Requirement of Law from being repatriated to the Borrower, the portion of such Net Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Loans at the times provided in Section 2.09(b) or (c), as the case may be, and such amounts may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable Requirement of Law will not permit repatriation to the Borrower (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all actions reasonably required by the applicable Requirement of Law to permit such repatriation), and once such repatriation of any of such affected Net Proceeds or Excess Cash Flow is permitted under the applicable Requirement of Law, such repatriation will be promptly effected and such repatriated Net Proceeds or Excess Cash Flow will be promptly (and in any event not later than three Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to Section 2.09(b) or (c), as applicable, and (B) to the extent that and for so long as the Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Foreign Prepayment Event or Excess Cash Flow would have a material adverse tax consequence (taking into account any foreign tax credit or benefit actually realized in connection with such repatriation) with respect to such Net Proceeds or Excess Cash Flow, the Net Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Loans at the times provided in Section 2.09(b) or (c), as the case may be, and such amounts may be retained by the applicable Foreign Subsidiary; provided that when the Borrower determines in good faith that repatriation of any of or all the Net Proceeds of any Foreign Prepayment Event or Excess Cash Flow would no longer have a material adverse tax consequence (taking into account any foreign tax credit or benefit actually realized in connection with such repatriation) with respect to such Net Proceeds or Excess Cash Flow, such Net Proceeds or Excess Cash Flow shall be promptly (and in any event not later than three Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to Section 2.09(b) or (c), as applicable.

SECTION 2.10      Fees.  The Borrower agrees to pay to the Administrative Agent, for its own account, an agency fee payable in the amount and at the times separately agreed upon between the Borrower and the Administrative Agent.

SECTION 2.11      Interest.

(a)     The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)     The Loans comprising each Eurocurrency Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)     Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2.00% per annum plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2.00% per annum plus the rate applicable to Term Loans that are ABR Loans as provided in paragraph (a) of this Section; provided that no amount shall be payable pursuant to this Section 2.11(c) to a Defaulting Lender so long as such Lender shall be a Defaulting Lender; provided, further, that no amounts shall accrue pursuant to this Section 2.11(c) on any overdue amount or other amount payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(d)     Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and, provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurocurrency Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     All computations of interest for ABR Loans (including ABR Loans determined by reference to the Adjusted LIBO Rate) shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.16, bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

SECTION 2.12     Alternate Rate of Interest.  If at least two Business Days prior to the commencement of any Interest Period for a Eurocurrency Borrowing:

(a)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period with respect to a Borrowing; or

(b)     the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period (in each case with respect to the Loans impacted by this clause (b) or clause (a) above, "Impacted Loans"),

(c)     in the case of clause (a) or (b) above, the Administrative Agent shall give notice thereof (and, if requested by the Borrower, reasonably acceptable evidence of such determination) to the Borrower and the Lenders by telephone or facsimile as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to,

-70-

or continuation of any Borrowing as, a Eurocurrency Borrowing shall be ineffective and (ii) all Borrowings shall be made as an ABR Borrowing and the utilization of the LIBO Rate component in determining the Alternate Base Rate shall be suspended; provided, however, that, in each case, the Borrower may revoke any Borrowing Request that is pending when such notice is received.

(d)    Notwithstanding the foregoing, if the Administrative Agent has made the determination described in clause (a) of this Section 2.12 and/or is advised by the Required Lenders of their determination in accordance with clause (b) of this Section 2.12 and the Borrower shall so request, the Administrative Agent, the Required Lenders and the Borrower shall negotiate in good faith to amend the definition of "LIBO Rate" and other applicable provisions to preserve the original intent thereof in light of such change; provided that, until so amended, such Impacted Loans will be handled as otherwise provided pursuant to the terms of this Section 2.12.

SECTION 2.13    Increased Costs.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate); or

(ii)    impose on any Lender or the London interbank market any other condition, cost or expense (other than with respect to Taxes) affecting this Agreement or Eurocurrency Loans made by such Lender; or

(iii)    subject any Lender to any Taxes on its Loans, letters of credit, Commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurocurrency Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then, from time to time upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such increased costs actually incurred or reduction actually suffered, provided that to the extent any such costs or reductions are incurred by any Lender as a result of any requests, rules, guidelines or directives enacted or promulgated under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and Basel III after the Effective Date, then such Lender shall be compensated pursuant to this Section 2.13(a) only to the extent such Lender is imposing such charges on similarly situated borrowers under the other syndicated credit facilities that such Lender is a lender under. Notwithstanding the foregoing, this paragraph will not apply to (A) Indemnified Taxes or Other Taxes or (B) Excluded Taxes.

(b)    If any Lender determines that any Change in Law regarding capital or liquidity requirements has the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity requirements), then, from time to time upon request of such Lender, the Borrower will pay to such Lender, as the case may be, such additional

amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction actually suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company in reasonable detail, as the case may be, as specified in paragraph (a) or (b) of this Section delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 15 days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided, further, that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.14     Break Funding Payments.  In the event of (a) the payment of any principal of any Eurocurrency Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.09(e) and is revoked in accordance therewith) or (d) the assignment of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.17 or Section 9.02(c), then, in any such event, the Borrower shall, after receipt of a written request by any Lender affected by any such event (which request shall set forth in reasonable detail the basis for requesting such amount), compensate each Lender for the actual loss, cost and expense attributable to such event.  For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 2.14, each Lender shall be deemed to have funded each Eurocurrency Loan made by it at the Adjusted LIBO Rate for such Loan by a matching deposit or other borrowing for a comparable amount and for a comparable period, whether or not such Eurocurrency Loan was in fact so funded.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 15 days after receipt of such demand.  Notwithstanding the foregoing, this Section 2.14 will not apply to losses, costs or expenses resulting from Taxes, as to which Section 2.15 shall govern.

SECTION 2.15     Taxes.

(a)     Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction for any Taxes, provided that if the applicable Withholding Agent shall be required by applicable Requirements of Law to deduct any Taxes from such payments, then (i) the applicable Withholding Agent shall make such deductions, (ii) the applicable Withholding Agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law and (iii) if the Tax in question is an Indemnified Tax or Other Tax, the amount payable by the applicable Loan Party shall be increased as necessary so that after all required deductions have been made (including deductions applicable to additional amounts payable under this Section 2.15) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made.

(b)    Without limiting the provisions of paragraph (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Requirements of Law.

(c)    The Borrower shall indemnify the Administrative Agent and each Lender, within 30 days after written demand therefor, for the full amount of any Indemnified Taxes paid by the Administrative Agent or such Lender, as the case may be, and any Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Loan Party to a Governmental Authority pursuant to this Section 2.15, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Each Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law and such other documentation reasonably requested by the Borrower or the Administrative Agent (i) as will permit payments under any Loan Document to be made without, or at a reduced rate of, withholding or (ii) as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to withholding or information reporting requirements. Each Lender shall, whenever a lapse or time or change in circumstances renders such documentation obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so.

Without limiting the foregoing:

(1)    Each Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) two properly completed and duly signed original copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding.

(2)    Each Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)    two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party,

(B)    two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)    in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates substantially in the form of Exhibit P-1, P-2, P-3 or P-4, as applicable, (any such certificate, a "U.S. Tax Compliance Certificate") and (y) two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms),

(D)    to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), two properly completed and duly signed original copies of Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E, U.S. Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information (or any successor forms) from each beneficial owner that would be required under this Section 2.15(e) if such beneficial owner were a Lender, as applicable (provided that, if the Lender is a partnership for U.S. federal income tax purposes (and not a participating Lender) and one or more direct or indirect partners are claiming the portfolio interest exemption, the U.S. Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)    two properly completed and duly signed original copies of any other form prescribed by applicable U.S. federal income tax laws as a basis for claiming a complete exemption from, or a reduction in, U.S. federal withholding tax on any payments to such Lender under the Loan Documents, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(3)    If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA , to determine whether such Lender has or has not complied with such Lender's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (3), "FATCA" shall include any amendments made to FATCA after the date hereof.

Notwithstanding any other provisions of this clause (e), a Lender shall not be required to deliver any form or other documentation that such Lender is not legally eligible to deliver.

(f)    If the Borrower determines in good faith that a reasonable basis exists for contesting any Taxes for which indemnification has been demanded hereunder, the Administrative Agent or the relevant Lender, as applicable, shall use commercially reasonable efforts to cooperate with the Borrower in a reasonable challenge of such Taxes if so requested by the Borrower; provided that (a) the Administrative Agent or such Lender determines in its reasonable discretion that it would not be subject to any

-74-

unreimbursed third party cost or expense or otherwise be prejudiced by cooperating in such challenge, (b) the Borrower pays all related expenses of the Administrative Agent or such Lender, as applicable and (c) the Borrower indemnifies the Administrative Agent or such Lender, as applicable, for any liabilities or other costs incurred by such party in connection with such challenge. The Administrative Agent or a Lender shall claim any refund of any Taxes that it determines is reasonably available to it, unless it concludes in its reasonable discretion that it would be adversely affected by making such a claim. If the Administrative Agent or a Lender receives a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.15, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.15 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees promptly to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  The Administrative Agent or such Lender, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (provided that the Administrative Agent or such Lender may delete any information therein that the Administrative Agent or such Lender deems confidential).  Notwithstanding anything to the contrary, this Section 2.15(f) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to Taxes which it deems confidential to any Loan Party or any other Person).

(g)     The agreements in this Section 2.15 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

SECTION 2.16     Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)     The Borrower shall make each payment required to be made by it under any Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.13, 2.14 or 2.15, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to such account as may be specified by the Administrative Agent, except that payments pursuant to Sections 2.13, 2.14, 2.15 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment (other than payments on the Eurocurrency Loans) under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day.  If any payment on a Eurocurrency Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate for the period of such extension.  All payments under each Loan Document shall be made in dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)     If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans of a given Class resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of such Class and accrued interest thereon than the proportion received by any other Lender with outstanding Loans of the same Class, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of such Class of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class, provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from existence of a Defaulting Lender), (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant or (C) any disproportionate payment obtained by a Lender of any Class as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans of that Class or any increase in the Applicable Rate in respect of Loans of Lenders that have consented to any such extension. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and in its sole discretion, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.04(a) or 2.04(b), 2.16(d) or 9.03(c), then the Administrative Agent may, in its discretion and in the order determined by the Administrative Agent (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Section until all such unsatisfied obligations are fully paid and/or (ii) hold any such amounts in a segregated account as cash collateral for, and to be applied to, any future funding obligations of such Lender under any such Section.

SECTION 2.17     Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.13, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15 or any event that gives rise to the operation of Section 2.21, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.13 or Section 2.15 or mitigate the applicability of Section 2.21, as the case may be, and (ii) would not subject such Lender to any unreimbursed cost or expense reasonably deemed by such Lender to be material and would not be inconsistent with the internal policies of, or otherwise be disadvantageous in any material economic, legal or regulatory respect to, such Lender.

(b)     If (i) any Lender requests compensation under Section 2.13 or gives notice under Section 2.21, (ii) the Borrower is required to pay any additional amount to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.15, or (iii) any Lender becomes a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment and delegation), provided that (A) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consents, in each case, shall not unreasonably be withheld or delayed, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (C) the Borrower or such assignee shall have paid (unless waived) to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii) and (D) in the case of any such assignment resulting from a claim for compensation under Section 2.13, payment required to be made pursuant to Section 2.15 or a notice given under Section 2.21, such assignment will result in a material reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrower to require such assignment and delegation cease to apply.  Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

SECTION 2.18     Increased Loans.

(a)     At any time and from time to time after the Effective Date, subject to the terms and conditions set forth herein, the Borrower may, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly make available to each of the Lenders), request to effect one or more additional tranches of term loans hereunder or increases in the aggregate amount of the Loans which may take the form of an additional tranche of term loans hereunder (each such increase, an "Incremental Loan") from one or more the Additional Lenders; provided that at the time of each such request and upon the effectiveness of each Incremental Facility Amendment, (A) (i) no Event of Default shall have occurred and be continuing (except in connection with a Permitted Acquisition or any other Investment not prohibited by the terms of this Agreement, which shall be subject to no continuing Event of Default under clauses (a), (b), (h) (i) of Section 7.01) or shall result therefrom and (ii) the representations and warranties set forth Article III shall be true and correct in all material respects (except in connection with

a Permitted Acquisition or any other Investment not prohibited by the terms of this Agreement, which shall be subject to, if and only to the extent required by the Lenders providing such Incremental Loan, shall be subject to customary "SunGard" or "certain funds" conditionality), (B) the maturity date of any Incremental Loans shall not be earlier than the Term Maturity Date and the Weighted Average Life to Maturity of the Incremental Loans shall not be shorter than the remaining Weighted Average Life to Maturity of the Term Loans, (C) the pricing, interest rate margins, rate floors, fees, premiums, funding discounts and, subject to clause (B), the maturity and amortization schedule for any Incremental Loans shall be determined by the Borrower and the applicable Additional Lenders, (D)(i) the Incremental Loans shall be secured solely by the Collateral on an equal and ratable basis with the Secured Obligations and (ii) no Incremental Loans shall be guaranteed by entities other than the Guarantors, (E) any Incremental Loan shall be on terms and pursuant to documentation to be determined by the Borrower and the applicable Additional Lenders; provided, that to the extent such terms and documentation are not consistent with the Term Loans (except to the extent permitted by clause (B) or (C) above), they shall be reasonably satisfactory to the Administrative Agent (it being understood that, to the extent that any financial maintenance covenant or any other term more favorable to the Additional Lenders than the terms of this Agreement is added for the benefit of any Incremental Loan, no consent shall be required from the Administrative Agent or any of the Term Lenders to the extent that such financial maintenance covenant or other such term is (1) also added for the benefit of any existing Loans or (2) only applicable after the Latest Maturity Date) and (F) such Incremental Loans may be provided in any currency as mutually agreed among the Administrative Agent, the Borrower and the applicable Additional Lenders. Notwithstanding anything to contrary herein, the sum of (i) the aggregate principal amount of the Incremental Loans and (ii) the aggregate principal amount of Incremental Equivalent Debt incurred after the Effective Date pursuant to Section 6.01(a)(xxiii) shall not at the time of incurrence of any such Incremental Loans or Incremental Equivalent Debt (and after giving effect to such incurrence) exceed the Incremental Cap at such time. Each Incremental Loan shall be in a minimum principal amount of $10,000,000 and integral multiples of $1,000,000 in excess thereof (unless the Borrower and the Administrative Agent otherwise agree); provided that such amount may be less than $10,000,000 if such amount represents all the remaining availability under the aggregate principal amount of Incremental Loans set forth above; provided further, that in the event that the Applicable Rates for any Incremental Loan are greater than the Applicable Rates for the Term Loans by more than 0.50% per annum, then the Applicable Rates for the Term Loans shall be increased to the extent necessary so that the Applicable Rates for the Term Loans are equal to the Applicable Rates for the Incremental Loans minus 0.50% per annum; provided, further, that with respect to any Incremental Loans that do not bear interest at a rate determined by reference to the Eurocurrency Rate, for purposes of calculating the applicable increase (if any) in the Applicable Rates for the Term Loans in the preceding provisos, the Applicable Rate for such Incremental Loans shall be deemed to be the interest rate (calculated after giving effect to any increases required pursuant to the immediately succeeding proviso) of such Incremental Loans less the then applicable LIBO Rate; provided, further, that in determining the Applicable Rates applicable to the Term Loans, the Incremental Loans, (x) original issue discount ("OID") or upfront fees (which shall be deemed, solely for purposes of this clause (x), to constitute like amounts of OID) payable by the Borrower to the Lenders of the Term Loans and the Incremental Loans in the initial primary syndication thereof shall be included (with OID or upfront fees being equated to interest based on an assumed four-year life to maturity), (y) (1) with respect to the Term Loans, to the extent that the LIBO Rate on the closing date of the Incremental Facility Amendment is less than the "LIBOR Floor", the amount of such difference shall be deemed added to the Applicable Rate for the Term Loans solely for the purpose of determining whether an increase in the Applicable Rate for the Term Loans shall be required and (2) with respect to the Incremental Loans, to the extent that the LIBO Rate on the closing date of the Incremental Facility Amendment is less than the interest rate floor, if any, applicable to the Incremental Loans, the amount of such difference shall be deemed added to the Applicable Rate for the Incremental Loans solely for the purpose of determining whether an increase in the Applicable Rate for the Term Loans shall be required and (z) any arrangement, commitment or similar fees payable to the Lead Arrangers (or their respective

Affiliates) in connection with the Term Loans or to one or more arrangers (or their Affiliates) or other providers of the Incremental Loans shall be excluded. The Incremental Loans may otherwise have terms and conditions different from those of the Term Loans.

(b)    (i)    Each notice from the Borrower pursuant to this Section shall set forth the requested amount of the relevant Incremental Loans.

(ii)    Commitments in respect of any Incremental Loans shall become Commitments under this Agreement pursuant to an amendment (an "Incremental Facility Amendment") to this Agreement and, as appropriate, the other Loan Documents executed by the Borrower, such Additional Lender and the Administrative Agent.  Incremental Loans may be provided, subject to the prior written consent of the Borrower (not to be unreasonably withheld), by any existing Lender (it being understood that no existing Lender shall have any right to participate in any Incremental Loans or, unless it agrees, be obligated to provide any Incremental Loans) or by any Additional Lender.  An Incremental Facility Amendment may, without the consent of any other Lenders, effect such amendments to any Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent, to (x) effect the provisions of this Section and/or (y) so long as such amendments are not, in the reasonable opinion of the Administrative Agent, materially adverse to the Lenders, maintain the "fungibility" of any such Incremental Loans with any tranche of then-outstanding Loans hereunder.

(c)    Upon each Incremental Loan pursuant to this Section, each Additional Lender shall make an additional term loan to the Borrower in a principal amount equal to such Lender's Incremental Loan. Any such term loan shall be a "Loan" for all purposes of this Agreement and the other Loan Documents.

(d)    Notwithstanding anything to the contrary, this Section 2.18 shall supersede any provisions in Section 2.16 or Section 9.02 to the contrary.

SECTION 2.19    Refinancing Amendments.

(a)    At any time after the Effective Date, the Borrower may obtain, from any Lender or any Additional Lender, Credit Agreement Refinancing Indebtedness in respect of all or any portion of the Loans then outstanding under this Agreement (which will be deemed to include any then outstanding Other Loans), in the form of Other Loans or Other Commitments, in each case pursuant to a Refinancing Amendment; provided that the Net Proceeds of such Credit Agreement Refinancing Indebtedness shall be applied, substantially concurrently with the incurrence thereof, to the prepayment of outstanding Loans being so refinanced.  Each Class of Credit Agreement Refinancing Indebtedness incurred under this Section 2.19 shall be in an aggregate principal amount that is (i) not less than $10,000,000 and (ii) an integral multiple of $1,000,000 in excess thereof (unless the Borrower and the Administrative Agent otherwise agree).  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Refinancing Amendment.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Credit Agreement Refinancing Indebtedness incurred pursuant thereto (including any amendments necessary to treat the Loans and Commitments subject thereto as Other Loans and/or Other Commitments).  Any Refinancing Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section.

(b)    Notwithstanding anything to the contrary, this Section 2.19 shall supersede any provisions in Section 2.16 or Section 9.02 to the contrary.

SECTION 2.20     Defaulting Lenders.

(a)     General.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)     Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 9.02.

(ii)     Reallocation of Payments.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 9.08), shall be applied at such time or times as may be determined by the Administrative Agent as follows:  first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fourth, so long as no Default or Event of Default exists, to the payment of any amounts owing to any Loan Party as a result of any judgment of a court of competent jurisdiction obtained by any Loan Party against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and fifth, subject to the last sentence of Section 2.09(e), to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction.

(b)     Defaulting Lender Cure.  If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

SECTION 2.21     Illegality.  If any Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to make, maintain or fund Loans whose interest is determined by reference to the Adjusted LIBO Rate, or to determine or charge interest rates based upon the Adjusted LIBO Rate, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurocurrency Loans or to convert ABR Loans to Eurocurrency Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (x) the Borrower shall, upon three Business Days' notice from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurocurrency Loans of such Lender to ABR Loans either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurocurrency Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Adjusted LIBO Rate, the Administrative Agent shall, during the period of such suspension, compute the

Alternate Base Rate applicable to such Lender without reference to the Adjusted LIBO Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal  for such Lender to determine or charge interest rates based upon the Adjusted LIBO Rate.  Each Lender agrees to notify the Administrative Agent and the Borrower in writing promptly upon becoming aware that it is no longer illegal for such Lender to determine or charge interest rates based upon the Adjusted LIBO Rate.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

SECTION 2.22    Loan Modification Offers.

(a)    At any time after the Effective Date, the Borrower may on one or more occasions, by written notice to the Administrative Agent, make one or more offers (each, a "Loan Modification Offer") to all the Lenders of one or more Classes (each Class subject to such a Loan Modification Offer, an "Affected Class") to effect one or more Permitted Amendments relating to such Affected Class pursuant to procedures reasonably specified by the Administrative Agent and reasonably acceptable to the Borrower (including mechanics to permit cashless rollovers and exchanges by Lenders).  Such notice shall set forth (i) the terms and conditions of the requested Permitted Amendment and (ii) the date on which such Permitted Amendment is requested to become effective.  Permitted Amendments shall become effective only with respect to the Loans and Commitments of the Lenders of the Affected Class that accept the applicable Loan Modification Offer (such Lenders, the "Accepting Lenders") and, in the case of any Accepting Lender, only with respect to such Lender's Loans and Commitments of such Affected Class as to which such Lender's acceptance has been made.

(b)    A Permitted Amendment shall be effected pursuant to a Loan Modification Agreement executed and delivered by Holdings, the Borrower, each applicable Accepting Lender and the Administrative Agent; provided that no Permitted Amendment shall become effective unless Holdings and the Borrower shall have delivered to the Administrative Agent such legal opinions, board resolutions, secretary's certificates, officer's certificates and other documents as shall be reasonably requested by the Administrative Agent in connection therewith.  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Loan Modification Agreement.  Each Loan Modification Agreement may, without the consent of any Lender other than the applicable Accepting Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to give effect to the provisions of this Section 2.22, including any amendments necessary to treat the applicable Loans and/or Commitments of the Accepting Lenders as a new "Class" of loans and/or commitments hereunder.

(c)    If, in connection with any proposed Loan Modification Offer, any Lender declines to consent to such Loan Modification Offer on the terms and by the deadline set forth in such Loan Modification Offer (each such Lender, a "Non-Accepting Lender") then the Borrower may, on notice to the Administrative Agent and the Non-Accepting Lender, (i) replace such Non-Accepting Lender in whole or in part by causing such Lender to (and such Lender shall be obligated to) assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04) all or any part of its interests, rights and obligations under this Agreement in respect of the Loans and Commitments of the Affected Class to one or more Eligible Assignees (which Eligible Assignee may be another Lender, if a Lender accepts such assignment); provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender; provided, further, that (a) the applicable assignee shall have agreed to provide Loans and/or Commitments on the terms set forth in the applicable Permitted Amendment, (b) such Non-Accepting Lender shall have received payment of an amount equal to the outstanding principal of the Loans of the Affected Class assigned by it pursuant to this Section 2.22(c), accrued interest thereon, accrued fees and all other amounts (including any amounts under Section 2.09(a)(i)) payable to it hereunder from the Eligible Assignee (to the extent of such

-81-

outstanding principal and accrued interest and fees) and (c) unless waived, the Borrower or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b).

(d)    Notwithstanding anything to the contrary, this Section 2.22 shall supersede any provisions in Section 2.16 or Section 9.02 to the contrary.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

Each of Holdings and the Borrower represents and warrants to the Lenders as of the Effective Date (and after giving effect to the Transactions) that:

SECTION 3.01    Organization; Powers.  Each of Holdings, the Borrower and each Restricted Subsidiary is (a) duly organized, validly existing and in good standing (to the extent such concept exists in the relevant jurisdictions) under the laws of the jurisdiction of its organization, (b) has the corporate or other organizational power and authority to carry on its business as now conducted and to execute, deliver and perform its obligations under each Loan Document to which it is a party and, (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except in the case of clause (a) (other than with respect to any Loan Party), clause (b) (other than with respect to Holdings and the Borrower (and, any other Loan Party in the case of the execution and delivery of any Loan Document to which it is a party) and clause (c), where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.02    Authorization; Enforceability.  This Agreement has been duly authorized, executed and delivered by each of Holdings and the Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of Holdings, the  Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03    Governmental and Third-Party Approvals; No Conflicts.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or third-party, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of Holdings, the Borrower or any other Loan Party, or (ii) any Requirements of Law applicable to Holdings, the Borrower or any Restricted Subsidiary, (c) will not violate or result in a default under any indenture or other agreement or instrument binding upon Holdings, the Borrower or any other Restricted  Subsidiary or their respective assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by Holdings, the Borrower or any Restricted Subsidiary, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation thereunder, and (d) will not result in the creation or imposition of any Lien on any asset of Holdings, the Borrower or any Restricted Subsidiary, except Liens created under the Loan Documents, except (in the case of each of clauses (a), (b)(ii) and (c)) to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, default or right as the case may be, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.04    Financial Condition; No Material Adverse Effect.

-82-

(a) The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly indicated therein, including the notes thereto, and (ii) fairly present in all material respects the financial condition of the Target and its consolidated subsidiaries as of the respective dates thereof and the consolidated results of their operations for the respective periods then ended in accordance with GAAP consistently applied during the periods referred to therein, except as otherwise expressly indicated therein, including the notes thereto.

(b) The unaudited consolidated balance sheets of the Target and its subsidiaries as at the end of and the related statements of income, stockholders' equity and cash flows for the three, six and nine month periods ended May 4, 2014, August 3, 2014 and November 2, 2014, (i) were prepared in accordance with GAAP consistently applied during the periods referred to therein, except as otherwise expressly indicated therein, including the notes thereto, and (ii) fairly present in all material respects the financial condition of the Target and its subsidiaries as of the date thereof and for the periods covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments and to any other adjustments described therein.

(c) Holdings has heretofore furnished to the Lead Arrangers the pro forma consolidated balance sheet and the related pro forma consolidated statement of income of the Target and its Subsidiaries as of, and for the twelve-month period ending on, November 2, 2014, in each case of the Borrower and its Subsidiaries (such pro forma balance sheet and statement of income, the "Pro Forma Financial Statements"), which have been prepared giving effect to the Transactions as if such transactions had occurred on such date or at the beginning of such period. The Pro Forma Financial Statements have been prepared in good faith, based on assumptions believed by Holdings to be reasonable as of the date of delivery thereof (it being understood that such Pro Forma Financial Statements need not be prepared in compliance with Regulation S-X of the Securities Act of 1933, as amended, or include adjustments for purchase accounting (including any adjustments of the type contemplated by Financial Accounting Standards Board Accounting Standards Codification 805, *Business Combinations* (formerly SFAS 141R)).

(d) Since the Effective Date, there has been no Material Adverse Effect.

SECTION 3.05    Properties; Insurance.

(a) Each of Holdings, the Borrower and each Restricted Subsidiary has good title to, or valid leasehold interests in, all its real and personal property material to its business, if any (including the Mortgaged Properties), (i) free and clear of all Liens except for Liens permitted by Section 6.02 and (ii) except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes, in each case, except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b) As of the Effective Date after giving effect to the Transactions, there is no fee owned real property owned by any Loan Party.

(c) Each of Holdings, the Borrower and each Restricted Subsidiary maintains in effect insurance that complies, in all material respects, with the requirements of Section 5.07.

SECTION 3.06     Litigation and Environmental Matters.

(a)     There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of Holdings or the Borrower, threatened in writing against or affecting Holdings, the Borrower or any Restricted Subsidiary that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)     Except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of Holdings, the Borrower or any Restricted Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of Holdings or the Borrower, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) has, to the knowledge of Holdings or the Borrower, any basis to reasonably expect that Holdings, the Borrower or any Restricted Subsidiary will become subject to any Environmental Liability.

SECTION 3.07     Compliance with Laws and Agreements.  Each of Holdings, the Borrower and each Restricted Subsidiary is in compliance with (a) its Organizational Documents, (b) all Requirements of Law applicable to it or its property and (c) all indentures and other agreements and instruments binding upon it or its property, except, in the case of clauses (b) and (c) of this Section, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.08     Investment Company Status.  None of Holdings, the Borrower or any other Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended from time to time.

SECTION 3.09     Taxes.  Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Holdings, the Borrower and each Restricted Subsidiary (a) have timely filed or caused to be filed all Tax returns required to have been filed and (b) have paid or caused to be paid all Taxes required to have been paid (whether or not shown on a Tax return) including in their capacity as tax withholding agents, except any Taxes (i) that are not overdue by more than 30 days or (ii) that are being contested in good faith by appropriate proceedings, provided that Holdings, the Borrower or such Restricted Subsidiary, as the case may be, has set aside on its books adequate reserves therefor in accordance with GAAP.

SECTION 3.10     ERISA.

(a)     Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws.

(b)     Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred during the five year period prior to the date on which this representation is made or deemed made or is reasonably expected to occur, (ii) no Plan has failed to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, whether or not waived, (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA), (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result

-84-

in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

SECTION 3.11     Disclosure.  As of the Effective Date, neither (a) the Information Memorandum nor (b) any of the other reports, financial statements, certificates or other written information furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading, provided that, with respect to projected financial information, Holdings and the Borrower represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date, it being understood that any such projected financial information may vary from actual results and such variations could be material.

SECTION 3.12     Subsidiaries.  As of the Effective Date, Schedule 3.12 sets forth the name of, and the ownership interest of Holdings, the Borrower and each Subsidiary in, each Subsidiary.

SECTION 3.13     Intellectual Property; Licenses, Etc.  Each of Holdings, the Borrower and each Restricted Subsidiary owns, licenses or possesses the right to use, all of the rights to Intellectual Property that are reasonably necessary for the operation of its business as currently conducted, and, without conflict with the rights of any Person, except to the extent such conflicts, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Holdings, the Borrower or any Restricted Subsidiary do not, in the operation of their businesses as currently conducted, infringe upon any Intellectual Property rights held by any Person except for such infringements, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding any of the Intellectual Property owned by Holdings, the Borrower or any of the Restricted Subsidiaries is pending or, to the knowledge of Holdings and the Borrower, threatened in writing against Holdings, the Borrower or any Restricted Subsidiary, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 3.14     Solvency.  On the Effective Date, immediately after the consummation of the Transactions to occur on the Effective Date, Holdings and its Subsidiaries are, on a consolidated basis after giving effect to the Transactions, Solvent.

SECTION 3.15     Senior Indebtedness.  The Loan Document Obligations constitute "Senior Indebtedness" (or any comparable term) under and as defined in the documentation governing any Subordinated Indebtedness.

SECTION 3.16     Federal Reserve Regulations.  None of Holdings, the Borrower or any Restricted Subsidiary is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any margin stock or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

SECTION 3.17    Use of Proceeds.  The Borrower will use the proceeds of the Loans made on the Effective Date to finance a portion of the Transactions.

SECTION 3.18    PATRIOT Act, OFAC and FCPA.

(a)    The Borrower will not, directly or indirectly, use the proceeds of the transaction, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, for the purpose of funding (i) any activities of or business with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, or (ii) any other transaction that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor or otherwise) of Sanctions.

(b)    The Borrower and the Restricted Subsidiaries will not use the proceeds of the Loans directly or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended (the "FCPA").

(c)    Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, to the knowledge of the Borrower, none of Holdings, the Borrower or the Restricted Subsidiaries has, in the past three years, committed a violation of applicable regulations of the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), Title III of the USA Patriot Act or the FCPA.

(d)    None of Holdings, the Borrower or any of the Restricted Subsidiaries is an individual or entity currently on OFAC's list of Specifically Designated Nationals and Blocked Persons.

(e)    Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, to the knowledge of the Borrower, no director, officer, employee or agent of Holdings, the Borrower or any Restricted Subsidiary  is an individual or entity currently on OFAC's list of Specifically Designated Nationals and Blocked Persons, nor is Holdings, the Borrower or any Restricted Subsidiary located, organized or resident in a country or territory that is the subject of Sanctions.

ARTICLE IV

CONDITIONS

SECTION 4.01    Effective Date.  The obligations of the Lenders to make Loans hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)    The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include facsimile or other electronic transmission of a signed counterpart of this Agreement) that such party has signed a counterpart of this Agreement.

(b)    The Administrative Agent shall have received a written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Simpson Thacher & Bartlett LLP,

-86-

New York counsel for the Loan Parties.  The Borrower hereby requests such counsel to deliver such opinions.

(c)     The Administrative Agent shall have received a certificate of each Loan Party (other than the Insignificant Subsidiaries), dated the Effective Date, substantially in the form of Exhibit G with appropriate insertions, executed by any Responsible Officer of such Loan Party, and including or attaching the documents referred to in paragraph (d) of this Section.

(d)     The Administrative Agent shall have received a copy of (i) each Organizational Document of each Loan Party (other than the Insignificant Subsidiaries for which Organizational Documents shall be delivered to the Administrative Agent within five days after the Effective Date, or such later date as agreed by the Administrative Agent in its reasonable discretion) certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) signature and incumbency certificates of the Responsible Officers of each Loan Party (other than the Insignificant Subsidiaries for which certificates shall be delivered to the Administrative Agent within five days after the Effective Date, or such later date as agreed by the Administrative Agent in its reasonable discretion) executing the Loan Documents to which it is a party, (iii) resolutions of the Board of Directors and/or similar governing bodies of each Loan Party (other than the Insignificant Subsidiaries) approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, certified as of the Effective Date by its secretary, an assistant secretary or a Responsible Officer as being in full force and effect without modification or amendment, and (iv) a good standing certificate (to the extent such concept exists) from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation.

(e)     The Administrative Agent shall have received all fees and other amounts previously agreed in writing by the Joint Bookrunners and Holdings to be due and payable on or prior to the Effective Date, including, to the extent invoiced at least three Business Days prior to the Effective Date (except as otherwise reasonably agreed by Borrower), reimbursement or payment of all out-of-pocket expenses (including reasonable fees, charges and disbursements of counsel) required to be reimbursed or paid by any Loan Party under any Loan Document.

(f)     The Collateral and Guarantee Requirement shall have been satisfied; provided that if, notwithstanding the use by Holdings and the Borrower of commercially reasonable efforts to cause the Collateral and Guarantee Requirement to be satisfied on the Effective Date, the requirements thereof (other than (a) the execution and delivery of the Guarantee Agreement and the Collateral Agreement by the Loan Parties (other than the Insignificant Subsidiaries), (b) creation of and perfection of security interests in the certificated Equity Interests of (i) the Borrower to the extent received from the Target so long as Holdings used commercially reasonable efforts to obtain such certificates on the Effective Date, and (c) delivery of Uniform Commercial Code financing statements with respect to perfection of security interests in other assets of the Loan Parties that may be perfected by the filing of a financing statement under the Uniform Commercial Code) are not satisfied as of the Effective Date, the satisfaction of such requirements shall not be a condition to the availability of the initial Loans on the Effective Date (but shall be required to be satisfied as promptly as practicable after the Effective Date and in any event within the period specified therefor in Schedule 5.14 or such later date as the Administrative Agent may reasonably agree).

(g)     Except as disclosed in (a) the Company SEC Documents (as defined in the Acquisition Agreement) publicly filed with or publicly furnished to the SEC prior to December 14, 2014 (including exhibits and other information incorporated by reference therein, but excluding any disclosures set forth in any "risk factors", "forward-looking statements" or "market risk" sections or to the extent they are cautionary, predictive or forward-looking in nature) and (b) the disclosure letter delivered by the Target to

the Borrower immediately prior to the execution of the Acquisition Agreement (the "Company Disclosure Letter") (provided, that disclosure of any item in any section or subsection of the Company Disclosure Letter shall be deemed disclosed with respect to any other section or subsection to the extent that the relevance of any disclosed event, item or occurrence in such section or subsection to such other section or subsection is reasonably apparent), (x) Since February 2, 2014 through December 14, 2014 there has not been any event or effect that has had or would have, individually or in the aggregate, a Company Material Adverse Effect and (y) since December 14, 2014 there has not been any event or effect that has had or would have, individually or in the aggregate, a Company Material Adverse Effect.

(h)     The Joint Bookrunners shall have received the (i) Pro Forma Financial Statements, (ii) Audited Financial Statements and (iii) unaudited consolidated statement of financial position and related statements of income and cash flow of the Target and its consolidated subsidiaries (excluding notes thereto) for each fiscal quarter ended after February 2, 2014 which is ended at least 45 days before the Effective Date.

(i)     The Specified Representations shall be accurate in all material respects on and as of the Effective Date; provided that any Specified Representations set forth in clause (b) of the definition thereof that are qualified by materiality, Company Material Adverse Effect or Material Adverse Effect, shall be accurate in all respects on and as of the Effective Date.

(j)     The Acquisition shall have been consummated, or substantially simultaneously with the initial funding of Loans on the Effective Date, shall be consummated, in all material respects in accordance with the Acquisition Agreement (without giving effect to any amendments, supplements, waivers or other modifications to or of the Acquisition Agreement that are materially adverse to the interests of the Lenders or the Joint Bookrunners in their capacities as such, except to the extent that the Joint Bookrunners have consented thereto).

(k)     The Equity Financing shall have been made, or substantially simultaneously with the initial Borrowings under the Term Facility, shall be made.

(l)     Substantially simultaneously with the initial Borrowing under the Term Facility and the consummation of the Acquisition, the Effective Date Refinancing shall be consummated.

(m)     The Administrative Agent shall have received a certificate from the chief financial officer of Holdings or the Borrower certifying that Holdings and its Subsidiaries on a consolidated basis after giving effect to the Transactions are Solvent.

(n)     The Administrative Agent and the Joint Bookrunners shall have received all documentation at least two (2) Business Days prior to the Effective Date and other information about the Loan Parties that shall have been reasonably requested in writing at least ten (10) Business Days prior to the Effective Date and that the Administrative Agents or the Joint Bookrunners have reasonably determined is required by United States regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation Title III of the USA Patriot Act.

ARTICLE V

AFFIRMATIVE COVENANTS

Until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all fees, expenses and other amounts (other than contingent amounts not yet due) payable

-88-

under any Loan Document shall have been paid in full, each of Holdings and the Borrower covenants and agrees with the Lenders that:

SECTION 5.01    Financial Statements and Other Information.  The Borrower will furnish to the Administrative Agent, on behalf of each Lender:

(a)    on or before the date on which such financial statements are required or permitted to be filed with the SEC (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 90  days after the end of such fiscal year (or, in the case of financial statements for the fiscal year ended January 31, 2016, on or before the date that is 120 days after the end of such fiscal year), audited consolidated balance sheet and audited consolidated statements of income, comprehensive income, stockholders' equity and cash flows of the Borrower (or the Target, in the case of the fiscal year ending February 1, 2015) as of the end of and for such fiscal year, and related notes thereto, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by Deloitte LLP or other independent public accountants of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit (other than any exception or explanatory paragraph, but not a qualification, that is expressly solely with respect to, or expressly resulting solely from, (A) an upcoming maturity date of any Indebtedness  under this Agreement, the ABL Facility or the Senior Notes occurring within one year from the time such opinion is delivered or (B) any potential inability to satisfy a financial maintenance covenant on a future date or in a future period)) to the effect that such consolidated financial statements present fairly in all material respects the financial position and results of operations and cash flows of the Borrower and its Subsidiaries as of the end of and for such year on a consolidated basis in accordance with GAAP consistently applied;

(b)    commencing with the financial statements for the fiscal quarter ending May 3, 2015, on or before the date on which such financial statements are required or permitted to be filed with the SEC with respect to each of the first three fiscal quarters of each fiscal year of the Borrower (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 45 days after the end of each such fiscal quarter (or, in the case of financial statements for the fiscal quarter ending on May 3, 2015, August 2, 2015 and November 1, 2015, on or before the date that is 60 days after the end of such fiscal quarter), unaudited consolidated balance sheet and unaudited consolidated statements of income, comprehensive income and cash flows of the Borrower as of the end of  and for such fiscal quarter (except in the case of cash flows) and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the financial position and results of operations and cash flows of the Borrower and the Subsidiaries as of the end of and for such fiscal quarter (except in the case of cash flows) and such portion of the fiscal year on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes and which may exclude the effects of purchase accounting with respect to the Transactions or any Permitted Investment or similar Investment permitted under this Agreement;

(c)    simultaneously with the delivery of each set of consolidated financial statements referred to in paragraphs (a) and (b) above, the related consolidating financial information (which may be unaudited) reflecting adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements;

(d)    not later than five days after any delivery of financial statements under paragraph (a) or (b) above, a certificate of a Financial Officer (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with

respect thereto, (ii) setting forth reasonably detailed calculations in the case of financial statements delivered under paragraph (a) above, beginning with the financial statements for the fiscal year of the Borrower ending January 29, 2017, of Excess Cash Flow for such fiscal year and (iii) in the case of financial statements delivered under paragraph (a) above, setting forth a reasonably detailed calculation of the Net Proceeds received during the applicable period by or on behalf of the Borrower or any Subsidiary in respect of any event described in clause (a) of the definition of the term "Prepayment Event" and the portion of such Net Proceeds that has been invested or are intended to be reinvested in accordance with the proviso in Section 2.09(b);

(e)    commencing with the fiscal year ending January 31, 2016, not later than 90 days after the commencement of each fiscal year of the Borrower (or in the case of the fiscal year ending January 31, 2016, on or before the date that is 120 days after the end of such fiscal year), a detailed consolidated budget for the Borrower and its Subsidiaries for such fiscal year (including a projected consolidated balance sheet and consolidated statements of projected operations and cash flows as of the end of and for such fiscal year and setting forth the material assumptions used for purposes of preparing such budget) in the form customarily provided by management of the Borrower (or otherwise provided to the Investors);

(f)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and registration statements (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) filed by Holdings, the Borrower or any Subsidiary (or, if the Borrower is a subsidiary of the IPO Entity, the IPO Entity) with the SEC or with any national securities exchange;

(g)    reasonably promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Restricted Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request in writing; and

(h)    to the extent provided in connection with the Senior Notes, the management's discussion and analysis in the form provided to the holders of the Senior Notes promptly after the same is delivered to the holders thereof.

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 5.01 may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (A) the Form 10-K or 10-Q (or the equivalent), as applicable, of the Borrower (or a parent company thereof) filed with the SEC or with a similar regulatory authority in a foreign jurisdiction or (B) the applicable financial statements of Holdings (or any Intermediate Parent or any direct or indirect parent of Holdings); provided that to the extent such information relates to a parent of the Borrower, such information is accompanied by consolidating information, which may be unaudited, that explains in reasonable detail the differences between the information relating to such parent, on the one hand, and the information relating to the Borrower and its Subsidiaries on a stand-alone basis, on the other hand, and to the extent such information is in lieu of information required to be provided under Section (a), such materials are accompanied by a report and opinion of Deloitte LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit (other than any exception or explanatory paragraph, but not a qualification, that is expressly solely with respect to, or expressly resulting solely from, (i) an upcoming maturity date of any Indebtedness under this Agreement, the ABL Facility or the Senior Notes or any other Material Indebtedness occurring within one year from

the time such opinion is delivered or (ii) any potential inability to satisfy a financial maintenance covenant on a future date or in a future period).

Documents required to be delivered pursuant to Section (a), (b) or (f) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the earlier of the date (A) on which the Borrower posts such documents, or provides a link thereto, on the Borrower's website on the Internet or (B) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (i) the Borrower shall deliver such documents to the Administrative Agent upon its reasonable request until a written notice to cease delivering such documents is given by the Administrative Agent and (ii) the Borrower shall notify the Administrative Agent (by telecopier or electronic mail) of the posting of any such documents and upon its reasonable request, provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  The Administrative Agent shall have no obligation to request the delivery of or maintain paper copies of the documents referred to above, and each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Joint Bookrunners will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Company Materials") by posting the Company Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that it will, upon the Administrative Agent's reasonable request, identify that portion of the Company Materials that may be distributed to the Public Lenders and that (i) all such Company Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Company Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Joint Bookrunners and the Lenders to treat such Company Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Company, the Borrower or their respective securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Company Materials constitute Information, they shall be treated as set forth in Section 9.12); (iii) all Company Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (iv) the Administrative Agent and the Joint Bookrunners shall be entitled to treat any Company Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

SECTION 5.02    Notices of Material Events.  Promptly after any Responsible Officer of Holdings or the Borrower obtains actual knowledge thereof, Holdings or the Borrower will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent) written notice of the following:

(a)        the occurrence of any Default; and

(b)        the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or, to the knowledge of a Financial Officer or another executive officer of Holdings, the Borrower or any of its Subsidiaries, affecting the Borrower or any of its

Subsidiaries or the receipt of a written notice of an Environmental Liability or the occurrence of an ERISA Event, in each case, that could reasonably be expected to result in a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a written statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

      SECTION 5.03     <u>Information Regarding Collateral</u>.

      (a)     Holdings or the Borrower will furnish to the Administrative Agent promptly (and in any event within 60 days or such longer period as reasonably agreed to by the Administrative Agent) written notice of any change (i) in any Loan Party's legal name (as set forth in its certificate of organization or like document), or (ii) in the jurisdiction of incorporation or organization of any Loan Party or in the form of its organization.

      (b)     Not later than five days after delivery of financial statements pursuant to Section 5.01(a) (or such later date as agreed by the Administrative Agent in its reasonable discretion), Holdings or the Borrower shall deliver to the Administrative Agent a certificate executed by a Responsible Officer of Holdings or the Borrower (i) setting forth the information required pursuant to Schedules I through IV of the Collateral Agreement or confirming that there has been no change in such information since the Effective Date or the date of the most recent certificate delivered pursuant to this Section, (ii) identifying any wholly-owned Subsidiary that has become, or ceased to be, a Material Subsidiary during the most recently ended fiscal quarter and (iii) certifying that all notices required to be given prior to the date of such certificate by Section 5.03 or 5.12 have been given.

      SECTION 5.04     <u>Existence; Conduct of Business</u>.  Each of Holdings and the Borrower will, and will cause each Restricted Subsidiary to, do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, the patents, copyrights, trademarks and trade names material to the conduct of its business, in each case (other than the preservation of the existence of Holdings and the Borrower) to the extent that the failure to do so could reasonably be expected to have a Material Adverse Effect, <u>provided</u> that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or any Disposition permitted by Section 6.05.

      SECTION 5.05     <u>Payment of Taxes, etc.</u>  Each of Holdings and the Borrower will, and will cause each Restricted Subsidiary to, pay its obligations in respect of Taxes before the same shall become delinquent or in default, except where (i) the validity or amount thereof is being contested in good faith by appropriate proceedings or (ii) the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

      SECTION 5.06     <u>Maintenance of Properties</u>.  Each of Holdings and the Borrower will, and will cause each Restricted Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

      SECTION 5.07     <u>Insurance</u>.

      (a)     Each of Holdings and the Borrower will, and will cause each Restricted Subsidiary to, maintain, with insurance companies that Holdings and the Borrower believe (in the good faith judgment of the management of Holdings and the Borrower) are financially sound and responsible at the time the

relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which Holdings and the Borrower believes (in the good faith judgment of management of Holdings and the Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as Holdings and the Borrower believe (in the good faith judgment of the management of Holdings and the Borrower) are reasonable and prudent in light of the size and nature of its business; and will furnish to the Lenders, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried. Each such policy of insurance maintained by a Loan Party shall (i) name the Administrative Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy, contain a loss payable/mortgagee clause or endorsement that names Administrative Agent, on behalf of the Lenders, as the loss payee/mortgagee thereunder.

(b)        If any portion of any Mortgaged Property subject to FEMA rules and regulations  is at any time located in an area identified by FEMA (or any successor agency) as a Special Flood Hazard Area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto, the "Flood Insurance Laws"), then the Borrower shall, or shall cause the relevant Loan Party to, (i) maintain or cause to be maintained, flood insurance sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance, which evidence complies with applicable Flood Insurance Laws and rules and regulations promulgated pursuant thereto.

SECTION 5.08        Books and Records; Inspection and Audit Rights.  Each of Holdings and the Borrower will, and will cause each Restricted Subsidiary to, maintain proper books of record and account in which entries that are full, true and correct in all material respects and are in conformity with GAAP (or applicable local standards) consistently applied shall be made of all material financial transactions and matters involving the assets and business of Holdings, the Borrower or the Restricted Subsidiaries, as the case may be. Each of Holdings and the Borrower will, and will cause the Restricted Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise visitation and inspection rights of the Administrative Agent and the Lenders under this Section 5.08 and the Administrative Agent shall not exercise such rights more often than one time during any calendar year absent the existence of an Event of Default, which visitation and inspection shall be at the reasonable expense of the Borrower; provided, further, that (a) when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice and (b) the Administrative Agent and the Lenders shall give Holdings and the Borrower the opportunity to participate in any discussions with Holdings' or the Borrower's independent public accountants.

SECTION 5.09        Compliance with Laws.  Each of Holdings and the Borrower will, and will cause each Restricted Subsidiary to, comply with its Organizational Documents and all Requirements of Law with respect to it or its property (including, including without limitation, ERISA and applicable Environmental Laws), except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.10        Use of Proceeds.  The Borrower will use the proceeds of the Loans, together with cash on hand of the Borrower and its Subsidiaries, on the Effective Date to, directly or indirectly finance a portion of the Transactions.  Following the Effective Date, the Borrower and its subsidiaries will

use the proceeds of (i) any Incremental Loan for working capital or any other purpose not prohibited by this Agreement and (ii) any Credit Agreement Refinancing Indebtedness, applied among the Loans and any Incremental Loans in accordance with the terms of this Agreement.

SECTION 5.11    Additional Subsidiaries.  If any additional Restricted Subsidiary or Intermediate Parent is formed or acquired after the Effective Date, Holdings or the Borrower will, within 60 days after such newly formed or acquired Restricted Subsidiary is formed or acquired (unless such Subsidiary is an Excluded Subsidiary), notify the Administrative Agent thereof, and all actions (if any) required to be taken with respect to such newly formed or acquired Subsidiary in order to satisfy the Collateral and Guarantee Requirement shall have been taken with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party within 60 days after such notice (or such longer period as the Administrative Agent shall reasonably agree).

SECTION 5.12    Further Assurances.

(a)    Each of Holdings and the Borrower will, and will cause each Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law and that the Administrative Agent or the Required Lenders may reasonably request, to cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Loan Parties.

(b)    If, after the Effective Date, any material assets (including any owned (but not leased) real property or improvements thereto or any interest therein) with a book value in excess of $10,000,000, are acquired by the Borrower or any other Loan Party or are held by any Subsidiary on or after the time it becomes a Loan Party pursuant to Section 5.11 (other than assets constituting Collateral under a Security Document that become subject to the Lien created by such Security Document upon acquisition thereof or constituting Excluded Assets), the Borrower will notify the Administrative Agent thereof, and, if requested by the Administrative Agent, the Borrower will cause such assets to be subjected to a Lien securing the Secured Obligations and will take and cause the other Loan Parties to take, such actions as shall be necessary and reasonably requested by the Administrative Agent and consistent with the Collateral and Guarantee Requirement to grant and perfect such Liens, including actions described in paragraph (a) of this Section, all at the expense of the Loan Parties and subject to last paragraph of the definition of the term "Collateral and Guarantee Requirement."

SECTION 5.13    Ratings.  Each of Holdings and the Borrower will use commercially reasonable efforts to cause (a) the Borrower to continuously have a public corporate credit rating from each of S&P and Moody's (but not to maintain a specific rating) and (b) the credit facilities made available under this Agreement to be continuously rated by each of S&P and Moody's (but not to maintain a specific rating).

SECTION 5.14    Certain Post-Closing Obligations.  As promptly as practicable, and in any event within the time periods after the Effective Date specified in Schedule 5.14 or such later date as the Administrative Agent reasonably agrees to in writing, including to reasonably accommodate circumstances unforeseen on the Effective Date, Holdings, the Borrower and each other Loan Party shall deliver the documents or take the actions specified on Schedule 5.14 that would have been required to be delivered or taken on the Effective Date but for the proviso to Section 4.01(f), in each case except to the extent otherwise agreed by the Administrative Agent pursuant to its authority as set forth in the definition of the term "Collateral and Guarantee Requirement".

SECTION 5.15    Designation of Subsidiaries.  The Borrower may at any time after the Effective Date designate any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; provided that (i) immediately before and after such designation, no Event of Default shall have occurred and be continuing and (ii) no Subsidiary may be designated as an Unrestricted Subsidiary or continue as an Unrestricted Subsidiary if it is a "Restricted Subsidiary" for the purpose of any Material Indebtedness.  The designation of any Subsidiary as an Unrestricted Subsidiary after the Effective Date shall constitute an Investment by the Borrower therein at the date of designation in an amount equal to the Fair Market Value of the Borrower's or its Subsidiary's (as applicable) investment therein.  The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute (i) the incurrence at the time of designation of any Investment, Indebtedness or Liens of such Subsidiary existing at such time and (ii) a return on any Investment by the Borrower in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the Fair Market Value at the date of such designation of the Borrower's or its Subsidiary's (as applicable) Investment in such Subsidiary.

SECTION 5.16    Change in Business.  Holdings, the Borrower and the Restricted Subsidiaries, taken as a whole, will not fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by them on the Effective Date and other business activities which are extensions thereof or otherwise incidental, reasonably related or ancillary to any of the foregoing.

SECTION 5.17    Changes in Fiscal Periods.  The Borrower shall not make any change in its fiscal year; provided, however, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

SECTION 5.18    Quarterly Lender Calls.  To the extent requested by the Administrative Agent, the Borrower shall conduct quarterly conference calls with management of the Borrower and the Lenders (at such times as reasonably agreed by the Borrower and the Administrative Agent) to discuss the financial performance of the Borrower and the Restricted Subsidiaries.

ARTICLE VI

NEGATIVE COVENANTS

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable (other than contingent amounts not yet due) under any Loan Document have been paid in full, each of Holdings and the Borrower covenants and agrees with the Lenders that:

SECTION 6.01    Indebtedness; Certain Equity Securities.

(a)    Holdings, any Intermediate Parent and the Borrower will not, and will not permit any Restricted Subsidiary or Intermediate Parent to, create, incur, assume or permit to exist any Indebtedness, except:

(i)    Indebtedness of Holdings, the Borrower and the Restricted Subsidiaries under the Loan Documents (including any Indebtedness incurred pursuant to Section 2.18, 2.19 or 2.22);

(ii)    Indebtedness (A) outstanding on the date hereof and listed on Schedule 6.01 and any Permitted Refinancing thereof, (B) that is intercompany Indebtedness outstanding on the date hereof, (C) under the Senior Notes and any Permitted Refinancing thereof and (D) under the ABL Facility and

any Permitted Refinancing thereof not to exceed, in the case of this clause (D), the greater of (x) $1,100,000,000 and (y) the Borrowing Base Basket as of the date of such incurrence less the aggregate principal amount of Indebtedness incurred under clause (viii) below, at any time outstanding;

(iii)     Guarantees by Holdings, any Intermediate Parent, the Borrower and the Restricted Subsidiaries in respect of Indebtedness of the Borrower or any Restricted Subsidiary otherwise permitted hereunder; provided that (A) such Guarantee is otherwise permitted by Section 6.04, (B) no Guarantee by any Restricted Subsidiary of any Junior Financing shall be permitted unless such Restricted Subsidiary shall have also provided a Guarantee of the Loan Document Obligations pursuant to the Guarantee Agreement and (C) if the Indebtedness being Guaranteed is subordinated to the Loan Document Obligations, such Guarantee shall be subordinated to the Guarantee of the Loan Document Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(iv)     Indebtedness of any Intermediate Parent, the Borrower or of any Restricted Subsidiary owing to any other Restricted Subsidiary, the Borrower, Holdings or any Intermediate Parent to the extent permitted by Section 6.04; provided that all such Indebtedness of any Loan Party owing to any Restricted Subsidiary that is not a Loan Party shall be subordinated to the Loan Document Obligations (to the extent any such Indebtedness is outstanding at any time after the date that is 30 days after the Effective Date or such later date as the Administrative Agent may reasonably agree) (but only to the extent permitted by applicable law and not giving rise to material adverse Tax consequences) on terms (A) at least as favorable to the Lenders as those set forth in the form of intercompany note attached as Exhibit H or (B) otherwise reasonably satisfactory to the Administrative Agent;

(v)     (A) Indebtedness (including Capital Lease Obligations) of the Borrower or any of the Restricted Subsidiaries financing the acquisition, construction, repair, replacement or improvement of fixed or capital assets; provided that such Indebtedness is incurred concurrently with or within 270 days after the applicable acquisition, construction, repair, replacement or improvement, and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (A); provided further that, at the time of any such incurrence of Indebtedness and after giving Pro Forma Effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance on this clause (v) shall not exceed the greater of $250,000,000 and 25% of Consolidated EBITDA for the most recently ended Test Period as of such time;

(vi)     Indebtedness in respect of (A) Swap Agreements entered into to hedge or mitigate risks to which Holdings, any Intermediate Parent, the Borrower or any Restricted Subsidiary has actual exposure (other than those in respect of shares of capital stock or other Equity Interests of Holdings, any Intermediate Parent, the Borrower or any Restricted Subsidiary) and (B) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of Holdings, any Intermediate Parent, the Borrower or any Restricted Subsidiary;

(vii)     (A) Indebtedness of any Person that becomes a Restricted Subsidiary (or of any Person not previously a Restricted Subsidiary that is merged or consolidated with or into the Borrower or a Restricted Subsidiary) after the date hereof as a result of a Permitted Acquisition, or Indebtedness of any Person that is assumed by the Borrower or any Restricted Subsidiary in connection with an acquisition of assets by the Borrower or such Restricted Subsidiary in a Permitted Acquisition; provided that such Indebtedness is not incurred in contemplation of such Permitted Acquisition; provided further that either (I) the Interest Coverage Ratio after giving Pro Forma Effect to the assumption of such Indebtedness and such Permitted Acquisition is equal to or greater than either (x) 2.00 to 1.00 or (y) the Interest Coverage Ratio immediately prior to the assumption of such Indebtedness and such Permitted Acquisition for the

most recently ended Test Period as of such time or (II) the Total Leverage Ratio after giving Pro Forma Effect to the assumption of such Indebtedness and such Permitted Acquisition is less than or equal to either (x) 6.50 to 1.00 or (y) the Total Leverage Ratio immediately prior to the assumption of such Indebtedness and such Permitted Acquisition for the most recently ended Test Period as of such time and (B) any Permitted Refinancing of Indebtedness incurred pursuant to the foregoing clause (A); provided that the aggregate principal amount of Indebtedness of which the primary obligor or a guarantor is a Restricted Subsidiary that is not a Loan Party outstanding in reliance on this clause (vii) and clauses (xiv), (xix) and (xxvi) below shall not exceed, at the time of incurrence thereof and after giving Pro Forma Effect thereto, the greater of $200,000,000 and 20% of Consolidated EBITDA for the most recently ended Test Period as of such time

        (viii)     Indebtedness in respect of Permitted Receivables Financings;

        (ix)     Indebtedness representing deferred compensation to employees of Holdings, any Intermediate Parent, the Borrower and the Restricted Subsidiaries incurred in the ordinary course of business;

        (x)     Indebtedness consisting of unsecured promissory notes issued by any Loan Party to current or former officers, directors and employees or their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests in Holdings (or any direct or indirect parent thereof) permitted by Section 6.08(a);

        (xi)     Indebtedness constituting indemnification obligations or obligations in respect of purchase price or other similar adjustments incurred in a Permitted Acquisition, any other Investment or any Disposition, in each case permitted under this Agreement;

        (xii)     Indebtedness consisting of obligations under deferred compensation or other similar arrangements incurred in connection with the Transactions or any Permitted Acquisition or other Investment permitted hereunder;

        (xiii)     Cash Management Obligations and other Indebtedness in respect of netting services, overdraft protections and similar arrangements and Indebtedness arising from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

        (xiv)     Indebtedness of the Borrower and the Restricted Subsidiaries; provided that at the time of the incurrence thereof and after giving Pro Forma Effect thereto, the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xiv) shall not exceed the greater of $500,000,000 and 50% of Consolidated EBITDA for the most recently ended Test Period as of such time; provided, further, that the aggregate principal amount of Indebtedness of which the primary obligor or a guarantor is a Restricted Subsidiary that is not a Loan Party outstanding in reliance on this clause (xiv), clause (vii) above, and clauses (xix) and (xxvi) below shall not exceed, at the time of incurrence thereof and after giving Pro Forma Effect thereto, the greater of $200,000,000 and 20% of Consolidated EBITDA for the most recently ended Test Period as of such time;

        (xv)     Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case in the ordinary course of business;

        (xvi)     (A) Indebtedness incurred by the Borrower or any of the Restricted Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created, or related to obligations or liabilities incurred, in the ordinary course of business, including in

respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims and (B) Indebtedness of the Borrower or any of the Restricted Subsidiaries as an account party in respect of letters of credit, bank guarantees or similar instruments in favor of suppliers or trade creditors issued in the ordinary course of business; provided that the aggregate principal amount of Indebtedness outstanding in reliance on this sub-clause (B) shall not exceed, at the time of incurrence thereof and after giving Pro Forma Effect thereto, the greater of $150,000,000 and 15% of Consolidated EBITDA for the most recently ended Test Period as of such time;

(xvii)    obligations in respect of performance, bid, appeal and surety bonds and performance, bankers acceptance facilities and completion guarantees and similar obligations provided by the Borrower or any of the Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(xviii)   unsecured Indebtedness of Holdings or any Intermediate Parent ("Permitted Holdings Debt") (A) that is not subject to any Guarantee by any subsidiary thereof, (B) that will not mature prior to the date that is 91 days after the Latest Maturity Date in effect on the date of issuance or incurrence thereof, (C) that has no scheduled amortization or payments, repurchases or redemptions of principal (it being understood that such Indebtedness may have mandatory prepayment, repurchase or redemption provisions satisfying the requirements of clause (E) below), (D) that permits payments of interest or other amounts in respect of the principal thereof to be paid in kind rather than in cash, (E) that has mandatory prepayment, repurchase or redemption, covenant, default and remedy provisions customary for senior or senior subordinated discount notes of an issuer that is the parent of a borrower under senior secured credit facilities, and in any event, with respect to covenant, default and remedy provisions, no more restrictive (taken as a whole) than those set forth in this Agreement (other than provisions customary for senior or senior subordinated discount notes of a holding company); provided that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days prior to the issuance or incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees) and (F) that any such Indebtedness of Holdings is subordinated in right of payment to its Guarantee under the Guarantee Agreement; provided further that any such Indebtedness shall constitute Permitted Holdings Debt only if immediately after giving effect to the issuance or incurrence thereof, no Event of Default shall have occurred and be continuing;

(xix)    (A) unsecured Indebtedness of the Borrower or any of the Restricted Subsidiaries; provided that after giving effect to the incurrence of such Indebtedness on a Pro Forma Basis, either (i) the Interest Coverage Ratio is greater than or equal to 2.00 to 1.00 or (ii) the Total Leverage Ratio is less than or equal to 6.50 to 1.00 and (B) any Permitted Refinancing of Indebtedness incurred pursuant to the foregoing clause (A); provided, further, that the aggregate principal amount of Indebtedness of which the primary obligor or a guarantor is a Restricted Subsidiary that is not a Loan Party outstanding in reliance on this clause (xix), clauses (vii) and (xiv) above, and clause (xxvi) below shall not exceed, at the time of incurrence thereof and after giving Pro Forma Effect thereto, the greater of $200,000,000 and 20% of Consolidated EBITDA for the most recently ended Test Period as of such time;

(xx)    Indebtedness supported by a letter of credit or bank guaranty issued under the ABL Facility or otherwise permitted to be issued hereunder to the extent the Borrower or any Restricted

-98-

Subsidiary is the account party, in a principal amount not to exceed the face amount of such letter of credit;

(xxi)    Permitted Unsecured Refinancing Debt and any Permitted Refinancing thereof;

(xxii)    Permitted First Priority Refinancing Debt and Permitted Second Priority Refinancing Debt, and any Permitted Refinancing thereof;

(xxiii)    (A) Indebtedness of the Borrower issued in lieu of Incremental Loans consisting of (i) secured or unsecured bonds, notes or debentures (which bonds, notes or debentures, if secured, may be secured by Liens having equal priority with, or junior priority relative to, the Liens on the Collateral securing the Secured Obligations (but without regard to control of remedies)) or (ii) secured or unsecured loans (which loans, if secured, must be secured by Liens having a junior priority relative to the Liens on the Collateral securing the Secured Obligations); provided that (i) the aggregate principal amount of all such Indebtedness issued pursuant to this clause shall, when aggregated with any secured indebtedness incurred pursuant to clause (xxvi) below, shall not exceed (x) the Incremental Cap less (y) the amount of all Incremental Loans, (ii) all such Indebtedness shall be considered Consolidated First Lien Debt (whether or not so secured) for purposes of this clause, the determination of the "Incremental Cap" amount and Section 2.18, (iii) such Indebtedness complies with the Required Additional Debt Terms and (iv) the condition set forth in clause (A) of the proviso in Section 2.18(a) shall have been complied with as if such Indebtedness was an Incremental Loan and (B) any Permitted Refinancing of Indebtedness incurred pursuant to the foregoing clause (A) (provided that, for the avoidance of doubt, (x) any such Permitted Refinancing shall continue to constitute a utilization of the incurrence capacity set forth in clause (A)(i) and (y) shall continue to be considered Consolidated First Lien Debt (whether or not so secured) for purposes of clause (A) and Section 2.18;

(xxiv)    (A) Indebtedness of the Borrower or any of the Restricted Subsidiaries consisting of (i) secured bonds, notes or debentures (which bonds, notes or debentures must be secured by Liens having a junior priority relative to the Liens on the Collateral securing the Secured Obligations) or (ii) secured loans (which loans must be secured by Liens having a junior priority relative to the Liens on the Collateral securing the Secured Obligations); provided that (i) after giving effect to the incurrence of such Indebtedness on a Pro Forma Basis, the Secured Leverage Ratio is less than or equal to 4.43 to 1.00, (ii) such Indebtedness complies with the Required Additional Debt Terms and (B) any Permitted Refinancing of Indebtedness incurred pursuant to the foregoing clause (A) and (iii) a Senior Representative acting on behalf of the holders of such Indebtedness shall have entered into the Second Lien Intercreditor Agreement;

(xxv)    Indebtedness of any Restricted Subsidiary that is not a Loan Party; provided that the aggregate principal amount of Indebtedness of which the primary obligor or a guarantor is a Restricted Subsidiary that is not a Loan Party outstanding in reliance on this clause (xxv) shall not exceed, at the time of incurrence thereof and after giving Pro Forma Effect thereto, the greater of $100,000,000 and 10% of Consolidated EBITDA for the most recently ended Test Period as of such time;

(xxvi)    (A) Indebtedness incurred to finance a Permitted Acquisition; provided that (i) (I) the Interest Coverage Ratio after giving Pro Forma Effect to the incurrence of such Indebtedness and such Permitted Acquisition is equal to or greater than either (x) 2.00 to 1.00 or (y) the Interest Coverage Ratio immediately prior to the incurrence of such Indebtedness and such Permitted Acquisition for the most recently ended Test Period as of such time or (II) the Total Leverage Ratio after giving Pro Forma Effect to the incurrence of such Indebtedness and such Permitted Acquisition is less than or equal to either (x) 6.50 to 1.00 or (y) the Total Leverage Ratio immediately prior to the incurrence of such Indebtedness and such Permitted Acquisition for the most recently ended Test Period as of such time and

-99-

(ii) such Indebtedness complies with the Required Additional Debt Terms and to the extent secured by Liens on Collateral, such Liens shall be junior in priority relative to the Liens on the Collateral securing the Secured Obligations and (B) any Permitted Refinancing of Indebtedness incurred pursuant to the foregoing clause (A); provided that the aggregate principal amount of Indebtedness of which the primary obligor or a guarantor is a Restricted Subsidiary that is not a Loan Party outstanding in reliance on this clause (xxvi) and clauses (vii), (xiv) and (xix) above shall not exceed, at the time of incurrence thereof and after giving Pro Forma Effect thereto, the greater of $200,000,000 and 20% of Consolidated EBITDA for the most recently ended Test Period as of such time; provided, further, that any such Indebtedness that is secured by Liens on Collateral shall constitute the incurrence of (and, for the avoidance of doubt, comply with the conditions related to) Incremental Equivalent Debt;

(xxvii)  Indebtedness in the form of Capital Lease Obligations arising out of any Sale Leaseback and any Permitted Refinancing thereof;

(xxviii) all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xxix) above.

(b)    Holdings and each Intermediate Parent will not create, incur, assume or permit to exist any Indebtedness except Indebtedness created under Sections 6.01(a)(i), (iii), (iv), (vi), (ix), (x), (xi), (xii) and (xiii) and all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in the foregoing clauses.

(c)    Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary or Intermediate Parent to, issue any preferred Equity Interests or any Disqualified Equity Interests, except (A) in the case of Holdings, preferred Equity Interests that are Qualified Equity Interests and (B) in the case of the Borrower or any Restricted Subsidiary or Intermediate Parent, preferred Equity Interests or Disqualified Equity Interests issued to and held by Holdings, the Borrower or any Restricted Subsidiary.

For purposes of determining compliance with this Section 6.01, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described in clauses (i) through (xxxi) above, the Borrower shall, in its sole discretion, classify and reclassify or later divide, classify or reclassify such item of Indebtedness (or any portion thereof) and will only be required to include the amount and type of such Indebtedness in one or more of the above clauses; provided that all Indebtedness outstanding under the Loan Documents will be deemed to have been incurred in reliance only on the exception in clause (i).

SECTION 6.02    Liens.  Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary or Intermediate Parent to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except:

(i)    Liens created under the Loan Documents;

(ii)    Permitted Encumbrances;

(iii)    Liens existing on Effective Date; provided that any Lien securing Indebtedness or other obligations in excess of $2,500,000 individually shall only be permitted if set forth on Schedule 6.02, and any modifications, replacements, renewals or extensions thereof; provided that (1) such modified, replacement, renewal or extension Lien does not extend to any additional property other than (a) after-acquired property that is affixed or incorporated into the property covered by such Lien and (b) proceeds and products thereof, and (2) the obligations secured or benefited by such modified, replacement, renewal or extension Lien are permitted by Section 6.01;

-100-

(iv)     Liens securing Indebtedness permitted under Section 6.01(a)(v) or (xxvii); provided that (A) such Liens attach concurrently with or within 270 days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, except for accessions to such property and the proceeds and the products thereof, and any lease of such property (including accessions thereto) and the proceeds and products thereof and (C) with respect to Capital Lease Obligations, such Liens do not at any time extend to or cover any assets (except for accessions to or proceeds of such assets) other than the assets subject to such Capital Lease Obligations; provided, further, that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)     leases, licenses, subleases or sublicenses granted to others that do not (A) interfere in any material respect with the business of Holdings, the Borrower and the Restricted Subsidiaries, taken as a whole or (B) secure any Indebtedness;

(vi)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(vii)     Liens (A) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (B) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking industry;

(viii)     Liens (A) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 6.04 to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment or any Disposition permitted under Section 6.05 (including any letter of intent or purchase agreement with respect to such Investment or Disposition) or (B) consisting of an agreement to dispose of any property in a Disposition permitted under Section 6.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(ix)     Liens on property of any Restricted Subsidiary that is not a Loan Party, which Liens secure Indebtedness of such Restricted Subsidiary or another Restricted Subsidiary that is not a Loan Party, in each case permitted under Section 6.01;

(x)     Liens granted by a Restricted Subsidiary that is not a Loan Party in favor of any Loan Party, Liens granted by a Restricted Subsidiary that is not a Loan Party in favor of Restricted Subsidiary that is not a Loan Party and Liens granted by a Loan Party in favor of any other Loan Party;

(xi)     Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary, in each case after the date hereof (other than Liens on the Equity Interests of any Person that becomes a Restricted Subsidiary); provided that (A) such Lien was not created in contemplation of such acquisition or such Person becoming a Restricted Subsidiary, (B) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require or include, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition), and (C) the Indebtedness secured thereby is permitted under Section 6.01(a)(v) or (vii);

-101-

(xii)    any interest or title of a lessor under leases (other than leases constituting Capital Lease Obligations) entered into by any of the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(xiii)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods by any of the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(xiv)    Liens deemed to exist in connection with Investments in repurchase agreements under clause (e) of the definition of the term "Permitted Investments";

(xv)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xvi)    Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Holdings, any Intermediate Parent, the Borrower and the Restricted Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(xvii)    ground leases in respect of real property on which facilities owned or leased by the Borrower or any of the Restricted Subsidiaries are located;

(xviii)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xix)    Liens (A) on the Collateral securing Permitted First Priority Refinancing Debt, (B) on the Collateral securing Permitted Second Priority Refinancing Debt, (C) on the Collateral securing Incremental Equivalent Debt (and junior Liens on the Collateral securing Indebtedness incurred pursuant to Section 6.01(a)(xxvi) in lieu thereof) and (D) on the Collateral securing Indebtedness permitted pursuant to Sections 6.01(a)(ii)(D), 6.01(a)(ii)(E) and 6.01(a)(xxiv);

(xx)    other Liens; provided that at the time of incurrence of the obligations secured thereby (after giving Pro Forma Effect to any such obligations) the aggregate outstanding face amount of obligations secured by Liens existing in reliance on this clause (xx) shall not exceed the greater of $150,000,000 and 15% of Consolidated EBITDA for the Test Period then last ended;

(xxi)    Liens on cash and Permitted Investments used to satisfy or discharge Indebtedness; provided such satisfaction or discharge is permitted hereunder;

(xxii)    receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(xxiii)    Liens on cash or Permitted Investments securing Swap Agreements in the ordinary course of business submitted for clearing in accordance with applicable Requirements of Law; and

(xxiv)    Liens on deposits taken by a Restricted Subsidiary that constitutes a regulated bank incurred in connection with the taking of such deposits.

SECTION 6.03     Fundamental Changes.

(a)     Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary or Intermediate Parent to, merge into or consolidate or amalgamate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that:

(i)     any Restricted Subsidiary may merge with (A) the Borrower; provided that the Borrower shall be the continuing or surviving Person or (B) one or more other Restricted Subsidiaries; provided that when any Subsidiary Loan Party is merging or amalgamating with another Restricted Subsidiary either (1) the continuing or surviving Person shall be a Subsidiary Loan Party or (2) if the continuing or surviving Person is not a Subsidiary Loan Party, the acquisition of such Subsidiary Loan Party by such surviving Restricted Subsidiary is permitted under Section 6.04;

(ii)     any Restricted Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of Holdings, the Borrower and the Restricted Subsidiaries and is not materially disadvantageous to the Lenders;

(iii)     any Restricted Subsidiary may make a Disposition of all or substantially all of its assets (upon voluntary liquidation or otherwise) to another Restricted Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then either (A) the transferee must be a Loan Party, (B) to the extent constituting an Investment, such Investment must be an Investment in a Restricted Subsidiary that is not a Loan Party permitted by Section 6.04 or (C) to the extent constituting a Disposition to a Restricted Subsidiary that is not a Loan Party, such Disposition is for Fair Market Value and any promissory note or other non-cash consideration received in respect thereof is an Investment in a Restricted Subsidiary that is not a Loan Party permitted by Section 6.04;

(iv)     the Borrower may merge, amalgamate or consolidate with any other Person; provided that (A) the Borrower shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger or consolidation is not the Borrower (any such Person, the "Successor Borrower"), (1) the Successor Borrower shall be an entity organized or existing under the laws of the United States or any political subdivision thereof, (2) the Successor Borrower shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form and substance reasonably satisfactory to the Administrative Agent, (3) each Loan Party other than the Borrower, unless it is the other party to such merger or consolidation, shall have reaffirmed, pursuant to an agreement in form and substance reasonably satisfactory to the Administrative Agent, that its Guarantee of, and grant of any Liens as security for, the Secured Obligations shall apply to the Successor Borrower's obligations under this Agreement and (4) the Borrower shall have delivered to the Administrative Agent a certificate of a Responsible Officer and an opinion of counsel, each stating that such merger, amalgamation or consolidation complies with this Agreement; provided, further, that (x) if such Person is not a Loan Party, no Event of Default exists after giving effect to such merger or consolidation and (y) if the foregoing requirements are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement and the other Loan Documents; provided, further, that the Borrower agrees to provide any documentation and other information about the Successor Borrower as shall have been reasonably requested in writing by any Lender through the Administrative Agent that such Lender shall have reasonably determined is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including Title III of the USA Patriot Act;

(v)     Holdings or any Intermediate Parent may merge, amalgamate or consolidate with any other Person (other than the Borrower), so long as no Event of Default exists after giving effect to such merger, amalgamation or consolidation; provided that (A) Holdings or Intermediate Parent, as

-103-

applicable, shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, amalgamation or consolidation is not Holdings or Intermediate Parent, as applicable, or is a Person into which Holdings or Intermediate Parent, as applicable, has been liquidated (any such Person, the "Successor Holdings"), (1) the Successor Holdings shall expressly assume all the obligations of Holdings or Intermediate Parent, as applicable, under this Agreement and the other Loan Documents to which Holdings or Intermediate Parent, as applicable, is a party pursuant to a supplement hereto or thereto in form and substance reasonably satisfactory to the Administrative Agent, (2) each Loan Party other than Holdings or Intermediate Parent, as applicable, unless it is the other party to such merger, amalgamation or consolidation, shall have reaffirmed, pursuant to an agreement in form and substance reasonably satisfactory to the Administrative Agent, that its Guarantee of and grant of any Liens as security for the Secured Obligations shall apply to the Successor Holdings' obligations under this Agreement, (3) the Successor Holdings shall, immediately following such merger, amalgamation or consolidation, directly or indirectly own all Subsidiaries owned by Holdings or Intermediate Parent, as applicable, immediately prior to such transaction, (4) Holdings or Intermediate Parent, as applicable, shall have delivered to the Administrative Agent a certificate of a Responsible Officer and an opinion of counsel, each stating that such merger or consolidation complies with this Agreement and (5) Holdings or such Intermediate Parent, as applicable, may not merge, amalgamate or consolidate with any Subsidiary Guarantor if any Permitted Holdings Debt is then outstanding unless, after giving effect to such merger, amalgamation or consolidation, the Interest Coverage Ratio is greater than 2.00 to 1.00 on a Pro Forma Basis; provided, further, that if the foregoing requirements are satisfied, the Successor Holdings will succeed to, and be substituted for, Holdings or Intermediate Parent, as applicable, under this Agreement and the other Loan Documents; provided, further, that the Borrower agree to provide any documentation and other information about the Successor Holdings as shall have been reasonably requested in writing by any the Lender through the Administrative Agent that such Lender shall have reasonably determined is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including Title III of the USA Patriot Act;

(vi)    any Restricted Subsidiary may merge, consolidate or amalgamate with any other Person in order to effect an Investment permitted pursuant to Section 6.04; provided that the continuing or surviving Person shall be a Restricted Subsidiary, which together with each of the Restricted Subsidiaries, shall have complied with the requirements of Sections 5.11 and 5.12;

(vii)    Holdings, the Borrower and the Restricted Subsidiaries may consummate the Transactions; and

(viii)    any Restricted Subsidiary may effect a merger, dissolution, liquidation consolidation or amalgamation to effect a Disposition permitted pursuant to Section 6.05.

SECTION 6.04    Investments, Loans, Advances, Guarantees and Acquisitions.  Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary or Intermediate Parent to, make or hold any Investment, except:

(a)    Permitted Investments at the time such Permitted Investment is made;

(b)    loans or advances to officers, directors and employees of Holdings, the Borrower and the Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests in Holdings (or any direct or indirect parent thereof) (provided that the amount of such loans and advances made in cash to such Person shall be contributed to the Borrower in cash as common equity or Qualified Equity Interests) and (iii) for purposes not described in the foregoing clauses (i) and (ii);

provided that at the time of incurrence thereof and after giving Pro Forma Effect thereto, the aggregate principal amount outstanding in reliance on this clause (iii) shall not to exceed $25,000,000;

(c)     Investments by Holdings, any Intermediate Parent, the Borrower or any Restricted Subsidiary in any of Holdings, any Intermediate Parent, the Borrower or any Restricted Subsidiary; provided that, in the case of any Investment by a Loan Party in a Restricted Subsidiary that is not a Loan Party, no Event of Default shall have occurred and be continuing or would result therefrom;

(d)     Investments consisting of prepayments to suppliers in the ordinary course of business;

(e)     Investments consisting of extensions of trade credit in the ordinary course of business;

(f)     Investments (i) existing or contemplated on the date hereof and set forth on Schedule 6.04(f) and any modification, replacement, renewal, reinvestment or extension thereof and (ii) Investments existing on the date hereof by Holdings, the Borrower or any Restricted Subsidiary in the Borrower or any Restricted Subsidiary and any modification, renewal or extension thereof; provided that the amount of the original Investment is not increased except by the terms of such Investment to the extent as set forth on Schedule 6.04(f) or as otherwise permitted by this Section 6.04;

(g)     Investments in Swap Agreements permitted under Section 6.01;

(h)     promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 6.05;

(i)     Permitted Acquisitions;

(j)     the Transactions;

(k)     Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(l)     Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers, from financially troubled account debtors or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(m)     loans and advances to Holdings (or any direct or indirect parent thereof) or any Intermediate Parent in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Holdings (or such parent) or such Intermediate Parent in accordance with Section 6.08(a);

(n)     other Investments and other acquisitions; provided that at the time any such Investment or other acquisition is made, the aggregate outstanding amount of all Investments made in reliance on this clause (n) together with the aggregate amount of all consideration paid in connection with all other acquisitions made in reliance on this clause (n) (including the aggregate principal amount of all Indebtedness assumed in connection with any such other acquisition), shall not exceed the sum of (A) the greater of $375,000,000 and 37.5% of Consolidated EBITDA for the most recently ended Test Period after giving Pro Forma Effect to the making of such Investment or other acquisition, plus (B) so long as immediately after giving effect to any such Investment no Event of Default has occurred and is continuing (or, in the case of the use of the Starter Basket that is Not Otherwise Applied, no Event of Default under

-105-

Section 7.01(a), (j), (h) or (l)), the Available Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such Investment, plus (C) the Available Equity Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such Investment;

(o)    [Reserved];

(p)    advances of payroll payments to employees in the ordinary course of business;

(q)    Investments and other acquisitions to the extent that payment for such Investments is made with Qualified Equity Interests of Holdings (or any direct or indirect parent thereof or the IPO Entity); provided that (i) such amounts used pursuant to this clause (q) shall not increase the Available Equity Amount and (ii) any amounts used for such an Investment or other acquisition that are not Qualified Equity Interests of Holdings (or any direct or indirect parent thereof or the IPO Entity) shall otherwise be permitted pursuant to this Section 6.04;

(r)    Investments of a Subsidiary acquired after the Effective Date or of a Person merged or consolidated with any Subsidiary in accordance with this Section and Section 6.03 after the Effective Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(s)    non-cash Investments in connection with tax planning and reorganization activities; provided that after giving effect to any such activities, the security interests of the Lenders in the Collateral, taken as a whole, would not be materially impaired;

(t)    Investments consisting of Liens, Indebtedness, fundamental changes, Dispositions and Restricted Payments permitted (other than by reference to this Section 6.04(t)) under Sections 6.02, 6.01, 6.03, 6.05 and 6.08, respectively;

(u)    additional Investments; provided that after giving effect to such Investment (A) on a Pro Forma Basis, the Total Leverage Ratio is less than or equal to 5.00 to 1.00 and (B) there is no continuing Event of Default;

(v)    contributions to a "rabbi" trust for the benefit of employees, directors, consultants, independent contractors or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of the Borrower;

(w)    to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses or leases of other assets, intellectual property, or other rights, in each case in the ordinary course of business;

(x)    Investments in Subsidiaries in the form of receivables and related assets required in connection with a Permitted Receivables Financing (including the contribution or lending of cash and cash equivalents to Subsidiaries to finance the purchase of such assets from the Borrower or other Restricted Subsidiaries or to otherwise fund required reserves); and

(y)    Investments by an Unrestricted Subsidiary entered into prior to the day such Unrestricted Subsidiary is redesignated as a Restricted Subsidiary pursuant to the definition of "Unrestricted Subsidiary".

SECTION 6.05    Asset Sales.  (a)  Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary or Intermediate Parent, to, (i) sell, transfer, lease, license or otherwise dispose of any asset, including any Equity Interest owned by it or (ii) permit any Restricted Subsidiary to issue any additional Equity Interest in such Restricted Subsidiary (other than issuing directors' qualifying shares, nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law and other than issuing Equity Interests to Holdings, the Borrower or a Restricted Subsidiary in compliance with Section 6.04(c)) (each, a "Disposition"), except:

(a)    Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful, or economically practicable to maintain, in the conduct of the business of Holdings, any Intermediate Parent, the Borrower and the Restricted Subsidiaries (including allowing any registration or application for registration of any Intellectual Property that is no longer used or useful, or economically practicable to maintain, to lapse or go abandoned);

(b)    Dispositions of inventory and other assets in the ordinary course of business;

(c)    Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) an amount equal to the Net Proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)    Dispositions of property to the Borrower or a Restricted Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then either (i) the transferee must be a Loan Party, (ii) to the extent constituting an Investment, such Investment must be an Investment in a Restricted Subsidiary that is not a Loan Party permitted by Section 6.04 or (iii) to the extent constituting a Disposition to a Restricted Subsidiary that is not a Loan Party, such Disposition is for Fair Market Value and any promissory note or other non-cash consideration received in respect thereof is an Investment in a Restricted Subsidiary that is not a Loan Party permitted by Section 6.04;

(e)    Dispositions permitted by Section 6.03, Investments permitted by Section 6.04, Restricted Payments permitted by Section 6.08 and Liens permitted by Section 6.02, in each case, other than by reference to this Section 6.05(e);

(f)    [Reserved];

(g)    Dispositions of Permitted Investments;

(h)    Dispositions of (A) accounts receivable in connection with the collection or compromise thereof (including sales to factors or other third parties) and (B) receivables and related assets pursuant to any Permitted Receivables Financing;

(i)    leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and that do not materially interfere with the business of Holdings, the Borrower and the Restricted Subsidiaries, taken as a whole;

(j)    transfers of property subject to Casualty Events upon receipt of the Net Proceeds of such Casualty Event;

(k)    Dispositions of property to Persons other than Holdings, the Borrower or any of the Restricted Subsidiaries (including (x) the sale or issuance of Equity Interests in a Restricted Subsidiary and (y) any Sale Leaseback) not otherwise permitted under this Section 6.05; provided that (i) such

LEGAL_US_E # 113405763.8

Disposition is made for Fair Market Value and (ii) with respect to any Disposition pursuant to this clause (k) for a purchase price in excess of $25,000,000 for any transaction or series of related transactions, the Borrower or a Restricted Subsidiary shall receive not less than 75% of such consideration in the form of cash or Permitted Investments; provided, however, that for the purposes of this clause (ii), (A) any liabilities (as shown on the most recent balance sheet of the Borrower provided hereunder or in the footnotes thereto) of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms subordinated in right of payment to the Loan Document Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which Holdings, any Intermediate Parent, the Borrower and the Restricted Subsidiaries shall have been validly released by all applicable creditors in writing, shall be deemed to be cash, (B) any securities received by Holdings, any Intermediate Parent the Borrower or such Restricted Subsidiary from such transferee that are converted by the Borrower or such Restricted Subsidiary into cash or Permitted Investments (to the extent of the cash or Permitted Investments received) within 180 days following the closing of the applicable Disposition, shall be deemed to be cash and (C) any Designated Non-Cash Consideration received by Holdings, any Intermediate Parent, the Borrower or such Restricted Subsidiary in respect of such Disposition having an aggregate Fair Market Value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (k) that is at that time outstanding, not in excess (at the time of receipt of such Designated Non-Cash Consideration) of the greater of (x) $240,000,000 and (y)2.00% of Consolidated Total Assets for the most recently ended Test Period, with the Fair Market Value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value, shall be deemed to be cash;

(l)       Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(m)      Dispositions of any assets (including Equity Interests) (i) acquired in connection with any Permitted Acquisition or other Investment permitted hereunder, which assets are not used or useful to the core or principal business of the Borrower and the Restricted Subsidiaries and (ii) made to obtain the approval of any applicable antitrust authority in connection with a Permitted Acquisition;

(n)      transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(o)      Dispositions of property for Fair Market Value not otherwise permitted under this Section 6.05 having an aggregate purchase price not to exceed $250,000,000;

(p)      the sale or discount (with or without recourse) and related assets in connection with a Permitted Receivables Financing; and

(q)      the sale of assets acquired by Target pursuant to the: (i) Aircraft Purchase Agreement (C350-0887) dated September 27, 2013, and (ii) Aircraft Purchase Agreement (C350-0888) dated September 27, 2013, in each case, by and among Bombardier Aerospace Corporation and the Target.

SECTION 6.06    Holdings Covenant.  Holdings and any Intermediate Parent will not conduct, transact or otherwise engage in any business or operations other than (i) the ownership and/or acquisition of the Equity Interests of the Borrower and any Intermediate Parent, (ii) the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance, (iii)

-108-

participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and the Borrower, (iv) the performance of its obligations under and in connection with the Loan Documents, any documentation governing any Indebtedness or Guarantee permitted to be incurred or made by it under Article VI, the Acquisition Agreement, the Transactions, the other agreements contemplated by the Acquisition Agreement and the other agreements contemplated hereby and thereby, (v) any public offering of its common stock or any other issuance or registration of its (or its direct or indirect parent's) Equity Interests for sale or resale not prohibited by this Agreement, including the costs, fees and expenses related thereto, including the formation of one or more "shell" companies to facilitate any such offering or issuance, (vi) any transaction that Holdings or any Intermediate Parent is permitted to enter into or consummate under Article VI (including, but not limited to, the making of any Restricted Payment permitted by Section 6.08 or holding of any cash or Permitted Investments received in connection with Restricted Payments made in accordance with Section 6.08 pending application thereof in the manner contemplated by Section 6.04, the incurrence of any Indebtedness permitted to be incurred by it under Section 6.01 and the making of any Investment permitted to be made by it under Section 6.04), (vii) incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, (viii) providing indemnification to officers and directors and as otherwise permitted in Section 6.09, (ix) activities incidental to the consummation of the Transactions and (x) activities incidental to the businesses or activities described in clauses (i) to (ix) of this paragraph.

SECTION 6.07    <u>Negative Pledge</u>.  Holdings and the Borrower will not, and will not permit any Restricted Subsidiary or Intermediate Parent to enter into any agreement, instrument, deed or lease that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, for the benefit of the Secured Parties with respect to the Secured Obligations or under the Loan Documents; <u>provided</u> that the foregoing shall not apply to:

(a)    restrictions and conditions imposed by (i) Requirements of Law, (ii) any Loan Document, (iii) the Senior Notes, (iv) the ABL Facility, (v) any documentation related to any Permitted Receivables Financing, (vi) any documentation governing Incremental Equivalent Debt, (vii) any documentation governing Permitted Unsecured Refinancing Debt, Permitted First Priority Refinancing Debt or Permitted Second Priority Refinancing Debt, (viii)  any documentation governing Indebtedness incurred pursuant to Section 6.01(a)(xxiv) and (ix) any documentation governing any Permitted Refinancing incurred to refinance any such Indebtedness referenced in clauses (i) through (ix) above; <u>provided</u> that with respect to Indebtedness referenced in (A) clauses (vi) and (viii) above, such restrictions shall be no more restrictive in any material respect than the restrictions and conditions in the Loan Documents or, in the case of Junior Financing, are market terms at the time of issuance and (B) clause (vii) above, such restrictions shall not expand the scope in any material respect of any such restriction or condition contained in the Indebtedness being Refinanced;

(b)    customary restrictions and conditions existing on the Effective Date and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)    restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale; <u>provided</u> that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

(d)    customary provisions in leases, licenses and other contracts restricting the assignment thereof;

(e)     restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing by such Indebtedness;

(f)     any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Restricted Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); provided that such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary and the restriction or condition set forth in such agreement does not apply to the Borrower or any Restricted Subsidiary;

(g)     restrictions or conditions in any Indebtedness permitted pursuant to Section 6.01 that is incurred or assumed by Restricted Subsidiaries that are not Loan Parties to the extent such restrictions or conditions are no more restrictive in any material respect than the restrictions and conditions in the Loan Documents or, in the case of Junior Financing, are market terms at the time of issuance and are imposed solely on such Restricted Subsidiary and its Subsidiaries;

(h)     restrictions on cash (or Permitted Investments) or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Permitted Encumbrances);

(i)     restrictions set forth on Schedule 6.07 and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(j)     customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted by Section 6.02 and applicable solely to such joint venture and entered into in the ordinary course of business; and

(k)     customary net worth provisions contained in real property leases entered into by Subsidiaries, so long as the Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrower and its Subsidiaries to meet their ongoing obligations.

SECTION 6.08     Restricted Payments; Certain Payments of Indebtedness.

(a)     Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary to pay or make, directly or indirectly, any Restricted Payment, except:

(i)     The Borrower and each Restricted Subsidiary may make Restricted Payments to the Borrower or any other Restricted Subsidiary; provided that in the case of any such Restricted Payment by a Restricted Subsidiary that is not a wholly-owned Subsidiary of the Borrower, such Restricted Payment is made to the Borrower, any Restricted Subsidiary and to each other owner of Equity Interests of such Restricted Subsidiary based on their relative ownership interests of the relevant class of Equity Interests;

(ii)     [Reserved];

(iii)     Holdings, any Intermediate Parent and the Borrower may declare and make dividend payments or other distributions payable solely in the Equity Interests of such Person;

(iv)     Restricted Payments made to consummate the Transactions and pay fees and expenses related thereto (including Restricted Payments made (A) to holders of restricted stock or

-110-

performance stock units as provided by the Acquisition Agreement, (B) to holders of Equity Interests of the Target (immediately prior to giving effect to the Acquisition) in connection with, or as a result of, their exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, in each case, with respect to the Transactions and (C) in order to satisfy indemnity and other similar obligations under the Acquisition Agreement);

(v)     repurchases of Equity Interests in Holdings (or Restricted Payments by Holdings to allow repurchases of Equity Interest in any direct or indirect parent of Holdings) or the Borrower deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such stock options or warrants;

(vi)     Restricted Payments to Holdings which Holdings may use to redeem, acquire, retire or repurchase its Equity Interests (or any options, warrants, restricted stock units or stock appreciation rights issued with respect to any of such Equity Interests) (or make Restricted Payments to allow any of Holdings' direct or indirect parent companies to so redeem, retire, acquire or repurchase their Equity Interests) held by current or former officers, managers, consultants, directors and employees (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) of Holdings (or any direct or indirect parent thereof), the Borrower and the Restricted Subsidiaries, upon the death, disability, retirement or termination of employment of any such Person or otherwise in accordance with any stock option or stock appreciation rights plan, any management, director and/or employee stock ownership or incentive plan, stock subscription plan, employment termination agreement or any other employment agreements or equity holders' agreement; provided that the aggregate amount of Restricted Payments permitted by this clause (vi) after the Effective Date, together with the aggregate amount of loans and advances to Holdings made pursuant to Section 6.04(m) in lieu thereof, shall not exceed the sum of (A) $25,000,000 in any fiscal year of the Borrower and (B) the amount in any fiscal year equal to the cash proceeds of key man life insurance policies received by the Borrower or the Restricted Subsidiaries after the Effective Date; provided that any unused portion of the preceding basket calculated pursuant to clauses (A) and (B) above for any fiscal year may be carried forward to succeeding fiscal years;

(vii)     any Intermediate Parent or the Borrower may make Restricted Payments in cash to Holdings and any Intermediate Parent and, where applicable, Holdings and such Intermediate Parent may make Restricted Payments in cash:

(A)     the proceeds of which shall be used by Holdings or any Intermediate Parent to pay (or to make Restricted Payments to allow any direct or indirect parent of Holdings to pay), for any taxable period for which the Borrower and/or any of its Subsidiaries are members of a consolidated, combined or unitary tax group for U.S. federal and/or applicable state, local or foreign income Tax purposes of which a direct or indirect parent of the Borrower is the common parent (a "Tax Group"), the portion of any U.S. federal, state, local or foreign Taxes (as applicable) of such Tax Group for such taxable period that are attributable to the income of the Borrower and/or its Subsidiaries; provided that Restricted Payments made pursuant to this clause (a)(vii)(A) shall not exceed the Tax liability that the Borrower and/or its Subsidiaries (as applicable) would have incurred were such Taxes determined as if such entity(ies) were a stand-alone taxpayer or a stand-alone group; and provided, further, that Restricted Payments under this clause (A) in respect of any Taxes attributable to the income of any Unrestricted Subsidiaries of the Borrower may be made only to the extent that such Unrestricted Subsidiaries have made cash payments for such purpose to the Borrower or its Restricted Subsidiaries;

(B)     the proceeds of which shall be used by Holdings or any Intermediate Parent to pay (or to make Restricted Payments to allow any direct or indirect parent of Holdings to pay) (1)

-111-

its operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses payable to third parties) that are reasonable and customary and incurred in the ordinary course of business, (2) any reasonable and customary indemnification claims made by directors or officers of Holdings (or any parent thereof or any Intermediate Parent) attributable to the ownership or operations of Holdings, the Borrower and the Restricted Subsidiaries, (3) fees and expenses (x) due and payable by any of the Borrower and the Restricted Subsidiaries and (y) otherwise permitted to be paid by the Borrower and the Restricted Subsidiaries under this Agreement and (4) payments that would otherwise be permitted to be paid directly by the Borrower or the Restricted Subsidiaries pursuant to Section 6.09(iii) or (x);

(C)    the proceeds of which shall be used by Holdings or any Intermediate Parent to pay (or to make Restricted Payments to allow any direct or indirect parent of Holdings to pay) franchise and similar Taxes, and other fees and expenses, required to maintain its corporate existence;

(D)    the proceeds of which shall be used by Holdings to make Restricted Payments permitted by Section 6.08(a)(iv) or Section 6.08(a)(vi);

(E)    to finance any Investment permitted to be made pursuant to Section 6.04 other than Section 6.04(m); provided that (1) such Restricted Payment shall be made substantially concurrently with the closing of such Investment and (2) Holdings or any Intermediate Parent shall, immediately following the closing thereof, cause (x) all property acquired (whether assets or Equity Interests but not including any loans or advances made pursuant to Section 6.04(b)) to be contributed to the Borrower or the Restricted Subsidiaries or (y) the Person formed or acquired to merge into or consolidate with the Borrower or any of the Restricted Subsidiaries to the extent such merger or consolidation is permitted in Section 6.03) in order to consummate such Investment, in each case in accordance with the requirements of Sections 5.11 and 5.12;

(F)    the proceeds of which shall be used to pay customary salary, bonus and other benefits payable to officers and employees of Holdings or any direct or indirect parent company of Holdings to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries; and

(G)    the proceeds of which shall be used by Holdings or any Intermediate Parent to pay (or to make Restricted Payments to allow any direct or indirect parent thereof to pay) fees and expenses related to any equity or debt offering not prohibited by this Agreement (whether or not such offering is successful);

(viii)    in addition to the foregoing Restricted Payments, the Borrower and any Intermediate Parent may make additional Restricted Payments to any Intermediate Parent and Holdings, the proceeds of which may be utilized by Holdings to make additional Restricted Payments or by Holdings or by any Intermediate Parent to make any payments in respect of any Permitted Holdings Debt, in an aggregate amount, when taken together with the aggregate amount of (1) prepayments, redemptions, purchases, defeasances and other payments in respect of Junior Financings made pursuant to Section 6.08(b)(iv) and (2) loans and advances to Holdings made pursuant to Section 6.04(m) in lieu of Restricted Payments permitted by this clause (viii), not to exceed the sum of (A) an amount at the time of making any such Restricted Payment and together with any other Restricted Payment made utilizing this clause (A) so long as no Event of Default shall have occurred and be continuing or would result therefrom, not to exceed the greater of $200,000,000 and 20% of Consolidated EBITDA for the most recently ended Test Period after giving Pro Forma Effect to the making of such Restricted Payment plus (B) so long as (x) no

Event of Default shall have occurred and be continuing or would result therefrom and (y) after giving effect thereto, the Total Leverage Ratio, calculated on a Pro Forma Basis, does not exceed 6.25 to 1.00, the Available Amount that is Not Otherwise Applied plus (C) the Available Equity Amount that is Not Otherwise Applied;

(ix)    redemptions in whole or in part of any of its Equity Interests for another class of its Equity Interests or with proceeds from substantially concurrent equity contributions or issuances of new Equity Interests; provided that such new Equity Interests contain terms and provisions at least as advantageous to the Lenders in all respects material to their interests as those contained in the Equity Interests redeemed thereby;

(x)    payments made or expected to be made in respect of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant and any repurchases of Equity Interests in consideration of such payments including deemed repurchases in connection with the exercise of stock options and the vesting of restricted stock and restricted stock units;

(xi)    Holdings or the Borrower may (a) pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof or any Permitted Acquisition (or other similar Investment) and (b) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms;

(xii)    the declaration and payment of Restricted Payments on Holdings' or the Borrower's common stock (or the payment of Restricted Payments to any direct or indirect parent company of Holdings to fund a payment of dividends on such company's common stock), following consummation of an IPO; provided that the aggregate amount of Restricted Payments made pursuant to this clause (xii) in any fiscal year shall not exceed an amount equal to the greater of (i) 6.0% of the aggregate net cash proceeds of such IPO received by or contributed to the IPO Entity and (ii) 5.0% of the market capitalization of Holdings, the Borrower or such parent, as applicable, immediately after giving effect to such IPO;

(xiii)    payments made or expected to be made by Holdings, the Borrower or any Restricted Subsidiary in respect of withholding or similar taxes payable upon exercise of Equity Interests by any future, present or former employee, director, officer, manager or consultant (or their respective controlled Affiliates or Immediate Family Members) and any repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants or required withholding or similar taxes;

(xiv)    additional Restricted Payments; provided that after giving effect to such Restricted Payment (A) on a Pro Forma Basis, the Total Leverage Ratio is less than or equal to 5.00 to 1.00 and (B) there is no continuing Event of Default; and

(xv)    the distribution, by dividend or otherwise, of shares of Equity Interests of, or Indebtedness owed to Holdings, the Borrower or a Restricted Subsidiary by, Unrestricted Subsidiaries (other than Unrestricted Subsidiaries, the primary assets of which are Permitted Investments).

(b)    Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary to make or pay, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Junior Financing, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit,

-113-

on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Junior Financing, except:

(i)     payment of regularly scheduled interest and principal payments as, in the form of payment and when due in respect of any Indebtedness, other than payments in respect of any Junior Financing prohibited by the subordination provisions thereof;

(ii)     refinancings of Indebtedness with proceeds of Indebtedness permitted to be incurred under Section 6.01;

(iii)     the conversion of any Junior Financing to Equity Interests (other than Disqualified Equity Interests) of Holdings or any of its direct or indirect parent companies or any Intermediate Parent;

(iv)     prepayments, redemptions, purchases, defeasances and other payments in respect of Junior Financings prior to their scheduled maturity in an aggregate amount, when taken together with the aggregate amount of (1) Restricted Payments made pursuant to Section 6.08(a)(viii) and (2) loans and advances to Holdings made pursuant to Section 6.04(m) in lieu of Restricted Payments permitted by this clause (iv) not to exceed the sum of (A) an amount at the time of making any such Restricted Payment and together with any other Restricted Payment made utilizing this clause (A) so long as no Event of Default shall have occurred and be continuing or would result therefrom, not to exceed the greater of $200,000,000 and 20% of Consolidated EBITDA for the most recently ended Test Period after giving Pro Forma Effect to the making of such prepayment, redemption, purchase, defeasance or other payment plus (B) so long as (x) no Event of Default shall have occurred and be continuing or would result therefrom and (y) after giving effect thereto, the Total Leverage Ratio, calculated on a Pro Forma Basis, does not exceed 6.25 to 1.00, the Available Amount that is Not Otherwise Applied plus (C) the Available Equity Amount that is Not Otherwise Applied; and

(v)     prepayments, redemptions, purchases, defeasances and other payments in respect of Junior Financings prior to their scheduled maturity; provided that after giving effect to such Restricted Payment (A) on a Pro Forma Basis, the Total Leverage Ratio is less than or equal to 5.00 to 1.00 and (B) there is no continuing Event of Default.

(c)     Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary or Intermediate Parent to, amend or modify any documentation governing any Junior Financing, in each case if the effect of such amendment or modification (when taken as a whole) is materially adverse to the Lenders.

Notwithstanding anything herein to the contrary, the foregoing provisions of Section 6.08 will not prohibit the payment of any Restricted Payment or the consummation of any irrevocable redemption, purchase, defeasance or other payment within 60 days after the date of declaration thereof or the giving of such irrevocable notice, as applicable, if at the date of declaration or the giving of such notice such payment would have complied with the provisions of this Agreement.

SECTION 6.09     Transactions with Affiliates.  Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary or Intermediate Parent to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

(i)      (A) transactions with Holdings, the Borrower, any Intermediate Parent or any Restricted Subsidiary and (B) transactions involving aggregate payments or consideration of less than $50,000,000;

(ii)      on terms substantially as favorable to Holdings, the Borrower, such Intermediate Parent or such Restricted Subsidiary as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(iii)      the Transactions and the payment of fees and expenses related to the Transactions;

(iv)      issuances of Equity Interests of Holdings or the Borrower to the extent otherwise permitted by this Agreement;

(v)      employment and severance arrangements between Holdings, the Borrower, any Intermediate Parent and the Restricted Subsidiaries and their respective officers and employees in the ordinary course of business or otherwise in connection with the Transactions (including loans and advances pursuant to Sections 6.04(b) and 6.04(p));

(vi)      payments by Holdings (and any direct or indirect parent thereof), the Borrower and the Restricted Subsidiaries pursuant to tax sharing agreements among Holdings (and any such parent thereof), any Intermediate Parent, the Borrower and the Restricted Subsidiaries on customary terms to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries, to the extent payments are permitted by Section 6.08;

(vii)      the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers and employees of Holdings (or any direct or indirect parent company thereof), the Borrower, any Intermediate Parent and the Restricted Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of Holdings, any Intermediate Parent, the Borrower and the Restricted Subsidiaries;

(viii)      transactions pursuant to permitted agreements in existence or contemplated on the Effective Date and set forth on Schedule 6.09 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect;

(ix)      Restricted Payments permitted under Section 6.08 (other than Section 6.08(vii)(B)(4));

(x)      customary payments (including related indemnities and expense reimbursements) by Holdings, any Intermediate Parent, the Borrower and any of the Restricted Subsidiaries to the Sponsors made for any financial advisory, consulting, financing, underwriting or placement services or in respect of other investment banking activities (including in connection with acquisitions, divestitures or financings), which payments are approved by the majority of the members of the Board of Directors or a majority of the disinterested members of the Board of Directors of such Person in good faith (including the payment of management and monitoring fees to certain of the Sponsors (or management companies of the Sponsors) in amounts contemplated by the services agreement entered into as of the Effective Date and any termination or success fees payable thereunder in connection with the early termination of such agreement);

(xi)      the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any Permitted Holder or to any former, current or future director, manager,

-115-

officer, employee or consultant (or any Affiliate of any of the foregoing) of the Borrower, any of the Subsidiaries or any direct or indirect parent thereof; and

(xii)    transactions in connection with any Permitted Receivables Financing.

ARTICLE VII

EVENTS OF DEFAULT

SECTION 7.01    Events of Default.  If any of the following events (any such event, an "Event of Default") shall occur:

(a)    any Loan Party shall fail to pay any principal of any Loan when and as the same shall become due and payable hereunder, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    any Loan Party shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in paragraph (a) of this Section) payable under any Loan Document, when and as the same shall become due and payable hereunder, and such failure shall continue unremedied for a period of five Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of Holdings, the Borrower or any of the Restricted Subsidiaries in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made, and such incorrect representation or warranty (if curable) shall remain incorrect for a period of 30 days after notice thereof from the Administrative Agent to the Borrower;

(d)    Holding, the Borrower or any of the Restricted Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in Sections 5.02(a), 5.04 (with respect to the existence of the Borrower) or in Article VI;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (a), (b) or (d) of this Section), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrower;

(f)    Holdings, the Borrower or any of the Restricted Subsidiaries shall fail to make any payment (whether of principal, interest or otherwise and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period);

(g)    any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, provided that this paragraph (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement) or (ii) termination

-116-

events or similar events occurring under any Swap Agreement that constitutes Material Indebtedness (it being understood that paragraph (f) of this Section will apply to any failure to make any payment required as a result of any such termination or similar event); provided further that no ABL Financial Covenant Default shall constitute an Event of Default under this clause (g) until the acceleration of the Indebtedness (if any) and termination of commitments under the ABL Facility;

(h)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, court protection, reorganization or other relief in respect of Holdings, the Borrower or any Material Subsidiary or its debts, or of a material part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, examiner, sequestrator, conservator or similar official for Holdings, the Borrower or any Material Subsidiary or for a material part of its assets, and, in any such case, such proceeding or petition shall continue undismissed or unstayed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)    Holdings, the Borrower or any Material Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, court protection, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in paragraph (h) of this Section, (iii) apply for or consent to the appointment of a receiver, trustee, examiner, custodian, sequestrator, conservator or similar official for Holdings, the Borrower or any Material Subsidiary or for a material part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding or (v) make a general assignment for the benefit of creditors;

(j)    one or more enforceable judgments for the payment of money in an aggregate amount in excess of $100,000,000 (to the extent not covered by insurance as to which the insurer has been notified of such judgment or order and has not denied its obligation) shall be rendered against Holdings, the Borrower, any of the Restricted Subsidiaries or any combination thereof and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any judgment creditor shall legally attach or levy upon assets of such Loan Party that are material to the businesses and operations of Holdings, the Borrower and the Restricted Subsidiaries, taken as a whole, to enforce any such judgment;

(k)    (i) an ERISA Event occurs that has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA in an aggregate amount that could reasonably be expected to result in a Material Adverse Effect, or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount that could reasonably be expected to result in a Material Adverse Effect;

(l)    any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material portion of the Collateral, except (i) as a result of the sale or other disposition of the applicable Collateral to a Person that is not a Loan Party in a transaction permitted under the Loan Documents, (ii) as a result of the Administrative Agent's failure to (A) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Security Documents or (B) file Uniform Commercial Code continuation statements, (iii) as to Collateral consisting of real property, to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage or (iv) as a result of acts or omissions of the Administrative Agent or any Lender;

(m)    any material provision of any Loan Document or any Guarantee of the Loan Document Obligations shall for any reason be asserted by any Loan Party not to be a legal, valid and binding obligation of any Loan Party thereto other than as expressly permitted hereunder or thereunder;

(n)    any Guarantees of the Loan Document Obligations by Holdings, the Borrower or Subsidiary Loan Party pursuant to the Guarantee Agreement shall cease to be in full force and effect (in each case, other than in accordance with the terms of the Loan Documents);

(o)    a Change in Control shall occur;

(p)    then, and in every such event (other than an event with respect to Holdings or the Borrower described in paragraph (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:  (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to Holdings or the Borrower described in paragraph (h) or (i) of this Article, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

SECTION 7.02    Application of Proceeds.  After the exercise of remedies provided for in Section 7.01, any amounts received on account of the Secured Obligations shall be applied by the Administrative Agent in accordance with Section 4.02 of the Collateral Agreement and/or the similar provisions in the other Security Documents.  Notwithstanding the foregoing, Excluded Swap Obligations with respect to any Guarantor shall not be paid with amounts received from such Guarantor or its assets, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Secured Obligations otherwise set forth in Section 4.02 of the Collateral Agreement and/or the similar provisions in the other Security Documents.

ARTICLE VIII

THE ADMINISTRATIVE AGENT

Each of the Lenders hereby irrevocably appoints Citibank to serve as Administrative Agent, collateral agent and trustee under the Loan Documents, and authorizes the Administrative Agent to take such actions and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders, and none of Holdings, the Borrower or any other Loan Party shall have any rights as a third party beneficiary of any such provisions.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such Person and its Affiliates may accept deposits from, lend money to, act as

-118-

the financial advisor or in any other advisory capacity for and generally engage in any kind of business with Holdings, the Borrower or any other Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or to exercise any discretionary power, except discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in the Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Holdings, the Borrower, any other Subsidiary or any other Affiliate of any of the foregoing that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by Holdings, the Borrower, a Lender and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Administrative Agent.

The Administrative Agent shall be entitled to rely, and shall not incur any liability for relying, upon any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person (including, if applicable, a Responsible Officer or Financial Officer of such Person).  The Administrative Agent also may rely, and shall not incur any liability for relying, upon any statement made to it orally or by telephone and believed by it to be made by the proper Person (including, if applicable, a Financial Officer or a Responsible Officer of such Person).  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any of and all its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any of and all their duties and exercise their rights and powers through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the

-119-

Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign upon 30 days' notice to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the Borrower's consent (unless an Event of Default under Section 7.01(a), (b), (h) or (i) has occurred and is continuing), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Administrative Agent, which shall be an Approved Bank with an office in New York, New York, or an Affiliate of any such Approved Bank (the date upon which the retiring Administrative Agent is replaced, the "Resignation Effective Date").

If the Person serving as Administrative Agent is a Defaulting Lender, the Required Lenders and the Borrower may, to the extent permitted by applicable law, by notice in writing to such Person remove such Person as Administrative Agent and, with the consent of the Borrower, appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except (i) that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed and (ii) with respect to any outstanding payment obligations) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents as set forth in this Section.  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 9.04 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any Joint Bookrunner or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own

-120-

credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any Joint Bookrunner or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption, Incremental Facility Amendment or Refinancing Amendment pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Effective Date.

No Lender shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Secured Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Lenders in accordance with the terms thereof.  In the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent, as agent for and representative of the Lenders (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent on behalf of the Lenders at such sale or other disposition.  Each Lender, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Secured Obligations, to have agreed to the foregoing provisions.

Notwithstanding anything herein to the contrary, neither any Joint Bookrunner nor any Person named on the cover page of this Agreement as a Lead Arranger, a Syndication Agent or a Co-Documentation Agent shall have any duties or obligations under this Agreement or any other Loan Document (except in its capacity as a Lender), but all such Persons shall have the benefit of the indemnities provided for hereunder, including under Section 9.03, fully as if named as an indemnitee or indemnified person therein and irrespective of whether the indemnified losses, claims, damages, liabilities and/or related expenses arise out of, in connection with or as a result of matters arising prior to, on or after the effective date of any Loan Document.

To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  Without limiting or expanding the provisions of Section 2.15, each Lender shall, and does hereby, indemnify the Administrative Agent against, and shall make payable in respect thereof within 30 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the U.S. Internal Revenue Service or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold tax from amounts paid to or for the account of such Lender for any reason (including, without limitation, because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the

-121-

Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph. The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

Each party to this Agreement hereby appoints the Administrative Agent to act as its agent under and in connection with the relevant Security Documents, acknowledges that the Administrative Agent is the beneficiary of the parallel debt referred to in the relevant Security Documents and the Administrative Agent will accept the parallel debt arrangements reflected in the relevant Security Documents on its behalf and will enter into the relevant Security Documents as pledgee in its own name.

ARTICLE IX

MISCELLANEOUS

SECTION 9.01    Notices. Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, e-mail or other electronic transmission, as follows:

(a)    If to Holdings, to c/o/ BC Partners, Inc., 667 Madison Avenue, New York, New York 10064, Attn: Michael Chang (Phone (212) 891-2880, Email: Michael.Chang@BCPartners.com);

(b)    If to the Borrower, to 19601 N. 27th Avenue, Phoenix Arizona 85027, Attn:  Paulette Dodson, Senior Vice President and General Counsel (Phone (623) 587-2038, Email: PDodson@ssg.PetSmart.com);

(c)    If to the Administrative Agent, to Citibank, N.A., 1615 Brett Road, Building III, New Castle, Delaware 19720, Attention:  Loan Administration, Fax:  212-994-0847, Email:  GLOriginationOps@citigroup.com;;

(d)    if to any other Lender, to it at its address (or fax number or email address) set forth in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax or other electronic transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).

Holdings and the Borrower may change their address, email or facsimile number for notices and other communications hereunder by notice to the Administrative Agent, the Administrative Agent may change its address, email or facsimile number for notices and other communications hereunder by notice to Holdings and the Borrower and the Lenders may change their address, email or facsimile number for notices and other communications hereunder by notice to the Administrative Agent. Notices and other communications to the Lenders hereunder may also be delivered or furnished by electronic transmission (including email and Internet or intranet websites) pursuant to procedures reasonably approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic transmission.

-122-

Notwithstanding anything herein or in any other Loan Document providing for the delivery of any Approved Electronic Communication by any other means, the Loan Parties shall deliver all Approved Electronic Communications to the Administrative Agent by properly transmitting such Approved Electronic Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent to oploanswebadmin@citigroup.com or such other electronic mail address (or similar means of electronic delivery) as the Administrative Agent may notify to the Borrower (which notice shall be effective upon acknowledgement of receipt thereof by the Borrower). Nothing in this paragraph shall prejudice the right of the Administrative Agent or any Lender Party to deliver any Approved Electronic Communication to any Loan Party in any manner authorized in this Agreement or to request that the Borrower effect delivery in such manner.

Each of the Lenders and each Loan Party agrees that the Administrative Agent may, but shall not be obligated to, make the Approved Electronic Communications available to the Lender Parties by posting such Approved Electronic Communications on IntraLinks™ or a substantially similar electronic platform chosen by the Administrative Agent to be its electronic transmission system (the "Approved Electronic Platform"). Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a dual firewall and a User ID/Password Authorization System) and the Approved Electronic Platform is secured through a single-user-per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Lender Parties and each Loan Party acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution. In consideration for the convenience and other benefits afforded by such distribution and for the other consideration provided hereunder, the receipt and sufficiency of which is hereby acknowledged, each of the Lender Parties and each Loan Party hereby approves distribution of the Approved Electronic Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution.

SECTION 9.02    Waivers; Amendments.

(a)    No failure or delay by the Administrative Agent or any Lender in exercising any right or power under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on the Borrower or Holdings in any case shall entitle the Borrower or Holdings to any other or further notice or demand in similar or other circumstances.

(b)    Except as provided in Section 2.18 with respect to any Incremental Loans, Section 2.19 with respect to any Refinancing Amendment and Section 2.22 with respect to any Permitted Amendment, neither any Loan Document nor any provision thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Holdings, the Borrower, the Administrative Agent (to the extent that such waiver, amendment or modification does not affect the rights, duties, privileges or obligations of the Administrative Agent under this Agreement, the

Administrative Agent shall execute such waiver, amendment or other modification to the extent approved by the Required Lenders) and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, provided that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender), (ii) reduce the principal amount of any Loan (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute a reduction or forgiveness in principal) or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly and adversely affected thereby, provided that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay default interest pursuant to Section 2.11(c), (iii) postpone the maturity of any Loan (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension of any maturity date), or the date of any scheduled amortization payment of the principal amount of any Loan under Section 2.08 or the applicable Refinancing Amendment or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly and adversely affected thereby), (iv) change any of the provisions of this Section without the written consent of each Lender directly and adversely affected thereby, provided that any such change which is in favor of a Class of Lenders holding Loans maturing after the maturity of other Classes of Lenders (and only takes effect after the maturity of such other Classes of Loans or Commitments) will require the written consent of the Required Lenders with respect to each Class directly and adversely affected thereby, (v) change any of the provisions of this Section or the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders (or Lenders of any Class) required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender (or each Lender of such Class, as the case may be), (vi) release all or substantially all the value of the Guarantees under the Guarantee Agreement (except as expressly provided in the Loan Documents) without the written consent of each Lender (other than a Defaulting Lender or a Disqualified Lender) or (vii) release all or substantially all the Collateral from the Liens of the Security Documents, without the written consent of each Lender (other than a Defaulting Lender or a Disqualified Lender) (except as expressly provided in the Loan Documents); provided, further, that (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent without the prior written consent of the Administrative Agent and (B) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by Holdings, the Borrower and the Administrative Agent to cure any ambiguity, omission, defect or inconsistency.  Notwithstanding the foregoing, (a) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent, Holdings and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders on substantially the same basis as the Lenders prior to such inclusion, (b) this Agreement and other Loan Documents may be amended or supplemented by an agreement or agreements in writing entered into by the Administrative Agent and Holdings, the Borrower or any Loan Party as to which such agreement or agreements is to apply, without the need to obtain the consent of any Lender, to include "parallel debt" or similar provisions, and any authorizations or granting of powers by the Lenders and the other Secured Parties in favor of the Administrative Agent, in each case required to create in favor of the Administrative Agent any security interest contemplated to be created under this Agreement, or to perfect any such security interest, where the Administrative Agent shall have been advised by its counsel that

-124-

such provisions are necessary or advisable under local law for such purpose (with Holdings and the Borrower hereby agreeing to, and to cause their subsidiaries to, enter into any such agreement or agreements upon reasonable request of the Administrative Agent promptly upon such request) and (c) upon notice thereof by the Borrower to the Administrative Agent with respect to the inclusion of any previously absent financial maintenance covenant, this Agreement shall be amended by an agreement in writing entered into by the Borrower and the Administrative Agent without the need to obtain the consent of any Lender to include such covenant on the date of the incurrence of the applicable Indebtedness to the extent required by the terms of such definition or section.

(c)     In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section being referred to as a "Non-Consenting Lender"), then, so long as the Lender that is acting as Administrative Agent is not a Non-Consenting Lender, the Borrower may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (a) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent shall not unreasonably be withheld, (b) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts (including any amounts under Section 2.09(a)(i)), payable to it hereunder from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (c) unless waived, the Borrower or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b).

(d)     Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, the Loans of any Lender that is at the time (i) an Affiliated Lender (other than an Affiliate Debt Fund), (ii) a Defaulting Lender or (iii) a Disqualified Lender, shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders (or all Lenders of a Class), all affected Lenders (or all affected Lenders of a Class) or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to this Section 9.02); provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

(e)     Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, each Affiliated Lender hereby agrees that, if a proceeding under the United States Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law shall be commenced by or against the Borrower or any other Loan Party at a time when such Lender is an Affiliated Lender, such Affiliated Lender irrevocably authorizes and empowers the Administrative Agent to vote on behalf of such Affiliated Lender with respect to the Loans held by such Affiliated Lender in any manner in the Administrative Agent's sole discretion, unless the Administrative Agent instructs such Affiliated Lender to vote, in which case such Affiliated Lender shall vote with respect to the Loans held by it as the Administrative Agent directs; provided that such Affiliated Lender shall be entitled to vote in accordance with its sole discretion (and not in accordance with the direction of the Administrative Agent) in connection with any plan of reorganization to the extent any such plan of reorganization proposes to

-125-

treat any Secured Obligations held by such Affiliated Lender in a manner that is less favorable in any material respect to such Affiliated Lender than the proposed treatment of similar Secured Obligations held by Lenders that are not Affiliates of the Borrower.

SECTION 9.03    Expenses; Indemnity; Damage Waiver.

(a)    The Borrower shall pay, if the Effective Date occurs, (i) all reasonable and documented or invoiced out of pocket expenses incurred by the Administrative Agent and its Affiliates (without duplication), including the reasonable fees, charges and disbursements of Paul Hastings LLP and to the extent reasonably determined by the Administrative Agent to be necessary one local counsel in each applicable jurisdiction or otherwise retained with the Borrower's consent (not to be unreasonably withheld, conditioned or delayed), in each case for the Administrative Agent, and to the extent retained with the Borrower's consent (not to be unreasonably withheld, conditioned or delayed), consultants, in connection with their due diligence investigation, the syndication of the credit facilities provided for herein, the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof and (ii) all reasonable and documented or invoiced out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of counsel for the Administrative Agent and the Lenders, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that such counsel shall be limited to one lead counsel and one local counsel in each applicable jurisdiction and, in the case of an actual or perceived conflict of interest, one additional counsel per affected party.

(b)    The Borrower shall indemnify each Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable and documented or invoiced out-of-pocket fees and expenses of one counsel and one local counsel in each applicable jurisdiction (and, in the case of an actual or perceived conflict of interest, where the Indemnitee affected by such conflict notifies the Borrower of the existence of such conflict and thereafter retains its own counsel, one additional counsel for such affected Indemnitee) for all Indemnitees (which may include a single special counsel acting in multiple jurisdictions), incurred by or asserted against any Indemnitee by any third party or by Holdings or any Subsidiary arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) to the extent in any way arising from or relating to any of the foregoing, any actual or alleged presence or Release of Hazardous Materials on, at or from any Mortgaged Property or any other property currently or formerly owned or operated by Holdings, the Borrower or any Restricted Subsidiary, or any other Environmental Liability, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Holdings or any Subsidiary and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (i) are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of, or a material breach of the Loan Documents by, such Indemnitee or its Related Parties or (ii) any dispute between and among indemnified persons that does not involve an act or omission by Holdings, the Borrower or any of the Restricted Subsidiaries, except that each Agent, the Lead Arrangers and the Joint Bookrunners shall be indemnified in their capacities as such to the extent that none of the exceptions set forth in clause (i) applies to such Person at

-126-

such time.  This paragraph shall not apply to Taxes other than any Taxes with respect to losses, claims or damages arising from any non-Tax claim.

(c)    To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under paragraph (a) or (b) of this Section, and without limiting the Borrower's obligation to do so, each Lender severally agrees to pay to the Administrative Agent such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.  For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the aggregate outstanding Loans and unused Commitments at the time.  The obligations of the Lenders under this paragraph (c) are subject to the last sentence of Section 2.02 (which shall apply mutatis mutandis to the Lenders' obligations under this paragraph (c)).

(d)    To the fullest extent permitted by applicable law, none of Holdings or the Borrower shall assert, and each hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet), provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of, or a material breach of the Loan Documents by, such Indemnitee or its Related Parties, or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)    All amounts due under this Section shall be payable not later than 10 Business Days after written demand therefor; provided, however, that any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 9.03.

SECTION 9.04    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)    Subject to the conditions set forth in paragraphs (b)(ii) and (g) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent (except with respect to assignments to competitors of the Borrower) not to be unreasonably withheld or delayed) of (A) the Borrower, provided that no consent of the Borrower shall be required for an assignment by a Lender to any Lender or an Affiliate of any Lender, by

-127-

a Lender to an Approved Fund or, if an Event of Default under Section 7.01(a), (b), (h) or (i) has occurred and is continuing, any other assignee; and provided, further, that the Borrower shall have the right to withhold its consent to any assignment if, in order for such assignment to comply with applicable law, the Borrower would be required to obtain the consent of, or make any filing or registration with, any Governmental Authority and (B) the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of a Loan to a Lender, an Affiliate of a Lender or an Approved Fund or to the Borrower or any Affiliate thereof.  Notwithstanding anything in this Section 9.04 to the contrary, if the consent of the Borrower is otherwise required by this paragraph with respect to any assignment of Loans, and the Borrower has not given the Administrative Agent written notice of its objection to such assignment within 15 Business Days after written notice to the Borrower, the Borrower shall be deemed to have consented to such assignment.

(ii)    Assignments shall be subject to the following additional conditions:  (A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the trade date specified in the Assignment and Assumption with respect to such assignment or, if no trade date is so specified, as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless the Borrower and the Administrative Agent otherwise consent (such consent not to be unreasonably withheld or delayed), provided that no such consent of the Borrower shall be required if an Event of Default under Section 7.01(a), (b), (h) or (i) has occurred and is continuing, (B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, provided that this clause (B) shall not be construed to prohibit assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Loans, (C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together (unless waived by the Administrative Agent) with a processing and recordation fee of $3,500 (provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment), provided that assignments made pursuant to Section 2.17(b) or Section 9.02(d) shall not require the signature of the assigning Lender to become effective; provided, further, that such recordation fee shall not be payable in the case of assignments by any Affiliate of the Joint Bookrunners and (D) the assignee, if it shall not be a Lender, shall deliver to the Borrower and the Administrative Agent any tax forms required by Section 2.15(e) and shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (and subject to the obligations and limitations of) Sections 2.13, 2.14, 2.15 and 9.03 and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of

-128-

this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c)(i) of this Section.

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it, each Affiliated Lender Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and stated interest amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and Holdings, the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  Notwithstanding the foregoing, in no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any Lender is an Affiliated Lender, nor shall the Administrative Agent be obligated to monitor the aggregate amount of the Loans or Incremental Loans held by Affiliated Lenders.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and any tax forms required by Section 2.15(e) (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)     The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)     (i)     Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other Persons (other than to a Person that is not an Eligible Assignee; provided that for the purposes of this provision, Disqualified Lenders shall be deemed to be Eligible Assignees unless a list of Disqualified Lenders has been made available to all Lenders by the Borrower) (a "Participant"), provided, further, that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) Holdings, the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents, provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(c) that directly and adversely affects such Participant.  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of (and subject to

-129-

the obligations and limitations of) Sections 2.13, 2.14 and 2.15 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided that such Participant agrees to be subject to Section 2.16(c) as though it were a Lender.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 2.13 or Section 2.15 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior consent (not to be unreasonably withheld or delayed).

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"), provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that such Commitment, Loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive (absent manifest error), and each Person whose name is recorded in the Participant Register pursuant to the terms hereof shall be treated as a Participant for all purposes of this Agreement, notwithstanding notice to the contrary

(d)    Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank, and this Section shall not apply to any such pledge or assignment of a security interest, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)    Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (an "SPV"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement, provided that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, such party will not institute against, or join any other person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative

Agent) providing liquidity or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(f)     Any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement to the Affiliated Lenders or any Purchasing Borrower Party, subject to the following limitations:

(1)     Affiliated Lenders will not receive information provided solely to Lenders by the Administrative Agent or any Lender and will not be permitted to attend or participate in meetings attended solely by the Lenders and the Administrative Agent, other than the right to receive notices of Borrowings, notices of prepayments and other administrative notices in respect of its Loans or Commitments required to be delivered to Lenders pursuant to Article II; provided, however, that the foregoing provisions of this clause will not apply to the Affiliated Debt Funds;

(2)     for purposes of any amendment, waiver or modification of any Loan Document (including such modifications pursuant to Section 9.02), or, subject to Section 9.02(d), any plan of reorganization pursuant to the U.S. Bankruptcy Code, that in either case does not require the consent of each Lender or each affected Lender or does not adversely affect such Affiliated Lender in any material respect as compared to other Lenders, Affiliated Lenders will be deemed to have voted in the same proportion as the Lenders that are not Affiliated Lenders voting on such matter; and each Affiliated Lender hereby acknowledges, agrees and consents that if, for any reason, its vote to accept or reject any plan pursuant to the U.S. Bankruptcy Code is not deemed to have been so voted, then such vote will be (x) deemed not to be in good faith and (y) "designated" pursuant to Section 1126(e) of the U.S. Bankruptcy Code such that the vote is not counted in determining whether the applicable class has accepted or rejected such plan in accordance with Section 1126(c) of the U.S. Bankruptcy Code; provided that Affiliated Debt Funds will not be subject to such voting limitations and will be entitled to vote as any other Lender;

(3)     with respect to any assignment to a Purchasing Borrower Party, no Event of Default has occurred or is continuing or would result therefrom;

(4)     any Loans assigned to any Purchasing Borrower Party shall be automatically and permanently cancelled upon the effectiveness of such assignment and will thereafter no longer be outstanding for any purpose hereunder;

(5)     the aggregate principal amount of Loans purchased by assignment pursuant to this Section 9.04 and held at any one time by Affiliated Lenders (other than Affiliated Debt Funds) may not exceed 25% of the outstanding principal amount of all Loans plus the outstanding principal amount of all term loans made pursuant to an Incremental Loan calculated at the time such Loans are purchased (such percentage, the "Affiliated Lender Cap"); provided that to the extent any assignment to an Affiliated Lender would result in the aggregate principal amount of all Loans held by Affiliated Lenders exceeding the Affiliated Lender Cap, the assignment of such excess amount will be void ab initio; and

(6)     the assigning Lender and the Affiliated Lender purchasing such Lender's Loans shall execute and deliver to the Administrative Agent an assignment agreement substantially in the form of Exhibit B hereto (an "Affiliated Lender Assignment and Assumption"); provided that each Affiliated Lender agrees to notify the Administrative Agent and the Borrower promptly (and

-131-

in any event within 10 Business Days) if it acquires any Person who is also a Lender, and each Lender agrees to notify the Administrative Agent and the Borrower promptly (and in any event within 10 Business Days) if it becomes an Affiliated Lender.

Notwithstanding anything in Section 9.02 or the definition of "Required Lenders" to the contrary, for purposes of determining whether the Required Lenders have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required the Administrative Agent, Collateral Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, the aggregate amount of Loans held by any Affiliated Debt Funds shall be deemed to be not outstanding to the extent in excess of 49.9% of the amount required for all purposes of calculating whether the Required Lenders have taken any actions.

Each Affiliated Lender by its acquisition of any Loans outstanding hereunder will be deemed to have waived any right it may otherwise have had to bring any action in connection with such Loans against the Administrative Agent, in its capacity as such, and will be deemed to have acknowledged and agreed that the Administrative Agent shall not have any liability for any losses suffered by any Person as a result of any purported assignment to or from an Affiliated Lender.

(g)    Upon any contribution of Loans to the Borrower or any Restricted Subsidiary and upon any purchase of Loans by a Purchasing Borrower Party, (A) the aggregate principal amount (calculated on the face amount thereof) of such Loans shall automatically be cancelled and retired by the Borrower on the date of such contribution or purchase (and, if requested by the Administrative Agent, with respect to a contribution of Loans, any applicable contributing Lender shall execute and deliver to the Administrative Agent an Assignment and Assumption, or such other form as may be reasonably requested by the Administrative Agent, in respect thereof pursuant to which the respective Lender assigns its interest in such Loans to the Borrower for immediate cancellation) and (B) the Administrative Agent shall record such cancellation or retirement in the Register.

(h)    Notwithstanding anything herein or in any other Loan Document to the contrary, the Administrative Agent shall not (i) except to the extent of its own gross negligence or willful misconduct in taking or failing to take any action, be responsible for, have any liability with respect to, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions of this Agreement relating to Disqualified Lenders or have any liability with respect to or arising out of any assignment or participation of Loans or Commitments to any Disqualified Lender and (ii) except to the extent arising out of its or its Related Parties' gross negligence or willful misconduct, have any liability with respect to any disclosure of confidential information to any Disqualified Lender.

SECTION 9.05    Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Sections 2.13, 2.14, 2.15 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the

transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06     Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent or the syndication of the Loans and Commitments constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.07     Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08     Right of Setoff.  If an Event of Default under Section 7.01(a), (b), (h) or (i) shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness.  The applicable Lender shall notify the Borrower and the Administrative Agent of such setoff and application, provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender may have.  Notwithstanding the foregoing, no amount set off from any Guarantor shall be applied to any Excluded Swap Obligation of such Guarantor.

SECTION 9.09     Governing Law; Jurisdiction; Consent to Service of Process.

(a)     This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)     Each of parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York sitting in New York County, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be

conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in any Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to any Loan Document against Holdings, the Borrower or their respective properties in the courts of any jurisdiction.

(c)      Each of parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)      Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10      WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11      Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12      Confidentiality.

(a)      Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees, trustees and agents, including accountants, legal counsel and other agents and advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and any failure of such Persons to comply with this Section 9.12 shall constitute a breach of this Section 9.12 by the Administrative Agent or the relevant Lender, as applicable), (b) (x) to the extent requested by any regulatory (including self-regulatory) authority, required by applicable law or by any subpoena or similar legal process  or (y) necessary in connection with the exercise of remedies; provided that, (i) in each case, unless specifically prohibited by applicable law or court order, each Lender and the Administrative Agent shall notify the Borrower of any request by any governmental agency or representative thereof (other than any such request in connection with an examination of the financial condition of such Lender by such governmental agency or other routine examinations of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information and (ii) in the case of clause (y) only, each Lender and the Administrative Agent shall use reasonable best efforts to ensure that such Information is kept confidential in connection with the exercise of such remedies, and provided, further, that in no event shall any Lender or the Administrative Agent be

-134-

obligated or required to return any materials furnished by Holdings, the Borrower or any of their Subsidiaries, (c) to any other party to this Agreement, (d) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any Swap Agreement relating to any Loan Party or their Subsidiaries and its obligations under the Loan Documents, (e) with the consent of the Borrower, in the case of Information provided by Holdings, the Borrower or any other Subsidiary, (f) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than Holdings or the Borrower or (g) to any ratings agency or the CUSIP Service Bureau on a confidential basis.  In addition, the Agents and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments and the Borrowings hereunder.  For the purposes of this Section, "Information" means all information received from Holdings or the Borrower relating to Holdings, the Borrower, any Subsidiary or their business, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by Holdings or the Borrower.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)     EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 9.12(a) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING HOLDINGS, THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)     ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT HOLDINGS, THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES.  ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

SECTION 9.13     USA Patriot Act.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of Title III of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or Administrative Agent, as applicable, to identify each Loan Party in accordance with the Title III of the USA Patriot Act.

SECTION 9.14     Judgment Currency.

(a)     If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum owing hereunder in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures in the relevant jurisdiction the first currency could be purchased with such other currency on the Business Day immediately preceding the day on which final judgment is given.

(b)     The obligations of the Borrower in respect of any sum due to any party hereto or any holder of any obligation owing hereunder (the "Applicable Creditor") shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than the currency in which such sum is stated to be due hereunder (the "Agreement Currency"), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any sum adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency with the Judgment Currency; if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Applicable Creditor against such loss.  The obligations of the Borrower under this Section shall survive the termination of this Agreement and the payment of all other amounts owing hereunder.

SECTION 9.15     Release of Liens and Guarantees.  A Loan Party shall automatically be released from its obligations under the Loan Documents, and all security interests created by the Security Documents in Collateral owned by such Subsidiary Loan Party shall be automatically released, (1) upon the consummation of any transaction permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Subsidiary (including pursuant to a merger with a Subsidiary that is not a Loan Party or a designation as an Unrestricted Subsidiary) or (2) upon the request of the Borrower, in connection with a transaction permitted under this Agreement, as a result of which such Subsidiary Loan party ceases to be a wholly-owned Subsidiary.  Upon (i) any sale or other transfer by any Loan Party (other than to Holdings, the Borrower or any other Subsidiary Loan Party) of any Collateral in a transaction permitted under this Agreement or (ii) the effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral or the release of any Loan Party from its Guarantee under the Guarantee Agreement pursuant to Section 9.02, the security interests in such Collateral created by the Security Documents or such guarantee shall be automatically released. Upon termination of the aggregate Commitments and payment in full of all Loan Document Obligations (other than contingent indemnification obligations), all obligations under the Loan Documents and all security interests created by the Security Documents shall be automatically released.  In connection with any termination or release pursuant to this Section, the Administrative Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section shall be without recourse to or warranty by the Administrative Agent.  The Lenders irrevocably authorize the Administrative Agent to release or subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(iv) or (xxii) to the extent required by the terms of the obligations secured by such Liens pursuant to documents reasonably acceptable to the Administrative Agent).

SECTION 9.16     No Fiduciary Relationship.  Each of Holdings and the Borrower, on behalf of itself and its subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, Holdings, the Borrower, the other Subsidiaries and their Affiliates, on the one hand, and the Administrative Agent, the Lenders and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any

-136-

fiduciary duty on the part of the Administrative Agent, the Lenders or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.

SECTION 9.17    <u>Effectiveness of the Mergers</u>.  The Target shall have no rights or obligations hereunder until the consummation of the Acquisition and their merger with and into Merger Sub and any representations and warranties of the Target hereunder shall not become effective until such time.  Upon consummation of the Acquisition, the Target shall succeed to all the rights and obligations of Merger Sub under this Agreement and the other Loan Documents to which it is a party and all representations and warranties of the Target shall become effective as of the date hereof, without any further action by any Person.

SECTION 9.18    <u>Interest Rate Limitation</u>.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "<u>Maximum Rate</u>").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Loan Document Obligations hereunder.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

ARGOS HOLDINGS INC.

By: _____

Name: Michael Chang

Title: VP & Treasurer

[TERM LOAN CREDIT AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

Prior to the merger:

ARGOS MERGER SUB INC.

By: _____
Name: Michael Chang
Title: VP & Treasurer

[TERM LOAN CREDIT AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

Upon and after the merger:

PETSMART, INC.

By: _____

Name:  David K. Lenhardt
Title:  President and Chief Executive Officer

[TERM LOAN CREDIT AGREEMENT SIGNATURE PAGE]

CITIBANK, N.A.
as Administrative Agent

By: _____
    Name:    David Tuder
    Title:     Vice President

CITIBANK, N.A.
as Lender

By: _____
     Name:   David Tuder
     Title:    Vice President

:

**Annex I**

Amortization Table

| Date | Term Loan Amount |
|---|---|
| July 31, 2015 | $10,750,000 |
| October 31, 2015 | $10,750,000 |
| January 31, 2016 | $10,750,000 |
| April 30, 2016 | $10,750,000 |
| July 31, 2016 | $10,750,000 |
| October 31, 2016 | $10,750,000 |
| January 31, 2017 | $10,750,000 |
| April 30, 2017 | $10,750,000 |
| July 31, 2017 | $10,750,000 |
| October 31, 2017 | $10,750,000 |
| January 31, 2018 | $10,750,000 |
| April 30, 2018 | $10,750,000 |
| July 31, 2018 | $10,750,000 |
| October 31, 2018 | $10,750,000 |
| January 31, 2019 | $10,750,000 |
| April 30, 2019 | $10,750,000 |
| July 31, 2019 | $10,750,000 |
| October 31, 2019 | $10,750,000 |
| January 31, 2020 | $10,750,000 |
| April 30, 2020 | $10,750,000 |
| July 31, 2020 | $10,750,000 |
| October 31, 2020 | $10,750,000 |
| January 31, 2021 | $10,750,000 |
| April 30, 2021 | $10,750,000 |
| July 31, 2021 | $10,750,000 |
| October 31, 2021 | $10,750,000 |
| January 31, 2022 | $10,750,000 |

Schedule 1.01(a) - Excluded Subsidiaries

None.

Schedule 2.01 – Term Commitments

| Lender | Commitment | Commitment Percentage |
|---|---|---|
| Citibank, N.A. | 860,000,000 | 20.00% |
| Barclays Bank PLC | 860,000,000 | 20.00% |
| Nomura Securities International, Inc. | 791,200,000 | 18.40% |
| Deutsche Bank AG New York Branch | 584,800,000 | 13.60% |
| Jefferies Finance LLC | 344,000,000 | 8.00% |
| Royal Bank of Canada | 344,000,000 | 8.00% |
| MIHI LLC | 301,000,000 | 7.00% |
| Natixis, New York Branch | 215,000,000 | 5.00% |
| **Total** | **$4,300,000,000** | **100%** |

Schedule 3.12 - Subsidiaries

| Name | Jurisdiction | Parent(s) | Ownership Interest |
|---|---|---|---|
| PET WISE INC | New York | PetSmart, Inc. | 100% |
| Pacific Coast Distributing, Inc. | Delaware | PetSmart, Inc. | 100% |
| Pet360, Inc. | Delaware | PetSmart, Inc. | 100% |
| Authority Pet Food Company | Delaware | PetSmart, Inc. | 100% |
| Petstuff Canada (USA) Holdings, Inc. | Delaware | PetSmart, Inc. | 100% |
| PetSmart Puerto Rico, LLC | Puerto Rico | PetSmart, Inc. | 100% |
| Petstuff Nova Scotia, Inc. | Delaware | PetSmart, Inc. | 100% |
| PetsCard LLC | New Hampshire | PetSmart, Inc. | 100% |
| Simply Nourish Pet Food Company LLC | Arizona | PetSmart, Inc. | 100% |
| PetSmart Store Support Group, Inc. | Delaware | PetSmart, Inc. | 100% |
| Maverick Leasing, Inc. | Delaware | PetSmart, Inc. | 100% |
| ONP-Ecom, LLC | Delaware | Pet360, Inc. | 100% |
| ONP-Retail, LLC | Delaware | Pet360, Inc. | 100% |
| Pet360 Media, Inc. | Delaware | Pet360, Inc. | 100% |
| PetMD, Inc. | Delaware | Pet360, Inc. | 100% |
| PetMD, LLC | Florida | PetMD Ventures, Inc. | 100% |
| PETMD VENTURES INC. | Florida | PetMD, Inc. | 100% |
| KY Shelter & Mobile Vet Service, LLC | Kentucky | Pet360, Inc. | 100% |
| PETM Canada Corporation | Nova Scotia | • Petstuff Canada (USA) Holdings, Inc.<br><br>• PetNova Scotia, Inc. | 50%<br><br><br>50% |
| Animal Wellness LLC | Pennsylvania | Pet360, Inc. | 100% |
| The Cat and Dog Clinic of Lansdale, LLC | Pennsylvania | Pet360, Inc. | 100% |
| Pet360 Pharmacy Holding, LLC | Delaware | Pet360, Inc. | 100% |
| Pet360 Pharmacy, LLC | Delaware | Pet360 Pharmacy Holding, LLC | 100% |

Schedule 5.14 - Certain Post-Closing Obligations

None.

Schedule 6.01 – Existing Indebtedness

**Capital Leases**

| Lessee | Lessor | US/PR or Canada | Net Obligation / Liability |
|---|---|---|---|
| PetSmart | WATERSTONE RETAIL DEVELOPMENT, INC., | US - Estimate | (1,222,413) |
| PetSmart | BERKELEY CORNER, LLC | US - Estimate | (1,315,422) |
| PetSmart | MHW LAKE ANDREW, LLC | US - Estimate | (1,544,255) |
| PetSmart | 529 OCEAN LLC | US - Estimate | (304,443) |
| PetSmart | ENCHANTED 528 DEVELOPMENT, LLC | US - Estimate | (287,956) |
| PetSmart | VETERANS SQUARE TOWNE CENTER, LLC | US - Estimate | (317,575) |
| PetSmart | MARLBORO PLAZA ASSOCIATES LLC and UNIONDALE WG, LLC, | US - Estimate | (127,181) |
| PetSmart | HACKETT LA TOSCANA LLC, M. KNOTT LA TOSCANA LLC, and JTLA TOSCANA, LLC | US - Estimate | (282,521) |
| PetSmart | PACIFIC REALTY ASSOCIATES, L.P. | US - Estimate | (1,722,700) |
| PetSmart | BEAR VALLEY 2005, LLC | US - Estimate | (1,257,901) |
| PetSmart | Goletta Hollister, LLC | US - Estimate | (1,595,802) |
| PetSmart | SHAWNEE MARKETPLACE INVESTORS LP, | US - Estimate | (1,013,659) |
| PetSmart | PULASKI PROMENADE, LLC | US - Estimate | (1,582,249) |
| PetSmart | MAYFAIRE SPEIB, LLC | US - Estimate | (1,409,232) |
| PetSmart | TMD IOWA, LLC | US - Estimate | (1,675,060) |
| PetSmart | CSC RAYNHAM LP | US - Estimate | (1,346,754) |
| PetSmart | CHICOPEE CROSSING, LLC | US - Estimate | (1,180,337) |
| PetSmart | DFG-FRANKLIN PLACE SHOPS-GREEN, LLC | US - Estimate | (1,097,541) |
| PetSmart | VF CENTER ASSOCIATES, L.P. | US - Estimate | (1,389,704) |
| PetSmart | WRI SOUTHERN INDUSTRIAL POOL, LLC | US - Estimate | (1,219,217) |
| PetSmart | SOMERET ELIZABETH III, LLC | US - Estimate | (634,600) |
| PetSmart | PTV CAPITAL PARTNERS LAVALE, LLC | US - Estimate | (634,363) |
| PetSmart | BK PA, LTD. | US - Estimate | (1,663,484) |
| PetSmart | RED DEVELOPMENT OF OCOTILLO, LLC FOUR | US - Estimate | |

009290-0014-11824-Active.16924289.4

|          |                                                              |               |                |
|----------|--------------------------------------------------------------|---------------|----------------|
|          |                                                              |               | (1,187,951)    |
| PetSmart | ROSEMEAD PLACE, LLC                                           | US - Estimate | (1,805,588)    |
| PetSmart | KEIZER ENTERPRISES, LLC                                       | US - Estimate | (947,768)      |
| PetSmart | TVO HOLDINGS LLC,                                            | US - Estimate | (2,874,776)    |
| PetSmart | WALGREEN CO.                                                  | US - Estimate | (3,754,975)    |
| PetSmart | 5th STREET STATION, LLC                                       | US - Estimate | 1,528,385      |
| PetSmart | RICH DEVELOPMENT ENTERPRISES, LLC                            | US - Estimate | 1,382,240      |
| PetSmart | ALBERTVILLE INVESTMENT PARTNERS, LLC                         | US - Estimate | 1,204,897      |
| PetSmart | REGENCY CENTERS, LP,                                          | US - Estimate | 1,947,757      |
| PetSmart | LBG HUNTINGTON BEACH, LLC                                     | US - Estimate | 2,335,558      |
| PetSmart | Omni Financial Associates                                     | US            | (1,873,399.00) |
| PetSmart | Pet (TX)                                                      | US            | (1,445,320.00) |
| PetSmart | PROSPERITY HOSPITALITY GROUP LLC-604957 (Payee-no LL listed in LA8) | US      | (1,015,261.00) |
| PetSmart | Elaine Hoffman(1)                                             | US            | (694,325.00)   |
| PetSmart | Hughes Markets, Inc.                                          | US            | (2,626,053.19) |
| PetSmart | OWRF Baybrook, LLC                                            | US            | (2,433,101.05) |
| PetSmart | OT Texas Greenville, LP                                       | US            | (1,929,879.54) |
| PetSmart | The Irvine Company - Retail Properties                        | US            | (1,780,427.57) |
| PetSmart | J & G Realty, LLC                                             | US            | (1,491,910.95) |
| PetSmart | PETM Vero Beach                                               | US            | (1,349,963.77) |
| PetSmart | Benenson Bellevue II, LP                                      | US            | (1,342,043.86) |
| PetSmart | 190 Route 10 West LLC(1)                                      | US            | (1,282,137.35) |
| PetSmart | Cole MT Merced CA, LP                                         | US            | (1,145,828.75) |
| PetSmart | William C Knapp, LC                                           | US            | (1,142,232.96) |
| PetSmart | BRE DDR Shoppers World, LLC(1)                                | US            | (1,095,925.27) |
| PetSmart | BRE DDR Great Northern, LLC                                   | US            | (1,071,312.41) |
| PetSmart | Primrose Marketplace 625, LLC                                 | US            |                |

009290-0014-11824-Active.16924289.4

|  |  |  | (1,069,449.89) |
|---|---|---|---|
| PetSmart | TSCA-250 LP | US | (1,025,141.20) |
| PetSmart | Cole MT Redding CA, LP | US | (1,013,724.33) |
| PetSmart | BRE DDR Lake Brandon Village LLC | US | (1,000,875.87) |
| PetSmart | The Colonies-Pacific, LLC(2) | US | (1,000,150.38) |
| PetSmart | CRCH, LLC | US | (978,054.15) |
| PetSmart | Cedar PCP - New London, LLC | US | (932,719.82) |
| PetSmart | MKP Tujunga, LP | US | (911,703.97) |
| PetSmart | Industry East Land Retail 1, LLC | US | (906,490.37) |
| PetSmart | Holmdel Towne Center 1007 Inc. | US | (852,150.74) |
| PetSmart | Arundel Mills Residual, L. P. | US | (810,927.19) |
| PetSmart | Sand Capital VI LLC | US | (744,483.74) |
| PetSmart | Ramco-Gershenson Properties, LP | US | (669,922.51) |
| PetSmart | Lawnside UE LLC | US | (612,271.16) |
| PetSmart | DealPoint Merrill Properties Corporation | US | (600,617.83) |
| PetSmart | WRI/Raleigh LP | US | (588,758.76) |
| PetSmart | Camel Investment, LLC | US | (562,239.64) |
| PetSmart | KRG Portofino Project Group | US | (514,113.00) |
| PetSmart | HH Golden Gate LLC | US | (448,244.23) |
| PetSmart | Southwest Commons 05 A LLC | US | (446,115.79) |
| PetSmart | Sand Capital VI LLC | US | (438,887.11) |
| PetSmart | RLV Troy Center, LP | US | (417,911.81) |
| PetSmart | WFC Sycamore NM I, LLC | US | (406,443.80) |
| PetSmart | Shops at Greenridge LLC | US | (351,239.32) |
| PetSmart | Gateway Center Associates, Ltd | US | (331,025.17) |
| PetSmart | Market Square East, LLC | US | (290,602.28) |
| PetSmart | Grosvenor USA | US |  |

|          |                                      |    |                 |
|----------|--------------------------------------|----|-----------------|
|          |                                      |    | (218,338.59)    |
| PetSmart | VNO TRU Jericho Turnpike, LLC        | US | (195,249.21)    |
| PetSmart | UE Wyomissing Properties LP          | US | (158,592.68)    |
| PetSmart | Joan R. Hull Trust - CTA             | US | (2,149,754.00)  |
| PetSmart | Boniuk Interests, Ltd.               | US | (1,896,507.00)  |
| PetSmart | Bruce J. MacDonald                   | US | (643,558.00)    |
| PetSmart | Dinova Partners                      | US | (570,963.00)    |
| PetSmart | PETS Bowie Delaware Business Trust   | US | (2,126,077.00)  |
| PetSmart | Trails - Harris Street, Ltd.         | US | (2,110,965.00)  |
| PetSmart | Spirit SPE Loan Portfolio 2013-2, LLC| US | (2,014,297.00)  |
| PetSmart | Inland Commercial Property Account   | US | (1,952,965.00)  |
| PetSmart | Spirit SPE Loan Portfolio 2013-3, LLC| US | (1,912,552.00)  |
| PetSmart | DeSaussure Properties, LLC           | US | (1,883,017.00)  |
| PetSmart | Spirit SPE Loan Portoflio 2013-2, LLC| US | (1,832,798.00)  |
| PetSmart | COLE PM OVERLAND PARK KS, LLC        | US | (1,817,512.00)  |
| PetSmart | Cole PM Parma OH, LLC                | US | (1,689,514.00)  |
| PetSmart | JDS Properties                       | US | (1,654,271.00)  |
| PetSmart | Sacco of Killeen, LLC                | US | (1,624,742.00)  |
| PetSmart | Cole PM Eden Estate Investments      | US | (1,336,676.00)  |
| PetSmart | Labrador (AZ)                        | US | (15,596,978.00) |
| PetSmart | Cole MP PM Portfolio, LLC            | US | (3,742,208.00)  |
| PetSmart | Cole MP PM Portfolio, LLC            | US | (3,284,471.00)  |
| PetSmart | Cole MP PM Portfolio, LLC            | US | (3,084,520.00)  |
| PetSmart | Cole MP PM Portfolio, LLC            | US | (3,020,491.00)  |
| PetSmart | Cole MP PM Portfolio, LLC            | US | (2,716,734.00)  |
| PetSmart | Cole MP PM Portfolio, LLC            | US | (2,615,841.00)  |
| PetSmart | Cole MP PM Portfolio, LLC            | US |                 |

| | | | |
|---|---|---|---|
| | | | (2,413,796.00) |
| PetSmart | Cole MP PM Portfolio, LLC | US | (2,201,642.00) |
| PetSmart | Cole MP PM Portfolio, LLC | US | (1,943,615.00) |
| PetSmart | Cole MP PM Portfolio, LLC | US | (1,916,020.00) |
| PetSmart | Cole MP PM Portfolio, LLC | US | (1,108,315.00) |
| PetSmart | Arredondo Properties, LP | US | (2,382,223.75) |
| PetSmart | Vestar LPTC, LLC | US | (2,185,486.17) |
| PetSmart | VPQCM, LLC | US | (2,170,897.67) |
| PetSmart | Weingarten Realty(10) | US | (1,982,423.51) |
| PetSmart | Gilbatar Property Management, Inc. | US | (1,843,037.03) |
| PetSmart | Pacific Castle Groves, LLC | US | (1,841,528.71) |
| PetSmart | OCW Retail-Nashua, LLC | US | (1,755,181.53) |
| PetSmart | Fremont Retail Partners, LP | US | (1,657,448.27) |
| PetSmart | RJ Ventures, LLC(1) | US | (1,621,576.27) |
| PetSmart | Eldorado Marketplace Associates, LLC | US | (1,535,825.66) |
| PetSmart | Champion Real Estate Company | US | (1,465,902.25) |
| PetSmart | Hartz Mountain Development Corporation | US | (1,331,968.17) |
| PetSmart | LPF San Jose Retail, Inc. | US | (1,215,691.92) |
| PetSmart | Ronald J. And  Marcia L. Michealsen | US | (1,071,685.43) |
| PetSmart | Manalapan UE LLC | US | (1,026,628.67) |
| PetSmart | Excel Trust, LP | US | (906,354.93) |
| PetSmart | RioCan Austin Southpark Meadows, LP | US | (873,346.93) |
| PetSmart | Baril Family Trust | US | (852,615.19) |
| PetSmart | Orchard Center | US | (797,100.10) |
| PetSmart | James Anderson | US | (779,217.24) |
| PetSmart | Plaza at Jordan Landing, LLC | US | (752,190.27) |
| PetSmart | IA Management LLC/Bldg. #44901 | US | |

| | | | |
|---|---|---|---|
| | | | (677,490.88) |
| PetSmart | Western Ventures LLC | US | (636,289.29) |
| PetSmart | El Camino - Sunnyvale Rental Account | US | (611,644.92) |
| PetSmart | MECA, LLC | US | (610,800.94) |
| PetSmart | Stirling Bossier, LLC(1) | US | (593,866.92) |
| PetSmart | Del Vista Village, LP(3) | US | (586,822.24) |
| PetSmart | BRE DDR BR Whittwood CA LLC | US | (471,666.76) |
| PetSmart | DSM Realty | US | (435,866.19) |
| PetSmart | NT Dunhill I, LLC | US | (391,349.60) |
| PetSmart | Hollymead Town Center, LLC | US | (341,400.50) |
| PetSmart | Rockaway Center Assoc | US | (305,583.81) |
| PetSmart | SCI ITC South Fund, LLC | US | (302,860.54) |
| PetSmart | Ramco/West Oaks II - Spring Meadows, LLC, a Michigan limited liability company | US | (275,451.37) |
| PetSmart | Bradley Wisconsin Associates, LP(1) | US | (258,521.07) |
| PetSmart | Federal Realty Investment Trust(3) | US | (253,077.43) |
| PetSmart | R&D Okemos Retail, LLC | US | (252,907.30) |
| PetSmart | Michael Quagliano | US | (205,588.39) |
| PetSmart | RPAI US Management LLC(3) | US | (200,048.88) |
| PetSmart | Toby, LLC | US | (194,006.48) |
| PetSmart | COR Holt Road Company, LLC(1) | US | (71,067.05) |
| PetSmart | Renaissance 632 Broadway, LLC | US | (6,810,353.64) |
| PetSmart | Forest City Ratner Companies | US | (4,376,176.98) |
| PetSmart | Bensonhurst Realty LLC | US | (4,055,801.21) |
| PetSmart | Donahue Schriber Realty Group, LP(1) | US | (3,262,756.76) |
| PetSmart | Walgreens Co | US | (3,085,573.80) |
| PetSmart | Teachers Insurance and Annuity Association of America | US | (2,878,345.16) |
| PetSmart | CIM/Pico, LP | US | |

| | | | |
|---|---|---|---|
| | | | (2,813,999.49) |
| PetSmart | ARBOR SQUARE II, LLC | US | (2,574,777.15) |
| PetSmart | Springfield UE LLC. | US | (2,506,362.66) |
| PetSmart | Cole MT Sunset Valley TX, LLC | US | (2,497,066.86) |
| PetSmart | North Anchorage Real Estate Investors, LLC | US | (2,463,757.05) |
| PetSmart | Maverick Investors, LLC | US | (2,419,692.84) |
| PetSmart | CRESCENT LAND DEVELOPMENT ASSOCIATE ( 75965 ) | US | (2,374,999.98) |
| PetSmart | TKG - Manchester Highlands Shopping Center, LLC | US | (2,343,214.91) |
| PetSmart | Inland Western Spokane Northpointe, LLC | US | (2,326,550.82) |
| PetSmart | M & J Wilkow Properties, LLC | US | (2,326,254.90) |
| PetSmart | 95th & Western, LLC | US | (2,296,068.54) |
| PetSmart | Brixmor Warminster SPE, LLC | US | (2,282,489.92) |
| PetSmart | T-C Charleston Plaza, LLC | US | (2,270,824.44) |
| PetSmart | BRE DDR BR Kingsbury IL LLC | US | (2,261,753.82) |
| PetSmart | Howell Friendship Real Estate Co | US | (2,221,302.49) |
| PetSmart | Khuri Family Living Trust Dated 2-18-92 | US | (2,214,450.10) |
| PetSmart | BLVDCON, LLC | US | (2,201,358.94) |
| PetSmart | Route 553 Retail, LLC | US | (2,188,423.20) |
| PetSmart | DDRA Community Centers Eight | US | (2,184,869.99) |
| PetSmart | Home Silk Shop, Inc. | US | (2,157,549.11) |
| PetSmart | Inland National Real Estate Services, LLC | US | (2,149,388.53) |
| PetSmart | Vestar/Kimco Tustin, LP | US | (2,100,192.95) |
| PetSmart | HART Miracle Marketplace | US | (2,043,046.90) |
| PetSmart | Bal Harbour Square, LLC | US | (1,997,595.64) |
| PetSmart | KIR Smoketown Station, LP(1) | US | (1,989,912.30) |
| PetSmart | Forty West, LLC(1) | US | (1,970,317.40) |
| PetSmart | Dadeland Station Associates, Ltd. | US | |

| | | | |
|---|---|---|---|
| | | | (1,939,287.08) |
| PetSmart | Cole MT San Jose CA, LP | US | (1,938,083.86) |
| PetSmart | Brixmor GA Apollo I Sub Holdings, LLC | US | (1,935,245.89) |
| PetSmart | KeyPoint Partners, LLC | US | (1,927,527.50) |
| PetSmart | GASTON/GRAND LTD., | US | (1,907,473.24) |
| PetSmart | Crossroads Joint Venture, LLC | US | (1,882,175.70) |
| PetSmart | Regency Centers, LP(11) | US | (1,829,979.92) |
| PetSmart | Linton 510, LLC | US | (1,796,234.89) |
| PetSmart | Palm Beach Mall Holdings, LLC | US | (1,794,053.66) |
| PetSmart | Frank Mission Marketplace, LLC | US | (1,781,725.32) |
| PetSmart | Braxton SC, LLC | US | (1,779,948.32) |
| PetSmart | BRE DDR BR Dimond Xing AK LLC | US | (1,775,114.56) |
| PetSmart | MGP XI REIT, LLC(1) | US | (1,773,622.85) |
| PetSmart | IT 112 Commerce Way LLC | US | (1,743,251.91) |
| PetSmart | Almaden Plaza Shopping Center | US | (1,710,257.73) |
| PetSmart | Reston Spectrum, LLLP | US | (1,697,532.41) |
| PetSmart | CLPF - Victory Station , LLC | US | (1,673,954.20) |
| PetSmart | Sunbelt Investment Holdings, Inc. | US | (1,655,720.73) |
| PetSmart | Equity One JV Sub Northborough LLC | US | (1,646,969.88) |
| PetSmart | Brixmor GA Hilltop Plaza, LLC | US | (1,640,962.17) |
| PetSmart | Red Rose Commons Associates, LP | US | (1,634,225.82) |
| PetSmart | 215-225 Route 73 North LLC(1) | US | (1,587,484.81) |
| PetSmart | JCC Californoia Properties, LLC | US | (1,580,438.82) |
| PetSmart | San Carlos Retail Venture, LP | US | (1,577,412.28) |
| PetSmart | Bristol-Warner Investors, LLC(1) | US | (1,570,414.26) |
| PetSmart | UE TRU Jericho Turnpike LLC | US | (1,562,049.10) |
| PetSmart | Fourth Quarter Properties 141, LLC | US | |

| | | | |
|---|---|---|---|
| | | | (1,561,736.64) |
| PetSmart | Walpole Mall Associates, LLC | US | (1,548,717.42) |
| PetSmart | PL Smithtown, LLC | US | (1,535,873.88) |
| PetSmart | Marlton UE LLC | US | (1,529,012.75) |
| PetSmart | Northland 215 Needham Street LLC | US | (1,517,307.43) |
| PetSmart | BRE DDR BR Prairie IL LLC | US | (1,507,634.13) |
| PetSmart | TPP 211 Canyon Trails, LLC | US | (1,506,596.41) |
| PetSmart | PITV, L.P. | US | (1,496,363.93) |
| PetSmart | Robertson Properties Group(2) | US | (1,493,707.29) |
| PetSmart | WP Chesterfield Associates, LP | US | (1,479,975.30) |
| PetSmart | PZ Southland LP | US | (1,479,653.53) |
| PetSmart | Inland Commercial Property Management(2) | US | (1,473,097.30) |
| PetSmart | Cole MT Riverdale UT, LLC | US | (1,456,533.34) |
| PetSmart | Fenimore Tyson, LLC and Benlin Tysons, LLC | US | (1,451,979.72) |
| PetSmart | IA Management LLC/Bldg. #44704 | US | (1,450,757.88) |
| PetSmart | Peachtree Square Holdings, LLC | US | (1,449,759.43) |
| PetSmart | Post Road Development Equity, LLC | US | (1,416,388.62) |
| PetSmart | Airport Plaza, LLC | US | (1,404,716.56) |
| Assigned to Sprouts | Mardesich Crossroads | US | (1,403,218.44) |
| PetSmart | 535 Montauk Associates, LLC | US | (1,399,005.74) |
| PetSmart | Orchard Lake Forest CA, LP(2) | US | (1,379,480.28) |
| PetSmart | Bellmore Holdco, LLC | US | (1,369,875.41) |
| PetSmart | Vestar RW Tempe Marketplace, LLC | US | (1,360,408.90) |
| PetSmart | DDRA Akwatukee Foothills, LLC | US | (1,351,088.68) |
| PetSmart | REA Reno, LLC(5) | US | (1,331,432.58) |
| PetSmart | Alamo Ranch Marketplace TX LP | US | (1,321,771.76) |
| PetSmart | TKG EL Con Center, LLC | US | |

|  |  |  | (1,305,554.28) |
|---|---|---|---|
| PetSmart | Edison Route 27 Associates, LLC | US | (1,300,933.59) |
| PetSmart | Slidell Development Company, LLC | US | (1,300,014.90) |
| PetSmart | Oak Valley Centre Partnership | US | (1,290,237.21) |
| PetSmart | Route 28 Salem LP | US | (1,283,996.44) |
| PetSmart | Sutter Street Company LLC | US | (1,277,392.38) |
| PetSmart | Linear Retail Nashua #2, LLC(1) | US | (1,274,678.13) |
| PetSmart | Market Square, LLC | US | (1,274,290.17) |
| PetSmart | Acadia Marcus Avenue, LLC | US | (1,272,001.22) |
| PetSmart | Argyle Capital, LLC | US | (1,240,312.68) |
| PetSmart | Eastside II Land Lease, LLC | US | (1,233,286.70) |
| PetSmart | LGC Eastvale Gateway, LLC | US | (1,228,651.89) |
| PetSmart | VSTC, LLC | US | (1,228,425.29) |
| PetSmart | UE Wyomissing Properties LP | US | (1,227,675.00) |
| PetSmart | Kimco North Brunswick 617, Inc. | US | (1,221,797.55) |
| PetSmart | Hendon/Atlantic Rim John's Creek, LLC | US | (1,211,922.99) |
| PetSmart | Martinsburg Commons WVA LP | US | (1,206,424.00) |
| PetSmart | Gemini Parkway Plaza S, LLC/Gemini Parkway Plaza H, LLC | US | (1,200,261.65) |
| PetSmart | SJ Realty Investments, LLC | US | (1,191,214.99) |
| PetSmart | Agree Rapid City SD, LLC | US | (1,188,351.29) |
| PetSmart | Hull Family Partnership, LLC | US | (1,187,558.35) |
| PetSmart | DDR Seabrook, LLC(1) | US | (1,186,383.08) |
| PetSmart | Seacliff Village Shopping Centers | US | (1,183,527.74) |
| PetSmart | MCS Civic Center Plaza, LLC | US | (1,162,713.10) |
| PetSmart | Highland Commons Assoc. | US | (1,162,071.26) |
| PetSmart | Blackstock Westside Associates, LLC | US | (1,160,103.63) |
| PetSmart | DV VIIII, LLC | US |  |

|  |  |  | (1,159,062.96) |
|---|---|---|---|
| PetSmart | The Marketplace of Rochester Hills Parcel B, LLC | US | (1,158,739.22) |
| PetSmart | AEI National Income Property Fund VII LP(1) | US | (1,155,167.38) |
| PetSmart | Weis Markets, Inc. | US | (1,136,154.66) |
| PetSmart | GLL BVK Properties, LP | US | (1,119,704.59) |
| PetSmart | Florin Associates, LLC | US | (1,118,364.47) |
| PetSmart | Turnpike, LLC | US | (1,117,026.41) |
| PetSmart | Good Mac Realty Partners, LP | US | (1,116,527.54) |
| PetSmart | Destination Ramon, LLC(1) | US | (1,115,135.53) |
| PetSmart | ARC TSKCYMO001, LLC | US | (1,112,411.56) |
| PetSmart | AEI National Income Property Fund VII LP | US | (1,106,763.59) |
| PetSmart | 4TH STREET RETAIL LLC-605410 | US | (1,104,355.87) |
| PetSmart | Levittown, LP | US | (1,103,499.71) |
| PetSmart | 1-7 Route 206, LLC | US | (1,096,800.79) |
| PetSmart | Monroeville SC, LP | US | (1,084,834.54) |
| PetSmart | Union Square Newcastle Joint Venture | US | (1,074,722.95) |
| PetSmart | Kendall Pointe, LLC | US | (1,074,459.67) |
| PetSmart | Brixmor Property Group(1) | US | (1,067,468.00) |
| PetSmart | Wise Dog SV, LLC | US | (1,061,506.19) |
| PetSmart | UE North Bergen EAT II LLC | US | (1,051,485.66) |
| PetSmart | QC East, LLC | US | (1,046,755.69) |
| PetSmart | RPAI US Management, LLC(4) | US | (1,035,984.25) |
| PetSmart | OCW Retail-Rochester, LLC | US | (1,035,762.48) |
| PetSmart | ARC NWNCHSC001 LLC | US | (1,031,820.99) |
| PetSmart | Downey Landing SPE, LLC | US | (1,029,344.86) |
| PetSmart | Abingdon Plaza, LLC | US | (1,026,830.24) |
| PetSmart | SEMBLER FAMILY PARTNERSHIP 41 LTD ( 84011 | US |  |

| | | | |
|---|---|---|---|
| | ) | | (1,025,012.12) |
| PetSmart | Stafford Park Commercial, LLC | US | (1,020,190.78) |
| PetSmart | HARSCH INVESTMENT REAL TV, LLC, SERIES F | US | (1,016,577.71) |
| PetSmart | Laguna Gateway Phase 2, LP | US | (1,016,041.70) |
| PetSmart | Omega Sonora, LLC | US | (1,014,252.05) |
| PetSmart | Waterstone Retail Epping, LLC | US | (1,011,308.23) |
| PetSmart | CP/IPERS Woodfield, LLC | US | (1,008,501.75) |
| PetSmart | GM Realty of Bangor LLC | US | (1,005,628.14) |
| PetSmart | Market Square Investors, LLC | US | (1,003,039.26) |
| PetSmart | Route 251 Development, LLC | US | (999,157.92) |
| PetSmart | BRE DDR BR Peninsula DE LLC | US | (993,141.48) |
| PetSmart | Burlingame Coastal LLC | US | (990,803.48) |
| PetSmart | Vestar Development | US | (975,452.98) |
| PetSmart | Samuel Carson Trust fbo Carol Johnson, Samuel Carson Trust fbo Dorothy Dunnion and Harry Dean Trust | US | (972,462.00) |
| PetSmart | KRG Charlotte Perimeter Woods, LLC | US | (958,977.12) |
| PetSmart | Retail Properties of American | US | (950,849.05) |
| PetSmart | Buffalo-Greenbriar Associates, LLC.(1) | US | (948,815.03) |
| PetSmart | Amsterdam KM III, LLC(1) | US | (944,334.71) |
| PetSmart | Federal Realty Investment Trust(4) | US | (936,526.35) |
| PetSmart | Excel Highland Reserve, LLC | US | (935,521.66) |
| PetSmart | KB Columbus I - PM, LLC | US | (933,542.71) |
| PetSmart | Main Street Stop, LLC | US | (928,880.56) |
| PetSmart | BRE DDR BR Eastland CA LLC | US | (928,374.11) |
| PetSmart | Cole MT Columbus OH, LLC | US | (926,553.14) |
| PetSmart | AKB, LLC | US | (926,432.64) |
| PetSmart | Port Plaza (E&A), LLC | US | (921,077.61) |

| | | | |
|---|---|---|---|
| PetSmart | REMCO Properties, LLC | US | (918,603.48) |
| PetSmart | Widewaters Greenport Company, LLC | US | (916,957.90) |
| PetSmart | KRG Virginia Beach Landstown, LLC | US | (910,156.07) |
| PetSmart | Northern Avenue Holdings, LLC(1) | US | (905,320.79) |
| PetSmart | LRC Northway Mall Acquisitions, LLC(1) | US | (899,510.31) |
| PetSmart | Site C LLC | US | (897,313.36) |
| PetSmart | Simon Property Group, LP(1) | US | (894,158.08) |
| PetSmart | Cole MT Darien IL, LLC | US | (884,683.30) |
| PetSmart | P & L Oceanside Group, LLC | US | (884,649.40) |
| PetSmart | 93 NYRPT, LLC | US | (881,835.54) |
| PetSmart | Albertson's LLC | US | (880,343.43) |
| PetSmart | Gemstone Resources LP & Wallingford One Holdings | US | (879,578.17) |
| PetSmart | Regency Petaluma, LLC | US | (873,329.01) |
| PetSmart | Bustleton Partners | US | (870,304.36) |
| PetSmart | Canyon Hub Holdings, LP | US | (863,411.90) |
| PetSmart | RB Quakertown, LP | US | (860,282.80) |
| PetSmart | Brixmor GA North Haven Crossing, LLC | US | (859,735.28) |
| PetSmart | Excel Stockton, LLC | US | (859,122.58) |
| PetSmart | Parr-Bohn Redwood LTD | US | (855,145.06) |
| PetSmart | Deptford Landing NJ, LP | US | (853,321.47) |
| PetSmart | Inland Commercial Property Management | US | (851,779.38) |
| PetSmart | Cole MT Beavercreek OH, LLC | US | (849,738.58) |
| PetSmart | MV Management, Inc. | US | (846,619.92) |
| PetSmart | Seaview Acquisition, LLC | US | (843,051.25) |
| PetSmart | Concord Retail Partners, LP | US | (842,188.98) |
| PetSmart | Harbour View East Shopping Center | US | (839,274.63) |

| | | | |
|---|---|---|---|
| PetSmart | Paradise Isle Destin LLC | US | (830,061.08) |
| PetSmart | Ronald Benderson 1995 Trust | US | (829,290.09) |
| PetSmart | Carter's Corner, LLC(1) | US | (825,138.26) |
| PetSmart | 89 Commercial Road, LLC | US | (820,636.02) |
| PetSmart | NORCAL EMPIRE PARTNERS LLC ( 75790 ) | US | (819,182.23) |
| PetSmart | Inland Diversified Palm Cost Landing, LLC | US | (817,343.27) |
| PetSmart | DONAHUE SCHRIBER REALTY GROUP, L.P. | US | (813,044.84) |
| PetSmart | Raymond A. Carye and Barbara F. Carye as Trustees of Carex Realty Trust | US | (812,026.77) |
| PetSmart | Dewcom, LLC(1) | US | (808,977.12) |
| PetSmart | Pineapple Commons Retail, LP | US | (804,335.59) |
| PetSmart | Rubloff C & G, LLC | US | (799,192.07) |
| PetSmart | UC Retail, LLC | US | (782,761.59) |
| PetSmart | Bromont Property Management, LLC | US | (776,478.72) |
| PetSmart | Wausau One LLC | US | (763,712.38) |
| PetSmart | Newton Center Associates 2, LP | US | (758,163.85) |
| PetSmart | TRT Beaver Creek, LLC | US | (756,007.49) |
| PetSmart | The Sully Limited Partnership | US | (755,947.68) |
| PetSmart | DDRTC Village Crossing, LLC | US | (753,152.09) |
| PetSmart | Urstadt Biddle Properties, Inc | US | (751,578.88) |
| PetSmart | BRE DDR BR Widewater PA LLC | US | (750,885.68) |
| PetSmart | McGrath - RHD Partners, LP | US | (742,891.00) |
| PetSmart | Valley Stream Green Acres, LLC | US | (740,754.77) |
| PetSmart | ARC Dogwood Promenade, LLC | US | (736,283.61) |
| PetSmart | Bay Shore Oil Company, Inc. | US | (733,742.22) |
| PetSmart | Tanurb Rosedale Commons, LP(1) | US | (730,922.88) |
| PetSmart | BRE DDR BR Northpoint FL LLC | US | (687,403.54) |

| | | | |
|---|---|---|---|
| PetSmart | Stringtown south, LLC(1) | US | (683,474.77) |
| PetSmart | Argyle Forest Retail I, LLC | US | (655,277.52) |
| PetSmart | HAWKINS COMPANIES LLC | US | (652,839.99) |
| PetSmart | Rainbow Arroyo Commons, LLC | US | (651,980.13) |
| PetSmart | Greenspring Associates Limited Partnership | US | (642,053.23) |
| PetSmart | DDR Miami Avenue, LLC | US | (637,993.09) |
| PetSmart | HKJV, LLC | US | (633,010.01) |
| PetSmart | CHERRY IDLLS MARKETPLACE, LLC | US | (632,682.57) |
| PetSmart | BROADWAY FOSTER LLC | US | (632,070.16) |
| PetSmart | THE FRESH MARKET, INC. | US | (630,234.66) |
| PetSmart | N/A | US | (629,483.61) |
| PetSmart | The Widewaters Group, Inc | US | (627,812.63) |
| PetSmart | KRG Port St. Lucie Landing, LLC | US | (626,908.70) |
| PetSmart | Pitt Village, LP | US | (599,435.72) |
| PetSmart | Newburgh Plaza, LLC | US | (591,702.95) |
| PetSmart | Chambersburg Crossing, LP | US | (586,904.20) |
| PetSmart | Morris Heritage Associates, LLC | US | (577,627.10) |
| PetSmart | Heritage Wolfcreek IV, LLC | US | (575,140.68) |
| PetSmart | Goodman Properties | US | (572,189.45) |
| PetSmart | Bouraxis Properties (Budget S108) | US | (568,604.26) |
| PetSmart | ARCP MT Stroudsburg PA, LLC | US | (539,632.80) |
| PetSmart | IA Management LLC/Bldg. #44695 | US | (538,131.90) |
| PetSmart | Rutherford Farm, LLC | US | (535,834.90) |
| PetSmart | Gateway Pinole Vista, LLC | US | (532,548.02) |
| PetSmart | NORTH GRIFFIN SQUARE, LLC | US | (527,769.72) |
| PetSmart | Vestal Parkway Plaza LLC | US | (527,076.55) |

| | | | |
|---|---|---|---|
| PetSmart | Shelby (Creekside) WMS, LLC | US | (518,576.12) |
| PetSmart | Harry and Tania Berman Company, LLC | US | (491,998.38) |
| PetSmart | Cedar Ridge, LLC | US | (489,506.07) |
| PetSmart | ANGLE GULLY LLC | US | (487,129.73) |
| PetSmart | Renaissance Land Development LLC | US | (480,564.79) |
| PetSmart | Continental 64 Fund LLC | US | (477,580.02) |
| PetSmart | Centerpoint Plaza Shops, LLLP | US | (476,640.01) |
| PetSmart | Coastal Grand Outparcel CMBS, LLC. | US | (472,928.47) |
| PetSmart | HGV Properties, LLC | US | (469,525.10) |
| PetSmart | Northlake Partners, LLC | US | (463,573.94) |
| PetSmart | Dakota UPREIT | US | (449,921.44) |
| PetSmart | ELPF Howell Mill, LLC(1) | US | (440,891.77) |
| PetSmart | Brixmor GA Apollo IV Sub LLC | US | (438,306.39) |
| PetSmart | Town Center North, LLC | US | (435,280.57) |
| PetSmart | Smithfield (Smithfield) WMB, LLC | US | (429,642.45) |
| PetSmart | Regency Centers, LP (1) | US | (429,630.74) |
| PetSmart | BRE Throne Clovis Commons, (LLC) | US | (426,703.26) |
| PetSmart | 195 Associates, LLC | US | (424,701.09) |
| PetSmart | A&R Millburn Associates, LP | US | (414,105.66) |
| PetSmart | Twin City Estate Corporation | US | (412,671.98) |
| PetSmart | Martinsville Associates, LLC | US | (411,617.22) |
| PetSmart | Townfair (PA) Station LLC | US | (406,187.28) |
| PetSmart | Lincoln Square Dunhill, LP | US | (403,092.03) |
| PetSmart | Grand Blanc Town Center Developer Parcel, LLC | US | (400,546.18) |
| PetSmart | HEPMAG, LLC, | US | (399,041.63) |
| PetSmart | Faribo West Mall, LLC | US | (396,724.10) |

| | | | |
|---|---|---|---|
| PetSmart | Payson Development Associates, LLC | US | (384,833.62) |
| PetSmart | Centro NP Holdings 10 SPE, LLC | US | (379,524.66) |
| PetSmart | Michael Hillsman and Frances Hillsman | US | (358,213.87) |
| PetSmart | Dunkirk Market Place, LLC | US | (357,513.54) |
| PetSmart | AVR Portchester, LLC | US | (346,455.21) |
| PetSmart | Amish Farm Development Company, LLC | US | (344,335.28) |
| PetSmart | Center Pointe Associates, LP(1) | US | (342,220.90) |
| PetSmart | Athens Center, LLC | US | (335,107.71) |
| PetSmart | American Realty Capital Properties, Inc | US | (325,372.48) |
| PetSmart | Columbia Tech Center, LLC | US | (324,052.07) |
| PetSmart | BRE Retail Residual Owner I LLC | US | (323,831.34) |
| PetSmart | KIOP Delran, LP | US | (323,678.49) |
| PetSmart | Zaremba Grande, LLC | US | (319,101.27) |
| PetSmart | Providence Marketplace, LLC | US | (300,018.47) |
| PetSmart | Z.A. Sneeden, LLC | US | (293,405.93) |
| PetSmart | SDCO Highlands Denton County LP | US | (292,330.86) |
| PetSmart | News Company LLC(1) | US | (285,258.30) |
| PetSmart | Gateway Center, LC | US | (285,024.40) |
| PetSmart | Centennial-Hanford Center II, LLC | US | (275,330.03) |
| PetSmart | R.K. SWANSEA, LLC | US | (256,304.44) |
| PetSmart | Yacoel Investments II, LLC | US | (248,632.99) |
| PetSmart | Four Plus Hanover Square South, LLC | US | (237,238.87) |
| PetSmart | PC Crossings, LLC | US | (221,427.71) |
| PetSmart | Centro/IA Quentin Collection, LLC(1) | US | (220,948.33) |
| PetSmart | Fairgrounds  Plaza Associates | US | (216,152.52) |
| PetSmart | Matthew Mason as Receiver | US | (213,961.31) |

| | | | |
|---|---|---|---|
| PetSmart | Creekstone Towne South Plaza, LLC | US | (207,689.91) |
| PetSmart | The Shoppes at Schererville, LLC | US | (192,825.30) |
| PetSmart | RPAI US Management, LLC(6) | US | (186,419.08) |
| PetSmart | N&D Speno, LLC, G&M Vali, LLC & J&T Giannetto, LLC | US | (171,665.27) |
| PetSmart | Federal Realty Partners LP - Property #1490 | US | (171,272.54) |
| PetSmart | Centerton Square, LLC(1) | US | (150,421.20) |
| PetSmart | Weatherford Capital, LLC | US | (138,946.36) |
| PetSmart | ADD Kings Crossing, LLC | US | (126,645.94) |
| PetSmart | Aberdeen Commons Associates LLC | US | (95,391.79) |
| PetSmart | Marisopa Mall Shopping Center, LP | US | (48,980.70) |
| PetSmart | COR Route 31 Company, LLC(2) | US | (43,133.95) |
| PetSmart | Beral LLLP ( 75903 ) | US | (23,883.40) |
| PetSmart | Federal Realty Investment Trust(4) | US | (0.01) |
| PetSmart | Raintree Realty, LLC | US | 0.02 |
| PetSmart | Kim-Sam PR Retail, LLC(1) | PR | (1,877,899.67) |
| PetSmart | Mayaguez Town Center Corp. | PR | (1,577,690.66) |
| PetSmart | DDR Escorial LLC, SE(1) | PR | (1,404,233.91) |
| PetSmart | DDR Fajardo, LLC SE | PR | (1,240,129.79) |
| PetSmart | MJS Rexville LP | PR | (1,204,317.42) |
| PetSmart | MJS Ponce, LP | PR | (1,116,601.92) |
| PetSmart | Caparra Center Associates, LLC | PR | (1,064,202.96) |
| PetSmart | DDR Rio Hondo LLC, SE | PR | (1,063,019.61) |
| PetSmart | FW Cauguas Ground Joint Venture | PR | (1,027,965.18) |
| PetSmart | DDRe Norte LLC, SE | PR | (854,238.59) |
| PetSmart | AB METRO PROPERTIES LTD. | Canada - Estimate | (1,215,827) |
| PetSmart | BARTON CENTRE GP LTD. | Canada - Estimate | (568,907) |

| | | | |
|---|---|---|---|
| PetSmart | MARTIN SVERSKY | Canada - Estimate | (140,078) |
| PetSmart | 4173015 CANADA INC., RIOTRIN PROPERTIES (CALGARY EAST) INC., an Ontario corporation, and 2185278 ONTARIO | Canada - Estimate | (1,542,555) |
| PetSmart | LIMITED | Canada - Estimate | 1,455,062 |
| PetSmart | MADY STEELES 2011 LTD. | Canada - Estimate | 1,544,521 |
| PetSmart | FIRST POLO SHOPPL~G CEl'lTRES LIMITED | Canada | (750,210.46) |
| PetSmart | Innes Shopping Centres Limited | Canada | (269,959.78) |
| PetSmart | ITF Spire Real Estate LP | Canada | (245,576.96) |
| PetSmart | Calloway Estate Investments | Canada | (220,118.44) |
| PetSmart | Purple Knights Development LLC | Canada | (178,795.67) |
| PetSmart | First Gulf Business Park, Inc. | Canada | (113,268.89) |
| PetSmart | Dartmouth Crossing Limited | Canada | (2,280,033.63) |
| PetSmart | Calloway REIT (Etobicoke-Index) Inc. | Canada | (1,974,907.77) |
| PetSmart | Orlando Corporation(3) | Canada | (1,874,206.40) |
| PetSmart | 4231 Investments, Ltd. | Canada | (1,343,763.87) |
| PetSmart | RioTrin Properties (Vaughan 2), Inc. | Canada | (1,167,749.90) |
| PetSmart | Heritage Greene Development Corp. | Canada | (1,113,443.23) |
| PetSmart | Plazacorp Property Holdings Inc. | Canada | (1,009,597.10) |
| PetSmart | 4993161 Manitoba Ltd | Canada | (950,788.14) |
| PetSmart | First Capital | Canada | (800,059.51) |
| PetSmart | Sarnia Shopping Centres, Ltd. | Canada | (778,885.46) |
| PetSmart | Big Bend Crossing Shopping Centre No. 2 LTD. | Canada | (768,947.50) |
| PetSmart | Riocan Meadows Shopping Cnetre, Inc. | Canada | (765,582.99) |
| PetSmart | ANTHEM KIMCO NORTH TOWN SHOPPING CENTRE LTD. | Canada | (749,347.24) |
| PetSmart | Riocan Holdings Inc 605392 | Canada | (739,681.59) |
| PetSmart | Airport Highway 7 Developments Limited | Canada | (715,131.37) |
| PetSmart | Vandy Developments Ltd. | Canada | |

|          |                                  |        | (659,220.60)   |
|----------|----------------------------------|--------|----------------|
| PetSmart | 22475 Dewdney Trunk Road, Inc.   | Canada | (623,132.47)   |
| PetSmart | PENRETAIL MANAGEMENT LTD.,        | Canada | (602,734.48)   |
| PetSmart | Lansdowne Retail Limited Partnership | Canada | (563,136.52) |
| PetSmart | RioCan Holdings Inc.             | Canada | (542,628.27)   |
| PetSmart | Oak Ridges Retail GP Limited     | Canada | (513,645.17)   |
| PetSmart | Trinity Properties Alberta Limited(1) | Canada | (460,498.40) |
| PetSmart | W C 401 Developments Ltd.        | Canada | (431,554.89)   |
| PetSmart | KS Village (Millstream) Inc.,    | Canada | (420,305.07)   |
| PetSmart | Riocan Holdings (Kingston) Inc.  | Canada | (355,346.72)   |
| PetSmart | Calloway REIT (Regina E2) Inc.   | Canada | (252,197.12)   |
| PetSmart | 2046740 Ontario Limited          | Canada | (173,012.37)   |
| PetSmart | Brant Qew Developments, Inc.     | Canada | (18,606.77)    |
| PetSmart | Biltmore Properties Corp.        | Canada | (1,680,414.00) |
| PetSmart | Opus Holdings Corporation        | Canada | (1,634,299.00) |
| PetSmart | Atlas Development Corporation    | Canada | (1,614,568.00) |
| PetSmart | Sun Life Assurance Company of Canada | Canada | 0.01       |

## Earnout Transactions

Obligation to pay additional purchase price consideration arising from the earnout provisions contained in the Agreement and Plan of Merger dated August 16, 2014, by and between PetSmart,Inc., Viggo Acquisition Co., and Pet360, Inc.

## Letters of Credit

| Type    | No.        | Issuing Bank | Amount       | Beneficiary           |
|---------|------------|--------------|--------------|-----------------------|
| Utility | 73928      | Scotia Bank  | $10,000,000  | Whitby Hydro Electric |
| Utility | OSB4243TOR | Scotia Bank  | $10,000,000  | Whitby Hydro Electric |

## Intercompany Indebtedness

- $55 million long-term investment made by PetSmart, Inc. in PETM Canada

Corporation on January 1, 2000, which is evidenced by that certain non-interest bearing Promissory Note from 3003300 Nova Scotia Company (predecessor in interest to PETM Canada Corporation), as Borrower, in favor of PetSmart, Inc., as Lender.

- The $20 million intercompany note between PetSmart Puerto Rico, LLC and PetSmart, Inc.

**<u>Other</u>**
The purchase money indebtedness giving rise to the liens listed on Schedule 6.02 hereto.

Schedule 6.02 - Existing Liens

| UCC# | Debtor | General Description | Secured Party |
|---|---|---|---|
| 20104593756 | PetSmart, Inc. | Certain listed equipment. | U.S. Bancorp Business Equipment Finance Group |
| 20112888728 | PetSmart, Inc. | Al equipment, all insurance, warranty and rental claims and all books, records and proceeds relating to the foregoing. | Cisco Systems Capital Corporation |
| 20114380328 | PetSmart, Inc. | Certain listed equipment. | U.S. Bancorp Equipment Finance, Inc. |
| 20124107597 | PetSmart, Inc. | Certain copiers, together with all replacements, parts, repairs, additions, accessions and accessories incorporated, affixed or attached thereto. | U.S. Bank Equipment Finance |
| 20130666793 | PetSmart, Inc. | Certain listed computer, data processing and related equipment. | BankFinancial, F.S.B. |
| 20133226553 | PetSmart, Inc. | Certain listed equipment and all replacements, parts, repairs and attachments incorporated therein or affixed thereto. | PNC Equipment Finance, LLC |
| 20133226629 | PetSmart, Inc. | Certain listed equipment and all replacements, parts, repairs and attachments incorporated therein or affixed thereto. | PNC Equipment Finance, LLC |
| 20135095097 | PetSmart, Inc. | Certain listed equipment. | U.S. Bank Equipment Finance |
| 20140262121 | PetSmart, Inc. | Certain listed equipment and any and all additions, attachments, accessories, accessions and upgrades thereto or substitutions therefor or replacements thereof. | IBM Credit LLC |
| 20140776641 | PetSmart, Inc. | Certain listed equipment and any and all replacements, parts, repairs, additions, accessions and accessories incorporated therein or affixed or attached thereto. | U.S. Bank Equipment Finance |
| 20140776658 | PetSmart, Inc. | Certain listed equipment and any and all replacements, parts, repairs, additions, accessions and accessories incorporated therein or affixed or attached thereto. | U.S. Bank Equipment Finance |
| 20140808139 | PetSmart, Inc. | Certain listed equipment and any and all replacements, parts, repairs, additions, accessions and accessories incorporated therein or affixed or attached thereto. | U.S. Bank Equipment Finance |
| 20140808154 | PetSmart, Inc. | Certain listed equipment and any and all replacements, parts, repairs, additions, accessions and accessories incorporated therein or affixed or attached thereto. | U.S. Bank Equipment Finance |
| 20141106459 | PetSmart, Inc. | Certain listed equipment and any and all replacements, parts, repairs, additions, accessions and accessories incorporated therein or affixed or attached thereto. | U.S. Bank Equipment Finance |
| 20141193051 | PetSmart, Inc. | Certain listed equipment and any and all replacements, parts, repairs, additions, accessions and accessories incorporated | U.S. Bank Equipment Finance |

| | | therein or affixed or attached thereto. | |
|---|---|---|---|
| 20141232347 | PetSmart, Inc. | Certain listed equipment and any and all replacements, parts, repairs, additions, accessions and accessories incorporated therein or affixed or attached thereto. | U.S. Bank Equipment Finance |
| 20141232784 | PetSmart, Inc. | Certain listed equipment. | Lexmark International, Inc. |
| 20141873728 | PetSmart, Inc. | Certain listed equipment and any and all replacements, parts, repairs, additions, accessions and accessories incorporated therein or affixed or attached thereto. | U.S. Bank Equipment Finance |
| 20142696292 | PetSmart, Inc. | Certain listed equipment and any and all replacements, parts, repairs, additions, accessions and accessories incorporated therein or affixed or attached thereto. | U.S. Bank Equipment Finance |
| 20144549523 | PetSmart, Inc. | Certain listed equipment and any and all replacements, parts, repairs, additions, accessions and accessories incorporated therein or affixed or attached thereto. | U.S. Bank Equipment Finance |
| 20145301106 | Maverick Leasing, Inc. | Certain listed equipment. | Banc of America Leasing & Capital, LLC |
| 20134760832 | Pet360, Inc. | Certain listed equipment and all present and future attachments, accessories, replacement parts, additions and all cash and non-cash proceeds thereof. | Western Equipment Finance, Inc. |
| 20071285054 | PetSmart, Inc. | All equipment leased to or financed for the debtor under the listed equipment lease agreement. | General Electric Capital Corp. |
| 20090583606 | PetSmart, Inc. | All listed equipment together with all related software then owned or thereafter acquired. | IBM Credit LLC |
| 20093080444 | PetSmart, Inc. | All listed equipment together with all related software then owned or thereafter acquired. | IBM Credit LLC |
| 20093195127 | PetSmart, Inc. | All listed equipment together with all related software then owned or thereafter acquired. | IBM Credit LLC |
| 20093672687 | PetSmart, Inc. | All listed equipment together with all related software then owned or thereafter acquired. | IBM Credit LLC |
| 20094123276 | PetSmart, Inc. | Computer, data processing, telecommunications and other equipment together with all attachments, accessories and replacements and proceeds thereof leased to lessor under the listed equipment lease agreement. | Forsythe/McArthur Associates, Inc. |
| 20102264459 | PetSmart, Inc. | All listed equipment together with all related software then owned or thereafter acquired. | IBM Credit LLC |
| 20103257775 | PetSmart, Inc. | Certain listed equipment. | U.S. Bancorp |
| 20103559535 | PetSmart, Inc. | All listed equipment together with all related software then owned or thereafter acquired. | IBM Credit LLC |
| 20103581778 | PetSmart, Inc. | Certain listed equipment. | U.S. Bancorp |

| 20104171173 | PetSmart, Inc. | Certain listed equipment. | U.S. Bancorp Business Equipment Finance Group |
| 20104587055 | PetSmart, Inc. | Certain listed equipment | U.S. Bancorp Business Equipment Finance Group |

Liens granted on cash collateral held in connection with the following letters of credit:

| **Type** | **No.** | **Issuing Bank** | **Amount** | **Beneficiary** |
|---|---|---|---|---|
| Utility | 73928 | Scotia Bank | $10,000,000 | Whitby Hydro Electric |
| Utility | OSB4243TOR | Scotia Bank | $10,000,000 | Whitby Hydro Electric |

Schedule 6.04(f) - Existing Investments

| Investment | Owner | Class of Capital Stock | Shares Owned | % of Class Owned |
|---|---|---|---|---|
| PetCoach, Inc. | Pet360, Inc. | Common | 1,900,000 | 19% |
| MMI Holdings, Inc. | PetSmart, Inc. | Class A Common Stock 1,784,423<br>Series A Preferred Stock 550,750<br>Series D Preferred Stock 354,705<br>Series E Preferred Stock 165,317<br>Series F Preferred Stock 1,674,951<br>Series G Preferred Stock 163,158 | | 21% (overall) |

- $55 million long-term investment made by PetSmart, Inc. in PETM Canada Corporation on January 1, 2000, which is evidenced by that certain non-interest bearing Promissory Note from 3003300 Nova Scotia Company (predecessor in interest to PETM Canada Corporation), as Borrower, in favor of PetSmart, Inc., as Lender.

- $20 million note between PetSmart Puerto Rico, LLC and PetSmart, Inc.

Schedule 6.07 - Existing Restrictions

None.

Schedule 6.09 - Existing Affiliate Transactions

None.

EXHIBIT A

## [Form of] ASSIGNMENT AND ASSUMPTION[1]

       This Assignment and Assumption (the "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [Insert name of Assignor] (the "<u>Assignor</u>") and [Insert name of Assignee] (the "<u>Assignee</u>").  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

       For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the credit facility identified below (including any guarantees included in such facility) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "<u>Assigned Interest</u>").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

    1.       Assignor:  _____

    2.       Assignee:  **_____**
         [and is an Affiliate/Approved Fund of [Identify Lender]][2]

    3.       Borrower:  PetSmart, Inc.

    4.       Administrative Agent:  Citibank, N.A., as Administrative Agent under the Credit Agreement

    5.       Credit Agreement:  The Credit Agreement dated as of March 11, 2015, among Argos Holdings Inc., Argos Merger Sub Inc. (which merged with and into PetSmart, Inc., a Delaware corporation, with PetSmart, Inc. surviving such merger as the Borrower), the Lenders party thereto and Citibank, N.A., as Administrative Agent.

---

[1]      Form to be used for any Assignee other than an Affiliated Lender.

[2]      Select as applicable.

6.    Assigned Interest:

| Facility Assigned | Aggregate Amount of Term Loans for all Lenders | Amount of Term Loans Assigned | Percentage Assigned of Term Loans[3] |
|---|---|---|---|
| Term Loan | $ | $ | % |

Effective Date: _____ ___, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR].

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[3]    Set forth, to at least 9 decimals, as a percentage of the Term Loans of all Lenders thereunder.

A-2

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR [NAME OF ASSIGNOR],

By: _____
      Title:

ASSIGNEE [NAME OF ASSIGNEE],

By: _____
      Title:

[Consented to and][4] Accepted:

CITIBANK, N.A., as
Administrative Agent,

By: _____
    Title:

[Consented to:][5]

PETSMART, INC.

By: _____
    Title:

---

[4]     To be included only if the consent of the Administrative Agent is required by Section 9.04(b)(i)(B) of the Credit Agreement.

[5]     To be included only if the consent of the Borrower is required by Section 9.04(b)(i)(A) of the Credit Agreement.

**PetSmart, Inc.**

**$[          ] CREDIT FACILITY**

**STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION**

1.      Representations and Warranties.

1.1     Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents, (iii) the financial condition of the Borrower, any of the Subsidiaries or other Affiliates of the Borrower or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of the Subsidiaries or other Affiliates of the Borrower or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender and it is not a Disqualified Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender and (v) attached to this Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      Payments.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.      General Provisions.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and As-

sumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

EXHIBIT B

## [Form of] AFFILIATED LENDER ASSIGNMENT AND ASSUMPTION

This Affiliated Lender Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [Insert name of Assignor] (the "Assignor") and [Insert name of Assignee] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the credit facility identified below (including any guarantees included in such facility) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.    Assignor:    _____

2.    Assignee:    _____
      [and is an Affiliate/Approved Fund of [Identify Lender]][6]

3.    Borrower:  PetSmart, Inc.

4.    Administrative Agent:  Citibank, N.A., as Administrative Agent under the Credit Agreement

5.    Credit Agreement:  The Credit Agreement dated as of March 11, 2015, among Argos Holdings Inc., Argos Merger Sub Inc. (which merged with and into PetSmart, Inc., a Delaware corporation, with PetSmart, Inc. surviving such merger as the Borrower), the Lenders party thereto and Citibank, N.A., as Administrative Agent.

6.    Assigned Interest:

---

[6]    Select as applicable.

| Facility Assigned | Aggregate Amount of Term Loans for all Lenders | Amount of Term Loans Assigned | Percentage Assigned of Term Loans[7] |
|---|---|---|---|
| Term Loan | $ | $ | % |

Each Assignee acknowledges the limitation on the rights of Lenders that are Affiliated Lenders set forth in the Credit Agreement, including Sections 9.02 and 9.04 thereof.

Effective Date: _____ ___, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR].

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[7]     Set forth, to at least 9 decimals, as a percentage of the Term Loans of all Lenders thereunder.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR [NAME OF ASSIGNOR],

By: _____
    Title:

ASSIGNEE [NAME OF ASSIGNEE],

By: _____
    Title:

[Consented to and][8] Accepted:

CITIBANK, N.A., as
Administrative Agent,

By: _____
    Title:

[Consented to:][9]

PETSMART, INC.

By: _____
    Title:

---

[8]     To be included only if the consent of the Administrative Agent is required by Section 9.04(b)(i)(B) of the Credit Agreement.

[9]     To be included only if the consent of the Borrower is required by Section 9.04(b)(i)(A) of the Credit Agreement.

**PetSmart, Inc.**

**$[          ] CREDIT FACILITY**

**STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION**

1.        Representations and Warranties.

1.1      Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents, (iii) the financial condition of the Borrower, any of the Subsidiaries or other Affiliates of the Borrower or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of the Subsidiaries or other Affiliates of the Borrower or any other Person of any of their respective obligations under any Loan Document.

1.2.      Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, (v) as of the Effective Date, after giving effect to the assignment of the Assigned Interest pursuant to this Assignment and Assumption, the aggregate principal amount of all Loans held by all Affiliated Lenders (other than Affiliated Debt Funds) shall not exceed 25% of the outstanding principal amount of all Loans plus the outstanding principal amount of all term loans made pursuant to an Incremental Loan and (vi) attached to this Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.        Payments.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.    <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

EXHIBIT C

[*Form of Guarantee Agreement*]

GUARANTEE AGREEMENT

dated as of

March 11, 2015,

among

ARGOS HOLDINGS INC.,

PETSMART, INC.,

THE SUBSIDIARY GUARANTORS
IDENTIFIED HEREIN

and

CITIBANK, N.A.,
as Collateral Agent

TABLE OF CONTENTS

Page

ARTICLE I

Definitions

SECTION 1.01.  Credit Agreement ..................................................................................... 1
SECTION 1.02.  Other Defined Terms ................................................................................ 1

ARTICLE II

The Guarantees

SECTION 2.01.  Guarantee ................................................................................................. 2
SECTION 2.02.  Guarantee of Payment; Continuing Guarantee ........................................ 2
SECTION 2.03.  No Limitations .......................................................................................... 2
SECTION 2.04.  Reinstatement ........................................................................................... 4
SECTION 2.05.  Agreement to Pay; Subrogation ............................................................... 4
SECTION 2.06.  Information ................................................................................................ 4
SECTION 2.07.  Maximum Liability ................................................................................... 5

ARTICLE III

Indemnity, Subrogation and Subordination

SECTION 3.01.  Indemnity and Subrogation ...................................................................... 5
SECTION 3.02.  Contribution and Subrogation .................................................................. 5
SECTION 3.03.  Subordination ........................................................................................... 5

ARTICLE IV

Representations and Warranties

ARTICLE V

Miscellaneous

SECTION 5.01.  Notices ...................................................................................................... 6
SECTION 5.02.  Waivers; Amendment ............................................................................... 6
SECTION 5.03.  Collateral Agent's Fees and Expenses; Indemnification .......................... 7
SECTION 5.04.  Successors and Assigns ............................................................................ 7
SECTION 5.05.  Survival of Agreement .............................................................................. 8
SECTION 5.06.  Counterparts; Effectiveness; Several Agreement ..................................... 8
SECTION 5.07.  Severability ............................................................................................... 8
SECTION 5.08.  Right of Set-Off ....................................................................................... 8
SECTION 5.09.  Governing Law; Jurisdiction; Consent to Service of Process; Appointment of Service
                of Process Agent ...................................................................................... 9
SECTION 5.10.  WAIVER OF JURY TRIAL ..................................................................... 9

SECTION 5.11.   Headings ............................................................................................. 10
SECTION 5.12.   Termination or Release......................................................................... 10
SECTION 5.13.   Additional Guarantors .......................................................................... 10
SECTION 5.14.   Effectiveness of the Acquisition .......................................................... 10

GUARANTEE AGREEMENT dated as of March 11, 2015 (this "Agreement"), among ARGOS HOLDINGS INC., PETSMART, INC., the various other Guarantors identified herein and CITIBANK, N.A., as Collateral Agent, on behalf of itself and the other Guaranteed Parties.

Reference is made to the Credit Agreement dated as of March 11, 2015 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Argos Holdings Inc., a Delaware corporation ("Holdings"), PetSmart, Inc., a Delaware corporation (the "Borrower"), the Lenders party thereto and Citibank, N.A., as Collateral Agent, and the various other parties thereto.  The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  The obligations of the Lenders to extend such credit are conditioned upon, among other things, the execution and delivery of this Agreement.  Holdings and the Subsidiary Guarantors are affiliates of the Borrower, will derive substantial benefits from the extension of credit to the Borrower pursuant to the Credit Agreement and are willing to execute and deliver this Agreement in order to induce the Lenders to extend such credit.  Accordingly, the parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01.  Credit Agreement.

(a)      Capitalized terms used in this Agreement (including in the introductory paragraph hereto) and not otherwise defined herein have the meanings specified in the Credit Agreement.

(b)      The rules of construction specified in Section 1.03 of the Credit Agreement also apply to this Agreement, mutatis mutandis.

SECTION 1.02   Other Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"Agreement" has the meaning assigned to such term in the preamble to this Agreement.

"Borrower" has the meaning assigned to such term in the introductory paragraph to this Agreement.

"Claiming Party" has the meaning assigned to such term in Section 3.02.

"Contributing Party" has the meaning assigned to such term in Section 3.02.

"Credit Agreement" has the meaning assigned to such term in the introductory paragraph to this Agreement.

"Guaranteed Obligations" means the Secured Obligations guaranteed pursuant to Section 2.01 of this Agreement.

"Guaranteed Parties" means (a) each Lender, (b) the Collateral Agent, (c) each Joint Bookrunner, (d) each Issuing Bank, (e) each Person to whom any Secured Cash Management Obligations are owed, (f) each counterparty to any Swap Agreement the obligations under which constitute Secured Swap Obligations, (g) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (h) the permitted successors and assigns of each of the foregoing.

"Guarantors" means Holdings, the Borrower and the Subsidiary Guarantors.

"Holdings" has the meaning assigned to such term in the introductory paragraph to this Agreement.

"Subsidiary" means any subsidiary of Holdings.

"Subsidiary Guarantors" means the Subsidiaries identified as such on Schedule I and each other Subsidiary that becomes a party to this Agreement as a Subsidiary Guarantor after the Effective Date pursuant to Section 5.13; provided that if a Subsidiary is released from its obligations as a Subsidiary Guarantor hereunder as provided in Section 5.12(b), such Subsidiary shall cease to be a Subsidiary Guarantor hereunder effective upon such release.

"Supplement" means an instrument in the form of Exhibit A hereto, or any other form approved by the Collateral Agent, and in each case reasonably satisfactory to the Collateral Agent.


ARTICLE II

The Guarantees

SECTION 2.01.  Guarantee.  Each Guarantor irrevocably and unconditionally guarantees to each of the Guaranteed Parties, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, by way of an independent payment obligation, the due and punctual payment and performance of the Secured Obligations (other than, (i) with respect to any Guarantor, any Excluded Swap Obligations of such Guarantor and (ii) in the case of the Borrower, in respect of its own obligations).  Each Guarantor further agrees that the Secured Obligations may be extended or renewed, in whole or in part, or amended or modified, without notice to or further assent from it, and that it will remain bound upon its Guarantee hereunder notwithstanding any such extension or renewal, or amendment or modification, of any of the Secured Obligations.  Each Guarantor waives presentment to, demand of payment from and protest to any Loan Party of any of the Secured Obligations, and also waives notice of acceptance of its Guarantee and notice of protest for nonpayment.  Each Guarantor intends that its Guarantee under this Section 2.01 constitute, and this Section 2.01 shall be deemed to constitute, a guarantee or other agreement for the benefit of each other Guarantor for all purposes of section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 2.02   Guarantee of Payment; Continuing Guarantee.  Each Guarantor further agrees that its Guarantee hereunder constitutes a Guarantee of payment when due (whether or not any bankruptcy or similar proceeding shall have stayed the accrual of collection of any of the Secured Obligations or operated as a discharge thereof) and not merely of collection, and waives any right to require that any resort be had by the Collateral Agent or any other Guaranteed Party to any security held for the payment of any of the Secured Obligations or to any balance of any deposit account or credit on the books of the Collateral Agent or any other Guaranteed Party in favor of any Loan Party or any other Person.  Each Guarantor agrees that its Guarantee hereunder is continuing in nature and applies to all of the Guaranteed Obligations, whether currently existing or hereafter incurred.

SECTION 2.03   No Limitations.

(a)      Except for the termination or release of a Guarantor's obligations hereunder as expressly provided in Section 5.12 and the limitations set forth in Section 2.07 or in the Supplement

pursuant to which such Guarantor became a party hereto, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise of any of the Secured Obligations, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Secured Obligations, any impossibility in the performance of any of the Secured Obligations or otherwise.  Without limiting the generality of the foregoing, except for the termination or release of its obligations hereunder as expressly provided in Section 5.12, the obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by:

(i)        the failure of any Guaranteed Party or any other Person to assert any claim or demand or to enforce any right or remedy under the provisions of any Loan Document or otherwise;

(ii)       any rescission, waiver, amendment, restatement or modification of, or any release from any of the terms or provisions of, any Loan Document or any other agreement, including with respect to any other Guarantor under this Agreement;

(iii)      the release of, or any impairment of or failure to perfect any Lien on, any security held by any Guaranteed Party for any of the Secured Obligations;

(iv)      any default, failure or delay, willful or otherwise, in the performance of any of the Secured Obligations;

(v)       any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the payment in full in cash of all the Secured Obligations);

(vi)      any illegality, lack of validity or lack of enforceability of any of the Secured Obligations;

(vii)     any change in the corporate existence, structure or ownership of any Loan Party, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Loan Party or its assets or any resulting release or discharge of any of the Secured Obligations;

(viii)    the existence of any claim, set-off or other rights that any Guarantor may have at any time against the Borrower, the Collateral Agent, any other Guaranteed Party or any other Person, whether in connection with the Credit Agreement, the other Loan Documents or any unrelated transaction;

(ix)      this Agreement having been determined (on whatsoever grounds) to be invalid, non-binding or unenforceable against any other Guarantor *ab initio* or at any time after the Effective Date;

(x)       the fact that any Person that, pursuant to the Loan Documents, was required to become a party hereto may not have executed or is not effectually bound by this Agreement, whether or not this fact is known to the Guaranteed Parties;

(xi)      any action permitted or authorized hereunder; or

(xii)     any other circumstance (including any statute of limitations), or any existence of or reliance on any representation by the Collateral Agent, any other Guaranteed Party or any other Person, that might otherwise constitute a defense to, or a legal or equitable discharge of, the

Borrower, any Guarantor or any other guarantor or surety (other than the payment in full in cash of all the Secured Obligations (other than contingent obligations not yet due, Secured Cash Management Obligations and Secured Swap Obligations)).

To the fullest extent permitted by applicable law, each Guarantor expressly authorizes the Guaranteed Parties to take and hold security in accordance with the terms of the Loan Documents for the payment and performance of the Guaranteed Obligations, to exchange, waive or release any or all such security (with or without consideration), to enforce or apply such security and direct the order and manner of any sale thereof in their sole discretion or to release or substitute any one or more other guarantors or obligors upon or in respect of the Guaranteed Obligations, all without affecting the obligations of any Guarantor hereunder.

(b)     To the fullest extent permitted by applicable law, each Guarantor waives any defense based on or arising out of any defense of any Loan Party or the unenforceability of the Secured Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any Loan Party, other than the payment in full in cash of all the Secured Obligations. To the fullest extent permitted by applicable law, the Collateral Agent and the other Guaranteed Parties may, at their election and in accordance with the terms of the Loan Documents, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Loan Party or exercise any other right or remedy available to them against any Loan Party, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Guaranteed Obligations have been paid in full in cash. To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Guarantor against any Loan Party, as the case may be, or any security.

SECTION 2.04   Reinstatement. Each Guarantor agrees that, unless released pursuant to Section 5.12(b), its Guarantee hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Guaranteed Obligations is rescinded or must otherwise be restored by any Guaranteed Party upon the bankruptcy or reorganization (or any analogous proceeding in any jurisdiction) of any Loan Party or otherwise.

SECTION 2.05   Agreement to Pay; Subrogation. In furtherance of the foregoing and not in limitation of any other right that the Collateral Agent or any other Guaranteed Party has at law or in equity against any Guarantor by virtue hereof, upon the failure of any Loan Party to pay any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each Guarantor hereby promises to and will forthwith pay, or cause to be paid, to the Collateral Agent for distribution to the applicable Guaranteed Parties in cash the amount of such unpaid Guaranteed Obligation. Upon payment by any Guarantor of any sums to the Collateral Agent as provided above, all rights of such Guarantor against any Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subject to Article III.

SECTION 2.06   Information. Each Guarantor assumes all responsibility for being and keeping itself informed of each Loan Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Secured Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that none of the Guaranteed Parties will have any duty to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

SECTION 2.07   <u>Maximum Liability</u>.  Notwithstanding anything to the contrary in this Agreement, the obligations and liabilities of any Subsidiary Guarantor that becomes a party to this Agreement after the date hereof shall be limited as and to the extent set forth in the applicable Supplement.

ARTICLE III

Indemnity, Subrogation and Subordination

SECTION 3.01.   <u>Indemnity and Subrogation</u>.  In addition to all such rights of indemnity and subrogation as the Guarantors may have under applicable law (but subject to Section 3.03) in respect of any payment hereunder, the Borrower agrees that (a) in the event a payment in respect of any Guaranteed Obligations shall be made by any Guarantor under this Agreement, the Borrower shall indemnify such Guarantor for the full amount of such payment and such Guarantor shall be subrogated to the rights of the Person to whom such payment shall have been made to the extent of such payment and (b) in the event any assets of any Guarantor shall be sold pursuant to any Security Document to satisfy in whole or in part any Guaranteed Obligations owed to any Guaranteed Party, the Borrower shall indemnify such Guarantor in an amount equal to the greater of the book value or the fair market value of the assets so sold.

SECTION 3.02.   <u>Contribution and Subrogation</u>.  Each Guarantor (a "<u>Contributing Party</u>") agrees (subject to Sections 2.07 and 3.03) that, in the event a payment shall be made by any other Guarantor hereunder in respect of any Guaranteed Obligations or assets of any other Guarantor shall be sold pursuant to any Security Document to satisfy any Guaranteed Obligation owed to any Guaranteed Party and such other Guarantor (the "<u>Claiming Party</u>") shall not have been fully indemnified as provided in Section 3.01, the Contributing Party shall indemnify the Claiming Party in an amount equal to the amount of such payment or the greater of the book value or the fair market value of such assets, as the case may be, in each case multiplied by a fraction of which the numerator shall be the net worth of the Contributing Party on the date of such payment or sale, as applicable, (or, in the case of any Guarantor becoming a party hereto pursuant to Section 5.13, the date of the Supplement executed and delivered by such Guarantor) and the denominator shall be the aggregate net worth of all the Guarantors on the date of such payment or sale, as applicable.  Any Contributing Party making any payment to a Claiming Party pursuant to this Section 3.02 shall be subrogated to the rights of such Claiming Party under Section 3.01 to the extent of such payment.

SECTION 3.03.   <u>Subordination</u>.  (a) Notwithstanding any provision of this Agreement to the contrary, but subject to Section 2.07, all rights of the Guarantors under Sections 3.01 and 3.02 and all other rights of the Guarantors of indemnity, contribution or subrogation under applicable law or otherwise shall be fully subordinated to the payment in full in cash of all of the Secured Obligations.  No failure on the part of any Guarantor to make the payments required by Sections 3.01 and 3.02 (or any other payments required under applicable law or otherwise) shall in any respect limit the obligations and liabilities of any Guarantor with respect to its obligations hereunder, and each Guarantor shall remain liable for the full amount of the obligations of such Guarantor hereunder.

(b)      Each Guarantor hereby agrees that upon the occurrence and during the continuance of an Event of Default and after notice from the Collateral Agent (<u>provided</u> that no such notice shall be required to be given in the case of any Event of Default arising under Section 7.01(h) or 7.01(i) of the Credit Agreement), all Indebtedness and other monetary obligations owed by it to, or to it by, any other Guarantor or any other Subsidiary shall be fully subordinated to the payment in full in cash of all the Secured Obligations.

ARTICLE IV

Representations and Warranties

Each Subsidiary Guarantor represents and warrants to the Collateral Agent and the other Guaranteed Parties that (a) the execution, delivery and performance by such Subsidiary Guarantor of this Agreement have been duly authorized by all necessary corporate or other action and, if required, action by the holders of such Subsidiary Guarantor's Equity Interests, and that this Agreement has been duly executed and delivered by such Subsidiary Guarantor and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law, and (b) all representations and warranties set forth in the Credit Agreement as to such Subsidiary Guarantor are true and correct in all material respects; provided that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language is true and correct in all respects.

ARTICLE V

Miscellaneous

SECTION 5.01.  Notices.  All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 9.01 of the Credit Agreement.  All communications and notices hereunder to any Subsidiary Guarantor shall be given to it in care of the Borrower as provided in Section 9.01 of the Credit Agreement.

SECTION 5.02.  Waivers; Amendment.

(a)     No failure or delay by the Collateral Agent or any other Guaranteed Party in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Collateral Agent and the other Guaranteed Parties hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 5.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Collateral Agent or any other Guaranteed Party may have had notice or knowledge of such Default at the time.  No notice or demand on any Loan Party in any case shall entitle any Loan Party to any other or further notice or demand in similar or other circumstances.

(b)     Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Guarantor or Guarantors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 9.02 of the Credit Agreement; provided that the Collateral Agent may, without the consent of any other Guaranteed Party, consent to a departure by any Guarantor from any covenant of such Guarantor set forth herein to the extent such departure is

consistent with the authority of the Collateral Agent set forth in the definition of the term "Collateral and Guarantee Requirement" in the Credit Agreement.

SECTION 5.03.  Collateral Agent's Fees and Expenses; Indemnification.

(a)    Each Guarantor, jointly with the other Guarantors and severally, agrees to reimburse the Collateral Agent for its fees and expenses incurred hereunder as provided in Section 9.03(a) of the Credit Agreement; provided that each reference therein to a "Borrower" shall be deemed to be a reference to "each Guarantor".

(b)    Without limitation of its indemnification obligations under the other Loan Documents, each Guarantor, jointly with the other Guarantors and severally, agrees to indemnify the Collateral Agent and the other Indemnitees  against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee by any third party or by Holdings or any Subsidiary arising out of, in connection with, or as a result of, the execution, delivery or performance of this Agreement or any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether brought by a third party or by Holdings or any Subsidiary and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of, or a breach of the Loan Documents by, such Indemnitee or its Related Parties.

(c)    To the fullest extent permitted by applicable law, no Guarantor shall assert, and each Guarantor hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet), provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of, or a breach of the Loan Documents by, such Indemnitee or its Related Parties, or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated thereby, the Transactions, any Loan or the use of the proceeds thereof.

(d)    The provisions of this Section 5.03 shall remain operative and in full force and effect regardless of the termination of this Agreement or any other Loan Document, the consummation of the transactions contemplated hereby or thereby, the repayment of any of the Secured Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of any Guaranteed Party.  All amounts due under this Section shall be payable not later than 10 Business Days after written demand therefor; provided, however, any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 5.03.  Any such amounts payable as provided hereunder shall be additional Secured Obligations.

SECTION 5.04.  Successors and Assigns.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Guarantor or the Collateral Agent that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

SECTION 5.05.  Survival of Agreement.  All covenants, agreements, representations and warranties made by the Loan Parties in this Agreement or any other Loan Document and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Guaranteed Parties and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by or on behalf of any Guaranteed Party and notwithstanding that the Collateral Agent, any Lender or any other Guaranteed Party may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement or any other Loan Document, and shall continue in full force and effect until such time as (a) all the Loan Document Obligations (other than contingent obligations not yet due) have been paid in full in cash and (b) all Commitments have terminated or expired.

SECTION 5.06.  Counterparts; Effectiveness; Several Agreement.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Agreement.  This Agreement shall become effective as to any Guarantor when a counterpart hereof executed on behalf of such Guarantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon such Guarantor and the Collateral Agent and their respective permitted successors and assigns, and shall inure to the benefit of such Guarantor, the Collateral Agent and the other Guaranteed Parties and their respective successors and assigns, except that no Guarantor shall have the right to assign or transfer its rights or obligations hereunder or any interest herein (and any such assignment or transfer shall be void) except as expressly provided in this Agreement and the Credit Agreement.  This Agreement shall be construed as a separate agreement with respect to each Guarantor and may be amended, modified, supplemented, waived or released with respect to any Guarantor without the approval of any other Guarantor and without affecting the obligations of any other Guarantor hereunder.

SECTION 5.07.  Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  The parties shall endeavor in good-faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of such invalid, illegal or unenforceable provisions.

SECTION 5.08.  Right of Set-Off.  If an Event of Default under Sections 7.01(a), (b), (h) or (i) of the Credit Agreement shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender to or for the credit or the account of any Guarantor against any of and all the obligations of such Guarantor then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness.  The applicable Lender shall notify the applicable Guarantor and the Agent of such setoff and application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section 5.08.  The rights of each Lender under this Section 5.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender may have;

provided, further, that to the extent prohibited by applicable law as described in the definition of "Excluded Swap Obligation," no amounts received from, or set off with respect to, any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

SECTION 5.09.  Governing Law; Jurisdiction; Consent to Service of Process; Appointment of Service of Process Agent.

(a)    This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)    Each party to this Agreement hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Collateral Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against any Guarantor or its respective properties in the courts of any jurisdiction.

(c)    Each party to this Agreement hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 5.01.  Nothing in this Agreement will affect the right of any party to this Agreement or any other Loan Document to serve process in any other manner permitted by law.

(e)    Each Subsidiary Guarantor hereby irrevocably designates, appoints and empowers the Borrower as its designee, appointee and agent to receive, accept and acknowledge for and on its behalf, and in respect of its property, service of any and all legal process, summons, notices and documents that may be served in any such action or proceeding.

SECTION 5.10.  WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 5.10.

SECTION 5.11.  <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 5.12.  <u>Termination or Release</u>.

(a)    Subject to Section 2.04, this Agreement and the Guarantees made herein shall terminate when (i) all the Loan Document Obligations (other than contingent indemnification obligations) have been paid in full in cash and (ii) all Commitments have terminated or expired.

(b)    The Guarantees made herein shall also terminate and be released at the time or times and in the manner set forth in Section 9.15 of the Credit Agreement.

(c)    In connection with any termination or release pursuant to paragraph (a) or (b) of this Section, the Collateral Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents by the Collateral Agent pursuant to this Section shall be without recourse to or warranty by the Collateral Agent.

SECTION 5.13.  <u>Additional Guarantors</u>.  Pursuant to the Credit Agreement, (i) additional Subsidiaries (including Intermediate Parent) may be required to become Guarantors after the date hereof.  Upon execution and delivery by the Collateral Agent and a Subsidiary of a Supplement, any such Subsidiary shall become a Guarantor hereunder with the same force and effect as if originally named as such herein.  The execution and delivery of any such instrument shall not require the consent of any other Guarantor hereunder.  The rights and obligations of each Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any Subsidiary as a party to this Agreement.

SECTION 5.14 <u>Effectiveness of the Acquisition</u>.  No Guarantor (other than Holdings) shall have any rights or obligations hereunder until the consummation of the Acquisition, and any representations and warranties of the Guarantors (other than Holdings) hereunder shall not become effective until such time.

IN WITNESS WHEREOF, the parties hereto have duly executed this Guarantee Agreement as of the day and year first above written.

ARGOS HOLDINGS INC.,

By: _____
    Name:
    Title:

PETSMART, INC.

By: _____
    Name:
    Title:

PET WISE INC.
PACIFIC COAST DISTRIBUTING, INC.
PET360, INC.
AUTHORITY PET FOOD COMPANY
PETSTUFF CANADA (USA) HOLDINGS, INC.
PETSTUFF NOVA SCOTIA, INC.
PETSCARD, LLC
SIMPLY NOURISH PET FOOD COMPANY, LLC
PETSMART STORE SUPPORT GROUP, INC.
MAVERICK LEASING, INC.
ONP-ECOM, LLC
ONP-RETAIL, LLC
PET360 MEDIA, INC.
PETMD, INC.
PETMD LLC
PETMD VENTURES, INC.
KY SHELTER AND MOBILE VET SERVICE LLC
ANIMAL WELLNESS LLC
THE CAT AND DOG CLINIC OF LANSDALE, LLC
PET360 PHARMACY HOLDING, LLC
PET360 PHARMACY, LLC


By:   _____
        Name:
        Title:


SIGNATURE PAGE TO GUARANTEE AGREEMENT

CITIBANK, N.A., as Collateral Agent, on behalf of itself and the other Guaranteed Parties,

By: _____
     Name:
     Title:

Schedule I to
the Guarantee Agreement

## INITIAL SUBSIDIARY GUARANTORS

PET WISE INC.
PACIFIC COAST DISTRIBUTING, INC.
PET360, INC.
AUTHORITY PET FOOD COMPANY
PETSTUFF CANADA (USA) HOLDINGS, INC.
PETSTUFF NOVA SCOTIA, INC.
PETSCARD, LLC
SIMPLY NOURISH PET FOOD COMPANY, LLC
PETSMART STORE SUPPORT GROUP, INC.
MAVERICK LEASING, INC.
ONP-ECOM, LLC
ONP-RETAIL, LLC
PET360 MEDIA, INC.
PETMD, INC.
PETMD LLC
PETMD VENTURES, INC.
KY SHELTER AND MOBILE VET SERVICE LLC
ANIMAL WELLNESS LLC
THE CAT AND DOG CLINIC OF LANSDALE, LLC
PET360 PHARMACY HOLDING, LLC
PET360 PHARMACY, LLC

Exhibit A to
the Guarantee Agreement

SUPPLEMENT NO. __ dated as of [      ] , 20[  ] to the Guarantee Agreement dated as of March 11, 2015, among Argos Holdings Inc. ("Holdings"), PetSmart, Inc. (the "Borrower"), the subsidiaries of Holdings party thereto (Holdings, the Borrower and such subsidiaries being collectively referred to as the "Guarantors") and Citibank, N.A., as Collateral Agent.

A.       Reference is made to the Credit Agreement dated as of March 11, 2015 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Holdings, the Borrower, the Lenders party thereto, Citibank, N.A., as Collateral Agent and the various other parties thereto.

B.       Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement and the Guarantee Agreement referred to therein, as applicable.

C.       The Guarantors have entered into the Guarantee Agreement in order to induce the Lenders to extend credit to the Borrower.  Section 5.13 of the Guarantee Agreement provides that additional Subsidiaries may become Guarantors under the Guarantee Agreement by execution and delivery of an instrument in the form of this Supplement.  The undersigned Subsidiary (the "New Guarantor") is executing this Supplement to become a Guarantor under the Guarantee Agreement in order to induce the Lenders to make additional extensions of credit under the Credit Agreement and as consideration for such extensions of credit previously issued.

Accordingly, the Collateral Agent and the New Guarantor agree as follows:

SECTION 1.       In accordance with Section 5.13 of the Guarantee Agreement, the New Guarantor by its signature below becomes a Guarantor under the Guarantee Agreement with the same force and effect as if originally named therein as a Guarantor, and the New Guarantor hereby agrees to all the terms and provisions of the Guarantee Agreement applicable to it as a Guarantor thereunder, and hereby irrevocably and unconditionally guarantees to each of the Guaranteed Parties, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, by way of an independent payment obligation, the due and punctual payment and performance of the Secured Obligations (other than any Excluded Swap Obligations of the New Guarantor).  Each reference to a "Subsidiary Guarantor" or a "Guarantor" in the Guarantee Agreement shall be deemed to include the New Guarantor.  The Guarantee Agreement is hereby incorporated herein by reference.

SECTION 2.       The New Guarantor represents and warrants to the Collateral Agent and the other Guaranteed Parties that (a) the execution, delivery and performance by the New Guarantor of this Supplement have been duly authorized by all necessary corporate or other action and, if required, action by the holders of such New Guarantor's Equity Interests, and that this Supplement has been duly executed and delivered by the New Guarantor and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law, and (b) all representations and warranties set forth in the Credit Agreement as to the New Guarantor are true and correct in all material respects as of the date hereof; provided that, to the extent such representations and warranties specifically refer to an earlier date, they are true and correct in all material respects as of such

earlier date; provided further that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language is true and correct in all respects.

SECTION 3.    This Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract.  Delivery of an executed signature page to this Supplement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Supplement.  This Supplement shall become effective as to the New Guarantor when a counterpart hereof executed on behalf of the New Guarantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon the New Guarantor and the Collateral Agent and their respective permitted successors and assigns, and shall inure to the benefit of the New Guarantor, the Collateral Agent and the other Guaranteed Parties and their respective successors and assigns, except that the New Guarantor shall not have the right to assign or transfer its rights or obligations hereunder or any interest herein (and any such assignment or transfer shall be void) except as expressly provided in this Supplement, the Guarantee Agreement and the Credit Agreement.

SECTION 4.    Except as expressly supplemented hereby, the Guarantee Agreement shall remain in full force and effect.

**SECTION 5.    This Supplement shall be construed in accordance with and governed by the law of the State of New York.**

SECTION 6.    Any provision of this Supplement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  The parties shall endeavor in good-faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of such invalid, illegal or unenforceable provisions.

SECTION 7.    All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the Guarantee Agreement.

SECTION 8.  The New Guarantor agrees to reimburse the Collateral Agent for its fees and expenses incurred hereunder and under the Guarantee Agreement as provided in Section 9.03(a) of the Credit Agreement; provided that each reference therein to a "Borrower" shall be deemed to be a reference to "each Guarantor".

IN WITNESS WHEREOF, the New Guarantor and the Collateral Agent have duly executed this Supplement to the Guarantee Agreement as of the day and year first above written.

[Name Of New Guarantor],

By: _____
Name:
Title:


CITIBANK, N.A., as Collateral Agent, on behalf of itself and the other Guaranteed Parties,

By: _____
Name:
Title:

EXHIBIT D

[*Form of Collateral Agreement*]

COLLATERAL AGREEMENT

dated as of

March 11, 2015,

among

ARGOS HOLDINGS INC,

PETSMART, INC.,

THE OTHER GRANTORS PARTY HERETO

and

CITIBANK, N.A.,

as Collateral Agent

TABLE OF CONTENTS

Page

ARTICLE I

Definitions

SECTION 1.01.    Defined Terms .................................................................................... 1
SECTION 1.02.    Other Defined Terms .......................................................................... 1

ARTICLE II

Pledge of Securities

SECTION 2.01.    Pledge........................................................................................................ 4
SECTION 2.02.    Delivery of the Pledged Collateral ...................................................... 4
SECTION 2.03.    Representations, Warranties and Covenants ...................................... 5
SECTION 2.04.    [Reserved]............................................................................................... 6
SECTION 2.05.    Registration in Nominee Name; Denominations ............................. 6
SECTION 2.06.    Voting Rights; Dividends and Interest................................................ 7
SECTION 2.07.    Certain Agreements of Grantors As Issuers and Holders of Capital Stock. .................. 8

ARTICLE III

Security Interests in Personal Property

SECTION 3.01.    Security Interest ................................................................................... 9
SECTION 3.02.    Representations and Warranties......................................................... 10
SECTION 3.03.    Covenants............................................................................................. 12
SECTION 3.04.    Other Actions ...................................................................................... 14
SECTION 3.05.    Covenants Regarding Patent, Trademark and Copyright Collateral ........................... 15

ARTICLE IV

Remedies

SECTION 4.01.    Remedies upon Default........................................................................ 16
SECTION 4.02.    Application of Proceeds ....................................................................... 17
SECTION 4.03.    Grant of License to Use Intellectual Property .................................. 17
SECTION 4.04.    Securities Act ....................................................................................... 18

ARTICLE V

Miscellaneous

SECTION 5.01.    Notices .................................................................................................. 18
SECTION 5.02.    Waivers; Amendment .......................................................................... 18
SECTION 5.03.    Collateral Agent's Fees and Expenses; Indemnification ................. 19
SECTION 5.04.    Successors and Assigns........................................................................ 20
SECTION 5.05.    Survival of Agreement ........................................................................ 20

Page

SECTION 5.06.  Counterparts; Effectiveness; Several Agreement ...........................................20
SECTION 5.07.  Severability ...................................................................................................21
SECTION 5.08.  Right of Set-Off ............................................................................................21
SECTION 5.09.  Governing Law; Jurisdiction; Consent to Service of Process; Appointment
                of Service of Process Agent .............................................................................21
SECTION 5.10.  WAIVER OF JURY TRIAL ........................................................................22
SECTION 5.11.  Headings .......................................................................................................22
SECTION 5.12.  Security Interest Absolute ............................................................................22
SECTION 5.13.  Termination or Release .................................................................................22
SECTION 5.14.  Additional Grantors ......................................................................................23
SECTION 5.15.  Collateral Agent Appointed Attorney-in-Fact ..............................................23
SECTION 5.16.  Intercreditor Agreement Governs .................................................................23
SECTION 5.17.  Effectiveness of the Acquisition ...................................................................24

Schedules

Schedule I        Grantors
Schedule II       Pledged Equity Interests; Pledged Debt Securities
Schedule III      Intellectual Property
Schedule IV       Commercial Tort Claims

Exhibits

Exhibit I         Form of Supplement
Exhibit II        Form of Copyright Security Agreement
Exhibit III       Form of Patent Security Agreement
Exhibit IV        Form of Trademark Security Agreement

LEGAL_US_E # 113937414.3

COLLATERAL AGREEMENT dated as of March 11, 2015 (this "Agreement"), among ARGOS HOLDINGS INC., PETSMART, INC., the various other GRANTORS party hereto and CITIBANK, N.A., as Collateral Agent (in such capacity and together with successors in such capacity, the "Collateral Agent").

Reference is made to the Credit Agreement dated as of March 11, 2015 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Argos Holdings Inc., a Delaware corporation ("Holdings"), PetSmart, Inc., a Delaware corporation (the "Borrower"), the Lenders party thereto and Citibank, N.A., as Administrative Agent and Collateral Agent, and the various other parties thereto.  The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  The obligations of the Lenders to extend such credit are conditioned upon, among other things, the execution and delivery of this Agreement.  The Grantors (other than the Borrower) are Affiliates of the Borrower, will derive substantial benefits from the extension of credit to the Borrower pursuant to the Credit Agreement and are willing to execute and deliver this Agreement in order to induce the Lenders to extend such credit.  Accordingly, the parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01.     Defined Terms.

(a)     Each capitalized term used but not defined herein shall have the meaning assigned thereto in the Credit Agreement; provided that each term defined in the New York UCC (as defined herein) and not defined in this Agreement shall have the meaning specified in the New York UCC.

(b)     The rules of construction specified in Section 1.03 and 1.04 of the Credit Agreement also apply to this Agreement, mutatis mutandis.

SECTION 1.02.     Other Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"Account Debtor" means any Person that is or may become obligated to any Grantor under, with respect to or on account of an Account.

"Agreement" has the meaning assigned to such term in the preamble to this Agreement.

"Article 9 Collateral" has the meaning assigned to such term in Section 3.01.

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Borrower" has the meaning assigned to such term in the introductory paragraph to this Agreement.

"Collateral" means Article 9 Collateral and Pledged Collateral.

"Copyright License" means any written agreement, now or hereafter in effect, granting to any Person any right under any Copyright now or hereafter owned by any other Person or that such other Person otherwise has the right to license, and all rights of any such Person under any such agreement.

"<u>Copyright Security Agreement</u>" means the Copyright Security Agreement substantially in the form of Exhibit II.

"<u>Copyrights</u>" means, with respect to any Person, all of the following now owned or hereafter acquired by such Person:  (a) all copyright rights in any work arising under the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, and (b) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, supplemental registrations and pending applications for registration in the United States Copyright Office (or any similar office in any other country), including, in the case of any Grantor, registrations, supplemental registrations and pending applications for registration in the United States Copyright Office set forth next to its name on Schedule III.

"<u>Credit Agreement</u>" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Excluded Equity Interests</u>" has the meaning assigned to such term in Section 2.01.

"<u>Federal Securities Laws</u>" has the meaning assigned to such term in Section 4.04.

"<u>Grantors</u>" means (a) Holdings, (b) the Borrower, (c) each other Subsidiary identified on Schedule I and (d) each Subsidiary or Intermediate Parent that becomes a party to this Agreement as a Grantor after the Effective Date.

"<u>Information Certificate</u>" means the Information Certificate dated the Effective Date delivered to the Collateral Agent, as amended, restated, supplemented or otherwise modified from time to time.

"<u>Intellectual Property</u>" means, with respect to any Person, all intellectual and similar property of every kind and nature now owned or hereafter acquired by any such Person, including inventions, designs, Patents, Copyrights, Licenses, Trademarks, trade secrets, domain names, confidential or proprietary technical and business information, know-how, show-how or other data or information, software and databases.

"<u>IP Security Agreements</u>" means the Trademark Security Agreement, the Patent Security Agreement and the Copyright Security Agreement.

"<u>License</u>" means any Patent License, Trademark License, Copyright License or other license or sublicense agreement to which any Person is a party, including those exclusive Copyright Licenses under which any Grantor is a licensee listed on Schedule III.

"<u>New York UCC</u>" means the Uniform Commercial Code as from time to time in effect in the State of New York; <u>provided</u>, <u>however</u>, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's and the Secured Parties' security interest in any item or portion of the Article 9 Collateral is governed by the Uniform Commercial Code or similar law as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"<u>Patent License</u>" means any written agreement, now or hereafter in effect, granting to any Person any right to make, use or sell any invention on which a Patent, now or hereafter owned by any

other Person or that any other Person now or hereafter otherwise has the right to license, is in existence, and all rights of any such Person under any such agreement.

"Patent Security Agreement" means the Patent Security Agreement substantially in the form of Exhibit III.

"Patents" means, with respect to any Person, all of the following now owned or hereafter acquired by such Person:  (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations thereof and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, including, in the case of any Grantor, those filed in connection therewith in the United States Patent and Trademark Office listed on Schedule III, and (b) all reissues, continuations, divisions, continuations-in-part, renewals or extensions thereof, and the inventions disclosed or claimed therein, including the right to make, use and/or sell the inventions disclosed or claimed therein.

"Pledged Collateral" has the meaning assigned to such term in Section 2.01.

"Pledged Debt Securities" has the meaning assigned to such term in Section 2.01.

"Pledged Equity Interests" has the meaning assigned to such term in Section 2.01.

"Pledged Securities" means any promissory notes, stock certificates, unit certificates, limited or unlimited liability membership certificates or other securities now or hereafter included in the Pledged Collateral, including all certificates, instruments or other documents representing or evidencing any Pledged Collateral.

"Security Interest" has the meaning assigned to such term in Section 3.01(a).

"Supplement" means an instrument in the form of Exhibit I hereto, or any other form approved by the Collateral Agent, and in each case reasonably satisfactory to the Collateral Agent.

"Trademark License" means any written agreement, now or hereafter in effect, granting to any Person any right to use any Trademark now or hereafter owned by any other Person or that any other Person otherwise has the right to license, and all rights of any such Person under any such agreement.

"Trademark Security Agreement" means the trademark security agreement in the form of Exhibit IV.

"Trademarks" means, with respect to any Person, all of the following now owned or hereafter acquired by such Person: (a) all trademarks, service marks, trade names, brand names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, domain names, logos, other source or business identifiers, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations thereof, and all registration and applications filed in connection therewith, including registrations and applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, and all extensions or renewals thereof, including, in the case of any Grantor, any registrations and applications filed in connection therewith in the United States Patent and Trademark Office set forth next to its name on Schedule III, (b) all goodwill associated therewith or symbolized thereby and (c) all other assets, rights and interests that uniquely reflect or embody such goodwill.

ARTICLE II

Pledge of Securities

SECTION 2.01.    Pledge.  As security for the payment or performance, as the case may be, in full of all Secured Obligations, each Grantor hereby assigns and pledges to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties and hereby grants to the Collateral Agent, its successor and assigns, for the benefit of the Secured Parties a security interest in the Pledged Collateral. "Pledged Collateral" shall mean the collective reference to the following: all of such Grantor's right, title and interest in, to and under (a)(i) the shares of capital stock and other Equity Interests owned by such Grantor, including those listed opposite the name of such Grantor on Schedule II, (ii) any other Equity Interests obtained in the future by such Grantor and (iii) the certificates (if any) representing all such Equity Interests (collectively, the "Pledged Equity Interests"); provided that the Pledged Equity Interests shall not include any Excluded Assets (the Equity Interests excluded pursuant to this proviso being referred to as the "Excluded Equity Interests"); (b)(i) the debt securities owned by such Grantor, including those listed opposite the name of such Grantor on Schedule II, (ii) any debt securities in the future issued to or otherwise acquired by such Grantor and (iii) the promissory notes and any other instruments evidencing all such debt securities (collectively, the "Pledged Debt Securities"); (c) all other property that may be delivered to and held by the Collateral Agent pursuant to the terms of this Section 2.01 and Section 2.02; (d) subject to Section 2.06, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other Proceeds received in respect of, the securities referred to in clauses (a) and (b) above; (e) subject to Section 2.06, all rights and privileges of such Grantor with respect to the securities and other property referred to in clauses (a), (b), (c) and (d) above; and (f) all Proceeds of any of the foregoing.

SECTION 2.02.    Delivery of the Pledged Collateral.

(a)    Each Grantor agrees to deliver or cause to be delivered to the Collateral Agent any and all Pledged Securities (other than any uncertificated securities, but only for so long as such securities remain uncertificated) (i)(A) of the Borrower on the date hereof to the extent received from the Target so long as Holdings has used commercially reasonable efforts to obtain such certificates and (B) all other Pledged Securities, as promptly as practicable, and in any event within 5 days after the Effective Date (or such later date as the Collateral Agent may reasonably agree) in each case, in the case of any such Pledged Securities owned by such Grantor on the date hereof, and (ii) promptly (and in any event within 60 days or such later date as the Collateral Agent reasonably agrees) after the acquisition thereof, in the case of any such Pledged Securities acquired by such Grantor after the date hereof.

(b)    As promptly as practicable, and in any event within 30 days after the Effective Date, each Grantor will cause any Indebtedness for borrowed money (including in respect of cash management arrangements) owed to such Grantor by Holdings, the Borrower or any Subsidiary in a principal amount in excess of $10,000,000 to be evidenced by a duly executed promissory note (including, if such security interest can be perfected therein, a grid note) that is pledged and delivered to the Collateral Agent pursuant to the terms hereof.

(c)    Upon delivery to the Collateral Agent, (i) any certificate or promissory note representing Pledged Securities shall be accompanied by undated stock or note powers, as applicable, duly executed in blank or other undated instruments of transfer duly executed in blank and reasonably satisfactory to the Collateral Agent and by such other instruments and documents as the Collateral Agent may reasonably request and (ii) all other property comprising part of the Pledged Collateral shall be accompanied by undated proper instruments of assignment duly executed in blank by the applicable Grantor and

-4-

such other instruments and documents as the Collateral Agent may reasonably request. Each delivery of Pledged Securities shall be accompanied by a schedule describing such Pledged Securities, which schedule shall be deemed attached to, and shall supplement, Schedule II and be made a part hereof; provided that failure to provide any such schedule hereto shall not affect the validity of such pledge of such Pledged Securities.

(d)    Any equity interest in any limited liability company or limited partnership controlled by any Grantor and required to be pledged and/or otherwise secured under Section 2.01 shall either (i) be represented by a certificate, shall be a "security" within the meaning of Article 8 of the New York UCC, and shall be delivered to the Collateral Agent or (ii) not have elected to be treated as a "security" within the meaning of Article 8 of the New York UCC and shall not be represented by a certificate. To the extent an interest in any limited liability company or limited partnership controlled by any Grantor and pledged and/or otherwise secured under Section 2.01 is certificated or becomes certificated, (i) each such certificate shall be delivered to the Collateral Agent, pursuant to Section 2.02(a) and (ii) such Grantor shall fulfill all other requirements under Section 2.02 applicable in respect thereof.

(e)    With respect to (i) (A) any Pledged Equity Interests constituting an uncertificated security or (B) any Pledged Collateral held by a clearing corporation, securities intermediary or other financial intermediary of any kind, in each case, at the Collateral Agent's reasonable request, the relevant Grantor shall execute and deliver and use commercially reasonable efforts to cause, in the case of the foregoing clause (A), any issuer thereof, or, in the case of the foregoing clause (B), the applicable intermediary to execute and deliver an agreement among such Grantor, the Collateral Agent and such issuer or intermediary in form and substance reasonably satisfactory to the Collateral Agent which provides, among other things, for the issuer's or intermediary's agreement that it will comply with instructions or entitlement orders, as applicable, and apply any value distributed on account of any such Pledged Equity Interest or Pledged Collateral, as directed by the Collateral Agent without further consent by such Grantor and (ii) any partnership interest or limited liability company interest of any Grantor (other than a partnership interest or limited liability company interest held by a Clearing Corporation, Securities Intermediary or other financial intermediary of any kind) constituting Pledged Collateral not represented by a certificate and/or which is not a Security for purposes of the UCC, such Grantor shall not permit any issuer of such partnership interests or limited liability company interests to (A) enter into any agreement with any Person, other than the Collateral Agent, whereby such issuer effectively delivers "control" of such partnership interests or limited liability company interests (as applicable) under the UCC to such Person, or (B) allow such partnership interests or limited liability company interests (as applicable) to become Securities unless such Grantor complies with the procedures set forth herein.

SECTION 2.03.    Representations, Warranties and Covenants. The Grantors jointly and severally represent, warrant and covenant to and with the Collateral Agent, for the benefit of the Secured Parties, that:

(a)    as of the Effective Date, Schedule II sets forth a true and complete list, with respect to each Grantor, of (i) all the Equity Interests owned by such Grantor in any Subsidiary and the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Equity Interests owned by such Grantor and (ii) all the Pledged Debt Securities owned by such Grantor;

(b)    the Pledged Equity Interests and the Pledged Debt Securities have been duly and validly authorized and issued by the issuers thereof and (i) in the case of Pledged Equity Interests, are fully paid and nonassessable and (ii) in the case of Pledged Debt Securities, are legal, valid and binding obligations of the issuers thereof, except to the extent that enforceability of such obligations may be limited by applicable bankruptcy, insolvency, and other similar laws affecting

creditor's rights generally; <u>provided</u> that the foregoing representations, insofar as they relate to the Pledged Debt Securities issued by a Person other than Holdings, the Borrower or any Subsidiary, are made to the knowledge of the Grantors;

(c)      except for the security interests granted hereunder and under any other Loan Documents, each of the Grantors (i) is and, subject to any transfers made in compliance with the Credit Agreement, will continue to be the direct owner, beneficially and of record, of the Pledged Securities indicated on Schedule II as owned by such Grantor, (ii) holds the same free and clear of all Liens, other than Liens permitted pursuant to Section 6.02 of the Credit Agreement and transfers made in compliance with the Credit Agreement, (iii) will make no further assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Pledged Collateral, other than Liens permitted pursuant to Section 6.02 of the Credit Agreement and transfers made in compliance with the Credit Agreement, and (iv) will defend its title or interest thereto or therein against any and all Liens (other than the Liens created by this Agreement and the other Loan Documents and Liens permitted pursuant to Section 6.02 of the Credit Agreement), however arising, of all Persons whomsoever;

(d)      except for restrictions and limitations imposed by the Loan Documents or securities laws generally, the Pledged Equity Interests and, to the extent issued by Holdings, the Borrower or any Subsidiary, the Pledged Debt Securities are and will continue to be freely transferable and assignable, and none of the Pledged Equity Interests and, to the extent issued by Holdings, the Borrower or any Subsidiary, the Pledged Debt Securities are or will be subject to any option, right of first refusal, shareholders agreement, charter, by-law or other organizational document provisions or contractual restriction of any nature that might prohibit, impair, delay or otherwise affect in any manner adverse to the Secured Parties in any material respect the pledge of such Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Collateral Agent of rights and remedies hereunder;

(e)      each of the Grantors has the power and authority to pledge the Pledged Collateral pledged by it hereunder in the manner hereby done or contemplated; and

(f)      by virtue of the execution and delivery by the Grantors of this Agreement, when any Pledged Securities are delivered to the Collateral Agent in accordance with this Agreement, the Collateral Agent will obtain a legal, valid and perfected lien upon and security interest in such Pledged Securities, free of any adverse claims, under the New York UCC to the extent such lien and security interest may be created and perfected under the New York UCC, as security for the payment and performance of the Secured Obligations.

SECTION 2.04.      [Reserved].

SECTION 2.05.      <u>Registration in Nominee Name; Denominations</u>.  If an Event of Default shall have occurred and is continuing and the Collateral Agent shall have notified the Grantors of its intent to exercise such rights, the Collateral Agent, on behalf of the Secured Parties, shall have the right (in its sole and absolute discretion) to hold the Pledged Securities in the name of the applicable Grantor, endorsed or assigned in blank or in favor of the Collateral Agent or in its own name as pledgee or in the name of its nominee (as pledgee or as sub-agent), and each Grantor will promptly give to the Collateral Agent copies of any notices or other communications received by it with respect to Pledged Securities registered in the name of such Grantor.  If an Event of Default shall have occurred and is continuing and the Collateral Agent shall have notified the Grantors of its intent to exercise such rights, the Collateral Agent shall at all times have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any reasonable purpose consistent with this Agreement.

LEGAL_US_E # 113937414.3

SECTION 2.06.    Voting Rights; Dividends and Interest.

(a)    Unless and until an Event of Default shall have occurred and is continuing and the Collateral Agent shall have notified the Grantors that their rights under this Section 2.06 are being suspended:

(i)    each Grantor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Securities or any part thereof for any purpose consistent with the terms of this Agreement, the Credit Agreement and the other Loan Documents; provided that such rights and powers shall not be exercised in any manner that could materially and adversely affect the rights inuring to a holder of any Pledged Securities or the rights the rights and remedies of any of the Collateral Agent or the other Secured Parties under this Agreement or any other Loan Document or the ability of the Secured Parties to exercise the same;

(ii)    the Collateral Agent shall promptly execute and deliver to each Grantor, or cause to be promptly executed and delivered to such Grantor, all such proxies, powers of attorney and other instruments as such Grantor may reasonably request for the purpose of enabling such Grantor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section;

(iii)    each Grantor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Securities to the extent and only to the extent that such dividends, interest, principal and other distributions are permitted by, and are otherwise paid or distributed in accordance with, the terms and conditions of the Credit Agreement, the other Loan Documents and applicable laws; provided that any non-cash dividends, interest, principal or other distributions that would constitute Pledged Equity Interests or Pledged Debt Securities, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests in the issuer of any Pledged Securities or received in exchange for Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral and, if received by any Grantor, shall not be commingled by such Grantor with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Collateral Agent and the other Secured Parties and shall be forthwith delivered to the Collateral Agent in the same form as so received (with any necessary endorsements, stock or note powers and other instruments of transfer reasonably requested by the Collateral Agent).

(b)    Upon the occurrence and during the continuance of an Event of Default, after the Collateral Agent shall have notified the Grantors of the suspension of their rights under paragraph (a)(iii) of this Section 2.06, all rights of any Grantor to dividends, interest, principal or other distributions that such Grantor is authorized to receive pursuant to paragraph (a)(iii) of this Section 2.06 shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions.  All dividends, interest, principal or other distributions received by any Grantor contrary to the provisions of this Section 2.06 shall be held in trust for the benefit of the Collateral Agent and the other Secured Parties, shall be segregated from other property or funds of such Grantor and shall be forthwith delivered to the Collateral Agent upon demand in the same form as so received (with any necessary endorsements, stock or note powers and other instruments of transfer reasonably requested by the Collateral Agent).  Any and all money and other property paid over to or received by the Collateral Agent pursuant to the provisions of this paragraph (b) shall be retained by the Collateral Agent in an account to be established by the Collateral Agent upon receipt of such money or other property and shall be applied in accordance

-7-

with the provisions of Section 4.02.  After all Events of Default have been cured or waived and the Borrower has delivered to the Collateral Agent a certificate of a Responsible Officer of the Borrower to that effect, the Collateral Agent shall promptly repay to each Grantor (without interest) all dividends, interest, principal or other distributions that such Grantor would otherwise be permitted to retain pursuant to the terms of paragraph (a)(iii) of this Section 2.06 and that remain in such account.

(c)     Upon the occurrence and during the continuance of an Event of Default, after the Collateral Agent shall have notified the Grantors of the suspension of their rights under paragraph (a)(i) of this Section 2.06, all rights of any Grantor to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section 2.06, and the obligations of the Collateral Agent under paragraph (a)(ii) of this Section 2.06, shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers; provided that, unless otherwise directed by the Required Lenders, the Collateral Agent shall have the right from time to time following and during the continuance of an Event of Default to permit the Grantors to exercise such rights.  After all Events of Default have been cured or waived and the Borrower has delivered to the Collateral Agent a certificate of a Responsible Officer of the Borrower to that effect, all rights vested in the Collateral Agent pursuant to this paragraph (c) shall cease, and the Grantors shall have the exclusive right to exercise the voting and consensual rights and powers they would otherwise be entitled to exercise pursuant to paragraph (a)(i) of this Section 2.06.

(d)     Any notice given by the Collateral Agent to the Grantors suspending their rights under paragraph (a) of this Section 2.06 (i) may be given by telephone if promptly confirmed in writing, (ii) may be given with respect to one or more of the Grantors at the same or different times and (iii) may suspend the rights of the Grantors under paragraph (a)(i) or paragraph (a)(iii) in part without suspending all such rights (as specified by the Collateral Agent in its sole and absolute discretion) and without waiving or otherwise affecting the Collateral Agent's rights to give additional notices from time to time suspending other rights so long as an Event of Default has occurred and is continuing.

SECTION 2.07.     Certain Agreements of Grantors As Issuers and Holders of Capital Stock.

(a)     In the case of each Grantor which is an issuer of Pledged Collateral, such Grantor agrees to be bound by the terms of this Agreement relating to the Pledged Collateral issued by it and will comply with such terms insofar as such terms are applicable to it and will comply with instructions or entitlement orders with respect to such Pledged Collateral which are uncertificated securities as directed by the Collateral Agent without further consent by such Grantor.

(b)     In the case of each Grantor which is a partner, shareholder or member, as the case may be, in a partnership, limited liability company or other entity, such Grantor hereby consents to the extent required by the applicable Organizational Document to the pledge by each other Grantor, pursuant to the terms hereof, of the Pledged Collateral in such partnership, limited liability company or other entity and, upon the occurrence and during the continuance of an Event of Default (after notice if applicable), to the transfer of such Pledged Collateral to the Collateral Agent or its nominee and to the substitution of the Collateral Agent or its nominee as a substituted partner, shareholder or member in such partnership, limited liability company or other entity with all the rights, powers and duties of a general partner, limited partner, shareholder or member, as the case may be.

ARTICLE III

Security Interests in Personal Property

SECTION 3.01.     Security Interest.

(a)     As security for the payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest (the "Security Interest") in all of such Grantor's right, title and interest in, to and under any and all of the following assets now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "Article 9 Collateral"):

(I)     all Accounts;

(II)     all Chattel Paper;

(III)     all cash, Deposit Accounts, Securities Accounts and Commodity Accounts;

(IV)     all Documents;

(V)     all Supporting Obligations;

(VI)     all Equipment;

(VII)     all General Intangibles, including all Intellectual Property;

(VIII)     all Instruments;

(IX)     all Inventory;

(X)     all other Goods and Fixtures;

(XI)     all Investment Property;

(XII)     all Letter-of-Credit Rights;

(XIII)     all Commercial Tort Claims specifically described on Schedule IV hereto, as such schedule may be supplemented from time to time pursuant to Section 3.04(d);

(XIV)     all books and records pertaining to the Article 9 Collateral; and

(XV)     to the extent not otherwise included, all Proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing;

provided that in no event shall the Security Interest attach to (A) any Excluded Assets and (B) the Excluded Equity Interests (it being understood that, to the extent the Security Interest shall not have attached to any such asset as a result of clauses (A) and (B) above, the term "Article 9 Collateral" shall not include any such asset).

-9-

(b)    Each Grantor hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file in any relevant jurisdiction any initial financing statements (including fixture filings) with respect to the Article 9 Collateral or any part thereof and amendments thereto that (i) describe the collateral covered thereby in any manner that the Collateral Agent reasonably determines is necessary or advisable to ensure the perfection of the security interest in the Article 9 Collateral granted under this Agreement, including indicating the Collateral as "all assets" of such Grantor or words of similar effect, and (ii) contain the information required by Article 9 of the Uniform Commercial Code or the analogous legislation of each applicable jurisdiction for the filing of any financing statement or amendment, including (A) whether such Grantor is an organization, the type of organization and any organizational identification number issued to such Grantor and (B) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which such Article 9 Collateral relates.  Each Grantor agrees to provide such information to the Collateral Agent promptly upon request.

Each Grantor also ratifies its authorization for the Collateral Agent to file in any relevant jurisdiction any initial financing statements or amendments thereto with respect to the Article 9 Collateral or any part thereof naming any Grantor as debtor or the Grantors as debtors and the Collateral Agent as secured party, if filed prior to the date hereof.

The Collateral Agent is further authorized to file with the United States Patent and Trademark Office or United States Copyright Office (or any successor office) such documents as may be reasonably necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest in Article 9 Collateral consisting of Patents, Trademarks or Copyrights granted by each Grantor and naming any Grantor or the Grantors as debtors and the Collateral Agent as secured party.  No Grantor shall be required to complete any filings or other action with respect to the perfection of the Security Interests created hereby in any Intellectual Property subsisting in any jurisdiction outside of the United States.

(c)    The Security Interest and the security interest granted pursuant to Article II are granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Collateral.

SECTION 3.02.    Representations and Warranties.  The Grantors jointly and severally represent and warrant to the Collateral Agent, for the benefit of the Secured Parties, that:

(a)    Each Grantor has good and valid rights in and title to the Article 9 Collateral with respect to which it has purported to grant a Security Interest hereunder, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes, in each case except where the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and has full power and authority to grant to the Collateral Agent, for the benefit of the Secured Parties, the Security Interest in such Article 9 Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other Person other than any consent or approval that has been obtained and except to the extent that failure to obtain or make such consent or approval, as the case may be, individually or in aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)    The Information Certificate has been duly prepared, completed and executed and the information set forth therein, including the exact legal name and jurisdiction of organization of each Grantor, is correct and complete in all material respects as of the Effective Date (except

-10-

that the information therein with respect to the exact legal name of each Grantor shall be true and correct in all respects). The Uniform Commercial Code financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations prepared by the Collateral Agent based upon the information provided to the Collateral Agent in the Information Certificate for filing in each governmental, municipal or other office specified in Schedule 2 to the Information Certificate (or specified by notice from the Borrower to the Collateral Agent after the Effective Date in the case of filings, recordings or registrations required by Section 5.03 or 5.12 of the Credit Agreement), are all the filings, recordings and registrations (other than filings required to be made in the United States Patent and Trademark Office and the United States Copyright Office in order to perfect the Security Interest in Article 9 Collateral consisting of United States Patents, Trademarks and Copyrights) that are necessary to establish a legal, valid and perfected security interest in favor of the Collateral Agent, for the benefit of the Secured Parties, in respect of all Article 9 Collateral in which the Security Interest may be perfected by filing, recording or registration in the United States (or any political subdivision thereof) and its territories and possessions, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary in any such jurisdiction, except as provided under applicable law with respect to the filing of continuation statements (other than such actions as are necessary to perfect the Security Interest with respect to any Article 9 Collateral consisting of registered or applied for Patents, Trademarks and Copyrights acquired or developed by a Grantor after the date hereof). The Grantors represent and warrant that a fully executed Patent Security Agreement, Trademark Security Agreement and Copyright Security Agreement, in each case containing a description of the Article 9 Collateral consisting of United States registered Patents, United States registered Trademarks and United States registered Copyrights (and applications for any of the foregoing), as applicable, and executed by each Grantor owning any such Article 9 Collateral, have been delivered to the Collateral Agent for recording with the United States Patent and Trademark Office or the United States Copyright Office pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 or 17 U.S.C. § 205 and the regulations thereunder, as applicable, and otherwise as may be required pursuant to the laws of any other necessary jurisdiction, to protect the validity of and to establish a legal, valid and perfected security interest in favor of the Collateral Agent, for the benefit of the Secured Parties, in respect of all Article 9 Collateral consisting of Patents, Trademarks and Copyrights in which a security interest may be perfected by filing, recording or registration in the United States (or any political subdivision thereof) and its territories and possessions, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary (other than such actions as are necessary to perfect the Security Interest with respect to any Article 9 Collateral consisting of registered or applied for Patents, Trademarks and Copyrights acquired or developed by a Grantor after the date hereof).

(c)    The Security Interest constitutes (i) a legal and valid security interest in all the Article 9 Collateral securing the payment and performance of the Secured Obligations, (ii) subject to the filings described in paragraph (b) of this Section 3.02, a perfected security interest in all Article 9 Collateral in which a security interest may be perfected by filing, recording or registering a financing statement or analogous document in the United States (or any political subdivision thereof) and its territories and possessions pursuant to the Uniform Commercial Code or other applicable law in such jurisdictions and (iii) subject to the filings described in paragraph (b) of this Section 3.02, a security interest that shall be perfected in all Article 9 Collateral in which a security interest may be perfected upon the receipt and recording of a Patent Security Agreement, a Trademark Security Agreement and a Copyright Security Agreement with the United States Patent and Trademark Office and the United States Copyright Office, as applicable, within the three-month period after the date hereof pursuant to 35 U.S.C. § 261 or 15 U.S.C. § 1060 or the one-month period after the date hereof pursuant to 17 U.S.C. § 205.

-11-

(d)    The Security Interest is and shall be prior to any other Lien on any of the Article 9 Collateral, other than Liens permitted pursuant to Section 6.02 of the Credit Agreement. The Article 9 Collateral is owned by the Grantors free and clear of any Lien, except for Liens expressly permitted pursuant to Section 6.02 of the Credit Agreement.  None of the Grantors has filed or consented to the filing of (i) any financing statement or analogous document under the Uniform Commercial Code or any other applicable laws covering any Article 9 Collateral, (ii) any assignment in which any Grantor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with the United States Patent and Trademark Office or the United States Copyright Office or (iii) any assignment in which any Grantor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with any foreign governmental, municipal or other office, which financing statement or analogous document, assignment, security agreement or similar instrument is still in effect, except, in each case, for Liens expressly permitted pursuant to Section 6.02 of the Credit Agreement.

SECTION 3.03.    <u>Covenants</u>.

(a)    Each Grantor shall, at its own expense, take any and all commercially reasonable actions necessary to defend title to the Article 9 Collateral against all Persons, except with respect to Article 9 Collateral that such Grantor determines in its reasonable business judgment is no longer necessary or beneficial to the conduct of such Grantor's business, and to defend the Security Interest of the Collateral Agent in the Article 9 Collateral and the priority thereof against any Lien not permitted pursuant to Section 6.02 of the Credit Agreement, subject to Section 6.05 of the Credit Agreement and the rights of such Grantor under Section 9.15 of the Credit Agreement and corresponding provisions of the Security Documents to obtain a release of the Liens created under the Security Documents.

(b)    Each Grantor agrees, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as the Collateral Agent may from time to time reasonably request to better assure, preserve, protect and perfect the Security Interest and the rights and remedies created hereby, including the payment of any fees and Taxes required in connection with the execution and delivery of this Agreement, the granting of the Security Interest and the filing of any financing statements (including fixture filings) or other documents in connection herewith or therewith.  If any amount payable under or in connection with any of the Article 9 Collateral shall be or become evidenced by any promissory note (which may be a global note) or other instrument (other than any promissory note or other instrument in an aggregate principal amount of less than $10,000,000 owed to the applicable Grantor by any Person), such note or instrument shall be promptly (but in any event within 60 days of receipt by such Grantor or such longer period as the Collateral Agent may agree in its reasonable discretion) pledged and delivered to the Collateral Agent, for the benefit of the Secured Parties, together with an undated instrument of transfer duly executed in blank and in a manner reasonably satisfactory to the Collateral Agent.

Without limiting the generality of the foregoing, each Grantor hereby authorizes the Collateral Agent, with prompt written notice thereof to the Grantors, to supplement this Agreement by supplementing Schedule III or adding additional schedules hereto to identify specifically any asset or item that may constitute an application or registration for any Copyright, Patent or Trademark; <u>provided</u> that any Grantor shall have the right, exercisable within 10 days (or such longer period as shall be agreed by the Borrower and the Collateral Agent) after it has been notified in writing by the Collateral Agent of the specific identification of such Collateral, to advise the Collateral Agent in writing of any inaccuracy (i) with respect to such supplement or additional schedule or (ii) of the representations and warranties made by such Grantor hereunder with respect to such Collateral.  Each Grantor agrees that, at the reasonable request of the Collateral Agent, it will use commercially reasonable efforts to take such action as shall be

-12-

reasonably necessary in order that all representations and warranties hereunder shall be true and correct with respect to such Collateral within 10 days (or such longer period as shall be agreed by the Borrower and the Collateral Agent) after the date it has been notified in writing by the Collateral Agent of the specific identification of such Collateral.

In the event that any such Grantor, whether by acquisition, assignment, filing or otherwise, acquires any right in Intellectual Property (including, without limitation, continuation-in-part patent applications) after the date hereof (collectively, the "After-Acquired Intellectual Property"), such After-Acquired Intellectual Property shall automatically be included as part of the Collateral and shall be subject to the terms and conditions of this Agreement. Promptly upon the end of each fiscal quarter, but no later than 10 days therefrom, such Grantor shall (i) provide the Collateral Agent an updated Schedule III identifying the After-Acquired Intellectual Property issued by, registered with or filed in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, acquired during such fiscal quarter; and (ii) promptly execute and file with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, supplements to Exhibits II, II or IV, as applicable, to record the grant of the security interest hereunder in such After-Acquired Intellectual Property. As soon as practicable upon each such filing and recording, such Grantor shall deliver to the Collateral Agent true and correct copies of the relevant documents, instruments and receipts evidencing such filing and recording.

(c)    If an Event of Default shall have occurred and is continuing and the Collateral Agent shall have notified the Grantors of its intent to exercise such rights, at its option, the Collateral Agent may discharge past due taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the Article 9 Collateral and not permitted pursuant to Section 6.02 of the Credit Agreement, and may pay for the maintenance and preservation of the Article 9 Collateral to the extent any Grantor fails to do so as required by the Credit Agreement, this Agreement or any other Loan Document and within a reasonable period of time after the Collateral Agent has requested that it do so, and each Grantor jointly and severally agrees to reimburse the Collateral Agent, within 10 days after demand, for any reasonable payment made or any reasonable expense incurred by the Collateral Agent pursuant to the foregoing authorization; provided that nothing in this paragraph shall be interpreted as excusing any Grantor from the performance of, or imposing any obligation on the Collateral Agent or any Secured Party to cure or perform, any covenants or other promises of any Grantor with respect to taxes, assessments, charges, fees, Liens, security interests or other encumbrances and maintenance as set forth herein or in the other Loan Documents.

(d)    Each Grantor shall remain liable, as between such Grantor and the relevant counterparty under each contract, agreement or instrument relating to the Article 9 Collateral, to observe and perform all the conditions and obligations to be observed and performed by it under such contract, agreement or instrument, all in accordance with the terms and conditions thereof, and each Grantor jointly and severally agrees to indemnify and hold harmless the Collateral Agent and the other Secured Parties from and against any and all liability for such performance.

(e)    It is understood that no Grantor shall be required by this Agreement to perfect the security interests created hereunder by any means other than (i) filings pursuant to the Uniform Commercial Code, (ii) filings with the United States Patent and Trademark Office or United States Copyright Office (or any successor office) in respect of registered Intellectual Property (provided that, with respect to Licenses, such filings shall be limited to exclusive Copyright Licenses under which such Grantor is a licensee) and (iii) in the case of Collateral that constitutes Tangible Chattel Paper, Pledged Securities, Instruments, Certificated Securities or Negotiable Documents, delivery thereof to the Collateral Agent in accordance with the terms hereof (together with, where applicable, undated stock or note powers or other undated proper instruments of assignment) and  in the case of Collateral that constitutes Pledged Equity

Interests that are not represented by a certificate, the actions provided in Article II hereof. No Grantor shall be required to deliver control agreements with respect to Deposit Accounts and other bank or securities accounts.

(f) Each Grantor irrevocably makes, constitutes and appoints the Collateral Agent (and all officers, employees or agents designated by the Collateral Agent) as such Grantor's true and lawful agent (and attorney-in-fact) for the purpose, upon the occurrence and during the continuance of an Event of Default and after notice to the Borrower of its intent to exercise such rights, of making, settling and adjusting claims in respect of Article 9 Collateral under policies of insurance, endorsing the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto. In the event that any Grantor at any time or times shall fail to obtain or maintain any of the policies of insurance required hereby or to pay any premium in whole or part relating thereto, the Collateral Agent may, without waiving or releasing any obligation or liability of the Grantors hereunder or any Default or Event of Default, in its sole discretion, obtain and maintain such policies of insurance and pay such premium and take any other actions with respect thereto as the Collateral Agent reasonably deems advisable. All sums disbursed by the Collateral Agent in connection with this paragraph, including reasonable out-of-pocket attorneys' fees, court costs, expenses and other charges relating thereto, shall be payable, within 10 days of demand, by the Grantors to the Collateral Agent and shall be additional Secured Obligations secured hereby.

SECTION 3.04.    Other Actions. In order to further insure the attachment, perfection and priority of, and the ability of the Collateral Agent to enforce, the Security Interest, each Grantor agrees, in each case at such Grantor's own expense, to take the following actions with respect to the following Article 9 Collateral:

(a) Instruments. If any Grantor shall at any time hold or acquire any Instruments constituting Collateral (other than Instruments with a face amount of less than $10,000,000 and other than checks to be deposited in the ordinary course of business), such Grantor shall promptly (but in any event within 60 days of receipt by such Grantor or such longer period as the Collateral Agent may agree in its reasonable discretion) endorse, assign and deliver the same to the Collateral Agent, accompanied by such undated instruments of transfer or assignment duly executed in blank as the Collateral Agent may from time to time reasonably request.

(b) Investment Property. Except to the extent otherwise provided in Article II, if any Grantor shall at any time hold or acquire any certificated securities, such Grantor shall forthwith endorse, assign and deliver the same to the Collateral Agent, accompanied by such undated instruments of transfer or assignment duly executed in blank as the Collateral Agent may from time to time reasonably request. In the case of Collateral that constitutes Pledged Equity Interests that are not represented by a certificate, each Grantor shall forthwith take all actions with respect to such Pledged Equity Interests as provided by Article II hereof.

(c) Letter-of-Credit Rights. If any Grantor is at any time a beneficiary under a letter of credit with an aggregate face amount in excess of $10,000,000 now or hereafter issued in favor of such Grantor that is not a Supporting Obligation with respect to any of the Collateral, such Grantor shall promptly notify the Collateral Agent thereof and, at the request and option of the Collateral Agent, such Grantor shall, pursuant to an agreement in form and substance reasonably satisfactory to the Collateral Agent, either (i) use commercially reasonable efforts to arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Collateral Agent of the proceeds of any drawing under such letter of credit or (ii) use commercially reasonable efforts to arrange for the Collateral Agent to become the transferee beneficiary of such letter of credit, with the Collateral Agent agreeing, in each case, that the proceeds of any drawing under

-14-

such letter of credit are to be paid to the applicable Grantor unless an Event of Default has occurred and is continuing.

(d)    Commercial Tort Claims.  If any Grantor shall at any time hold or acquire a Commercial Tort Claim in an amount reasonably estimated to exceed $10,000,000, such Grantor shall promptly notify the Collateral Agent thereof in a writing signed by such Grantor, including a summary description of such claim, and Schedule IV shall be deemed to be supplemented to include such description of such commercial tort claim as set forth in such writing.

SECTION 3.05.    Covenants Regarding Patent, Trademark and Copyright Collateral.

(a)    Except to the extent failure to so act could not reasonably be expected to have a Material Adverse Effect of the type referred to in clause (a) or (b) of the definition of such term in the Credit Agreement and subject to Section 6.05 of the Credit Agreement, with respect to registration or pending application of each item of its Intellectual Property for which such Grantor has standing to do so, each Grantor agrees (i) to maintain the validity and enforceability of any registered Intellectual Property (or applications therefor) and to maintain such registrations and applications of Intellectual Property in full force and effect and (ii) to pursue the registration and maintenance of each Patent, Trademark or Copyright registration or application, now or hereafter included in the Intellectual Property of such Grantor, including the payment of required fees and taxes, the filing of responses to office actions issued by the U.S. Patent and Trademark Office, the U.S. Copyright Office or other governmental authorities, the filing of applications for renewal or extension, the filing of affidavits under Sections 8 and 15 of the U.S. Trademark Act, the filing of divisional, continuation, continuation-in-part, reissue and renewal applications or extensions, the payment of maintenance fees and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings.

(b)    Except as could not reasonably be expected to have a Material Adverse Effect of the type referred to in clause (a) or (b) of the definition of such term in the Credit Agreement and subject to section 6.05 of the Credit Agreement, no Grantor shall do or permit any act or knowingly omit to do any act whereby any of its Intellectual Property may lapse, be terminated, or become invalid or unenforceable or placed in the public domain (or in case of a trade secret, lose its competitive value).

(c)    Except where failure to do so could not reasonably be expected to have a Material Adverse Effect of the type referred to in clause (a) or (b) of the definition of such term in the Credit Agreement and subject to section 6.05 of the Credit Agreement, each Grantor shall take all steps to preserve and protect each item of its Intellectual Property, including maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks, consistent with the quality of the products and services as of the date hereof, and taking all steps necessary to ensure that all licensed users of any of the Trademarks abide by the applicable license's terms with respect to the standards of quality.

(d)    Each Grantor agrees that, should it obtain an ownership or other interest in any Intellectual Property after the Effective Date, (i) the provisions of this Agreement shall automatically apply thereto and (ii) any such Intellectual Property and, in the case of Trademarks, the goodwill symbolized thereby, shall automatically become Intellectual Property subject to the terms and conditions of this Agreement.

(e)    Nothing in this Agreement shall prevent any Grantor from disposing of, discontinuing the use or maintenance of, failing to pursue or otherwise allowing to lapse, terminate or put into the public domain any of its Intellectual Property to the extent permitted by the Credit Agreement if such

Grantor determines in its reasonable business judgment that such discontinuance is desirable in the conduct of its business.

ARTICLE IV

Remedies

SECTION 4.01.    Remedies upon Default.  If an Event of Default shall have occurred and is continuing and the Collateral Agent shall have notified the Grantors of its intent to exercise such rights, each Grantor agrees to deliver, on demand, each item of Collateral to the Collateral Agent or any Person designated by the Collateral Agent, and it is agreed that the Collateral Agent shall have the right to take any of or all the following actions at the same or different times:  (a) with respect to any Article 9 Collateral consisting of Intellectual Property, on demand, to cause the Security Interest to become an assignment, transfer and conveyance of any of or all such Article 9 Collateral by the applicable Grantors to the Collateral Agent, for the benefit of the Secured Parties, or to license or sublicense, whether on an exclusive or nonexclusive basis, any such Article 9 Collateral throughout the world on such terms and conditions and in such manner as the Collateral Agent shall determine (other than in violation of any then-existing licensing arrangements to the extent that waivers cannot be obtained) and (b) with or without legal process and with or without demand for performance but with notice (which need not be prior notice), to take possession of the Article 9 Collateral and the Pledged Collateral and without liability for trespass to enter any premises where the Article 9 Collateral or the Pledged Collateral may be located for the purpose of taking possession of or removing the Article 9 Collateral and the Pledged Collateral and, generally, to exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law.  Without limiting the generality of the foregoing, each Grantor agrees that the Collateral Agent shall have the right, subject to the mandatory requirements of applicable law and the notice requirements described below, to sell or otherwise dispose of all or any part of the Collateral at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Collateral Agent shall deem appropriate.  The Collateral Agent shall be authorized at any such sale of securities (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to Persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold.  Each such purchaser at any sale of Collateral shall hold the property sold absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by law) all rights of redemption, stay and appraisal that such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

The Collateral Agent shall give the applicable Grantors no less than 10 days' written notice (which each Grantor agrees is reasonable notice within the meaning of Section 9-611 of the New York UCC or its equivalent in other jurisdictions) of the Collateral Agent's intention to make any sale of Collateral.  Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral or portion thereof, will first be offered for sale at such board or exchange.  Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice (if any) of such sale.  At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion) determine.  The Collateral Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given.  The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale

-16-

may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Collateral Agent until the sale price is paid by the purchaser or purchasers thereof, but the Collateral Agent and the other Secured Parties shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, any Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of any Grantor (all said rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to such Secured Party from any Grantor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Grantor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Collateral Agent shall be free to carry out such sale pursuant to such agreement and no Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Collateral Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Secured Obligations paid in full. As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Any sale pursuant to the provisions of this Section 4.01 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the New York UCC or its equivalent in other jurisdictions.

SECTION 4.02.    Application of Proceeds.  Subject to any applicable Intercreditor Agreement, the Collateral Agent shall apply the proceeds of any collection or sale of Collateral, including any Collateral consisting of cash, in accordance with Section 7.02 of the Credit Agreement.

The Collateral Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement. Upon any sale of Collateral by the Collateral Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof.

SECTION 4.03.    Grant of License to Use Intellectual Property.  For the purpose of enabling the Collateral Agent to exercise rights and remedies under this Agreement, each Grantor, solely during the continuance of an Event of Default, grants to the Collateral Agent an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to the Grantors) to use, license or sublicense any of the Collateral consisting of Intellectual Property now owned or hereafter acquired by such Grantor, and wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof to the extent that such non-exclusive license (a) does not violate the express terms of any agreement between a Grantor and a third party governing the applicable Grantor's use of such Collateral consisting of Intellectual Property, or gives such third party any right of acceleration, modification or cancellation therein and (b) is not prohibited by any Requirements of Law; provided that such licenses to be granted hereunder with respect to Trademarks shall be subject to the maintenance of quality standards with respect to the goods and services on which such Trademarks are used sufficient to preserve the validity of such Trademarks. The use of such license by the Collateral Agent may only be exercised, at the option of the Collateral Agent, during the continuation

of an Event of Default; provided further that any license, sublicense or other transaction entered into by the Collateral Agent in accordance herewith shall be binding upon the Grantors notwithstanding any subsequent cure of an Event of Default.

SECTION 4.04.     Securities Act.  In view of the position of the Grantors in relation to the Pledged Collateral, or because of other current or future circumstances, a question may arise under the Securities Act of 1933, as now or hereafter in effect, or any similar statute hereafter enacted analogous in purpose or effect (such Act and any such similar statute as from time to time in effect being called the "Federal Securities Laws") with respect to any disposition of the Pledged Collateral permitted hereunder.  Each Grantor understands that compliance with the Federal Securities Laws might very strictly limit the course of conduct of the Collateral Agent if the Collateral Agent were to attempt to dispose of all or any part of the Pledged Collateral, and might also limit the extent to which or the manner in which any subsequent transferee of any Pledged Collateral could dispose of the same.  Similarly, there may be other legal restrictions or limitations affecting the Collateral Agent in any attempt to dispose of all or part of the Pledged Collateral under applicable blue sky or other state securities laws or similar laws analogous in purpose or effect.  Each Grantor recognizes that in light of such restrictions and limitations the Collateral Agent may, with respect to any sale of the Pledged Collateral, limit the purchasers to those who will agree, among other things, to acquire such Pledged Collateral for their own account, for investment and not with a view to the distribution or resale thereof.  Each Grantor acknowledges and agrees that in light of such restrictions and limitations, the Collateral Agent, in its sole and absolute discretion, (a) may proceed to make such a sale whether or not a registration statement for the purpose of registering such Pledged Collateral or part thereof shall have been filed under the Federal Securities Laws to the extent the Collateral Agent has determined that such a registration is not required by any Requirement of Law and (b) may approach and negotiate with a limited number of potential purchasers (including a single potential purchaser) to effect such sale.  Each Grantor acknowledges and agrees that any such sale might result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions.  In the event of any such sale, the Collateral Agent and the other Secured Parties shall incur no responsibility or liability for selling all or any part of the Pledged Collateral at a price that the Collateral Agent, in its sole and absolute discretion, may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might have been realized if the sale were deferred until after registration as aforesaid or if more than a limited number of purchasers (or a single purchaser) were approached.  The provisions of this Section 4.04 will apply notwithstanding the existence of a public or private market upon which the quotations or sales prices may exceed substantially the price at which the Collateral Agent sells.

ARTICLE V

Miscellaneous

SECTION 5.01.     Notices.  All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 9.01 of the Credit Agreement.  All communications and notices hereunder to any Grantor shall be given to it in care of Holdings as provided in Section 9.01 of the Credit Agreement.

SECTION 5.02.     Waivers; Amendment.

(a)     No failure or delay by the Collateral Agent or any Lender in exercising any right or power hereunder or under any Loan Document shall operate as a waiver thereof nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Collateral Agent and the Lenders hereunder and under the

-18-

other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 5.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Collateral Agent or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on any Loan Party in any case shall entitle any Loan Party to any other or further notice or demand in similar or other circumstances.

(b)     Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Grantor or Grantors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 9.02 of the Credit Agreement; provided that the Collateral Agent may, without the consent of any Secured Party, consent to a departure by any Grantor from any covenant of such Grantor set forth herein to the extent such departure is consistent with the authority of the Collateral Agent set forth in the definition of the term "Collateral and Guarantee Requirement" in the Credit Agreement.

SECTION 5.03.     Collateral Agent's Fees and Expenses; Indemnification.

(a)     Each Grantor, jointly with the other Grantors and severally, agrees to reimburse the Collateral Agent for its fees and expenses incurred hereunder as provided in Section 9.03(a) of the Credit Agreement; provided that each reference therein to the "Borrower" shall be deemed to be a reference to "each Grantor" and each reference therein to the "Collateral Agent" shall be deemed to be a reference to the "Collateral Agent".

(b)     Without limitation of its indemnification obligations under the other Loan Documents, each Grantor, jointly with the other Grantors and severally, agrees to indemnify the Collateral Agent and the other Indemnitees against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable and documented or invoiced out-of-pocket fees and expenses of one counsel and one local counsel in each applicable jurisdiction (and, in the case of an actual or perceived conflict of interest, where the Indemnitee affected by such conflict notifies the Borrower of the existence of such conflict and thereafter retains its own counsel, one additional counsel for such affected Indemnitee) for all Indemnitees (which may include a single special counsel acting in multiple jurisdictions), incurred by or asserted against any Indemnitee by any third party or by Holdings or any Subsidiary arising out of, in connection with, or as a result of, the execution, delivery or performance of this Agreement or any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Holdings or any Subsidiary and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence, bad faith or wilful misconduct of, or a breach of the Loan Documents by, such Indemnitee or its Related Parties.

(c)     To the fullest extent permitted by applicable law, no Grantor shall assert, and each Grantor hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet), provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or wilful misconduct

of, or a breach of the Loan Documents by, such Indemnitee or its Related Parties, or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated thereby, the Transactions, any Loan or the use of the proceeds thereof.

(d)     The provisions of this Section 5.03 shall remain operative and in full force and effect regardless of the termination of this Agreement or any other Loan Document, the consummation of the transactions contemplated hereby or thereby, the repayment of any of the Secured Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of any Secured Party.  All amounts due under this Section shall be payable not later than 10 Business Days after written demand therefor; provided, however, any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 5.03.  Any such amounts payable as provided hereunder shall be additional Secured Obligations.

SECTION 5.04.     Successors and Assigns.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Grantor or the Collateral Agent that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

SECTION 5.05.     Survival of Agreement.  All covenants, agreements, representations and warranties made by the Loan Parties in this Agreement or any other Loan Document and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Secured Parties and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by or on behalf of any Secured Party and notwithstanding that the Collateral Agent, any Lender or any other Secured Party may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement or any other Loan Document, and shall continue in full force and effect until such time as (a) all the Loan Document Obligations (excluding contingent indemnification obligations) have been paid in full in cash and (b) all Commitments have terminated or expired.

SECTION 5.06.     Counterparts; Effectiveness; Several Agreement.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Agreement.  This Agreement shall become effective as to any Grantor when a counterpart hereof executed on behalf of such Grantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon such Grantor and the Collateral Agent and their respective permitted successors and assigns, and shall inure to the benefit of such Grantor, the Collateral Agent and the other Secured Parties and their respective successors and assigns, except that no Grantor shall have the right to assign or transfer its rights or obligations hereunder or any interest herein (and any such assignment or transfer shall be void) except as expressly provided in this Agreement and the Credit Agreement.  This Agreement shall be construed as a separate agreement with respect to each Grantor and may be amended, modified, supplemented, waived or released with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereunder.

-20-

SECTION 5.07.    <u>Severability</u>.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  The parties shall endeavor in good-faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of such invalid, illegal or unenforceable provisions.

SECTION 5.08.    <u>Right of Set-Off</u>.  If an Event of Default under Sections 7.01(a), (b), (h) or (i) of the Credit Agreement shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender to or for the credit or the account of any Grantor against any of and all the obligations of such Grantor then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness.  The applicable Lender shall notify the applicable Grantor and the Collateral Agent of such setoff and application; <u>provided</u> that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section 5.08.  The rights of each Lender under this Section 5.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender may have.  Notwithstanding the foregoing, no amount set off from any Guarantor shall be applied to any Excluded Swap Obligation of such Guarantor.

SECTION 5.09.    <u>Governing Law; Jurisdiction; Consent to Service of Process; Appointment of Service of Process Agent</u>.

(a)    This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)    Each party to this Agreement hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Collateral Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against any Grantor or its respective properties in the courts of any jurisdiction.

(c)    Each party to this Agreement hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 5.01.  Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(e)    Each Grantor hereby irrevocably designates, appoints and empowers the Borrower as its designee, appointee and agent to receive, accept and acknowledge for and on its behalf, and in respect of its property, service of any and all legal process, summons, notices and documents that may be served in any such action or proceeding.

SECTION 5.10.    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 5.10.

SECTION 5.11.    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 5.12.    Security Interest Absolute.  All rights of the Collateral Agent hereunder, the Security Interest, the grant of a security interest in the Pledged Collateral and all obligations of each Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Loan Document, any agreement with respect to any of the Secured Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document or any other agreement or instrument, (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee securing or guaranteeing all or any of the Secured Obligations or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Grantor in respect of the Secured Obligations or this Agreement.

SECTION 5.13.    Termination or Release.

(a)    This Agreement, the Security Interest and all other security interests granted hereby shall terminate when (i) all the Loan Document Obligations (other than contingent indemnification obligations) have been paid in full in cash and (ii) all Commitments have terminated or expired.

(b)    The Security Interest and all other security interests granted hereby shall also terminate and be released at the time or times and in the manner set forth in Section 9.15 of the Credit Agreement.  A Subsidiary Loan Party shall also be released from its obligations under this Agreement at the time or times and in the manner set forth in Section 9.15 of the Credit Agreement.

(c)    In connection with any termination or release pursuant to paragraph (a) or (b) of this Section, the Collateral Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents by the Collateral Agent pursuant to this Section shall be without recourse to or warranty by the Collateral Agent.

SECTION 5.14.    Additional Grantors.  Pursuant to the Credit Agreement, additional Subsidiaries or any Intermediate Parent may or may be required to become Grantors after the date hereof.  Upon execution and delivery by the Collateral Agent and a Subsidiary or Intermediate Parent of a Supplement, any such Subsidiary or Intermediate Parent shall become a Grantor hereunder with the same force and effect as if originally named as such herein.  The execution and delivery of any such instrument shall not require the consent of any other Grantor hereunder.  The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any Subsidiary or Intermediate Parent as a party to this Agreement.

SECTION 5.15.    Collateral Agent Appointed Attorney-in-Fact.  Each Grantor hereby appoints the Collateral Agent the attorney-in-fact of such Grantor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof at any time after and during the continuance of an Event of Default, which appointment is irrevocable and coupled with an interest.  Without limiting the generality of the foregoing, the Collateral Agent shall have the right, but only upon the occurrence and during the continuance of an Event of Default and notice by the Collateral Agent to the Borrower of its intent to exercise such rights, with full power of substitution either in the Collateral Agent's name or in the name of such Grantor (a) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof; (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral; (c) to sign the name of any Grantor on any invoice or bill of lading relating to any of the Collateral; (d) to send verifications of Accounts Receivable to any Account Debtor; (e) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (f) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; (g) to notify, or to require any Grantor to notify, Account Debtors to make payment directly to the Collateral Agent; and (h) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes; provided that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby.  The Collateral Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct or that of any of their Affiliates, directors, officers, employees, counsel, agents or attorneys-in-fact.

SECTION 5.16.    Intercreditor Agreement Governs.  Each Person that is secured hereunder, by accepting the benefits of the security provided hereby, (i) consents (or is deemed to consent), to the subordination of Liens provided for in the Intercreditor Agreements, (ii) agrees (or is deemed to agree) that it will be bound by, and will take no actions contrary to, the provisions of the Intercreditor Agreements, and (iii) authorizes (or is deemed to authorize) the Collateral Agent Agent on behalf of such

Person to enter into, and perform under, the Intercreditor Agreements.  Notwithstanding any other provision contained herein, this Agreement, the Liens created hereby and the rights, remedies, duties and obligations provided for herein are subject in all respects to the provisions of the Intercreditor Agreements. In the event of any conflict or inconsistency between the provisions of this Agreement and any Intercreditor Agreement, the provisions of such Intercreditor Agreement shall control.  Notwithstanding anything herein to the contrary, so long as the Intercreditor Agreements are outstanding, any requirement hereunder to deliver ABL Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) to the Collateral Agent shall be deemed satisfied by delivery of such ABL Priority Collateral to the ABL Agent (as such term is defined in the ABL Intercreditor Agreement).

SECTION 5.17.    <u>Effectiveness of the Acquisition</u>.  The Target shall have no rights or obligations hereunder until the consummation of the Acquisition and the merger of Target with and into Merger Sub and any representations and warranties of the Target hereunder shall not become effective until such time.  Upon consummation of the Acquisition, the Target shall succeed to all the rights and obligations of Merger Sub under this Agreement and the other Loan Documents to which it is a party and all representations and warranties of the Target shall become effective as of the date hereof, without any further action by any Person.

[Signature Pages Follow]

-24-

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

ARGOS HOLDINGS INC.,

By: _____
     Name:
     Title:

PETSMART, INC.,

By: _____
     Name:
     Title:

ARGOS MERGER SUB INC.

By: _____
     Name:
     Title:

SIGNATURE PAGE TO COLLATERAL AGREEMENT

PET WISE INC.
PACIFIC COAST DISTRIBUTING, INC.
PET360, INC.
AUTHORITY PET FOOD COMPANY
PETSTUFF CANADA (USA) HOLDINGS, INC.
PETSTUFF NOVA SCOTIA, INC.
PETSCARD, LLC
SIMPLY NOURISH PET FOOD COMPANY, LLC
PETSMART STORE SUPPORT GROUP, INC.
MAVERICK LEASING, INC.
ONP-ECOM, LLC
ONP-RETAIL, LLC
PET360 MEDIA, INC.
PETMD, INC.
PETMD LLC
PETMD VENTURES, INC.
KY SHELTER AND MOBILE VET SERVICE LLC
ANIMAL WELLNESS, LLC
THE CAT AND DOG CLINIC OF LANSDALE, LLC
PET360 PHARMACY HOLDINGS, LLC
PET360 PHARMACY, LLC


By:  _____
     Name:
     Title:

Schedule I-1

Schedule I to the
Collateral Agreement

GRANTORS

| Grantor | Jurisdiction of Formation |
|---|---|
| PET WISE INC | New York |
| Pacific Coast Distributing, Inc. | Delaware |
| Pet360, Inc. | Delaware |
| Authority Pet Food Company | Delaware |
| Petstuff Canada (USA) Holdings, Inc. | Delaware |
| Petstuff Nova Scotia, Inc. | Delaware |
| PetsCard, LLC | New Hampshire |
| Simply Nourish Pet Food Company, LLC | Arizona |
| PetSmart Store Support Group, Inc. | Delaware |
| Maverick Leasing, Inc. | Delaware |
| ONP-Ecom, LLC | Delaware |
| ONP-Retail, LLC | Delaware |
| Pet360 Media, Inc. | Delaware |
| PETMD, Inc. | Delaware |
| PetMD LLC | Florida |
| PetMD Ventures, Inc. | Florida |
| KY Shelter and Mobile Vet Service LLC | Kentucky |
| Animal Wellness, LLC | Pennsylvania |
| The Cat and Dog Clinic of Lansdale, LLC | Pennsylvania |
| Pet360 Pharmacy Holding, LLC | Delaware |
| Pet360 Pharmacy, LLC | Delaware |

Schedule I-1

Schedule II to the
Collateral Agreement

## PLEDGED EQUITY INTERESTS

| Loan Party | Issuer | Certificate Number | Number of Equity Interests | Percentage of Ownership | Percentage Pledged |
|---|---|---|---|---|---|
| Argos Holdings Inc. | PetSmart, Inc. | 1 | 100 | 100% | 100% |
| PetSmart, Inc. | PET WISE INC | C-3 | 100,000 | 100% | 100% |
| | Pacific Coast Distributing, Inc. | C-3 | 100 | 100% | 100% |
| | Pet360, Inc. | 2 | 100 | 100% | 100% |
| | Authority Pet Food Company | C-3 | 100 | 100% | 100% |
| | Petstuff Canada (USA) Holdings, Inc. | C-3 | 50,000 | 100% | 100% |
| | PetSmart Puerto Rico, LLC | * | N/A | 100% | 100% |
| | Petstuff Nova Scotia, Inc. | C-3 | 10 | 100% | 100% |
| | PetsCard LLC | * | N/A | 100% | 100% |
| | Simply Nourish Pet Food Company LLC | * | N/A | 100% | 100% |
| | PetSmart Store Support Group, Inc. | 2 | 1,000 | 100% | 100% |
| | Maverick Leasing, Inc. | 2 | 10 | 100% | 100% |
| Petstuff Canada (USA) Holdings, Inc. | PETM Canada Corporation | 8 | 101 | 50% | 100%[1] |
| Petstuff Nova Scotia, Inc. | PETM Canada Corporation | 7 | 101 | 50% | 100%[2] |
| Pet360, Inc. | ONP-Ecom, LLC | * | N/A | 100% | 100% |
| | ONP-Retail, LLC | * | N/A | 100% | 100% |
| | Pet360 Media, Inc. | 2 | 100 | 100% | 100% |
| | PETMD, Inc. | 2 | 100 | 100% | 100% |
| | KY Shelter & Mobile Vet Service, LLC | * | N/A | 100% | 100% |
| | Animal Wellness LLC | * | N/A | 100% | 100% |
| | The Cat and Dog Clinic of Lansdale, LLC | * | N/A | 100% | 100% |
| | PetCoach, Inc. | C-002 | 1,900,000 | 19% | N/A |
| PETMD, Inc. | PETMD VENTURES, INC. | 8 | 7,240,042 | 100% | 100% |
| Pet360, Inc. | Pet360 Pharmacy Holding, LLC | N/A | N/A | 100% | 100% |
| Pet360 Pharmacy Holding, LLC | Pet360 Pharmacy, LLC | N/A | N/A | 100% | 100% |

[1] 65% with respect to Secured Obligations of U.S. Loan Parties.

[2] 65% with respect to Secured Obligations of U.S. Loan Parties.

Schedule II-1

| PetMD Ventures, Inc. | PetMD, LLC | N/A | N/A | 100% | 100% |

*PetSmart, Inc. is the sole member.


## PLEDGED DEBT SECURITIES

1.     Non-interest bearing intercompany note in the amount of $55 million between PetSmart, Inc. and PETM Canada Corporation.

2.     Intercompany note in the amount of $20 million between PetSmart Puerto Rico, LLC and PetSmart, Inc.

Schedule III to the
Collateral Agreement

<u>Intellectual Property</u>

<u>Patents and Patent Applications</u>

None.

<u>Copyrights and Copyright Applications</u>

| **<u>Copyrights</u>** | | |
|---|---|---|
| <u>Name</u> | <u>Title</u> | <u>Copyright Number</u> |
| PetSmart Store Support Group, Inc. | Pet & Parent : Your PetSmart Guide to Raising a Healthier, Happier Cat. | TX0005928290 |
| PetSmart Store Support Group, Inc. | Pet & Parent : Your PetSmart Guide to Raising a Healthier, Happier Dog. | TX0005928291 |
| PetSmart Store Support Group, Inc. | Top Paw. | VAu000995936 |
| PetSmart, Inc. | Potty Training is Possible! | TXu001923000 |
| Pet360, Inc. | ZooToo Icons. | VAu001003266 |
| Pet360, Inc. | ZooToo Icons. | VAu000971718 |

<u>Exclusive Copyright Licenses under which a Loan Party is a Licensee</u>

None.

<u>Registered Designs and Design Applications</u>

None.

LEGAL_US_E # 113937414.3

## Trademarks and Trademark Applications

| Owner _Client_ | **Trademark** _File Reference_ | Country **Next Renewal Due** | Appl. Date **Reg. Date** | , No. **, No.** | Status _Sub Status_ | Agent _Supervisor_ | |
|---|---|---|---|---|---|---|---|
| **United States of America** | | | | | | | |
| PETsMART Store Support Group, Inc | **(Device Only)** | United States of America | Jun 25 1997 | 75314521 | Registered | PetSmart Store Support Group |  |
| | _359_ | _May 4 2019_ | _May 4 1999_ | _2243580_ | _Renewal due_ | _Rhonda Snyder_ | |
| Class | 31 | | | | | | |
| Goods | cat food and edible treats and biscuits for dogs | | | | | | |
| PetSmart Store Support Group, Inc. | **(Device Only)** | United States of America | Jun 7 1996 | 75115829 | Registered | PetSmart Store Support Group |  |
| | _364_ | _Mar 25 2017_ | _Mar 25 1997_ | _2047930_ | _Renewal due_ | _Rhonda Snyder_ | |
| Class | 42 | | | | | | |
| Goods | retail pet supply store services; mail order catalog services featuring pet food, supplies and accessories | | | | | | |
| PetSmart Store Support Group, Inc. | **(Device Only)** | United States of America | Jun 27 1997 | 75315701 | Registered | PetSmart Store Support Group |  |
| | _360_ | _Jun 2 2018_ | _Jun 2 1998_ | _2162154_ | _Renewal due_ | _Rhonda Snyder_ | |
| Class | 31 | | | | | | |
| Goods | dog food | | | | | | |
| PetSmart Store Support Group, Inc. | **ALGAE THINS** | United States of America | Dec 11 2003 | 78339391 | Registered | PetSmart Store Support Group | ALGAE THINS |
| | _388_ | _Jul 19 2015_ | _Jul 19 2005_ | _2974281_ | _Renewal due_ | _Rhonda Snyder_ | |
| Class | 31 | | | | | | |

Schedule III-1

Schedule III to the
Collateral Agreement

| Goods | Fish Food | | | | | | | |
|---|---|---|---|---|---|---|---|---|

| PetSmart Store Support Group, Inc. | **ALL LIVING THINGS** | United States of America | Nov 25 1997 | 75395810 | Registered | PetSmart Store Support Group | **ALL LIVING THINGS** |
|---|---|---|---|---|---|---|---|
| | *330* | *May 16 2020* | *May 16 2000* | *2350602* | Renewal due | *Rhonda Snyder* | |

| Class | 21 |
|---|---|
| Goods | Cages, housing and play habitats for small animals, birds and reptiles, not being structures, and parts thereof, namely, water and feed dishes, ladders, not being structures, and |

| PetSmart Store Support Group, Inc. | **ALL LIVING THINGS** | United States of America | Jul 31 2013 | 86024525 | Registered | | |
|---|---|---|---|---|---|---|---|
| | *682* | *Aug 19 2024* | *Aug 19 2014* | *4587318* | | *Rhonda Snyder* | ALL LIVING THINGS |

| Class | 28 |
|---|---|
| Goods | Toys for domestic pets |

| PetSmart Store Support Group, Inc. | **ALL LIVING THINGS** | United States of America | Jul 31 2013 | 86024529 | Registered | | |
|---|---|---|---|---|---|---|---|
| | *683* | *Aug 19 2024* | *Aug 19 2014* | *4587320* | | *Rhonda Snyder* | |

| Class | 31 |
|---|---|
| Goods | Hay; food for small animals; edible treats for small animals; bird food; bird seed; bird treats; cuttlebones for birds; animal litter |

| PetSmart Store Support Group, Inc. | **ALL LIVING THINGS** | United States of America | Jul 31 2013 | 86024540 | Registered | | |
|---|---|---|---|---|---|---|---|
| | *684* | *Sep 16 2024* | *Sep 16 2014* | *4604257* | | *Rhonda Snyder* | |

| Class | 21 |
|---|---|
| Goods | Aquarium ornaments; aquarium fish nets; aquarium cleaning brushes; steel cups for animal cages; cages for domestic birds; bird baths; small animal feeders; animal litter pans; Plastic water bottles sold empty for pets |

| Class | 26 |
|---|---|
| Goods | Artificial plants for aquariums |

| PetSmart Store Support Group, Inc. | **ALL LIVING THINGS** | United States of America | Jul 31 2013 | 86024544 | Registered | | |
|---|---|---|---|---|---|---|---|
| | *685* | *Sep 2 2024* | *Sep 2 2014* | *4595616* | | *Rhonda Snyder* | |

| Class | 20 |
|---|---|
| Goods | Cage covers for pets |

| PetSmart Store Support Group, Inc. | **ALL LIVING THINGS** | United States of America | Jul 31 2013 | 86024548 | Registered | | |
|---|---|---|---|---|---|---|---|
| | *686* | *Sep 9 2024* | *Sep 9 2014* | *4599967* | | *Rhonda Snyder* | |

| Class | 11 |
|---|---|
| Goods | Electrical accessories for habitats for reptiles, aquatics, small animals and birds, namely heaters, heating mats, water filters, bulbs and lights |

| PetSmart Store Support Group, Inc. | **ALL LIVING THINGS** | United States of America | Jul 31 2013 | 86024552 | Registered | | |
|---|---|---|---|---|---|---|---|

Schedule III-2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 687 | | *Sep 2 2024* | *Sep 2 2014* | *4595617* | | *Rhonda Snyder* |

| Class | 1 |
|---|---|
| Goods | Chemicals for use in aquariums; chemical water conditioners for aquariums |

| Class | 5 |
|---|---|
| Goods | Calcium-based nutrient supplements for birds for use as a beak conditioner |

| PetSmart Store Support Group, Inc. | **ALL LIVING THINGS** | United States of America | Aug 6 2013 | 86027003 | Registered | |
|---|---|---|---|---|---|---|
| | 692 | | *Sep 9 2024* | *Sep 9 2014* | *4599974* | *Rhonda Snyder* |

| Class | 18 |
|---|---|
| Goods | Animal carriers; paper for use as animal bedding |

| Class | 22 |
|---|---|
| Goods | Cotton nesting material for birds |

| PetSmart Store Support Group, Inc. | **ALL THE WATER WITHOUT THE WORK** | United States of America | May 21 2009 | 77742528 | Registered | PetSmart Store Support Group | ALL THE WATER WITHOUT THE WORK |
|---|---|---|---|---|---|---|---|
| | *333* | | *Jun 22 2020* | *Jun 22 2010* | *3805677* | *8&15 due* | *Rhonda Snyder* |

| Class | 35 |
|---|---|
| Goods | Retail store services, namely, a section within a retail establishment featuring pretreated water for aquariums in homes and businesses |

| PetSmart Store Support Group, Inc. | **ALL THE WONDER WITHOUT THE WORK** | United States of America | Jul 17 2009 | 77783601 | Registered | PetSmart Store Support Group | ALL THE WONDER WITHOUT THE WORK |
|---|---|---|---|---|---|---|---|
| | *339* | | *Aug 24 2020* | *Aug 24 2010* | *3836793* | *8&15 due* | *Rhonda Snyder* |

| Class | 37 |
|---|---|
| Goods | Aquarium set-up and installation, cleaning and water changes provided to business and residential customers |

| PetSmart Store Support Group, Inc. | **ALL YOU NEED FOR THE LIFE OF YOUR PET** | United States of America | Mar 17 2009 | 77693145 | Registered | Christy Hubbard | ALL YOU NEED FOR THE LIFE OF YOUR PET |
|---|---|---|---|---|---|---|---|
| | *320* | | *May 29 2022* | *May 29 2012* | *4150474* | *8&15 due* | *Rhonda Snyder* |

| Class | 35 |
|---|---|
| Goods | Retail pet supply store services |

| PetSmart Store Support Group, Inc. | **AUTHORITY** | United States of America | Apr 24 1992 | 74269710 | Registered | PetSmart Store Support Group | |
|---|---|---|---|---|---|---|---|
| | *348* | | *Apr 27 2023* | *Apr 27 1993* | *1768199* | *Renewed* | *Rhonda Snyder* |

| Class | 31 |
|---|---|
| Goods | dog food, cat food and edible pet treats |

| PetSmart Store Support Group, | **AWARD** | United States of | Nov 16 1994 | 74599654 | Registered | PetSmart Store Sup- |
|---|---|---|---|---|---|---|

Schedule III to the
Collateral Agreement

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Inc. | | | America | | | port Group | |
| | | 350 | *Mar 23 2019* | *Mar 23 1999* | *2234471* | *Renewal due* | *Rhonda Snyder* |

| Class | 31 |
|---|---|
| Goods | pet food |

| PetSmart Store Support Group, Inc. | **BE BETTER TOGETHER** | United States of America | Apr 24 2007 | 77163965 | Allowed to Lapse | PetSmart Store Support Group | |
|---|---|---|---|---|---|---|---|
| | 353 | | *Feb 24 2009* | *3581131* | *Abandoned* | *Rhonda Snyder* | BE BETTER TOGETHER |

| Class | 35 |
|---|---|
| Goods | Retail store services and on-line retail store services featuring pet food, pet supplies and pet accessories; providing information about retail stores and online retail store services featuring pet food, pet supplies and pet accessories |

| Class | 41 |
|---|---|
| Goods | Educational services, namely, providing training related to pet food, pet supplies, pet accessories, pet care, pet grooming, pet boarding, pet adoption, and pet obedience; pet obedience training services; providing information about pet obedience training services |

| Class | 43 |
|---|---|
| Goods | Pet boarding, kennel services, and pet day care services; providing information about pet boarding and pet day care |

| PetSmart Store Support Group, Inc. | **BONE BOOTH** | United States of America | Mar 15 2006 | 78837705 | Registered | PetSmart Store Support Group, Inc. | |
|---|---|---|---|---|---|---|---|
| | 9 | | *Nov 28 2016* | *Nov 28 2006* | *3177178* | *Accepted* | *Rhonda Snyder* BONE BOOTH |

| Class | 43 |
|---|---|
| Goods | Kennel services and general pet day care services for domesticated animals |

| PetSmart Store Support Group, Inc. | **BOUNCE** | United States of America | Jan 6 2010 | 77906011 | Registered | PetSmart Store Support Group | |
|---|---|---|---|---|---|---|---|
| | 389 | | *Mar 22 2021* | *Mar 22 2011* | *3935503* | *8&15 due* | *Rhonda Snyder* BOUNCE |

| Class | 3 |
|---|---|
| Goods | Shampoo for pets |

| PetSmart Store Support Group, Inc. | **BOUNCE** | United States of America | Jan 6 2010 | 77982444 | Registered | PetSmart Store Support Group | |
|---|---|---|---|---|---|---|---|
| | 395 | | *Nov 1 2021* | *Nov 1 2011* | *4050063* | *8&15 due* | *Rhonda Snyder* BOUNCE |

| Class | 18 |
|---|---|
| Goods | Leashes for pets |

| PetSmart Store Support Group, Inc. | **BOUNCING BALL** | United States of America | Jun 11 1996 | 75117077 | Registered | PetSmart Store Support Group | |
|---|---|---|---|---|---|---|---|
| | 358 | | *Mar 25 2017* | *Mar 25 1997* | *2047937* | *Renewal due* | *Rhonda Snyder* |

Schedule III-4

Schedule III to the
Collateral Agreement



| | | | | | |
|---|---|---|---|---|---|
| Class | 42 | | | | |
| Goods | retail pet supply store services; mail order catalog services featuring pet food, supplies and accessories | | | | |

| | | | | | |
|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **CANAPALOOZA** | United States of America | Dec 15 2011 | 85496572 | Registered | PetSmart Store Support Group |
| | *307* | *Jan 1 2023* | *Jan 1 2013* | *4269589* | *8&15 due* | *Rhonda Snyder* |

CANAPALOOZA

| | |
|---|---|
| Class | 35 |
| Goods | Promotional services, namely, promoting the goods of others by publishing, distributing and displaying advertisements and other marketing materials in the field of pet food and pet food-related products and services; retail store services, on-line retail store services, featuring pet food and pet food-related products and services |

| | | | | | |
|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **COMPANION ROAD** | United States of America | Jan 28 1997 | 75232599 | Registered | PetSmart Store Support Group |
| | *362* | *May 26 2018* | *May 26 1998* | *2161032* | *Renewal due* | *Rhonda Snyder* |

| | |
|---|---|
| Class | 18 |
| Goods | apparel for pets |

| | | | | | |
|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **CRITTER DOME** | United States of America | Jul 31 2013 | 86024517 | Registered | |
| | *671* | *Jan 20 2025* | *Jan 20 2015* | *4676776* | | *Rhonda Snyder* |

CRITTER DOME

| | |
|---|---|
| Class | 21 |
| Goods | Small animal habitats and cages |

| | | | | | |
|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **DENTLEY'S** | United States of America | Nov 17 2011 | 85475810 | Registered | PetSmart Store Support Group |
| | *306* | *Mar 19 2023* | *Mar 19 2013* | *4303692* | *8&15 due* | *Rhonda Snyder* |

DENTLEY'S

| | |
|---|---|
| Class | 18 |
| Goods | Rawhide chews for dogs |

| | |
|---|---|
| Class | 31 |
| Goods | Pet treats |

| | | | | | |
|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **DENTLEY'S CHEWRITE** | United States of America | Nov 22 1996 | 75202331 | Registered | PetSmart Store Support Group |
| | *363* | *May 26 2018* | *May 26 1998* | *2160998* | *Renewal due* | *Rhonda Snyder* |

| | |
|---|---|
| Class | 18 |
| Goods | rawhide chews |

Schedule III-5

Schedule III to the
Collateral Agreement

| Class | 31 |
|---|---|
| Goods | pet chew treats |

| PetSmart Store Support Group, Inc. | **EMERGENCY RELIEF WAGGIN'** | United States of America | Apr 13 2006 | 78861181 | Registered | PETSMART STORE SUPPORT GROUP, INC. | EMERGENCY RELIEF WAGGIN |
|---|---|---|---|---|---|---|---|
| | *326* | *Oct 9 2017* | *Oct 9 2007* | *3309646* | Renewal due | *Rhonda Snyder* | |

| Class | 39 |
|---|---|
| Goods | Charitable services, namely providing transportation, via commercial motor vehicle, of pet food and pet supplies to pet animal rescue agencies |

| PetSmart Store Support Group, Inc. | **EXQUISICAT** | United States of America | Aug 27 1997 | 75347894 | Registered | PetSmart Store Support Group |
|---|---|---|---|---|---|---|
| | *365* | *Jun 1 2019* | *Jun 1 1999* | *2250416* | Renewal due | *Rhonda Snyder* |

| Class | 31 |
|---|---|
| Goods | litter for cats |

| PetSmart Store Support Group, Inc. | **G GROOMAX** | United States of America | Apr 28 1993 | 74385166 | Allowed to Lapse | PetSmart Store Support Group | groomax |
|---|---|---|---|---|---|---|---|
| | *368* | | *Apr 18 1995* | *1890373* | Allow to lapse | *Rhonda Snyder* | |

| Class | 3 |
|---|---|
| Goods | non-medicated, non-veterinary shampoo for domestic animals |

| Class | 5 |
|---|---|
| Goods | veterinary and medicated non-veterinary shampoo for domestic animals |

| PetSmart Store Support Group, Inc. | **GOOD NATURED** | United States of America | Nov 10 2014 | 86449349 | Pending | Mary Margaret Murray | GOOD NATURED |
|---|---|---|---|---|---|---|---|
| | *796* | | | | | *Rhonda Snyder* | |

| Class | 31 |
|---|---|
| Goods | pet food; pet treats |

| PetSmart Store Support Group, Inc. | **GRACEFUL FLIGHT** | United States of America | Nov 2 1994 | 75976853 | Registered | PetSmart Store Support Group |
|---|---|---|---|---|---|---|
| | *369* | *Mar 17 2018* | *Mar 17 1998* | *2145539* | Renewal due | *Rhonda Snyder* |

| Class | 31 |
|---|---|
| Goods | bird seed |

| PetSmart Store Support Group, Inc. | **GRREAT CHOICE** | United States of America | Jan 22 1992 | 74239400 | Registered | PetSmart Store Support Group |
|---|---|---|---|---|---|---|

Schedule III-6

Schedule III to the
Collateral Agreement

| | | | | | | |
|---|---|---|---|---|---|---|
| | *370* | *Jan 4 2024* | *Jan 4 1994* | *1815480* | Renewed | *Rhonda Snyder* |

| Class | 31 |
|---|---|
| Goods | pet food and edible pet treats |

| PetSmart Store Support Group, Inc. | **GRREAT CHOICE** | United States of America | May 21 2013 | 85938172 | Registered | |
|---|---|---|---|---|---|---|
| | *642* | *Mar 4 2024* | *Mar 4 2014* | *4490621* | | *Rhonda Snyder* |

GRREAT CHOICE

| Class | 3 |
|---|---|
| Goods | Odor removers for pets; stain removers for pets; disposable wipes impregnated with a cleaning preparation for pets; non-medicated, non-veterinary pet shampoo, namely deodorizing dog shampoo, tearless puppy shampoo, tearless cat shampoo, skin soothing shampoo, whitening shampoo, 2 in 1 shampoo & conditioner, deodorizing conditioner and waterless spray shampoo; fragrance spray for pets. |

| PetSmart Store Support Group, Inc. | **GRREAT CHOICE** | United States of America | May 21 2013 | 85938185 | Registered | |
|---|---|---|---|---|---|---|
| | *643* | *Mar 4 2024* | *Mar 4 2014* | *4490622* | | *Rhonda Snyder* |

GRREAT CHOICE

| Class | 8 |
|---|---|
| Goods | Scissors for pets. |

| PetSmart Store Support Group, Inc. | **GRREAT CHOICE** | United States of America | May 21 2013 | 85938217 | Registered | |
|---|---|---|---|---|---|---|
| | *646* | *Mar 4 2024* | *Mar 4 2014* | *4490623* | | *Rhonda Snyder* |

GRREAT CHOICE

| Class | 11 |
|---|---|
| Goods | Aquarium filters; filters for circulating waterer |

| PetSmart Store Support Group, Inc. | **GRREAT CHOICE** | United States of America | May 21 2013 | 85938841 | Registered | |
|---|---|---|---|---|---|---|
| | *652* | *Mar 4 2024* | *Mar 4 2014* | *4490626* | | *Rhonda Snyder* |

GRREAT CHOICE

| Class | 31 |
|---|---|
| Goods | Cat litter; pet food and treats, namely food for guinea pigs, rats, mice, rabbits, hamsters, gerbils, chinchillas and birds; wild bird food |

| PetSmart Store Support Group, Inc. | **GRREAT CHOICE** | United States of America | May 21 2013 | 85938845 | Registered | |
|---|---|---|---|---|---|---|
| | *650* | *Mar 4 2024* | *Mar 4 2014* | *4490627* | | *Rhonda Snyder* |

GRREAT CHOICE

| Class | 27 |
|---|---|
| Goods | Pet litter pan floor mats |

| PetSmart Store Support Group, Inc. | **GRREAT CHOICE** | United States of America | May 21 2013 | 85938847 | Registered | |
|---|---|---|---|---|---|---|
| | *649* | *Mar 4 2024* | *Mar 4 2014* | *4490628* | | *Rhonda Snyder* |

Schedule III-7

Schedule III to the
Collateral Agreement

GRREAT CHOICE

| Class | 21 |
|---|---|
| Goods | Pet feeding and watering bowls made of plastic, ceramic and stainless steel; grooming tools for pets, namely, combs, brushes and flea combs; pet food scoops; bird cages for domestic birds; animal litter boxes; animal litter pans; scoops for disposal of pet waste; cages for household pets; cages for household pets consisting of shelves, tunnels, wheels, water bottles and food dishes; disposable liners for litter boxes; Aquariums |

| PetSmart Store Support Group, Inc. | **GRREAT CHOICE** | United States of America | May 21 2013 | 85938850 | Registered | |
|---|---|---|---|---|---|---|
| | *644* | *Dec 30 2024* | *Dec 30 2014* | *4661788* | | *Rhonda Snyder* |

GRREAT CHOICE

| Class | 18 |
|---|---|
| Goods | Clothing for domestic pets; small animal bedding made of cedar and aspen; animal carriers, namely plastic and paper carriers; costumes for animals; clothing accessories for domestic pets, namely, hair bows; socks for pets; pet products, namely, pet restraining devices consisting of leashes, collars, harnesses, restraining straps, and leashes with locking devices; pet accessories, namely, dispensers of plastic bags for disposing of pet waste. |

| PetSmart Store Support Group, Inc. | **GRREAT CHOICE** | United States of America | Jun 3 2013 | 85948721 | Registered | |
|---|---|---|---|---|---|---|
| | *648* | *Dec 2 2024* | *Dec 2 2014* | *4647504* | | *Rhonda Snyder* |

GRREAT CHOICE

| Class | 20 |
|---|---|
| Goods | Pet crates; single door wire pet carrier; portable pet kennels; pet bedding, namely beds for pets, portable beds for pets; crate pads; pet cushions; mattresses for pet, pet pads; pet bedding in the nature of mattresses for pets; cat scratching posts |

| PetSmart Store Support Group, Inc. | **GRREAT CHOICE** | United States of America | Jun 3 2013 | 85948724 | Registered | |
|---|---|---|---|---|---|---|
| | *645* | *May 27 2024* | *May 27 2014* | *4536137* | | *Rhonda Snyder* |

| Class | 7 |
|---|---|
| Goods | Automated pet appliances, namely, circulating waterers for pets |

| PetSmart Store Support Group, Inc. | **GRREAT CHOICE** | United States of America | Jun 3 2013 | 85948981 | Registered | |
|---|---|---|---|---|---|---|
| | *651* | *Nov 5 2023* | *Nov 5 2013* | *4428960* | *Renewal due* | *Rhonda Snyder* |

GRREAT CHOICE

| Class | 28 |
|---|---|
| Goods | Toys for domestic pets; bird toys |

| PetSmart Store Support Group, Inc. | **HAPPINESS IN STORE** | United States of America | Jan 6 2011 | 85212293 | Registered | PetSmart Store Support Group |
|---|---|---|---|---|---|---|
| | *5* | *Aug 28 2022* | *Aug 28 2012* | *4199288* | *Published* | *Rhonda Snyder* |

HAPPINESS IN STORE

| Class | 35 |
|---|---|

Schedule III-8

Schedule III to the
Collateral Agreement

| Goods | Retail store services and on-line retail store services, featuring pet food, pet supplies and pet accessories |
|---|---|
| Class | 43 |
| Goods | Boarding for pets; pet day care services; providing information about pet boarding and pet day care |
| Class | 44 |
| Goods | Pet grooming services; providing information about pet grooming services |

| PetSmart Store Support Group, Inc. | INSPIRED BY PETS | United States of America | Feb 20 2014 | 86199699 | Pending | | INSPIRED BY PETS |
|---|---|---|---|---|---|---|---|
| Marketing | 689 | | | | Under examination | Rhonda Snyder | |

| Class | 35 |
|---|---|
| Goods | Retail store services featuring pet food, pet supplies and pet accessories; online retail store services featuring pet food, pet supplies and pet accessories; charitable services, namely, organizing and conducting volunteer programs and community service projects related to pets and animals |

| PetSmart Store Support Group, Inc. | LIL' PAW | United States of America | Apr 9 2004 | 78399435 | Allowed to Lapse | PetSmart Store Support Group | LIL' PAW |
|---|---|---|---|---|---|---|---|
| | 372 | | Feb 10 2009 | 3573902 | Abandoned | Rhonda Snyder | |

| Class | 18 |
|---|---|
| Goods | Dog collars and harnesses |

| PetSmart Store Support Group, Inc. | LOOK GREAT GUARANTEE YOU'RE HAPPY OR IT'S FREE! | United States of America | Apr 12 2011 | 85293378 | Registered | Christy Hubbard | LOOK GREAT GUARANTEE YOU'RE HAPPY OR IT'S FREE! |
|---|---|---|---|---|---|---|---|
| | 324 | Aug 7 2022 | Aug 7 2012 | 4187652 | | Rhonda Snyder | |

| Class | 44 |
|---|---|
| Goods | Pet grooming services; providing information about pet grooming services |

| PetSmart Store Support Group, Inc. | NUTRIPHASE | United States of America | Feb 5 1997 | 75236895 | Registered | PetSmart Store Support Group | |
|---|---|---|---|---|---|---|---|
| | 373 | Dec 23 2017 | Dec 23 1997 | 2123928 | Renewal due | Rhonda Snyder | |

| Class | 31 |
|---|---|
| Goods | food for animals; bird seed |

| PetSmart Store Support Group, Inc. | PETPERKS | United States of America | Sep 15 2000 | 78026051 | Registered | PetSmart Store Support Group | |
|---|---|---|---|---|---|---|---|
| | 375 | Jul 20 2024 | Jul 20 2004 | 2865599 | Renewed | Rhonda Snyder | |

Schedule III-9

Schedule III to the
Collateral Agreement

| Class | 35 | | | | | | |
|-------|----|--|--|--|--|--|--|
| Goods | Retail store services in the field of pet supplies featuring a frequent patron program in which points are accumulated to be used for discounts on future purchases | | | | | | |

| PetSmart Store Support Group, Inc. | **PETPERKS** | United States of America | Sep 21 2004 | 78487137 | Registered | PetSmart Store Support Group | PETPERKS |
|---|---|---|---|---|---|---|---|
| | *376* | | *Dec 27 2015* | *Dec 27 2005* | *3035037* | *Renewal due* | *Rhonda Snyder* |

| Class | 35 |
|-------|----|
| Goods | administering customer savings and loyalty program featuring bonus incentives and coupons in the field of animal and pet supplies and services |

| PetSmart Store Support Group, Inc. | **PETSMART** | United States of America | Jun 27 1988 | 73737004 | Registered | PetSmart Store Support Group |
|---|---|---|---|---|---|---|
| | *377* | | *Oct 3 2019* | *Oct 3 1989* | *1559337* | *Renewal due* | *Rhonda Snyder* |

| Class | 42 |
|-------|----|
| Goods | RETAIL PET SUPPLY STORE SERVICES |

| PetSmart Store Support Group, Inc. | **PETSMART** | United States of America | Dec 22 2005 | 78779558 | Registered | PetSmart Store Support Group | PETSMART |
|---|---|---|---|---|---|---|---|
| | *315* | | *Jan 9 2017* | *Jan 9 2007* | *3196335* | *Accepted* | *Rhonda Snyder* |

| Class | 35 |
|-------|----|
| Goods | Retail store services, on-line retail store services featuring pet food, pet supplies and pet accessories; charitable services, namely, organizing and conducting volunteer programs and community service projects related to pets and animals |

| Class | 41 |
|-------|----|
| Goods | Educational services, namely, providing training related to pet food, pet supplies, pet accessories, pet care, pet grooming, pet adoption, and pet obedience; pet obedience training services; providing information about pet obedience training services |

| Class | 43 |
|-------|----|
| Goods | Pet boarding, kennel services, and pet day care services |

| Class | 44 |
|-------|----|
| Goods | Pet grooming services; animal exercising services |

| Class | 45 |
|-------|----|
| Goods | Pet adoption services, namely, arranging for dogs and cats from shelters to be placed in homes; providing information about pet adoption; providing facilities for the adoption of pet animals |

| PetSmart Store Support Group, Inc. | **PETSMART & Design (Lower Case "s")** | United States of America | Nov 20 1990 | 74116938 | Registered | PetSmart Store Support Group | PETSMART |
|---|---|---|---|---|---|---|---|
| | *378* | | *Feb 9 2023* | *Feb 9 1993* | *1751656* | *Renewed* | *Rhonda Snyder* |

| Class | 42 |
|-------|----|
| Goods | retail pet supply store services |

| PetSmart Store Support Group, Inc. | **PETSMART (Logo -- color)** | United States of America | Dec 22 2005 | 78779554 | Registered | PetSmart Store Support Group | PETSMART |
|---|---|---|---|---|---|---|---|
| | *319* | | *Jan 9 2017* | *Jan 9 2007* | *3196334* | *Accepted* | *Rhonda Snyder* |

| Class | 35 |
|-------|----|
| Goods | Retail store services, on-line retail store services featuring pet food, pet supplies and pet accessories; charitable services, namely, organizing and conducting volunteer programs and community service pro- |

Schedule III-10

| | |
|---|---|
| | jects related to pets and animals |
| Class | 41 |
| Goods | Educational services, namely, providing training related to pet food, pet supplies, pet accessories, pet care, pet grooming, pet adoption, and pet obedience; pet obedience training services; providing information about pet obedience training services |
| Class | 43 |
| Goods | Pet boarding, kennel services, and pet day care services |
| Class | 44 |
| Goods | Pet grooming services; animal exercising services |
| Class | 45 |
| Goods | Pet adoption services, namely, arranging for dogs and cats from shelters to be placed in homes; providing information about pet adoption; providing facilities for the adoption of pet animals |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **PETSMART AQUARIUM SERVICES** | United States of America | May 21 2009 | 77742524 | Registered | PetSmart Store Support Group | |
| | *379* | *Jul 20 2020* | *Jul 20 2010* | *3820375* | *8&15 due* | *Rhonda Snyder* | |

| | |
|---|---|
| Class | 37 |
| Goods | Aquarium set-up and installation, cleaning and water changes provided to business and residential customers |
| Class | 39 |
| Goods | Aquarium delivery; moving of aquariums and their contents, including plants, water and fish, from one location to another |
| Class | 44 |
| Goods | Vacation service, namely, feeding of fish of absent owners and performing required cleaning and water changes; emergency care for fish provided to business and residential customers |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **PETSMART CHARITIES** | United States of America | Aug 2 1994 | 74556637 | Registered | PetSmart Store Support Group | |
| | *380* | *Oct 31 2015* | *Oct 31 1995* | *1931098* | *Renewal due* | *Rhonda Snyder* | |

| | |
|---|---|
| Class | 36 |
| Goods | charitable services, namely providing financial assistance to programs which increase the quality of care for animals |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **PETSMART PARTNERS IN PETHOOD** | United States of America | Feb 19 2015 | 86539459 | Pending | | |
| | *822* | | | | *Awaiting examination* | *Rhonda Snyder* | |

| | |
|---|---|
| Class | 35 |
| Goods | Retail store services, on-line retail store services featuring pet food, pet supplies and pet accessories; charitable services, namely, organizing and conducting volunteer programs and community service projects related to pets and animals |
| Class | 41 |
| Goods | Educational services, namely, providing training related to pet food, pet supplies, pet accessories, pet care, pet grooming, pet adoption, and pet obedience; pet obedience training services; providing information about pet obedience training services |
| Class | 43 |
| Goods | Pet boarding, kennel services, and pet day care services |
| Class | 44 |

Schedule III to the
Collateral Agreement

| Goods | Pet grooming services; animal exercising services |
|---|---|
| Class | 45 |
| Goods | Pet adoption services, namely, arranging for dogs and cats from shelters to be placed in homes; providing information about pet adoption; providing facilities for the adoption of pet animals |

| PetSmart Store Support Group, Inc. | **PETSMART PARTNERS IN PETHOOD and design** | United States of America | | 86539798 | Pending | | |
| | *826* | | | | *Awaiting examination* | *Rhonda Snyder* | |

| Class | 35 |
|---|---|
| Goods | Retail store services, on-line retail store services featuring pet food, pet supplies and pet accessories; charitable services, namely, organizing and conducting volunteer programs and community service projects related to pets and animals |
| Class | 41 |
| Goods | Educational services, namely, providing training related to pet food, pet supplies, pet accessories, pet care, pet grooming, pet adoption, and pet obedience; pet obedience training services; providing information about pet obedience training services |
| Class | 43 |
| Goods | Pet boarding, kennel services, and pet day care services |
| Class | 44 |
| Goods | Pet grooming services; animal exercising services |
| Class | 45 |
| Goods | Pet adoption services, namely, arranging for dogs and cats from shelters to be placed in homes; providing information about pet adoption; providing facilities for the adoption of pet animals |

| PetSmart Store Support Group, Inc. | **PETSMART PETSHOTEL** | United States of America | Feb 16 2004 | 78368653 | Registered | PetSmart Store Support Group, Inc. | |
| | *22* | *Dec 27 2015* | *Dec 27 2005* | *3034344* | *Renewal due* | *Rhonda Snyder* | PETSMART PETSHOTEL |

| Class | 43 |
|---|---|
| Goods | Kennel services and general pet day care services for domesticated animals |
| Class | 44 |
| Goods | Grooming and animal exercising services for domesticated animals |

| PetSmart Store Support Group, Inc. | **PETSMART VET ASSURED THE STANDARD FOR PETCARE** | United States of America | Mar 27 2013 | 85887833 | Registered | | |
| | *631* | *Jan 20 2025* | *Jan 20 2015* | *4675935* | | *Rhonda Snyder* | |

| Class | 16 |
|---|---|
| Goods | Printed pet care guides |
| Class | 44 |
| Goods | Program of health care for small pets, birds, reptiles and amphibians available for sale in pet stores |

Schedule III-12

| PetSmart Store Support Group, Inc. | **PETSMART WE LOVE TO SEE HEALTHY, HAPPY PETS** | United States of America | Jul 9 2009 | 77777757 | Registered | PetSmart Store Support Group | |
|---|---|---|---|---|---|---|---|
| | *418* | | *Sep 14 2020* | *Sep 14 2010* | *3848741* | *Renewal due* | *Rhonda Snyder* |

| Class | 35 |
|---|---|
| Goods | Retail store services and on-line retail store services, featuring pet food, pet supplies and pet accessories |

| PetSmart Store Support Group, Inc. | **PETSMART WE LOVE TO SEE HEALTHY, HAPPY PETS** | United States of America | Jul 9 2009 | 77777763 | Registered | PetSmart Store Support Group | |
|---|---|---|---|---|---|---|---|
| | *382* | | *Sep 14 2020* | *Sep 14 2010* | *3848742* | *Renewal due* | *Rhonda Snyder* |

| Class | 44 |
|---|---|
| Goods | Pet grooming services; providing information about pet grooming services |

| PetSmart Store Support Group, Inc. | **PETSMART WE LOVE TO SEE HEALTHY, HAPPY PETS.** | United States of America | Jul 9 2009 | 77777766 | Registered | PetSmart Store Support Group | |
|---|---|---|---|---|---|---|---|
| | *383* | | *Sep 14 2020* | *Sep 14 2010* | *3848743* | *8&15 due* | *Rhonda Snyder* |

| Class | 45 |
|---|---|
| Goods | Pet adoption services, namely, arranging for dogs and cats from shelters to be placed in homes; providing information about pet adoption; providing facilities for the adoption of pet animals |

| PetSmart Store Support Group, Inc. | **PETSMART. WE LOVE TO SEE HEALTHY, HAPPY PETS** | United States of America | Jul 9 2009 | 77777641 | Registered | PetSmart Store Support Group | |
|---|---|---|---|---|---|---|---|
| | *386* | | *Sep 14 2020* | *Sep 14 2010* | *3848738* | *8&15 due* | *Rhonda Snyder* |

| Class | 35 |
|---|---|
| Goods | Retail store services and on-line retail store services, featuring pet food, pet supplies and pet accessories |

| PetSmart Store Support Group, Inc. | **PETSMART. WE LOVE TO SEE HEALTHY, HAPPY PETS** | United States of America | Jul 9 2009 | 77777644 | Registered | PetSmart Store Support Group | |
|---|---|---|---|---|---|---|---|
| | *387* | | *Sep 14 2020* | *Sep 14 2010* | *3848739* | *8&15 due* | *Rhonda Snyder* |

| Class | 44 |
|---|---|
| Goods | Pet grooming services; providing information about pet grooming services |

| PetSmart Store Support Group, Inc. | **PETSMART. WE LOVE TO SEE HEALTHY, HAPPY PETS** | United States of America | Jul 9 2009 | 77777645 | Registered | PetSmart Store Support Group | |
|---|---|---|---|---|---|---|---|
| | *404* | | *Sep 14 2020* | *Sep 14 2010* | *3848740* | *8&15 due* | *Rhonda Snyder* |

| Class | 45 |
|---|---|
| Goods | Pet adoption services, namely, arranging for dogs and cats from shelters to be placed in homes; providing information about pet adoption; providing facilities for the adoption of pet animals |

Schedule III-13

Schedule III to the
Collateral Agreement

| PetSmart Store Support Group, Inc. | **PETSMART.COM** | United States of America | May 28 1999 | 75717136 | Registered | PetSmart Store Support Group |
|---|---|---|---|---|---|---|
| | *403* | *Mar 6 2021* | *Mar 6 2001* | *2434196* | *Renewal due* | *Rhonda Snyder* |

| Class | 35 |
|---|---|
| Goods | Retail store services provided on-line by means of a global computer network featuring pet-related products and supplies |

| Class | 42 |
|---|---|
| Goods | information and advisory services provided on-line by means of a global computer network in the field of pets and pet care |

| PetSmart Store Support Group, Inc. | **PURRRELY DIVINE** | United States of America | Aug 21 2014 | 86373999 | Pending | Mary Margaret Murray |
|---|---|---|---|---|---|---|
| | *700* | | | | | *Rhonda Snyder* |

PURRRELY DIVINE

| Class | 31 |
|---|---|
| Goods | Pet treats |

| PetSmart Store Support Group, Inc. | **RESCUE WAGGIN** | United States of America | Nov 14 2003 | 78328002 | Registered | PetSmart Store Support Group |
|---|---|---|---|---|---|---|
| | *399* | *Sep 13 2015* | *Sep 13 2005* | *2995927* | *Renewal due* | *Rhonda Snyder* |

RESCUE WAGGIN

| Class | 36 |
|---|---|
| Goods | Charitable fund raising services |

| Class | 39 |
|---|---|
| Goods | Transportation via commercial motor vehicle of domestic animals between shelters to help reduce the unnecessary euthanasia of pets |

| Class | 45 |
|---|---|
| Goods | Adoption services for domestic animals |

| PetSmart Store Support Group, Inc. | **SANTA CLAWS** | United States of America | Jan 5 1990 | 74016725 | Registered | PetSmart Store Support Group |
|---|---|---|---|---|---|---|
| | *397* | *Sep 18 2020* | *Sep 18 1990* | *1614449* | *Renewal due* | *Rhonda Snyder* |

| Class | 42 |
|---|---|
| Goods | Pet portrait services |

| PetSmart Store Support Group, Inc. | **SMART PETS** | United States of America | Feb 16 2004 | 78368683 | Registered | PetSmart Store Support Group |
|---|---|---|---|---|---|---|
| | *318* | *Oct 17 2016* | *Oct 17 2006* | *3156061* | *Renewal due* | *Rhonda Snyder* |



| Class | 41 |
|---|---|

Schedule III-14

Schedule III to the
Collateral Agreement

| Goods | Pet training services | | | | | | | |
|---|---|---|---|---|---|---|---|---|

| PetSmart Store Support Group, Inc. | **SMART SELECTOR** | United States of America | Dec 21 2009 | 77898606 | Registered | PetSmart Store Support Group | | |
| | *349* | *Nov 23 2020* | *Nov 23 2010* | *3878887* | *8&15 due* | *Rhonda Snyder* | | SMART SELECTOR |

| Class | 9 | | | | | | | |
| Goods | Interactive computer kiosks comprising computers, computer hardware, computer peripherals, and computer operating software, for use in providing information about pet products | | | | | | | |

| PetSmart Store Support Group, Inc. | **SMART SELECTOR** | United States of America | Dec 21 2009 | 77898608 | Registered | PetSmart Store Support Group | | |
| | *347* | *Nov 23 2020* | *Nov 23 2010* | *3878888* | *8&15 due* | *Rhonda Snyder* | | SMART SELECTOR |

| Class | 35 | | | | | | | |
| Goods | Advertising, marketing and promoting the pet products of others in retail locations using kiosks | | | | | | | |

| PetSmart Store Support Group, Inc. | **SOPHISTA CAT** | United States of America | Nov 17 1993 | 74461371 | Allowed to Lapse | PetSmart Store Support Group | | |
| | *346* | | *Oct 25 1994* | *1859903* | *Abandoned* | *Rhonda Snyder* | | |

| Class | 31 | | | | | | | |
| Goods | cat food and edible cat treats | | | | | | | |

| PetSmart Store Support Group, Inc. | **THINK TWICE** | United States of America | Nov 21 2008 | 77619971 | Registered | PetSmart Store Support Group | | |
| | *344* | *Apr 20 2020* | *Apr 20 2010* | *3779042* | *8&15 due* | *Rhonda Snyder* | | THINK TWICE |

| Class | 18 | | | | | | | |
| Goods | Canvas shopping bags | | | | | | | |

| PetSmart Store Support Group, Inc. | **THINK TWICE** | United States of America | Nov 21 2008 | 77620005 | Registered | PetSmart Store Support Group | | |
| | *342* | *May 11 2020* | *May 11 2010* | *3788207* | *8&15 due* | *Rhonda Snyder* | | THINK TWICE |

| Class | 35 | | | | | | | |
| Goods | providing to others information relating to public awareness of environmental sustainability issues and initiatives | | | | | | | |

| PetSmart Store Support Group, Inc. | **TOP FIN** | United States of America | Jul 13 1992 | 74802297 | Registered | PetSmart Store Support Group | | |
| | *340* | *Oct 10 2015* | *Oct 10 1995* | *1926192* | *Renewal due* | *Rhonda Snyder* | | |

| Class | 7 | | | | | | | |
| Goods | aquarium pumps | | | | | | | |

| Class | 16 | | | | | | | |

Schedule III-15

| Goods | aquarium filters, aquarium accessories; namely, nets, skimmers, scrapers, and gravel; aquariums |
|---|---|

| Class | 31 |
|---|---|
| Goods | fish food |

| PetSmart Store Support Group, Inc. | **TOP FIN** | United States of America | Jul 31 2013 | 86024603 | Registered | |
|---|---|---|---|---|---|---|
| | 667 | *Aug 26 2024* | *Aug 26 2014* | *4591540* | | *Rhonda Snyder* |

| Class | 1 |
|---|---|
| Goods | Chemicals for use in aquariums; chemical aquarium water conditioners; biologically active enzymes and microorganisms used in pond maintenance |

| PetSmart Store Support Group, Inc. | **TOP FIN** | United States of America | Jul 31 2013 | 86024633 | Registered | |
|---|---|---|---|---|---|---|
| | 666 | *Aug 26 2024* | *Aug 26 2014* | *4591541* | | *Rhonda Snyder* |

| Class | 9 |
|---|---|
| Goods | Thermometers |

| PetSmart Store Support Group, Inc. | **TOP FIN** | United States of America | Jul 31 2013 | 86024639 | Registered | |
|---|---|---|---|---|---|---|
| | 668 | *Aug 26 2024* | *Aug 26 2014* | *4591542* | | *Rhonda Snyder* |

| Class | 11 |
|---|---|
| Goods | Aquarium filters; aquarium heaters; aquarium heater holders |

| PetSmart Store Support Group, Inc. | **TOP FIN** | United States of America | Jul 31 2013 | 86024641 | Registered | |
|---|---|---|---|---|---|---|
| | 670 | *Aug 26 2024* | *Aug 26 2014* | *4591543* | | *Rhonda Snyder* |

| Class | 19 |
|---|---|
| Goods | Aquarium gravel; aquarium sand; decorative aquarium rocks and stones |

| PetSmart Store Support Group, Inc. | **TOP FIN** | United States of America | Jul 31 2013 | 86024645 | Registered | |
|---|---|---|---|---|---|---|
| | 669 | *Aug 26 2024* | *Aug 26 2014* | *4591544* | | *Rhonda Snyder* |

| Class | 17 |
|---|---|
| Goods | Flexible plastic and silicone tubing used for transport of air |

| PetSmart Store Support Group, Inc. | **TOP FIN** | United States of America | Jul 31 2013 | 86024649 | Pending | |
|---|---|---|---|---|---|---|
| | 673 | | | *Approved for Publication* | *Rhonda Snyder* | TOP FIN |

| Class | 21 |
|---|---|
| Goods | Aquarium air stones; aquarium fish nets; aquarium ornaments; artificial aquarium landscapes; fish net breeder; hand-operated aquarium cleaning tools, namely scrapers, scrubbers, multi-purpose cleaning tools in the nature of scrubbers and scrapers and brushes |

| PetSmart Store Support Group, Inc. | **TOP FIN** | United States of America | Jul 31 2013 | 86024784 | Registered | |
|---|---|---|---|---|---|---|

Schedule III to the
Collateral Agreement

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | *674* | *Aug 26 2024* | *Aug 26 2014* | *4591545* | | *Rhonda Snyder* |
| Class | 31 | | | | | |
| Goods | Live plants used as aquarium landscapes | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **TOP PAW** | United States of America | Dec 3 1991 | 74228055 | Registered | PetSmart Store Support Group |
| | *338* | *May 3 2024* | *May 3 1994* | *1834630* | *Renewed* | *Rhonda Snyder* |
| Class | 18 | | | | | |
| Goods | pet supplies; namely, leashes and collars | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **TOP PAW** | United States of America | Jul 31 2013 | 86024522 | Registered | |
| | *655* | *Sep 2 2024* | *Sep 2 2014* | *4595615* | | *Rhonda Snyder* |
| Class | 3 | | | | | |
| Goods | Pet stain removers; odor removers for pets; pet shampoo; waterless shampoo | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **TOP PAW** | United States of America | Jul 31 2013 | 86025268 | Registered | |
| | *656* | *Aug 19 2024* | *Aug 19 2014* | *4587329* | | *Rhonda Snyder* |
| Class | 5 | | | | | |
| Goods | Diapers for pets; medicated shampoo for pets | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **TOP PAW** | United States of America | Jul 31 2013 | 86026998 | Registered | |
| | *659* | *Aug 19 2024* | *Aug 19 2014* | *4587336* | | *Rhonda Snyder* |
| Class | 9 | | | | | |
| Goods | Life jackets for pets; clickers for training dogs | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **TOP PAW** | United States of America | | 86027015 | Registered | |
| | *657* | *Aug 19 2024* | *Aug 19 2014* | *4587337* | | *Rhonda Snyder* |
| Class | 6 | | | | | |
| Goods | Metal gates; metal safety gates for pets; extensions for metal gates; dog houses made of metal | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **TOP PAW** | United States of America | | 86027035 | Registered | |
| | *658* | *Aug 19 2024* | *Aug 19 2014* | *4587338* | | *Rhonda Snyder* |
| Class | 8 | | | | | |
| Goods | Nail clippers; nail files | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **TOP PAW** | United States of America | Jul 31 2013 | 86027039 | Registered | |
| | *660* | *Oct 28 2024* | *Oct 28 2014* | *4627210* | | *Rhonda Snyder* |
| Class | 12 | | | | | |

Schedule III-17

| | | | | | | |
|---|---|---|---|---|---|---|
| Goods | | Pet safety seats for use in vehicles; seat covers for vehicles; strollers for pets; booster seats for use in vehicles; fitted liners for the cargo area of vehicles; seat safety harnesses for cars; animal strollers | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **TOP PAW** | United States of America | Jul 31 2013 | 86027049 | Registered | |
| | *661* | *Aug 19 2024* | *Aug 19 2014* | *4587339* | | *Rhonda Snyder* |
| Class | 16 | | | | | |
| Goods | | Plastic bags for disposing of pet waste; plastic bags in the shape of tubes for the disposal of pet-waste; disposable house training pads for pets | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **TOP PAW** | United States of America | Aug 1 2013 | 86027052 | Registered | |
| | *663* | *Sep 2 2024* | *Sep 2 2014* | *4595629* | | *Rhonda Snyder* |
| Class | 21 | | | | | |
| Goods | | Scoops for disposal of pet waste; household storage containers for pet food; grooming tools for pets, namely, combs and brushes | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **TOP PAW** | United States of America | Aug 1 2013 | 86027055 | Registered | |
| | *665* | *Aug 19 2024* | *Aug 19 2014* | *4587340* | | *Rhonda Snyder* |
| Class | 27 | | | | | |
| Goods | | Bathing mats for pets | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **TOP PAW** | United States of America | Aug 1 2013 | 86027069 | Registered | |
| | *664* | *Oct 28 2024* | *Oct 28 2014* | *4627211* | | *Rhonda Snyder* |
| Class | 22 | | | | | |
| Goods | | Hammocks for pets; unfitted liners for the cargo area of vehicles, faucet sprayers; shower head sprayers | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **TOP PAW** | United States of America | Jul 31 2013 | 86027229 | Registered | |
| | *662* | *Oct 28 2024* | *Oct 28 2014* | *4627212* | Approved for Publication | *Rhonda Snyder* |
| Class | 20 | | | | | |
| Goods | | Fixed dispensers not of metal for pet waste bags; pet ramp; non-metal safety gates for pets; plastic lids for cans; beds for household pets; portable beds for pets; pillows for household pets; play yards for pets | | | | |
| Class | 21 | | | | | |
| Goods | | Pet feeding and drinking bowls; racks and stands for elevating pet feeding bowls and dishes | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **TOP WING** | United States of America | Dec 13 1995 | 75032240 | Registered | PetSmart Store Support Group |
| | *335* | *Nov 12 2016* | *Nov 12 1996* | *2015642* | Renewal due | *Rhonda Snyder* |
| Class | 21 | | | | | |
| Goods | | bird feeders | | | | |
| Class | 28 | | | | | |
| Goods | | toys for birds | | | | |

Schedule III-18

| PetSmart Store Support Group, Inc. | **TOYSHOPPE** | United States of America | Aug 2 1999 | 75766211 | Registered | PetSmart Store Support Group |  |
| | *334* | *Aug 7 2021* | *Aug 7 2001* | *2476470* | *Renewal due* | *Rhonda Snyder* | |

| Class | 28 |
| Goods | Toys for pets |

| PetSmart Store Support Group, Inc. | **TOYSHOPPE (with dog)** | United States of America | Aug 2 1999 | 75765647 | Registered | PetSmart Store Support Group |  |
| | *331* | *Aug 7 2021* | *Aug 7 2001* | *2476469* | *Renewal due* | *Rhonda Snyder* | |

| Class | 28 |
| Goods | Toys for pets |

| PetSmart Store Support Group, Inc. | **UNLOCK THE FUN** | United States of America | May 28 1999 | 75717137 | Registered | PetSmart Store Support Group | |
| | *312* | *Jan 1 2022* | *Jan 1 2002* | *2525692* | *Renewal due* | *Rhonda Snyder* | |

| Class | 28 |
| Goods | Toys for pets |

| PetSmart Store Support Group, Inc. | **WE CREATE MORE MOMENTS** | United States of America | Feb 28 2014 | 86208060 | Pending | PetSmart Store Support Group | We Create More Moments |
| | *690* | | *Office Action* | | *Published* | *Rhonda Snyder* | |

| Class | 35 |
| Goods | Retail store services featuring pet food, pet supplies and pet accessories; on-line retail store services, featuring pet food, pet supplies and pet accessories; charitable services, namely, organizing and conducting volunteer programs and community service projects related to pets and animals. |

| PetSmart Store Support Group, Inc. | **WHERE PETS ARE FAMILY** | United States of America | Jun 2 1994 | 74532367 | Registered | PetSmart Store Support Group | |
| | *329* | *Mar 12 2016* | *Mar 12 1996* | *1962411* | *Renewal due* | *Rhonda Snyder* | |

| Class | 42 |
| Goods | retail pet supply store services |

| PetSmart Store Support Group, Inc. | **WHISKER CITY** | United States of America | May 3 2002 | 78126191 | Registered | PetSmart Store Support Group | |
| | *328* | *Jun 10 2023* | *Jun 10 2003* | *2724232* | *Renewed* | *Rhonda Snyder* | |

| Class | 18 |
| Goods | Cat scratching posts |

| Class | 28 |

Schedule III-19

Schedule III to the
Collateral Agreement

| Goods | Cat toys |
|---|---|

| Class | 31 |
|---|---|
| Goods | Catnip |

| PetSmart Store Support Group, Inc. | **WHISKER CITY** | United States of America | Jul 31 2013 | 86024555 | Registered | |
|---|---|---|---|---|---|---|
| | *675* | *Sep 16 2024* | *Sep 16 2014* | *4604259* | | *Rhonda Snyder* |

| Class | 8 |
|---|---|
| Goods | Grooming tools for pets, namely, dematting and shedding blades |

| Class | 10 |
|---|---|
| Goods | flea combs |

| Class | 16 |
|---|---|
| Goods | Plastic bags for disposing of pet waste; pet litter box liners in the form of plastic bags |

| Class | 20 |
|---|---|
| Goods | reusable self-sealing lids for commercial containers for pet food; portable dispensers for plastic bags and liners for commercial use |

| Class | 21 |
|---|---|
| Goods | Pet feeding and watering bowls made of ceramic and stainless steel; pet food scoops; household storage containers for pet food; reusable self-sealing lids for household containers for pet food; cat litter pans; hooded cat litter pans; Pet waste management kits comprising scoops for disposal of pet waste, plastic bags and liners, portable dispensers for plastic bags and liners sold as a unit; scoops for disposal of pet waste; plastic pet litter box liners; portable dispensers for plastic bags and liners for household use; pet grooming aides; namely, grooming gloves and shedding rake. |

| PetSmart Store Support Group, Inc. | **WHISKER CITY** | United States of America | Jul 31 2013 | 86024576 | Registered | |
|---|---|---|---|---|---|---|
| | *676* | *Aug 19 2024* | *Aug 19 2014* | *4587321* | | *Rhonda Snyder*     WHISKER CITY |

| Class | 20 |
|---|---|
| Goods | Beds for household pets; portable beds for pets; pet bedding in the nature of mattresses for pets; enclosed beds for household pets; pet furniture; cat scratching pads; cat scratching posts; playhouses for pets; cat towers; scratch mats; cat perch; play yards for pets |

| PetSmart Store Support Group, Inc. | **WHISKER CITY** | United States of America | Jul 31 2013 | 86024581 | Registered | |
|---|---|---|---|---|---|---|
| | *677* | *Aug 19 2024* | *Aug 19 2014* | *4587322* | | *Rhonda Snyder* |

| Class | 18 |
|---|---|
| Goods | Pet products, namely, pet restraining devices consisting of leashes, retractable leashes, collars, break-away collars, harnesses and tie-outs; Pet collar accessories, namely, bells, pendants and charms; animal carriers; clothing, namely costumes for animals |

| PetSmart Store Support Group, Inc. | **WHISKER CITY** | United States of America | Jul 31 2013 | 86024584 | Registered | |
|---|---|---|---|---|---|---|
| | *678* | *Aug 19 2024* | *Aug 19 2014* | *4587323* | | *Rhonda Snyder* |

| Class | 17 |
|---|---|
| Goods | Scratch prevention tape for pets |

| PetSmart Store Support Group, Inc. | **WHISKER CITY** | United States of America | Jul 31 2013 | 86024588 | Registered | |
|---|---|---|---|---|---|---|

Schedule III-20

Schedule III to the
Collateral Agreement

| | | | | | | |
|---|---|---|---|---|---|---|
| | *679* | *Aug 19 2024* | Aug 19 2014 | *4587324* | Approved for Publica-tion | *Rhonda Snyder* |
| **Class** | 11 | | | | | |
| **Goods** | Drinking fountains for pets | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **WHISKER CITY** | United States of America | Jul 31 2013 | 86024595 | Registered | |
| | *680* | *Aug 19 2024* | Aug 19 2014 | *4587325* | | *Rhonda Snyder* |
| **Class** | 5 | | | | | |
| **Goods** | Animal repellants | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| PetSmart Store Support Group, Inc. | **WHISKER CITY** | United States of America | Jul 31 2013 | 86024598 | Registered | |
| | *681* | *Aug 19 2024* | Aug 19 2014 | *4587327* | | *Rhonda Snyder* |
| **Class** | 3 | | | | | |
| **Goods** | Odor removers for pets; disposable wipes impregnated with a cleaning preparation for cats; non medicated, non veterinary grooming preparations namely pet shampoo, conditioner and detangling spray; waterless shampoo for pets; deodorizers for pets | | | | | |

Schedule III-21

| Trademark | Registration No. | Registered Owner |
|---|---|---|
| PET360 | 3929944 | Pet360, Inc. |
| PET360 (Design and words indicated) | 4216914 | Pet360, Inc. |
| PET360 | 4304245 | Pet360, Inc. |
| PET360 (Design and words indicated) | 4304243 | Pet360, Inc. |
| Pet Parenting. Simplified. | 4385330 | Pet360, Inc. |
| PETOOLAH | 85458198 | Pet360, Inc. |
| PETSTYLE | 3214157 | Pet360, Inc. |
| PETSTYLE (Design and words indicated) | 3716961 | Pet360, Inc. |
| PETSTYLE.COM | 2438675 | Pet360, Inc. |
| BLOGPAWS (Design and words indicated) | 4000803 | Pet360, Inc. |
| ONLY NATURAL PET | 86232302 (serial number with USPTO, patent application pending) | Pet360, Inc. |
| ONLY NATURAL PET | 4197370 | Pet360, Inc. |
| ONLY NATURAL PET STORE | 4185509 | Pet360, Inc. |
| ONLY NATURAL PET STORE (Design and words indicated) | 3504384 | Pet360, Inc. |
| PETLANTHROPY | 3624223 | Pet360, Inc. |
| PETMD (Design and words indicated) | 4222503 | PETMD, Inc. |
| PETMD | 4113873 | PETMD, Inc. |
| PetMD Espanol | 4097472 | PETMD, Inc. |
| petmd.com | 3925998 | PETMD, Inc. |
| PETMD University | 4444999 | PETMD, Inc. |
| PETMDU | 4548465 | PETMD, Inc. |
| PETMD University (Design and words indicated) | 4445001 | PETMD, Inc. |
| PETMD University (Design and words indicated) | 4445000 | PETMD, Inc. |
| Doggyspace | 3585949 | PETMD, Inc. |
| Doggyspace (Design Only) | 3616013 | PETMD, Inc. |
| My Dog Has More Friends Than You | 3697864 | PETMD, Inc. |
| Breedopedia | 3635233 | PETMD, Inc. |
| because pets can't talk | 3557488 | PETMD, Inc. |
| Click.SAVE.Relax! | 3867153 | Pet360, Inc. |
| Dog and Cat Design with PFD Word | 3910083 | Pet360, Inc. |
| Dog and Cat (Design Only) | 3834849 | Pet360, Inc. |
| PETFOODDIRECT | 3246593 | Pet360, Inc. |
| PETFOOD DIRECT | 2445325 | Pet360, Inc. |
| PETFOODDIRECT.com | 2445327 | Pet360, Inc. |
| PETFOODDIRECT.com | 4117356 | Pet360, Inc. |

Schedule III-1

Schedule III to the
Collateral Agreement

| AMERICA'S PET STORE ON THE WEB | 3250818 | Pet360, Inc. |
|---|---|---|
| PETSCRIPTIONS | 3116518 | Pet360, Inc. |
| PFD Rewards | 4197657 | Pet360, Inc. |
| ZOOTOO | 3583894 | Pet360, Inc. |
| ZOO TOO | 3500033 | Pet360, Inc. |
| ZOOTOO | 3554591 | Pet360, Inc. |
| ZOOTOO (Design and words indicated) | 3600048 | Pet360, Inc. |
| ZOOTOO | 3565649 | Pet360, Inc. |
| ZOOTOO HOUSE | 3583892 | Pet360, Inc. |
| ZOOTOO HOUSE | 3583853 | Pet360, Inc. |
| RATE AND REVIEW THE PET WORLD | 3503707 | Pet360, Inc. |
| ZOOTOO TV | 3693195 | Pet360, Inc. |
| PET PULSE | 3581323 | Pet360, Inc. |
| PET PULSE (Design and words indicated) | 3581324 | Pet360, Inc. |
| BRINGING PET LOVERS TOGETHER | 3702328 | Pet360, Inc. |
| A PLACE FOR PET LOVERS | 3702327 | Pet360, Inc. |
| PET LOVERS CHOICE AWARDS | 3696540 | Pet360, Inc. |
| SOCIAL PETWORKING | 3729349 | Pet360, Inc. |
| PET WARS | 3620784 | Pet360, Inc. |
| ZOOTOO.COM ANGELS | 3641050 | Pet360, Inc. |
| ZOOTOO.COM ANGELS (Design and words indicated) | 3641051 | Pet360, Inc. |
| ZOOTOO PET NEWS | 3806123 | Pet360, Inc. |
| ZOOTOO (Design and words indicated) | 3950495 | Pet360, Inc. |
| VETMART | 1578361 | PetSmart Store Support Group, Inc. |
| VETMART | 1615854 | PetSmart Store Support Group, Inc. |

Trademarked Domain Names

| Trademark | Registration No. | Registered Owner |
|---|---|---|
| PETSMART.COM | 2434196 | PetSmart Store Support Group, Inc. |

Schedule III-2

Schedule IV to the
Collateral Agreement

## COMMERCIAL TORT CLAIMS

None.

Schedule IV-1

Exhibit I to the
Collateral Agreement

SUPPLEMENT NO. __ dated as of [  ] (this "Supplement"), to the Collateral Agreement dated as of March 11, 2015 (this "Agreement"), among ARGOS HOLDINGS INC., PETSMART, INC., the various other GRANTORS party thereto and CITIBANK, N.A., as Collateral Agent (in such capacity, the "Collateral Agent").

A.    Reference is made to the Credit Agreement dated as of March 11, 2015 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Argos Holdings Inc., a Delaware corporation ("Holdings"), PetSmart, Inc., a Delaware corporation (the "Borrower"), the Lenders party thereto and Citibank, N.A., as Administrative Agent, and the various other parties thereto and (b) the Collateral Agreement.

B.    Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement and the Collateral Agreement, as applicable.

C.    The Grantors have entered into the Collateral Agreement in order to induce the Lenders to make Loans.  Section 5.14 of the Collateral Agreement provides that additional Subsidiaries or any Intermediate Parent may become Grantors under the Collateral Agreement by execution and delivery of an instrument in the form of this Supplement.  The undersigned [Subsidiary][Intermediate Parent] (the "New Grantor") is executing this Supplement in accordance with the requirements of the Credit Agreement to become a Grantor under the Collateral Agreement in order to induce the Lenders to make additional Loans and as consideration for Loans previously made.

Accordingly, the Collateral Agent and the New Grantor agree as follows:

SECTION 1.    In accordance with Section 5.14 of the Collateral Agreement, the New Grantor by its signature below becomes a Grantor under the Collateral Agreement with the same force and effect as if originally named therein as a Grantor, and the New Grantor hereby (a) agrees to all the terms and provisions of the Collateral Agreement applicable to it as a Grantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Grantor thereunder are true and correct on and as of the date hereof.  In furtherance of the foregoing, the New Grantor, as security for the payment and performance in full of the Secured Obligations (as defined in the Collateral Agreement), does hereby create and grant to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest in and lien on all of the New Grantor's right, title and interest in, to and under the Pledged Collateral and the Article 9 Collateral (as each such term is defined in the Collateral Agreement).  Each reference to a "Grantor" in the Collateral Agreement shall be deemed to include the New Grantor.  The Collateral Agreement is hereby incorporated herein by reference.

SECTION 2.    The New Grantor represents and warrants to the Collateral Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except to the extent that enforceability of such obligations may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally.

SECTION 3.    This Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract.  Delivery of an executed signature page to this Supplement

Ex. I-1

by facsimile or other electronic transmission shall be effective as delivery of a manually signed counter-part of this Supplement. This Supplement shall become effective as to the New Grantor when a counter-part hereof executed on behalf of the New Grantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon the New Grantor and the Collateral Agent and their respective permitted successors and as-signs, and shall inure to the benefit of the New Grantor, the Collateral Agent and the other Secured Parties and their respective successors and assigns, except that the New Grantor shall not have the right to assign or transfer its rights or obligations hereunder or any interest herein (and any such assignment or transfer shall be void) except as expressly provided in this Supplement, the Collateral Agreement and the Credit Agreement.

SECTION 4.    The New Grantor hereby represents and warrants that (a) set forth on Schedule I attached hereto is a schedule with the true and correct legal name of the New Grantor, its ju-risdiction of formation and the location of its chief executive office, (b) Schedule II sets forth a true and complete list, with respect to the New Grantor, of (i) all the Equity Interests owned by the New Grantor in any Subsidiary and the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Equity Interests owned by the New Grantor and (ii) all the Pledged Debt Securities owned by the New Grantor and (c) Schedule III attached hereto sets forth, as of the date hereof, (i) all of the New Grantor's Patents constituting Article 9 Collateral, including the name of the registered owner, type, registration or application number and the expiration date (if already registered) of each such Patent owned by the New Grantor, (ii) all of the New Grantor's Trademarks con-stituting Article 9 Collateral, including the name of the registered owner, the registration or application number and the expiration date (if already registered) of each such Trademark owned by the New Gran-tor, and (iii) all of the New Grantor's Copyrights constituting Article 9 Collateral, including the name of the registered owner, title and, if applicable, the registration number of each such Copyright owned by the New Grantor, (d) Schedule IV attached hereto sets forth, as of the date hereof, each Commercial Tort Claim in respect of which a complaint or counterclaim has been filed by the New Grantor seeking damag-es in an amount of $12,500,000 or more, (e) Schedule V attached hereto sets forth, as of the date hereof, (i) a list of all leased locations of the New Grantor where the New Grantor maintains inventory with a value in excess of $250,000 and (ii) the names and addresses of all other persons with whom inventory owned by the New Grantor with a value in excess of $250,000 is or has been lodged at any time during the past four months and (f) Schedule VI attached hereto sets forth, as of the date hereof, a true and cor-rect list of all deposit accounts and securities accounts maintained by the New Grantor having a balance in excess of $2,500,000 at any time during the past 4 months, including the name and address of the de-positary institution or intermediary institution, the type of account and the account number and indicating if such account is required to be subject to a control agreement pursuant to the Loan Documents, and if not, the reason for such exclusion.

SECTION 5.    Except as expressly supplemented hereby, the Collateral Agreement shall remain in full force and effect.

**SECTION 6.    THIS SUPPLEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

SECTION 7.    Any provision of this Supplement held to be invalid, illegal or unen-forceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invali-date such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to re-place any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of such invalid, illegal or unenforceable provisions.

Ex. I-2

SECTION 8.    All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the Collateral Agreement.

SECTION 9.    The New Grantor agrees to reimburse the Collateral Agent for its fees and expenses incurred hereunder and under the Collateral Agreement as provided in Section 9.03(a) of the Credit Agreement; underlined provided that each reference therein to a "Borrower" shall be deemed to be a reference to "the New Grantor" and each reference therein to the "Administrative Agent" shall be deemed to be a reference to the "Collateral Agent".

IN WITNESS WHEREOF, the New Grantor and the Collateral Agent have duly executed this Supplement to the Collateral Agreement as of the day and year first above written.

[NAME OF NEW GRANTOR],

By: _____
     Name:
     Title:

     Legal Name:
     Jurisdiction of Formation:
     Location of Chief Executive Office:

CITIBANK, N.A.,
as Collateral Agent

By: _____
     Name:
     Title:

SIGNATURE PAGE TO SUPPLEMENT TO COLLATERAL AGREEMENT

Schedule I
to Supplement No. __ to the
Collateral Agreement

| Name | Jurisdiction of Formation | Chief Executive Office |
| --- | --- | --- |

Schedule I-1

Schedule II
to Supplement No. __ to the
Collateral Agreement

PLEDGED EQUITY INTERESTS

| Grantor | Issuer | Number of Certificate | Number and Class of Equity Interests | Percentage of Equity Interests |
|---------|--------|-----------------------|--------------------------------------|--------------------------------|
|         |        |                       |                                      |                                |

PLEDGED DEBT SECURITIES

| Grantor | Issuer | Principal Amount | Date of Note | Maturity Date |
|---------|--------|------------------|--------------|---------------|
|         |        |                  |              |               |

Schedule II-1

Schedule III
to Supplement No. __ to the
Collateral Agreement

INTELLECTUAL PROPERTY

Schedule IV
to Supplement No. __ to the
Collateral Agreement

COMMERCIAL TORT CLAIMS

Schedule IV-1

Schedule V
to Supplement No. __ to the
Collateral Agreement

COLLATERAL LOCATIONS

<u>Leased Inventory Locations</u>

| **Lessee** | **Common Name and Address** | **Landlord** | **Value of Inventory** |
|---|---|---|---|
| | | | |

<u>Other Inventory Locations</u>

| **PetSmart Entity** | **Service Provider** | **Street Address** | **City** | **State** | **Country** | **Book Value of Inventory** |
|---|---|---|---|---|---|---|
| | | | | | | |

Schedule V-1

Schedule VI
to Supplement No. __ to the
Collateral Agreement

DEPOSIT ACCOUNTS AND SECURITIES ACCOUNTS

Deposit Accounts and Securities Accounts

| Borrower | Bank | Address | Contact | Account # | ABA # | Purpose | Subject to control agreement [Yes/No] | Reason for Exclusion |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Operating/Deposit Accounts

| Borrower | Bank | Address | Contact | Account # | ABA # | Purpose | Subject to control agreement [Yes/No] | Reason for Exclusion |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Domestic Custody Accounts

| Borrower | Bank | Address | Contact | Account # | ABA # | Purpose | Subject to control agreement [Yes/No] | Reason for Exclusion |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Schedule VI-1

Exhibit II
to the Collateral Agreement

COPYRIGHT SECURITY AGREEMENT dated as of [   ], 20[  ] (this "<u>Agreement</u>"), among [     ] (the "<u>Grantor</u>") and Citibank, N.A., as Collateral Agent (in such capacity, the "<u>Collateral Agent</u>").

Reference is made to the Credit Agreement dated as of March 11, 2015 (as amended, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among Argos Holdings Inc., a Delaware corporation ("<u>Holdings</u>"), PetSmart, Inc., a Delaware corporation (the "<u>Borrower</u>"), the Lenders party thereto and Citibank, N.A., as Administrative Agent, and the various other parties thereto (b) the Collateral Agreement dated as of March 11, 2015 (the "<u>Collateral Agreement</u>"), among Holdings, the Borrower, the various other Grantors party thereto and  the Collateral Agent.  The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  The Grantor is an Affiliate of the Borrower and is willing to execute and deliver this Agreement in order to induce the Lenders to make additional Loans and as consideration for Loans previously made. Accordingly, the parties hereto agree as follows:

SECTION 1.    <u>Terms</u>.  Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the Collateral Agreement or the Credit Agreement, as applicable.  The rules of construction specified in Section 1.01(b) of the Collateral Agreement also apply to this Agreement.

SECTION 2.    <u>Grant of Security Interest</u>.  As security for the payment or performance, as the case may be, in full of the Secured Obligations, the Grantor hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest (the "<u>Security Interest</u>") in all of such Grantor's right, title and interest in, to and under any Copyrights now owned or at any time hereafter acquired by such Grantor, including those listed on Schedule I, and any exclusive Copyright Licenses under which such Grantor is a licensee, including those listed on Schedule II (collectively, the "<u>Copyright Collateral</u>").

SECTION 3.    <u>Collateral Agreement</u>.  The Security Interest granted to the Collateral Agent herein is granted in furtherance, and not in limitation, of the security interests granted to the Collateral Agent pursuant to the Collateral Agreement.  The Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the Copyright Collateral are more fully set forth in the Collateral Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this Agreement and the Collateral Agreement, the terms of the Collateral Agreement shall govern.

SECTION 4.    <u>Counterparts</u>.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Agreement.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

[                                              ],

By: _____
      Name:
      Title:

SIGNATURE PAGE TO COPYRIGHT SECURITY AGREEMENT

CITIBANK, N.A., as Collateral Agent,

By: _____

      Name:

      Title:

SIGNATURE PAGE TO COPYRIGHT SECURITY AGREEMENT

Schedule I

LEGAL_US_E # 113937414.3

Schedule II

LEGAL_US_E # 113937414.3

Exhibit III to the
Collateral Agreement

PATENT SECURITY AGREEMENT dated as of [    ], 20[    ] (this "Agreement"), among [    ] (the "Grantor") and Citibank, N.A., as Collateral Agent (in such capacity, the "Collateral Agent").

Reference is made to the Credit Agreement dated as of March 11, 2015 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Argos Holdings Inc., a Delaware corporation ("Holdings"), PetSmart, Inc., a Delaware corporation (the "Borrower"), the Lenders party thereto and Citibank, N.A., as Administrative Agent, and the various other parties thereto, (b) the Collateral Agreement dated as of March 11, 2015 (the "Collateral Agreement"), among Holdings, the Borrower, the various other Grantors party thereto and  the Collateral Agent.  The Lenders and have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  The Grantor is an Affiliate of the Borrower and is willing to execute and deliver this Agreement in order to induce the Lenders to make additional Loans and as consideration for Loans previously made.  Accordingly, the parties hereto agree as follows:

SECTION 1.    Terms.  Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the Collateral Agreement or the Credit Agreement, as applicable.  The rules of construction specified in Section 1.01(b) of the Collateral Agreement also apply to this Agreement.

SECTION 2.    Grant of Security Interest.  As security for the payment or performance, as the case may be, in full of the Secured Obligations, the Grantor hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest (the "Security Interest") in all of such Grantor's right, title and interest in, to and under any Patents now owned or at any time hereafter acquired by such Grantor, including those listed on Schedule I (the "Patent Collateral").

SECTION 3.    Collateral Agreement.  The Security Interest granted to the Collateral Agent herein is granted in furtherance, and not in limitation, of the security interests granted to the Collateral Agent pursuant to the Collateral Agreement.  The Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the Patent Collateral are more fully set forth in the Collateral Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this Agreement and the Collateral Agreement, the terms of the Collateral Agreement shall govern.

SECTION 4.    Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Agreement.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

[                                    ],

By: _____
    Name:
    Title:

CITIBANK, N.A., as Collateral Agent,

By: _____
Name:
Title:

SIGNATURE PAGE TO PATENT SECURITY AGREEMENT

Schedule I

Exhibit IV to the
Collateral Agreement

TRADEMARK SECURITY AGREEMENT dated as of [    ], 20[ ] (this "Agreement"), among [    ] (the "Grantor") and Citibank, N.A., as Collateral Agent (in such capacity, the "Collateral Agent").

Reference is made to the ABL Credit Agreement dated as of March 11, 2015 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Argos Holdings Inc., a Delaware corporation ("Holdings"), PetSmart, Inc., a Delaware corporation (the "Borrower"), the Lenders party thereto and Citibank, N.A., as Administrative Agent, and the various other parties thereto (b) the Collateral Agreement dated as of March 11, 2015 (the "Collateral Agreement"), among Holdings, the Borrower, the various other Grantors party thereto and the Collateral Agent. The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement. The Grantor is an Affiliate of the Borrower and is willing to execute and deliver this Agreement in order to induce the Lenders to make additional Loans and as consideration for Loans previously made. Accordingly, the parties hereto agree as follows:

SECTION 1.    Terms.  Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the Collateral Agreement or the Credit Agreement, as applicable.  The rules of construction specified in Section 1.01(b) of the Collateral Agreement also apply to this Agreement.

SECTION 2.    Grant of Security Interest.  As security for the payment or performance, as the case may be, in full of the Secured Obligations, the Grantor hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest (the "Security Interest") in all of such Grantor's right, title and interest in, to and under any Trademarks now owned or at any time hereafter acquired by such Grantor, including those listed on Schedule I (the "Trademark Collateral").

SECTION 3.    Collateral Agreement.  The Security Interest granted to the Collateral Agent herein is granted in furtherance, and not in limitation, of the security interests granted to the Collateral Agent pursuant to the Collateral Agreement.  The Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the Trademark Collateral are more fully set forth in the Collateral Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this Agreement and the Collateral Agreement, the terms of the Collateral Agreement shall govern.

SECTION 4.    Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Agreement.

[Remainder of this page intentionally left blank]

Ex. IV-1

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

[                                    ],

By: _____
     Name:
     Title:

CITIBANK, N.A., as Collateral Agent,

By: _____
      Name:
      Title:

SIGNATURE PAGE TO TRADEMARK SECURITY AGREEMENT

Schedule I

LEGAL_US_E # 113937414.3

EXHIBIT E

[*Form of ABL Intercreditor Agreement*]

ABL INTERCREDITOR AGREEMENT

dated as of March 11, 2015,

among

CITIBANK, N.A.,
as ABL Agent,

CITIBANK, N.A.,
as Term Loan Agent,

Each ADDITIONAL DEBT AGENT from time to time party hereto,

PETSMART, INC. and PETM CANADA CORPORATION,
each as a Grantor,

ARGOS HOLDINGS INC.,
as Holdings,

and
the other Grantors from time to time party hereto

**ABL INTERCREDITOR AGREEMENT**, dated as of March 11, 2015 (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "*Agreement*"), among **CITIBANK, N.A.**, as agent for the ABL Secured Parties referred to herein (in such capacity, and together with its successors in such capacity, the "*Original ABL Agent*"), **CITIBANK, N.A.**, as administrative agent and collateral agent for the Term Loan Secured Parties referred to herein (in such capacity, and together with its successors in such capacity, the "*Original Term Loan Agent*"), **PETSMART, INC.**, a Delaware limited liability company (the "*U.S. Borrower*"), **PETM CANADA CORPORATION** (the "*Canadian Borrower*" and, together with the U.S. Borrower, the "*Borrowers*"), , **ARGOS HOLDINGS INC.**, a Delaware corporation ("*Holdings*"), and each of the Subsidiaries of Holdings (other than the Borrowers) listed on the signature pages hereto (the "*Subsidiary Grantors*" and together with the Borrowers and Holdings, the "*Initial Grantors*").

Reference is made to (a) the ABL Credit Agreement (such term and each other capitalized term used and not otherwise defined herein having the meaning assigned to it in Article I) and (b) the Term Loan Agreement.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the ABL Agent (for itself and on behalf of the ABL Secured Parties), the Term Loan Agent (for itself and on behalf of the Term Loan Secured Parties) and each Additional Debt Agent (on behalf of the Additional Debt Secured Parties of the applicable Series), if any, and the Grantors agree as follows:

ARTICLE I

*Definitions*

SECTION 1.01.    Construction; Certain Defined Terms.

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein or in any Annex or Exhibit of this Agreement shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, restated, amended and restated, renewed, extended, supplemented or otherwise modified from time to time, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the Subsidiaries of such Person unless express reference is made to such Subsidiaries, (iii) the words "herein," "hereof and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections, Exhibits and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

(b)    All terms used in this Agreement that are defined in Article 1, 8 or 9 of the New York UCC (whether capitalized herein or not) and not otherwise defined herein have the meanings assigned to them in Article 1, 8 or 9 of the New York UCC.  If a term is defined in Article 9 of the New York UCC and another Article of the New York UCC, such term shall have the meaning assigned to it in Article 9 of the New York UCC.

(c)     As used in this Agreement, the following terms have the meanings specified below:

"*ABL Agent*" means the Original ABL Agent, and, from and after the date of execution and delivery of an ABL Substitute Facility, the agent, collateral agent, trustee or other representative of the lenders or holders of the ABL Debt Obligations evidenced thereunder or governed thereby, in each case, together with its successors in such capacity.

"*ABL Credit Agreement*" means the ABL Credit Agreement, dated as of the date hereof, among the Borrowers, the ABL Agent, the lenders party thereto from time to time and the other agents named therein, and any credit agreement, loan agreement, note agreement, promissory note, indenture or any other agreement or instrument evidencing or governing the terms of any ABL Substitute Facility, in each case (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time).

"*ABL Debt Documents*" means the ABL Credit Agreement, the ABL Security Documents, the other "Loan Documents" (as defined in the ABL Credit Agreement) and all other loan documents, notes, guarantees, instruments and agreements governing or evidencing, or executed or delivered in connection with, any ABL Substitute Facility.

"*ABL Debt Obligations*" means the "Secured Obligations" as defined in the ABL Credit Agreement (or any similar term of any ABL Substitute Facility) from time to time outstanding and, in any event, ABL Debt Obligations shall expressly include any and all interest accruing and fees, costs and charges incurred after the date of any filing by or against any Grantor of any petition or complaint initiating any Insolvency or Liquidation Proceeding, regardless of whether any ABL Secured Party's claim therefor is enforceable, allowable or allowed as a claim in the Insolvency or Liquidation Proceeding commenced by the filing of such petition or complaint.

"*ABL Facility Collateral*" means all assets and properties subject to Liens created by the ABL Security Documents to secure the ABL Debt Obligations.

"*ABL Lender*" means a "Lender" under (and as defined in) the ABL Credit Agreement (or under any ABL Substitute Facility).

"*ABL Liens*" means Liens on the ABL Facility Collateral created under the ABL Security Documents to secure the ABL Debt Obligations (including Liens on such Collateral under the security documents associated with any ABL Substitute Facility).

"*ABL Priority Collateral*" means all present and future right, title and interest of the Grantors in and to the following types of ABL Facility Collateral, whether now owned or hereafter acquired, existing or arising, and wherever located:

(a)     (i) accounts (including credit card receivables) and (ii) all other rights to payment, including accounts and other rights to payment, arising from services rendered or from the sale, lease, use or other disposition of inventory, whether such rights to payment constitute payment intangibles, letter-of-credit rights or any other classification of property, or are evidenced in whole or in part by instruments, chattel paper or documents;

(b)     inventory and documents relating to inventory;

(c)     all rights of an unpaid vendor with respect to inventory;

-2-

(d)    deposit accounts, commodity accounts, securities accounts and lockboxes, including all money and certificated securities, uncertificated securities (other than Capital Stock of Subsidiaries of the Grantors), securities entitlements and investment property credited thereto or deposited therein (including all cash, marketable securities and other funds held in or on deposit in any deposit account, commodity account or securities account), and all cash and cash equivalents, including cash and cash equivalents securing reimbursement obligations in respect of letters of credit or other ABL Debt Obligations;

(e)    instruments, chattel paper and general intangibles pertaining to the other items of property included within clauses (a), (b), (c), (d), (f) and (g) of this definition (other than any Capital Stock of Subsidiaries of the Grantors and Intellectual Property);

(f)    books and records, supporting obligations, documents and related letters of credit, letter-of-credit rights, commercial tort claims or other claims and causes of action, in each case, to the extent arising out of, related to or given in exchange or settlement of any of the foregoing; and

(g)    all substitutions, replacements, accessions, products and proceeds (including, without limitation, insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit) of all or any of the foregoing;

*provided* that in no case shall ABL Priority Collateral include any identifiable cash proceeds from a sale, lease, conveyance or other disposition of any CF Debt Priority Collateral that has been deposited in any Collateral Proceeds Account in accordance with the terms of the CF Debt Documents, until such time as such cash proceeds are released therefrom in accordance with the terms of the CF Debt Documents.

"***ABL Secured Parties***" means, at any time, the "Secured Parties" as defined in the ABL Credit Agreement (or any similar term of any ABL Substitute Facility).

"***ABL Security Documents***" means each agreement listed in part A of <u>Exhibit C</u> hereto, and any other security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, control agreements, guarantees, notes or any other documents or instruments now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any ABL Debt Obligations (including any such agreements, assignments, mortgages, deeds of trust and other documents or instruments associated with any ABL Substitute Facility).

"***ABL Substitute Facility***" means any asset-based loan facility with respect to which the requirements contained in Section 2.10(a) of this Agreement have been satisfied and the proceeds or commitments of which are used, among other things, to Replace the ABL Credit Agreement then in existence; *provided* that any ABL Lien securing such ABL Substitute Facility shall be subject to the terms of this Agreement for all purposes (including the lien priorities as set forth herein as of the date hereof).

"***Account Agreement***" means any lockbox account agreement, pledged account agreement, blocked account agreement, deposit account control agreement, securities account control agreement, or any similar deposit or securities account agreements among any CF Debt Agent and/or the ABL Agent, one or more Grantors and the relevant financial institution depository or securities intermediary.

"***Additional Debt***" means any Additional Pari First Lien CF Debt and any Pari Second Lien CF Debt.

-3-

"***Additional Debt Agent***" means, with respect to any Series of Additional Debt Obligations, the person or entity that, pursuant to the Additional Debt Documents relating to such Additional Debt Obligations, holds Liens on the Collateral on behalf of the Additional Debt Secured Parties thereunder.

"***Additional Debt Collateral***" means, with respect to any Series of Additional Debt Obligations, all assets and properties subject to Liens created by the Additional Debt Security Documents to secure such Additional Debt Obligations.

"***Additional Debt Documents***" means each Additional Debt Facility and the Additional Debt Security Documents.

"***Additional Debt Facility***" means one or more debt facilities, commercial paper facilities or indentures for which the requirements of <u>Section 2.10(b)</u> of this Agreement have been satisfied, in each case with banks, other lenders or trustees, providing for revolving credit loans, term loans, letters of credit, notes or other borrowings, in each case, as amended, restated, modified, renewed, refunded, restated, restructured, increased, supplemented, replaced or refinanced in whole or in part from time to time in accordance with each applicable Secured Document; *provided* that the ABL Credit Agreement and the Term Loan Agreement shall not constitute an Additional Debt Facility at any time.

"***Additional Debt Lien***" means a Lien granted pursuant to any Additional Debt Security Document to an Additional Debt Agent or Additional Debt Secured Party at any time upon any property of any Grantor that is Collateral to secure a Series of Additional Debt Obligations.

"***Additional Debt Obligations***" means, with respect to any Grantor, any obligations of such Grantor owed to any Additional Debt Secured Party under the Additional Debt Documents.

"***Additional Debt Secured Parties***" means, with respect to any Series of Additional Debt Obligations, at any time, the Additional Debt Agent and the other holders from time to time of Additional Debt Obligations of such Series.

"***Additional Debt Security Documents***" means the Additional Debt Facility (insofar as the same grants a Lien on any collateral) and all collateral trust agreements, security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, control agreements, guarantees, notes and any other documents or instruments now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Additional Debt Obligations of the Grantors owed thereunder to any Additional Debt Secured Parties.

"***Additional Pari First Lien CF Debt***" means any secured debt ranking equal in right of security with Term Loan Debt issued pursuant to an Additional Debt Facility and permitted under the ABL Credit Agreement and the Term Loan Agreement.

"***Agreement***" has the meaning assigned to that term in the preamble hereto.

"***Bankruptcy Code***" means Title 11 of the United States Code, or any similar foreign, federal or state law for relief of debtors as now or hereinafter in effect.

"***Bankruptcy Law***" means the Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, suspension of payments, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"***Borrowers***" has the meaning assigned to that term in the preamble hereto.

"***Business Day***" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

"***Canadian Borrower***" has the meaning assigned to that term in the preamble hereto.

"***Capital Stock***" means (a) in the case of a corporation, corporate stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited), and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"***CF Debt***" means the Term Loan Debt and any Additional Debt.

"***CF Debt Agents***" means the Term Loan Agent and each Additional Debt Agent.

"***CF Debt Collateral***" means the Term Loan Collateral and any Additional Debt Collateral.

"***CF Debt Documents***" means the Term Loan Documents and any Additional Debt Documents.

"***CF Debt Facility***" means the Term Loans (as defined in the Term Loan Agreement) and any Additional Debt Facility.

"***CF Debt Lien***" means each Term Loan Lien and each Additional Debt Lien.

"***CF Debt Obligations***" means the Term Loan Debt and any Additional Debt Obligations.

"***CF Debt Priority Collateral***" means all present and future right, title and interest of the Grantors, whether now owned or hereafter acquired, existing or arising, and wherever located, in all:  (a) Capital Stock of Subsidiaries held by the Grantors; (b) equipment; (c) Real Estate Assets; (d) Intellectual Property; (e) all general intangibles and investment property that do not constitute ABL Priority Collateral; (f) documents of title related to equipment; (g) books and records, supporting obligations and related letters of credit, commercial tort claims or other claims and causes of action, in each case, to the extent related primarily to the foregoing; (h) substitutions, replacements, accessions, products and proceeds (including, without limitation, insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit) of any or all of the foregoing; and (i) all of the other assets and property of any Grantor, whether real, personal or mixed (other than ABL Priority Collateral) included in the CF Debt Collateral.

"***CF Debt Secured Parties***" means the Term Loan Secured Parties and any Additional Debt Secured Parties.

"***CF Debt Security Documents***" means the Term Loan Security Documents and any Additional Debt Security Documents.

"***Collateral***" means all of the assets and property of any Grantor, whether real, personal or mixed, constituting the ABL Facility Collateral and the CF Debt Collateral; *provided* that Collateral

shall not include, and this Agreement shall not apply to, any assets pledged or purported to be pledged by Canadian Loan Parties (as such term is defined in the ABL Credit Agreement).

"*Collateral Proceeds Accounts*" means one or more deposit accounts or securities accounts established or maintained by any Grantor or a CF Debt Agent or its agent for the sole purpose of holding the proceeds of any sale, lease, conveyance or other disposition of any CF Debt Priority Collateral that are required to be held in trust in such account or accounts pursuant to the terms of any CF Debt Document.

"*Controlling CF Debt Agent*" means (i) for so long as there is only one Series of CF Debt, the CF Debt Agent for such Series, (ii) at any time when there is more than one Series of Pari First Lien CF Debt, the "Controlling Collateral Agent", as such term is defined in the First Lien Intercreditor Agreement, as designated by such CF Debt Agent in a notice to the ABL Agent, (iii) at any time there is only one Series of Pari First Lien CF Debt, the CF Debt Agent for such Series, and (iv) at any time when CF Debt consists solely of two or more Series of Pari Second Lien CF Debt, the CF Debt Agent designated by all then existing CF Debt Agents in a notice to the ABL Agent.

"*Deposit Accounts*" has the meaning assigned to that term in Section 3.02(a).

"*DIP Financing*" has the meaning assigned to that term in Section 2.06(b).

"*DIP Financing Liens*" has the meaning assigned to that term in Section 2.06(b).

"*DIP Lenders*" has the meaning assigned to that term in Section 2.06(b).

"*Discharge of Senior Secured Debt Obligations*" means, with respect to any particular Senior Secured Obligations, the occurrence of all of the following:

(a)     termination or expiration of all commitments to extend credit (or, in the case of Secured Cash Management Obligations, Secured Swap Obligations or similar Senior Secured Obligations, termination of arrangements giving rise to such debt) that would constitute such Senior Secured Obligations;

(b)     payment in full in cash of the principal of, interest and premium (if any) on, fees and other charges comprising such Senior Secured Obligations (other than any undrawn letters of credit) (including, in any event, all such interest, fees and other charges regardless of whether such interest, fees and other charges are allowed or recoverable in any Insolvency or Liquidation Proceeding under Section 506 of the Bankruptcy Code or otherwise);

(c)     discharge or cash collateralization (at the lower of (i) 103% of the aggregate undrawn amount, and (ii) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Senior Documents) of all outstanding letters of credit constituting such Senior Secured Obligations; and

(d)     payment in full in cash of all other such Senior Secured Obligations that are outstanding and unpaid at the time the principal of and interest and premium on all such Senior Secured Obligations are paid in full in cash (other than any obligations for taxes, costs, indemnification, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at such time); *provided* that the Discharge of Senior Secured Debt Obligations shall not be deemed to have occurred in connection with a Replacement as contemplated by Section 2.10(a).

-6-

"**Enforcement Notice**" means a written notice delivered, at a time when an Event of Default has occurred and is continuing, by either the ABL Agent or the Controlling CF Debt Agent to the other specifying the relevant Event of Default.

"**Event of Default**" means an "Event of Default" under and as defined in the ABL Credit Agreement, the Term Loan Agreement or any Additional Debt Document, as the context may require.

"**First Lien Intercreditor Agreement**" means the First Lien Intercreditor Agreement, substantially in the form of Exhibit F-1 to the Term Loan Agreement.

"**Grantor**" means the Initial Grantors and each other direct or indirect Subsidiary of Holdings that shall have granted any Lien in favor of the ABL Agent or any CF Debt Agent on any of its assets or properties to secure both (i) the ABL Debt Obligations and (ii) any CF Debt Obligations.

"**Holdings**" has the meaning assigned to that term in the preamble hereto.

"**Initial Grantors**" has the meaning assigned to such term in the preamble hereto.

"**Insolvency or Liquidation Proceeding**" means:

(a)     any case commenced by or, against any Grantor under the Bankruptcy Code, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of any Grantor, any receivership or assignment for the benefit of creditors relating to any Grantor or any similar case or proceeding relative to any Grantor or its creditors, as such, in each case whether or not voluntary;

(b)     any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to any Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency, in each case to the extent not permitted under the Senior Documents;

(c)     any proceeding seeking the appointment of any trustee, receiver, liquidator, custodian or other insolvency official with similar powers with respect to any Grantor or any of its assets; or

(d)     any other proceeding of any type or nature in which substantially all claims of creditors of any Grantor are determined and any payment or distribution is or may be made on account of such claims.

"**Intellectual Property**" has the meaning assigned to such term in the Term Loan Security Agreement (as defined in Exhibit C).

"**Intercreditor Agreement Joinder**" means an agreement substantially in the form of Exhibit A.

"**Junior Documents**" means (a) in respect of the CF Debt Priority Collateral, the ABL Debt Documents and (b) in respect of the ABL Priority Collateral, the CF Debt Documents.

"**Junior Liens**" means (a) in respect of the ABL Priority Collateral, the CF Debt Liens on such Collateral, and (b) in respect of the CF Debt Priority Collateral, the ABL Liens on such Collateral.

"*Junior Representative*" means (a) with respect to the CF Debt Priority Collateral, the ABL Agent and (b) with respect to the ABL Priority Collateral, each CF Debt Agent.

"*Junior Secured Obligations*" means (a) with respect to the CF Debt Obligations (to the extent such Obligations are secured, or intended to be secured, by the CF Debt Priority Collateral), the ABL Debt Obligations and (b) with respect to ABL Debt Obligations (to the extent such Obligations are secured, or intended to be secured, by the ABL Priority Collateral), the CF Debt Obligations.

"*Junior Secured Obligations Collateral*" means the Collateral in respect of which any Junior Representative (on behalf of itself and the applicable Junior Secured Obligations Secured Parties) holds a Junior Lien.

"*Junior Secured Obligations Secured Parties*" means (a) with respect to the CF Debt Priority Collateral, the ABL Secured Parties and (b) with respect to the ABL Priority Collateral, the CF Debt Secured Parties.

"*Junior Secured Obligations Security Documents*" means (a) with respect to the ABL Priority Collateral, the CF Debt Security Documents, and (b) with respect to the CF Debt Priority Collateral, the ABL Security Documents.

"*Lien*" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge, trust (deemed or statutory) or security interest in, on or of such asset, whether or not filed, recorded or otherwise perfected under applicable law,  (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities; *provided* that in no event shall an operating lease be deemed to be a Lien.

"*Lien Sharing and Priority Confirmation Joinder*" means an agreement substantially in the form of Exhibit B.

"*New York UCC*" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"*Obligations*" means, with respect to any Secured Parties, any principal, interest, penalties, fees, expenses, indemnifications, reimbursements, damages and other liabilities (including all interest, fees and expenses accruing after the commencement of any Insolvency or Liquidation Proceeding, even if such interest, fees and expenses are not enforceable, allowable or allowed as a claim in such proceeding) under the Secured Documents of such Secured Party.

"*Officer*" means the chief executive officer, the president, any vice president, the chief operating officer or any chief financial officer, treasurer or controller of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.  Any document delivered hereunder that is signed by an Officer of a Grantor shall be conclusively presented to have been authorized by all necessary corporate, partnership and/or other action on the part of such Grantor and such Officer shall be conclusively presumed to have acted on behalf of such Grantor.

"*Officer's Certificate*" means a certificate signed on behalf of applicable Grantor by an Officer of such Grantor, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of such Grantor.

"*Original ABL Agent*" has the meaning assigned to that term in the preamble hereto.

"*Original Term Loan Agent*" has the meaning assigned to that term in the preamble hereto.

"*Pari First Lien CF Debt*" means the Term Loan Obligations and the Additional Pari First Lien CF Debt.

"*Pari Second Lien CF Debt*" means any secured debt that constitutes (i) "Junior Financing" (as defined in the Term Loan Agreement) ranking junior in right of security to the Term Loan Debt and (ii) Additional Pari First Lien CF Debt issued pursuant to an Additional Debt Facility and permitted under the ABL Credit Agreement and the Term Loan Agreement.

"*Permitted Subordination*" has the meaning assigned thereto in Section 2.01(d).

"*Person*" means any individual, sole proprietorship, partnership, limited liability company, joint venture, joint-stock company, trust, unincorporated organization, association, corporation, government or any agency or political subdivision thereof or any other entity.

"*Plan of Reorganization*" means any plan of reorganization, plan of liquidation, plan of arrangement, agreement for composition, or other type of dispositive restructuring plan proposed in or in connection with any Insolvency or Liquidation Proceeding.

"*Real Estate Asset*" means, at any time of determination, any fee interest then owned by any Grantor in any real property.

"*Recovery*" has the meaning assigned to that term in Section 2.06(j).

"*Replaces*" means, (a) in respect of any agreement with reference to the ABL Credit Agreement or the ABL Debt Obligations or any ABL Substitute Facility, that such agreement refinances, replaces, exchanges or refunds the ABL Credit Agreement or such ABL Substitute Facility in whole (in a transaction that is in compliance with Section 2.10(a)) and that all commitments thereunder are terminated; and (b) in respect of any indebtedness with reference to the CF Debt Documents or the CF Debt Facility, that such indebtedness refinances, replaces, exchanges or refunds the CF Debt Documents or such CF Debt Facility (i) in whole (in a transaction that is in compliance with Section 2.10(a)) and that all commitments thereunder are terminated, or, (ii) to the extent permitted by the terms of the CF Debt Documents or such CF Debt Facility, in part.  "*Replace*," "*Replaced*" and "*Replacement*" shall have correlative meanings.

"*Representative*" means (a) in the case of any Series of CF Debt Obligations, the CF Debt Agent for such Series, and (b) in the case of any ABL Debt Obligations, the ABL Agent.

"*Second Lien Intercreditor Agreement*" means the Second Lien Intercreditor Agreement, substantially in the form of Exhibit F-2 to the Term Loan Agreement.

"*Secured Cash Management Obligations*" has the meaning assigned to that term in the ABL Credit Agreement (or any similar term of any ABL Substitute Facility) and the Term Loan Agreement (or any similar term of any Term Loan Substitute Facility).

"*Secured Debt Obligations*" means the CF Debt Obligations (including the Obligations incurred under each Series of CF Debt) and the ABL Debt Obligations.

"*Secured Documents*" means the CF Debt Documents and the ABL Debt Documents.

"*Secured Parties*" means the CF Debt Secured Parties and the ABL Secured Parties.

"*Secured Swap Obligations*" has the meaning assigned to that term in the ABL Credit Agreement (or any similar term of any ABL Substitute Facility) and the Term Loan Agreement (or any similar term of any Term Loan Substitute Facility).

"*Security Documents*" means the CF Debt Security Documents and the ABL Security Documents.

"*Senior Documents*" means (a) in respect of the CF Debt Priority Collateral, the CF Debt Documents, and (b) in respect of the ABL Priority Collateral, the ABL Debt Documents.

"*Senior Liens*" means (a) in respect of the ABL Priority Collateral, the ABL Liens on such Collateral, and (b) in respect of the CF Debt Priority Collateral, the CF Debt Liens on such Collateral.

"*Senior Representative*" means (a) with respect to the CF Debt Priority Collateral, the Controlling CF Debt Agent and (b) with respect to the ABL Priority Collateral, the ABL Agent.

"*Senior Secured Obligations*" means (a) with respect to the ABL Debt Obligations (to the extent such obligations are secured, or are intended to be secured, by the CF Debt Priority Collateral), the CF Debt Obligations, and (b) with respect to any CF Debt Obligations (to the extent such obligations are secured, or are intended to be secured, by the ABL Priority Collateral), the ABL Debt Obligations.

"*Senior Secured Obligations Collateral*" means the Collateral in respect of which any Senior Secured Obligations Secured Parties (or a Representative on their behalf) hold a Senior Lien.

"*Senior Secured Obligations Secured Parties*" means (a) with respect to the CF Debt Priority Collateral, the CF Debt Secured Parties, and (b) with respect to the ABL Priority Collateral, the ABL Secured Parties.

"*Senior Secured Obligations Security Documents*" means (a) with respect to the ABL Priority Collateral, the ABL Security Documents, and (b) with respect to the CF Debt Priority Collateral, the CF Debt Security Documents.

"*Series*" means each of (a) the Term Loan Debt and (b) each class or issuance of Additional Debt Obligations incurred under a single Additional Debt Facility. "*Series*" when used with respect to any agent, person, document, lien or other item with respect to any CF Debt Obligations shall have a correlative meaning.

"*Standstill Period*" has the meaning assigned to that term in Section 2.02.

"*Subsidiary*" means, with respect to any specified Person (a) any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of that Person (or a combination thereof); and (b) any partnership (i) the sole general partner or the managing general partner of which is such Person or a subsidiary of such Person or (ii)

the only general partners of which are such Person or one or more subsidiaries of such Person (or any combination thereof).

"**Subsidiary Grantors**" has the meaning assigned to that term in the preamble hereto.

"**Term Loan Agent**" means the Original Term Loan Agent, and, from and after the date of execution and delivery of a Term Loan Substitute Facility, the agent, collateral agent, trustee or other representative of the lenders or other holders of the indebtedness and other obligations evidenced there-under or governed thereby, in each case, together with its successors in such capacity.

"**Term Loan Agreement**" means the credit agreement, dated as of the date hereof, among the U.S. Borrower, the Grantors party thereto from time to time, the lenders party thereto from time to time, the other agents named therein, and the Term Loan Agent, and any credit agreement, loan agreement, note agreement, promissory note, indenture or any other agreement or instrument evidencing or governing the terms of any Term Loan Substitute Facility, in each case (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time).

"**Term Loan Collateral**" means all assets and properties subject to Liens created by the Term Loan Security Documents to secure the Term Loan Debt.

"**Term Loan Debt**" means all "Secured Obligations" as defined in the Term Loan Agreement (or any similar term of any Term Loan Substitute Facility). Term Loan Debt shall expressly include any and all interest accruing and fees, costs and charges incurred after the date of any filing by or against any Grantor of any petition or complaint initiating any Insolvency or Liquidation Proceeding, regardless of whether any Term Loan Secured Party's claim therefor is enforceable, allowable or allowed as a claim in the Insolvency or Liquidation Proceeding commenced by the filing of such petition or complaint.

"**Term Loan Documents**" means the Term Loan Agreement, the Term Loan Security Documents and all other loan documents, notes, guarantees, instruments and agreements governing or evidencing any Term Loan Substitute Facility.

"**Term Loan Lender**" means a "Lender" under (and as defined in) the Term Loan Agreement (or any similar term under any Term Loan Substitute Facility).

"**Term Loan Lien**" means a Lien granted by the Term Loan Security Documents to the Term Loan Agent at any time upon any property of any other Grantor to secure Term Loan Debt.

"**Term Loan Secured Parties**" means, at any time, the "Secured Parties" as defined in the Term Loan Agreement (or any similar term of any Term Loan Substitute Facility).

"**Term Loan Security Documents**" means each agreement listed in Part B of Exhibit C hereto and any other security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, control agreements, guarantees, notes or any other documents or instruments now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor or any of its Subsidiaries to secure any Term Loan Debt (including any such agreements, assignments, mortgages, deeds of trust and other documents or instruments associated with any Term Loan Substitute Facility).

"**Term Loan Substitute Facility**" means any facility with respect to which the requirements contained in Section 2.10(a) of this Agreement have been satisfied, the proceeds of which are used to, among other things, Replace the Term Loan Agreement. For the avoidance of doubt, no Term Loan

-11-

Substitute Facility shall be required to be evidenced by notes or other instruments and may be a facility evidenced or governed by a credit agreement, loan agreement, note agreement, promissory note, indenture or any other agreement or instrument; *provided* that any such Term Loan Substitute Facility shall be subject to the terms of this Agreement for all purposes (including the lien priority as set forth herein as of the date hereof) as the other Liens securing the Term Loan Debt are subject to under this Agreement.

"***U.S. Borrower***" has the meaning assigned to that term in the preamble hereto.

ARTICLE II

*Subordination of Junior Liens; Certain Agreements*

SECTION 2.01.    <u>Subordination of Junior Liens</u>.

(a)    The grant of the ABL Liens pursuant to the ABL Security Documents and each grant of CF Debt Liens pursuant to the CF Debt Security Documents of any Series create separate and distinct Liens on the Collateral.

(b)    All Junior Liens in respect of any Collateral are expressly subordinated and made junior in right, priority, operation and effect to any and all Senior Liens in respect of such Collateral, notwithstanding anything contained in this Agreement, the Term Loan Documents, the ABL Debt Documents, any Additional Debt Documents, or any other agreement or instrument or operation of law to the contrary, and irrespective of the time, order or method of creation, attachment or perfection of such Junior Liens and Senior Liens or any failure, defect or deficiency or alleged failure, defect or deficiency in any of the foregoing.

(c)    It is acknowledged that (i) the aggregate amount of the Senior Secured Obligations may be increased from time to time pursuant to the terms of the Senior Documents, (ii) a portion of the Senior Secured Obligations consists or may consist of indebtedness that is revolving in nature, and the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, and (iii) the Senior Secured Obligations may be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, refinanced or otherwise amended or modified from time to time, all without affecting the subordination of the Junior Liens hereunder or the provisions of this Agreement defining the relative rights of the ABL Secured Parties and the CF Debt Secured Parties. The lien priorities provided for herein shall not be altered or otherwise affected by any amendment, modification, supplement, extension, increase, renewal, restatement or Replacement of either the Junior Secured Obligations (or any part thereof) or the Senior Secured Obligations (or any part thereof).

(d)    If at any time the ABL Agent shall make a Permitted Subordination (as defined below) with respect to any ABL Priority Collateral or any CF Debt Agent shall make a Permitted Subordination with respect to any CF Debt Priority Collateral, in each case, to or in favor of any Person, the priority of such Representative's Liens vis-a-vis the Liens therein of the other Representative shall not be affected thereby and the subordinating Representative's Liens shall continue to be senior in priority to the other Representative's Liens in the affected Collateral as and to the extent provided in this Section 2. As used herein, the term "***Permitted Subordination***" shall mean a voluntary subordination by the ABL Agent, which is permitted under the applicable Senior Documents, of its Liens with respect to any or all ABL Priority Collateral, or by any CF Debt Agent of its Liens with respect to any or all CF Debt Priority Collateral, in favor of depository banks, securities or commodities intermediaries, landlords, mortgagees, custom brokers, freight forwarders, carriers, warehousemen, factors, and other Persons who provide goods or services to a Grantor in the ordinary course of business.

-12-

SECTION 2.02.    No Action With Respect to Junior Secured Obligations Collat-eral Subject to Senior Liens.  Subject to the last two sentences of this Section 2.02, no Junior Rep-resentative or other Junior Secured Obligations Secured Party shall commence or instruct any Jun-ior Representative to commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any ac-tion to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its interest in or realize upon, or take any other action available to it in respect of, any Junior Secured Obligations Collateral under any Junior Secured Obligations Security Doc-ument, applicable law or otherwise until the associated Discharge of Senior Secured Debt Obliga-tions (including, without limitation, exercising any rights under any deposit account control agree-ment in respect of Collateral constituting Junior Secured Obligations Collateral), it being agreed that only the Senior Representative or any Person authorized by the Senior Representative, acting in accordance with the applicable Senior Secured Obligations Security Documents, shall be entitled to take any such actions or exercise any such remedies prior to the associated Discharge of Senior Se-cured Debt Obligations; provided, however, that the Junior Representative (subject in the case of a CF Debt Agent to the terms of the First Lien Intercreditor Agreement and the Second Lien Inter-creditor Agreement, in each case, if in effect) may exercise any or all such rights with respect to any Junior Secured Obligations Collateral (but not rights the exercise of which is otherwise prohib-ited by this Agreement including Section 2.06 hereof) after a period (the "**Standstill Period**") of 180 consecutive days has elapsed from the date of delivery of written notice from a Junior Repre-sentative to each Senior Representative stating that (i) an Event of Default (as defined under the ap-plicable Junior Documents) has occurred and is continuing thereunder, (ii) the Junior Secured Obli-gations under such Junior Documents are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of such Junior Documents, and (iii) such Junior Representative intends to exercise its rights to take such actions; provided, further, that such Junior Representative shall not be entitled to exercise any such rights with respect to any Jun-ior Secured Obligations Collateral in the event (x) any Senior Representative or Senior Secured Ob-ligations Secured Parties are then diligently pursuing their rights and remedies with respect to all or a material portion of the Junior Secured Obligations Collateral or diligently attempting to vacate any stay or prohibition against such exercise or (y) a Grantor is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.  Notwithstanding the forego-ing, any Junior Representative may, subject to Section 2.05, take all such actions as it shall deem necessary to (i) perfect or continue the perfection of its Junior Liens or (ii) create, preserve or pro-tect (but not enforce) the Junior Liens on any Collateral.  In addition, any Junior Representative may, with respect to any Junior Secured Obligations:

(a)    file a claim or proof of claim or statement of interest with respect to such Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against any Grantor;

(b)    file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims or Liens of the Junior Secured Obligations Secured Parties, including any claims secured by the Junior Secured Obligations Collateral, in each case in ac-cordance with the terms of this Agreement;

(c)    in accordance with Section 2.06, file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising un-der either any Insolvency or Liquidation Proceeding, in accordance with applicable law (including the Bankruptcy Laws of any applicable jurisdiction); and

-13-

(d)     vote on any Plan of Reorganization, file any proof of claim, make other filings and make any arguments and motions (including in support of or opposition to, as applicable, the confirmation or approval of any Plan of Reorganization) that are, in each case, in accordance with the terms of this Agreement.

SECTION 2.03.     <u>No Duties of Senior Representative</u>.  Each Junior Secured Obligations Secured Party acknowledges and agrees that neither the Senior Representative nor any other Senior Secured Obligations Secured Party shall have any duties or other obligations to such Junior Secured Obligations Secured Party with respect to any Senior Secured Obligations Collateral, other than to transfer to the Junior Representative (and in the case there is more than one Junior Representative of CF Debt, to the Controlling CF Debt Agent) any remaining Collateral that constitutes Junior Secured Obligations Collateral and any proceeds of the sale or other disposition of any such Collateral that constitutes Junior Secured Obligations Collateral remaining in its possession following the associated Discharge of Senior Secured Debt Obligations, in each case without representation or warranty on the part of the Senior Representative or any Senior Secured Obligations Secured Party.  In furtherance of the foregoing, each Junior Secured Obligations Secured Party acknowledges and agrees that until the associated Discharge of Senior Secured Debt Obligations secured by any Collateral on which such Junior Secured Obligations Secured Party holds a Junior Lien, the Senior Representative or any Person authorized by the Senior Representative shall be entitled, for the benefit of the holders of such Senior Secured Obligations, to sell, transfer or otherwise dispose of or deal with such Collateral, as provided herein and in the Senior Secured Obligations Security Documents, without regard to any Junior Lien or any rights to which the holders of the Junior Secured Obligations would otherwise be entitled as a result of such Junior Lien.  Without limiting the foregoing, each Junior Secured Obligations Secured Party agrees that neither the Senior Representative nor any other Senior Secured Obligations Secured Party shall have any duty or obligation first to marshal or realize upon any type of Senior Secured Obligations Collateral (or any other collateral securing the Senior Secured Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Collateral (or any other collateral securing the Senior Secured Obligations), in any manner that would maximize the return to the Junior Secured Obligations Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Junior Secured Obligations Secured Parties from such realization, sale, disposition or liquidation.  Following the associated Discharge of Senior Secured Debt Obligations, the Junior Secured Obligations Secured Parties may, subject to any other agreements binding on such Junior Secured Obligations Secured Parties, assert their rights under the New York UCC or otherwise to any proceeds remaining following a sale, disposition or other liquidation of Collateral by, or on behalf of the Junior Secured Obligations Secured Parties.  Each of the Junior Secured Obligations Secured Parties waives any claim such Junior Secured Obligations Secured Party may now or hereafter have against the Senior Representative or any other Senior Secured Obligations Secured Party (or their representatives) arising out of any actions which the Senior Representative or the Senior Secured Obligations Secured Parties take or omit to take (including actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral, and actions with respect to the collection of any claim for all or any part of the Senior Secured Obligations from any account debtor, guarantor or any other party) in accordance with this Agreement and the Senior Secured Obligations Security Documents or any other agreement related thereto or to the collection of the Senior Secured Obligations or the valuation, use, protection or release of any security for the Senior Secured Obligations.

-14-

SECTION 2.04.    <u>No Interference; Payment Over; Reinstatement</u>.

(a)    Each Junior Secured Obligations Secured Party agrees that (i) it will not take or cause to be taken any action the purpose, or effect of which is, or could be, to make any Junior Lien rank equal with, or to give such Junior Secured Obligations Secured Party any preference or priority relative to, any Senior Lien with respect to the Collateral subject to such Senior Lien and Junior Lien or any part thereof, (ii) it will not challenge or question in any proceeding the validity or enforceability of any Senior Secured Obligations or Senior Secured Obligations Security Document, or the validity, attachment, perfection or priority of any Senior Lien, or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement, (iii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Collateral subject to any Junior Lien by any Senior Secured Obligations Secured Parties secured by Senior Liens on such Collateral or any Senior Representative acting on their behalf, (iv) it shall have no right to (A) direct any Senior Representative or any holder of Senior Secured Obligations to exercise any right, remedy or power with respect to the Collateral subject to any Junior Lien or (B) consent to the exercise by any Senior Representative or any other Senior Secured Obligations Secured Party of any right, remedy or power with respect to the Collateral subject to any Junior Lien, (v) it will not institute any suit or assert in any suit or Insolvency or Liquidation Proceeding any claim against any Senior Representative or other Senior Secured Obligations Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to, and neither any Senior Representative nor any other Senior Secured Obligations Secured Party shall be liable for, any action taken or omitted to be taken by such Senior Representative or other Senior Secured Obligations Secured Party with respect to any Collateral securing such Senior Secured Obligations that is subject to any Junior Lien, (vi) it will not seek, and hereby waives any right, to have any Senior Secured Obligations Collateral subject to any Junior Lien or any part thereof marshaled upon any foreclosure or other disposition of such Collateral and (vii) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement.

(b)    In connection with any enforcement action with respect to the Senior Secured Obligations Collateral or any Insolvency or Liquidation Proceeding with respect to any Grantor, all proceeds of Senior Secured Obligations Collateral will first be applied to the repayment in full of all outstanding Senior Secured Debt Obligations before being applied to any outstanding Junior Secured Obligations. If any Junior Secured Obligations Secured Party receives any proceeds of Senior Secured Obligations Collateral in contravention of the foregoing, such proceeds will be turned over to the applicable Senior Representative. Each Junior Representative and each other Junior Secured Obligations Secured Party hereby agrees that if it shall obtain possession of any Senior Secured Obligations Collateral or shall realize any proceeds or payment in respect of any such Collateral, pursuant to any Junior Secured Obligations Security Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies, at any time prior to the associated Discharge of Senior Secured Debt Obligations secured, or intended to be secured, by such Collateral, then it shall hold such Collateral, proceeds or payment in trust for the applicable Senior Secured Obligations Secured Parties and transfer such Collateral, proceeds or payment, as the case may be, to the Senior Representative reasonably promptly after obtaining actual knowledge or notice from the Senior Secured Obligations Secured Parties that it has possession of such Senior Secured Obligations Collateral or proceeds or payments in respect thereof. Each Junior Secured Obligations Secured Party agrees that if, at any time, it obtains actual knowledge or receives notice that all or part of any payment with respect to any Senior Secured Obligations previously made shall be rescinded for any reason whatsoever, such Junior Secured Obligations Secured Party shall promptly pay over to the Senior Representative any payment received by it and then in its possession or under its control in respect of any Collateral subject to any Senior Lien securing such Senior Secured Obligations and shall promptly turn any Collateral subject to

-15-

any such Senior Lien then held by it over to the Senior Representative, and the provisions set forth in this Agreement shall be reinstated as if such payment had not been made, until the Discharge of Senior Secured Debt Obligations in respect of such Senior Secured Obligations.  All Junior Liens will remain attached to and enforceable against all proceeds so held or remitted.  Anything contained herein to the contrary notwithstanding, this Section 2.04(b) shall not apply to any proceeds of Senior Secured Obligations Collateral realized in a transaction not prohibited by the Senior Documents and as to which the possession or receipt thereof by a Junior Representative or other Junior Secured Obligations Secured Party is otherwise permitted by the Senior Documents.

SECTION 2.05.    Release of Liens; Automatic Release of Junior Liens.

(a)    Each Junior Representative and each other Junior Secured Obligations Secured Party agree that in the event of a sale, transfer or other disposition of Senior Secured Obligations Collateral subject to any Junior Lien (regardless of whether or not an Event of Default has occurred and is continuing under the Junior Documents at the time of such sale, transfer or other disposition), such Junior Lien on such Collateral shall terminate and be released automatically and without further action if the applicable Senior Liens on such Collateral are released and if such sale, transfer or other disposition either (A) is then not prohibited by the Junior Documents (either pursuant to the terms of the Junior Documents or pursuant to a consent issued thereunder) or (B) occurs in connection with the foreclosure upon or other exercise of rights and remedies with respect to such Senior Secured Obligations Collateral (including, if the Senior Secured Obligations Collateral is ABL Priority Collateral, in connection with any liquidation or sale of ABL Facility Collateral consented to by the ABL Agent); *provided that* such Junior Lien shall remain in place with respect to any proceeds of a sale, transfer or other disposition under this clause (a) that remain after the associated Discharge of Senior Secured Debt Obligations.

(b)    The ABL Agent and each CF Debt Agent agrees that, with respect to the release of any Collateral, if the ABL Agent or CF Debt Agent, as applicable, at any time receives:

(i)    an Officer's Certificate from the relevant Grantor stating that (A) the signing Officer has read Article 2 of this Agreement and understands the provisions and the definitions relating hereto, (B) such Officer has made such examination or investigation as is necessary to enable such Persons to express an informed opinion as to whether or not the conditions precedent in this Agreement and all other Secured Documents, if any, relating to the release of such Collateral have been complied with and (C) in the opinion of such Officer, such conditions precedent, if any, have been complied with;

(ii)    the proposed instrument or instruments releasing such Lien as to such property in recordable form, if applicable; and

(iii)    prior to the associated Discharge of Senior Secured Debt Obligations, the written confirmation of the applicable Senior Representative (or, at any time after the associated Discharge of Senior Secured Debt Obligations, each Junior Representative) (such confirmation to be given promptly following receipt of, and based solely on, the Officer's Certificate described in clause (i) above) that, in its view, such release is permitted by Section 2.05(a) and the respective Secured Documents governing the CF Debt Obligations or the ABL Debt Obligations, as applicable, the holders of which such Representative represents;

then the ABL Agent or each CF Debt Agent, as applicable, will execute (with such acknowledgements and/or notarizations as are required) and deliver such release to the applicable Grantor on or before the later of (x) the date specified in such request for such release and (y) the fifth Business Day (or such

-16-

shorter period as shall be acceptable to the Representatives) after the date of receipt of the items required by this Section 2.05(b) by the applicable Representative.

(c)     Each Junior Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such releases and other instruments as shall reasonably be requested by the Senior Representative to evidence and confirm any release of Junior Secured Obligations Collateral provided for in this Section 2.05.

SECTION 2.06.     Certain Agreements With Respect to Insolvency or Liquidation Proceedings, Etc.

(a)     This Agreement shall continue in full force and effect, notwithstanding the commencement of any Insolvency or Liquidation Proceeding by or against Holdings, the Borrowers, any other Grantor or any of Holdings' other Subsidiaries.  Without limiting the generality of the foregoing, the provisions of this Agreement are intended to be and shall be enforceable as a "subordination agreement" under Section 510(a) of the Bankruptcy Code.  All references to the Borrowers or any other Grantor shall include the Borrowers or any other Grantor as debtor and debtor-in-possession and any receiver or trustee for such person in any Insolvency or Liquidation Proceeding.

(b)     If any Grantor shall become subject to a case under the Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing (a "*DIP Financing*") to be provided by one or more lenders (the "*DIP Lenders*") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code, each Junior Secured Obligations Secured Party agrees that it will raise no objection, and will waive any claim such Person may now or hereafter have, to any such financing or to the Liens on the Senior Secured Obligations Collateral securing the same ("*DIP Financing Liens*"), or to any use of cash collateral that constitutes Senior Secured Obligations Collateral or to any grant of administrative expense priority under Section 364 of the Bankruptcy Code, unless (i) the Senior Secured Obligations Secured Parties, or Senior Representative, shall then oppose or object to such DIP Financing or such DIP Financing Liens or such use of cash collateral or (ii) such DIP Financing Liens are neither senior to, nor rank equal with, the Senior Liens upon any property of the estate in such Insolvency or Liquidation Proceeding.  To the extent such DIP Financing Liens are senior to, or rank equal with, the Senior Liens on the Senior Secured Obligations Collateral, each Junior Representative will, for itself and on behalf of the other Junior Secured Obligations Secured Parties of the applicable Series, subordinate the Junior Liens on the Senior Secured Obligations Collateral to (i) the Senior Liens (and all adequate protection liens on the Senior Secured Obligations Collateral granted to the Senior Secured Obligations Secured Parties) and the DIP Financing Liens on the Senior Secured Obligations Collateral and (ii) any "carve out" for professional fees and United States Trustee fees and other payments from the Senior Secured Obligations Collateral agreed to by the Senior Representative, so long as the Junior Secured Obligations Secured Parties retain their valid, perfected and unvoidable Liens on all the Junior Secured Obligations Collateral, including proceeds thereof arising after the commencement of any Insolvency or Liquidation Proceeding, with the same priority as existed prior to the commencement of the case under the Bankruptcy Code.

(c)     Each Junior Secured Obligations Secured Party agrees that it will not object to or oppose (i) a sale or other disposition of any Senior Secured Obligations Collateral (or any portion thereof) under Section 363 of the Bankruptcy Code or any other provision of the Bankruptcy Code if the Senior Secured Obligations Secured Parties shall have consented to such sale or disposition of such Senior Secured Obligations Collateral and all Senior Liens and Junior Liens will attach to the proceeds of such sale or other disposition with the same priorities set forth herein; or (ii) any lawful exercise by any holder of claims in respect of any Senior Secured Obligations of the right to credit bid such claims under Section

-17-

363(k) of the Bankruptcy Code or any other applicable provision of the Bankruptcy Code or any sale in foreclosure of Collateral that is Senior Secured Obligations Collateral with respect to such claims.

(d)    (i)  No CF Debt Secured Party shall oppose (or support the opposition of any other Person) in any Insolvency or Liquidation Proceeding to (A) any motion or other request by any ABL Secured Party for adequate protection with respect to ABL Agent's Liens upon the ABL Priority Collateral, including any claim of any ABL Secured Party to post-petition interest, fees, or expenses as a result of the ABL Lien on the ABL Priority Collateral (so long as any post-petition interest, fees, or expenses paid as a result thereof is not paid from the proceeds of CF Debt Priority Collateral), a request for the application of proceeds of ABL Priority Collateral to the ABL Debt Obligations, and request for additional or replacement Liens on post-petition assets of the same type as the ABL Priority Collateral and/or a superpriority administrative claim, or (B) any objection by any ABL Secured Party to any motion, relief, action or proceeding based on such ABL Secured Party claiming a lack of adequate protection with respect to the ABL Liens in the ABL Priority Collateral.  In addition, the ABL Agent, for itself and on behalf of the ABL Secured Parties, may seek adequate protection of its junior interest in the CF Debt Priority Collateral in the form of an additional or replacement Lien on post-petition assets of the same type as the CF Debt Priority Collateral and/or a superpriority administrative claim, subject to the provisions of this Agreement; *provided*, that each CF Debt Agent is also granted adequate protection in the same form that is granted to the ABL Agent, which additional or replacement Lien on post-petition assets of the same type as the CF Debt Priority Collateral or superpriority administrative claim (as applicable) is senior to that granted to the ABL Agent in respect of the CF Debt Priority Collateral.  Such Lien on post-petition assets of the same type as the CF Debt Priority Collateral and/or superpriority administrative claim, if granted to the ABL Agent, will be subordinated to the adequate protection Liens and/or superpriority administrative claims (as applicable) granted in favor of each CF Debt Agent on such post-petition assets, and, if applicable, to the DIP Financing Liens of each CF Debt Agent or any other CF Debt Secured Party on such post-petition assets of the same type as the CF Debt Priority Collateral.  If the ABL Agent, for itself and on behalf of the ABL Secured Parties, seeks or requires (or is otherwise granted) adequate protection of its junior interest in the CF Debt Priority Collateral in the form of an additional or replacement Lien on post-petition assets of the same type as the CF Debt Priority Collateral and/or a superpriority administrative claim, then the ABL Agent, for itself and the ABL Secured Parties, agrees that each CF Debt Agent shall also be granted an additional or replacement Lien on such post-petition assets and/or a superpriority administrative claim as adequate protection of its senior interest in the CF Debt Priority Collateral and that the ABL Agent's additional or replacement Lien on post-petition assets of the same type as the CF Debt Priority Collateral and/or superpriority administrative claim (as applicable) shall be subordinated to the additional or replacement Lien on post-petition assets of the same type as the CF Debt Priority Collateral and/or superpriority administrative claim of each CF Debt Agent on the same basis as the Liens of the ABL Agent on, and claims with respect to, the CF Debt Priority Collateral are subordinated to the Liens of each CF Debt Agent on, and claims with respect to, the CF Debt Priority Collateral under this Agreement.  If the ABL Agent or any ABL Secured Party receives as adequate protection a Lien on post-petition assets of the same type as the ABL Priority Collateral, then such post-petition assets shall also constitute ABL Priority Collateral to the extent of any allowed claim of the ABL Secured Parties secured by such adequate protection Lien and shall be subject to this Agreement.

(ii)    No ABL Secured Party shall oppose (or support the opposition of any other Person) in any Insolvency or Liquidation Proceeding to (A) any motion or other request by any CF Debt Secured Party for adequate protection of any CF Debt Agent's Liens upon any of the CF Debt Priority Collateral, including any claim of any CF Debt Secured Party to post-petition interest, fees, or expenses as a result of any CF Debt Liens on the CF Debt Priority Collateral (so long as any post-petition interest, fees, or expenses paid as a result thereof is not paid from the proceeds of ABL Priority Collateral), a request for the application of proceeds of CF Debt Priority Collateral to the CF Debt Obligations, and request for additional or replacement Liens on post-petition assets of the same type as the CF Debt Priority Collateral

-18-

and/or a superpriority administrative claim or (B) any objection by any CF Debt Secured Party to any motion, relief, action or proceeding based on such CF Debt Secured Party claiming a lack of adequate protection, with respect to any CF Debt Agent's Liens in the CF Debt Priority Collateral.  In addition, any CF Debt Agent, for itself and on behalf of the applicable CF Debt Secured Parties, may seek adequate protection of its junior interest in the ABL Priority Collateral in the form of an additional or replacement Lien on post-petition assets of the same type as the ABL Priority Collateral and/or a superpriority administrative claim, subject to the provisions of this Agreement; *provided*, that the ABL Agent is also granted adequate protection in the same form that is granted to the applicable CF Debt Agent, which additional or replacement Lien on post-petition assets of the same type as the ABL Priority Collateral and/or superpriority administrative claim (as applicable) granted in favor of the ABL Agent is senior to that granted to the applicable CF Debt Agent in respect of the ABL Priority Collateral.  Such Lien on post-petition assets of the same type as the ABL Priority Collateral and/or superpriority administrative claim, if granted to any CF Debt Agent, will be subordinated to the adequate protection Liens and/or superpriority administrative claims (as applicable) granted in favor of the ABL Agent on such post-petition assets, and, if applicable, to the DIP Financing Liens of the ABL Agent or any other ABL Secured Party on such post-petition assets of the same type as the ABL Priority Collateral.  If any CF Debt Agent, for itself and on behalf of any CF Debt Secured Parties, seeks or requires (or is otherwise granted) adequate protection of its junior interest in the ABL Priority Collateral in the form of an additional or replacement Lien on the post-petition assets of the same type as the ABL Priority Collateral and/or a superpriority administrative claim, then such CF Debt Agent, for itself and the applicable CF Debt Secured Parties, agrees that the ABL Agent shall also be granted an additional or replacement Lien on such post-petition assets and/or a superpriority administrative claim as adequate protection of its senior interest in the ABL Priority Collateral and that such CF Debt Agent's additional or replacement Lien on such post-petition assets of the same type as the ABL Priority Collateral and/or superpriority administrative claim shall be subordinated to the additional or replacement Lien and/or superpriority administrative claim of the ABL Agent on the same basis as the Liens of such CF Debt Agent on and claims with respect to the ABL Priority Collateral are subordinated to the Liens of the ABL Agent on and claims with respect to the ABL Priority Collateral under this Agreement.  If any CF Debt Agent or any CF Debt Secured Party receives as adequate protection a Lien on post-petition assets of the same type as the CF Debt Priority Collateral, then such post-petition assets shall also constitute CF Debt Priority Collateral to the extent of any allowed claim of the applicable CF Debt Secured Parties secured by such adequate protection Lien and shall be subject to this Agreement.

(e)     Each of the Junior Secured Obligations Secured Parties waives any claim such Junior Secured Obligations Secured Party may now or hereafter have against the Senior Representative or any other Senior Secured Obligations Secured Party (or their representatives) arising out of any election by the Senior Representative or any Senior Secured Obligations Secured Parties, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code with respect to such party's Senior Secured Obligations Collateral.

(f)     Prior to any Discharge of Senior Secured Debt Obligations and any DIP Financing provided by the Senior Secured Obligations Secured Parties, no Junior Secured Obligations Secured Party shall seek relief from the automatic stay in any Insolvency or Liquidation Proceeding with respect to any Senior Secured Obligations Collateral unless (i) otherwise consented to by the Senior Representative or (ii) the Senior Representative or Senior Secured Obligations Secured Parties shall seek relief from the automatic stay with respect to such Collateral to commence a lien enforcement action with respect to such Senior Secured Obligations Collateral.  No Junior Secured Obligations Secured Party will object to or otherwise contest any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of the Senior Secured Obligations made by the Senior Representative or any other Senior Secured Obligations Secured Party (or their representatives).

-19-

(g)     Each of the Junior Secured Obligations Secured Parties hereby agrees that (i) it will not oppose or seek to challenge any claim by the Senior Representative or any other Senior Secured Obligations Secured Party (or their representatives) for allowance of Senior Secured Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Senior Representative's Lien on the Senior Secured Obligations Collateral, without regard to the existence of the Lien of the Junior Secured Obligations Secured Parties on the Senior Secured Obligations Collateral; and (ii) prior to any Discharge of Senior Secured Debt Obligations, will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code senior to or on a parity with the Liens on the Senior Secured Obligations Collateral securing the Senior Secured Obligations for costs or expenses of preserving or disposing of any Collateral.

(h)     Each CF Debt Agent, for itself and on behalf of the CF Debt Secured Parties under the applicable Series, and the ABL Agent, for itself and on behalf of the ABL Secured Parties, acknowledge and intend that:  the grants of Liens pursuant to the CF Debt Security Documents, on the one hand, and the ABL Security Documents, on the other hand, constitute separate and distinct grants of Liens, and because of, among other things, their differing rights in the Collateral, the ABL Debt Obligations are fundamentally different from the CF Debt Obligations and must be separately classified in any Plan of Reorganization proposed or confirmed (or approved) in an Insolvency or Liquidation Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the ABL Secured Parties and the claims of the CF Debt Secured Parties in respect of any Collateral constitute claims in the same class (rather than separate classes of secured claims), then the ABL Secured Parties and the CF Debt Secured Parties hereby acknowledge and agree that all distributions from the Collateral shall be made as if there were separate classes of ABL Debt Obligations and CF Debt Obligations against the Grantors (with the effect being that, to the extent that the aggregate value of the ABL Priority Collateral or the CF Debt Priority Collateral is sufficient (for this purpose ignoring all claims held by the other Secured Parties for whom such Collateral is Junior Secured Obligations Collateral), the ABL Secured Parties or the CF Debt Secured Parties, respectively, shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, fees, and expenses that are available from the applicable Senior Secured Obligations Collateral for each of the ABL Secured Parties and the CF Debt Secured Parties (regardless of whether any such claims for post-petition interest, fees, or expenses, may or may not be allowed or allowable in whole or in part as against any Grantor in the applicable Insolvency or Liquidation Proceeding(s) pursuant to Section 506(b) of the Bankruptcy Code or otherwise), respectively, before any distribution is made in respect of any claims in respect of the Junior Secured Obligations from, or with respect to, such applicable Senior Secured Obligations Collateral, with the holder of such claims hereby acknowledging and agreeing to turn over to the respective other Secured Parties amounts otherwise received or receivable by them from, or with respect to, such applicable Senior Secured Obligations Collateral to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing their aggregate recoveries.  This Section 2.06(h) is intended to govern the relationship between the classes of claims held by the ABL Secured Parties, on the one hand, and a collective class of claims comprised of each series of claims of the CF Debt Secured Parties (as opposed to separate classes of each such series of claims), on the other hand, and, for the avoidance of doubt, nothing set forth herein shall in any way alter or modify the relationship of each series of such separate claims held by the holders of the CF Debt Obligations, including as set forth in the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement, in each case, if in effect, or otherwise cause such different claims to be combined into one or more classes or otherwise classified in a manner that violates the First Lien Intercreditor Agreement or the Second Lien Intercreditor Agreement, in each case, if in effect.

(i)     If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a Plan of Reorganization or similar dispositive restructuring plan, both on account of the ABL Debt Obliga-

-20-

tions and on account of the CF Debt Obligations, then, to the extent the debt obligations distributed on account of the ABL Debt Obligations and on account of the CF Debt Obligations are secured by Liens upon the Collateral, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the debt obligations so distributed, to the Liens securing such debt obligations and the distribution of proceeds thereof.

(j)     If any Senior Secured Obligations Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of the Borrowers or any other Grantor (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "**_Recovery_**"), whether received as proceeds of security, enforcement of any right of setoff, recoupment or otherwise, then the Senior Secured Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred, and the Senior Secured Obligations Secured Parties shall be entitled to a future Discharge of Senior Secured Debt Obligations with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. Each Junior Representative, for itself and on behalf of each Junior Secured Obligations Secured Party under its Junior Documents, hereby agrees that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or allocation made in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

(k)     To the extent that any Junior Representative or any Junior Secured Obligations Secured Party has or acquires rights under Section 363 or Section 364 of the Bankruptcy Code or any similar provision of any other Bankruptcy Law with respect to any of the Collateral, such Junior Representative, on behalf of itself and each Junior Secured Obligations Secured Party under its Junior Documents, agrees not to assert any such rights without the prior written consent of the Senior Representative; _provided_ that if requested by the Senior Representative, such Junior Representative shall timely exercise such rights in the manner requested by the Senior Representative, including any rights to payments in respect of such rights.

(l)     No Junior Representative or any other Junior Secured Obligations Secured Party may support or vote in favor of any Plan of Reorganization (and each shall be deemed to have voted to reject any Plan of Reorganization) that is inconsistent with the terms of this Agreement.  Without limiting the generality of the foregoing, no Junior Representative or any other Junior Secured Obligations Secured Party may support or vote in favor of any Plan of Reorganization unless such plan (a) pays off, in cash in full, all Senior Secured Obligations or (b) is accepted by the class of holders of Senior Secured Obligations voting thereon in accordance with Section 1126 of the Bankruptcy Code.

SECTION 2.07.    Reinstatement.  In the event that any of the Senior Secured Obligations shall be paid and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference or other avoidance under the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Agreement shall be fully applicable thereto until all such Senior Secured Obligations shall again have been paid in full in cash.

SECTION 2.08.      Entry Upon Premises by the ABL Agent and the ABL Secured Parties; Intellectual Property License.

(a)      If the ABL Agent takes any enforcement action with respect to the ABL Priority Collateral, the CF Debt Secured Parties (i) shall reasonably cooperate with the ABL Agent (at the sole cost and expense of the ABL Agent and subject to the condition that no CF Debt Secured Party shall have any obligation or duty to take any action or refrain from taking any action that could in the opinion of such CF Debt Secured Party be expected to result in the incurrence of any liability or damage to such CF Debt Secured Party) in its efforts to enforce its security interest in the ABL Priority Collateral and to finish any work-in-process and assemble the ABL Priority Collateral, (ii) shall not take any action designed or intended to hinder or restrict in any respect the ABL Agent from enforcing its security interest in the ABL Priority Collateral or from finishing any work-in-process or assembling the ABL Priority Collateral, and (iii) subject to the rights of any landlords under real estate leases, shall permit the ABL Agent, its employees, agents, advisers and representatives, at the sole cost and expense of the ABL Secured Parties and upon reasonable advance notice, to enter upon and use the CF Debt Priority Collateral (including equipment, processors, computers and other machinery related to the storage or processing of records, documents or files), for a period not to exceed 180 days after the taking of such enforcement action, for purposes of (1) assembling and storing the ABL Priority Collateral and completing the processing of and turning into finished goods of any ABL Priority Collateral consisting of work-in-process, (2) selling any or all of the ABL Priority Collateral located on such CF Debt Priority Collateral, whether in bulk, in lots or to customers in the ordinary course of business by liquidation, sale, or otherwise, (3) removing any or all of the ABL Priority Collateral located on such CF Debt Priority Collateral, or (4) taking reasonable actions to protect, secure and otherwise enforce the rights of the ABL Secured Parties in and to the ABL Priority Collateral; *provided*, *however*, that nothing contained in this Agreement shall restrict the rights of any CF Debt Agent from selling, assigning or otherwise transferring any CF Debt Priority Collateral prior to the expiration of such 180-day period if the purchaser, assignee or transferee thereof agrees to be bound by the provisions of this Section 2.08.  If any stay or other order prohibiting the exercise of remedies with respect to the ABL Priority Collateral has been entered by a court of competent jurisdiction, such 180-day period shall be tolled during the pendency of any such stay or other order.  If the ABL Agent conducts a public auction or private sale of the ABL Priority Collateral at any of the real property included within the CF Debt Priority Collateral, the ABL Agent shall provide each CF Debt Agent with reasonable notice and use reasonable efforts to hold such auction, or sale in a manner which would not unduly disrupt such CF Debt Agent's use of such real property.

(b)      Notwithstanding any limitation set forth in Section 2.08(a), no CF Debt Secured Party shall in any manner interfere with ABL Agent's right to use any Intellectual Property pursuant to any license or other right of use granted by a Grantor or pursuant to any applicable law, and any sale or other disposition of such Intellectual Property whether by a lien enforcement action or otherwise shall be made expressly subject to such license or other right of use until the soonest to occur of the following:  (i) the Discharge of Senior Secured Debt Obligations of the ABL Secured Parties, or (ii) all ABL Priority Collateral consisting of inventory has been sold or otherwise disposed of after the occurrence and during the continuance of an Event of Default under the ABL Debt Documents, whether pursuant to a lien enforcement action by ABL Secured Parties, by a trustee or other representative of creditors in an Insolvency or Liquidation Proceeding or by one or more Grantors in an orderly liquidation of such ABL Priority Collateral, to repay the ABL Debt Obligations.  Nothing in this Section shall be deemed to modify, waive, condition, limit or otherwise adversely affect any right ABL Agent may have to sell or otherwise dispose of any inventory (including inventory bearing any trademarks or tradenames forming a part of the CF Debt Priority Collateral), whether by lien enforcement action or otherwise, after any sale or other disposition of any intellectual property by any CF Debt Agent or any other CF Debt Secured Party.

(c)    During the period of actual occupation, use or control by the ABL Secured Parties or their agents or representatives of any CF Debt Priority Collateral, the ABL Secured Parties shall (i) be responsible for the ordinary course third-party expenses related thereto, including costs with respect to heat, light, electricity, water and real property taxes with respect to that portion of any premises so used or occupied for such period, and (ii) be obligated to repair at their expense any physical damage to such CF Debt Priority Collateral or other assets or property resulting from such occupancy, use or control, and to leave such CF Debt Priority Collateral or other assets or property in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted.  The ABL Secured Parties severally (on a pro rata basis) agree to indemnify and hold harmless each CF Debt Agent and their respective officers, directors, employees and agents harmless from and against any liability, cost, expense, loss or damages, including legal fees and expenses, arising from any claim by a third party against any of them as a direct result of any action by the ABL Agent or any of its agents in its or their operation of such facilities to the extent not covered by insurance or the applicable insurer has denied coverage therefor as provided herein.  The ABL Secured Parties severally (on a pro rata basis) agree to pay, indemnify and hold each CF Debt Agent and their respective officers, directors, employees and agents harmless from and against any liability, cost, expense, loss or damages, including legal fees and expenses, resulting from the gross negligence or willful misconduct of the ABL Agent or any of its agents, representatives or invitees in its or their operation of such facilities.  Notwithstanding the foregoing, in no event shall the ABL Secured Parties have any liability to the CF Debt Secured Parties pursuant to this Section as a result of any condition (including any environmental condition, claim or liability) on or with respect to the CF Debt Priority Collateral existing prior to the date of the exercise by the ABL Secured Parties of their rights under this Section and the ABL Secured Parties shall have no duty or liability to maintain the CF Debt Priority Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the ABL Secured Parties, or for any diminution in the value of the CF Debt Priority Collateral that results solely from ordinary wear and tear resulting from the use of the CF Debt Priority Collateral by the ABL Secured Parties in the manner and for the time periods specified under this Section 2.08.  Without limiting the rights granted in this paragraph, ABL Agent, to the extent that rights have been exercised under this Section 2.08 by ABL Agent, shall cooperate with the CF Debt Secured Parties in connection with any efforts made by the CF Debt Secured Parties to sell the CF Debt Priority Collateral.

(d)    Each CF Debt Agent and each CF Debt Secured Party, in its capacity as a secured party (or as a purchaser, assignee or transferee, as applicable), and to the extent of its interest therein, hereby grants to the ABL Agent and the ABL Secured Parties a nonexclusive, irrevocable, royalty-free, worldwide license to use, license or sublicense any and all Intellectual Property now owned or hereafter acquired included as part of the CF Debt Collateral (and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof) as is or may be necessary or advisable in the ABL Agent's reasonable judgment for the ABL Agent to process, ship, produce, store, supply, lease, complete, sell, liquidate or otherwise deal with the ABL Priority Collateral, or to collect or otherwise realize upon any Accounts (as defined in the ABL Credit Agreement) comprising ABL Priority Collateral, in each case solely in connection with any exercise of remedies available to the ABL Secured Parties; provided that (i) any such license shall terminate upon the sale of the applicable ABL Priority Collateral and shall not extend or transfer to the purchaser of such ABL Priority Collateral, (ii) the ABL Agent's use of such Intellectual Property shall be reasonable and lawful, and (iii) any such license is granted on an "AS IS" basis, without any representation or warranty whatsoever. Furthermore, each CF Debt Agent agrees that, in connection with any exercise of remedies available to any CF Debt Agent in respect of CF Debt Collateral, such CF Debt Agent shall provide written notice to any purchaser, assignee or transferee of Intellectual Property pursuant to such exercise of remedies, that the applicable Intellectual Property is subject to such license.

-23-

SECTION 2.09.    Insurance.  Unless and until written notice by the ABL Agent to each CF Debt Agent that the Discharge of Senior Secured Debt Obligations in respect of the ABL Debt Obligations has occurred, as between the ABL Agent, on the one hand, and any CF Debt Agent, on the other hand, only the ABL Agent will have the right (subject to the rights of the Grantors under the ABL Debt Documents and the CF Debt Documents) to adjust or settle any insurance policy or claim covering or constituting ABL Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the ABL Priority Collateral.  Unless and until written notice by each CF Debt Agent to the ABL Agent that the CF Debt Obligations have been paid in full, as between the ABL Agent, on the one hand, and any CF Debt Agent, on the other hand, only CF Debt Agents will have the right (subject to the rights of the Grantors under the ABL Debt Documents and the CF Debt Documents) to adjust or settle any insurance policy covering or constituting CF Debt Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding solely affecting CF Debt Priority Collateral.  To the extent that an insured loss covers or constitutes both ABL Priority Collateral and CF Debt Priority Collateral, then the ABL Agent and each CF Debt Agent will work jointly and in good faith to collect, adjust or settle (subject to the rights of the Grantors under the ABL Debt Documents and the CF Debt Documents) under the relevant insurance policy.

SECTION 2.10.    Refinancing and Additional Secured Debt.

(a)    The ABL Debt Obligations and the CF Debt Obligations may be Replaced by any ABL Substitute Facility or Term Loan Substitute Facility, as the case may be, in each case, without notice to or the consent of any Secured Party, all without affecting the Lien priorities provided for herein or the other provisions hereof; provided, however, that each CF Debt Agent and the ABL Agent shall receive on or prior to incurrence of the Replacement of an ABL Substitute Facility or Term Loan Substitute Facility (i) an Officer's Certificate from the Borrower Agent (as defined in the ABL Credit Agreement) stating that (A) the Replacement is permitted by each applicable Secured Document to be incurred, or to the extent a consent is otherwise required to permit the Replacement under any Secured Document, each Grantor has obtained the requisite consent and (B) the requirements of Section 2.12 have been satisfied, and (ii) a Lien Sharing and Priority Confirmation Joinder from the holders or lenders of any indebtedness that Replaces the ABL Debt Obligations or the CF Debt Obligations (or an authorized agent, trustee or other representative on their behalf).

Each of the then-existing ABL Agent and CF Debt Agents shall be authorized to execute and deliver such documents and agreements (including amendments or supplements to this Agreement) as such holders, lenders, agent, trustee or other representative may reasonably request to give effect to such Replacement, it being understood that the ABL Agent and each CF Debt Agent, without the consent of any other Secured Party, may amend, supplement, modify or restate this Agreement to the extent reasonably necessary or appropriate to facilitate such amendments or supplements to effect such Replacement all at the expense of the Borrowers.  Upon the consummation of such Replacement and the execution and delivery of the documents and agreements contemplated in the preceding sentence, the holders or lenders of such indebtedness and any authorized agent, trustee or other representative thereof shall be entitled to the benefits of this Agreement.

(b)    Each Grantor will be permitted to designate as an additional holder of Secured Debt Obligations hereunder each Person who is or who becomes the registered holder of Additional Debt incurred by such Grantor after the date of this Agreement in accordance with the terms of all applicable Secured Documents.  Each Grantor may effect such designation by delivering to each CF Debt Agent and the ABL Agent, each of the following:

-24-

(i)    an Officer's Certificate stating that such Grantor intends to incur Additional Debt which will be permitted by each applicable Secured Document to be incurred and secured by a CF Debt Lien, and

(ii)    the Additional Debt Agent, on behalf of itself and the Additional Debt Secured Parties of the applicable Series must, prior to such designation, sign and deliver a Lien Sharing and Priority Confirmation Joinder.

(c)    Notwithstanding the foregoing, nothing in this Agreement will be construed to allow any Grantor to incur additional indebtedness unless otherwise permitted by the terms of each applicable Secured Document.

(d)    Any Series of Additional Pari First Lien CF Debt shall rank equal in right of security with all other Pari First Lien CF Debt.

SECTION 2.11.    Modification; No Interference.

(a)    The ABL Secured Parties may agree to modify the terms (including, amending, restating, amending and restating, supplementing, restructuring, repaying, refinancing or otherwise modifying) of any of the ABL Debt Obligations and grant extensions of the time of payment or performance to and make compromises (including releases of Liens on the ABL Priority Collateral or of guaranties) and settlements with any and all Grantors and all other Persons, in each case, without the consent of the CF Debt Secured Parties and without affecting agreements of the CF Debt Secured Parties in this Agreement. If an ABL Secured Party should amend or waive any provisions of the ABL Debt Documents, whether or not any ABL Secured Party has knowledge that such amendment or waiver would result in a breach of any CF Debt Documents or an Event of Default under any CF Debt Documents, or knowledge of an act, condition or event which with notice or passage of time or both would constitute an Event of Default under any CF Debt Documents, in no event shall the ABL Secured Parties have any liability to any CF Debt Secured Parties as a result of such breach and, without limiting generality of the foregoing, the ABL Secured Parties shall not have any liability for tortious interference with contractual relations or for inducement by the ABL Secured Parties of any Grantor to breach any contract or otherwise. Nothing contained in this Section 2.11(a) shall limit, impair or waive any right that the CF Debt Secured Parties have to enforce any of the provisions of the CF Debt Documents against any Grantor and the provisions of this Agreement against any ABL Secured Party.

(b)    The CF Debt Secured Parties may agree to modify the terms (including, amending, restating, amending and restating, supplementing, restructuring, repaying, refinancing or otherwise modifying) of any of their respective CF Debt Obligations and grant extensions of the time of payment or performance to and make compromises (including releases of Liens on CF Debt Priority Collateral or of guaranties) and settlements with any and all Grantors and all other Persons, in each case, without the consent of the ABL Secured Parties and without affecting the agreements of the ABL Secured Parties in this Agreement.  If a CF Debt Secured Party should amend or waive any provisions of its respective CF Debt Documents, whether or not any CF Debt Secured Party has knowledge that such amendment or waiver would result in a breach of any ABL Debt Documents or an Event of Default under any ABL Debt Documents, or knowledge of an act, condition or event which with notice or passage of time or both would constitute an Event of Default under any ABL Debt Documents, in no event shall the CF Debt Secured Parties have any liability to any ABL Secured Party as a result of such breach and, without limiting generality of the foregoing, the CF Debt Secured Parties shall not have any liability for tortious interference with contractual relations or for inducement by the CF Debt Secured Parties of any Grantor to breach any contract or otherwise.  Nothing contained in this Section 2.11(b) shall limit, impair or waive any right that

-25-

the ABL Secured Parties have to enforce any of the provisions of the ABL Debt Documents against any Grantor and the provisions of this Agreement against any CF Debt Secured Party.

SECTION 2.12.     Legends.  Each Security Document shall (and, to the extent already in existence, shall be amended to) include a legend, substantially in the form of Annex I, describing this Agreement.

SECTION 2.13.     Junior Secured Obligations Secured Parties Rights as Unsecured Creditors.  Notwithstanding the provisions of Sections 2.02, 2.04(a) and 2.06(b), (c) and (d) or otherwise, both before and during an Insolvency or Liquidation Proceeding, any of the Junior Secured Obligations Secured Parties may take any actions and exercise any and all rights that would be available to a holder of unsecured claims, including, without limitation, the commencement of an Insolvency or Liquidation Proceeding against any Grantor in accordance with applicable law (including the Bankruptcy Laws of any applicable jurisdiction); *provided* that, the Junior Secured Obligations Secured Parties may not take any of the actions prohibited by Section 2.02, clauses (i) through (vii) of Section 2.04(a) or Section 2.06(b), (c), (d) and (e); *provided further*, that in the event that any of the Junior Secured Obligations Secured Parties becomes a judgment lien creditor in respect of any Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Junior Secured Obligations, such judgment lien shall be subject to the terms of this Agreement for all purposes (including in relation to the Senior Secured Obligations) as the other Liens securing the Junior Secured Obligations are subject to this Agreement.

SECTION 2.14.     Set-Off and Tracing of and Priorities in Proceeds.  Each CF Debt Agent, on behalf of the CF Debt Secured Parties under the applicable Series, acknowledges and agrees that, to the extent any CF Debt Agent or any CF Debt Secured Party exercises any rights of set-off against any ABL Priority Collateral, the amount of such set-off shall be held and distributed pursuant to Section 2.04(b).  The ABL Agent, on behalf of the ABL Secured Parties, acknowledges and agrees that, to the extent the ABL Agent or any ABL Secured Party exercises any rights of set-off against any ABL Priority Collateral, the amount of such set-off shall be held and distributed pursuant to Section 2.04(b).  The ABL Agent, for itself and on behalf of the ABL Secured Parties, and each CF Debt Agent, for itself and on behalf of the CF Debt Secured Parties under the applicable series, further agree that prior to an issuance of any Enforcement Notice with respect to the Senior Secured Obligations Collateral or the commencement of any Insolvency or Liquidation Proceeding, any proceeds of Collateral, whether or not deposited under Account Agreements, which are used by any Grantor to acquire other property which is Collateral shall not (solely as between the ABL Agent, the ABL Secured Parties, the CF Debt Agents and the CF Debt Secured Parties) be treated as proceeds of Collateral for purposes of determining the relative priorities in the Collateral which was so acquired.  In addition, unless and until the Discharge of Senior Secured Debt Obligations occurs, the CF Debt Agents and the CF Debt Secured Parties each hereby consents to the application, prior to the receipt by the ABL Agent of an Enforcement Notice issued by any CF Debt Agent, of cash or other proceeds of Collateral, deposited under Account Agreements to the repayment of ABL Debt Obligations pursuant to the ABL Debt Documents; *provided* that after the receipt by the ABL Agent of an Enforcement Notice from any CF Debt Agent, any identifiable proceeds of CF Debt Priority Collateral (whether or not deposited under Account Agreements with the ABL Agent) shall be treated as CF Debt Priority Collateral.

ARTICLE III

*Gratuitous Bailment for Perfection of Certain Security
Interests; Rights Under Permits and Licenses*

SECTION 3.01.    General.  The ABL Agent and each CF Debt Agent agrees and acknowledges that if it shall at any time hold a Senior Lien on any Junior Secured Obligations Collateral that can be perfected by the possession or control of such Collateral or of any account in which such Collateral is held, and if such Collateral or any such account is in fact in the possession or under the control of the Senior Representative, the Senior Representative shall also hold such Collateral as gratuitous bailee for the Junior Representatives for the sole purpose of perfecting the Junior Lien of the Junior Representatives on such Collateral.  It is agreed that the obligations of the Senior Representative and the rights of the Junior Representatives and the other Junior Secured Obligations Secured Parties in connection with any such bailment arrangement will be in all respects subject to the provisions of Article II.  Notwithstanding anything to the contrary herein, the ABL Agent and each CF Debt Agent will be deemed to make no representation as to the adequacy of the steps taken by it to perfect the Junior Lien on any such Collateral and shall have no responsibility, duty, obligation or liability to the Junior Representatives or other Junior Secured Obligations Secured Party or any other person for such perfection or failure to perfect, it being understood that the sole purpose of this Article is to enable the Junior Secured Obligations Secured Parties to obtain a perfected Junior Lien in such Collateral to the extent, if any, that such perfection results from the possession or control of such Collateral or any such account by the ABL Agent or any CF Debt Agent.  Subject to Section 2.07 and to the ABL Agent or any CF Debt Agent receiving such indemnifications as shall be required by such ABL Agent or any CF Debt Agent, from and after the associated Discharge of Senior Secured Debt Obligations, the ABL Agent or any CF Debt Agent shall take all such actions in its power as shall reasonably be requested by any Junior Representative (at the sole cost and expense of the Grantors) to transfer possession of such Collateral in its possession (in each case to the extent such Junior Representative has a Lien on such Collateral after giving effect to any prior or concurrent releases of Liens) to such Junior Representative (and with respect to any Collateral constituting ABL Priority Collateral, to the Controlling CF Debt Agent for the benefit of all applicable Junior Secured Obligations Secured Parties).  In furtherance of the foregoing, each Grantor hereby grants a security interest in the Collateral to each ABL Agent and CF Debt Agent that controls such Collateral for the benefit of all Junior Representatives and Junior Secured Obligations Secured Parties which have been granted a Lien on such Collateral controlled by such Senior Representative to secure the Junior Secured Obligations.

SECTION 3.02.    Deposit Accounts.

(a)    The Grantors, to the extent required by the ABL Credit Agreement, may from time to time establish deposit or other accounts (the "***Deposit Accounts***") with certain depositary banks in which collections from Inventory (as defined in the ABL Credit Agreement) and Accounts (as defined in the ABL Credit Agreement) may be deposited.  To the extent that any such Deposit Account is under the control of the ABL Agent at any time, the ABL Agent will act as agent and gratuitous bailee for each CF Debt Agent for the purpose of perfecting the Liens of the CF Debt Secured Parties in such Deposit Accounts and the cash and other assets therein as provided in Section 3.01 (but will have no duty, responsibility or obligation to the CF Debt Secured Parties (including, without limitation, any duty, responsibility or obligation as to the maintenance of such control, the effect of such arrangement or the establishment of such perfection)).  Unless the Junior Liens on such ABL Priority Collateral shall have been or concurrently are released, after the occurrence of any Discharge of Senior Secured Debt Obligations, the ABL Agent shall, to the extent that the same are then under the sole dominion and control of the ABL Agent and that such action is otherwise within the power and authority of the ABL Agent pursuant to the ABL Debt

-27-

Documents, at the request of any CF Debt Agent, cooperate with Grantors and the other CF Debt Agents (at the expense of the Grantors) in permitting control of any Deposit Accounts to be transferred to the Controlling CF Debt Agent (or for other arrangements with respect to each such Deposit Accounts satisfactory to each CF Debt Agent to be made).

(b)    The Grantors, the Representatives, the Secured Parties and all other parties hereto agree that only proceeds of the CF Debt Priority Collateral may be deposited in the Collateral Proceeds Accounts and agree to take all other actions necessary to give effect to the intent of this Section 3.02(b). Without limiting the generality of the foregoing, each CF Debt Agent hereby agrees that if any Collateral Proceeds Account contains any proceeds of the ABL Priority Collateral, it shall hold such proceeds in trust for the ABL Secured Parties and transfer such proceeds to the ABL Secured Parties reasonably promptly after obtaining actual knowledge or notice from the ABL Secured Parties that it has possession of such proceeds in accordance with Section 2.04(b).  Subject to Section 7.12, each CF Debt Agent shall give written notice to the ABL Agent identifying the Collateral Proceeds Accounts.

SECTION 3.03.    Rights under Permits and Licenses.

Each CF Debt Agent agrees that if the ABL Agent shall require rights available under any permit or license controlled by such CF Debt Agent (as certified to such CF Debt Agent by the ABL Agent, upon which such CF Debt Agent may rely) in order to realize on any ABL Priority Collateral, such CF Debt Agent shall (subject to the terms of the CF Debt Documents, including this Section 3.02(b)), take all such actions as shall be available to it (at the sole expense of the Grantors), consistent with applicable law and reasonably requested by the ABL Agent in writing, to make such rights available to the ABL Agent, subject to the CF Debt Liens.  The ABL Agent agrees that if any CF Debt Agent shall require rights available under any permit or license controlled by the ABL Agent (as certified to the ABL Agent by such CF Debt Agent, upon which the ABL Agent may rely) in order to realize on any CF Debt Priority Collateral, the ABL Agent shall (subject to the terms of the ABL Debt Documents, including such ABL Agent's rights to indemnification thereunder) take all such actions as shall be available to it (at the sole expense of the Grantors), consistent with applicable law and reasonably requested by such CF Debt Agent in writing, to make such rights available to such CF Debt Agent, subject to the ABL Liens.

ARTICLE IV

*Existence and Amounts of Liens and Obligations*

Whenever a Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any Senior Secured Obligations (or the existence of any commitment to extend credit that would constitute Senior Secured Obligations) or Junior Secured Obligations (or the existence of any commitment to extend credit that would constitute Junior Secured Obligations), or the existence of any Lien securing any such obligations, or the Collateral subject to any such Lien, it may request that such information be furnished to it in writing by the other Representative or Representatives and shall be entitled to make such determination on the basis of the information so furnished; *provided*, *however*, that if a Representative shall fail or refuse reasonably promptly to provide the requested information, the requesting Representative shall be entitled to make any such determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Borrower Agent.  Each Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to the Grantors or any of their Subsidiaries, any Secured Party or any other person as a result of such determination.

-28-

ARTICLE V

*Consent of Grantors*

Each Grantor hereby consents to the provisions of this Agreement and the intercreditor arrangements provided for herein and agrees that the obligations of the Grantors under the Security Documents will in no way be diminished or otherwise affected by such provisions or arrangements (except as expressly provided herein).

ARTICLE VI

*Representations and Warranties*

SECTION 6.01.    <u>Representations and Warranties of Each Party</u>.  Each party hereto represents and warrants to the other parties hereto as follows:

(a)    Such party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite power and authority to enter into and perform its obligations under this Agreement.

(b)    This Agreement has been duly executed and delivered by such party.

(c)    The execution, delivery and performance by such party of this Agreement (i) do not require any consent or approval of, registration or filing with or any other action by any governmental authority of which the failure to obtain could reasonably be expected to have a Material Adverse Effect (as defined in the ABL Credit Agreement), (ii) will not violate any applicable law or regulation or any order of any governmental authority or any indenture, agreement or other instrument binding upon such party which could reasonably be expected to have a Material Adverse Effect and (iii) will not violate the charter, by-laws or other organizational documents of such party.

SECTION 6.02.    <u>Representations and Warranties of Each Representative</u>.  Each of the CF Debt Agents and the ABL Agent represents and warrants to the other parties hereto that it is authorized under their respective CF Debt Documents and the ABL Credit Agreement, as the case may be, to enter into this Agreement.

ARTICLE VII

*Miscellaneous*

SECTION 7.01.    <u>Notices</u>.  All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)    if to the Original ABL Agent, to Citibank, N.A. at 390 Greenwich Street, 1st Floor, New York, New York 10013; Attention of Christopher Marino, telephone (212) 723-3897; email:  christopher.marino@citi.com and Denise Perry, telephone 212-723-3744, telecopy (646) 291-3358; email: denise.perry@citi.com;

(b)    if to the Original Term Loan Agent, to Citibank, N.A., Attention of Loan Administration, telecopy (212) 994-0847; email:  GLOriginationOps@citigroup.com; and

(c)  if to any other Representative, to such address as specified in the Lien Sharing and Priority Confirmation Joinder.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto (and for this purpose a notice to the Borrower Agent shall be deemed to be a written notice to each Grantor). All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) at the address of such party as provided in this Section 7.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 7.01. As agreed to in writing among the Borrower Agent, on behalf of the Grantors, each CF Debt Agent and the ABL Agent from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

SECTION 7.02. Waivers; Amendment.

(a)  No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)  Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified except pursuant to an agreement or agreements in writing entered into by each Representative and the Borrowers, on behalf of the Grantors (it being understood that the consent of the Borrowers to any amendment or modification of this Agreement or any provision thereof shall only be required to the extent such amendment or modification adversely affects or impairs the rights of any Grantor (including rights hereunder, under the ABL Debt Documents and under the CF Debt Documents) or imposes any additional obligation or liability upon any Grantor); *provided*, *however*, that this Agreement may be amended from time to time (x) as provided in Section 2.10 and (y) at the sole request and expense of the Borrowers, and without the consent of any Representative, to add, pursuant to the Intercreditor Agreement Joinder, additional Grantors whereupon such Person will be bound by the terms hereof to the same extent as if it had executed and delivered this Agreement as of the date hereof. Any amendment of this Agreement that is proposed to be effected without the consent of a Representative as permitted by the proviso to the preceding sentence shall be submitted to such Representative for its review at least 5 Business Days (or such shorter period as shall be acceptable to such Representative) prior to the proposed effectiveness of such amendment; *provided* that no prior review shall be required for the joinder of a Grantor pursuant to a joinder in the form of Exhibit A.

SECTION 7.03. Parties in Interest. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

SECTION 7.04.   Survival of Agreement.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 7.05.   Counterparts.  This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract.  Delivery of an executed signature page to this Agreement by facsimile transmission (or other electronic transmission) shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 7.06.   Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.07.   Governing Law; Jurisdiction; Consent to Service of Process.

**(a)     This Agreement shall be construed in accordance with and governed by the laws of the State of New York.**

(b)     Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York, New York and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party hereto may otherwise have to bring any action or proceeding relating to this Agreement in the courts of any jurisdiction.

(c)     Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 7.01.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 7.08.   WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT.  EACH

-31-

PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 7.09.    <u>Headings</u>.  Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 7.10.    <u>Conflicts</u>.  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any Secured Documents, the provisions of this Agreement shall control.

SECTION 7.11.    <u>Provisions Solely to Define Relative Rights</u>.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the ABL Secured Parties, on the one hand, and the CF Debt Secured Parties, on the other hand.  None of the Grantors or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement (*provided that* nothing in this Agreement is intended to or will amend, waive or otherwise modify the provisions of the ABL Debt Documents or the CF Debt Documents), and no Grantor may rely on the terms hereof (other than <u>Sections 2.05</u>, <u>2.06</u>, <u>2.10</u>, <u>Article III</u>, <u>Article VI</u> and <u>Article VII</u>).  Nothing in this Agreement is intended to or shall impair the obligations of Grantors, which are absolute and unconditional, to pay the Obligations under the Secured Documents as and when the same shall become due and payable in accordance with their terms.  Notwithstanding anything to the contrary herein or in any Secured Document, the Grantors shall not be required to act or refrain from acting (a) pursuant to this Agreement or any CF Debt Document with respect to any ABL Priority Collateral in any manner that would cause a default under any ABL Debt Document, or (b) pursuant to this Agreement or any ABL Debt Document with respect to any CF Debt Priority Collateral in any manner that would cause a default under any CF Debt Document.

SECTION 7.12.    <u>Certain Terms Concerning the ABL Agent and each CF Debt Agent; Force Majeure</u>.

(a)    Neither the ABL Agent nor any CF Debt Agent shall have any liability or responsibility for the actions or omissions of any other Secured Party, or for any other Secured Party's compliance with (or failure to comply with) the terms of this Agreement.  Neither the ABL Agent nor any CF Debt Agent shall have individual liability to any Person if it shall mistakenly pay over or distribute to any Secured Party (or the Grantors) any amounts in violation of the terms of this Agreement, so long as the ABL Agent or such CF Debt Agent, as the case may be, is acting in good faith.  In no event shall the ABL Agent or any CF Debt Agent be responsible for or liable for (i) any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services or (ii) special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether any such party has been advised of the likelihood of such loss or damage and regardless of the form of action.

(b)     Each of the CF Debt Agents and the ABL Agent is executing and delivering this Agreement solely in its capacity as agent and in so doing, neither such CF Debt Agent nor the ABL Agent shall be responsible for the terms or sufficiency of this Agreement for any purpose.  None of the CF Debt Agents or the ABL Agent shall have any duties or obligations under or pursuant to this Agreement other than such duties as may be expressly set forth in this Agreement as duties on its part to be performed or observed.  In entering into this Agreement, or in taking (or forbearing from) any action under or pursuant to this Agreement, each CF Debt Agent and the ABL Agent shall have and be protected by all of the rights, immunities, indemnities and other protections granted to it under the ABL Debt Documents and the applicable CF Debt Documents, as applicable.

SECTION 7.13.     Intercreditor Agreements.  Notwithstanding anything to the contrary contained in this Agreement, each party hereto agrees that the CF Debt Secured Parties under the Pari First Lien CF Debt (as among themselves), the CF Debt Secured Parties under the Pari Second Lien CF Debt (as among themselves) and the CF Debt Secured Parties under the CF Debt (as among each other) may in each case enter into intercreditor agreements (or similar arrangements) with the relevant Representatives governing the rights, benefits and privileges of CF Debt Secured Parties under the Pari First Lien CF Debt (as among themselves), the CF Debt Secured Parties under the Pari Second Lien CF Debt (as among themselves) or the CF Debt Secured Parties under the CF Debt (as among each other), as the case may be, in respect of any or all of the Collateral and the applicable CF Debt Documents, including as to the application of proceeds of any Collateral, voting rights, control of any Collateral and waivers with respect to any Collateral, in each case so long as the terms thereof do not violate or conflict with the provisions of this Agreement.

SECTION 7.14.     Effectiveness of the Acquisition.  No Grantor (other than Holdings) shall have any rights or obligations hereunder until the consummation of the Acquisition, and any representations and warranties of the Grantors (other than Holdings) hereunder shall not become effective until such time.

[Remainder of this page intentionally left blank]

-33-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

CITIBANK, N.A.,
as Original ABL Agent

By: _____
Name:
Title:

Signature Page – ABL Intercreditor Agreement

CITIBANK, N.A.,
as Original Term Loan Agent

By: _____
     Name:
     Title:

PETSMART, INC., as the U.S. Borrower

By: _____
     Name:
     Title:

PETM CANADA CORPORATION, as the Canadian Borrower

By: _____
     Name:
     Title:

ARGOS HOLDINGS INC., as Holdings

By: _____
     Name:
     Title:

Signature Page – ABL Intercreditor Agreement

PET WISE INC.
PACIFIC COAST DISTRIBUTING, INC.
PET360, INC.
AUTHORITY PET FOOD COMPANY
PETSTUFF CANADA (USA) HOLDINGS, INC.
PETSMART PUERTO RICO, LLC
PETSTUFF NOVA SCOTIA, INC.
PETSCARD, LLC
SIMPLY NOURISH PET FOOD COMPANY, LLC
PETSMART STORE SUPPORT GROUP, INC.
MAVERICK LEASING, INC.
ONP-ECOM, LLC
ONP-RETAIL, LLC
PET360 MEDIA, INC.
PETMD, INC.
PETMD LLC
PETMD VENTURES, INC.
KY SHELTER AND MOBILE VET SERVICE LLC
PETM CANADA CORPORATION
ANIMAL WELLNESS, LLC
THE CAT AND DOG CLINIC OF LANSDALE, LLC
PET360 PHARMACY HOLDINGS, LLC
PET360 PHARMACY, LLC


By:    _____
       Name:
       Title:


Signature Page – ABL Intercreditor Agreement

ANNEX I

<u>Provision for all ABL Security Documents, Term Loan Security Documents and any Additional Debt Security Documents that Grant a Security Interest in Collateral</u>

**Reference is made to the ABL Intercreditor Agreement, dated as of March 11, 2015 (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "*ABL Intercreditor Agreement*") among Citibank, N.A., as ABL Agent for the ABL Secured Parties referred to therein; Citibank, N.A., as Term Loan Agent for the Term Loan Secured Parties referred to therein; each Additional Debt Agent for the Additional Debt Secured Parties referred to therein; PetSmart, Inc., Argos Holdings Inc. and the Subsidiaries of Argos Holdings Inc. party thereto. Each Person that is secured hereunder, by accepting the benefits of the security provided hereby, (i) consents (or is deemed to consent), to the subordination of Liens provided for in the ABL Intercreditor Agreement, (ii) agrees (or is deemed to agree) that it will be bound by, and will take no actions contrary to, the provisions of the ABL Intercreditor Agreement, and (iii) authorizes (or is deemed to authorize) the [ABL Agent] [Term Loan Agent] [Additional Debt Agent] on behalf of such Person to enter into, and perform under, the ABL Intercreditor Agreement.**

**Notwithstanding any other provision contained herein, this Agreement, the Liens created hereby and the rights, remedies, duties and obligations provided for herein are subject in all respects to the provisions of the ABL Intercreditor Agreement. In the event of any conflict or inconsistency between the provisions of this Agreement and the ABL Intercreditor Agreement, the provisions of the ABL Intercreditor Agreement shall control.**

EXHIBIT A

to ABL Intercreditor Agreement

**[FORM OF]**
**GRANTOR INTERCREDITOR AGREEMENT JOINDER**

The undersigned, _____, a _____, hereby agrees to become party as a Grantor under (a) the ABL Intercreditor Agreement, dated as of March 11, 2015 (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "***ABL Intercreditor Agreement***") among Citibank, N.A., as ABL Agent for the ABL Secured Parties referred to therein; Citibank, N.A., as Term Loan Agent for the Term Loan Secured Parties referred to therein; each Additional Debt Agent for the Additional Debt Secured Parties referred to therein; PetSmart, Inc., **Argos Holdings Inc**. and the Subsidiaries of **Argos Holdings Inc**. party thereto, and (b) the Additional Debt Security Documents (as defined therein), if any; for all purposes thereof on the terms set forth therein, and to be bound by the terms of the ABL Intercreditor Agreement as fully as if the undersigned had executed and delivered the ABL Intercreditor Agreement as of the date thereof.

The provisions of Article 7 of the ABL Intercreditor Agreement will apply with like effect to this Joinder.

IN WITNESS WHEREOF, the parties hereto have caused this ABL Intercreditor Agreement Joinder to be executed by their respective officers or representatives as of _____, 20 _____.

[_____]

By:    _____
       Name:
       Title:

[Notice Address]

A-1

EXHIBIT B
to ABL Intercreditor Agreement

**[FORM OF]**
**LIEN SHARING AND PRIORITY CONFIRMATION JOINDER**

Reference is made to the ABL Intercreditor Agreement, dated as of March 11, 2015 (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "***ABL Intercreditor Agreement***") among Citibank, N.A., as ABL Agent for the ABL Secured Parties referred to therein; Citibank, N.A., as Term Loan Agent for the Term Loan Secured Parties referred to therein; each Additional Debt Agent for the Additional Debt Secured Parties referred to therein; PetSmart, Inc., Argos Holdings Inc. and the Subsidiaries of Argos Holdings Inc. party thereto.

Capitalized terms used but not otherwise defined herein shall have meaning set forth in the ABL Intercreditor Agreement.  This Lien Sharing and Priority Confirmation Joinder is being executed and delivered pursuant to Section 2.10[a][b] of the ABL Intercreditor Agreement as a condition precedent to the debt for which the undersigned is acting as representative being entitled to the rights and obligations of being additional secured debt under the ABL Intercreditor Agreement.

1.    Joinder.  The undersigned, [_____], a [_____], (the "***New Representative***") as [trustee] [collateral trustee] [administrative agent] [collateral agent] under that certain [*described applicable indenture, credit agreement or other document governing the additional secured debt*] hereby:

(a)    represents that the New Representative has been authorized to become a party to the ABL Intercreditor Agreement on behalf of the [ABL Secured Parties under an ABL Substitute Facility] [Term Loan Secured Parties under the Term Loan Substitute Facility] [Additional Debt Secured Parties under the Additional Debt Facility] as [an ABL Agent under an ABL Substitute Facility] [a Term Loan Agent under a Term Loan Substitute Facility] [an Additional Debt Agent under an Additional Debt Facility] under the ABL Intercreditor Agreement for all purposes thereof on the terms set forth therein, and to be bound by the terms of the ABL Intercreditor Agreement as fully as if the undersigned had executed and delivered the ABL Intercreditor Agreement as of the date thereof; and

(b)    agrees that its address for receiving notices pursuant to the ABL Intercreditor Agreement shall be as follows:

[Address];

2.    Lien Sharing and Priority Confirmation.

[*Option A:  to be used if New Debt constitutes ABL Debt Obligations*]  The undersigned New Representative, on behalf of itself and each holder of ABL Debt Obligations for which the undersigned is acting as [collateral agent] hereby agrees, for the benefit of all Secured Parties and each future Representative, and as a condition to being treated as ABL Debt Obligations under the ABL Intercreditor Agreement, that the New Representative is bound by the provisions of the ABL Intercreditor Agreement, including the provisions relating to the ranking of ABL Liens **[or]**

[*Option B:  to be used if New Debt constitutes a Series of CF Debt*]  The undersigned New Representative, on behalf of itself and each holder of Obligations in respect of the applicable Series of CF Debt [that constitutes Term Loan Substitute Facility] [that constitutes Additional Debt Facility] for which

the undersigned is acting as [Term Loan Agent] [Additional Debt Agent] hereby agrees, for the benefit of all Secured Parties and each future Representative, and as a condition to being treated as Secured Debt Obligations under the ABL Intercreditor Agreement, that:

(a)  the New Representative and each holder of Obligations in respect of the Series of CF Debt for which the undersigned is acting as [Term Loan Agent] [Additional Debt Agent] are bound by the provisions of the ABL Intercreditor Agreement, including the provisions relating to the ranking of CF Debt Liens and the order of application of proceeds from enforcement of CF Debt Liens; and

(b)  the New Representative and each holder of Obligations in respect of the Series of CF Debt for which the undersigned is acting as [Term Loan Agent] [Additional Debt Agent] appoints the [Term Loan Agent] [Additional Debt Agent] and consents to the terms of the ABL Intercreditor Agreement and the performance by the [Term Loan Agent] [Additional Debt Agent] of, and directs the [Term Loan Agent] [Additional Debt Agent] to perform, its obligations under the ABL Intercreditor Agreement, together with all such powers as are reasonably incidental thereto.

3.    Governing Law and Miscellaneous Provisions.  The provisions of Article 7 of the ABL Intercreditor Agreement will apply with like effect to this Lien Sharing and Priority Confirmation Joinder.

B-2

IN WITNESS WHEREOF, the parties hereto have caused this Lien Sharing and Priority Confirmation Joinder to be executed by their respective officers or representatives as of _____ , 20___].

[insert name of New Representative]

By: _____
    Name:
    Title:

The ABL Agent hereby acknowledges receipt of this Lien Sharing and Priority Confirmation Joinder:

_____,
as ABL Agent

By: _____
    Name:
    Title:

[The Term Loan Agent hereby acknowledges receipt of this Lien Sharing and Priority Confirmation Joinder:

_____,
as Term Loan Agent

By: _____
    Name:
    Title:    ]

[Each Additional Debt Agent hereby acknowledges receipt of this Lien Sharing and Priority Confirmation Joinder:

_____,
as Additional Debt Agent

By: _____
    Name:
    Title:    ]

B-3

EXHIBIT C
to ABL Intercreditor Agreement

**SECURITY DOCUMENTS**

**PART A.**

**List of ABL Security Documents**

1.    Collateral Agreement, dated as of March 11, 2015, among certain of the Grantors and ABL Agent.

2.    Canadian Collateral Agreement, dated as of March 11, 2015, between PETM Canada Corporation and ABL Agent.

3.    Collateral Agreement, dated as of March 11, 2015, between PetSmart Puerto Rico, LLC and ABL Agent.

4.    And all other security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, collateral agency agreements, control agreements or other grants or transfers for security in the Collateral executed and delivered by any of the Grantors in favor of the ABL Agent from time to time.

**PART B.**

**List of Term Loan Security Documents**

1.    Collateral Agreement, dated as of March 11, 2015, among the Grantors and Term Loan Agent (the "Term Loan Security Agreement").

2.    And all other security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, collateral agency agreements, control agreements or other grants or transfers for security in the Collateral executed and delivered by any of the Grantors in favor of the Term Loan Agent.

EXHIBIT F-1

[*Form of First Lien Intercreditor Agreement*]

[FORM OF]

FIRST LIEN INTERCREDITOR AGREEMENT

Among

Argos Holdings Inc.,

Argos Merger Sub Inc.,

PetSmart, Inc.,

the other Grantors party hereto,

CITIBANK, N.A.,
as Term Loan Collateral Agent for the Credit Agreement Secured Parties


and

each Additional Agent from time to time party hereto


dated as of [•]

FIRST LIEN INTERCREDITOR AGREEMENT dated as of [•] (as amended, supplemented or otherwise modified from time to time, this "**Agreement**"), among Argos Holdings Inc., a Delaware corporation ("**Holdings**"), PetSmart, Inc., a Delaware corporation (the "**Company**"),  Argos Merger Sub Inc., a Delaware corporation (the "**Merger Sub**", which on the Effective Date merged with and into the Company, with the Company surviving such merger as the Borrower) (the "**Borrower**"), the other Grantors (as defined below) party hereto, Citibank, N.A., as collateral agent for the Credit Agreement Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "**Term Loan Collateral Agent**") and [•], as collateral agent for the Indenture Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "**Notes Collateral Agent**") and each Additional Agent from time to time party hereto for the Additional First Lien Secured Parties of the Series with respect to which it is acting in such capacity.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Term Loan Collateral Agent (for itself and on behalf of the Credit Agreement Secured Parties), the Notes Collateral Agent (for itself and on behalf of the Indenture Secured Parties) and each Additional Agent (for itself and on behalf of the Additional First Lien Secured Parties of the applicable Series) agree as follows:

ARTICLE I

Definitions

SECTION 1.10   Certain Defined Terms.  Capitalized terms used but not otherwise defined herein have the meanings set forth in the Credit Agreement and the Indenture, as applicable, with the Credit Agreement controlling in the event of discrepancies, or, if defined in the New York UCC, the meanings specified therein. As used in this Agreement, the following terms have the meanings specified below:

"**ABL Collateral**" means the "ABL Priority Collateral" (as defined in the ABL Intercreditor Agreement).

"**ABL Intercreditor Agreement**" means the "ABL Intercreditor Agreement" (as defined in the Credit Agreement).

"**Additional Agent**" means the collateral agent and the administrative agent and/or trustee (as applicable) or any other similar agent or Person under any Additional First Lien Documents, in each case, together with its successors in such capacity.

"**Additional First Lien Debt Facility**" means one or more debt facilities, commercial paper facilities or indentures for which the requirements of Section 5.13 of this Agreement have been satisfied, in each case with banks, other lenders or trustees, providing for revolving credit loans, term loans, letters of credit, notes or other borrowings, in each case, as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time; provided that neither the Credit Agreement nor the Indenture shall constitute an Additional First Lien Debt Facility at any time.

"**Additional First Lien Documents**" means, with respect to any Series of Additional First Lien Obligations, the notes, credit agreements, indentures, security documents and other operative agreements evidencing or governing such Indebtedness, and each other agreement entered into for the purpose of securing any Series of Additional First Lien Obligations.

2

"**Additional First Lien Obligations**" means, with respect to any Additional First Lien Debt Facility, (a) all principal of, and interest (including, without limitation, any interest, fees and other amounts which accrue after the commencement of any Bankruptcy Case, whether or not allowed or allowable as a claim in any such proceeding) payable with respect to, such Additional First Lien Debt Facility, (b) all other amounts payable to the related Additional First Lien Secured Parties under the related Additional First Lien Documents and (c) any renewals of extensions of the foregoing.

"**Additional First Lien Secured Party**" means, with respect to any Series of Additional First Lien Obligations, the holders of such Additional First Lien Obligations, the Additional Agent with respect thereto, any trustee or agent or any other similar agent or Person therefor under any related Additional First Lien Documents and the beneficiaries of each indemnification obligation undertaken by the Borrower or any Guarantor under any related Additional First Lien Documents.

"**Agreement**" has the meaning assigned to such term in the preamble hereto.

"**Bankruptcy Case**" has the meaning assigned to such term in Section 2.05(b).

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended.

"**Bankruptcy Law**" means the Bankruptcy Code and any other federal, state, or foreign law for the relief of debtors, or any arrangement, reorganization, insolvency, moratorium, assignment for the benefit of creditors, any other marshalling of the assets or liabilities of Holdings or any of its Subsidiaries, or similar law affecting creditors' rights generally.

"**Borrower**" has the meaning assigned to such term in the preamble hereto.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"**Collateral**" means all assets and properties subject to Liens created pursuant to any First Lien Security Document to secure one or more Series of First Lien Obligations.

"**Collateral Agent**" means (i) in the case of any Credit Agreement Obligations, the Term Loan Collateral Agent, (ii) in the case of the Indenture Obligations, the Notes Collateral Agent, and (iii) in the case of any Series of Additional First Lien Obligations or Additional First Lien Secured Parties that become subject to this Agreement after the date hereof, the Additional Agent named for such Series in the applicable Joinder Agreement.

"**Company**" has the meaning assigned to such term in the preamble hereto.

"**Controlling CF Debt Agent**" shall have the meaning assigned to such term in Section 4.01(a).

"**Controlling Collateral Agent**" means, with respect to any Shared Collateral, (i) until the earlier of (x) the Discharge of First Lien Obligations that are Credit Agreement Obligations and (y) the Non-Controlling Collateral Agent Enforcement Date, the Term Loan Collateral Agent and (ii) from and after the earlier of (x) the Discharge of First Lien Obligations that are Credit Agreement Obligations and (y) the Non-Controlling Collateral Agent Enforcement Date, the Major Non-Controlling Collateral Agent.

3

"**Controlling Secured Parties**" means, with respect to any Shared Collateral, the Series of First Lien Secured Parties whose Collateral Agent is the Controlling Collateral Agent for such Shared Collateral.

"**Credit Agreement**" means that certain Credit Agreement dated as of March 11, 2015, as amended, restated, supplemented, increased or otherwise modified, refinanced or replaced from time to time, among Holdings, the Company, the Borrower, the lenders from time to time party thereto, Citibank, N.A., as administrative agent, and the other parties thereto.

"**Credit Agreement Obligations**" means the "Secured Obligations" as defined in the Credit Agreement.

"**Credit Agreement Secured Parties**" means the "Secured Parties" as defined in the Credit Agreement.

"**DIP Financing**" has the meaning assigned to such term in Section 2.05(b).

"**DIP Financing Liens**" has the meaning assigned to such term in Section 2.05(b).

"**DIP Lenders**" has the meaning assigned to such term in Section 2.05(b).

"**Discharge**" means, with respect to any Shared Collateral and any Series of First Lien Obligations, the date on which such Series of First Lien Obligations is no longer secured by such Shared Collateral. The term "**Discharged**" shall have a corresponding meaning.

"**Discharge of First Lien Obligations**" means, with respect to any Shared Collateral, the Discharge of the applicable First Lien Obligations with respect to such Shared Collateral; provided that a Discharge of First Lien Obligations shall not be deemed to have occurred in connection with a Refinancing of such First Lien Obligations with additional First Lien Obligations secured by such Shared Collateral under an Additional First Lien Document which has been designated in writing by the applicable Collateral Agent (under First Lien Obligation so Refinanced) or by the Borrower, in each case, to each other Collateral Agent as a "First Lien Obligation" for purposes of this Agreement.

"**Event of Default**" means an "Event of Default" (or any other similarly defined term) as defined in any Secured Credit Document.

"**First Lien Obligations**" means, collectively, (i) the Credit Agreement Obligations, (ii) the Indenture Obligations and (iii) each Series of Additional First Lien Obligations.

"**First Lien Secured Parties**" means (i) the Credit Agreement Secured Parties, (ii) the Indenture Secured Parties and (iii) the Additional First Lien Secured Parties with respect to each Series of Additional First Lien Obligations.

"**First Lien Security Documents**" means the Term Loan Security Agreement, the other Security Documents (as defined in the Credit Agreement), the Notes Security Agreement, the other Security Documents (as defined in the Indenture) and each other agreement entered into in favor of any Collateral Agent for the purpose of securing any Series of First Lien Obligations and the Other Intercreditor Agreements.

4

"**Grantors**" means Holdings, the Company, the Borrower and each other Subsidiary of Holdings which has granted a security interest pursuant to any First Lien Security Document to secure any Series of First Lien Obligations. The Grantors existing on the date hereof are set forth in Annex I hereto.

"**Holdings**" has the meaning assigned to such term in the preamble hereto.

"**Impairment**" has the meaning assigned to such term in Section 1.03.

"**Indenture**" means that certain Indenture dated as of [•], among [•], as such Indenture may be amended, restated, supplemented, increased or otherwise modified, refinanced or replaced.

"**Indenture Obligations**" means the "Secured Obligations" as defined in the Notes Security Agreement.

"**Indenture Secured Parties**" means the "Secured Parties" as defined in the Notes Security Agreement.

"**Insolvency or Liquidation Proceeding**" means:

(1)     any case commenced by or against the Borrower or any other Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Borrower or any other Grantor, any receivership or assignment for the benefit of creditors relating to the Borrower or any other Grantor or any similar case or proceeding relative to the Borrower or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(2)     any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Borrower or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)     any other proceeding of any type or nature in which substantially all claims of creditors of the Borrower or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"**Intervening Creditor**" shall have the meaning assigned to such term in Section 2.01(a).

"**Joinder Agreement**" means a supplement to this Agreement in the form of Annex II hereof required to be delivered by an Additional Agent to the Controlling Collateral Agent pursuant to Section 5.13 hereto in order to establish an additional Series of Additional First Lien Obligations and become Additional First Lien Secured Parties hereunder.

"**Major Non-Controlling Collateral Agent**" means, with respect to any Shared Collateral, the Collateral Agent (other than the Term Loan Collateral Agent) of the Series of First Lien Obligations that constitutes the largest outstanding principal amount of any then outstanding Series of First Lien Obligations (excluding the Series of Credit Agreement Obligations) with respect to such Shared Collateral, but solely to the extent that such Series of First Lien Obligations has a larger aggregate principal amount than the Series of Credit Agreement Obligations then outstanding.

"**New York UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"**Non-Controlling Collateral Agent**" means, at any time with respect to any Shared Collateral, any Collateral Agent that is not the Controlling Collateral Agent at such time with respect to such Shared Collateral.

"**Non-Controlling Collateral Agent Enforcement Date**" means, with respect to any Non-Controlling Collateral Agent, the date which is 90 days (throughout which 90 day period such Non-Controlling Collateral Agent was the Major Non-Controlling Collateral Agent) after the occurrence of both (i) an Event of Default under and as defined in the Secured Credit Documents under which such Non-Controlling Collateral Agent is the Major Non-Controlling Collateral Agent and (ii) the Controlling Collateral Agent and each other Collateral Agent's receipt of written notice from such Non-Controlling Collateral Agent certifying that (x) such Non-Controlling Collateral Agent is the Major Non-Controlling Collateral Agent and that an Event of Default under and as defined in the Secured Credit Documents under which such Non-Controlling Collateral Agent is the Collateral Agent has occurred and is continuing and (y) the First Lien Obligations of the Series with respect to which such Non-Controlling Collateral Agent is the Collateral Agent are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Secured Credit Documents; provided that the Non-Controlling Collateral Agent Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred with respect to any Shared Collateral (1) at any time the Controlling Collateral Agent has commenced and is diligently pursuing any enforcement action (including delivery by the Controlling Collateral Agent of a notice to the ABL Agent (as such term is defined in the ABL Intercreditor Agreement) that commences a Standstill Period (as such term is defined in the ABL Intercreditor Agreement) thereunder) with respect to such Shared Collateral, (2) at any time the Controlling Collateral Agent is stayed under the ABL Intercreditor Agreement from pursuing enforcement actions with respect to such shared collateral or (3) at any time the Grantor which has granted a security interest in such Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"**Non-Controlling Secured Parties**" means, with respect to any Shared Collateral, the First Lien Secured Parties which are not Controlling Secured Parties with respect to such Shared Collateral.

"**Notes Collateral Agent**" has the meaning assigned to such term in the preamble hereto.

"**Notes Security Agreement**" means the "Security Agreement" as defined in the Indenture.

"**Other Intercreditor Agreements**" means the ABL Intercreditor Agreement and, if in effect, the Second Lien Intercreditor Agreement.

"**Possessory Collateral**" means any Shared Collateral in the possession of any Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction. Possessory Collateral includes, without limitation, any Certificated Securities, Promissory Notes, Instruments, and Chattel Paper, in each case, delivered to or in the possession of the Collateral Agent under the terms of the First Lien Security Documents.

"**Proceeds**" has the meaning assigned to such term in Section 2.01(a).

"**Refinance**" means, in respect of any Indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other Indebtedness or enter alternative financing arrangements, in exchange or replacement for such Indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such Indebtedness has

been terminated and including, in each case, through any credit agreement, indenture or other agreement. "**Refinanced**" and "**Refinancing**" have correlative meanings.

"**Second Lien Intercreditor Agreement**" means the "Second Lien Intercreditor Agreement" substantially in the form of Exhibit F-2 to the Credit Agreement.

"**Secured Credit Document**" means (i) the Credit Agreement and each other Loan Document (as defined in the Credit Agreement), (ii) the Indenture, the Notes (as defined in the Indenture), the Notes Security Agreement and each other Security Document (as defined in the Indenture) and (iii) each Additional First Lien Document.

"**Senior Class Debt**" shall have the meaning assigned to such term in Section 5.13.

"**Senior Class Debt Parties**" shall have the meaning assigned to such term in Section 5.13.

"**Senior Class Debt Representative**" shall have the meaning assigned to such term in Section 5.13.

"**Senior Collateral Agent**" shall have the meaning assigned to such term in Section 4.01(a).

"**Senior Lien**" means the Liens on the Collateral in favor of the First Lien Secured Parties under the First Lien Security Documents.

"**Series**" means (a) with respect to the First Lien Secured Parties, each of (i) the Credit Agreement Secured Parties (in their capacities as such), (ii) the Indenture Secured Parties (in their capacity as such) and (iii) the Additional First Lien Secured Parties that become subject to this Agreement after the date hereof that are represented by a common Collateral Agent (in its capacity as such for such Additional First Lien Secured Parties) and (b) with respect to any First Lien Obligations, each of (i) the Credit Agreement Obligations, (ii) the Indenture Obligations and (iii) the Additional First Lien Obligations incurred pursuant to any Additional First Lien Debt Facility or any related Additional First Lien Documents, which pursuant to any Joinder Agreement, are to be represented hereunder by a common Collateral Agent (in its capacity as such for such Additional First Lien Obligations).

"**Shared Collateral**" means, at any time, Collateral in which the holders of two or more Series of First Lien Obligations (or their respective Collateral Agents) hold a valid and perfected security interest at such time. If more than two Series of First Lien Obligations are outstanding at any time and the holders of less than all Series of First Lien Obligations hold a valid and perfected security interest in any Collateral at such time, then such Collateral shall constitute Shared Collateral for those Series of First Lien Obligations that hold a valid security interest in such Collateral at such time and shall not constitute Shared Collateral for any Series which does not have a valid and perfected security interest in such Collateral at such time.

"**Term Loan Collateral Agent**" has the meaning assigned to such term in the preamble hereto.

"**Term Loan Security Agreement**" means the "Collateral Agreement" as defined in the Credit Agreement.

"**Uniform Commercial Code**" or "**UCC**" means the New York UCC, or the Uniform Commercial Code (or any similar or comparable legislation) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

SECTION 1.02   Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

SECTION 1.03   Impairments.  It is the intention of the First Lien Secured Parties of each Series that the holders of First Lien Obligations of such Series (and not the First Lien Secured Parties of any other Series) bear the risk of (i) any determination by a court of competent jurisdiction that (x) any of the First Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of First Lien Obligations), (y) any of the First Lien Obligations of such Series do not have an enforceable security interest in any of the Collateral securing any other Series of First Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First Lien Obligations) on a basis ranking prior to the security interest of such Series of First Lien Obligations but junior to the security interest of any other Series of First Lien Obligations or (ii) the existence of any Collateral for any other Series of First Lien Obligations that is not Shared Collateral (any such condition referred to in the foregoing clauses (i) or (ii) with respect to any Series of First Lien Obligations, an "**Impairment**" of such Series); provided that the existence of a maximum claim with respect to Mortgaged Properties (as defined in the Credit Agreement) which applies to all First Lien Obligations shall not be deemed to be an Impairment of any Series of First Lien Obligations. In the event of any Impairment with respect to any Series of First Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including, without limitation, the right to receive distributions in respect of such Series of First Lien Obligations pursuant to Section 2.01) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First Lien Obligations subject to such Impairment. Additionally, in the event the First Lien Obligations of any Series are modified pursuant to applicable law (including, without limitation, pursuant to Section 1129 of the Bankruptcy Code), any reference to such First Lien Obligations or the First Lien Documents governing such First Lien Obligations shall refer to such obligations or such documents as so modified.

ARTICLE II

Priorities and Agreements with Respect to Shared Collateral

SECTION 2.01    Priority of Claims.

(a)    Anything contained herein or in any of the Secured Credit Documents to the contrary notwithstanding (but subject to Section 1.03), if an Event of Default has occurred and is continuing, and the Controlling Collateral Agent is taking action to enforce rights in respect of any Shared Collateral, or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of the Borrower or any other Grantor or any First Lien Secured Party receives any payment pursuant to any intercreditor agreement (other than this Agreement, but including the Other Intercreditor Agreements) with respect to any Shared Collateral, the proceeds of any sale, collection or other liquidation of any such Shared Collateral by any Collateral Agent or any First Lien Secured Party and proceeds of any such distribution (all proceeds of any sale, collection or other liquidation of any Shared Collateral and all proceeds of any such distribution being collectively referred to as "**Proceeds**"), shall, subject to the terms of the ABL Intercreditor Agreement with respect to ABL Collateral, be applied (i) FIRST, to the payment of all amounts owing to each Collateral Agent (in its capacity as such) pursuant to the terms of any Secured Credit Document, (ii) SECOND, subject to Section 1.03, to the payment in full of the First Lien Obligations of each Series on a ratable basis, with such Proceeds to be applied to the First Lien Obligations of a given Series in accordance with the terms of the applicable Secured Credit Documents and (iii) THIRD, after the Discharge of all First Lien Obligations, to the Borrower and the other Grantors or their successors or assigns, as their interests may appear, or to whosoever may be lawfully entitled to receive the same pursuant to the Second Lien Intercreditor Agreement, if in effect, or otherwise, or as a court of competent jurisdiction may direct.  Notwithstanding the foregoing, with respect to any Shared Collateral for which a third party (other than a First Lien Secured Party) has a lien or security interest that is junior in priority to the security interest of any Series of First Lien Obligations, after giving effect to the Second Lien Intercreditor Agreement, if applicable, but senior (as determined by appropriate legal proceedings in the case of any dispute) to the security interest of any other Series of First Lien Obligations (such third party an "**Intervening Creditor**"), the value of any Shared Collateral or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral or Proceeds to be distributed in respect of the Series of First Lien Obligations with respect to which such Impairment exists.  If, despite the provisions of this Section 2.01(a), any First Lien Secured Party shall receive any payment or other recovery in excess of its portion of payments on account of the First Lien Obligations to which it is then entitled in accordance with this Section 2.01(a), such First Lien Secured Party shall hold such payment or recovery in trust for the benefit of all First Lien Secured Parties for distribution in accordance with this Section 2.01(a).

(b)    It is acknowledged that the First Lien Obligations of any Series may, subject to the limitations set forth in the then extant Secured Credit Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced or otherwise amended or modified from time to time, all without affecting the priorities set forth in Section 2.01(a) or the provisions of this Agreement defining the relative rights of the First Lien Secured Parties of any Series.

(c)    Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing any Series of First Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Secured Credit Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of any Series or any other circumstance whatsoever (but, in each case, subject to Section 1.03), each First Lien Secured Party hereby agrees that (i) the Liens securing each Series of First Lien

Obligations on any Shared Collateral shall be of equal priority and (ii) the benefits and proceeds of the Shared Collateral shall be shared among the First Lien Secured Parties as provided herein.

SECTION 2.02   Actions with Respect to Shared Collateral; Prohibition on Contesting Liens.

(a)     With respect to any Shared Collateral, (i) subject to the terms of the ABL Intercreditor Agreement with respect to ABL Collateral, only the Controlling Collateral Agent shall act or refrain from acting with respect to the Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral) and (ii) no Non-Controlling Collateral Agent or other Non-Controlling Secured Party shall or shall instruct the Controlling Collateral Agent to, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), whether under any First Lien Security Document, applicable law or otherwise, it being agreed that, subject to the terms of the ABL Intercreditor Agreement with respect to ABL Collateral, only the Controlling Collateral Agent shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral; provided that, notwithstanding the foregoing, (i) in any Bankruptcy Case, any Collateral Agent or any other First Lien Secured Party may file a proof of claim or statement of interest with respect to the First Lien Obligations owed to the First Lien Secured Parties; (ii) any Collateral Agent or any other First Lien Secured Party may take any action to preserve or protect the validity and enforceability of the Liens granted in favor of First Lien Secured Parties, provided that no such action is, or could reasonably be expected to be, (A) adverse to the Liens granted in favor of the Controlling Secured Parties or the rights of the Controlling Collateral Agent or any other Controlling Secured Parties to exercise remedies in respect thereof or (B) otherwise inconsistent with the terms of this Agreement or the ABL Intercreditor Agreement; and (iii) any Collateral Agent or any other First Lien Secured Party may file any responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of such First Lien Secured Party, including any claims secured by the Shared Collateral, in each case, to the extent not inconsistent with the terms of this Agreement or the ABL Intercreditor Agreement.  Notwithstanding the equal priority of the Liens, the Controlling Collateral Agent may deal with the Shared Collateral as if such Controlling Collateral Agent had a senior Lien on such Collateral. No Non-Controlling Collateral Agent or Non-Controlling Secured Party will contest, protest or object to any foreclosure proceeding or action brought by the Controlling Collateral Agent or Controlling Secured Party or any other exercise by the Controlling Collateral Agent or Controlling Secured Party of any rights and remedies relating to the Shared Collateral. The foregoing shall not be construed to limit the rights and priorities of any First Lien Secured Party or Collateral Agent with respect to any Collateral not constituting Shared Collateral.

(b)     each Authorized Representative and the First Lien Secured Parties for which it is acting hereunder agree to be bound by the provisions of this Agreement.

(c)     Each of the First Lien Secured Parties agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity, attachment or enforceability of a Lien held by or on behalf of any of the First Lien Secured Parties in all or any part of the Collateral, or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any Collateral Agent or any other First Lien Secured Party to enforce this Agreement.

SECTION 2.03   No Interference; Payment Over.

LEGAL_US_E # 113716328.4

(a)    Each First Lien Secured Party agrees that (i) it will not challenge, or support any other Person in challenging, in any proceeding the validity or enforceability of any First Lien Obligations of any Series or any First Lien Security Document or the validity, attachment, perfection or priority of any Lien under any First Lien Security Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Shared Collateral by the Controlling Collateral Agent, (iii) it will not institute in any Bankruptcy Case or other proceeding any claim against the Controlling Collateral Agent or any other First Lien Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Shared Collateral, and none of the Controlling Collateral Agent or any other First Lien Secured Party shall be liable for any action taken or omitted to be taken by the Controlling Collateral Agent or other First Lien Secured Party with respect to any Shared Collateral in accordance with the provisions of this Agreement, (iv) it will not seek, and hereby waives any right, to have any Shared Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Collateral and (v) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any Collateral Agent or any other First Lien Secured Party to enforce this Agreement.

(b)    Each First Lien Secured Party hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any such Shared Collateral, pursuant to any First Lien Security Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each of the First Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First Lien Secured Parties that have a security interest in such Shared Collateral and promptly transfer such Shared Collateral, Proceeds or payment, as the case may be, to the Controlling Collateral Agent, to be distributed in accordance with the provisions of Section 2.01 hereof.

SECTION 2.04    Automatic Release of Liens; Amendments to First Lien Security Documents.

(a)    If, at any time the Controlling Collateral Agent forecloses upon or otherwise exercises remedies against any Shared Collateral resulting in a sale or disposition thereof, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of each Collateral Agent for the benefit of each Series of First Lien Secured Parties upon such Shared Collateral will automatically be released and discharged; provided that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.01 hereof.

(b)    Each First Lien Secured Party agrees that each Collateral Agent may enter into any amendment to any First Lien Security Document that does not violate this Agreement.

(c)    Each Collateral Agent agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Controlling Collateral Agent to evidence and confirm any release of Shared Collateral provided for in this Section.

SECTION 2.05.    Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a)    This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against Holdings or any of its Subsidiaries.

(b)    If the Borrower and/or any other Grantor shall become subject to a case (a "**Bankruptcy Case**") under the Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing ("**DIP Financing**") to be provided by one or more lenders (the "**DIP Lenders**") under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law or the use of cash collateral under Section 363 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, each First Lien Secured Party agrees that it will raise no objection to any such financing or to the Liens on the Shared Collateral securing the same ("**DIP Financing Liens**") or to any use of cash collateral that constitutes Shared Collateral unless the Controlling Collateral Agent or any Controlling Secured Party, shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any First Lien Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Secured Parties, each Non-Controlling Secured Party will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the First Lien Secured Parties of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-a-vis all the other First Lien Secured Parties (other than any Liens of the First Lien Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Secured Parties of each Series are granted Liens on any additional collateral pledged to any First Lien Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-a-vis the First Lien Secured Parties as set forth in this Agreement, (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.01 of this Agreement, and (D) if any First Lien Secured Parties are granted adequate protection with respect to First Lien Obligations subject hereto, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.01 of this Agreement; provided that the First Lien Secured Parties of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Secured Parties of such Series or its Collateral Agent that shall not constitute Shared Collateral; and provided, further, that the First Lien Secured Parties receiving adequate protection shall not object to any other First Lien Secured Party receiving adequate protection comparable to any adequate protection granted to such First Lien Secured Parties in connection with a DIP Financing or use of cash collateral.

SECTION 2.06.  Reinstatement. In the event that any of the First Lien Obligations shall be paid in full and payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference under the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash.

SECTION 2.07.  Insurance.  As between the First Lien Secured Parties, the Controlling Collateral Agent shall have the right to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral.

SECTION 2.08.  Refinancings. The First Lien Obligations of any Series may be Refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit the Refinancing transaction under any Secured Credit Document) of any First Lien Secured Party of any other Series, all without affecting the priorities provided for herein or the other provisions hereof; provided that the Collateral Agent of the holders of any such Refinancing indebtedness shall have executed a Joinder Agreement on behalf of the holders of such Refinancing indebtedness.

SECTION 2.09.  Possessory Collateral Agent as Gratuitous Bailee for Perfection.

(a)     The Controlling Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral that is part of the Shared Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the benefit of each other First Lien Secured Party and any assignee solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09 and the ABL Intercreditor Agreement with respect to ABL Collateral; provided that at any time after the Discharge of the First Lien Obligations of the Series for which the Controlling Collateral Agent is acting, the Controlling Collateral Agent shall (at the sole cost and expense of the Grantors), promptly deliver all Possessory Collateral to the Controlling Collateral Agent (after giving effect to the Discharge of such First Lien Obligations) together with any necessary endorsements reasonably requested by the Controlling Collateral Agent (or make such other arrangements as shall be reasonably requested by the Controlling Collateral Agent to allow the Controlling Collateral Agent to obtain control of such Possessory Collateral).  Pending delivery to the Controlling Collateral Agent, each other Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral, from time to time in its possession, as gratuitous bailee for the benefit of each other First Lien Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09.

(b)     The duties or responsibilities of the Controlling Collateral Agent and each other Collateral Agent under this Section 2.09 shall be limited solely to holding any Shared Collateral constituting Possessory Collateral as gratuitous bailee for the benefit of each other First Lien Secured Party for purposes of perfecting the Lien held by such First Lien Secured Parties therein.

ARTICLE III

Existence and Amounts of Liens and Obligations

SECTION 3.01.  Determinations with Respect to Amounts of Liens and Obligations. Whenever any Collateral Agent shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of any Series, or the Shared Collateral subject to any Lien securing the First Lien Obligations of any Series, it may request that such information be furnished to it in writing by each other Collateral Agent and shall be entitled to make such determination on the basis of the information so furnished; provided, however, that if any Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Collateral Agent shall be entitled to make any such determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Borrower. Each Collateral Agent may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Secured Party or any other Person as a result of such determination.

LEGAL_US_E # 113716328.4

ARTICLE IV

The Controlling Collateral Agent

SECTION 4.01.  Appointment and Authority.

(a)        Each of the First Lien Secured Parties hereby irrevocably appoints and authorizes the Controlling Collateral Agent to take such actions on its behalf and to exercise such powers as are delegated to the Controlling Collateral Agent by the terms hereof, together with such powers and discretion as are reasonably incidental thereto. Each of the First Lien Secured Parties also authorizes the Controlling Collateral Agent, at the request of the Borrower, to (x) if applicable, execute and deliver the Second Lien Intercreditor Agreement in the capacity as "Designated Senior Representative," or the equivalent agent, however referred to for the First Lien Secured Parties under such agreement (the "**Senior Collateral Agent**") and authorizes the Controlling Collateral Agent, in accordance with the provisions of this Agreement, to take such actions on its behalf and to exercise such powers as are delegated to, or otherwise given to, the Designated Senior Representative by the terms of the Second Lien Intercreditor Agreement, together with such powers and discretion as are reasonably incidental thereto and (y) execute and deliver the ABL Intercreditor Agreement in the capacity as "Controlling CF Debt Agent," or the equivalent agent, however referred to for the First Lien Secured Parties under such agreement (the "**Controlling CF Debt Agent**") and authorizes the Controlling Collateral Agent, in accordance with the provisions of this Agreement, to take such actions on its behalf and to exercise such powers as are delegated to, or otherwise given to, the Controlling CF Debt Agent by the terms of the ABL Intercreditor Agreement, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Controlling Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Controlling Collateral Agent pursuant to the applicable Senior Credit Documents for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under any of the First Lien Security Documents, or for exercising any rights and remedies thereunder or under any of the Other Intercreditor Agreements at the direction of the Controlling Collateral Agent, shall be entitled to the benefits of all provisions of this Article IV and Article VIII of the Credit Agreement and the equivalent provision of the Indenture and the Notes Security Agreement and any Additional First Lien Document (as though such co-agents, sub-agents and attorneys-in-fact were the "Collateral Agent" named therein) as if set forth in full herein with respect thereto.  Without limiting the foregoing, each of the First Lien Secured Parties, and each Collateral Agent, hereby agrees to provide such cooperation and assistance as may be reasonably requested by the Controlling Collateral Agent to facilitate and effect actions taken or intended to be taken by the Controlling Collateral Agent pursuant to this Article IV, such cooperation to include execution and delivery of notices, instruments and other documents as are reasonably deemed necessary by the Controlling Collateral Agent to effect such actions, and joining in any action, motion or proceeding initiated by the Controlling Collateral Agent for such purposes.

(b)        Each Non-Controlling Secured Party acknowledges and agrees that the Controlling Collateral Agent shall be entitled, for the benefit of the First Lien Secured Parties, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First Lien Security Documents, without regard to any rights to which the holders of the Non-Controlling Secured Obligations would otherwise be entitled as a result of such Non-Controlling Secured Obligations. Without limiting the foregoing, each Non-Controlling Secured Party agrees that none of the Controlling Collateral Agent or any other First Lien Secured Party shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Non-Controlling Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or

14

liquidation may affect the amount of proceeds actually received by the Non-Controlling Secured Parties from such realization, sale, disposition or liquidation. Each of the First Lien Secured Parties waives any claim it may now or hereafter have against the Controlling Collateral Agent or the Collateral Agent for any other Series of First Lien Obligations or any other First Lien Secured Party of any other Series arising out of (i) any actions that do not violate this Agreement which any Collateral Agent or any First Lien Secured Party takes or omits to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First Lien Security Documents or any other agreement related thereto or to the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations, (ii) any election by any Collateral Agent or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.05, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law by, any Grantor or any of its Subsidiaries, as debtor-in-possession.

SECTION 4.02.  <u>Rights as a First Lien Secured Party</u>.

(a)    The Person serving as the Controlling Collateral Agent hereunder shall have the same rights and powers in its capacity as a First Lien Secured Party under any Series of First Lien Obligations that it holds as any other First Lien Secured Party of such Series and may exercise the same as though it were not the Controlling Collateral Agent and the term "First Lien Secured Party" or "First Lien Secured Parties" or (as applicable) "Credit Agreement Secured Party", "Credit Agreement Secured Parties," "Indenture Secured Party," "Indenture Secured Parties," "Additional First Lien Secured Party" or "Additional First Lien Secured Parties" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Controlling Collateral Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Grantors or any Subsidiary or other Affiliate thereof as if such Person were not the Controlling Collateral Agent hereunder and without any duty to account therefor to any other First Lien Secured Party.

SECTION 4.03.  <u>Exculpatory Provisions</u>.  The Controlling Collateral Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, the Controlling Collateral Agent:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether an Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby; <u>provided</u> that the Controlling Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Controlling Collateral Agent to liability or that is contrary to this Agreement or applicable law;

(iii)    shall not, except as expressly set forth herein, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to a Grantor or any of its Affiliates that is communicated to or obtained by the Person serving as the Controlling Collateral Agent or any of its Affiliates in any capacity;

(iv)    shall not be liable for any action taken or not taken by it (1) in the absence of its own gross negligence or willful misconduct or (e) in reliance on a certificate of an authorized officer of the Borrower stating that such action is permitted by the terms of this Agreement. The Controlling Collateral Agent shall be deemed not to have knowledge of any Event of Default under any Series of First Lien Obligations unless and until notice describing such Event Default and referencing applicable agreement is given to the Controlling Collateral Agent;

(v)    shall not be responsible for or have any duty to ascertain or inquire into (1) any statement, warranty or representation made in or in connection with this Agreement or any other First Lien Security Document, (2) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (3) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (4) the validity, enforceability, effectiveness or genuineness of this Agreement, any other First Lien Security Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the First Lien Security Documents, (5) the value or the sufficiency of any Collateral for any Series of First Lien Obligations, or (6) the satisfaction of any condition set forth in any Secured Credit Document, other than to confirm receipt of items expressly required to be delivered to the Controlling Collateral Agent; and

(vi)    need not segregate money held hereunder from other funds except to the extent required by law.  The Controlling Collateral Agent shall be under no liability for interest on any money received by it hereunder except as otherwise agreed in writing.

SECTION 4.04. <u>Collateral and Guaranty Matters.</u>  Each of the First Lien Secured Parties irrevocably authorizes the applicable Collateral Agent, at its option and in its discretion, to release any Lien on any property granted to or held by the Collateral Agent under any First Lien Security Document in accordance with Section 2.04 or upon receipt of a written request from the Borrower stating that the releases of such Lien is permitted by the terms of each then extant Secured Credit Document.


ARTICLE V

<u>Miscellaneous</u>

SECTION 5.01.  <u>Notices</u>. All notices and other communications provided for herein (including, but not limited to, all the directions and instructions to be provided to the Controlling Collateral Agent herein by the First Lien Secured Parties) shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)    if to the Borrower or any Grantor, to the Borrower, at its address at: [ ], telecopy [ ], Email: [ ];

(b)    if to the Term Loan Collateral Agent, to it at 1615 Brett Road, Building III, New Castle, Delaware 19720, Attention:  Loan Administration, Fax :  212-994-0847, Email: GLOriginationOps@citigroup.com; and

(d)    if to any other Collateral Agent, to it at the address set forth in the applicable Joinder Agreement.

16

Any party hereto may change its address, fax number or email address for notices and other communications hereunder by notice to the other parties hereto. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and, may be personally served, telecopied, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or electronic mail or upon receipt via U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth above or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties. As agreed to in writing among the Controlling Collateral Agent and each other Collateral Agent from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

The Notes Collateral Agent agrees to accept and act upon instructions or directions pursuant to this Agreement sent by unsecured e-mail, pdf, facsimile transmission or other similar unsecured electronic methods, provided, however, that the Notes Collateral Agent shall have received an incumbency certificate listing persons designated to give such instructions or directions and containing specimen signatures of such designated persons, which such incumbency certificate shall be amended and replaced whenever a person is to be added or deleted from the listing. If the Borrower, a Grantor, the Term Loan Collateral Agent or any other Collateral Agent or Senior Class Debt Representative elects to give the Notes Collateral Agent e-mail or facsimile instructions (or instructions by a similar electronic method) and the Notes Collateral Agent in its discretion elects to act upon such instructions, the Notes Collateral Agent's understanding of such instructions shall be deemed controlling. The Notes Collateral Agent shall not be liable for any losses, costs or expenses arising directly or indirectly from the Notes Collateral Agent's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction. The Borrower, each Grantor, the Term Loan Collateral Agent and any other Collateral Agent or Senior Class Debt Representative each agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Notes Collateral Agent, including without limitation the risk of the Notes Collateral Agent acting on unauthorized instructions, and the risk or interception and misuse by third parties.

SECTION 5.02.   Waivers; Amendment; Joinder Agreements.

(a)      No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)      Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified (other than pursuant to any Joinder Agreement) except pursuant to an agreement or agreements in writing entered into by each Collateral Agent (and with respect to any such termination, waiver, amendment or modification which by the terms of this Agreement requires the Borrower's consent or which increases the obligations or reduces the rights of the Borrower or any other Grantor, with the consent of the Borrower).

17

(c)    Notwithstanding the foregoing, without the consent of any First Lien Secured Party, any Additional Agent may become a party hereto by execution and delivery of a Joinder Agreement in accordance with Section 5.13 of this Agreement and upon such execution and delivery, such Additional Agent and the Additional First Lien Secured Parties and Additional First Lien Obligations of the Series for which such Additional Agent is acting shall be subject to the terms hereof.

(d)    Notwithstanding the foregoing, without the consent of any other Collateral Agent or First Lien Secured Party, the Controlling Collateral Agent may effect amendments and modifications to this Agreement to the extent necessary to reflect any incurrence of any Additional First Lien Obligations in compliance with the Credit Agreement, the Indenture and any Additional First Lien Documents.

SECTION 5.03.    Parties in Interest.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other First Lien Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

SECTION 5.04.    Survival of Agreement. All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 5.05.    Counterparts. This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 5.06    Severability.    Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 5.07.    Authorization.    By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement. The Term Loan Collateral Agent represents and warrants that this Agreement is binding upon the Credit Agreement Secured Parties. The Notes Collateral Agent represents and warrants that this Agreement is binding upon the Indenture Secured Parties.

SECTION 5.08.    Submission to Jurisdiction Waivers; Consent to Service of Process.    Each Collateral Agent, on behalf of itself and the First Lien Secured Parties of the Series for whom it is acting, irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York sitting in New York County, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or

proceeding in any such court or that such action or proceeding was brought in an inconvenient forum and agrees not to plead or claim the same;

     (c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Collateral Agent) at the address referred to in 5.01;

     (d)     agrees that nothing herein shall affect the right of any other party hereto (or any First Lien Secured Party) to effect service of process in any other manner permitted by law or shall limit the right of any party hereto (or any First Lien Secured Party) to sue in any other jurisdiction; and

     (e)     waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 5.08 any special, exemplary, punitive or consequential damages.

     SECTION 5.09.  **GOVERNING LAW; WAIVER OF JURY TRIAL.**

     **(A)     THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS, EXCEPT AS REQUIRED BY MANDATORY PROVISIONS OF LAW.**

     **(B)     EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.**

     SECTION 5.10.  <u>Headings</u>.  Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

     SECTION 5.11.  <u>Conflicts</u>.  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any of the other First Lien Security Documents or Additional First Lien Documents, the provisions of this Agreement shall control.

     SECTION 5.12.  <u>Provisions Solely to Define Relative Rights</u>.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Secured Parties in relation to one another. None of the Borrower, any other Grantor or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement (provided that nothing in this Agreement (other than Section 2.04, 2.05 or 2.09) is intended to or will amend, waive or otherwise modify the provisions of the Credit Agreement or any Additional First Lien Documents), and none of the Borrower or any other Grantor may rely on the terms hereof (other than Section 2.04, 2.05 or 2.09). Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms.

     SECTION 5.13.  <u>Additional First Lien Obligations</u>.  To the extent, but only to the extent permitted by the provisions of the Credit Agreement, the Indenture and the Additional First Lien Documents, the Borrower may incur Additional First Lien Obligations.  Any such additional class or series of Additional First Lien Obligations (the "**Senior Class Debt**") may be secured by a Lien and may be

Guaranteed by the Grantors on a pari passu basis, in each case under and pursuant to the First Lien Documents, if and subject to the condition that the Collateral Agent of any such Senior Class Debt (each, a "**Senior Class Debt Representative**"), acting on behalf of the holders of such Senior Class Debt (such Collateral Agent and holders in respect of any Senior Class Debt being referred to as the "**Senior Class Debt Parties**"), becomes a party to this Agreement by satisfying the conditions set forth in clauses (i) through (iv) of the immediately succeeding paragraph.

In order for a Senior Class Debt Representative to become a party to this Agreement,

(i)        such Senior Class Debt Representative, the Controlling Collateral Agent and each Grantor shall have executed and delivered an instrument substantially in the form of Annex II (with such changes as may be reasonably approved by the Controlling Collateral Agent and such Senior Class Representative) pursuant to which such Senior Class Debt Representative becomes a Collateral Agent and Additional Agent hereunder, and the Senior Class Debt in respect of which such Senior Class Debt Representative is the Collateral Agent and the related Senior Class Debt Parties become subject hereto and bound hereby;

(ii)        the Borrower shall have delivered to the Controlling Collateral Agent true and complete copies of each of the Additional First Lien Documents relating to such Senior Class Debt, certified as being true and correct by a Responsible Officer of the Borrower;

(iii)        the Borrower shall have delivered to the Controlling Collateral Agent an Officer's Certificate stating that such Additional First Lien Obligations are permitted by each applicable Secured Credit Document to be incurred, or to the extent a consent is otherwise required to permit the incurrence of such Additional First Lien Obligations under any Secured Credit Document, each Grantor has obtained the requisite consent; and

(iv)        the Additional First Lien Documents, as applicable, relating to such Senior Class Debt shall provide, in a manner reasonably satisfactory to the Controlling Collateral Agent, that each Senior Class Debt Party with respect to such Senior Class Debt will be subject to and bound by the provisions of this Agreement in its capacity as a holder of such Senior Class Debt.

SECTION 5.14    Integration.  This Agreement together with the other Secured Credit Documents and the First Lien Security Documents represents the entire agreement of each of the Grantors and the First Lien Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by any Grantor, any Collateral Agent or any other First Lien Secured Party relative to the subject matter hereof not expressly set forth or referred to herein or in the other Secured Credit Documents or the First Lien Security Documents.

SECTION 5.15    ABL Intercreditor Agreement.  Notwithstanding anything herein to the contrary, the exercise of any right or remedy by any Collateral Agent or First Lien Secured Party hereunder with respect to ABL Collateral is subject to the terms of the ABL Intercreditor Agreement and in the event of any conflict or inconsistency between this Agreement and the ABL Intercreditor Agreement with respect to the ABL Collateral, the ABL Intercreditor Agreement shall govern.

SECTION 5.16    Information Concerning Financial Condition of the Borrower and the other Grantors.  The Controlling Collateral Agent, the other Collateral Agents and the Secured Parties shall each be responsible for keeping themselves informed of (a) the financial condition of the Borrower and the other Grantors and all endorsers or guarantors of the First Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations. The Controlling Collateral Agent, the other Collateral Agents and the Secured Parties shall have no duty to advise any other party hereunder of

20

information known to it or them regarding such condition or any such circumstances or otherwise. In the event that the Controlling Collateral Agent, any other Collateral Agent or any Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it shall be under no obligation to (i) make, and Controlling Collateral Agent, the other Collateral Agents and the Secured Parties shall not make or be deemed to have made, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (ii) provide any additional information or to provide any such information on any subsequent occasion, (iii) undertake any investigation or (iv) disclose any information that, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

SECTION 5.17.  Additional Grantors.  The Borrower agrees that, if any Intermediate Holdings or Subsidiary of Holdings shall become a Grantor after the date hereof, it will promptly cause such Intermediate Holdings or Subsidiary to become party hereto by executing and delivering an instrument in the form of Annex III. Upon such execution and delivery, such Intermediate Holdings or Subsidiary will become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein. The execution and delivery of such instrument shall not require the consent of any other party hereunder, and will be acknowledged by the Controlling Collateral Agent. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

SECTION 5.18.  Further Assurances.  Each Collateral Agent, on behalf of itself and each First Lien Secured Party under the applicable Credit Agreement, Indenture or Additional First Lien Debt Facility, agrees that it will take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the other parties hereto may reasonably request to effectuate the terms of, and the Lien priorities contemplated by, this Agreement.

SECTION 5.19.  Term Loan Collateral Agent and Notes Collateral Agent.  It is understood and agreed that (a) the Term Loan Collateral Agent is entering into this Agreement in its capacity as administrative agent under the Credit Agreement and the provisions of Article VIII of the Credit Agreement applicable to it as administrative agent thereunder shall also apply to it as Controlling Collateral Agent hereunder and (b) the Notes Collateral Agent is entering in this Agreement in its capacity as Trustee and Collateral Agent under the Indenture and as Notes Collateral Agent under the Notes Security Agreement and the provisions of the Indenture and the Notes Security Agreement granting or extending any rights, protections, privileges, indemnities and immunities to the Trustee, Collateral Agent or Notes Collateral Agent thereunder shall also apply to the Notes Collateral Agent hereunder.

For the avoidance of doubt, the parties hereto acknowledge that in no event shall the Term Loan Collateral Agent or Notes Collateral Agent be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether any such party has been advised of the likelihood of such loss or damage and regardless of the form of action.

SECTION 5.20. Effectiveness of the Acquisition.  No Grantor (other than Holdings) shall have any rights or obligations hereunder until the consummation of the Acquisition, and any representations and warranties of the Grantors (other than Holdings) hereunder shall not become effective until such time.

21

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**CITIBANK, N.A.,**
as Term Loan Collateral Agent and Controlling Collateral Agent


By: _____
       Name:
       Title:


**[•],**
as Notes Collateral Agent


By: _____
       Name:
       Title:


**ARGOS HOLDINGS INC.**


By: _____
       Name:
       Title:


**ARGOS MERGER SUB INC.**


By: _____
       Name:
       Title:


**PETSMART, INC.**


By: _____
       Name:
       Title:

**THE GRANTORS LISTED ON ANNEX I HERETO**,

By: _____
      Name:
      Title:

23

**ANNEX I**

Grantors

| |
|---|
| Argos Holdings Inc. |
| Argos Merger Sub Inc. |
| PetSmart, Inc. |
| PET WISE INC |
| Pacific Coast Distributing, Inc. |
| Pet360, Inc. |
| Authority Pet Food Company |
| Petstuff Canada (USA) Holdings, Inc. |
| Petstuff Nova Scotia, Inc. |
| PETSCARD LLC |
| Simply Nourish Pet Food Company LLC |
| PetSmart Store Support Group, Inc. |
| Maverick Leasing, Inc. |
| ONP-Ecom, LLC |
| ONP-Retail, LLC |
| Pet360 Media, Inc. |
| PETMD, Inc. |
| PETMD, LLC |
| PETMD VENTURES INC. |
| KY Shelter & Mobile Vet Service, LLC |
| Animal Wellness LLC |
| The Cat and Dog Clinic of Lansdale, LLC |
| Pet360 Pharmacy Holding, LLC |
| Pet360 Pharmacy, LLC |

**ANNEX II**

[FORM OF] JOINDER NO. [ ] dated as of [    ], 20[ ] to the FIRST LIEN INTERCREDITOR AGREEMENT dated as of [•] (the "**First Lien Intercreditor Agreement**"), among Argos Holdings Inc., a Delaware corporation ("**Holdings**"), PetSmart, Inc., a Delaware corporation (the "**Company**"), Argos Merger Sub Inc., a Delaware corporation (which, on the Effective Date, was merged with and into the Company with the Company surviving such merger as the "**Borrower**"), the other Grantors (as defined therein), Citibank, N.A., as collateral agent for the Credit Agreement Secured Parties (in such capacity, the "**Term Loan Collateral Agent**") and [•], as collateral agent for the Indenture Secured Parties (in such capacity, the "**Notes Collateral Agent**") and each Additional Agent from time to time party thereto.

A.      Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the First Lien Intercreditor Agreement.

B.      As a condition to the ability of the Company or its Restricted Subsidiaries to incur Additional First Lien Obligations and to secure such Senior Class Debt with the Senior Lien and to have such Senior Class Debt guaranteed by the Grantors on a senior basis, in each case under and pursuant to the Additional First Lien Documents, the Senior Class Debt Representative in respect of such Senior Class Debt is required to become a Collateral Agent under, and such Senior Class Debt and the Senior Class Debt Parties in respect thereof are required to become subject to and bound by, the First Lien Intercreditor Agreement. Section 5.13 of the First Lien Intercreditor Agreement provides that such Senior Class Debt Representative may become a Collateral Agent under, and such Senior Class Debt and such Senior Class Debt Parties may become subject to and bound by, the First Lien Intercreditor Agreement, upon the execution and delivery by the Senior Class Representative of an instrument in the form of this Joinder and the satisfaction of the other conditions set forth in Section 5.13 of the First Lien Intercreditor Agreement. The undersigned Senior Class Debt Representative (the "**New Collateral Agent**") is executing this Joinder in accordance with the requirements of the First Lien Intercreditor Agreement.

Accordingly, the Controlling Collateral Agent and the New Collateral Agent agree as follows:

SECTION 1.      In accordance with Section 5.13 of the First Lien Intercreditor Agreement, the New Collateral Agent by its signature below becomes a Collateral Agent and Additional Agent under, and the related Senior Class Debt and Senior Class Debt Parties become subject to and bound by, the First Lien Intercreditor Agreement with the same force and effect as if the New Collateral Agent had originally been named therein as a Collateral Agent, and the New Collateral Agent, on behalf of itself and such Senior Class Debt Parties, hereby agrees to all the terms and provisions of the First Lien Intercreditor Agreement applicable to it as a Collateral Agent and to the Senior Class Debt Parties that it represents as Additional First Lien Secured Parties. Each reference to a "**Collateral Agent**" or an "**Additional Agent**" in the First Lien Intercreditor Agreement shall be deemed to include the New Collateral Agent. The First Lien Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.      The New Collateral Agent represents and warrants to the Controlling Collateral Agent and the other First Lien Secured Parties that (i) it has full power and authority to enter into this Joinder, in its capacity as [agent] [trustee], (ii) this Joinder has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of such Agreement and (iii) the Additional First Lien Documents relating to such Senior Class Debt provide that, upon the New Collateral Agent's entry into this Agreement, the Senior Class Debt Parties in respect of such Senior Class Debt will be subject to and bound by the provisions of the First Lien Intercreditor Agreement as Additional First Lien Secured Parties.

SECTION 3.    This Joinder may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Joinder shall become effective when the Collateral Agent shall have received a counterpart of this Joinder that bears the signature of the New Collateral Agent.  Delivery of an executed signature page to this Joinder by facsimile transmission shall be effective as delivery of a manually signed counterpart of this Joinder.

SECTION 4.    Except as expressly supplemented hereby, the First Lien Intercreditor Agreement shall remain in full force and effect.

**SECTION 5.    THIS JOINDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.    In case any one or more of the provisions contained in this Joinder should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the First Lien Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.    All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the First Lien Intercreditor Agreement.  All communications and notices hereunder to the New Collateral Agent shall be given to it at the address set forth below its signature hereto.

SECTION 8.    The Borrower agrees to reimburse the Controlling Collateral Agent for its reasonable out-of-pocket expenses in connection with this Joinder, including the reasonable fees, other charges and disbursements of counsel for the Controlling Collateral Agent.

IN WITNESS WHEREOF, the New Collateral Agent and the Controlling Collateral Agent have duly executed this Joinder to the First Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW COLLATERAL AGENT], as
[        ] for the holders of
[             ],

By: _____
      Name:
      Title:

Address for notices:

_____

_____

attention of:
_____

Telecopy:
_____

Acknowledged by:

[_____],
as Controlling Collateral Agent

By: _____
     Name:
     Title:

ARGOS HOLDINGS INC.

By: _____
     Name:
     Title:

ARGOS MERGER SUB INC.

By: _____
     Name:
     Title:

PETSMART, INC.

By: _____
     Name:
     Title:

THE GRANTORS
LISTED ON SCHEDULE I HERETO

By: _____
     Name:
     Title:

Schedule I to the
Joinder to the
First Lien Intercreditor Agreement

Grantors

[        ]

<b>ANNEX III</b>

SUPPLEMENT NO.   dated as of    , to the FIRST LIEN INTERCREDITOR AGREEMENT dated as of [•] (the "**First Lien Intercreditor Agreement**"), among Argos Holdings Inc., a Delaware corporation ("**Holdings**"), PetSmart, Inc., a Delaware corporation (the "**Company**"), Argos Merger Sub Inc., a Delaware corporation (which, on the Effective Date, was merged with and into the Company with the Company surviving such merger as the "**Borrower**"), the other Grantors, Citibank, N.A., as collateral agent for the Credit Agreement Secured Parties (in such capacity, the "**Term Loan Collateral Agent**") and [•], as collateral agent for the Indenture Secured Parties (in such capacity, the "**Notes Collateral Agent**") and each Additional Agent from time to time party thereto.

A.    Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the First Lien Intercreditor Agreement.

B.    The Grantors have entered into the First Lien Intercreditor Agreement.  Pursuant to certain Secured Credit Documents, certain newly acquired or organized Subsidiaries of Holdings are required to enter into the First Lien Intercreditor Agreement.  Section 5.17 of the First Lien Intercreditor Agreement provides that such Subsidiaries may become party to the First Lien Intercreditor Agreement by execution and delivery of an instrument in the form of this Supplement.  The undersigned Subsidiary (the "**New Grantor**") is executing this Supplement in accordance with the requirements of the Credit Agreement, the Indenture and Additional First Lien Documents.

Accordingly, the Controlling Collateral Agent and the New Grantor agree as follows:

SECTION 1.    In accordance with Section 5.17 of the First Lien Intercreditor Agreement, the New Grantor by its signature below becomes a Grantor under the First Lien Intercreditor Agreement with the same force and effect as if originally named therein as a Grantor, and the New Grantor hereby agrees to all the terms and provisions of the First Lien Intercreditor Agreement applicable to it as a Grantor thereunder.  Each reference to a "Grantor" in the First Lien Intercreditor Agreement shall be deemed to include the New Grantor.  The First Lien Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.    The New Grantor represents and warrants to the Controlling Collateral Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms.

SECTION 3.    This Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Supplement shall become effective when the Controlling Collateral Agent shall have received a counterpart of this Supplement that bears the signature of the New Grantor.  Delivery of an executed signature page to this Supplement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4.    Except as expressly supplemented hereby, the First Lien Intercreditor Agreement shall remain in full force and effect.

**SECTION 5.    THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.    In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the First Lien Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.    All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the First Lien Intercreditor Agreement.  All communications and notices hereunder to the New Grantor shall be given to it in care of the Borrower as specified in the First Lien Intercreditor Agreement.

SECTION 8.    The Borrower agrees to reimburse the Controlling Collateral Agent for its reasonable out-of-pocket expenses in connection with this Supplement, including the reasonable fees, other charges and disbursements of counsel for the Controlling Collateral Agent.

LEGAL_US_E # 113716328.4

   IN WITNESS WHEREOF, the New Grantor, and the Controlling Collateral Agent have duly executed this Supplement to the First Lien Intercreditor Agreement as of the day and year first above written.

        [NAME OF NEW GRANTOR],

        By: _____

          Name:

          Title:

Acknowledged by:

[_____], as Controlling Collateral Agent,

By: _____

   Name:

   Title:

EXHIBIT F-2

[*Form of Second Lien Intercreditor Agreement*]

[FORM OF]

SECOND LIEN INTERCREDITOR AGREEMENT

Among

Argos Holdings Inc.,

PetSmart, Inc.,

the other Grantors party hereto,

CITIBANK, N.A.
as Term Loan Collateral Agent for the Credit Agreement Secured Parties,

[          ],
as the Initial Junior Priority Representative

and

each Additional Senior Agent and Additional Junior Agent from time to time party hereto

dated as of [      ], 20[  ]

SECOND LIEN INTERCREDITOR AGREEMENT dated as of [          ], 20[  ] (as amended, supplemented or otherwise modified from time to time, this "**Agreement**"), among Argos Holdings Inc., a Delaware corporation ("**Holdings**"), PetSmart, Inc., a Delaware corporation (the "**Borrower**"), the other Grantors (as defined below) party hereto, Citibank, N.A., as collateral agent for the Credit Agreement Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "**Term Loan Collateral Agent**"), [INSERT NAME AND CAPACITY], as Representative for the Initial Junior Secured Parties (in such capacity and together with its successors in such capacity, the "**Initial Junior Priority Representative**") and each Additional Senior Agent and each Additional Junior Agent that from time to time becomes a party hereto pursuant to Section 8.09.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Term Loan Collateral Agent (for itself and on behalf of the Credit Agreement Secured Parties), the Initial Junior Priority Representative (for itself and on behalf of the Initial Junior Secured Parties), each Additional Senior Agent (for itself and on behalf of the Additional Senior Secured Parties under the applicable Additional Senior Debt Facility) and each Additional Junior Agent (for itself and on behalf of the Additional Junior Secured Parties under the applicable Additional Junior Debt Facility) agree as follows:

## ARTICLE I

### Definitions

SECTION 1.10   Certain Defined Terms.  Capitalized terms used but not otherwise defined herein have the meanings set forth in the Credit Agreement or, if defined in the New York UCC, the meanings specified therein. As used in this Agreement, the following terms have the meanings specified below:

"**ABL Collateral**" means the "ABL Priority Collateral" (as defined in the ABL Intercreditor Agreement).

"**ABL Intercreditor Agreement**" means the "ABL Intercreditor Agreement" (as defined in the Credit Agreement).

"**Additional Junior Agent**" means the collateral agent, administrative agent and/or trustee (as applicable) or any other similar agent or Person under any Additional Junior Debt Documents, in each case, together with its successors in such capacity.

"**Additional Junior Debt**" means any Indebtedness of the Borrower or any other Grantor (other than Indebtedness constituting Initial Junior Debt Obligations) Guaranteed by the Guarantors (and not Guaranteed by any other Person) which Indebtedness and Guarantees are secured by the Junior Collateral (or a portion thereof) on a pari passu basis (but without regard to control of remedies) with the Initial Junior Debt Obligations (and not secured by Liens on any other assets of the Borrower or any Guarantor); provided, however, that, (i) such Indebtedness is permitted to be incurred, secured and Guaranteed on such basis by each Senior Debt Document and Junior Debt Document and (ii) the Representative for the holders of such Indebtedness shall have become party to this Agreement pursuant to, and by satisfying the conditions set forth in, Section 8.09 hereof.  Additional Junior Debt shall include any Registered Equivalent Notes and Guarantees thereof by the Guarantors issued in exchange therefor.

"**Additional Junior Debt Documents**" means, with respect to any Series of Additional Junior Debt Obligations, the notes, credit agreements, indentures, security documents and other operative

agreements evidencing or governing such Additional Junior Debt Obligations and each other agreement entered into for the purpose of securing such Additional Junior Debt Obligations.

"**Additional Junior Debt Facility**" means each debt facility, credit agreement, indenture or other governing agreement with respect to any Additional Junior Debt.

"**Additional Junior Debt Obligations**" means, with respect to any Series of Additional Junior Debt, (a) all principal of, and interest, fees and other amounts (including, without limitation, any interest, fees, and expenses which accrue after the commencement of any Insolvency or Liquidation Proceeding, whether or not allowed or allowable as a claim in any such proceeding) payable with respect to, such Additional Junior Debt, (b) all other amounts payable to the related Additional Junior Secured Parties under the related Additional Junior Debt Documents and (c) any renewals or extensions of the foregoing.

"**Additional Junior Secured Parties**" means, with respect to any Series of Additional Junior Debt Obligations, the holders of such Additional Junior Debt Obligations, the Representative with respect thereto, any trustee or agent therefor under any related Additional Junior Debt Documents and the beneficiaries of each indemnification obligation undertaken by the Borrower or any Guarantor under any related Additional Junior Debt Documents.

"**Additional Senior Agent**" means the collateral agent, administrative agent and/or trustee (as applicable) under any Additional Senior Debt Documents, in each case, together with its successors in such capacity.

"**Additional Senior Debt**" means any Indebtedness of the Borrower or any other Grantor (other than Indebtedness constituting Credit Agreement Obligations) Guaranteed by the Guarantors (and not Guaranteed by any other Subsidiary) which Indebtedness and Guarantees are secured by the Senior Collateral (or a portion thereof) on a pari passu basis (but without regard to control of remedies) with the Credit Agreement Obligations (and not secured by Liens on any other assets of the Borrower or any Subsidiary); provided, however, that, (i) such Indebtedness is permitted to be incurred, secured and Guaranteed on such basis by each Senior Debt Document and Junior Debt Document and (ii) the Representative for the holders of such Indebtedness shall have become party to (A) this Agreement pursuant to, and by satisfying the conditions set forth in, Section 8.09 hereof and (B) the First Lien Intercreditor Agreement pursuant to, and by satisfying the conditions set forth in Section 5.13 thereof. Additional Senior Debt shall include any Registered Equivalent Notes and Guarantees thereof by the Guarantors issued in exchange therefor.

"**Additional Senior Debt Documents**" means, with respect to any Series of Additional Senior Debt Obligations, the notes, credit agreements, indentures, security documents and other operative agreements evidencing or governing such Additional Senior Debt Obligations and each other agreement entered into for the purpose of securing such Additional Senior Debt Obligations.

"**Additional Senior Debt Facility**" means each debt facility, credit agreement, indenture or other governing agreement with respect to any Additional Senior Debt.

"**Additional Senior Debt Obligations**" means, with respect to any Series of Additional Senior Debt, (a) all principal of, and interest, fees and other amounts (including, without limitation, any interest, fees, and expenses which accrue after the commencement of any Insolvency or Liquidation Proceeding, whether or not allowed or allowable as a claim in any such proceeding) payable with respect to, such Additional Senior Debt, (b) all other amounts payable to the related Additional Senior Secured Par-

ties under the related Additional Senior Debt Documents and (c) any renewals or extensions of the fore-going.

"**Additional Senior Secured Parties**" means, with respect to any Series of Additional Senior Debt Obligations, the holders of such Additional Senior Debt Obligations, the Representative with respect thereto, any trustee or agent therefor under any related Additional Senior Debt Documents and the beneficiaries of each indemnification obligation undertaken by the Borrower or any Guarantor under any related Additional Senior Debt Documents.

"**Agreement**" has the meaning assigned to such term in the preamble hereto.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended.

"**Bankruptcy Law**" means the Bankruptcy Code and any other federal, state, or foreign law for the relief of debtors, or any arrangement, reorganization, insolvency, moratorium, assignment for the benefit of creditors, any other marshalling of the assets or liabilities of Holdings or any of its Subsidiaries, or similar law affecting creditors' rights generally.

"**Borrower**" has the meaning provided in the preamble hereto.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"**Class Debt**" has the meaning assigned to such term in Section 8.09.

"**Class Debt Parties**" has the meaning assigned to such term in Section 8.09.

"**Class Debt Representatives**" has the meaning assigned to such term in Section 8.09.

"**Collateral**" means the Senior Collateral and the Junior Collateral.

"**Collateral Documents**" means the Senior Collateral Documents and the Junior Collateral Documents.

"**Credit Agreement**" means that certain Credit Agreement dated as of March [ ], 2015, as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, among Holdings, Argos Merger Sub Inc., the Borrower, the lenders from time to time party thereto, Citibank, N.A., as administrative agent, and the other parties thereto.

"**Credit Agreement Loan Documents**" means the Credit Agreement and the other "Loan Documents" as defined in the Credit Agreement.

"**Credit Agreement Obligations**" means the "Secured Obligations" as defined in the Credit Agreement.

"**Credit Agreement Secured Parties**" means the "Secured Parties" as defined in the Credit Agreement Security Agreement.

"**Credit Agreement Security Agreement**" means the "Collateral Agreement" as defined in the Credit Agreement.

"**Debt Facility**" means any Senior Debt Facility and any Junior Debt Facility.

F-3

"**Designated Junior Representative**" means (i) the Initial Junior Priority Representative until such time as the Junior Debt Facility under the Initial Junior Debt Documents ceases to be the only Junior Debt Facility under this Agreement and (ii) thereafter, the Junior Representative designated by all then existing Junior Representatives in a notice to the Designated Senior Representative.

"**Designated Senior Representative**" means (i) the "Controlling Collateral Agent" as defined in the First Lien Intercreditor Agreement or any comparable designated entity under any successor agreement to the First Lien Intercreditor Agreement or (ii) in the case that no First Lien Intercreditor Agreement or any successor thereto is then in effect, the remaining Senior Representative.

"**DIP Financing**" has the meaning assigned to such term in Section 6.01.

"**Discharge**" means, with respect to any Shared Collateral and any Debt Facility, the date on which such Debt Facility and the Senior Obligations or Junior Obligations thereunder, as the case may be, are no longer secured by such Shared Collateral. The term "**Discharged**" shall have a corresponding meaning.

"**Discharge of Credit Agreement Obligations**" means, with respect to any Shared Collateral, the Discharge of the Credit Agreement Obligations with respect to such Shared Collateral; provided that the Discharge of Credit Agreement Obligations shall not be deemed to have occurred in connection with a Refinancing of such Credit Agreement Obligations with an Additional Senior Debt Facility secured by such Shared Collateral under one or more Additional Senior Debt Documents which has been designated in writing by the Representative (under the Credit Agreement so Refinanced) or by the Borrower, in each case, to each other Representative as the "Credit Agreement" for purposes of this Agreement.

"**Discharge of Senior Obligations**" means the date on which the Discharge of Credit Agreement Obligations and the Discharge of each Additional Senior Debt Facility has occurred.

"**First Lien Intercreditor Agreement**" has the meaning assigned to such term in the Credit Agreement.

"**Grantors**" means Holdings, the Borrower and each other Subsidiary of Holdings which has granted a security interest pursuant to any Collateral Document to secure any Secured Obligations. The Grantors existing on the date hereof are set forth in Annex I hereto.

"**Guarantors**" has the meaning assigned to such term in the Guarantee Agreement.

"**Holdings**" has the meaning assigned to such term in the preamble hereto.

"**Initial Junior Debt**" means the Junior Debt incurred pursuant to the Initial Junior Debt Documents.

"**Initial Junior Debt Documents**" means that certain [[Indenture/Credit Agreement] dated as of [ ], 20[ ], among the Borrower, [the Guarantors identified therein,] [ ], as [trustee/administrative agent], and [ ], as [paying agent, registrar and transfer agent]] and any notes, security documents and other operative agreements evidencing or governing such Indebtedness, including any agreement entered into for the purpose of securing the Initial Junior Debt Obligations.

"**Initial Junior Debt Obligations**" means the Junior Debt Obligations arising pursuant to the Initial Junior Debt Documents.

F-4

"**Initial Junior Priority Representative**" has the meaning assigned to such term in the introductory paragraph of this Agreement

"**Initial Junior Secured Parties**" means the holders of any Initial Junior Debt Obligations and the Initial Junior Priority Representative.

"**Insolvency or Liquidation Proceeding**" means:

(1)      any case commenced by or against the Borrower or any other Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Borrower or any other Grantor, any receivership or assignment for the benefit of creditors relating to the Borrower or any other Grantor or any similar case or proceeding relative to the Borrower or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(2)      any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Borrower or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)      any other proceeding of any type or nature in which substantially all claims of creditors of the Borrower or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"**Intellectual Property**" means "Intellectual Property" as defined in the Credit Agreement Security Agreement.

"**Joinder Agreement**" means a supplement to this Agreement in the form of Annex III or Annex IV hereof required to be delivered by a Representative to the Designated Senior Representative and the Designated Junior Representative pursuant to Section 8.09 hereof in order to include an additional Debt Facility hereunder and to become the Representative hereunder for the Senior Secured Parties or Junior Secured Parties, as the case may be, under such Debt Facility.

"**Junior Class Debt**" has the meaning assigned to such term in Section 8.09.

"**Junior Class Debt Parties**" has the meaning assigned to such term in Section 8.09.

"**Junior Class Debt Representative**" has the meaning assigned to such term in Section 8.09.

"**Junior Collateral**" means any "Collateral" as defined in any Junior Debt Document or any other assets of the Borrower or any other Grantor with respect to which a Lien is granted or purported to be granted pursuant to a Junior Collateral Document as security for any Junior Obligation.

"**Junior Collateral Documents**" means each of the security agreements and other instruments and documents executed and delivered by the Borrower or any Grantor for purposes of providing collateral security for any Junior Obligation.

"**Junior Debt**" means any Indebtedness of the Borrower or any other Grantor Guaranteed by the Guarantors (and not Guaranteed by any other Subsidiary), including the Initial Junior Debt, which Indebtedness and Guarantees are secured by the Junior Collateral on a pari passu basis (but without regard to control of remedies) with any other Junior Obligations and the applicable Junior Debt Documents of

F-5

which provide that such Indebtedness and Guarantees are to be secured by such Junior Collateral on a subordinate basis to the Senior Obligations (and which is not secured by Liens on any assets of the Borrower or any other Grantor other than the Junior Collateral or which are not included in the Senior Collateral); provided, however, that (i) such Indebtedness is permitted to be incurred, secured and Guaranteed on such basis by each Senior Debt Document and Junior Debt Document and (ii) except in the case of the Initial Junior Debt hereunder, the Representative for the holders of such Indebtedness shall have become party to this Agreement pursuant to, and by satisfying the conditions set forth in, Section 8.09 hereof. Junior Debt shall include any Registered Equivalent Notes and Guarantees thereof by the Guarantors issued in exchange therefor.

"**Junior Debt Documents**" means (a) the Initial Junior Debt Documents and (b) any Additional Junior Debt Documents.

"**Junior Debt Facility**" means each debt facility, credit agreement, indenture or other governing agreement with respect to any Junior Debt.

"**Junior Obligations**" means (a) the Initial Junior Debt Obligations and (b) any Additional Junior Debt Obligations.

"**Junior Representative**" means (i) in the case of the Initial Junior Debt Facility covered hereby, the Initial Junior Priority Representative and (ii) in the case of any Additional Junior Debt Facility and the Additional Junior Secured Parties thereunder, each Additional Junior Agent in respect of such Additional Junior Debt Facility that is named as such in the applicable Joinder Agreement.

"**Junior Secured Parties**" means the Initial Junior Secured Parties and any Additional Junior Secured Parties.

"**Lien**" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"**New York UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"**Officer's Certificate**" has the meaning assigned to such term in Section 8.08.

"**Plan of Reorganization**" means any plan of reorganization, plan of liquidation, plan of arrangement, agreement for composition, or other type of dispositive restructuring plan proposed in or in connection with any Insolvency or Liquidation Proceeding.

"**Pledged or Controlled Collateral**" has the meaning assigned to such term in Section 5.05(a).

"**Proceeds**" means the proceeds of any sale, collection or other liquidation of Shared Collateral, any payment or distribution made in respect of Shared Collateral in an Insolvency or Liquidation Proceeding and any amounts received by any Senior Representative or any Senior Secured Party from a Junior Secured Party in respect of Shared Collateral pursuant to this Agreement or any other intercreditor agreement.

F-6

"**Recovery**" has the meaning assigned to such term in Section 6.04.

"**Refinance**" means, in respect of any Indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other Indebtedness or enter alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such Indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "**Refinanced**" and "**Refinancing**" have correlative meanings.

"**Registered Equivalent Notes**" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act of 1933, substantially identical notes (having the same Guarantees) issued in a dollar for dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"**Representatives**" means the Senior Representatives and the Junior Representatives.

"**SEC**" means the United States Securities and Exchange Commission and any successor agency thereto.

"**Secured Obligations**" means the Senior Obligations and the Junior Obligations.

"**Secured Parties**" means the Senior Secured Parties and the Junior Secured Parties.

"**Senior Class Debt**" has the meaning assigned to such term in Section 8.09.

"**Senior Class Debt Parties**" has the meaning assigned to such term in Section 8.09.

"**Senior Class Debt Representative**" has the meaning assigned to such term in Section 8.09.

"**Senior Collateral**" means any "Collateral" as defined in any Credit Agreement Loan Document or any other Senior Debt Document or any other assets of the Borrower or any other Grantor with respect to which a Lien is granted or purported to be granted pursuant to a Senior Collateral Document as security for any Senior Obligation.

"**Senior Collateral Documents**" means the Credit Agreement Security Agreement and the other "Security Documents" as defined in the Credit Agreement, the First Lien Intercreditor Agreement and each of the security agreements and other instruments and documents executed and delivered by the Borrower or any Grantor for purposes of providing collateral security for any Senior Obligation.

"**Senior Debt Documents**" means (a) the Credit Agreement Loan Documents and (b) any Additional Senior Debt Documents.

"**Senior Debt Facilities**" means the Credit Agreement and any Additional Senior Debt Facilities.

"**Senior Lien**" means the Liens on the Senior Collateral in favor of the Senior Secured Parties under the Senior Collateral Documents.

F-7

"**Senior Obligations**" means the Credit Agreement Obligations and any Additional Senior Debt Obligations.

"**Senior Representative**" means (i) in the case of any Credit Agreement Obligations or the Credit Agreement Secured Parties, the Term Loan Collateral Agent and (ii) in the case of any Additional Senior Debt Facility and the Additional Senior Secured Parties thereunder, each Additional Senior Agent in respect of such Additional Senior Debt Facility that is named as such in the applicable Joinder Agreement.

"**Senior Secured Parties**" means the Credit Agreement Secured Parties and any Additional Senior Secured Parties.

"**Series**" means (a) (x) with respect to the Senior Secured Parties, each of (i) the Credit Agreement Secured Parties (in their capacities as such) and (ii) the Additional Senior Secured Parties that become subject to this Agreement after the date hereof that are represented by a common Representative (in its capacity as such for such Additional Senior Secured Parties) and (y) with respect to the Junior Secured Parties, each of (i) the Initial Junior Secured Parties (in their capacity as such) and (ii) the Additional Junior Secured Parties that become subject to this Agreement after the date hereof that are represented by a common Representative (in its capacity as such for such Additional Junior Secured Parties) and (b) (x) with respect to any Senior Obligations, each of (i) the Credit Agreement Obligations and (ii) the Additional Senior Debt Obligations incurred pursuant to any Additional Senior Debt Facility and or any Additional Senior Debt Documents, which pursuant to any Joinder Agreement, are to be represented hereunder by a common Representative (in its capacity as such for such Additional Senior Debt Obligations) and (y) with respect to any Junior Obligations, each of (i) the Initial Junior Debt Obligations and (ii) the Additional Junior Debt Obligations incurred pursuant to any Additional Junior Debt Facility and the related Additional Junior Debt Documents, which pursuant to any Joinder Agreement, are to be represented hereunder by a common Representative (in its capacity as such for such Additional Junior Debt Obligations).

"**Shared Collateral**" means, at any time, Collateral in which the holders of Senior Obligations under at least one Senior Debt Facility and the holders of Junior Obligations under at least one Junior Debt Facility (or their Representatives) hold a security interest at such time. If, at any time, any portion of the Senior Collateral under one or more Senior Debt Facilities does not constitute Junior Collateral under one or more Junior Debt Facilities, then such portion of such Senior Collateral shall constitute Shared Collateral only with respect to the Junior Debt Facilities for which it constitutes Junior Collateral and shall not constitute Shared Collateral for any Junior Debt Facility which does not have a security interest in such Collateral at such time.

"**Term Loan Collateral Agent**" has the meaning assigned to such term in the preamble hereto.

"**Uniform Commercial Code**" or "**UCC**" means the New York UCC, or the Uniform Commercial Code (or any similar or comparable legislation) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

SECTION 1.02.  <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation here-

in shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "herein", "hereof and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

## ARTICLE II

## Priorities and Agreements with Respect to Shared Collateral

SECTION 2.01.  Subordination.

(a)     Notwithstanding the date, time, manner or order of filing or recordation of any document or instrument or grant, attachment or perfection of any Liens granted to any Junior Representative or any Junior Secured Parties on the Shared Collateral or of any Liens granted to any Senior Representative or the Senior Secured Parties on the Shared Collateral (or any actual or alleged defect in any of the foregoing) and notwithstanding any provision of the UCC, any applicable law, any Junior Debt Document or any Senior Debt Document or any other circumstance whatsoever, each Junior Representative, on behalf of itself and each Junior Secured Party under its Junior Debt Facility, hereby agrees that any Lien on the Shared Collateral securing any Senior Obligations now or hereafter held by or on behalf of any Senior Secured Parties or any Senior Representative or other agent or trustee therefor, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall have priority over and be senior in all respects and prior to any Lien on the Shared Collateral securing any Junior Obligations; and

(b)     any Lien on the Shared Collateral securing any Junior Obligations now or hereafter held by or on behalf of any Junior Secured Parties or any Junior Representative or other agent or trustee therefor, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Shared Collateral securing any Senior Obligations.  All Liens on the Shared Collateral securing any Senior Obligations shall be and remain senior in all respects and prior to all Liens on the Shared Collateral securing any Junior Obligations for all purposes, whether or not such Liens securing any Senior Obligations are subordinated to any Lien securing any other obligation of the Borrower, any Grantor or any other Person or otherwise subordinated, voided, avoided, invalidated or lapsed.

SECTION 2.02.  Nature of Senior Lender Claims.  Each Junior Representative, on behalf of itself and each Junior Secured Party under its Junior Debt Facility, acknowledges that (a) a portion of the Senior Obligations may be revolving in nature and that the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, (b) the terms of the Senior Debt Documents and the Senior Obligations may be amended, supplemented or otherwise modified, and the Senior Obligations, or a portion thereof, may be Refinanced from time to time and (c) the aggregate amount of the Senior Obligations may be increased, in each case, without notice to or consent by the Junior Representatives or the Junior Secured Parties and without affecting the provisions hereof.  The Lien priorities provided for in Section 2.01 shall not be altered or otherwise affected by any amendment, supplement or other modification, or any Refinancing, of either the Senior Obligations or the

Junior Obligations, or any portion thereof. As between the Borrower and the other Grantors and the Junior Secured Parties, the foregoing provisions will not limit or otherwise affect the obligations of the Borrower and the Grantors contained in any Junior Debt Document with respect to the incurrence of additional Senior Obligations.

SECTION 2.03.  <u>Prohibition on Contesting Liens</u>.  Each of the Junior Representatives, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, extent, perfection, priority or enforceability of any Lien securing any Senior Obligations held (or purported to be held) by or on behalf of any of the Senior Secured Parties or any Senior Representative or other agent or trustee therefor in any Senior Collateral, and the Designated Senior Representative and each other Senior Representative, for itself and on behalf of each Senior Secured Party under its Senior Debt Facility, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, extent, perfection, priority or enforceability of any Lien securing any Junior Obligations held (or purported to be held) by or on behalf of any of  any Junior Representative or any of the Junior Secured Parties in the Junior Collateral.  Notwithstanding the foregoing, no provision in this Agreement shall be construed to prevent or impair the rights of the Designated Senior Representative or any other Senior Representative to enforce this Agreement (including the priority of the Liens securing the Senior Obligations as provided in Section 2.01) or any of the Senior Debt Documents.

SECTION 2.04.  <u>No New Liens</u>.  The parties hereto agree that, so long as the Discharge of Senior Obligations has not occurred (a) none of the Grantors shall grant or permit any additional Liens on any asset or property of any Grantor to secure any Junior Obligation unless it has granted, or concurrently therewith grants, a Lien on such asset or property of such Grantor to secure the Senior Obligations; and (b) if any Junior Representative or any Junior Secured Party shall hold any Lien on any assets or property of any Grantor securing any Junior Obligations that are not also subject to the senior-priority Liens securing Senior Obligations under the Senior Collateral Documents, such Junior Representative or Junior Secured Party (i) shall notify the Designated Senior Representative promptly upon becoming aware thereof and, unless such Grantor shall promptly grant a similar Lien on such assets or property to the Senior Representatives as security for the Senior Obligations, shall assign such Lien to the Senior Representatives as security for the Senior Obligations (but may retain a junior lien on such assets or property subject to the terms hereof) and (ii) until such assignment or such grant of a similar Lien to the Senior Representatives, shall be deemed to hold and have held such Lien for the benefit of the Senior Representatives as security for the Senior Obligations.

SECTION 2.05.  <u>Perfection of Liens</u>.  Except for the agreements of the Designated Senior Representative pursuant to Section 5.05 hereof, none of the Designated Senior Representative, the other Senior Representatives or the Senior Secured Parties shall be responsible for perfecting and maintaining the perfection of Liens with respect to the Shared Collateral for the benefit of the Junior Representatives or the Junior Secured Parties.  The provisions of this Agreement are intended solely to govern the respective Lien priorities as between the Senior Secured Parties and the Junior Secured Parties and shall not impose on the Designated Senior Representative, the other Senior Representatives, the Senior Secured Parties, the Junior Representatives, the Junior Secured Parties or any agent or trustee therefor any obligations in respect of the disposition of Proceeds of any Shared Collateral which would conflict with prior perfected claims therein in favor of any other Person or any order or decree of any court or governmental authority or any applicable law.

SECTION 2.06.  <u>Refinancings</u>. The Credit Agreement Obligations of any Series may be Refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a con-

sent is otherwise required to permit the Refinancing transaction under any Secured Credit Document) of any party hereto, all without affecting the priorities provided for herein or the other provisions hereof; provided that the Collateral Agent of the holders of any such Refinancing indebtedness shall have executed a Joinder Agreement on behalf of the holders of such Refinancing indebtedness and such Collateral Agent and Grantors shall have complied with Section 8.09 with respect to such Indebtedness.

## ARTICLE III

### Enforcement

SECTION 3.01   Exercise of Remedies.

(a)       So long as the Discharge of Senior Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor, (i) neither any Junior Representative nor any Junior Secured Party will (x) exercise or seek to exercise any rights or remedies (including setoff or recoupment) with respect to any Shared Collateral in respect of any Junior Obligations, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), (y) contest, protest or object to any foreclosure proceeding or action brought with respect to the Shared Collateral or any other Senior Collateral by the Designated Senior Representative, any other Senior Representative or any Senior Secured Party in respect of the Senior Obligations, the exercise of any right by the Designated Senior Representative, any other Senior Representative or any Senior Secured Party (or any agent or sub-agent on their behalf) in respect of the Senior Obligations under any lockbox agreement, control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Designated Senior Representative, any other Senior Representative or any Senior Secured Party either is a party or may have rights as a third party beneficiary, or any other exercise by any such party of any rights and remedies relating to the Shared Collateral under the Senior Debt Documents or otherwise in respect of the Senior Collateral or the Senior Obligations, or (z) object to the forbearance by the Senior Secured Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Shared Collateral in respect of Senior Obligations and (ii) except as otherwise provided herein, the Designated Senior Representative, the other Senior Representatives and the Senior Secured Parties shall have the exclusive right to enforce rights, exercise remedies (including setoff, recoupment, and the right to credit bid their debt) and make determinations regarding the release, disposition or restrictions with respect to the Shared Collateral without any consultation with or the consent of any Junior Representative or any Junior Secured Party; provided, however, that (A) in any Insolvency or Liquidation Proceeding commenced by or against the Borrower or any other Grantor, any Junior Representative may file a claim, proof of claim, or statement of interest with respect to the Junior Obligations under its Junior Debt Facility, (B) any Junior Representative may take any action (not adverse to the prior Liens on the Shared Collateral securing the Senior Obligations or the rights of the Designated Senior Representative, the other Senior Representatives or the Senior Secured Parties to exercise remedies in respect thereof) in order to create, prove, perfect, preserve or protect (but not enforce) its rights in, and perfection and priority of its Lien on, the Shared Collateral, (C) to the extent not otherwise inconsistent with this Agreement, any Junior Representative and the Junior Secured Parties may exercise their rights and remedies as unsecured creditors, as provided in Section 5.04, (D) any Junior Representative may exercise the rights and remedies provided for in Section 6.03 and (E) any Junior Representative and the Junior Secured Parties may file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims or Liens of the Junior Secured Parties, including any claims secured by the Junior Collateral, in each case in accordance with the terms of this

LEGAL_US_E # 113716329.4

Agreement. In exercising rights and remedies with respect to the Senior Collateral, the Designated Senior Representative, the other Senior Representatives and the Senior Secured Parties may enforce the provisions of the Senior Debt Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Shared Collateral upon foreclosure, to incur expenses in connection with such sale or disposition and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b)       So long as the Discharge of Senior Obligations has not occurred, each Junior Representative, on behalf of itself and each Junior Secured Party under its Junior Debt Facility, agrees that it will not, in the context of its role as secured creditor, take or receive any Shared Collateral or any Proceeds of Shared Collateral in connection with the exercise of any right or remedy (including setoff or recoupment) with respect to any Shared Collateral in respect of Junior Obligations. Without limiting the generality of the foregoing, unless and until the Discharge of Senior Obligations has occurred, except as expressly provided in the proviso in Section 3.01(a), the sole right of the Junior Representatives and the Junior Secured Parties with respect to the Shared Collateral is to hold a Lien on the Shared Collateral in respect of Junior Obligations pursuant to the Junior Debt Documents for the period and to the extent granted therein and to receive a share of the Proceeds thereof, if any, after the Discharge of Senior Obligations has occurred.

(c)       Subject to the proviso in Section 3.01(a), (i) each Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, agrees that neither such Junior Representative nor any such Junior Secured Party will take any action that would hinder any exercise of remedies undertaken by the Designated Senior Representative, any other Senior Representative or any Senior Secured Party with respect to the Shared Collateral under the Senior Debt Documents, including any sale, lease, exchange, transfer or other disposition of the Shared Collateral, whether by foreclosure or otherwise, and (ii) each Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, hereby waives any and all rights it or any such Junior Secured Party may have as a junior lien creditor or otherwise to object to the manner in which the Designated Senior Representative, the other Senior Representatives or the Senior Secured Parties seek to enforce or collect the Senior Obligations or the Liens granted on any of the Senior Collateral, regardless of whether any action or failure to act by or on behalf of the Designated Senior Representative, any other Senior Representative or any other Senior Secured Party is adverse to the interests of the Junior Secured Parties.

(d)       Each Junior Representative hereby acknowledges and agrees that no covenant, agreement or restriction contained in any Junior Debt Document shall be deemed to restrict in any way the rights and remedies of the Designated Senior Representative, the other Senior Representatives or the Senior Secured Parties with respect to the Senior Collateral as set forth in this Agreement and the Senior Debt Documents.

(e)       Subject to the proviso in Section 3.01(a), until the Discharge of Senior Obligations, the Designated Senior Representative or any Person authorized by it shall have the exclusive right to exercise any right or remedy with respect to the Shared Collateral and shall have the exclusive right to determine and direct the time, method and place for exercising such right or remedy or conducting any proceeding with respect thereto. Following the Discharge of Senior Obligations, the Designated Junior Representative or any Person authorized by it shall have the exclusive right to exercise any right or remedy with respect to the Collateral and shall have the exclusive right to direct the time, method and place of exercising or conducting any proceeding for the exercise of any right or remedy available to the Junior Secured Parties with respect to the Collateral, or of exercising or directing the exercise of any trust or power conferred on the Junior Representatives, or for the taking of any other action authorized by the Jun-

F-12

ior Collateral Documents; provided, however, that nothing in this Section shall impair the right of any Junior Representative or other agent or trustee acting on behalf of the Junior Secured Parties to take such actions with respect to the Collateral after the Discharge of Senior Obligations as may be otherwise required or authorized pursuant to any intercreditor agreement governing the Junior Secured Parties or the Junior Obligations.

SECTION 3.02.  Cooperation.  Subject to the proviso in Section 3.01(a), each Junior Representative, on behalf of itself and each Junior Secured Party under its Junior Debt Facility, agrees that, unless and until the Discharge of Senior Obligations has occurred, it will not commence, or join with any Person (other than the Senior Secured Parties and the Designated Senior Representative upon the request thereof) in commencing, any enforcement, collection, execution, levy or foreclosure action or proceeding with respect to any Lien held by it in the Shared Collateral under any of the Junior Debt Documents or otherwise in respect of the Junior Obligations.

SECTION 3.03.  Actions upon Breach.  Should any Junior Representative or any Junior Secured Party, contrary to this Agreement, in any way take, attempt to take or threaten to take any action with respect to the Shared Collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement) or fail to take any action required by this Agreement, the Designated Senior Representative or any other Senior Representative or other Senior Secured Party (in its or their own name or in the name of the Borrower or any other Grantor) or the Borrower may obtain relief against such Junior Representative or such Junior Secured Party by injunction, specific performance or other appropriate equitable relief. Each Junior Representative, on behalf of itself and each Junior Secured Party under its Junior Debt Facility, hereby (i) agrees that the Senior Secured Parties' damages from the actions of the Junior Representatives or any Junior Secured Party may at that time be difficult to ascertain and may be irreparable and waives any defense that the Borrower, any other Grantor or the Senior Secured Parties cannot demonstrate damage or be made whole by the awarding of damages and (ii) irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by the Designated Senior Representative, any other Senior Representative or and Senior Secured Party.

**ARTICLE IV**

**Payments**

SECTION 4.01.  Application of Proceeds. Subject to the ABL Intercreditor Agreement with respect to ABL Collateral, after an event of default under any Senior Debt Document has occurred and until such event of default is cured or waived, so long as the Discharge of Senior Obligations has not occurred, the Shared Collateral or Proceeds thereof received in connection with the sale or other disposition of, or collection on, such Shared Collateral upon the exercise of remedies shall be applied by the Designated Senior Representative to the Senior Obligations in such order as specified in the First Lien Intercreditor Agreement and the relevant Senior Debt Documents until the Discharge of Senior Obligations has occurred. Upon the Discharge of Senior Obligations, the Designated Senior Representative shall deliver promptly to the Designated Junior Representative any Shared Collateral or Proceeds thereof held by it in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct, to be applied by the Designated Junior Representative to the Junior Obligations in such order as specified in the relevant Junior Debt Documents.

SECTION 4.02.  Payments Over. Subject to the ABL Intercreditor Agreement with respect to ABL Collateral, any Shared Collateral or Proceeds thereof received by any Junior Representative or any Junior Secured Party in connection with the exercise of any right or remedy (including setoff or

F-13

recoupment) relating to the Shared Collateral in contravention of this Agreement shall be segregated and held in trust for the benefit of and forthwith paid over to the Designated Senior Representative for the benefit of the Senior Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. The Designated Senior Representative is hereby authorized to make any such endorsements as agent for each of the Junior Representatives or any such Junior Secured Party. This authorization is coupled with an interest and is irrevocable.

## ARTICLE V

## Other Agreements

SECTION 5.01.  Releases.

(a)    Each Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, agrees that, in the event of a sale, transfer or other disposition of any specified item of Shared Collateral (including all or substantially all of the equity interests of any subsidiary of Holdings), the Liens granted to the Junior Representatives and the Junior Secured Parties upon such Shared Collateral to secure Junior Obligations shall terminate and be released, automatically and without any further action, concurrently with the termination and release of all Liens granted upon such Shared Collateral to secure Senior Obligations. Upon delivery to a Junior Representative of an Officer's Certificate stating that any such termination and release of Liens securing the Senior Obligations has become effective (or shall become effective concurrently with such termination and release of the Liens granted to the Junior Secured Parties and the Junior Representatives) and any necessary or proper instruments of termination or release prepared by the Borrower or any other Grantor, such Junior Representative will promptly execute, deliver or acknowledge, at the Borrower's or the other Grantor's sole cost and expense, such instruments to evidence such termination and release of the Liens. Nothing in this Section 5.01(a) will be deemed to affect any agreement of a Junior Representative, for itself and on behalf of the Junior Secured Parties under its Junior Debt Facility, to release the Liens on the Junior Collateral as set forth in the relevant Junior Debt Documents.

(b)    Each Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, hereby irrevocably constitutes and appoints each Senior Representative and any officer or agent of each Senior Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Junior Representative or such Junior Secured Party or in such Senior Representative's own name, from time to time in such Senior Representative's discretion, for the purpose of carrying out the terms of Section 5.01(a), to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of Section 5.01(a), including any termination statements, endorsements or other instruments of transfer or release.

(c)    Unless and until the Discharge of Senior Obligations has occurred, each Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, hereby consents to the application, whether prior to or after an event of default under any Senior Debt Document of proceeds of Shared Collateral to the repayment of Senior Obligations pursuant to the Senior Debt Documents, provided that nothing in this Section 5.01(c) shall be construed to prevent or impair the rights of the Junior Representatives or the Junior Secured Parties to receive proceeds in connection with the Junior Obligations not otherwise in contravention of this Agreement.

(d)    Notwithstanding anything to the contrary in any Junior Collateral Document, in the event the terms of a Senior Collateral Document and a Junior Collateral Document each require any

Grantor (i) to make payment in respect of any item of Shared Collateral, (ii) to deliver or afford control over any item of Shared Collateral to, or deposit any item of Shared Collateral with, (iii) to register ownership of any item of Shared Collateral in the name of or make an assignment of ownership of any Shared Collateral or the rights thereunder to, (iv) cause any securities intermediary, commodity intermediary or other Person acting in a similar capacity to agree to comply, in respect of any item of Shared Collateral, with instructions or orders from, or to treat, in respect of any item of Shared Collateral, as the entitlement holder, (v) hold any item of Shared Collateral in trust for (to the extent such item of Shared Collateral cannot be held in trust for multiple parties under applicable law), (vi) obtain the agreement of a bailee or other third party to hold any item of Shared Collateral for the benefit of or subject to the control of or, in respect of any item of Shared Collateral, to follow the instructions of or (vii) obtain the agreement of a landlord with respect to access to leased premises where any item of Shared Collateral is located or waivers or subordination of rights with respect to any item of Shared Collateral in favor of, in any case, both any Designated Senior Representative and any Junior Representative or Junior Secured Party, such Grantor may, until the applicable Discharge of Senior Obligations has occurred, comply with such requirement under the Junior Collateral Document as it relates to such Shared Collateral by taking any of the actions set forth above only with respect to, or in favor of, the Designated Senior Representative.

SECTION 5.02    Insurance and Condemnation Awards.  Unless and until the Discharge of Senior Obligations has occurred, the Designated Senior Representative and the Senior Secured Parties shall have the sole and exclusive right, subject to the rights of the Grantors under the Senior Debt Documents and subject to the ABL Intercreditor Agreement with respect to the ABL Collateral, (a) to adjust settlement for any insurance policy covering the Shared Collateral in the event of any loss thereunder and (b) to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral. Unless and until the Discharge of Senior Obligations has occurred and subject to the ABL Intercreditor Agreement with respect to the ABL Collateral, all proceeds of any such policy and any such award, if in respect of the Shared Collateral, shall be paid (i) first, prior to the occurrence of the Discharge of Senior Obligations, to the Designated Senior Representative for the benefit of Senior Secured Parties pursuant to the terms of the Senior Debt Documents, (ii) second, after the occurrence of the Discharge of Senior Obligations, to the Designated Junior Representative for the benefit of the Junior Secured Parties pursuant to the terms of the applicable Junior Debt Documents and (iii) third, if no Junior Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. If any Junior Representative or any Junior Secured Party shall, at any time, receive any proceeds of any such insurance policy or any such award in contravention of this Agreement, it shall pay such proceeds over to the Designated Senior Representative in accordance with the terms of Section 4.02.

SECTION 5.03.    Amendments to Junior Collateral Documents.

(a)    Without the prior written consent of the Designated Senior Representative, no Junior Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Junior Collateral Document, would be prohibited by or inconsistent with any of the terms of this Agreement. The Borrower agrees to deliver to the Designated Senior Representative copies of (i) any amendments, supplements or other modifications to the Junior Collateral Documents and (ii) any new Junior Collateral Documents promptly after effectiveness thereof.  Each, Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, agrees that each Junior Collateral Document under its Junior Debt Facility shall include the following language (or language to similar effect reasonably approved by the Designated Senior Representative):

"Notwithstanding anything herein to the contrary, (i) the liens and security interests granted to the [Junior Representative] pursuant to this

F-15

Agreement are expressly subject and subordinate to the liens and security interests granted in favor of the Senior Secured Parties (as defined in the Intercreditor Agreement referred to below), including liens and security interests granted to Citibank, N.A., as collateral agent, pursuant to or in connection with the Credit Agreement dated as of March [  ], 2015 (as amended, restated, supplemented or otherwise modified from time to time), among Argos Holdings Inc., PetSmart, Inc., Argos Merger Sub Inc., the lenders party thereto, the other parties thereto, and Citibank, N.A., as administrative agent and collateral agent and (ii) the exercise of any right or remedy by the [Junior Representative] hereunder is subject to the limitations and provisions of the Second Lien Intercreditor Agreement dated as of [  ], 20[  ] (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among Citibank, N.A., as collateral agent, the other agents and representatives party thereto, PetSmart, Inc. and Argos Holdings Inc. and its other subsidiaries and affiliated entities party thereto. In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, the terms of the Intercreditor Agreement shall govern."

(b)      In the event that any Senior Representative enters into any amendment, waiver or consent in respect of any of the Senior Collateral Documents for the purpose of adding to or deleting from, or waiving or consenting to any departures from any provisions of, any Senior Collateral Document or changing in any manner the rights of the Designated Senior Representative, the Senior Secured Parties, the Borrower or any other Grantor thereunder (including the release of any Liens in Senior Collateral), then such amendment, waiver or consent shall apply automatically to any comparable provision of the comparable Junior Collateral Documents without the consent of any Junior Representative or any Junior Secured Party and without any action by any Junior Representative, the Borrower or any other Grantor; provided, however, (A) no such amendment, waiver or consent shall have the effect of (i) removing assets subject to the Lien of the Junior Collateral Documents, except to the extent that a release of such Lien is permitted by Section 5.01 of this Agreement and provided that there is a corresponding release of the Lien securing the Senior Obligations, (ii) imposing duties that are adverse on any Junior Representative without its consent or (iii) altering the terms of the Junior Debt Documents to permit other Liens on the Collateral not permitted under the terms of the Junior Debt Documents as in effect on the date hereof or Article VI hereof and (B) that written notice of such amendment, waiver or consent shall have been given to each Junior Representative within 10 Business Days after the effectiveness of such amendment, waiver or consent.

SECTION 5.04.  Rights as Unsecured Creditors.  Notwithstanding anything to the contrary in this Agreement, the Junior Representatives and the Junior Secured Parties may exercise rights and remedies as unsecured creditors against the Borrower and any other Grantor in accordance with the terms of the Junior Debt Documents and applicable law so long as such rights and remedies do not violate any express provision of this Agreement. Nothing in this Agreement shall prohibit the receipt by any Junior Representative or any Junior Secured Party of the required payments of principal, premium, interest, fees and other amounts due under the Junior Debt Documents so long as such receipt is not the direct or indirect result of the exercise by a Junior Representative or any Junior Secured Party of rights or remedies as a secured creditor in respect of Shared Collateral. In the event any Junior Representative or any Junior Secured Party becomes a judgment lien creditor in respect of Shared Collateral as a result of its enforcement of its rights as an unsecured creditor in respect of Junior Obligations, such judgment lien shall be subordinated to the Liens securing Senior Obligations on the same basis as the other Liens securing the Junior Obligations are so subordinated to such Liens securing Senior Obligations under this Agreement.

F-16

Nothing in this Agreement shall impair or otherwise adversely affect any rights or remedies the Designated Senior Representative, the other Senior Representatives or the Senior Secured Parties may have with respect to the Senior Collateral.

SECTION 5.05.  Gratuitous Bailee for Perfection.

(a)        Each Senior Representative acknowledges and agrees that if it shall at any time hold a Lien securing any Senior Obligations on any Shared Collateral that can be perfected by the possession or control of such Shared Collateral or of any account in which such Shared Collateral is held, and if such Shared Collateral or any such account is in fact in the possession or under the control of such Senior Representative, or of agents or bailees of such Senior Representative (such Shared Collateral being referred to herein as the **"Pledged or Controlled Collateral"**), or if it shall any time obtain any landlord waiver or bailee's letter or any similar agreement or arrangement granting it rights or access to Shared Collateral, such Senior Representative shall also hold such Pledged or Controlled Collateral, or take such actions with respect to such landlord waiver, bailee's letter or similar agreement or arrangement, as sub-agent or gratuitous bailee for the relevant Junior Representatives, in each case solely for the purpose of perfecting the Liens granted under the relevant Junior Collateral Documents and subject to the terms and conditions of this Section 5.05.

(b)        In the event that the Senior Collateral Agent (or its agents or bailees) has Lien filings against Intellectual Property that is part of the Shared Collateral that are necessary for the perfection of Liens in such Shared Collateral, the Senior Collateral Agent agrees to hold such Liens as sub-agent and gratuitous bailee for the relevant Second Priority Representatives and any assignee thereof, solely for the purpose of perfecting the security interest granted in such Liens pursuant to the relevant Second Priority Collateral Documents, subject to the terms and conditions of this Section 5.05.

(c)        Except as otherwise specifically provided herein, until the Discharge of Senior Obligations has occurred, each Senior Representative shall be entitled to deal with the Pledged or Controlled Collateral in accordance with the terms of the Senior Debt Documents as if the Liens under the Junior Collateral Documents did not exist. The rights of the Junior Representatives and the Junior Secured Parties with respect to the Pledged or Controlled Collateral shall at all times be subject to the terms of this Agreement.

(d)        No Senior Representative shall have any obligation whatsoever to the Junior Representatives or any Junior Secured Party to assure that any of the Pledged or Controlled Collateral is genuine or owned by the Grantors or to protect or preserve rights or benefits of any Person or any rights pertaining to the Shared Collateral, except as expressly set forth in this Section 5.05. The duties or responsibilities of each Senior Representative under this Section 5.05 shall be limited solely to holding or controlling the Shared Collateral and the related Liens referred to in paragraphs (a) and (b) of this Section 5.05 as subagent and gratuitous bailee for the relevant Junior Representative for purposes of perfecting the Lien held by such Junior Representative.

(e)        No Senior Representative shall have by reason of the Junior Collateral Documents or this Agreement, or any other document, a fiduciary relationship in respect of any Junior Representative or any Junior Secured Party, and each, Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, hereby waives and releases each Senior Representative from all claims and liabilities arising pursuant to such Senior Representative's role under this Section 5.05 as sub-agent and gratuitous bailee with respect to the Shared Collateral.

(f)        Upon the Discharge of Senior Obligations, each Senior Representative shall, at the Grantors' sole cost and expense, (i) (A) deliver to the Designated Junior Representative, to the extent

F-17

that it is legally permitted to do so, all Shared Collateral, including all proceeds thereof, held or controlled by such Senior Representative or any of its agents or bailees, including the transfer of possession and control, as applicable, of the Pledged or Controlled Collateral, together with any necessary endorsements and notices to depositary banks, securities intermediaries and commodities intermediaries, and assign its rights under any landlord waiver or bailee's letter or any similar agreement or arrangement granting it rights or access to Shared Collateral, or (B) direct and deliver such Shared Collateral as a court of competent jurisdiction may otherwise direct, (ii) notify any applicable insurance carrier that it is no longer entitled to be a loss payee or additional insured under the insurance policies of any Grantor issued by such insurance carrier and (iii) notify any governmental authority involved in any condemnation or similar proceeding involving any Grantor that the Designated Junior Representative is entitled to approve any awards granted in such proceeding. The Borrower and the other Grantors shall take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify each Senior Representative for loss or damage suffered by such Senior Representative as a result of such transfer, except for loss or damage suffered by such Senior Representative as a result of its own willful misconduct, gross negligence or bad faith. No Senior Representative has any obligation to follow instructions from the Designated Junior Representative in contravention of this Agreement.

(g)     Neither the Designated Senior Representative nor any of the other Senior Representatives or Senior Secured Parties shall be required to marshal any present or future collateral security for any obligations of the Borrower or any other Grantor to the Designated Senior Representative, any other Senior Representative or any Senior Secured Party under the Senior Debt Documents or any assurance of payment in respect thereof, or to resort to such collateral security or other assurances of payment in any particular order, and all of their rights in respect of such collateral security or any assurance of payment in respect thereof shall be cumulative and in addition to all other rights, however existing or arising.

SECTION 5.06.  <u>When Discharge of Senior Obligations Deemed to Not Have Occurred</u>. If, at any time after the Discharge of Senior Obligations has occurred, the Borrower or any other Grantor incurs any Senior Obligations (other than in respect of the payment of indemnities surviving the Discharge of Senior Obligations), then the Discharge of Senior Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of Senior Obligations) and the applicable agreement governing such Senior Obligations shall automatically be treated as a Senior Debt Document for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Shared Collateral set forth herein and the granting by the Designated Senior Representative of amendments, waivers and consents hereunder and the agent, representative or trustee for the holders of such Senior Obligations shall be a Senior Representative for all purposes of this Agreement. Upon receipt of notice of such incurrence (including the identity of the new Designated Senior Representative), each Junior Representatives (including the Designated Junior Representative) shall promptly (a) enter into such documents and agreements (at the expense of the Borrower), including amendments or supplements to this Agreement, as the Borrower or such new Senior Representative shall reasonably request in writing in order to provide the new Senior Representative the rights of a Senior Representative contemplated hereby, (b) deliver to the Designated Senior Representative, to the extent that it is legally permitted to do so, all Shared Collateral, including all proceeds thereof, held or controlled by such Junior Representative or any of its agents or bailees, including the transfer of possession and control, as applicable, of the Pledged or Controlled Collateral, together with any necessary endorsements and notices to depositary banks, securities intermediaries and commodities intermediaries, and assign its rights under any landlord waiver or bailee's letter or any similar agreement or arrangement granting it rights or access to Shared Collateral, (c) notify any applicable insurance carrier that it is no longer entitled to be a loss payee or additional insured under the insurance policies of any Grantor issued by such insurance carrier and (d) notify any gov-

F-18

ernmental authority involved in any condemnation or similar proceeding involving a Grantor that the new Designated Senior Representative is entitled to approve any awards granted in such proceeding.

## ARTICLE VI

## Insolvency or Liquidation Proceedings.

SECTION 6.01.  Financing and Sale Issues.  Until the Discharge of Senior Obligations has occurred, if the Borrower or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the Designated Senior Representative, any other Senior Representative or any Senior Secured Party shall desire to consent (or not object) to, as applicable, the sale, use or lease of cash or other collateral or to consent (or not object) to the Borrower's or any other Grantor's obtaining financing under Section 363 or Section 364 of the Bankruptcy Code or any similar provision of any other Bankruptcy Law to be secured by the Senior Collateral ("**DIP Financing**"), then each Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, agrees that it will (as applicable) raise no (a) objection to and will not otherwise contest such use of such cash or other collateral or such DIP Financing and, except to the extent permitted by the proviso in clause (ii) of Section 3.01(a) and Section 6.03, will not request adequate protection or any other relief in connection therewith and, to the extent the Liens securing the Senior Obligations under the Credit Agreement or, if no Credit Agreement then exists, under the other Senior Debt Documents are subordinated to or pari passu with such DIP Financing, will subordinate (and will be deemed hereunder to have subordinated) its Liens in the Shared Collateral to (x) such DIP Financing (and all obligations relating thereto) on the same basis as the Liens securing the Junior Obligations are so subordinated to Liens securing Senior Obligations under this Agreement, (y) any adequate protection Liens provided to the Senior Secured Parties, and (z) to any "carve-out" for professional and United States Trustee fees agreed to by the Designated Senior Representative, and the Designated Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, agrees that notice received two Business Days prior to the entry of an order approving such usage of cash or other collateral or approving such DIP Financing shall be adequate notice, (b) objection to (and will not otherwise contest) any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of Senior Obligations with respect to the Senior Collateral made by Designated Senior Representative, any other Senior Representative or any other Senior Secured Party, (c) objection to (and will not otherwise contest) any lawful exercise by any Senior Secured Party of the right to credit bid Senior Obligations at any sale in foreclosure of Senior Collateral (including, without limitation, pursuant to Section 363(k) of the Bankruptcy Code or any similar provision under any other applicable Bankruptcy Law) or to exercise any rights under Section 1111(b) of the Bankruptcy Code, (d) objection to (and will not otherwise contest) any other request for judicial relief made in any court by any Senior Secured Party relating to the lawful enforcement of any Lien on Senior Collateral or (e) objection to (and will not otherwise contest or oppose) any order relating to a sale or other disposition of any or all of the Senior Collateral for which the Designated Senior Representative has consented that provides, to the extent such sale or other disposition is to be free and clear of Liens, that the Liens securing the Senior Obligations and the Junior Obligations will attach to the proceeds of the sale on the same basis of priority as the Liens on the Shared Collateral securing the Senior Obligations rank to the Liens on the Shared Collateral securing the Junior Obligations pursuant to this Agreement, provided that the Junior Secured Parties may assert any objection to a sale or disposition that could be asserted by an unsecured creditor in any Insolvency or Liquidation Proceeding; without limiting the foregoing, each Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, agrees that it may not raise any objections based on rights afforded by Sections 363(e); [provided, however that the Junior Representative or any Junior Secured Party may exercise any or all such rights after the passage of a period of 180 days from the date of delivery of a notice in writing to the Designated Senior Representative of any Junior Representative's or Junior Secured Party's intention to exercise its right to take such actions which

notice shall specify that an "Event of Default" as defined in the applicable Junior Debt Documents has occurred and as a result of such "Event of Default", the principal and interest under such Junior Debt Documents have become due and payable unless a Senior Representative has commenced and is diligently pursuing remedies with respect to any material portion of the Shared Collateral (or such exercise of remedies is stayed by applicable Insolvency or Liquidation Proceedings)][1].  In addition, the Junior Secured Parties are not deemed to have waived any rights to credit bid on the Shared Collateral in any such sale or disposition in accordance with Section 363(k) of the Bankruptcy Code (or any similar provision under any other applicable Bankruptcy Law), so long as any such credit bid provides for the payment in full in cash of the Senior Obligations.

SECTION 6.02.  Relief from the Automatic Stay.  Until the Discharge of Senior Obligations has occurred, each Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding or take any action in derogation thereof, in each case in respect of any Shared Collateral, without the prior written consent of the Designated Senior Representative.

SECTION 6.03.  Adequate Protection.  Each Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, agrees that none of them shall object, contest or support any other Person objecting to or contesting (a) any request by the Designated Senior Representative, the other Senior Representatives or the Senior Secured Parties for adequate protection in any form, (b) any objection by the Designated Senior Representative, the other Senior Representatives or the Senior Secured Parties to any motion, relief, action or proceeding based on the Designated Senior Representative's or any other Senior Representative's or Senior Secured Party's claiming a lack of adequate protection or (c) the allowance and payment of interest, fees, expenses or other amounts of the Designated Senior Representative, any other Senior Representative or any other Senior Secured Party as adequate protection or otherwise under Section 506(b) or 506(c) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law. Notwithstanding anything contained in this Section 6.03 or in Section 6.01, in any Insolvency or Liquidation Proceeding, (i) if the Senior Secured Parties (or any subset thereof) are granted adequate protection in the form of a Lien on additional or replacement collateral and/or a superpriority administrative expense claim in connection with any DIP Financing or use of cash collateral under Section 363 or 364 of the Bankruptcy Code or any similar provision of any other Bankruptcy Law, then each Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, may seek or request adequate protection in the form of (as applicable) a Lien on such additional or replacement collateral and/or a superpriority administrative expense claim, which Lien and/or superpriority administrative expense claim (as applicable) is subordinated to the Liens securing and claims with respect to the Senior Obligations and such DIP Financing (and all obligations relating thereto) on the same basis as the other Liens securing and claims with respect to the Junior Obligations are so subordinated to the Liens securing and claims with respect to the Senior Obligations under this Agreement and (ii) in the event any Junior Representatives, for themselves and on behalf of the Junior Secured Parties under their Junior Debt Facilities, seek or request adequate protection and such adequate protection is granted in the form of (as applicable) a Lien on additional or replacement collateral and/or a superpriority administrative expense claim, then such Junior Representatives, for themselves and on behalf of each Junior Secured Party under their Junior Debt Facilities, agree that the Senior Representatives shall also be granted (as applicable) a senior Lien on such additional or replacement collateral as security for the Senior Obligations and/or a senior superpriority administrative expense claim, and that any Lien on such additional or replacement collateral securing the Junior Obligations and/or superpriority adminis-

---

[1] To be included to the extent the Term Loan Collateral Agent and Borrower reasonably agree it to be advisable in light of current market practice for the relevant debt issuance.

trative expense claim shall be subordinated to the Liens on such collateral securing and claims with re-
spect to the Senior Obligations and any such DIP Financing (and all obligations relating thereto) and any
other Liens and claims granted to the Senior Secured Parties as adequate protection on the same basis as
the other Liens securing and claims with respect to the Junior Obligations are so subordinated to such
Liens securing and claims with respect to Senior Obligations under this Agreement.  Without limiting the
generality of the foregoing, to the extent that the Senior Secured Parties are granted adequate protection in
the form of payments in the amount of current post-petition fees and expenses, and/or other cash pay-
ments, then the Junior Representatives, for themselves and on behalf of the Junior Secured Parties under
their Junior Debt Facilities, shall not be prohibited from seeking adequate protection in the form of pay-
ments in the amount of current post-petition incurred fees and expenses, and/or other cash payments (as
applicable), subject to the right of the Senior Secured Parties to object to the reasonableness of the
amounts of fees and expenses or other cash payments so sought by the Junior Secured Parties.

       SECTION 6.04.  <u>Preference Issues</u>.  If any Senior Secured Party is required in any Insol-
vency or Liquidation Proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the
estate of the Borrower or any other Grantor (or any trustee, receiver or similar Person therefor), because
the payment of such amount was declared to be fraudulent or preferential in any respect or for any other
reason, any amount (a "**Recovery**"), whether received as proceeds of security, enforcement of any right of
setoff, recoupment or otherwise, then the Senior Obligations shall be reinstated to the extent of such Re-
covery and deemed to be outstanding as if such payment had not occurred and the Senior Secured Parties
shall still be entitled to a future Discharge of Senior Obligations with respect to all such recovered
amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be
reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair
or otherwise affect the obligations of the parties hereto. Each Junior Representative, for itself and on be-
half of each Junior Secured Party under its Junior Debt Facility, hereby agrees that none of them shall be
entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or alloca-
tion made in accordance with this Agreement, whether by preference or otherwise, it being understood
and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated
and turned over for application in accordance with the priorities set forth in this Agreement.

       SECTION 6.05.  <u>Separate Grants of Security and Separate Classifications</u>.  Each Junior
Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility,
acknowledges and agrees that (a) the grants of Liens pursuant to the Senior Collateral Documents and the
Junior Collateral Documents constitute separate and distinct grants of Liens, (b) the Junior Secured Par-
ties' claims against the Grantors in respect of their Liens on the Shared Collateral constitute junior claims
separate and apart (and of a different class) from the senior claims of the Secured Parties against the
Grantors in respect of the Shared Collateral, and (c) because of, among other things, their differing rights
in the Shared Collateral, the Junior Obligations are fundamentally different from the Senior Obligations
and must be separately classified in any Plan of Reorganization proposed, confirmed, or adopted in an
Insolvency or Liquidation Proceeding.  To further effectuate the intent of the parties as provided in the
immediately preceding sentence, if it is held that the claims of the Senior Secured Parties and the Junior
Secured Parties in respect of the Shared Collateral constitute only one secured claim (rather than separate
classes of senior and junior secured claims), then each Junior Representative, for itself and on behalf of
each Junior Secured Party under its Junior Debt Facility, hereby acknowledges and agrees that all distri-
butions from the Shared Collateral shall be made as if there were separate classes of senior and junior se-
cured claims against the Grantors in respect of the Shared Collateral (with the effect being that, to the ex-
tent that the aggregate value of the Shared Collateral is sufficient (for this purpose ignoring all claims
held by the Junior Secured Parties), the Senior Secured Parties shall be entitled to receive, in addition to
amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts ow-
ing in respect of post-petition interest, fees, and expenses (whether or not allowed or allowable in such
Insolvency or Liquidation Proceeding) before any distribution is made from the Shared Collateral in re-

F-21

spect of the Junior Obligations, with each Junior Representative, for itself and on behalf of each Junior Secured Party under its Junior Debt Facility, hereby acknowledging and agreeing to turn over to the Designated Senior Representative amounts otherwise received or receivable by them from the Shared Collateral to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Junior Secured Parties. This Section 6.05 is intended to govern the relationship between the classes of claims held by the Junior Secured Parties, on the one hand, and a collective class of claims comprised of the Credit Agreement Secured Parties and any Additional Senior Secured Parties (as opposed to separate classes of each such series of claims), on the other hand, and, for the avoidance of doubt, nothing set forth herein shall in any way alter or modify the relationship of each series of such separate claims held by the Senior Secured Parties, including as set forth in the First Lien Intercreditor Agreement, or otherwise cause such different claims to be combined into one or more classes or otherwise classified in a manner that violates the First Lien Intercreditor Agreement.

SECTION 6.06.  No Waivers of Rights of Senior Secured Parties.  Nothing contained herein shall, except as expressly provided herein, prohibit or in any way limit the Designated Senior Representative, any other Senior Representative or any other Senior Secured Party from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by any Junior Secured Party, including the seeking by any Junior Secured Party of adequate protection or the asserting by any Junior Secured Party of any of its rights and remedies under the Junior Debt Documents or otherwise.

SECTION 6.07.  Application.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law, shall be effective before, during and after the commencement of any Insolvency or Liquidation Proceeding. The relative rights as to the Shared Collateral and proceeds thereof shall continue after the commencement of any Insolvency or Liquidation Proceeding on the same basis as prior to the date of the petition therefor, subject to any court order approving the financing of, or use of cash collateral by, any Grantor. All references herein to any Grantor shall include such Grantor as a debtor-in-possession and any receiver or trustee for such Grantor.

SECTION 6.08.  Other Matters.  To the extent that any Junior Representative or any Junior Secured Party has or acquires rights under Section 363 or Section 364 of the Bankruptcy Code or any similar provision of any other Bankruptcy Law with respect to any of the Shared Collateral, such Junior Representative, on behalf of itself and each Junior Secured Party under its Junior Debt Facility, agrees not to assert any such rights without the prior written consent of the Designated Senior Representative, provided that if requested by the Designated Senior Representative, such Junior Representative shall timely exercise such rights in the manner requested by the Designated Senior Representative, including any rights to payments in respect of such rights.

SECTION 6.09  506(c) Claims.  Until the Discharge of Senior Obligations has occurred, each Junior Representative, on behalf of itself and each Junior Secured Party under its Junior Debt Facility, agrees that it will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law senior to or on a parity with the Liens securing the Senior Obligations for costs or expenses of preserving or disposing of any Shared Collateral.

SECTION 6.10.  Reorganization Securities.  If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a Plan of Reorganization on account of both the Senior Obligations and the Junior Obligations, then, to the extent the debt obligations distributed on account of the Senior Obligations and on account of the Junior Obligations are secured by Liens upon the same assets or property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

F-22

SECTION 6.11 <u>Post Petition Interest</u>

(a) None of the Junior Representatives or any other Junior Secured Party shall oppose or seek to challenge any claim by any Senior Representative or any Senior Secured Party for allowance in any Insolvency or Liquidation Proceeding of Senior Obligations consisting of claims for post-petition interest, fees, costs, expenses, and/or other charges, under Section 506(b) of the Bankruptcy Code or otherwise (for this purpose ignoring all claims and Liens held by the Junior Secured Parties on the Shared Collateral).

(b) None of the Senior Representatives or any Senior Secured Party shall oppose or seek to challenge any claim by any Junior Representative or any other Junior Secured Party for allowance in any Insolvency or Liquidation Proceeding of Junior Obligations consisting of claims for post-petition interest, fees, costs, expenses, and/or other charges, under Section 506(b) of the Bankruptcy Code or otherwise, to the extent of the value of the Lien of the Junior Representatives on behalf of the Junior Secured Parties on the Shared Collateral (after taking into account the Senior Obligations and the Senior Liens).

SECTION 6.12. <u>Voting</u>. No Junior Representative or any other Junior Secured Party may support or vote in favor of any Plan of Reorganization (and each shall be deemed to have voted to reject any Plan of Reorganization) that is inconsistent with the terms of this Agreement. Without limiting the generality of the foregoing, no Junior Representative or any other Junior Secured Party may support or vote in favor of any Plan of Reorganization unless such plan (a) pays off, in cash in full, all Senior Obligations or (b) is accepted by the class of holders of Senior Obligations voting thereon in accordance with Section 1126(c) of the Bankruptcy Code.

## **ARTICLE VII**

### **Reliance; etc.**

SECTION 7.01.  <u>Reliance</u>.  The consent by the Senior Secured Parties to the execution and delivery of the Junior Debt Documents to which the Senior Secured Parties have consented and all loans and other extensions of credit made or deemed made on and after the date hereof by the Senior Secured Parties to the Borrower or any Subsidiary shall be deemed to have been given and made in reliance upon this Agreement. Each Junior Representative, on behalf of itself and each Junior Secured Party under its Junior Debt Facility, acknowledges that it and such Junior Secured Parties have, independently and without reliance on the Designated Senior Representative or any other Senior Representative or other Senior Secured Party, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the Junior Debt Documents to which they are party or by which they are bound, this Agreement and the transactions contemplated hereby and thereby, and they will continue to make their own credit decision in taking or not taking any action under the Junior Debt Documents or this Agreement.

SECTION 7.02.  <u>No Warranties or Liability</u>.  Each Junior Representative, on behalf of itself and each Junior Secured Party under its Junior Debt Facility, acknowledges and agrees that neither the Designated Senior Representative nor any other Senior Representative or other Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Senior Debt Documents, the ownership of any Shared Collateral or the perfection or priority of any Liens thereon. The Senior Secured Par-

F-23

ties will be entitled to manage and supervise their respective loans and extensions of credit under the Senior Debt Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate, and the Senior Secured Parties may manage their loans and extensions of credit without regard to any rights or interests that the Junior Representatives and the Junior Secured Parties have in the Shared Collateral or otherwise, except as otherwise provided in this Agreement. Neither the Designated Senior Representative nor any other Senior Representative or other Senior Secured Party shall have any duty to any Junior Representative or Junior Secured Party to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of an event of default or default under any agreement with the Borrower or any Subsidiary (including the Junior Debt Documents), regardless of any knowledge thereof that they may have or be charged with. Except as expressly set forth in this Agreement, the Designated Senior Representative, the other Senior Representatives, the Senior Secured Parties, the Junior Representatives and the Junior Secured Parties have not otherwise made to each other, nor do they hereby make to each other, any warranties, express or implied, nor do they assume any liability to each other with respect to (a) the enforceability, validity, value or collectibility of any of the Senior Obligations, the Junior Obligations or any guarantee or security which may have been granted to any of them in connection therewith, (b) any Grantor's title to or right to transfer any of the Shared Collateral or (c) any other matter except as expressly set forth in this Agreement.

SECTION 7.03.  <u>Obligations Unconditional</u>.  All rights, interests, agreements and obligations of the Designated Senior Representative, the other Senior Representatives, the Senior Secured Parties, the Junior Representatives and the Junior Secured Parties hereunder shall remain in full force and effect irrespective of:

(a)  any lack of validity or enforceability of any Senior Debt Document or any Junior Debt Document;

(b)  any change in the time, manner or place of payment of, or in any other terms of, all or any of the Senior Obligations or Junior Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any Senior Debt Document or of the terms of any Junior Debt Document;

(c)  any exchange of any security interest in any Shared Collateral or any other collateral or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the Senior Obligations or Junior Obligations or any guarantee thereof;

(d)  the commencement of any Insolvency or Liquidation Proceeding in respect of the Borrower or any other Grantor; or

(e)  any other circumstances that otherwise might constitute a defense available to, or a discharge of, (i) the Borrower or any other Grantor in respect of the Senior Obligations or (ii) any Junior Representative or Junior Secured Party in respect of this Agreement.

**ARTICLE VII**

**<u>Miscellaneous</u>**

SECTION 8.01.  <u>Conflicts</u>.  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any Senior Debt Document or any Junior Debt Document, the provisions of this Agreement shall govern.

F-24

SECTION 8.02.  Continuing Nature of this Agreement; Severability.  Subject to Section 6.04, this Agreement shall continue to be effective until the Discharge of Senior Obligations shall have occurred. This is a continuing agreement of Lien subordination, and the Senior Secured Parties may continue, at any time and without notice to the Junior Representatives or any Junior Secured Party, to extend credit and other financial accommodations and lend monies to or for the benefit of the Borrower or any other Grantor constituting Senior Obligations in reliance hereon. The terms of this Agreement shall survive and continue in full force and effect in any Insolvency or Liquidation Proceeding. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 8.03.  Amendments; Waivers.

(a)     No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)     Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified (other than pursuant to any Joinder Agreement) except pursuant to an agreement or agreements in writing entered into by each Representative (and with respect to any such termination, waiver, amendment or modification which by the terms of this Agreement requires the Borrower's consent or which increases the obligations or reduces the rights of the Borrower or any other Grantor, with the consent of the Borrower).

(c)     Notwithstanding the foregoing, without the consent of any Secured Party, any Representative may become a party hereto by execution and delivery of a Joinder Agreement in accordance with Section 8.09 of this Agreement and upon such execution and delivery, such Representative and the Secured Parties and Senior Obligations or Junior Obligations of the Debt Facility for which such Representative is acting shall be subject to the terms hereof.

(d)     Notwithstanding the foregoing, without the consent of any other Representative or Secured Party, the Designated Senior Representative may effect amendments and modifications to this Agreement to the extent necessary to reflect any incurrence of any Additional Junior Debt Obligations or Additional Senior Debt Obligations in compliance with the Credit Agreement, the Initial Junior Debt Documents, any Additional Senior Debt Documents and any Additional Junior Debt Documents.

SECTION 8.04.  Information Concerning Financial Condition of the Borrower and the other Grantors.  The Designated Senior Representative, the other Senior Representatives, the Senior Secured Parties, the Junior Representatives and the Junior Secured Parties shall each be responsible for keeping themselves informed of (a) the financial condition of the Borrower and the other Grantors and all

endorsers or guarantors of the Senior Obligations or the Junior Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the Senior Obligations or the Junior Obligations. The Designated Senior Representative, the other Senior Representatives, the Senior Secured Parties, the Junior Representatives and the Junior Secured Parties shall have no duty to advise any other party hereunder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that the Designated Senior Representative, any other Senior Representative, any Senior Secured Party, any Junior Representative or any Junior Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it shall be under no obligation to (i) make, and the Designated Senior Representative, the other Senior Representatives, the Senior Secured Parties, the Junior Representatives and the Junior Secured Parties shall not make or be deemed to have made, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (ii) provide any additional information or to provide any such information on any subsequent occasion, (iii) undertake any investigation or (iv) disclose any information that, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

SECTION 8.05.  <u>Subrogation</u>.  Each Junior Representative, on behalf of itself and each Junior Secured Party under its Junior Debt Facility, hereby waives any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of Senior Obligations has occurred.

SECTION 8.06.  <u>Application of Payments</u>.  Except as otherwise provided herein, all payments received by the Senior Secured Parties may be applied, reversed and reapplied, in whole or in part, to such part of the Senior Obligations as the Senior Secured Parties, in their sole discretion, deem appropriate, consistent with the terms of the Senior Debt Documents. Except as otherwise provided herein, each Junior Representative, on behalf of itself and each Junior Secured Party under its Junior Debt Facility, assents to any such extension or postponement of the time of payment of the Senior Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security that may at any time secure any part of the Senior Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

SECTION 8.07.  <u>Additional Grantors</u>.  The Borrower agrees that, if any Subsidiary of Holdings shall become a Grantor after the date hereof, it will promptly cause such Subsidiary to become party hereto by executing and delivering an instrument in the form of Annex II. Upon such execution and delivery, such Subsidiary will become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein. The execution and delivery of such instrument shall not require the consent of any other party hereunder, and will be acknowledged by the Designated Senior Representative. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

SECTION 8.08.  <u>Dealings with Grantors</u>.  Upon any application or demand by the Borrower or any Grantor to the Designated Senior Representative or the Designated Junior Representative to take or permit any action under any of the provisions of this Agreement or under any Collateral Document (if such action is subject to the provisions hereof), the Borrower or such Grantor, as appropriate, shall furnish to the Designated Junior Representative or the Designated Senior Representative a certificate of an appropriate officer ( an **"Officer's Certificate"**) stating that all conditions precedent, if any, provided for in this Agreement or such Collateral Document, as the case may be, relating to the proposed action have been complied with, except that in the case of any such application or demand as to which the furnishing of such documents is specifically required by any provision of this Agreement or any Collateral Document relating to such particular application or demand, no additional certificate or opinion need be furnished.

F-26

SECTION 8.09.  <u>Additional Debt Facilities</u>.  To the extent, but only to the extent, permitted by the provisions of the Senior Debt Documents and the Junior Debt Documents, the Borrower may incur or issue and sell one or more series or classes of Additional Junior Debt and one or more series or classes of Additional Senior Debt. Any such additional class or series of Additional Junior Debt (the "**Junior Class Debt**") may be secured by a junior priority, subordinated Lien on Shared Collateral, in each case under and pursuant to the Junior Collateral Documents for such Junior Class Debt, if and subject to the condition that the Representative of any such Junior Class Debt (each, a "**Junior Class Debt Representative**"), acting on behalf of the holders of such Junior Class Debt (such Representative and holders in respect of any such Junior Class Debt being referred to as the "**Junior Class Debt Parties**"), becomes a party to this Agreement by satisfying the conditions set forth in clauses (i) through (v), as applicable, of the immediately succeeding paragraph.  Any such additional class or series of Additional Senior Debt (the "**Senior Class Debt**"; and the Senior Class Debt and Junior Class Debt, collectively, the "**Class Debt**") may be secured by a senior Lien on Shared Collateral, in each case under and pursuant to the Senior Collateral Documents, if and subject to the condition that the Representative of any such Senior Class Debt (each, a "**Senior Class Debt Representative**"; and the Senior Class Debt Representatives and Junior Class Debt Representatives, collectively, the "**Class Debt Representatives**"), acting on behalf of the holders of such Senior Class Debt (such Representative and holders in respect of any such Senior Class Debt being referred to as the "**Senior Class Debt Parties**"; and the Senior Class Debt Parties and Junior Class Debt Parties, collectively, the "**Class Debt Parties**"), becomes a party to this Agreement by satisfying the conditions set forth in clauses (i) through (v), as applicable, of the immediately succeeding paragraph. In order for a Class Debt Representative to become a party to this Agreement:

(i)        such Class Debt Representative shall have executed and delivered a Joinder Agreement to the Designated Senior Representative and the Designated Junior Representative substantially in the form of Annex III (if such Representative is a Junior Class Debt Representative) or Annex IV (if such Representative is a Senior Class Debt Representative) (with such changes as may be reasonably approved by the Designated Senior Representative and such Class Debt Representative) pursuant to which it becomes a Representative hereunder, and the Class Debt in respect of which such Class Debt Representative is the Representative and the related Class Debt Parties become subject hereto and bound hereby;

(ii)       the Borrower shall have delivered to the Designated Senior Representative and the Designated Junior Representative true and complete copies of each of the Junior Debt Documents or Senior Debt Documents, as applicable, relating to such Class Debt, certified as being true and correct by a Responsible Officer of the Borrower;

(iii)      in the case of any Junior Class Debt, all filings, recordations and/or amendments or supplements to the Junior Collateral Documents necessary to confirm and perfect the junior priority Liens securing the relevant Junior Obligations relating to such Class Debt shall have been made, executed and/or delivered (or, with respect to any such filings or recordations, acceptable provisions to perform such filings or recordings have been taken in the reasonable judgment of the Borrower), and all fees and taxes in connection therewith shall have been paid (or acceptable provisions to make such payments have been taken in the reasonable judgment of the Designated Senior Representative);

(iv)      the Borrower shall have delivered to the Designated Senior Representative and the Designated Junior Representative an Officer's Certificate stating that such Additional Senior Debt Obligations or Additional Junior Debt Obligations are permitted by each applicable Senior Debt Document and Junior Debt Document to be incurred, or to the extent a consent is otherwise required to permit the incurrence of such Additional Senior Debt Obligations or Additional Junior

F-27

Debt Obligations under any applicable Senior Debt Document and Junior Debt Document, each Grantor has obtained the requisite consent; and

(v)     the Junior Debt Documents or Senior Debt Documents, as applicable, relating to such Class Debt shall provide, in a manner reasonably satisfactory to the Designated Senior Representative, that each Class Debt Party with respect to such Class Debt will be subject to and bound by the provisions of this Agreement in its capacity as a holder of such Class Debt.

SECTION 8.10.   Consent to Jurisdiction; Waivers.  The Designated Senior Representative and each other Representative, on behalf of itself and the Secured Parties of the Debt Facility for which it is acting, irrevocably and unconditionally:

(a)     submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York sitting in New York County, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Representative) at the address referred to in Section 8.11;

(d)     agrees that nothing herein shall affect the right of any other party hereto (or any Secured Party) to effect service of process in any other manner permitted by law or shall limit the right of any party hereto (or any Secured Party) to sue in any other jurisdiction; and

(e)     waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 8.10 any special, exemplary, punitive or consequential damages.

SECTION 8.11.   Notices.  All notices, requests, demands and other communications provided for or permitted hereunder shall be in writing and shall be sent:

(i)     if to the Borrower or any Grantor, to the Borrower, at its address at:[ ], Attention of [ ], telecopy [ ];

(ii)     if to the Term Loan Collateral Agent, to it at Citibank, N.A., [●], Attention of [●] (Fax No.: [●]) (email: [●]);

(iii)     if to the Initial Junior Priority Representative, to it at [        ], [●], Attention of [●] (Fax No.: [●]) (email: [●]); and

(iv)     if to any other Representative, to it at the address specified by it in the Joinder Agreement delivered by it pursuant to Section 8.09.

F-28

Any party hereto may change its address, fax number or email address for notices and other communications hereunder by notice to the other parties hereto. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and, may be personally served, telecopied, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or electronic mail or upon receipt via U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth above or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties. As agreed to in writing among the Designated Senior Representative and each other Representative from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

SECTION 8.12. <u>Further Assurances</u>. Each Senior Representative, on behalf of itself and each Senior Secured Party under its Senior Debt Facility, and each Junior Representative, on behalf of itself and each Junior Secured Party under its Junior Debt Facility, agrees that it will take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the other parties hereto may reasonably request to effectuate the terms of, and the Lien priorities contemplated by, this Agreement.

SECTION 8.13. **<u>GOVERNING LAW; WAIVER OF JURY TRIAL.</u>**

**(A)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS, EXCEPT AS REQUIRED BY MANDATORY PROVISIONS OF LAW.**

**(B)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.**

SECTION 8.14. <u>Parties in Interest.</u> This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

SECTION 8.15. <u>Headings</u>. Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 8.16. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 8.17. <u>Authorization</u>. By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement. The Term Loan Collateral Agent represents and warrants that this Agreement is binding upon the Credit Agreement Secured Parties. The Initial Junior Priority Representative represents and warrants that this Agreement is binding upon the Initial Junior Secured Parties.

SECTION 8.18.  <u>Provisions Solely to Define Relative Rights</u>.  The lien priorities set forth in this Agreement and the rights and benefits hereunder in respect of such lien priorities shall inure solely to the benefit of the Designated Senior Representative, the other Senior Representatives, the Senior Secured Parties, the Junior Representatives and the Junior Secured Parties, and their respective permitted successors and assigns, and no other Person (including the Grantors, or any trustee, receiver, debtor in possession or bankruptcy estate in a bankruptcy or like proceeding) shall have or be entitled to assert such rights.  Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the Obligations as and when the same shall become due and payable in accordance with their terms.

SECTION 8.19.  <u>Effectiveness</u>.  This Agreement shall become effective when executed and delivered by the parties hereto.

SECTION 8.20.  <u>Term Loan Collateral Agent and Initial Junior Priority Representative</u>. It is understood and agreed that (a) the Term Loan Collateral Agent is entering into this Agreement in (i) its capacities as administrative agent under the Credit Agreement and the provisions of Article VIII of the Credit Agreement applicable to it as administrative agent thereunder shall also apply to it as Designated Senior Representative hereunder and (ii) its capacity as Collateral Agent under the First Lien Intercreditor Agreement (if applicable), and the provisions of Article IV of the First Lien Intercreditor Agreement applicable to it as collateral agent thereunder shall also apply to it as Designated Senior Representative hereunder and (b) [  ] is entering in this Agreement in its capacity as [Trustee/administrative agent] under [indenture/credit agreement] and the provisions of Article [ ] of such [indenture/credit agreement] applicable to the [Trustee/administrative agent] thereunder shall also apply to the [Trustee/administrative agent] hereunder.

For the avoidance of doubt, the parties hereto acknowledge that in no event shall the Term Loan Collateral Agent or the Initial Junior Priority Representative be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether any such party has been advised of the likelihood of such loss or damage and regardless of the form of action.

SECTION 8.21.  <u>Relative Rights</u>.  Notwithstanding anything in this Agreement to the contrary (except to the extent expressly contemplated herein), nothing in this Agreement is intended to or will (a) amend, waive or otherwise modify the provisions of any Senior Debt Documents or any Junior Debt Documents, or permit the Borrower or any other Grantor to take any action, or fail to take any action, to the extent such action or failure would otherwise constitute a breach of, or default under, any Senior Debt Documents or any Junior Debt Documents, (b) change the relative priorities of the Senior Obligations or the Liens granted under the Senior Collateral Documents on the Shared Collateral (or any other assets) as among the Senior Secured Parties, (c) otherwise change the relative rights of the Senior Secured Parties in respect of the Shared Collateral as among such Senior Secured Parties or (d) obligate the Borrower or any other Grantor to take any action, or fail to take any action, that would otherwise constitute a breach of, or default under, any Senior Debt Document or any Junior Debt Document.

SECTION 8.22.  <u>Survival of Agreement</u>.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 8.23.  <u>ABL Intercreditor Agreement</u>.  Notwithstanding anything herein to the contrary, the exercise of any right or remedy by any Representative or Secured Party hereunder with respect to ABL Collateral is subject to the terms of the ABL Intercreditor Agreement and in the event of

any conflict or inconsistency between this Agreement and the ABL Intercreditor Agreement with respect to the ABL Collateral, the ABL Intercreditor Agreement shall govern.

SECTION 8.25    Integration.  This Agreement together with the other Senior Debt Documents and Junior Debt Documents represents the entire agreement of each of the Grantors and the First Lien Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by any Grantor, any Representative or any other Secured Party relative to the subject matter hereof not expressly set forth or referred to herein or in the other Senior Debt Documents or Junior Debt Documents.

SECTION 8.26. Effectiveness of the Acquisition.  No Grantor (other than Holdings) shall have any rights or obligations hereunder until the consummation of the Acquisition, and any representations and warranties of the Grantors (other than Holdings) hereunder shall not become effective until such time.

LEGAL_US_E # 113716329.4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**CITIBANK, N.A.,**
as Term Loan Collateral Agent and Designated Senior Representative

By: _____
        Name:
        Title:

[_____],
as Initial Junior Priority Representative

By: _____
        Name:
        Title:

**ARGOS HOLDINGS INC.**

By: _____
        Name:
        Title:

**PETSMART, INC.**

By: _____
        Name:
        Title:

**THE GRANTORS LISTED ON ANNEX I HERETO,**

By: _____
        Name:
        Title:

F-32

**ANNEX I**

**Grantors**

[        ]

ANNEX II

SUPPLEMENT NO.   dated as of   , to the SECOND LIEN INTERCREDITOR AGREEMENT dated as of [     ], 20[ ] (the "**Second Lien Intercreditor Agreement**"), among Argos Holdings Inc., a Delaware corporation ("**Holdings**"), PetSmart, Inc., a Delaware corporation (the "**Borrower**"), the other Grantors party hereto, Citibank, N.A., as collateral agent for the Credit Agreement Secured Parties  (in such capacity, the "**Term Loan Collateral Agent**") and [_____], as Initial Junior Priority Representative (in such capacity, the "**Initial Junior Priority Representative**") and each Additional Senior Agent and each Additional Junior Agent that from time to time becomes a party thereto.

A.     Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Second Lien Intercreditor Agreement.

B.     The Grantors have entered into the Second Lien Intercreditor Agreement.  Pursuant to certain Senior Debt Documents and certain Junior Debt Documents, certain newly acquired or organized Subsidiaries of Holdings are required to enter into the Second Lien Intercreditor Agreement.  Section 8.07 of the Second Lien Intercreditor Agreement provides that such Subsidiaries may become party to the Second Lien Intercreditor Agreement by execution and delivery of an instrument in the form of this Supplement.  The undersigned Subsidiary (the "**New Grantor**") is executing this Supplement in accordance with the requirements of the Credit Agreement, the Additional Junior Debt Documents and Additional Senior Debt Documents.

Accordingly, the Designated Senior Representative and the New Grantor agree as follows:

SECTION 1.     In accordance with Section 8.07 of the Second Lien Intercreditor Agreement, the New Grantor by its signature below becomes a Grantor under the Second Lien Intercreditor Agreement with the same force and effect as if originally named therein as a Grantor, and the New Grantor hereby agrees to all the terms and provisions of the Second Lien Intercreditor Agreement applicable to it as a Grantor thereunder.  Each reference to a "Grantor" in the Second Lien Intercreditor Agreement shall be deemed to include the New Grantor.  The Second Lien Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.     The New Grantor represents and warrants to the Designated Senior Representative and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms.

SECTION 3.     This Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Supplement shall become effective when the Designated Senior Representative shall have received a counterpart of this Supplement that bears the signature of the New Grantor.  Delivery of an executed signature page to this Supplement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4.     Except as expressly supplemented hereby, the Second Lien Intercreditor Agreement shall remain in full force and effect.

**SECTION 5.     THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

F-32

SECTION 6.     In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Second Lien Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.     All communications and notices hereunder shall be in writing and given as provided in Section 8.11 of the Second Lien Intercreditor Agreement.  All communications and notices hereunder to the New Grantor shall be given to it in care of the Borrower as specified in the Second Lien Intercreditor Agreement.

SECTION 8.     The Borrower agrees to reimburse the Designated Senior Representative for its reasonable out-of-pocket expenses in connection with this Supplement, including the reasonable fees, other charges and disbursements of counsel for the Designated Senior Representative.

F-33

IN WITNESS WHEREOF, the New Grantor, and the Designated Senior Representative have duly executed this Supplement to the Second Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW GRANTOR],

By: _____

    Name:
    Title:

Acknowledged by:

[_____], as Designated Senior Representative,

By: _____

    Name:
    Title:

F-34

ANNEX III

[FORM OF] JOINDER NO. [ ] dated as of [     ], 20[ ] to the SECOND LIEN INTERCREDITOR AGREEMENT dated as of [      ], 20[ ] (the "**Second Lien Intercreditor Agreement**"), among Argos Holdings Inc., a Delaware corporation ("**Holdings**"), PetSmart, Inc., a Delaware corporation (the "**Borrower**"), the other Grantors party hereto, Citibank, N.A., as collateral agent for the Credit Agreement Secured Parties (in such capacity, the "**Term Loan Collateral Agent**") and [_____], as Initial Junior Priority Representative (in such capacity, the "**Initial Junior Priority Representative**") and each Additional Senior Agent and each Additional Junior Agent that from time to time becomes a party thereto.

A.    Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Second Lien Intercreditor Agreement.

B.    As a condition to the ability of the Borrower to incur Junior Debt and to secure such Junior Class Debt with a Lien pari passu with the Lien securing the existing Junior Debt and to have such Junior Class Debt guaranteed by the Grantors, in each case under and pursuant to the Junior Collateral Documents, the Junior Class Representative in respect of such Junior Class Debt is required to become a Representative under, and such Junior Class Debt and the Junior Class Debt Parties in respect thereof are required to become subject to and bound by, the Second Lien Intercreditor Agreement. Section 8.09 of the Second Lien Intercreditor Agreement provides that such Junior Class Debt Representative may become a Representative under, and such Junior Class Debt and such Junior Class Debt Parties may become subject to and bound by, the Second Lien Intercreditor Agreement, pursuant to the execution and delivery by the Junior Class Debt Representative of an instrument in the form of this Joinder and the satisfaction of the other conditions set forth in Section 8.09 of the Second Lien Intercreditor Agreement. The undersigned Junior Class Debt Representative (the "**New Representative**") is executing this Joinder in accordance with the requirements of the Senior Debt Documents and the Junior Debt Documents.

Accordingly, the Designated Senior Representative and the New Representative agree as follows:

SECTION 1.    In accordance with Section 8.09 of the Second Lien Intercreditor Agreement, the New Representative by its signature below becomes a Representative under, and the related Junior Class Debt and Junior Class Debt Parties become subject to and bound by, the Second Lien Intercreditor Agreement with the same force and effect as if the New Representative had originally been named therein as a Representative, and the New Representative, on behalf of itself and such Junior Class Debt Parties, hereby agrees to all the terms and provisions of the Second Lien Intercreditor Agreement applicable to it as a Junior Representative and to the Junior Class Debt Parties that it represents as Junior Secured Parties. Each reference to a "**Representative,**" "**Junior Representative**" or "**Additional Junior Agent**" in the Second Lien Intercreditor Agreement shall be deemed to include the New Representative. The Second Lien Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.    The New Representative represents and warrants to the Designated Senior Representative and the other Secured Parties that (i) it has full power and authority to enter into this Joinder, in its capacity as [agent] [trustee] under [describe new Junior Debt Facility], (ii) this Joinder has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of such Agreement and (iii) the Junior Debt Documents relating to such Junior Class Debt provide that, upon the New Representative's entry into this Agreement, the Junior Class Debt Parties in respect of such Junior Class Debt will be subject to and bound by the provisions of the Second Lien Intercreditor Agreement as Junior Secured Parties.

F-35

SECTION 3.    This Joinder may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Joinder shall become effective when the Designated Senior Representative shall have received a counterpart of this Joinder that bears the signature of the New Representative.  Delivery of an executed signature page to this Joinder by facsimile transmission shall be effective as delivery of a manually signed counterpart of this Joinder.

SECTION 4.    Except as expressly supplemented hereby, the Second Lien Intercreditor Agreement shall remain in full force and effect.

**SECTION 5.    THIS JOINDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.    In case any one or more of the provisions contained in this Joinder should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Second Lien Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.    All communications and notices hereunder shall be in writing and given as provided in Section 8.11 of the Second Lien Intercreditor Agreement.  All communications and notices hereunder to the New Representative shall be given to it at the address set forth below its signature hereto.

SECTION 8.    The Borrower agrees to reimburse the Designated Senior Representative for its reasonable out-of-pocket expenses in connection with this Joinder, including the reasonable fees, other charges and disbursements of counsel for the Designated Senior Representative.

F-36

IN WITNESS WHEREOF, the New Representative and the Designated Senior Representative have duly executed this Joinder to the Second Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW REPRESENTATIVE], as
[            ] for the holders of
[                        ],
By:    _____
       Name:
       Title:
Address for notices:

       _____

       _____

       attention of: _____

       Telecopy: _____
[                        ],
as Designated Senior Representative,
By:    _____
       Name:
       Title:

F-37

Acknowledged by:

ARGOS HOLDINGS INC.,


By: _____
      Name:
      Title:


PETSMART, INC.,


By: _____
      Name:
      Title:

THE GRANTORS
LISTED ON SCHEDULE I HERETO,


By: _____
      Name:
      Title:

F-38

Schedule I to the
Joinder to the
Second Lien Intercreditor Agreement

**Grantors**

[          ]

**ANNEX IV**



[FORM OF] JOINDER NO. [ ] dated as of [    ], 20[ ] to the SECOND LIEN INTERCREDITOR AGREEMENT dated as of [      ], 20[ ] (the "**Second Lien Intercreditor Agreement**"), among Argos Holdings Inc., a Delaware corporation ("**Holdings**"), PetSmart, Inc., a Delaware corporation (the "**Borrower**"), the other Grantors party hereto, Citibank, N.A., as collateral agent for the Credit Agreement Secured Parties (in such capacity, the "**Term Loan Collateral Agent**") and [_____], as Initial Junior Priority Representative (in such capacity, the "**Initial Junior Priority Representative**") and each Additional Senior Agent and each Additional Junior Agent that from time to time becomes a party thereto.

      A.     Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Second Lien Intercreditor Agreement.

      B.     As a condition to the ability of the Borrower to incur Senior Class Debt after the date of the Second Lien Intercreditor Agreement and to secure such Senior Class Debt with the Senior Lien and to have such Senior Class Debt guaranteed by the Grantors, in each case under and pursuant to the Senior Collateral Documents, the Senior Class Debt Representative in respect of such Senior Class Debt is required to become a Representative under, and such Senior Class Debt and the Senior Class Debt Parties in respect thereof are required to become subject to and bound by, the Second Lien Intercreditor Agreement. Section 8.09 of the Second Lien Intercreditor Agreement provides that such Senior Class Debt Representative may become a Representative under, and such Senior Class Debt and such Senior Class Debt Parties may become subject to and bound by, the Second Lien Intercreditor Agreement, pursuant to the execution and delivery by the Senior Class Debt Representative of an instrument in the form of this Joinder and the satisfaction of the other conditions set forth in Section 8.09 of the Second Lien Intercreditor Agreement. The undersigned Senior Class Debt Representative (the "**New Representative**") is executing this Supplement in accordance with the requirements of the Senior Debt Documents and the Junior Debt Documents.

      Accordingly, the Designated Senior Representative and the New Representative agree as follows:

      SECTION 1.    In accordance with Section 8.09 of the Second Lien Intercreditor Agreement, the New Representative by its signature below becomes a Representative under, and the related Senior Class Debt and Senior Class Debt Parties become subject to and bound by, the Second Lien Intercreditor Agreement with the same force and effect as if the New Representative had originally been named therein as a Representative, and the New Representative, on behalf of itself and such Senior Class Debt Parties, hereby agrees to all the terms and provisions of the Second Lien Intercreditor Agreement applicable to it as a Senior Representative and to the Senior Class Debt Parties that it represents as Senior Debt Parties. Each reference to a "**Representative,**" "**Senior Representative**" or "**Additional Senior Agent**" in the Second Lien Intercreditor Agreement shall be deemed to include the New Representative. The Second Lien Intercreditor Agreement is hereby incorporated herein by reference.

      SECTION 2.    The New Representative represents and warrants to the Designated Senior Representative and the other Secured Parties that (i) it has full power and authority to enter into this Joinder, in its capacity as [agent] [trustee] under [describe new Senior Debt Facility], (ii) this Joinder has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of such Agreement and (iii) the Senior Debt Documents relating to such Senior Class Debt provide that, upon the New Representative's entry into this Agreement, the Senior Class Debt Parties in respect of such Senior Class Debt will be subject to and bound by the provisions of the Second Lien Intercreditor Agreement as Senior Secured Parties.

F-40

SECTION 3.    This Joinder may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Joinder shall become effective when the Designated Senior Representative shall have received a counterpart of this Joinder that bears the signature of the New Representative.  Delivery of an executed signature page to this Joinder by facsimile transmission shall be effective as delivery of a manually signed counterpart of this Joinder.

SECTION 4.    Except as expressly supplemented hereby, the Second Lien Intercreditor Agreement shall remain in full force and effect.

**SECTION 5.    THIS JOINDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.    In case any one or more of the provisions contained in this Joinder should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Second Lien Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.    All communications and notices hereunder shall be in writing and given as provided in Section 8.11 of the Second Lien Intercreditor Agreement.  All communications and notices hereunder to the New Representative shall be given to it at the address set forth below its signature hereto.

SECTION 8.    The Borrower agrees to reimburse the Designated Senior Representative for its reasonable out-of-pocket expenses in connection with this Joinder, including the reasonable fees, other charges and disbursements of counsel for the Designated Senior Representative.

      IN WITNESS WHEREOF, the New Representative and the Designated Senior Representative have duly executed this Joinder to the Second Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW REPRESENTATIVE], as
[         ] for the holders of
[               ],

By: _____
      Name:
      Title:

Address for notices:

      _____

      _____

      attention of: _____

      Telecopy: _____

[              ],
as Designated Senior Representative,

By: _____
      Name:
      Title:

F-42

Acknowledged by:


ARGOS HOLDINGS INC.,


By: _____
       Name:
       Title:


PETSMART, INC.,


By: _____
       Name:
       Title:

THE GRANTORS
LISTED ON SCHEDULE I HERETO,


By: _____
       Name:
       Title:

Schedule I to the
Joinder to the
Second Lien Intercreditor Agreement

**Grantors**

[          ]

Exhibit A-1

EXHIBIT G

<u>FORM OF CLOSING CERTIFICATE</u>

[NAME OF CERTIFYING LOAN PARTY]

[_____], 2015

Reference is made to the (i) Credit Agreement dated as of March 11, 2015 (the "<u>Term Loan Credit Agreement</u>"), among Argos Holdings Inc. ("<u>Holdings</u>"), Argos Merger Sub Inc. (which on the Effective Date shall be merged with and into PetSmart, Inc., with PetSmart, Inc. surviving such merger as the Borrower) ("<u>Merger Sub</u>"), the lending institutions from time to time parties thereto and Citibank, N.A., as Administrative Agent and Collateral Agent, and (ii) ABL Credit Agreement dated as of March 11, 2015 (the "<u>ABL Credit Agreement</u>," and, together with the Term Loan Credit Agreement, the "<u>Credit Agreements</u>"), among Argos Holdings Inc., Argos Merger Sub Inc. (which on the Effective Date shall be merged with and into PetSmart, Inc. with PetSmart, Inc. surviving such merger as the U.S. Borrower), PETM Canada Corporation, as Canadian Borrower, the lending institutions from time to time parties thereto and Citibank, N.A., as Administrative Agent.  Capitalized terms used but not defined herein have the meanings given to such terms in the Credit Agreements.

1.      The undersigned, [                    ], a Responsible Officer of [____] (the "<u>Certifying Loan Party</u>"), hereby certifies that [              ] is a duly elected and qualified Responsible Officer of the Certifying Loan Party and the signature set forth on the signature line for such officer below is such officer's true and genuine signature, and such officer is duly authorized to execute and deliver on behalf of the Certifying Loan Party each Loan Document to which it is a party and any certificate or other document to be delivered by the Certifying Loan Party pursuant to such Loan Documents.

2.      The undersigned, [                    ], a Responsible Officer of the Certifying Loan Party, hereby certifies as follows:

(a)      Except as disclosed in (a) the Company SEC Documents publicly filed with or publicly furnished to the SEC prior to December 14, 2014 (including exhibits and other information incorporated by reference therein, but excluding any disclosures set forth in any "risk factors", "forward-looking statements" or "market risk" sections or to the extent they are cautionary, predictive or forward-looking in nature) and (b) the Company Disclosure Letter (provided, that disclosure of any item in any section or subsection of the Company Disclosure Letter shall be deemed disclosed with respect to any other section or subsection to the extent that the relevance of any disclosed event, item or occurrence in such section or subsection to such other section or subsection is reasonably apparent), (x) Since February 2, 2014 through December 14, 2014 there has not been any event or effect that has had or would have, individually or in the aggregate, a Company Material Adverse Effect and (y) since December 14, 2014 there has not been any event or effect that has had or would have, individually or in the aggregate, a Company Material Adverse Effect;

(b)      The Specified Representations are accurate in all material respects on and as of the date hereof; provided that any Specified Representations set forth in clause (b) of the definition thereof that are qualified by materiality, Company Material Adverse Effect or Material Adverse Effect, are accurate in all respects on and as of the date hereof;

(c)      Prior to or substantially simultaneously (i) with the initial Borrowings under the Term Facility, the Equity Financing has been made, (ii) with the initial funding of

F-2-1

Loans on the date hereof, the Acquisition has been consummated in all material respects in accordance with the Acquisition Agreement (without giving effect to any amendments, supplements, waivers or other modifications to or of the Acquisition Agreement that are materially adverse to the interests of the Lenders or the Joint Bookrunners in their capacities as such, except to the extent that the Joint Bookrunners have consented thereto), and (iii) with the initial borrowings under the Term Facility and the consummation of the Acquisition, the Effective Date Refinancing has been consummated;

(d)     There are no liquidation or dissolution proceedings pending or to my knowledge threatened against the Certifying Loan Party, nor to my knowledge has any other event occurred affecting or threatening the [corporate] existence of the Certifying Loan Party;

(e)     The Certifying Loan Party is a [corporation] [limited liability company] [other relevant entity] duly organized, validly existing and in good standing under the laws of the [jurisdiction];

(f)     Attached hereto as Exhibit A is a complete and correct copy of the resolutions duly adopted by the [board of directors (or a duly authorized committee thereof)] [members] [other relevant body in foreign jurisdictions] of the Certifying Loan Party on [●], 2015, authorizing [(a)] the execution, delivery and performance of the Loan Documents (and any agreements relating thereto) to which it is a party [and (b) the extensions of credit contemplated by the Credit Agreement][10]; such resolutions have not in any way been amended, modified, revoked or rescinded and have been in full force and effect since their adoption to and including the date hereof and are now in full force and effect; and such resolutions are the only [corporate] [company] proceedings of the Certifying Loan Party now in force relating to or affecting the matters referred to therein;

(g)     Attached hereto as Exhibit B is a true and complete copy of the certificate of [incorporation] [formation] [other relevant organizational document] of the Certifying Loan Party as in effect on the date hereof, certified by the [Secretary of State of the State of [____] [other relevant body in foreign jurisdictions] as of a recent date;

(h)     Attached hereto as Exhibit C is a true and complete copy of the [by-laws] [limited liability company agreement] [other relevant governing document] of the Certifying Loan Party as in effect on the date hereof;

(i)     Attached hereto as Exhibit D is a true and complete copy of a [good standing certificate] [other relevant document], certified by [the Secretary of State of [   ]] [other relevant body in foreign jurisdictions] as of a recent date;

(j)     The following persons are now duly elected and qualified Responsible Officers of the Certifying Loan Party holding the offices indicated next to their respective names below, and such officers hold such offices with the Certifying Loan Party on the date hereof, and the signatures appearing opposite their respective names below are the true and genuine signatures of such officers, and each of such officers is duly authorized to execute and deliver on behalf of the Certifying Loan Party each Loan Document to which it is a party and any certificate or other document to be delivered by the Certifying Loan Party pursuant to such Loan Documents:

---

[10]     Borrower only.

| Name | Office | Signature |
|------|--------|-----------|
|      |        | _____ |
|      |        | _____ |
|      |        | _____ |

IN WITNESS WHEREOF, the undersigned have signed this certificate as of the date first written above.

_____          _____
Name:                                        Name:
Title:                                       Title:

Exhibit A
<u>to the Closing Certificate</u>

Resolutions

Exhibit B
<u>to the Closing Certificate</u>

Certificate of [formation] [incorporation]

Exhibit C
<u>to the Closing Certificate</u>

[by-laws] [limited liability company agreement]

EXHIBIT H

## FORM OF INTERCOMPANY NOTE

March [●], 2015

  FOR VALUE RECEIVED, each of the undersigned, to the extent a borrower from time to time from any other Person listed on the signature page hereto (each, in such capacity, a "Payor"), hereby promises to pay on demand to the order of such other Person listed below (each, in such capacity, a "Payee"), in lawful money of the United States of America, or in such other currency as agreed to by such Payor and such Payee, in immediately available funds, at such location as such Payee shall from time to time designate, the unpaid principal amount of all loans and advances (including trade payables) made by such Payee to such Payor. Each Payor promises also to pay interest on the unpaid principal amount of all such loans and advances in like money at said location from the date of such loans and advances until paid at such rate per annum as shall be agreed upon from time to time by such Payor and such Payee.

  Reference is made to (i) that certain Term Loan Credit Agreement, dated as of March 11, 2015 (the "Effective Date") (as amended, restated, supplemented or otherwise modified from time to time, the "Term Loan Agreement") among Argos Holdings Inc. ("Holdings"), Argos Merger Sub Inc. ("**Merger Sub**," which on the Effective Date shall be merged with and into PetSmart, Inc., with PetSmart, Inc. surviving such merger as the Borrower) (the "Term Loan Borrower" and, under the ABL Credit Agreement (as defined herein) the "U.S. Borrower"), the Lenders party thereto and Citibank, N.A., as Administrative Agent and Collateral Agent (the "Term Agent"), (ii) that certain ABL Credit Agreement, dated as of March 11, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "ABL Credit Agreement") by and among Holdings, the U.S. Borrower, [_____] (the "Canadian Borrower" and, collectively with the U.S. Borrower, the "ABL Borrowers"), the Lenders party thereto, Citibank, N.A., as administrative agent for the Lenders thereunder (the "ABL Agent" and together with the Term Agent, the "Agents") and the other parties thereto and (iii) that certain ABL Intercreditor Agreement dated as of March 11, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "ABL Intercreditor Agreement") among Term Agent, ABL Agent, Holdings, the U.S. Borrower, the Canadian Borrower, the Guarantors and the other grantors from time to time party thereto. Capitalized terms used in this intercompany promissory note (this "Note") but not otherwise defined herein shall have the meanings given to them in the Term Loan Agreement, ABL Credit Agreement or ABL Intercreditor Agreement, as applicable.

  This Note shall be pledged by each Payee that is a Loan Party (a "Loan Party Payee") (i) to the Term Agent, for the benefit of the Term Loan Secured Parties, pursuant to the Term Loan Security Documents as collateral security for such Payee's Term Loan Debt and (ii) to the ABL Agent for the benefit of the ABL Secured Parties, pursuant to the ABL Security Documents as collateral security for such Payee's ABL Debt Obligations. Each Payee hereby acknowledges and agrees that (i) after the occurrence of and during the continuance of an Event of Default under and as defined in the Term Loan Agreement, the Term Agent may, in addition to the other rights and remedies provided pursuant to the Term Loan Security Documents and otherwise available to it, exercise all rights of the Loan Party Payees with respect to this Note and (ii) after the occurrence of and during the continuance of an Event of Default under and as defined in the ABL Credit Agreement, but subject to the terms of the ABL Intercreditor Agreement, the ABL Agent may, in addition to the other rights and remedies provided pursuant to the ABL Security Documents and otherwise available to it, exercise all rights of the Loan Party Payees with respect to this Note.

Upon the commencement of any insolvency or bankruptcy proceeding, or any receivership, liquidation, reorganization or other similar proceeding in connection therewith, relating to any Payor owing any amounts evidenced by this Note to any Loan Party, or to any property of any such Payor, or upon the commencement of any proceeding for voluntary liquidation, dissolution or other winding up of any such Payor, all amounts evidenced by this Note owing by such Payor to any and all Loan Parties shall become immediately due and payable, without presentment, demand, protest or notice of any kind.

Anything in this Note to the contrary notwithstanding, the indebtedness evidenced by this Note owed by any Payor that is a Loan Party to any Payee shall be subordinate and junior in right of payment, to the extent and in the manner hereinafter set forth, to all Obligations of such Payor to the ABL Secured Parties until the payment in full in cash of all ABL Debt Obligations (other than contingent indemnification obligations, Secured Cash Management Obligations and Secured Swap Obligations) and to all Senior Secured Obligations of such Payor to the Term Loan Secured Parties until the payment in full in cash of the Term Loan Debt (other than contingent obligations not yet due, Secured Cash Management Obligations and Secured Swap Obligations); provided that each Payor may make payments to the applicable Payee so long as no Event of Default under and as defined in either the ABL Credit Agreement or the Term Loan Agreement shall have occurred and be continuing and such Payor shall have received notice from the applicable Agent (provided that no such notice shall be required to be given in the case of any Event of Default arising under Section 7.01(h) or 7.01(i) of the Term Loan Agreement or Section 7.01(h) or 7.01(i) of the ABL Credit Agreement) (such Secured Obligations and other indebtedness and obligations in connection with any renewal, refunding, restructuring or refinancing thereof, including interest thereon accruing after the commencement of any proceedings referred to in clause (i) below, whether or not such interest is an allowed claim in such proceeding, being hereinafter collectively referred to as "Senior Indebtedness").

(i)    In the event of any insolvency or bankruptcy proceedings, and any receivership, liquidation, reorganization or other similar proceedings in connection therewith, relating to any Payor or to its property, and in the event of any proceedings for voluntary liquidation, dissolution or other winding up of such Payor (except as expressly permitted by the ABL Credit Agreement and the Term Loan Agreement), whether or not involving insolvency or bankruptcy, then, if an Event of Default (as defined in either the ABL Credit Agreement or the Term Loan Agreement) has occurred and is continuing, (x) the holders of Senior Indebtedness shall be paid in full in cash in respect of all amounts constituting Senior Indebtedness (other than contingent obligations not yet due, Secured Cash Management Obligations and Secured Swap Obligations) before any Payee is entitled to receive (whether directly or indirectly), or make any demands for, any payment on account of this Note and (y) until the holders of Senior Indebtedness are paid in full in cash in respect of all amounts constituting Senior Indebtedness (other than contingent obligations not yet due, Secured Cash Management Obligations and Secured Swap Obligations), any payment or distribution to which such Payee would otherwise be entitled (other than debt securities of such Payor that are subordinated, to at least the same extent as this Note, to the payment of all Senior Indebtedness then outstanding (such securities being hereinafter referred to as "Restructured Debt Securities")) shall be made to the holders of Senior Indebtedness.

(ii)    If any Event of Default (as defined in either the ABL Credit Agreement or the Term Loan Agreement) occurs and is continuing after prior written notice from the Agent (provided that no such notice shall be required to be given in the case of any Event of Default arising under Section 7.01(h) or 7.01(i) of the Term Loan Agreement or Section 7.01(h) or 7.01(i) of the ABL Credit Agreement) to the Borrower, then (x) no payment or distribution of any kind or character shall be made by or on behalf of the Payor, or any other Person on its behalf, with respect to this Note and (y) upon the request of the Agents, no amounts evidenced by this Note owing by

any Payor to any Payee that is a Loan Party shall be forgiven or otherwise reduced in any way, other than as a result of payment in full thereof made in cash.

(iii)    If any payment or distribution of any character, whether in cash, securities or other property (other than Restructured Debt Securities), and whether directly, by purchase, redemption, exercise of any right of setoff or otherwise, with respect to any amounts evidenced by this Note shall (despite these subordination provisions) be received by any Payee in violation of clause (i) or (ii) above prior to all Senior Indebtedness having been paid in full in cash (other than contingent obligations not yet due, Secured Cash Management Obligations and Secured Swap Obligations), such payment or distribution shall be held by such Payee in trust (segregated from other property of such Payee) for the benefit of the Agents, and shall be paid over or delivered in accordance with the ABL Intercreditor Agreement or, if no such agreement is in effect at such time, pursuant to the applicable Loan Documents.

(iv)    Each Payee agrees to file all claims against each relevant Payor in any bankruptcy or other proceeding in which the filing of claims is required by law in respect of any Senior Indebtedness, and the Agents shall be entitled to all of such Payee's rights thereunder.  If for any reason a Payee fails to file such claim at least ten Business Days prior to the last date on which such claim should be filed, such Payee hereby irrevocably appoints each Agent as its true and lawful attorney-in-fact and each Agent is hereby authorized to act as attorney-in-fact in such Payee's name to file such claim or, in such Agent's discretion, to assign such claim to and cause proof of claim to be filed in the name of such Agent or its nominee.  In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to the applicable Agent the full amount payable on the claim in the proceeding, and, to the full extent necessary for that purpose, each Payee hereby assigns to each of the Agents all of such Payee's rights to any payments or distributions to which such Payee otherwise would be entitled. If the amount so paid is greater than such Payee's liability hereunder, the applicable Agent shall pay the excess amount to the party entitled thereto under the ABL Intercreditor Agreement or, if no such agreement is in effect at such time, pursuant to the applicable Loan Documents, and applicable law.  In addition, each Payee hereby irrevocably appoints each Agent as its attorney-in-fact to exercise all of such Payee's voting rights in connection with any bankruptcy proceeding or any plan for the reorganization of each relevant Payor.

(v)    Each Payee waives the right to compel that any property of any Payor or any property of any guarantor of any Senior Indebtedness or any other Person be applied in any particular order to discharge such Senior Indebtedness.  Each Payee expressly waives the right to require the Agents or any other holder of Senior Indebtedness to proceed against any Payor, any guarantor of any Senior Indebtedness or any other Person, or to pursue any other remedy in its or their power that such Payee cannot pursue and that would lighten such Payee's burden, notwithstanding that the failure of the Agents or any such other holder to do so may thereby prejudice such Payee.  Each Payee agrees that it shall not be discharged, exonerated or have its obligations hereunder reduced by the Agents' or any other holder's of Senior Indebtedness delay in proceeding against or enforcing any remedy against any Payor, any guarantor of any Senior Indebtedness or any other Person; by the Agents or any holder of Senior Indebtedness releasing any Payor, any guarantor of any Senior Indebtedness or any other Person from all or any part of the Senior Indebtedness; or by the discharge of any Payor, any guarantor of any Senior Indebtedness or any other Person by an operation of law or otherwise, with or without the intervention or omission of the Agents or any such holder.

(vi)    Each Payee waives all rights and defenses arising out of an election of remedies by the Agents or any other holder of Senior Indebtedness, even though that election of remedies,

including any nonjudicial foreclosure with respect to any property securing any Senior Indebtedness, has impaired the value of such Payee's rights of subrogation, reimbursement, or contribution against any Payor, any guarantor of any Senior Indebtedness or any other Person. Each Payee expressly waives any rights or defenses it may have by reason of protection afforded to any Payor, any guarantor of any Senior Indebtedness or any other Person with respect to the Senior Indebtedness pursuant to any anti-deficiency laws or other laws of similar import that limit or discharge the principal debtor's indebtedness upon judicial or nonjudicial foreclosure of property or assets securing any Senior Indebtedness.

(vii)    Each Payee agrees that, without the necessity of any reservation of rights against it, and without notice to or further assent by it, any demand for payment of any Senior Indebtedness made by the Agents or any other holder of Senior Indebtedness may be rescinded in whole or in part by the Agents or such holder, and any Senior Indebtedness may be continued, and the Senior Indebtedness or the liability of any Payee, any guarantor thereof or any other Person obligated thereunder, or any right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, modified, accelerated, compromised, waived, surrendered or released by the Agents or any other holder of Senior Indebtedness, in each case without notice to or further assent by such Payee, which will remain bound hereunder, and without impairing, abridging, releasing or affecting the subordination provided for herein.

(viii)    Each Payee waives any and all notice of the creation, renewal, extension or accrual of any Senior Indebtedness, and any and all notice of or proof of reliance by holders of Senior Indebtedness upon the subordination provisions set forth herein. The Senior Indebtedness shall be deemed conclusively to have been created, contracted or incurred, and the consent to create the obligations of any Payee evidenced by this Note shall be deemed conclusively to have been given, in reliance upon the subordination provisions set forth herein.

(ix)    To the maximum extent permitted by law, each Payee waives any claim it might have against the Agents or any other holder of Senior Indebtedness with respect to, or arising out of, any action or failure to act or any error of judgment, negligence, or mistake or oversight whatsoever on the part of the Agents or any such holder, or any of their Related Parties, with respect to any exercise of rights or remedies under the Loan Documents, except to the extent due to the gross negligence or willful misconduct of the Agents or any such holder, as the case may be, or any of its Related Parties, as determined by a court of competent jurisdiction in a final and nonappealable judgment. None of the Agents, any other holder of Senior Indebtedness or any of their Related Parties shall be liable for failure to demand, collect or realize upon any guarantee of any Senior Indebtedness, or for any delay in doing so, or shall be under any obligation to sell or otherwise dispose of any property upon the request of any Payor, any Payee or any other Person or to take any other action whatsoever with regard to any such guarantee or any other property.

Each Payee and each Payor hereby agree that the subordination provisions set forth in this Note are for the benefit of each Agent and the other holders of Senior Indebtedness. Each Agent and the other holders of Senior Indebtedness are obligees under this Note to the same extent as if their names were written herein as such and the Administrative Agent may, on behalf of itself and such other holders, proceed to enforce the subordination provisions set forth herein.

All rights and interests of each Agent and the other holders of Senior Indebtedness hereunder, and the subordination provisions and the related agreements of the Payors and Payees set forth herein, shall remain in full force and effect irrespective of:

(i)     any lack of validity or enforceability of the ABL Credit Agreement, the Term Loan Agreement or any other Loan Document;

(ii)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Senior Indebtedness or any amendment or waiver or other modification, whether by course of conduct or otherwise, of, or consent to departure from, the ABL Credit Agreement, the Term Loan Agreement or any other Loan Document;

(iii)     any release, amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of or consent to departure from, any guarantee of any Senior Indebtedness; or

(iv)     any other circumstances that might otherwise constitute a defense available to, or a discharge of, any Payor in respect of any Senior Indebtedness or of any Payee or any Payor in respect of the subordination provisions set forth herein.

The indebtedness evidenced by this Note owed by any Payor that is not a Loan Party shall not be subordinated to, and shall rank *pari passu* in right of payment with, any other obligation of such Payor.

Nothing contained in the subordination provisions set forth above is intended to or will impair, as between each Payor and each Payee, the obligations of such Payor, which are absolute and unconditional, to pay to such Payee the principal of and interest on this Note as and when due and payable in accordance with its terms, or is intended to or will affect the relative rights of such Payee and other creditors of such Payor other than the holders of Senior Indebtedness.

Each Payee is hereby authorized to record all loans and advances made by it to any Payor (all of which shall be evidenced by this Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting prima facie evidence of the accuracy of the information contained therein; provided that the failure of any Payee to record such information shall not affect any Payor's obligations in respect of intercompany indebtedness extended by such Payee to such Payor.

Each Payor hereby waives diligence, presentment, demand, protest or notice of any kind whatsoever in connection with this Note. All payments under this Note shall be made without offset, counterclaim or deduction of any kind.

It is understood that this Note shall only evidence Indebtedness.

This Note shall be binding upon each Payor and its successors and assigns, and the terms and provisions of this Note shall inure to the benefit of each Payee and its successors and assigns, including subsequent holders hereof. Notwithstanding anything to the contrary contained herein, in any other Loan Document or in any other promissory note or other instrument, this Note replaces and supersedes any and all promissory notes or other instruments which create or evidence any loans or advances made on, before or after the date hereof by any Payee to Holdings or any Subsidiary.

From time to time after the date hereof, additional Subsidiaries of Holdings may become parties hereto (as Payor and/or Payee, as the case may be) by executing a counterpart signature page to this Note (each additional Subsidiary, an "Additional Party"). Upon delivery of such counterpart signature page to the Payees, notice of which is hereby waived by the other Payors, each Additional Party shall be a Payor and/or a Payee, as the case may be, and shall be as fully a party hereto as if such Additional Party were an original signatory hereof. Each Payor expressly agrees that its obligations arising hereun-

H-5

der shall not be affected or diminished by the addition or release of any other Payor or Payee hereunder. This Note shall be fully effective as to any Payor or Payee that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Payor or Payee hereunder.

        No amendment, modification or waiver of, or consent with respect to, any provisions of this Note shall be effective unless the same shall be in writing and signed and delivered by each Payor and Payee whose rights or obligations shall be affected thereby; <u>provided</u> that, until such time as (i) all the Loan Document Obligations (but excluding contingent obligations not yet due) have been paid in full in cash and (ii) all Commitments have terminated or expired, the Administrative Agent shall have provided its prior written consent to such amendment, modification, waiver or consent (such consent not to be unreasonably withheld to the extent such amendment or modification is required to comply with any Requirement of Law or is not adverse to the interests of the Lenders in any material respects).

H-6

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

[                    ]

By: _____
        Name:
        Title:

**EXHIBIT I**

**Form of Specified Discount Prepayment Notice**

Date:  [_____, 20___]

To:  [•]¹¹, as Auction Agent

Ladies and Gentlemen:

This Specified Discount Prepayment Notice is delivered to you pursuant to Section 2.09(a)(ii)(B) of that certain Credit Agreement, dated as of March 11, 2015 (as further amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement"), among Argos Holdings Inc., a Delaware corporation, Argos Merger Sub Inc., a Delaware corporation ("Merger Sub", which merged with and into PetSmart, Inc., a Delaware corporation, with PetSmart, Inc. surviving such merger as the Borrower) (the "Borrower"), the lenders from time to time party thereto and Citibank, N.A., as Administrative Agent and Collateral Agent.  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

Pursuant to Section 2.09(a)(ii)(B) of the Agreement, the Borrower hereby offers to make a Discounted Term Loan Prepayment to each [Term Lender] [and to each Additional Lender of the [●, 20●]¹² tranche[s] of Loans] on the following terms:

1. This Borrower Offer of Specified Discount Prepayment is available only to each [Term Lender] [and to each Additional Lender of the [●, 20●]¹³ tranche[s] of Loans].

2. The maximum aggregate outstanding amount of the Discounted Loan Prepayment that will be made in connection with this offer shall not exceed $[●] of [Term Loans] [and $[●] of the [●, 20●]¹⁴ tranche[(s) of Loans] (the "Specified Discount Prepayment Amount").¹⁵

3. The percentage discount to par value at which such Discounted Loan Prepayment will be made is [●]% in respect of the [Term Loans] [and [●]% in respect of the [●, 20●]¹⁶ tranche[(s) of Loans] (the "Specified Discount").

---

11    To be (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Loan Prepayment pursuant to Section **Error! Reference source not found.** of the Credit Agreement; provided that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent)

12    List multiple tranches if applicable.

13    List multiple tranches if applicable.

14    List multiple tranches if applicable.

15    Minimum of $10.0 million and whole increments of $1.0 million.

16    List multiple tranches if applicable.

I-1

To accept this offer, you are required to submit to the Administrative Agent a Specified Discount Prepayment Response on or before 5:00 p.m. New York time on the date that is three (3) Business Days following the date of delivery of this notice pursuant to Section 2.09(a)(ii)(B) of the Agreement.

The Borrower hereby represents and warrants to the Administrative Agent [and the Lenders][, the Lenders and each Additional Lender of the [●, 20●][17] tranche[s] of Loans] that [at least ten (10) Business Days have passed since the consummation of the most recent Discounted Loan Prepayment as a result of a prepayment made by the Borrower on the applicable Discounted Prepayment Effective Date.][at least three (3) Business Days have passed since the date the Borrower was notified that no Lender was willing to accept any prepayment of any Loan and/or Other Loan at the Specified Discount, within the Discount Range or at any discount to par value, as applicable, or in the case of Borrower Solicitation of Discounted Prepayment Offers, the date of the Borrower's election not to accept any Solicited Discounted Prepayment Offers made by a Lender.][18]

The Borrower acknowledges that the Auction Agent and the relevant Lenders are relying on the truth and accuracy of the foregoing representations and warranties in connection with their decision whether or not to accept the offer set forth in this Specified Discount Prepayment Notice and the acceptance of any prepayment made in connection with this Specified Discount Prepayment Notice.

The Borrower requests that Auction Agent promptly notify each of the relevant Lenders party to the Agreement of this Specified Discount Prepayment Notice.

[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]

---

[17]     List multiple tranches if applicable.

[18]     Insert applicable representation.

IN WITNESS WHEREOF, the undersigned has executed this Specified Discount Pre-payment Notice as of the date first above written.

PetSmart, Inc.

By: _____
Name:
Title:

Enclosure:  Form of Specified Discount Prepayment Response

**EXHIBIT J**

**Form of Specified Discount Prepayment Response**

Date:  [_____, 20__]

To:  [•][19], as Auction Agent

Ladies and Gentlemen:

Reference is made to (a) that certain Credit Agreement, dated as of March 11, 2015 (as further amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement"), among Argos Holdings Inc., a Delaware corporation, Argos Merger Sub Inc., a Delaware corporation ("Merger Sub", which merged with and into PetSmart, Inc., a Delaware corporation, with PetSmart, Inc. surviving such merger as the Borrower) (the "Borrower"), the lenders from time to time party thereto and Citibank, N.A., as Administrative Agent and the Collateral Agent, and (b) that certain Specified Discount Prepayment Notice, dated [_____, 20__], from the Borrower (the "Specified Discount Prepayment Notice").  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such terms in the Specified Discount Prepayment Notice or, to the extent not defined therein, in the Agreement.

The undersigned [Lender] [Additional Lender] hereby gives you irrevocable notice, pursuant to Section 2.09(a)(ii)(B) of the Agreement, that it is willing to accept a prepayment of the following [tranches of] Loans held by such [Lender] [Additional Lender] at the Specified Discount in an aggregate outstanding amount as follows:

[Term Loans - $[•]]

[[•, 20•][20] tranche[s] of Loans - $[•]]

The undersigned [Lender] [Additional Lender] hereby expressly consents and agrees to a prepayment of its [Loans][[•, 20•][21] tranche[s]] pursuant to Section 2.09(a)(ii)(B) of the Agreement at a price equal to the [applicable] Specified Discount in the aggregate outstanding amount not to exceed the amount set forth above, as such amount may be reduced in accordance with the Specified Discount Proration, and as otherwise determined in accordance with and subject to the requirements of the Agreement.

[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]

---

[19]    To be (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Loan Prepayment pursuant to Section **Error! Reference source not found.** of the Credit Agreement; provided that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent)

[20]    List multiple tranches if applicable.

[21]    List multiple tranches if applicable.

IN WITNESS WHEREOF, the undersigned has executed this Specified Discount Pre-payment Response as of the date first above written.

[                    ]

By: _____
Name
Title:


By: _____
Name
Title:

EXHIBIT K

**Form of Discount Range Prepayment Notice**

Date:  [_____, 20___]

To:  [•][22], as Auction Agent

Ladies and Gentlemen:

This Discount Range Prepayment Notice is delivered to you pursuant to Section 2.09(a)(ii)(C) of that certain Credit Agreement, dated as of March 11, 2015, (as further amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement"), among Argos Holdings Inc., a Delaware corporation, Argos Merger Sub Inc., a Delaware corporation ("Merger Sub," which merged with and into PetSmart, Inc., a Delaware corporation, with PetSmart, Inc. surviving such merger as the Borrower) (the "Borrower"), the lenders from time to time party thereto and Citibank, N.A., as Administrative Agent and the Collateral Agent.  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

Pursuant to Section 2.09(a)(ii)(C) of the Agreement, the Borrower hereby requests that each [Term Lender] [and each Lender of the [•, 20•][23] tranche[s] of Loans] submit a Discount Range Prepayment Offer.  Any Discounted Loan Prepayment made in connection with this solicitation shall be subject to the following terms:

1.      This Borrower Solicitation of Discount Range Prepayment Offers is extended at the sole discretion of the Borrower to each [Term Lender] [and to each Additional Lender of the [•, 20•][24] tranche[s] of Loans].

2.      The maximum aggregate outstanding amount of the Discounted Loan Prepayment that will be made in connection with this solicitation is $[•] of [Term Loans] [and $[•] of the [•, 20•][25] tranche[(s)] of Loans] (the "Discount Range Prepayment Amount").[26]

3.      The Borrower is willing to make Discount Loan Prepayments at a percentage discount to par value greater than or equal to [•]% but less than or equal to [•]% in respect of the

---

[22]     To be (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Loan Prepayment pursuant to Section **Error! Reference source not found.** of the Credit Agreement; provided that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent)

[23]     List multiple tranches if applicable.

[24]     List multiple tranches if applicable.

[25]     List multiple tranches if applicable.

[26]     Minimum of $10.0 million and whole increments of $1.0 million.

[Term Loans] [and greater than or equal to [●]% but less than or equal to [●]% in respect of the [●, 20●][27] tranche[(s)] of Loans] (the "Discount Range").

To make an offer in connection with this solicitation, you are required to deliver to the Administrative Agent a Discount Range Prepayment Offer on or before 5:00 p.m. New York time on the date that is three (3) Business Days following the dated delivery of the notice pursuant to Section 2.09(a)(ii)(C) of the Agreement.

The Borrower hereby represents and warrants to the Auction Agent [and the Lenders][, the Lenders and each Additional Lender of the [●, 20●][28] tranche[s] of Loans] that [at least ten (10) Business Days have passed since the consummation of the most recent Discounted Loan Prepayment as a result of a prepayment made by the Borrower on the applicable Discounted Prepayment Effective Date.][at least three (3) Business Days have passed since the date the Borrower was notified that no Lender was willing to accept any prepayment of any Loan and/or Other Loan at the Specified Discount, within the Discount Range or at any discount to par value, as applicable, or in the case of Borrower Solicitation of Discounted Prepayment Offers, the date of the Borrower's election not to accept any Solicited Discounted Prepayment Offers made by a Lender.][29]

The Borrower acknowledges that the Auction Agent and the relevant Lenders are relying on the truth and accuracy of the foregoing representations and warranties in connection with any Discount Range Prepayment Offer made in response to this Discount Range Prepayment Notice and the acceptance of any prepayment made in connection with this Discount Range Prepayment Notice.

The Borrower requests that Auction Agent promptly notify each of the relevant Lenders party to the Agreement of this Discount Range Prepayment Notice.

[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]

---

[27]     List multiple tranches if applicable.

[28]     List multiple tranches if applicable.

[29]     Insert applicable representation.

IN WITNESS WHEREOF, the undersigned has executed this Discount Range Prepayment Notice as of the date first above written.

PetSmart, Inc.

By: _____
Name:
Title:

Enclosure:  Form of Discount Range Prepayment Offer

[SIGNATURE PAGE]
K-3

EXHIBIT L

**Form of Discount Range Prepayment Offer**

Date:  [_____, 20__]

To:  [•][30], as Auction Agent

Ladies and Gentlemen:

Reference is made to (a) that certain Credit Agreement, dated as of March 11, 2015, (as further amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement"), among Argos Holdings Inc., a Delaware corporation, Argos Merger Sub Inc., a Delaware corporation ("Merger Sub," which merged with and into PetSmart, Inc., a Delaware corporation, with PetSmart, Inc. surviving such merger as the Borrower) (the "Borrower"), the lenders from time to time party thereto and Citibank, N.A., as Administrative Agent and the Collateral Agent, and (b) that certain Discount Range Prepayment Notice, dated [_____, 20__], from the Borrower (the "Discount Range Prepayment Notice").  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such terms in the Discount Range Prepayment Notice or, to the extent not defined therein, in the Agreement.

The undersigned [Lender] [Additional Lender] hereby gives you irrevocable notice, pursuant to Section 2.09(a)(ii)(C) of the Agreement, that it is hereby offering to accept a Discounted Term Loan Prepayment on the following terms:

1.      This Discount Range Prepayment Offer is available only for prepayment on the [Term Loans] [and the [•, 20•][31] tranche[s] of Loans] held by the undersigned.

2.      The maximum aggregate outstanding amount of the Discounted Loan Prepayment that may be made in connection with this offer shall not exceed (the "Submitted Amount"):

[Term Loans - $[•]]

[[•, 20•][32] tranche[s] of Loans - $[•]]

3.      The percentage discount to par value at which such Discounted Loan Prepayment may be made is [•]% in respect of the [Term Loans] [and [•]% in respect of the [•, 20•][33] tranche[(s)] of Loans] (the "Submitted Discount").

---

[30]    To be (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Loan Prepayment pursuant to Section **Error! Reference source not found.** of the Credit Agreement; provided that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent)

[31]    List multiple tranches if applicable.

[32]    List multiple tranches if applicable.

[33]    List multiple tranches if applicable.

The undersigned [Lender] [Additional Lender] hereby expressly consents and agrees to a prepayment of its [Term Loans] [[●, 20●][34] tranche[s] of Loans] indicated above pursuant to Section 2.11(a)(ii)(C) of the Agreement at a price equal to the Applicable Discount and in an aggregate outstanding amount not to exceed the Submitted Amount, as such amount may be reduced in accordance with the Discount Range Proration, if any, and as otherwise determined in accordance with and subject to the requirements of the Agreement.

[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]

---

[34]     List multiple tranches if applicable.

IN WITNESS WHEREOF, the undersigned has executed this Discount Range Prepayment Offer as of the date first above written.

[                    ]

By: _____
     Name
     Title:

By: _____
     Name
     Title:

EXHIBIT M

**Form of Solicited Discounted Prepayment Notice**

Date:  [_____, 20___]

To:  [•]<sup>35</sup>, as Auction Agent

Ladies and Gentlemen:

   This Solicited Discounted Prepayment Notice is delivered to you pursuant to <u>Section 2.09(a)(ii)(D)</u> of that certain Credit Agreement, dated as of March 11, 2015, (as further amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "<u>Agreement</u>"), among Argos Holdings Inc., a Delaware corporation, Argos Merger Sub Inc., a Delaware corporation ("<u>Merger Sub</u>," which merged with and into PetSmart, Inc., a Delaware corporation, with PetSmart, Inc. surviving such merger as the Borrower) (the "<u>Borrower</u>"), the lenders from time to time party thereto and Citibank, N.A., as Administrative Agent and the Collateral Agent.  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

   Pursuant to <u>Section 2.09(a)(ii)(D)</u> of the Agreement, the Borrower hereby requests that each [Term Lender] [and to each Additional Lender of the [•, 20•]<sup>36</sup> tranche[s] of Loans] submit a Solicited Discounted Prepayment Offer.  Any Discounted Loan Prepayment made in connection with this solicitation shall be subject to the following terms:

   1. This Borrower Solicitation of Discounted Prepayment Offers is extended at the sole discretion of the Borrower to each [Term Lender] [and to each Additional Lender of the [•, 20•]<sup>37</sup> tranche[s] of Loans].

   2. The maximum aggregate outstanding amount of the Discounted Loan Prepayment that will be made in connection with this solicitation is (the "<u>Solicited Discounted Prepayment Amount</u>"):<sup>38</sup>

   [Term Loans - $[•]]

   [[•, 20•]<sup>39</sup> tranche[s] of Loans - $[•]]

---

<sup>35</sup> To be (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Loan Prepayment pursuant to Section **Error! Reference source not found.** of the Credit Agreement; <u>provided</u> that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent)

<sup>36</sup> List multiple tranches if applicable.

<sup>37</sup> List multiple tranches if applicable.

<sup>38</sup> Minimum of $10.0 million and whole increments of $1.0 million.

<sup>39</sup> List multiple tranches if applicable.

To make an offer in connection with this solicitation, you are required to deliver to the Administrative Agent a Solicited Discounted Prepayment Offer on or before 5:00 p.m. New York time on the date that is three (3) Business Days following delivery of this notice pursuant to Section 2.09(a)(ii)(D) of the Agreement.

The Borrower requests that Auction Agent promptly notify each of the relevant Lenders party to the Agreement of this Solicited Discounted Prepayment Notice.

[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned has executed this Solicited Discounted Pre-payment Notice as of the date first above written.

PetSmart, Inc.

By: _____
Name:
Title:

Enclosure:  Form of Solicited Discounted Prepayment Offer

**EXHIBIT N**

**Form of Solicited Discounted Prepayment Offer**

Date:  [_____, 20___]

To:  [•][40], as Auction Agent

Ladies and Gentlemen:

Reference is made to (a) that certain Credit Agreement, dated as of March 11, 2015, (as further amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement"), among Argos Holdings Inc., a Delaware corporation, Argos Merger Sub Inc., a Delaware corporation ("Merger Sub," which merged with and into PetSmart, Inc., a Delaware corporation, with PetSmart, Inc. surviving such merger as the Borrower) (the "Borrower"), the lenders from time to time party thereto and Citibank, N.A., as Administrative Agent and the Collateral Agent, and (b) that certain Solicited Discounted Prepayment Notice, dated [_____, 20___], from the Borrower (the "Solicited Discounted Prepayment Notice").  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such terms in the Solicited Discounted Prepayment Notice or, to the extent not defined therein, in the Agreement.

To accept the offer set forth herein, you must submit an Acceptance and Prepayment Notice on or before the third Business Day following your receipt of this notice.

The undersigned [Lender] [Additional Lender] hereby gives you irrevocable notice, pursuant to Section 2.09(a)(ii)(D) of the Agreement, that it is hereby offering to accept a Discounted Loan Prepayment on the following terms:

1.      This Solicited Discounted Prepayment Offer is available only for prepayment on the [Term Loans] [[●, 20●][41] tranche[s] of Loans] held by the undersigned.

2.      The maximum aggregate outstanding amount of the Discounted Loan Prepayment that may be made in connection with this offer shall not exceed (the "Offered Amount"):

[Term Loans - $[●]]

[[●, 20●][42] tranche[s] of Loans - $[●]]

---

[40]     To be (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Loan Prepayment pursuant to Section **Error! Reference source not found.** of the Credit Agreement; provided that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent)

[41]     List multiple tranches if applicable.

[42]     List multiple tranches if applicable.

3.      The percentage discount to par value at which such Discounted Loan Prepayment may be made is [●]% in respect of the [Term Loans] [and [●]% in respect of the [●, 20●][43] tranche[(s)] of Loans] (the "Offered Discount").

The undersigned [Lender] [Additional Lender] hereby expressly consents and agrees to a prepayment of its [Term Loans] [[●, 20●][44] tranche[s] of Loans] pursuant to Section 2.09(a)(ii)(D) of the Agreement at a price equal to the Acceptable Discount and in an aggregate outstanding amount not to exceed such Lender's Offered Amount as such amount may be reduced in accordance with the Solicited Discount Proration, if any, and as otherwise determined in accordance with and subject to the requirements of the Agreement.

[REMINDER OF THE PAGE INTENTIONALLY LEFT BLANK]

---

[43]      List multiple tranches if applicable.

[44]      List multiple tranches if applicable.

N-2

IN WITNESS WHEREOF, the undersigned has executed this Solicited Discounted Pre-payment Offer as of the date first above written.

[                    ]

By: _____
Name
Title:


By: _____
Name
Title:

EXHIBIT O

**Form of Acceptance and Prepayment Notice**

Date:  [_____, 20___]

To:  [•]⁴⁵, as Auction Agent

Ladies and Gentlemen:

This Acceptance and Prepayment Notice is delivered to you pursuant to Section 2.09(a)(ii)(D) of that certain Credit Agreement, dated as of March 11, 2015, (as further amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement"), among Argos Holdings Inc., a Delaware corporation, Argos Merger Sub Inc., a Delaware corporation ("Merger Sub," which merged with and into PetSmart, Inc., a Delaware corporation, with PetSmart, Inc. surviving such merger as the Borrower) (the "Borrower"), the lenders from time to time party thereto and Citibank, N.A., as Administrative Agent and the Collateral Agent.  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

Pursuant to Section 2.09(a)(ii)(D) of the Agreement, the Borrower hereby irrevocably notifies you that it accepts offers delivered in response to the Solicited Discounted Prepayment Notice having an Offered Discount equal to or greater than [●]% in respect of the [Term Loans] [and [●]% in respect of the [●, 20●]⁴⁶ tranche[(s) of Loans] (the "Acceptable Discount") in an aggregate amount not to exceed the Solicited Discounted Prepayment Amount.

The Borrower expressly agrees that this Acceptance and Prepayment Notice shall be irrevocable and is subject to the provisions of Section 2.09(a)(ii)(D) of the Agreement.

The Borrower hereby represents and warrants to the Auction Agent [and the Lenders][and the Lenders and each Additional Lender of the [●, 20●]⁴⁷ tranche[s] of Loans] that [at least ten (10) Business Days have passed since the consummation of the most recent Discounted Loan Prepayment as a result of a prepayment made by the Borrower on the applicable Discounted Prepayment Effective Date.][At least three (3) Business Days have passed since the date the Borrower was notified that no Lender was willing to accept any prepayment of any Loan and/or Other Loan at the Specified Discount, within the Discount Range or at any discount to par value, as applicable, or in the case of Borrower Solicitation of Discounted Prepayment Offers, the date of the Borrower's election not to accept any Solicited Discounted Prepayment Offers made by a Lender.]⁴⁸

---

⁴⁵    To be (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Loan Prepayment pursuant to Section **Error! Reference source not found.** of the Credit Agreement; provided that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent)

⁴⁶    List multiple tranches if applicable.

⁴⁷    List multiple tranches if applicable.

⁴⁸    Insert applicable representation.

The Borrower acknowledges that the Auction Agent and the relevant Lenders are relying on the truth and accuracy of the foregoing representations and warranties in connection with the acceptance of any prepayment made in connection with a Solicited Discounted Prepayment Offer.

The Borrower requests that Auction Agent promptly notify each of the relevant Lenders party to the Agreement of this Acceptance and Prepayment Notice.

[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned has executed this Acceptance and Prepayment Notice as of the date first above written.

PetSmart, Inc.

By: _____
Name:
Title:

**EXHIBIT P-1**

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Non-U.S. Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to that certain Credit Agreement (the "Credit Agreement") dated as of March 11, 2015, (as further amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), among Argos Holdings Inc., a Delaware corporation, Argos Merger Sub Inc., a Delaware corporation ("Merger Sub," which merged with and into PetSmart, Inc., a Delaware corporation, with PetSmart, Inc. surviving such merger as the Borrower) (the "Borrower"), the lenders from time to time party thereto, Citibank, N.A., as Administrative Agent and Collateral Agent, and certain other parties thereto. Capitalized terms used herein but not otherwise defined shall have the meaning given to such term in the Credit Agreement.

Pursuant to the provisions of Section 2.15(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (v) no payments in connection with any Loan Document are effectively connected with the undersigned's conduct of a United States trade or business.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. person status on Internal Revenue Service Form W-8BEN or W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent in writing and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which payment is to be made to the undersigned, or in either of the two calendar years preceding such payment.

[Signature Page Follows]

[Lender]

By: _____
      Name:
      Title:

[Address]

Dated: _____, 20[  ]

**EXHIBIT P-2**

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Non-U.S. Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to that certain Credit Agreement (the "Credit Agreement") dated as of March 11, 2015, (as further amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), among Argos Holdings Inc., a Delaware corporation, Argos Merger Sub Inc., a Delaware corporation ("Merger Sub," which merged with and into PetSmart, Inc., a Delaware corporation, with PetSmart, Inc. surviving such merger as the Borrower) (the "Borrower"), the lenders from time to time party thereto, Citibank, N.A., as Administrative Agent and Collateral Agent, and certain other parties thereto.  Capitalized terms used herein but not otherwise defined shall have the meaning given to such term in the Credit Agreement.

Pursuant to the provisions of Section 2.15(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any note(s) evidencing such Loan(s)), (iii) neither the undersigned nor any of its direct or indirect partners/members is a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (vi) no payments in connection with any Loan Document are effectively connected with the undersigned's or its direct or indirect partners'/members' conduct of  a United States trade or business.

The undersigned has furnished the Administrative Agent and the Borrower with Internal Revenue Service Form W-8IMY accompanied by one of the following forms from each of its direct or indirect partners/members that is claiming the portfolio interest exemption: (i) an Internal Revenue Service Form W-8BEN or W-8BEN-E or (ii) an Internal Revenue Service Form W-8IMY accompanied by an Internal Revenue Service Form W-8BEN or W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent in writing and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[Signature Page Follows]

[Lender]

By: _____
    Name:
    Title:


[Address]


Dated: _____, 20[  ]

EXHIBIT P-3

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Non-U.S. Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to that certain Credit Agreement (the "Credit Agreement") dated as of March 11, 2015, (as further amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), among Argos Holdings Inc., a Delaware corporation, Argos Merger Sub Inc., a Delaware corporation ("Merger Sub," which merged with and into PetSmart, Inc., a Delaware corporation, with PetSmart, Inc. surviving such merger as the Borrower) (the "Borrower"), the lenders from time to time party thereto, Citibank, N.A., as Administrative Agent and Collateral Agent, and certain other parties thereto. Capitalized terms used herein but not otherwise defined shall have the meaning given to such term in the Credit Agreement.

Pursuant to the provisions of Section 2.15(e) and Section 9.04(c) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code and (v) no payments in connection with any Loan Document are effectively connected with the undersigned's conduct of a United States trade or business.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. person status on Internal Revenue Service Form W-8BEN or W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[Signature Page Follows]

[Participant]

By: _____
      Name:
      Title:


[Address]


Dated: _____, 20[  ]

**EXHIBIT P-4**

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Non-U.S. Participants That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to that certain Credit Agreement (the "Credit Agreement") dated as of March 11, 2015, (as further amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement"), among Argos Holdings Inc., a Delaware corporation, Argos Merger Sub Inc., a Delaware corporation ("Merger Sub," which merged with and into PetSmart, Inc., a Delaware corporation, with PetSmart, Inc. surviving such merger as the Borrower) (the "Borrower"), the lenders from time to time party thereto, Citibank, N.A., as Administrative Agent and Collateral Agent, and certain other parties thereto. Capitalized terms used herein but not otherwise defined shall have the meaning given to such term in the Credit Agreement.

Pursuant to the provisions of Section 2.15(e) and Section 9.04(c) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) neither the undersigned nor any of its direct or indirect partners/members is a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code and (vi) no payments in connection with any Loan Document are effectively connected with the undersigned's or its direct or indirect partners/members' conduct of a United States trade or business.

The undersigned has furnished its participating Lender with Internal Revenue Service Form W-8IMY accompanied by one of the following forms from each of its direct or indirect partners/members that is claiming the portfolio interest exemption: (i) an Internal Revenue Service Form W-8BEN or W-8BEN-E or (ii) an Internal Revenue Service Form W-8IMY accompanied by an Internal Revenue Service Form W-8BEN or W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[Signature Page Follows]

[Participant]

By: _____

Name:

Title:

[Address]

Dated: _____, 20[ ]

EXHIBIT Q

[*Form of Mortgage*]

This instrument was prepared in
consultation with counsel in the state
in which the Mortgaged Property is located
by the attorney named below, and after
recording, please return to:

[_____]

## MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND LEASES AND FIXTURE FILING

**by and from**

**[_____]**

*"Mortgagor"*

**to**

**CITIBANK, N.A.,**
**in its capacity as Collateral Agent**

*"Mortgagee"*

**Dated as of [_____] [__], 20[__]**

**Relating to Premises in:**
**[_____] County, [_____]**

## MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND LEASES AND FIXTURE FILING

THIS MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND LEASES AND FIXTURE FILING (this "**Mortgage**") is executed as of [_____] [__], 20[__] by and from [_____], a [_____] [_____], as mortgagor, assignor and debtor (in such capacities and together with any successors in such capacities, "**Mortgagor**"), whose address is [_____], in favor of **CITIBANK, N.A.**, having an address at [_____], as Administrative Agent and Collateral Agent for the benefit of the Secured Parties, as mortgagee, assignee and secured party (in such capacities and, together with its successors and assigns in such capacities, the "**Mortgagee**").

WHEREAS, ARGOS HOLDINGS INC. ("**Initial Holdings**"), PETSMART, INC. (as the survivor of Merger with Merger Sub, the "**Borrower**") are parties to that certain Credit Agreement, dated as of March 11, 2015 (as the same may be amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "**Credit Agreement**"), among Initial Holdings, the Borrower, the Lenders party thereto, CITIBANK, N.A., as Administrative Agent and as Collateral Agent, BARCLAYS BANK PLC, as syndication agent (the "**Syndication Agent**") and DEUTSCHE BANK SECURITIES INC., NOMURA SECURITIES INTERNATIONAL, INC. and JEFFERIES FINANCE LLC, as co-documentation agents (the "**Co-Documentation Agents**");

WHEREAS, pursuant to the Credit Agreement, the Lenders have severally agreed to extend credit to the Borrower upon the terms and subject to the conditions set forth therein;

WHEREAS, pursuant to the Guarantee Agreement, Mortgagor has agreed to unconditionally and irrevocably guarantee, as primary obligor and not merely as surety, to the Guaranteed Parties (as defined therein) the prompt and complete payment and performance when due of the Secured Obligations;[49]

WHEREAS, Mortgagor acknowledges that it will derive substantial direct and indirect benefit from the extensions of credit to Borrower pursuant to the Credit Agreement; and[50]

WHEREAS, it is a condition to the obligations of the Lenders to make their respective extensions of credit to the Borrower under the Credit Agreement that the Mortgagor shall have executed and delivered this Mortgage to the Mortgagee for the benefit of the Secured Parties.

NOW, THEREFORE, in consideration of the Mortgaged Property and to induce the Administrative Agent, the Collateral Agent and the Lenders to enter into the Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrower under the

---

[49] To be revised/deleted if Mortgagor = Borrower

[50] To be revised if Mortgagor = Borrower

Credit Agreement, and for other good and valuable consideration the sufficiency of which is hereby acknowledged, the Mortgagor hereby agrees with the Mortgagee, for the benefit of the Secured Parties, as follows:

## DEFINITIONS

**Definitions.**  All capitalized terms used herein without definition shall have the respective meanings ascribed to them in the Credit Agreement.  The rules of construction specified in Section 1.03 of the Credit Agreement also apply to this Mortgage.  As used herein, the following terms shall have the following meanings:

"*Charges*":  shall mean any and all present and future real estate, property and other taxes, assessments and special assessments, levies, fees, all water and sewer rents and charges and all other governmental charges imposed upon or assessed against, and all claims (including, without limitation, claims for landlords', carriers', mechanics', workmen's, repairmen's, laborer's, materialmen's, suppliers' and warehousemen's liens and other claims arising by operation of law), judgments or demands against, all or any portion of the Mortgaged Property or other amounts of any nature which, if unpaid, might result in or permit the creation of, a Lien on the Mortgaged Property or which might result in foreclosure of all or any portion of the Mortgaged Property except, in each case, Permitted Liens.

"*Mortgaged Property*":  The fee interest in the real property described in <u>Exhibit A</u> attached hereto and incorporated herein by this reference, together with any greater estate therein as hereafter may be acquired by Mortgagor and all of Mortgagor's right, title and interest in, to and under all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances appertaining to the foregoing in each case whether now owned or hereinafter acquired, including without limitation all water rights, mineral, oil and gas rights, easements and rights of way (collectively, the "*Land*"), and all of Mortgagor's right, title and interest now or hereafter acquired in, to and under (1) all buildings, structures and other improvements now owned or hereafter acquired by Mortgagor, now or at any time situated, placed or constructed upon the Land (the "*Improvements*"; the Land and Improvements are collectively referred to as the "*Premises*"), (2) all materials, supplies, equipment, apparatus and other items of personal property now owned or hereafter acquired by Mortgagor and now or hereafter attached to, installed in or used in connection with any of the Improvements or the Land, and water, gas, electrical, telephone, storm and sanitary sewer facilities and all other utilities whether or not situated in easements, and all equipment, inventory and other goods in which Mortgagor now has or hereafter acquires any rights or any power to transfer rights and that are or are to become fixtures (as defined in the UCC, defined below) related to the Land (the "*Fixtures*"), (3) all goods, accounts, inventory, general intangibles, instruments, documents, contract rights and chattel paper, including all such items as defined in the UCC, now owned or hereafter acquired by Mortgagor and now or hereafter affixed to, placed upon, used in connection with, arising from or otherwise related to the Premises (the "*Personalty*"), (4) all reserves, escrows or impounds required under the Credit Agreement or any of

the other Loan Documents and all of Mortgagor's right, title and interest in all reserves, deferred payments, deposits, refunds and claims of any nature relating to the Mortgaged Property (the "***Deposit Accounts***"), (5) all leases, licenses, concessions, occupancy agreements or other agreements (written or oral, now or at any time in effect) which grant to any Person a possessory interest in, or the right to use, all or any part of the Mortgaged Property, together with all related security and other deposits (the "***Leases***"), (6) all of the rents, revenues, royalties, income, proceeds, profits, accounts receivable, security and other types of deposits, and other benefits paid or payable by parties to the Leases for using, leasing, licensing, possessing, operating from, residing in, selling or otherwise enjoying the Mortgaged Property (the "***Rents***"), (7) all other agreements, such as construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, service contracts, listing agreements, guaranties, indemnities, warranties, permits, licenses, certificates and entitlements in any way relating to the construction, use, occupancy, operation, maintenance, enjoyment or ownership of the Mortgaged Property (the "***Property Agreements***"), (8) all property tax refunds payable with respect to the Mortgaged Property (the "***Tax Refunds***"), (9) all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof (the "***Proceeds***"), (10) all insurance policies, unearned premiums therefor and proceeds from such policies covering any of the above property now or hereafter acquired by Mortgagor (the "***Insurance***"), (11) all awards, damages, remunerations, reimbursements, settlements or compensation heretofore made or hereafter to be made by any governmental authority pertaining to any condemnation or other taking (or any purchase in lieu thereof) of all or any portion of the Land, Improvements, Fixtures or Personalty (the "***Condemnation Awards***") and (12) any and all right, title and interest of Mortgagor in and to any and all drawings, plans, specifications, file materials, operating and maintenance records, catalogues, tenant lists, correspondence, advertising materials, operating manuals, warranties, guarantees, appraisals, studies and data relating to the Mortgaged Property or the construction of any alteration relating to the Premises or the maintenance of any Property Agreement (the "***Records***").  As used in this Mortgage, the term "Mortgaged Property" shall mean all or, where the context permits or requires, any portion of the above or any interest therein, *provided*, *however*, that the Mortgaged Property shall not include any assets (real or personal) constituting Excluded Assets (as such term is defined in the Credit Agreement).

"***Permitted Liens***": means any Lien permitted by Section 6.02 of the Credit Agreement or any Lien otherwise consented to by the Mortgagee.

"***UCC***":  The Uniform Commercial Code of [_____], or, if the creation, perfection and enforcement of any security interest herein granted is governed by the laws of a state other than [_____], then, as to the matter in question, the Uniform Commercial Code in effect in that state.

# GRANT

**Grant.** To secure the full and timely payment and performance, as the case may be, in full of all Secured Obligations, Mortgagor hereby MORTGAGES, WARRANTS, GRANTS, BARGAINS, ASSIGNS, SELLS, TRANSFERS, CONVEYS and CONFIRMS, to the Mortgagee and its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Mortgagee a security interest in and lien upon, the Mortgaged Property whether now owned or hereafter acquired, subject, however, only to Permitted Liens.

**Secured Obligations**. This Mortgage secures, and the Mortgaged Property is collateral security for, the payment and performance in full when due of the Secured Obligations.

**Future Advances**. This Mortgage shall secure all Secured Obligations including, without limitation, future advances whenever hereafter made with respect to or under the Credit Agreement or the other Loan Documents and shall secure not only Secured Obligations with respect to presently existing indebtedness under the Credit Agreement or the other Loan Documents, but also any and all other indebtedness which may hereafter be owing to the Secured Parties under the Credit Agreement or the other Loan Documents, however incurred, whether interest, discount or otherwise, and whether the same shall be deferred, accrued or capitalized, including future advances and re-advances, pursuant to the Credit Agreement or the other Loan Documents, whether such advances are obligatory or to be made at the option of the Secured Parties, or otherwise, and any extensions, refinancings, modifications or renewals of all such Secured Obligations whether or not Mortgagor executes any extension agreement or renewal instrument and, in each case, to the same extent as if such future advances were made on the date of the execution of this Mortgage.

**No Release**. Nothing set forth in this Mortgage shall relieve Mortgagor from the performance of any term, covenant, condition or agreement on Mortgagor's part to be performed or observed under or in respect of any of the Mortgaged Property or from any liability to any Person under or in respect of any of the Mortgaged Property or shall impose any obligation on Mortgagee or any other Secured Party to perform or observe any such term, covenant, condition or agreement on Mortgagor's part to be so performed or observed or shall impose any liability on Mortgagee or any other Secured Party for any act or omission on the part of Mortgagor relating thereto or for any breach of any representation or warranty on the part of Mortgagor contained in this Mortgage or any other Loan Document, or under or in respect of the Mortgaged Property or made in connection herewith or therewith. The obligations of Mortgagor contained in this Section 2.4 shall survive the termination hereof and the discharge of Mortgagor's other obligations under this Mortgage or the other Loan Documents.

# WARRANTIES, REPRESENTATIONS AND COVENANTS

Mortgagor warrants, represents and covenants to Mortgagee as follows:

**Title to Mortgaged Property and Lien of this Instrument.** Mortgagor has good and indefeasible fee simple title to the Mortgaged Property free and clear of any liens, claims or interests, except the Permitted Liens. This Mortgage creates a valid, enforceable first priority lien and security interest in favor of Mortgagee against the Mortgaged Property for the benefit of the Secured Parties securing the payment and performance of the Secured Obligations subject only to Permitted Liens. Upon recordation in the official real estate records in the county (or other applicable jurisdiction) in which the Mortgaged Property is located, this Mortgage will constitute a valid and enforceable first priority mortgage lien on the Mortgaged Property in favor of Mortgagee for the benefit of the Secured Parties subject only to Permitted Liens.

**First Lien Status.** Mortgagor shall preserve and protect the first lien and security interest status of this Mortgage. If any lien or security interest other than a Permitted Lien is asserted against the Mortgaged Property, Mortgagor shall promptly take such action as may be required pursuant to the Credit Agreement so as to cause it to be released or contested (including, if applicable, the requirement of providing a bond or other security reasonably satisfactory to Mortgagee).

**Replacement of Fixtures and Personalty.** Mortgagor shall not, without the prior written consent of Mortgagee, permit any of the Fixtures or Personalty owned or leased by Mortgagor to be removed at any time from the Land or Improvements, unless the removed item is removed temporarily for its protection, maintenance or repair or is not prohibited from being removed by the Credit Agreement, the Collateral Agreement or any other Loan Document.

**Inspection.** Pursuant to Section 5.08 of the Credit Agreement, Mortgagor shall permit Mortgagee and its agents, representatives and employees, upon reasonable prior notice to Mortgagor, to inspect the Mortgaged Property and all books and records of Mortgagor located thereon.

**Insurance; Condemnation Awards and Insurance Proceeds.**

Insurance. Mortgagor shall maintain or cause to be maintained the insurance required by the Credit Agreement and any other Loan Document. If any portion of the Mortgaged Property is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (or any amendment or successor act thereto), then the Mortgagor shall maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount sufficient to comply with all applicable rules and regulations promulgated pursuant to such Act.

Condemnation Awards. Mortgagor shall cause all Condemnation Awards to be applied in accordance with the Credit Agreement and any other Loan Document.

Insurance Proceeds. Mortgagor shall cause all proceeds of any insurance policies insuring against loss or damage to the Mortgaged Property to be applied in accordance with the Credit Agreement and any other Loan Document.

Payment of Charges. Except as otherwise permitted by the terms of the Credit Agreement, the Collateral Agreement and any other Loan Document, Mortgagor shall pay and

discharge, or cause to be paid and discharged, from time to time prior to same becoming delinquent, all Charges. Mortgagor shall, upon Mortgagee's reasonable written request, deliver to Mortgagee receipts evidencing the payment of all such Charges.

**Mortgagor's Covenants.**  In order to induce the Mortgagee to enter into this Mortgage, the Credit Agreement and the other Loan Documents, the Mortgagor agrees that the covenants of Mortgagor set forth in the Credit Agreement, solely to the extent applicable to the Mortgaged Property, this Mortgage and/or Mortgagor in its capacity as Mortgagor hereunder, are incorporated into this Mortgage by reference as if fully set forth herein and are of full force and effect as if made by Mortgagor herein.

## DEFAULT AND REMEDIES

**Remedies.**  Upon the occurrence and during the continuance of an Event of Default, Mortgagee may, at Mortgagee's election, exercise any or all of the following rights, remedies and recourses:

Acceleration.  Subject to any provisions of the Loan Documents providing for the automatic acceleration of the Secured Obligations upon the occurrence of certain Events of Default, declare the Secured Obligations to be immediately due and payable, without further notice, presentment, protest, notice of intent to accelerate, notice of acceleration, demand or action of any nature whatsoever (each of which hereby is expressly waived by Mortgagor), whereupon the same shall become immediately due and payable.

Entry on Mortgaged Property.  Enter the Mortgaged Property and take exclusive possession thereof and of all books, records and accounts relating thereto or located thereon.  If Mortgagor remains in possession of the Mortgaged Property following the occurrence and during the continuance of an Event of Default and without Mortgagee's prior written consent, Mortgagee may invoke any legal remedies to dispossess Mortgagor.

Operation of Mortgaged Property.  Hold, lease, develop, manage, operate, carry on the business thereof or otherwise use the Mortgaged Property upon such terms and conditions as Mortgagee may deem reasonable under the circumstances (making such repairs, alterations, additions and improvements and taking other actions, from time to time, as Mortgagee deems necessary or desirable), and apply all Rents and other amounts collected by Mortgagee in connection therewith in accordance with the provisions of Section 4.7.

Default and Remedies  Institute proceedings for the complete foreclosure of this Mortgage by judicial action or by power of sale, in which case the Mortgaged Property may be sold for cash or credit in one or more parcels. [Such sale shall be made in accordance with [_____] law at the time of the sale, governing sales of real property under powers of sale conferred by mortgages relating to the sale of real estate or by the UCC relating to the sale of collateral after default by a debtor (as such laws now exist or may be

hereafter amended or succeeded), or by any other present or subsequent articles or enactments relating to same.][51]  With respect to any notices required or permitted under the UCC, Mortgagor agrees that ten (10) days' prior written notice shall be deemed commercially reasonable.  At any such sale by virtue of any judicial proceedings, power of sale, or any other legal right, remedy or recourse, the title to and right of possession of any such property shall pass to the purchaser thereof, and to the fullest extent permitted by law, Mortgagor shall be completely and irrevocably divested of all of its right, title, interest, claim, equity, equity of redemption, and demand whatsoever, either at law or in equity, in and to the property sold and such sale shall be a perpetual bar both at law and in equity against Mortgagor, and against all other Persons claiming or to claim the property sold or any part thereof, by, through or under Mortgagor.  Mortgagee or any of the other Secured Parties may be a purchaser at such sale.  If Mortgagee or such other Secured Party is the highest bidder, Mortgagee or such other Secured Party may credit the portion of the purchase price that would be distributed to Mortgagee or such other Secured Party against the Secured Obligations in lieu of paying cash.  In the event this Mortgage is foreclosed by judicial action, appraisement of the Mortgaged Property is waived, Mortgagee may postpone from time to time any sale to be made under or by virtue hereof by announcement at the time and place appointed for such sale or for such postponed sale or sales, and Mortgagee, without further notice or publication, may make such sale at the time and place as announced at the postponed sale.

Receiver.  Make application to a court of competent jurisdiction for, and obtain from such court as a matter of strict right and without notice to Mortgagor or regard to the adequacy of the Mortgaged Property for the repayment of the Secured Obligations, the appointment of a receiver of the Mortgaged Property, and Mortgagor irrevocably consents to such appointment.  Any such receiver shall have all the usual powers and duties of receivers in similar cases, including the full power to rent, maintain and otherwise operate the Mortgaged Property upon such terms as may be approved by the court, and shall apply such Rents in accordance with the provisions of Section 4.7; *provided*, *however*, that, notwithstanding the appointment of any receiver, Mortgagee shall be entitled as pledgee to the possession and control of any cash, deposits or instruments at the time held by or payable or deliverable under the terms of the Credit Agreement to Mortgagee.

UCC.  Exercise any and all rights and remedies granted to a secured party upon default under the UCC, including, without limiting the generality of the foregoing: (i) the right to take possession of the personal property or any part thereof, and to take such other measures as Mortgagee may deem necessary for the care, protection and preservation of the personal property, and (ii) request Mortgagor at its expense to assemble the personal property and make it available to Mortgagee at a convenient place acceptable to Mortgagee. Any notice of sale, disposition or other intended action by Mortgagee with respect to the personal property sent to Mortgagor in accordance with the provisions hereof at least ten (10) days prior to such action, shall constitute commercially reasonable notice to Mortgagor.

---

[51] Local counsel to advise regarding appropriate power of sale language

<u>Other</u>.  Exercise all other rights, remedies and recourses granted under the Loan Documents or otherwise available at law or in equity.

**Separate Sales.**  The Mortgaged Property may be sold in one or more parcels and in such manner and order as Mortgagee in its sole discretion may elect.  The right of sale arising out of any Event of Default shall not be exhausted by any one or more sales.

**Remedies Cumulative, Concurrent and Nonexclusive.**  The Mortgagee and the other Secured Parties shall have all rights, remedies and recourses granted in the Loan Documents and available at law or equity (including the UCC), which rights (a) shall be cumulative and concurrent, (b) may be pursued separately, successively or concurrently against Mortgagor or others obligated under the Loan Documents, or against the Mortgaged Property, or against any one or more of them, at the sole discretion of Mortgagee or such other Secured Party, as the case may be, (c) may be exercised as often as occasion therefor shall arise, and the exercise or failure to exercise any of them shall not be construed as a waiver or release thereof or of any other right, remedy or recourse, and (d) are intended to be, and shall be, nonexclusive.  No action by Mortgagee or any other Secured Party in the enforcement of any rights, remedies or recourses under the Loan Documents or otherwise at law or equity shall be deemed to cure any Event of Default.

**Release of and Resort to Collateral.**  Mortgagee may release, regardless of consideration and without the necessity for any notice to or consent by the holder of any subordinate lien on the Mortgaged Property, any part of the Mortgaged Property without, as to the remainder, in any way impairing, affecting, subordinating or releasing the lien or security interest created in or evidenced by the Loan Documents or their status as a first priority lien and security interest in and to the Mortgaged Property.  For payment of the Secured Obligations, Mortgagee may resort to any other security in such order and manner as Mortgagee may elect.

**Appearance, Waivers, Notice and Marshalling of Assets.**  After the occurrence and during the continuance of any Event of Default and immediately upon the commencement of any action, suit or legal proceedings to obtain judgment for the payment or performance of the Secured Obligations or any part thereof, or of any proceedings to foreclose the lien and security interest created and evidenced hereby or otherwise enforce the provisions hereof or of any other proceedings in aid of the enforcement hereof, Mortgagor shall enter its voluntary appearance in such action, suit or proceeding.  To the fullest extent permitted by law, Mortgagor hereby irrevocably and unconditionally waives and releases (a) all benefit that might accrue to Mortgagor by virtue of any present or future statute of limitations or law or judicial decision exempting the Mortgaged Property from attachment, levy or sale on execution or providing for any stay of execution, exemption from civil process, redemption or extension of time for payment, (b) all notices of any Event of Default or of Mortgagee's election to exercise or the actual exercise of any right, remedy or recourse provided for under the Loan Documents, and (c) any right to a marshalling of assets or a sale in inverse order of alienation.  Mortgagor shall not claim, take or insist on any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales of the Mortgaged Property which may be made pursuant to this Mortgage, or pursuant to any decree, judgment or order of any court of competent jurisdiction.  Mortgagor covenants not to hinder, delay or impede the execution of any power granted or delegated to Mortgagee by this Mortgage but to

suffer and permit the execution of every such power as though no such law or laws had been made or enacted.

**Discontinuance of Proceedings.**  If Mortgagee or any other Secured Party shall have proceeded to invoke any right, remedy or recourse permitted under the Loan Documents and shall thereafter elect to discontinue or abandon it for any reason, Mortgagee or such other Secured Party, as the case may be, shall have the unqualified right to do so and, in such an event, Mortgagor, Mortgagee and the other Secured Parties shall be restored to their former positions with respect to the Secured Obligations, the Loan Documents, the Mortgaged Property and otherwise, and the rights, remedies, recourses and powers of Mortgagee and the other Secured Parties shall continue as if the right, remedy or recourse had never been invoked, but no such discontinuance or abandonment shall waive any Event of Default which may then exist or the right of Mortgagee or any other Secured Party thereafter to exercise any right, remedy or recourse under the Loan Documents for such Event of Default.

**Application of Proceeds.**  Subject to any applicable Intercreditor Agreement, the Mortgagee shall apply the proceeds of any collection or sale of the Mortgaged Property at any time after receipt in the order set forth below:

> *first*, to the payment of all costs and expenses incurred by the Mortgagee in connection with such collection or sale or otherwise in connection with this Mortgage, any other Loan Document or any of the Secured Obligations, including all court costs and the fees and expenses of its agents and legal counsel, the repayment of all advances made by the Mortgagee hereunder or under any other Loan Document on behalf of Mortgagor and any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Loan Document;

> *second*, to the payment in full of the Secured Obligations (the amounts so applied to be distributed among the Secured Parties pro rata in accordance with the amounts of the Secured Obligations owed to them on the date of any such distribution); and

> *third*, to the Mortgagor, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Mortgagee shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Mortgage.  Upon any sale of Mortgaged Property by the Mortgagee (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Mortgagee or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Mortgaged Property so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Mortgagee or such officer or be answerable in any way for the misapplication thereof.

**Occupancy After Sale.**  Any sale of the Mortgaged Property or any part thereof in accordance with Section 4.1(d) will divest all right, title and interest of Mortgagor in and to the property sold.  Subject to applicable law, any purchaser at a sale will receive immediate possession of the property purchased.  If Mortgagor retains possession of such property or any part

thereof subsequent to such sale, Mortgagor will be considered a tenant at sufferance of the purchaser, and will, if Mortgagor remains in possession after demand to remove, be subject to eviction and removal, forcible or otherwise, with or without process of law.

**Additional Advances and Disbursements; Costs of Enforcement.**

Upon the occurrence and during the continuance of any Event of Default, Mortgagee and each of the other Secured Parties shall have the right, but not the obligation, to cure such Event of Default in the name and on behalf of Mortgagor. All reasonable sums advanced and expenses incurred at any time by Mortgagee or any other Secured Party under this <u>Section 4.9</u>, or otherwise under this Mortgage or applicable law, shall bear interest from the date that such sum is advanced or expense incurred, to and including the date of reimbursement, computed at the highest rate at which interest is then computed on any portion of the Secured Obligations and all such sums, together with interest thereon, shall be secured by this Mortgage.

Mortgagor shall pay all out-of-pocket expenses (including reasonable attorneys' fees and expenses) of or incidental to the perfection and enforcement of this Mortgage or the enforcement, compromise or settlement of the Secured Obligations or any claim under this Mortgage, and for the curing thereof, or for defending or asserting the rights and claims of the Mortgagee in respect thereof, by litigation or otherwise.

**No Mortgagee in Possession.** Neither the enforcement of any of the remedies under this <u>Article IV</u>, the assignment of the Rents and Leases under <u>Article V</u>, the security interests under <u>Article VI</u>, nor any other remedies afforded to the Mortgagee under the Loan Documents, at law or in equity shall cause the Mortgagee or any other Secured Party to be deemed or construed to be a mortgagee in possession of the Mortgaged Property, to obligate the Mortgagee or any other Secured Party to lease the Mortgaged Property or attempt to do so, or to take any action, incur any expense, or perform or discharge any obligation, duty or liability whatsoever under any of the Leases or otherwise.

## ASSIGNMENT OF RENTS AND LEASES

**Assignment.** In furtherance of and in addition to the assignment made by Mortgagor in <u>Section 2.1</u> of this Mortgage, Mortgagor hereby absolutely and unconditionally assigns, sells, transfers and conveys to Mortgagee all of its right, title and interest in and to all Leases (but only to the extent permitted under the existing Leases), whether now existing or hereafter entered into, and all of its right, title and interest in and to all Rents. This assignment is an absolute assignment and not an assignment for additional security only. So long as no Event of Default shall have occurred and be continuing, Mortgagor shall have a revocable license from the Mortgagee to exercise all rights extended to the landlord under the Leases, including the right to receive and collect all Rents and to hold the Rents in trust for use in the payment and performance of the Secured Obligations and to otherwise use the same. The foregoing license is granted subject to the conditional limitation that no Event of Default shall have occurred and be continuing. Upon the occurrence and during the continuance of an Event of Default, whether or not legal proceedings have commenced, and without regard to waste, adequacy of security for the Secured Obligations

or solvency of Mortgagor, the license herein granted shall, at the election of the Mortgagee, expire and terminate, upon written notice to Mortgagor by the Mortgagee.

**Perfection Upon Recordation.** Mortgagor acknowledges that Mortgagee has taken all actions necessary to obtain, and that upon recordation of this Mortgage, Mortgagee shall have, to the extent permitted under applicable law, a valid and fully perfected, first priority, present assignment of the Rents arising out of the Leases and all security for such Leases. Mortgagor acknowledges and agrees that upon recordation of this Mortgage, Mortgagee's interest in the Rents shall be deemed to be fully perfected, "choate" and enforced as to Mortgagor and to the extent permitted under applicable law, all third parties, including, without limitation, any subsequently appointed trustee in any case under Title 11 of the United States Code (the "***Bankruptcy Code***"), without the necessity of commencing a foreclosure action with respect to this Mortgage, making formal demand for the Rents, obtaining the appointment of a receiver or taking any other affirmative action.

**Bankruptcy Provisions.** Without limitation of the absolute nature of the assignment of the Rents hereunder, Mortgagor and Mortgagee agree that (a) this Mortgage shall constitute a "security agreement" for purposes of Section 552(b) of the Bankruptcy Code, (b) the security interest created by this Mortgage extends to property of Mortgagor acquired before the commencement of a case in bankruptcy and to all amounts paid as Rents and (c) such security interest shall extend to all Rents acquired by the estate after the commencement of any case in bankruptcy.

**No Merger of Estates.** The rights and estate created by this Mortgage shall not, under any circumstances, be held to have merged into any other estate or interest now owned or hereafter acquired by the Mortgagee unless the Mortgagee shall have consented to such merger in writing.

## SECURITY AGREEMENT

**Security Interest.** This Mortgage constitutes a "security agreement" on personal property within the meaning of the UCC and other applicable law and with respect to the Personalty, Fixtures, Leases, Rents, Deposit Accounts, Property Agreements, Tax Refunds, Proceeds, Insurance, Condemnation Awards and Records. To this end, Mortgagor grants to Mortgagee a first priority security interest in the Personalty, Fixtures, Leases, Rents, Deposit Accounts, Property Agreements, Tax Refunds, Proceeds, Insurance, Condemnation Awards, Records and all other Mortgaged Property which is personal property to secure the payment and performance of the Secured Obligations, and agrees that Mortgagee shall have all the rights and remedies of a secured party under the UCC with respect to such property. Any notice of sale, disposition or other intended action by Mortgagee with respect to the Personalty, Fixtures, Leases, Rents, Deposit Accounts, Property Agreements, Tax Refunds, Proceeds, Insurance, Condemnation Awards and Records sent to Mortgagor at least ten (10) days prior to any action under the UCC shall constitute reasonable notice to Mortgagor. In the event of any conflict or inconsistency whatsoever between the terms of this Mortgage and the terms of the Collateral Agreement with respect to the collateral covered both therein and herein, including, but not limited to, with respect to whether

any such Mortgaged Property is to be subject to a security interest or the use, maintenance or transfer of any such Mortgaged Property, the Collateral Agreement shall control, govern, and prevail, to the extent of any such conflict or inconsistency.  For the avoidance of doubt, no personal property of Mortgagor that does not constitute "Collateral" under and as defined in the Collateral Agreement shall be subject to any security interest of Mortgagee or any Secured Party or constitute collateral hereunder.

**Financing Statements.**  Mortgagor shall prepare and deliver to Mortgagee such financing statements, and shall execute and deliver to Mortgagee such other documents, instruments and further assurances, in each case in form and substance reasonably satisfactory to Mortgagee, as Mortgagee may, from time to time, reasonably consider necessary to create, perfect and preserve Mortgagee's security interest hereunder.  Mortgagor hereby irrevocably authorizes Mortgagee to cause financing statements (and amendments thereto and continuations thereof) and any such documents, instruments and assurances to be recorded and filed, at such times and places as may be required or permitted by law to so create, perfect and preserve such security interest.

**Fixture Filing.**  This Mortgage shall also constitute a "fixture filing" for the purposes of the UCC against all of the Mortgaged Property which is or is to become fixtures.  The information provided in this Section 6.3 is provided so that this Mortgage shall comply with the requirements of the UCC for a mortgage instrument to be filed as a financing statement.  Mortgagor is the "Debtor" and its name and mailing address are set forth in the preamble of this Mortgage preceding Article I.  Mortgagee is the "Secured Party" and its name and mailing address from which information concerning the security interest granted herein may be obtained are also set forth in the preamble of this Mortgage preceding Article I.  A statement describing the portion of the Mortgaged Property comprising the fixtures hereby secured is set forth in the definition of "Mortgaged Property" in Section 1.1 of this Mortgage.  Mortgagor represents and warrants to Mortgagee that Mortgagor is the record owner of the Mortgaged Property [and the organizational identification number of Mortgagor is [_____]][52].  Mortgagor represents and warrants to Mortgagee that Mortgagor's jurisdiction of organization is the state of [_____].

## MISCELLANEOUS

**Notices.**  All notices, requests and demands pursuant hereto shall be made in accordance with Section 9.01 of the Credit Agreement. All communications and notices hereunder to any Loan Party shall be given to it in care of the Borrower at the Borrower's address set forth in Section 9.01 of the Credit Agreement.

**Covenants Running with the Land.**  All grants, covenants, terms, provisions and conditions contained in this Mortgage are intended by Mortgagor and Mortgagee to be, and shall be construed as, covenants running with the Land.  As used herein, "Mortgagor" shall refer to the party named in the first paragraph of this Mortgage and to any subsequent owner of all or any

---

[52] Local counsel to advise if organizational IDs are still required given new UCC forms adopted by most states on 7/1/13

portion of the Mortgaged Property.  All Persons who may have or acquire an interest in the Mortgaged Property shall be deemed to have notice of, and be bound by, the terms of the Credit Agreement and the other Loan Documents; *provided*, *however*, that no such party shall be entitled to any rights thereunder without the prior written consent of Mortgagee.

**Attorney-in-Fact.**  Mortgagor hereby appoints the Mortgagee the attorney-in-fact of Mortgagor for the purpose of carrying out the provisions of this Mortgage and taking any action and executing any instrument that the Mortgagee may deem necessary or advisable to accomplish the purposes hereof at any time after and during the continuance of an Event of Default, which appointment is irrevocable and coupled with an interest.  The Mortgagor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.  Without limiting the generality of the foregoing, the Mortgagee shall have the right, but only upon the occurrence and during the continuance of an Event of Default and notice by the Mortgagee to the Borrower of its intent to exercise such rights, with full power of substitution either in the Mortgagee's name or in the name of Mortgagor (a) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Mortgaged Property or any part thereof; (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Mortgaged Property; (c) to sign the name of Mortgagor on any invoice or bill of lading relating to any of the Mortgaged Property; (d) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Mortgaged Property or to enforce any rights in respect of any Mortgaged Property; (e) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Mortgaged Property; (f) to pay the premiums in respect of all required insurance policies hereunder and under the Credit Agreement and the other Loan Documents; (g) to pay Charges; (h) to make repairs; (i) to discharge Liens; (j) to pay or perform any obligations of the Mortgagor under any Mortgaged Property; and (k) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Mortgaged Property, and to do all other acts and things necessary to carry out the purposes of this Mortgage, as fully and completely as though the Mortgagee were the absolute owner of the Mortgaged Property for all purposes, and Mortgagee may expend funds for such purpose or purposes; *provided* that nothing herein contained shall be construed as requiring or obligating the Mortgagee to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Mortgagee, or to present or file any claim or notice, or to take any action with respect to the Mortgaged Property or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby; *provided further* that the Mortgagee shall in no event be bound to inquire into the validity of any tax, Lien, imposition or other obligation which the Mortgagor fails to pay or perform as and when required hereby and which the Mortgagor does not contest in accordance with the provisions of the Credit Agreement and the other Loan Documents.  Any and all amounts so expended shall be paid by the Mortgagor in accordance with the Credit Agreement and the other Loan Documents, and repayment shall be secured by this Mortgage.  Neither the provisions of this Section 7.3 nor any action taken by Mortgagee pursuant to the provisions of this Section 7.3 shall prevent any such failure to observe any covenant contained in this Mortgage nor any breach of warranty from constituting an Event of Default.  The Mortgagee and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to Mortgagor for any act or failure to act hereunder, except for their own gross negli-

gence or willful misconduct or that of any of their Affiliates, directors, officers, employees, counsel, agents or attorneys-in-fact.

**Successors and Assigns.**  Whenever in this Mortgage any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of Mortgagor or the Mortgagee that are contained in this Mortgage shall bind and inure to the benefit of their respective successors and assigns.

**Waivers; Amendments.**

No failure or delay by the Mortgagee or any Secured Party in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Mortgagee and the Secured Parties hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Mortgage or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 7.5, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Mortgagee or any Secured Party may have had notice or knowledge of such Default at the time.  No notice or demand on any Loan Party in any case shall entitle any Loan Party to any other or further notice or demand in similar or other circumstances.

Neither this Mortgage nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Mortgagee and the Mortgagor with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 9.02 of the Credit Agreement; provided that the Mortgagee may, without the consent of any Secured Party, consent to a departure by Mortgagor from any covenant of Mortgagor set forth herein to the extent such departure is consistent with the authority of the Mortgagee set forth in the definition of the term "Collateral and Guarantee Requirement" in the Credit Agreement.

**WAIVER OF JURY TRIAL**.  **EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN**

**INDUCED TO ENTER INTO THIS MORTGAGE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 7.6</u>.**

> **<u>Termination or Release</u>.**

> > The lien of this Mortgage and all other security interests granted hereby shall terminate when (i) all the Secured Obligations (other than contingent obligations not yet due) have been paid in full in cash and (ii) all Commitments have terminated or expired.

> > The lien of this Mortgage all other security interests granted hereby shall also terminate and be released at the time or times and in the manner set forth in Section 9.15 of the Credit Agreement.

> > In connection with any termination or release pursuant to paragraph (a) or (b) of this <u>Section 7.7</u>, the Mortgagee shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents by the Mortgagee pursuant to this <u>Section 7.7</u> shall be without recourse to or warranty by the Mortgagee.

> **<u>Waiver of Stay, Moratorium and Similar Rights</u>.**  Mortgagor agrees, to the full extent that it may lawfully do so, that it will not at any time insist upon or plead or in any way take advantage of any stay, marshalling of assets, extension, redemption or moratorium law now or hereafter in force and effect so as to prevent or hinder the enforcement of the provisions of this Mortgage or the Secured Obligations secured hereby, or any agreement between Mortgagor and Mortgagee or any rights or remedies of Mortgagee or any other Secured Party.

> **<u>Applicable Law</u>.**  The provisions of this Mortgage shall be governed by and construed under the laws of the state in which the Mortgaged Property is located.

> **<u>Headings</u>.**  The Article, Section and Subsection titles hereof are inserted for convenience of reference only and shall in no way alter, modify or define, or be used in construing, the text of such Articles, Sections or Subsections.

> **<u>Severability</u>.**  Any provision of this Mortgage held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  The parties shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of such invalid, illegal or unenforceable provisions.

> **<u>Entire Agreement</u>.**  This Mortgage and the other Loan Documents embody the entire agreement and understanding between Mortgagor and Mortgagee relating to the subject matter hereof and thereof and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof.  Accordingly, the Loan Documents may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.

**Mortgagee as Collateral Agent.**  Citibank, N.A. has been appointed to act as the Collateral Agent under the Credit Agreement, by the Lenders under the Credit Agreement and, by their acceptance of the benefits hereof, the other Secured Parties. The Collateral Agent shall be obligated, and shall have the right hereunder, to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking any action (including the release or substitution of Mortgaged Property), solely in accordance with this Mortgage and the Credit Agreement, provided that the Collateral Agent shall exercise, or refrain from exercising, any remedies provided for in Article IV in accordance with the instructions of Required Lenders. In furtherance of the foregoing provisions of this Section 7.13, each Secured Party, by its acceptance of the benefits hereof, agrees that it shall have no right individually to realize upon the Mortgaged Property hereunder, it being understood and agreed by such Secured Party that all rights and remedies hereunder may be exercised solely by the Collateral Agent for the ratable benefit of the applicable Lenders and Secured Parties in accordance with the terms of this Section 7.13.

**Recording Documentation To Assure Security.**  Mortgagor shall, forthwith after the execution and delivery hereof and thereafter, from time to time, cause this Mortgage and any financing statement, continuation statement or similar instrument relating to any of the Mortgaged Property or to any property intended to be subject to the lien hereof or the security interests created hereby to be filed, registered and recorded in such manner and in such places as may be required by any present or future law and shall take such actions as Mortgagee shall reasonably deem necessary in order to publish notice of and fully to protect the validity and priority of the liens, assignment, and security interests purported to be created upon the Mortgaged Property and the interest and rights of Mortgagee therein.  Mortgagor shall pay or cause to be paid all taxes and fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment thereof, and of any instrument of further assurance, and all Federal or state stamp taxes or other taxes, duties and charges arising out of or in connection with the execution and delivery of such instruments. In the event Mortgagee advances any sums to pay the amounts set forth in the preceding sentence, such advances shall be secured by this Mortgage.

**Further Acts**.  The Mortgagor shall, at the sole cost and expense of the Mortgagor, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, transfers, financing statements, continuation statements, instruments and assurances as the Mortgagee shall from time to time reasonably request, which may be necessary in the judgment of the Mortgagee from time to time to assure, perfect, convey, assign, mortgage, transfer and confirm unto the Mortgagee, the property and rights hereby conveyed or assigned or which the Mortgagor may be or may hereafter become bound to convey or assign to the Mortgagee or for carrying out the intention or facilitating the performance of the terms hereof or the filing, registering or recording hereof.  Without limiting the generality of the foregoing, in the event that the Mortgagee desires to exercise any remedies, consensual rights or attorney-in-fact powers set forth in this Mortgage and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other person therefor, then, upon the reasonable request of the Mortgagee, the Mortgagor agrees to use its commercially reasonable efforts to assist and aid the Mortgagee to obtain as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.  In the event the Mortgagor shall fail after demand to execute any instrument or take any action required to be executed or

taken by the Mortgagor under this <u>Section 7.15</u>, the Mortgagee may execute or take the same as the attorney-in-fact for the Mortgagor, such power of attorney being coupled with an interest and is irrevocable.

**Additions to Mortgaged Property**.  All right, title and interest of Mortgagor in and to all extensions, amendments, relocations, restakings, improvements, betterments, renewals, substitutes and replacements of, and all additions and appurtenances to, the Mortgaged Property hereafter acquired by or released to Mortgagor or constructed, assembled or placed by Mortgagor upon the Land, and all conversions of the security constituted thereby, immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, and in each such case without any further mortgage, conveyance, assignment or other act by Mortgagor, shall become subject to the Lien and security interest of this Mortgage as fully and completely and with the same effect as though now owned by Mortgagor and specifically described in the grant of the Mortgaged Property above, but at any and all times Mortgagor will execute and deliver to Mortgagee any and all such further assurances, mortgages, conveyances or assignments thereof as Mortgagee may reasonably require for the purpose of expressly and specifically subjecting the same to the Lien and security interest of this Mortgage.

**Relationship**.  The relationship of Mortgagee to Mortgagor hereunder is strictly and solely that of mortgagee and mortgagor and nothing contained in the Credit Agreement, this Mortgage or any other document or instrument now existing and delivered in connection therewith or otherwise in connection with the Secured Obligations is intended to create, or shall in any event or under any circumstance be construed as creating a partnership, joint venture, tenancy-in-common, joint tenancy or other relationship of any nature whatsoever between Mortgagee and Mortgagor other than as mortgagee and mortgagor.

**No Claims Against Mortgagee**.  Nothing contained in this Mortgage shall constitute any consent or request by Mortgagee, express or implied, for the performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any part thereof, nor as giving Mortgagor any right, power or authority to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against Mortgagee in respect thereof or any claim that any lien based on the performance of such labor or services or the furnishing of any such materials or other property is prior to the lien hereof.

**Mortgagee's Fees and Expenses; Indemnification**.

Mortgagor agrees to reimburse the Mortgagee for its fees and expenses incurred hereunder as provided in Section 9.03(a) of the Credit Agreement; provided that each reference therein to the "Company" or the "Borrower" shall be deemed to be a reference to "Mortgagor" and each reference therein to the "Administrative Agent" shall be deemed to be a reference to the "Mortgagee".

Without limitation of its indemnification obligations under the other Loan Documents, Mortgagor agrees to indemnify the Mortgagee and the other Indemnitees against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, in-

curred by or asserted against any Indemnitee by any third party or by Holdings or any Subsidiary arising out of, in connection with, or as a result of, the execution, delivery or performance of this Mortgage or any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether brought by a third party or by Holdings or any Subsidiary and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or wilful misconduct of, or a breach of the Loan Documents by, such Indemnitee or its Related Parties.

To the fullest extent permitted by applicable law, Mortgagor shall not assert, and Mortgagor hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet), provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or wilful misconduct of, or a breach of the Loan Documents by, such Indemnitee or its Related Parties, or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated thereby, the Transactions, any Loan or the use of the proceeds thereof.

The provisions of this Section 7.19 shall remain operative and in full force and effect regardless of the termination of this Mortgage or any other Loan Document, the consummation of the transactions contemplated hereby or thereby, the repayment of any of the Secured Obligations, the invalidity or unenforceability of any term or provision of this Mortgage or any other Loan Document, or any investigation made by or on behalf of any Secured Party. All amounts due under this Section 7.19 shall be payable not later than 10 Business Days after written demand therefor; provided, however, any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 7.19. Any such amounts payable as provided hereunder shall be additional Secured Obligations.

**Jurisdiction; Consent to Service of Process; Appointment of Service of Process Agent.** Mortgagor hereto hereby irrevocably and unconditionally:

submits for itself and its property in any legal action or proceeding relating to this Mortgage and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address referred to in <u>Section 7.1</u> or at such other address of which such Person shall have been notified pursuant thereto;

agrees that nothing herein shall affect the right of any other party hereto (or any Secured Party) to effect service of process in any other manner permitted by law or shall limit the right of any party hereto (or any Secured Party) to sue in any other jurisdiction; and

waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this <u>Section 7.20</u> any special, exemplary, punitive or consequential damages.

designates, appoints and empowers the Borrower as its designee, appointee and agent to receive, accept and acknowledge for and on its behalf, and in respect of its property, service of any and all legal process, summons, notices and documents that may be served in any such action or proceeding.

**<u>Reinstatement</u>**.  Mortgagor further agrees that, if any payment made by any Loan Party or other Person and applied to the Secured Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or the proceeds of Mortgaged Property are required to be returned by any Secured Party to such Loan Party, its estate, trustee, receiver or any other Person, including Mortgagor, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, any Lien and security interest securing such liability shall be and remain in full force and effect, as fully as if such payment had never been made or, if prior thereto the Lien and security interest granted hereby securing such liability hereunder shall have been released or terminated by virtue of such cancellation or surrender), such Lien or security interest  shall be reinstated in full force and effect, and such prior cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect any Lien or security interest securing the obligations of Mortgagor in respect of the amount of such payment.

**<u>Intercreditor Agreements Govern.</u>** Notwithstanding anything herein to the contrary, the lien and security interest granted to the Mortgagee pursuant to this Mortgage and the exercise of any right or remedy by the Mortgagee hereunder are subject to the provisions of the Intercreditor Agreements. In the event of any conflict between the terms of the Intercreditor Agreements and this Mortgage, the terms of the Intercreditor Agreements shall govern.

# **[LOCAL LAW PROVISIONS**[53]

<u>Principles of Construction</u>.  The terms and provisions set forth below in this <u>Article VIII</u> shall be construed, to the greatest extent possible, consistently with all other provisions set forth in this Mortgage, and shall be deemed as being in addition to and

---

[53]    Local Counsel to provide additional local law provisions as necessary.

supplementing all such other terms and provisions of this Mortgage.  However, notwithstanding anything to the contrary set forth elsewhere in this Mortgage, in the event of any inconsistencies between the terms and conditions of this <u>Article VIII</u> and the other terms and conditions of this Mortgage, the terms and conditions of this <u>Article VIII</u> shall control and be binding.]

*[The remainder of this page has been intentionally left blank]*

IN **WITNESS WHEREOF**, Mortgagor has on the date set forth in the acknowledgement hereto, effective as of the date first above written, caused this instrument to be duly EXECUTED AND DELIVERED by authority duly given.

**MORTGAGOR:**

By: _____
     Name:
     Title:

[LOCAL COUNSEL TO CONFIRM ADEQUACY OF SIGNATURE PAGE AND PROVIDE FORM OF NOTARY ACKNOWLEDGMENT]

[Signature page to Mortgage]

**EXHIBIT A**

**LEGAL DESCRIPTION**

[To come from title policy]